# EXHIBIT N

| | |
|---|---|
| **From:** | Ramirez, Geneva |
| **Sent:** | Monday, January 29, 2024 11:40 AM |
| **To:** | cleta@cletamitchell.com |
| **Cc:** | Dockterman, Michael |
| **Subject:** | Democracy North Carolina et al. v. Alan Hirsch et al., Case No. 1:23-cv-00878-TDS-JEP - Subpoena for Documents |
| **Attachments:** | Subpoena for Documents (Mitchell) (2023.12.15).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Ms. Mitchell:

Please find attached a copy of the subpoena for documents that was served upon you in the above-referenced matter on January 2, 2024, by Certified Mail. Please acknowledge receipt and advise whether you are represented by counsel in this matter.

Best regards,

**Geneva Ramirez**
Associate

## Steptoe

Steptoe LLP | 227 West Monroe Street | Suite 4700 | Chicago, IL 60606
+1 312 577 1279 direct | +1 312 577 1370 fax | gramirez@steptoe.com | www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

Michael Dockterman
312 577 1243
MDockterman@steptoe.com

227 W. Monroe Street
Suite 4700
Chicago, IL 60606
312 577 1300 main
www.steptoe.com

**Steptoe**

December 15, 2023

***Via Process Server***

Cleta Mitchell
139 National Dr.
Pinehurst, NC  28374-8166

>    Re:    *Democracy North Carolina, et al., v. Hirsch, et al.,*
>            Case No. 1:23-CV-00878 (Middle District North Carolina)

Dear Ms. Mitchell:

Enclosed please find a Subpoena for the Production of Documents issued in the above-referenced lawsuit which challenges the constitutionality of portions of North Carolina Senate Bill 747, passed by the North Carolina General Assembly on October 10, 2023. As part of this litigation, and in accordance with the Federal Rules of Civil Procedure, the parties in the case are entitled to seek and obtain records related to the claims in the case and certain provisions of the challenged law, including from third-parties. To that end, by way of the enclosed Subpoena, we are requesting all records in your possession that are responsive to the requests identified therein. For ease of reference and for additional background, we have enclosed a copy of the operative complaint.

Thank you for your assistance with this matter. If you have any questions, please feel free to contact our office.

Yours very truly,

Michael Dockterman

MD:me

Enclosures

# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| Democracy North Carolina, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 1:23CV00878-TDS-JEP |
| Hirsch, et al. | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            Cleta Mitchell
            139 National Dr., Pinehurst, NC  28374

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: 5517 Durham Chapel Hill Blvd.<br>Durham, NC 27707<br>or by email to mdockterman@steptoe.com | Date and Time:<br><br>01/16/2024 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/15/2023

_CLERK OF COURT_

OR

_____           _____
_Signature of Clerk or Deputy Clerk_              _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_    Democracy North Carolina, NC Black Alliance, and League of Women Voters NC        , who issues or requests this subpoena, are:

Michael Dockterman | 227 W. Monroe St., Ste 4700, Chicago, IL 60606 | mdockterman@steptoe.com | 312-577-1243

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:23CV00878-TDS-JEP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                   _____
                                                                    *Server's signature*

                                                    _____
                                                                    *Printed name and title*

                                                    _____
                                                                    *Server's address*

Additional information regarding attempted service, etc.:

Case 1:23-cv-01810-TSC Document 56-14 Filed 01/31/24 Page 6 of 56

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
 **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
 **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA; NORTH CAROLINA BLACK ALLIANCE; LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> ALAN HIRSCH, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; STACY EGGERS IV, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KEVIN LEWIS, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; SIOBHAN O'DUFFY MILLEN, in her official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; NORTH CAROLINA STATE BOARD OF ELECTIONS, <br><br> Defendants. | Case No. 1:23CV00878-TDS-JEP |

## EXHIBIT A TO SUBPOENA TO PRODUCE DOCUMENTS OR INFORMATION

Pursuant to Rules 30, 34, and 45 of the Federal Rules of Civil Procedure, you are commanded to produce at the time, date, and place set forth in the Subpoena the following documents, electronically stored information or objects specified below, and permit their inspection, copying, testing, or sampling of the materials in accordance with the Definitions and Instructions set forth below. Further, you are directed to supplement this production as provided by the same Rules.

1

## DEFINITIONS

1.      "You" and "Your" shall refer to Cleta Mitchell.

2.      "S.B. 747" shall refer to An Act to Make Various Changes Regarding Elections Law, N.C. Sess. Laws 2023-140.

3.      "[P]roposed or actual changes to same-day registration" shall refer to any proposal, concept, idea, draft language, or bill text for adding, deleting, amending, or in any way altering the requirements for same-day registration in North Carolina, both for voters and voter applicants who utilize North Carolina's same-day registration system as well as for election officials and administrators who process same-day registrations and ballots cast by same-day registrants. This shall include, but not be limited to, any proposal that was considered or intended to be considered by any legislative or administrative body in North Carolina.

4.      "S.B. 747's changes to same-day registration" shall refer to any legal requirements for same-day registration that were added, removed, or modified by S.B. 747, both for voters and voter applicants who utilize North Carolina's same-day registration system as well as for election officials and administrators who process same-day registrations and ballots cast by same-day registrants. This shall include, but not be limited to, any changes made to the process County Boards of Elections use to verify the residential address of a person who registers using same-day registration, the consequence to the voter or voter applicant should such address mail verification fail (including the status of that voter or voter applicant's ballot), and the notice and opportunity to be heard that a voter or voter applicant shall have should such address mail verification fail.

5.      The words "records" and "documents" have the broadest possible meaning to include without limitation the original as well as any identical copy/copies, whether written, printed, typed, electronic, photostatic, photographed, recorded, graphic, digital, or otherwise,

however produced or reproduced, whether comprised of letters, words, numbers, pictures, sounds, symbols, or otherwise, as well as any combination thereof, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio, video, digital or other recordings, as well as any non-identical copy/copies, including but not limited to any preliminary versions, drafts, or revisions of any of the foregoing, along with attachments, enclosures, comments, notations, additions, insertions, or markings of any kind.

6.      The word "communications" includes oral statements, conversations, written statements, events, and messages, whether send or received, whether prepared by hand or by mechanical, electronic, magnetic, photographic, or other means, as well as audio, video, digital or other recordings, including any and all records and documents of the same.

7.      The word "person" means any natural person and/or any entity along with any of that entity's successors, parents, predecessors, subsidiaries, members, affiliates, assigns, partners, directors, officers, employees, attorneys, accountants, representatives and/or agents.

8.      The word "concerning" shall mean relating to, referring to, describing, evidencing, constituting, bearing upon, addressing, respecting, regarding, discussing, mentioning, reflecting, responding to, identifying, pertaining to, to do with, or being in any way relevant to the subject.

9.      The word "relating" or "relates" or "relate" means comprising, mentioning or describing, containing, enumerating, involving or in any way concerning, pertaining or referring to, being connected with, reflecting upon or resulting from, in whole or in part, directly or indirectly, the stated subject matter.

## INSTRUCTIONS

1.      You shall furnish all information, documents, materials and things available through a diligent search of all information, documents, materials and things within Your possession, custody and/or control, as well as in the possession, custody and/or control of Your

3

agents or representatives, including without limitation Your attorneys, accountants, advisors, current/former employees and agents, or anyone else otherwise subject to Your control.

2.      You shall produce the information, documents, materials and/or things as kept in the ordinary course of business or in a manner organized and labeled to correspond with the categories in these requests for production. If nothing is responsive to a particular request, You shall state so in a written response to these requests. If You are unable to produce information, documents, materials and/or things as requested, You must nevertheless provide the following information in Your written response to these requests: (i) why production is not possible; and (ii) if the inability to produce is due to lack of possession, the person reasonably believed to be in possession of the information, documents, materials and/or things, if known, including their name, address, and telephone number.

3.      If You deem any information, document, material and/or thing sought by these requests as privileged or otherwise protected from discovery, You must nevertheless provide the following information in a privilege log to Plaintiffs: (i) the nature of the privilege asserted; (ii) the person asserting the privilege; and (iii) an identification and description of the requested information, document, material and/or thing sufficient to frame an appropriate demand upon a motion to compel disclosure. At a minimum, the description shall include the (a) general subject matter; (b) the date authored/created and/or communicated/shared; and (c) any and all persons involved in authoring/creating and/or communicating/sharing the information, document, material and/or thing.

4.      If You perceive an ambiguity within a request, the instructions, or the definitions, then You shall set forth (i) the matter deemed ambiguous in a written response to these requests, (ii) the reasonable construction it used in answering the request; and (iii) Your good faith response

4

to the request using that reasonable construction. No part of a request shall be left unanswered merely because an objection is interposed to a part of the request.

5.     In interpreting these requests, instructions, and definitions, any masculine, feminine, or neuter term includes all other genders; the singular includes the plural and the plural includes the singular; and "or," "and," and/or," and "including" shall be read inclusively rather than exclusively.

## REQUESTS FOR PRODUCTION

1.     All communications from October 1, 2022 to the present which were designed, calibrated, constructed, drafted, prepared, disseminated, or relied upon to influence or attempt to influence the purpose, drafting, development, and/or implementation of any proposed or actual changes to same-day registration by the North Carolina General Assembly, including but not limited to S.B. 747's changes to same-day registration. This shall include any such communications between You and third parties, including but not limited to:

     a.    North Carolina General Assembly, including but not limited to members of the House of Representatives and Senate, their staff, interns, consultants, contractors, and agents;

     b.    North Carolina State Board of Elections, including but not limited to any individual Board members, Directors, or any other staff;

     c.    Any North Carolina County Board of Elections, including but not limited to any individual Board members, Directors, or any other staff;

     d.    Any agent, employee, or representative of a North Carolina public or private university or college, the University of North Carolina System, and/or the North Carolina Community College System;

     e.    North Carolina Election Integrity Team(s) (NCEIT) and any representatives, including but not limited to Jay DeLancy, Jim Womack, or any other agent or representative of or appearing to be of NCEIT;

     f.    Voter Integrity Project (VIP) and any representatives, including but not limited to Jay DeLancy, John Pizzo, or any other agent or representative of or appearing to be of VIP;

g.      Jay DeLancy, in any capacity;

h.      John Locke Foundation (JLF), including Civitas Center for Public Integrity, and any representatives, including but not limited to Andy Jackson, or any other agent or representative of or appearing to be of JLF;

i.      Public Interest Legal Foundation (PILF) and any representatives, including but not limited to J. Christian Adams, or any other agent or representative of or appearing to be of PILF;

j.      Asheville Tea Party and any representatives or agents of or appearing to be of the Asheville Tea Party.

2.      All written testimony, comments, and/or input, and any documents related thereto, from October 1, 2022 to the present date provided by You to the North Carolina General Assembly, any committee or subcommittee of the North Carolina General Assembly, or any legislator(s) thereof, by mail, email, legislative portal, or by other means relating to any proposed or actual changes to same-day registration or youth and student voting. This shall include, but not be limited to, any notes, calendar entries, topics of discussion, and/or items discussed at any meeting with any legislator or legislative staffer.[1]

3.      All communications relating to the rationale, purpose, drafting, development, consideration, analysis, and/or implementation of any proposed or actual changes to same-day registration shared by You, including but not limited to documents supporting or relating to public statements made by You about same-day registration, S.B. 747's changes to same-day registration, and/or youth and student voting. This shall include, but not be limited to, documents and communications relating to:

---

[1] Examples of such statements are reported at
https://www.theassemblync.com/politics/elections/north-carolina-election-integrity/ &
https://www.wral.com/story/nc-lawmakers-expected-to-roll-out-major-election-law-changes-with-input-from-former-trump-lawyer/20889083/.

6

a. Conservative Partnership Institute ("CPI") summits, meetings, gatherings, convenings, conferences, panels, and/or events, whether online, telephonic, or in-person[2];

b. CPI's Election Integrity Network summits, meetings, gatherings, convenings, conferences, panels, and/or events, whether online, telephonic, or in-person[3];

c. Summits, meetings, gatherings, convenings, conferences, panels, and/or events hosted, sponsored, or otherwise affiliated, in whole or in part, with or by Republican Party organizations, including but not limited to the Republican National Committee (RNC), North Carolina Republican Party, and county-level Republican Party organizations.[4]

---

[2] Examples of such statements are reported at https://documented.net/investigations/recordings-reveal-whats-really-going-on-cleta-mitchell-election-integrity-network.

[3] Examples of such statements are reported at https://documented.net/investigations/recordings-reveal-whats-really-going-on-cleta-mitchell-election-integrity-network.

[4] Examples of such statements are reported at https://www.washingtonpost.com/nation/2023/04/20/cleta-mitchell-voting-college-students/; https://www.politico.com/news/2022/08/02/rnc-stop-the-steal-advocates-poll-workers-00049109; https://michiganadvance.com/2023/05/02/a-top-gop-lawyer-wants-to-crack-down-on-the-college-vote-states-already-are/

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA; NORTH CAROLINA BLACK ALLIANCE; LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, <br><br> *Plaintiffs,* <br><br> *vs.* <br><br> ALAN HIRSCH, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; STACY EGGERS IV, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KEVIN LEWIS, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; SIOBHAN O'DUFFY MILLEN, in her official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; NORTH CAROLINA STATE BOARD OF ELECTIONS, <br><br> *Defendants.* | **COMPLAINT** <br><br> Civil Action No. 23-878 |

Plaintiffs Democracy North Carolina, North Carolina Black Alliance, and League of Women Voters of North Carolina (collectively, "Plaintiffs"), bring this civil rights action under 42 U.S.C. § 1983 and the First, Fourteenth, and Twenty-Sixth Amendments for declaratory and injunctive relief against Defendants North Carolina State Board of Elections ("NCSBE"); Alan Hirsch, in his official capacity as Chair of the NCSBE; Jeff Carmon III, in his official capacity as Secretary of the NCSBE; Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen, all in their official capacities as Members of the NCSBE; and Karen Brinson Bell, in her official capacity as

1

Executive Director of the NCSBE (collectively, "Defendants").  Plaintiffs hereby allege as follows:

## INTRODUCTION

1.      For young people turning 18 years old, the right to vote is among the first opportunities they have to participate in the democratic process.  Rather than welcoming these new voters to exercise their constitutional franchise, North Carolina Senate Bill 747 ("SB 747") targets the right of young voters, including students, to register to vote and have their ballots counted, thereby making it more difficult for them to exercise that right and participate in the electoral process.  Young people are the future of North Carolina, and Plaintiffs bring this action to protect their sacred and fundamental right to vote from the serious threat posed by SB 747.

2.      Because young voters are often new voters who have only recently become eligible to vote or are voting for the first time from an on-campus college address that changes yearly, they frequently take advantage of the opportunities to register and vote on days other than Election Day. In particular, young voters often use early voting, which provides flexibility in voting, given the availability of "same-day registration."  Through same-day registration, voters are able to register to vote and cast their ballot at the same time—a particularly useful means for voters who have recently moved, as is often the case with young voters.  Notably, in North Carolina, same-day registration is available only during early voting; on Election Day only prior-registered voters are eligible to cast a ballot.

3.      In the 2022 midterm election, over half the electorate voted at a one-stop early voting site.[1]  And in the 2020 general election, nearly two-thirds of the electorate voted at a one-

---

[1] 2022 General Election Turnout, NCSBE, https://www.ncsbe.gov/results-data/voter-turnout/2022-general-election-turnout (last visited Oct. 11, 2023) (noting that 2,010,355 of a total of 3,786,904 voters, or approximately 53% of the electorate, voted at a one-stop early voting site).

2

stop early voting site.[2]  While early voting has been extremely popular for all voters in North Carolina's recent elections, the availability of early voting has been critical to encourage young and student voters to exercise their franchise. The share of young voters (age 18 to 25) using one-stop early voting was nearly 64% in 2020 and 43% in 2022.

4.      Same-day registration is disproportionately used by young voters so that curtailing its use will have a disproportionate impact on their participation in the electoral process.  In each of the last four statewide elections (2016, 2018, 2020 and 2022), young voters comprised nearly 1/3 of the voters who cast ballots utilizing same-day registration.  In fact, in two of those elections (2018 and 2022), young voters were the single largest age demographic utilizing same-day registration, even though they comprised a relatively small share (less than 15%) of the overall electorate.  And even in those elections where young voters were not the largest raw total of same-day registrants (2016 and 2020), they were still very close to being the leading demographic. Overall, based on voting data, young voters were by far the likeliest demographic to utilize same-day registration.

5.      Young voters have many reasons to prefer same-day registration.  In addition to moving frequently—often annually, especially while in college—young voters face several unique challenges when it comes to accessing the polls.  Young voters are less likely than older voters to have a driver's license, to own or have access to a car, or to have reliable access to other forms of transportation.  These factors are frequently exacerbated for voters of color, who also make up a disproportionate share of young voters in North Carolina.  Many young voters also have inflexible and irregular school or work schedules.  And unlike seasoned voters, many young voters have only

---

[2] 2020 General Election Turnout, NCSBE, https://www.ncsbe.gov/results-data/voter-turnout/2020-general-election-turnout (last visited Oct. 11, 2023) (noting that 3,629,461 of a total of 5,544,018 voters, or approximately 65% of the electorate, voted at a one-stop early voting site).

recently become eligible to vote—which means they may be navigating the voting process for the first time and be unfamiliar with the processes and facilities in their locale. All these factors make same-day registration—with its flexibility and broadly accessible hours and availability at any early voting site in the county, including campus locations for some counties—a strongly preferred option for young voters in North Carolina.

6.      SB 747 erects substantial new barriers to voting found nowhere else in the North Carolina election code, relegating new voters who use same-day registration—and who otherwise meet all the eligibility requirements for voting—into second-class citizens whose ballots may not be counted through no fault of their own. The impact on young voters is demonstrable: young voters, though they are the smallest age group of voters by any measure, constitute the largest share of all recorded registration rejections for failed mail verification in the last decade. Notably, at the same time failed mail verification disproportionately disqualifies young voters, there is no evidence that same-day registration has contributed to an increase in voter fraud in North Carolina. Its only effect has been to encourage participation in American democracy through voter registration and voting.

7.      Under the guise of "election integrity," SB 747's modification to North Carolina's same-day registration process exacerbates the known complexities and challenges of mail verification, particularly on or near college campuses, to prevent young and student voters from having their voices heard at the ballot box. Instead, its restrictions on voter registration introduce new variables that make voter participation in North Carolina more uncertain. Under SB 747, approval of an eligible voter's registration and ballot depends solely on whether a single piece of mail reaches its intended destination between the time the voter votes and the day before canvass. If that mail is returned as undeliverable—and regardless of whether the voter is otherwise eligible

4

to vote and regardless of whether the voter, election board, or postal system is to blame for the mail's failure to reach its destination—county election boards must cancel the voter's registration and retrieve and destroy their ballot. No notice is given to the voter before canceling their registration and rescinding their ballot, and the voter has no opportunity to remedy any mail delivery issue, even if they learn of it before the close of county canvass. Instead, such voters are left in the dark about the status of their registration and vote, and may not even discover that their registration and vote were cancelled until they attempt to vote in the next election.

8. SB 747 impairs the fundamental right to vote of young voters who use same-day registration in violation of the First, Fourteenth, and Twenty-Sixth Amendments. None of the generic state interests offered to support SB 747, such as preventing fraud or enhancing the security of election administration, justifies the extreme and specifically targeted burdens and barriers that SB 747 intentionally imposes on these voters, and the North Carolina legislature offered no public analysis, data, or documentation that even attempted to do so. Lifting these restrictions is crucial to safeguarding the rights of young and student voters across North Carolina and ensuring a functioning and inclusive democracy for all.

## JURISDICTION AND VENUE

9. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

10. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and the laws of the United States and seeks equitable and other relief for the deprivation of constitutional and federal statutory rights under color of state law.

11. The Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

5

12.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is appropriate in the Middle District of North Carolina because a substantial part of the events or omissions giving rise to the claims occurred in this District.  28 U.S.C. § 1391(b)(1).

## PARTIES

### A.     Plaintiffs

14.     Plaintiff Democracy North Carolina ("Democracy NC") is a non-partisan 501(c)(3) organization dedicated to increasing voter access and participation and reducing the corrupting role of money in politics through research, organizing, and advocacy.  By engaging in substantial election protection efforts to ensure that voters can access the ballot, and spending substantial time and effort to produce non-partisan voter guides to educate voters about candidates and issues, Democracy NC works for pro-democracy reforms that protect voting rights and improve government accountability and ethics.  Democracy NC's volunteers, who are registered North Carolina voters from every region of the state, form grassroots coalitions throughout the state and spend thousands of hours advocating for more early voting sites and times to ensure that all voters, including young voters, have reasonable access to the franchise.  In previous elections, Democracy NC has advocated for strong early voting plans, including sites on college campuses, and other ways to allow young voters to more readily participate in elections, and plans to continue to do so in future elections.  Democracy NC also engages extensively with young and student voters.  This summer, Democracy NC completed its 24th consecutive year of Democracy Summer, a youth leadership program that trains young people, ages 18 to 24, on all aspects of community organizing, advocacy, and communications pertaining to voting rights. The program works directly with college students, universities and community colleges throughout North Carolina,

6

prioritizing those students attending North Carolina's Historically Black Colleges and Universities ("HBCUs") and community colleges. Program graduates then become leaders on their campuses and in their communities for voter access and voting rights, working alongside other Democracy NC advocates to help college students access the polls through registration, assistance with transportation, know-your-rights education, and other advocacy aimed at equitable access to the ballot. Democracy NC's Organizing Team, located in six regions across the state, also maintains close relationships with the colleges and universities within their regions to ensure that student voters can navigate the processes for registration and voting and fully participate in elections. Through original research, policy advocacy, grassroots organizing, civic engagement, and leadership training, Democracy NC seeks to achieve a fair and representative political system and advance a just and equitable North Carolina.

15. Plaintiff North Carolina Black Alliance ("NC Black Alliance") is a non-partisan 501(c)(3) organization that addresses policy and economic issues to enhance Black communities by developing and promoting systemic policy change as well as youth and leadership development. To further its mission, NC Black Alliance works to mobilize the electorate through registration and education, including by eliminating barriers to voting participation. To mobilize Black college students in particular, NC Black Alliance partners with North Carolina's 11 HBCUs to encourage students to vote and ensure that these campuses have access to fair elections, voter resources and voter education. NC Black Alliance engages with college students at every stage of the electoral process, helping students register and vote through education, organizing, and advocacy work. NC Black Alliance operates three programs to support its work with students: the HBCU Think Tank, the V-OTEC-O-MING HBCU Tour, and Raising the B.A.R. The HBCU Think Tank program is a yearly meeting of HBCU student leaders from across North Carolina, where students

discuss and receive training on the development of voter and civic engagement on their campuses. The V-OTEC-O-MING HBCU Tour visits every HBCU in North Carolina with the goal of engaging students in elections, and each tour stop provides transportation to polling locations. Raising the B.A.R. empowers student leaders as Black Alliance Representatives, training and equipping them to represent their campuses by advocating for youth voter engagement, civic participation, and issues impacting their communities. NC Black Alliance has also created a platform (located at https://safevoternc.org/) to provide voters with credible, up-to-date information regarding voting options and clear guidelines on how they can vote and avoid obstacles while voting at the polls. In all of its efforts, NC Black Alliance works toward state-level systemic change through democratic engagement and collaboration with grassroots networks, including its student programs.

16.     Plaintiff League of Women Voters of North Carolina ("LWVNC" or the "League") is a non-partisan community-based 501(c)(3) organization that is the state affiliate of the League of Women Voters, which was founded in 1920, just six months before the ratification of the Nineteenth Amendment. LWVNC promotes political responsibility through informed and active participation in government, including by encouraging its members and the people of North Carolina to exercise the right to vote protected by the U.S. Constitution and the Voting Rights Act of 1965. LWVNC impacts public policies, promotes citizen education, and makes democracy work by, among other things, helping remove unnecessary barriers to full participation in the electoral process. While LWVNC began as an organization focused on training women voters, it has evolved into one dedicated to educating, advocating for, and empowering all North Carolinians. LWVNC has 17 local leagues and approximately 1,800 members, who are registered North Carolina voters. With Leagues located throughout the state, LWVNC's local leagues are

8

engaged in numerous activities, including hosting public forums and open discussions on issues important to the community. Individual League members and volunteers invest hundreds of hours in activities that focus almost exclusively on efforts to inform voters. They regularly conduct civic engagement activities, such as voter registration, get-out-the-vote ("GOTV") programs and distribution of election information throughout the year, including during the early voting period. LWVNC has developed a First Time Voter Engagement Program, which partners with local election boards and schools to encourage young voters to register and vote, including by informing high school and college students about the importance of voting and the rules governing elections. LWVNC works to develop productive relationships with local college campuses in order to most effectively perform this work. LWVNC also devotes substantial time and effort to ensuring that government at every level in North Carolina works effectively and fairly in implementing voting regulations and procedures. To do so, LWVNC advocates to make elections in the state more transparent, to support a strong and diverse judiciary, and to urge for appropriate government oversight.

17.     Plaintiffs have standing to challenge SB 747 because the law directly impacts and frustrates their civic engagement missions and will result in a drain on their time and resources. SB 747 severely restricts voting opportunities that have been used by hundreds of thousands of North Carolinians in recent elections and will make it substantially more difficult for Plaintiffs to engage in the GOTV, voter education, voter protection, and voter registration work that they perform in support of their civic engagement missions. Plaintiffs' programs that focus on youth and student engagement will be particularly hindered, given that young voters often rely on same-day registration during the early voting period and now face acute risk of disenfranchisement under SB 747's new same-day registration regime.

9

18.     As a result, SB 747 will force Plaintiffs to divert time and resources away from their many other civic engagement activities in order to bolster their GOTV, voter education, voter protection and voter registration efforts to counteract and overcome the harm caused by SB 747 to the communities they serve.  For example, the challenged provisions of SB 747 will force Plaintiffs to devote more resources to independent voter registration efforts before the close of the voter registration period (25 days before a primary or general election) because qualified individuals who submit a same-day registration application and then vote during the early voting period can no longer rely on their ballots being counted.  The change to same-day registration will also force Plaintiffs to devote more resources to education efforts, so that voters are warned about the risk of the new same-day registration regime, know how to correctly complete a voter registration application to increase the likelihood of their ballot counting, and are aware of other methods of voting that do not carry the same risk of disenfranchisement.  Plaintiffs will also need to expend more time and resources educating election officials and college or university administrators to ensure they understand the consequence of failed mail verification for young voters and how best to assist those voters and avoid the common administrative processes that contribute to high rates of failed mail verification.

19.     Additionally, LWVNC has associational standing because its members have standing to challenge the law.  LWVNC is a membership organization, and its members will be harmed by SB 747's restrictions on early voting and same-day registration.  SB 747 will unduly burden LWVNC's members' ability to participate freely and equally in the political process and, in some cases, will deny their right to vote with no warning.

20.     Plaintiffs also have third-party standing to bring these claims on behalf of the young voters they engage in their organizational advocacy and who risk disenfranchisement under

10

SB 747.  The challenged provisions of SB 747 will affect at least some voters, and will result in an unconstitutional burden on their right to vote if and when the challenged provisions result in the rejection of their otherwise lawfully cast ballots.  While it is virtually certain that at least *some* voters will be disenfranchised by SB 747, it is impossible to ascertain precisely *which* voters will be disenfranchised until they have already been disqualified, since it is unclear precisely which North Carolinians will utilize same-day registration, and of those voters which will have a mailing returned as undeliverable.  The random nature of postal mistakes, delays, and misdirections with no mechanism for curing such error introduces an arbitrary and unnecessary barrier to participation in the electoral process.  As structured in SB 747, because the challenged provisions will operate to disenfranchise voters only during the pendency of an actual election when it would be far too late to press those claims in court, those voters will be barred from vitiating their constitutional rights in a similar action on their own behalf.

21.     Each Plaintiff has a close relationship with the classes of voters who are at risk of disenfranchisement under SB 747's scheme, by virtue of their extensive, robust, and ongoing civic engagement work regarding democratic and electoral participation generally and with young and student voters specifically.  There is also a severe hindrance to these voters' ability to protect their own interests, since these voters cannot say with certainty that they will utilize same-day registration, and even if they did, they could not know whether they would be arbitrarily denied their right to vote until it is too late for them to take remedial action, let alone seek judicial review of the challenged provisions.  Accordingly, Plaintiffs have third-party standing to bring the claims on behalf of the voters they serve and whose rights will be threatened by SB 747.

**B.     Defendants**

22.     Defendant NCSBE is the agency responsible for the administration of the election laws of the State of North Carolina.

23.     Defendant Alan Hirsch is the Chair of the NCSBE.  Mr. Hirsch is sued in his official capacity.

24.     Defendant Jeff Carmon III is the Secretary of the NCSBE.  Mr. Carmon is sued in his official capacity.

25.     Defendant Stacy Eggers IV is a Member of the NCSBE.  Mr. Eggers is sued in his official capacity.

26.     Defendant Kevin Lewis is a Member of the NCSBE.  Mr. Lewis is sued in his official capacity.

27.     Defendant Siobhan O'Duffy Millen is a Member of the NCSBE.  Ms. Millen is sued in her official capacity.

28.     Defendant Karen Brinson Bell is the Executive Director of the NCSBE.  The Executive Director is appointed by the Board's members and serves as the "chief State elections official."  N.C.G.S. § 163-27.  Director Brinson Bell is sued in her official capacity.

## STATEMENT OF FACTS

### A.     Youth Voter Registration and Participation is Steadily Increasing in North Carolina's Elections

29.     Over the past decade, steady increases in voter registration, turnout, and overall participation by young voters[3] in North Carolina have established young voters as a powerful voting bloc with the potential to significantly influence election results locally and statewide.

30.     The number of individuals aged 18 to 25 on North Carolina's voter rolls has grown substantially.   In November 2012, there were nearly 850,000 registered young voters.   By

---

[3] The NCSBE's publicly available voter registration and election data categorizes registrants and voters into four different age groups: "18 to 25," "26 to 40," "41 to 65," and "over 66."  Young voters are defined here as those falling within the 18 to 25 age group.

12

November 2020, that number had grown to over 980,000 registered voters.  Young voter turnout also steadily increased during that time from approximately 55% to 60%.

31.     North Carolina's significant student population contributes to the overall increase in youth voting.  North Carolina has 130 post-secondary institutions (colleges, universities, and technical and trade schools), with a total statewide enrollment of over 450,000.[4]  These students have a constitutional right to participate in the electoral process—to register, to vote and to have their votes counted in the locations where they reside—just as new residents moving to North Carolina for work or to retire have that right.

**B.      North Carolina's Historical Attempts to Restrain the Youth Vote**

32.     This increase in youth voting participation and voting power has not gone unnoticed.  North Carolina's recent history is replete with attacks on young voters and their preference for early voting and same-day registration.

33.     In 2013, the North Carolina General Assembly (the "General Assembly") passed House Bill 589 ("HB 589"), an omnibus election bill (like SB 747) that drastically reduced access to the ballot.  In particular, HB 589 decreased the number of days dedicated to early voting, eliminated same-day registration, and eliminated preregistration—a process that allowed 16- and 17-year-olds to "preregister" to vote while obtaining their driver's licenses or attending certain mandatory high school events.  Those preregistration applications were automatically processed when the registrant turned 18, thereby increasing turnout among young voters.[5]

---

[4] Colleges and Universities, NC OneMap,
https://www.nconemap.gov/datasets/ce5bbbe0c8194778859df0d3e02be3e7_0/explore?location=35.170131%2C-80.118905%2C8.09 (last updated Mar. 22, 2023).

[5] Caroline Linnea Carlson, Expanding the Electorate: The Effects of Preregistration on Youth Turnout, The University of North Carolina at Chapel Hill ProQuest Dissertations Publishing, 2019, https://www.proquest.com/openview/97f9b0b534afadc7ced196fa4e64ef24/1?pq-origsite=gscholar&cbl=18750&diss=y (finding that "preregistered voters were much more likely to turn out than non-preregistered voters in the 2012-2016 elections" in North Carolina).

13

34.    In July 2016, the Fourth Circuit struck down the challenged provisions of HB 589 on the ground that they were motivated by discriminatory intent.  *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 215 (4th Cir. 2016).  Specifically, the Fourth Circuit held that many of the justifications offered by the State for the provisions restricting or eliminating early voting, same-day registration and preregistration—namely, "to combat voter fraud and promote public confidence in the electoral system"—were not in fact advanced by those provisions.  *Id.* at 235.  The court explained that those proffered justifications were nothing more than "solutions in search of a problem"—with the "problem" being "emerging support for the minority party."  *Id.* at 238.

35.    In 2018, the General Assembly again attempted to suppress youth voting by passing Senate Bill 824 ("SB 824"), again in the name of "election integrity."[6]  SB 824 required registered voters to present certain forms of approved photo IDs before voting.[7]  While student ID cards *could* satisfy this requirement in theory, they qualified as "approved" forms of voter ID only if colleges and universities first satisfied SB 824's complex and onerous requirements.  Those restrictions were unique to North Carolina—no other state imposed such obstacles to the use of student ID cards for voting.

36.    Due to SB 824's swift implementation and the onerous requirements for approval, many colleges and universities—including most UNC schools—were unable to meet the requirements necessary for their student ID cards to qualify as voter photo IDs.[8]  School administrators contacted the NCSBE and the General Assembly with concerns about the

---

[6] Melissa Boughton, House approves voter ID after long debate over voter fraud, NC News Line (Dec. 6, 2018, 5:30 AM), https://ncnewsline.com/2018/12/06/house-approves-voter-id-after-long-debate-over-voter-fraud-student-ids/.
[7] S.B. 824, 2017 Gen. Assemb., Reg. Sess. (N.C. 2017).
[8] Lynn Bonner, Voter ID:  Most UNC system student IDs rejected for 2020 voting, The News & Observer, https://www.newsobserver.com/news/politics-government/article228029634.html (last visited Oct. 11, 2023).

14

complexity of the application process and its impact on their institutions and students.  After individual voters brought suit to challenge the constitutionality of SB 824, the General Assembly amended the law to extend some of the deadlines for student ID approvals and relax some of the burdensome standards on university administrators.[9]

37.    While HB 589 and SB 824 are examples of direct modifications to North Carolina election law that negatively impacted the youth vote, the General Assembly has sought to disadvantage the youth vote in other ways—including through gerrymandering.  In 2016, after the United States Supreme Court held that North Carolina's 2011 congressional districts were impermissibly race-based,[10] the General Assembly redrew the districts in a manner that divided the nation's largest HBCU, North Carolina A&T State University, into separate districts.[11]

38.    Young voters have also been targeted through the mechanics of local election administration.  Over the past decade, county boards of elections have sought to close or significantly limit on-campus early voting sites throughout the state, including at Appalachian State University, North Carolina State University, Duke University, East Carolina University, University of North Carolina at Charlotte, and Winston-Salem State University.[12]  A state court legal challenge concerning the closure of an early voting site at Appalachian State University concluded with the trial court holding that the closure had "no other intent from [the] board's

---

[9] H.B. 646, 2019 Gen. Assemb., Reg. Sess. (N.C. 2019).
[10] *Cooper v. Harris*, 581 U.S. 285, 299, 309 (2017).
[11] Ella Nilsen, North Carolina's extreme gerrymandering could save the House Republican majority, Vox (May 8, 2018, 11:00 AM), https://www.vox.com/policy-and-politics/2018/5/8/17271766/north-carolina-gerrymandering-2018-midterms-partisan-redistricting.
[12] Evan Walker-Wells, Blocking the youth vote in the South, Facing South (Oct. 29, 2014), https://perma.cc/BQ76-LPDL.

15

decision other than to discourage student voting."[13] This tactic of restricting and opposing campus early voting sites was openly endorsed by leadership in the General Assembly at that time.[14]

39. From the enactment of those earlier laws to this year's passage of SB 747, certain advocates have attempted to erect additional barriers to voting for student and youth populations. For example, Cleta Mitchell, a Senior Legal Fellow at the Conservative Partnership Institute and the Founder of their Election Integrity Network, has spearheaded a "crack down" on student voting and candidly expressed her intention to squash the youth and student vote. In 2022, Mitchell advocated for an "army of poll watchers and workers" to prevent the "numerical majority" of "young people, people of color, [and] unmarried women" from voting.[15] At an April 2023 conference, Mitchell pressed for rules to make it more difficult for college students to vote, expressing a desire for advocates to "band together to limit voting on college campuses [and] same-day voter registration . . . ."[16] Mitchell spoke disparagingly of college students' exercise of the franchise, asking "What are these college campus locations? What is this young people effort that they do? They basically just put the polling place next to the student dorm so they just have to roll out of bed, vote, and go back to bed." Mitchell added that "we can fix a few things in North Carolina,"[17] and recommended "strong election integrity task forces" in Durham, Wake, and

---

[13] *See Anderson v. The North Carolina State Bd. of Elections*, No. 14CVS12648, 2014 WL 6771270, at *1 (N.C. Super. Oct. 13, 2014) (concluding that the removal of an early voting polling site from Appalachian State University campus indicated "no other intent from [the] board's decision other than to discourage student voting") (alteration in original).

[14] *See* Colin Campbell, "Party Line Changes" Urged to Limit Early Voting Hours, News & Observer (Aug. 18, 2016), https://perma.cc/HQ33-BTCS (quoting the executive director of the North Carolina GOP, Dallas Woodhouse, as stating, "Republicans can and should make party line changes to early voting").

[15] Leaked Audio: Cleta Mitchell's Election Integrity Network Bringing Conspiracy Theorists Into Election System, Documented (Aug. 2, 2022), https://documented.net/investigations/recordings-reveal-whats-really-going-on-cleta-mitchell-election-integrity-network.

[16] Josh Dawsey and Amy Gardner, Top GOP lawyer decries ease of campus voting in private pitch to RNC, Wash. Post (Apr. 20, 2023, 11:28 AM), https://www.washingtonpost.com/nation/2023/04/20/cleta-mitchell-voting-college-students/.

[17] Lynn Bonner, NC Republican proposed voting restrictions fit a red-state pattern, NC Newsline (June 22, 2023, 5:59 AM), https://ncnewsline.com/2023/06/22/nc-republican-proposed-voting-restrictions-fit-a-red-state-pattern/.

16

Mecklenburg Counties—all home to large college campuses and student populations.[18] "Election integrity" is a euphemism for preventing young voters from voting where they live, depriving those young voters of the exercise of their constitutional rights because they are young, because they are people of color or because they are unmarried, all of which are unlawful reasons to prevent eligible voters from voting.

40.     Mitchell's focus on North Carolina was not accidental. Upon information and belief, the drafting and passage of SB 747 was influenced by Mitchell and members of the North Carolina Election Integrity Team ("NCEIT"), a North Carolina-based organization with which she frequently consults.[19]  Mitchell was seen repeatedly in the General Assembly halls in the lead up to the passage of SB 747, and members of the General Assembly acknowledged meeting with her.[20]  Efforts by certain legislative leaders to distance themselves from Mitchell regarding the drafting of SB 747 have been directly contradicted by local NCEIT chapters claiming credit for the law.  In a since-deleted blog post on an Asheville Tea Party website, NCEIT touted the introduction of SB 747 by announcing "Look What WE Did" and "NCEIT will be tracking our proposed legislation in the NCGA."[21]  Moreover, excerpts from NCEIT's legislative priorities and SB 747 itself are substantially similar, undermining any claim that Mitchell did not coordinate with the General Assembly.[22]

---

[18] Zachary Roth, A top GOP lawyer wants to crack down on the college vote.  States already are., Mich. Advance (May 2, 2023, 4:22 AM), https://michiganadvance.com/2023/05/02/a-top-gop-lawyer-wants-to-crack-down-on-the-college-vote-states-already-are/.

[19] Laura Lee and Jordan Wilkie, Inside the 'Election Integrity' Efforts Targeting North Carolina, The Assembly (Oct. 11, 2022), https://www.theassemblync.com/politics/elections/north-carolina-election-integrity/.

[20] Will Doran, NC lawmakers expected to roll out major election law changes, with input from former Trump lawyer, WRAL News (May 21, 2023, 10:04 PM), https://www.wral.com/story/nc-lawmakers-expected-to-roll-out-major-election-law-changes-with-input-from-former-trump-lawyer/20889083/.

[21] J. Sailor Jones, "Look what WE did:" National extremists score with NC voter suppression bill, Laurinburg Exch. (June 16, 2023), https://www.laurinburgexchange.com/opinion/259718/look-what-we-did-national-extremists-score-with-nc-voter-suppression-bill.

[22] Rob Schofield, North Carolina GOP advances "Monster Voting Law" 2.0, NC Newsline (June 6, 2023, 6:00 AM), https://ncnewsline.com/2023/06/06/north-carolina-gop-advances-monster-voting-law-2-0/.

41.     Proponents of SB 747 also expressed direct animus toward young voters' democratic participation, casting doubt on their equal standing as voters while SB 747 was being considered.  While debating a related elections bill, House Bill 770, in the House Election Law and Campaign Finance Committee on September 12, 2023 (after SB 747 was vetoed but before the veto was overridden), multiple members of the General Assembly made disparaging statements about youth voters in North Carolina.  One such representative said "the problem is that college students don't understand the issues of local politics or the local people.…when you have a big university in a college town, the college students effectively have the ability to completely eliminate essentially the representation of the local people because they don't understand the issues."  In the same hearing, a different representative argued that students exercising their right to vote "certainly does have an impact on the local communities" and that college voters "may or may not be as well versed in the issues or really have a right to say within those local communities."  These remarks, and the lack of regard they demonstrate for the full and equal democratic rights of young voters to participate in local governance and help shape their communities, were enthusiastically endorsed in a public comment from Jay Delancy, the founder of NCEIT, during the hearing.  "Representative [], I love your idea," Delancy said.  "It impacts State House races in Boone and in New Hanover.  Those college campuses totally blow up even State House races with the impact, the disproportionate impact those kids bring."

42.     After making these comments in debate over HB 770, both representatives voted to override the veto for SB 747.

18

**C.**     **Registering to Vote and Voting in North Carolina Prior to SB 747**

    **1.**     **Laws Related to Voter Registration, Early Voting, and Same-Day Registration**

43.     North Carolina elections are governed by the North Carolina State Constitution, election statutes (primarily N.C.G.S. Chapter 163, titled "Elections and Election Laws"), administrative rules, and guidance issued by the Executive Director of the NCSBE through Numbered Memos.

44.     Under North Carolina law, an individual is eligible to vote if they are a U.S. Citizen, live in the county where they are registering and have resided there for at least 30 days prior to Election Day, are at least 18 years old (or will be by the date of the general election), and are not serving a felony sentence, including any period of probation, post-release supervision, or parole. Registration is a prerequisite to voting.  N.C.G.S §§ 163-54, 163-55; N.C. Const. art. VI, § 2.

(a)     <u>Voter Registration</u>

45.     Persons eligible to vote in North Carolina can register in person, by mail, or (under some circumstances) online with the North Carolina Department of Motor Vehicles ("DMV").  To register, an applicant must complete and submit the voter registration form prepared by the NCSBE.

46.     The voter registration form requires the applicant to provide their name; date of birth; residential address; a mailing address if not receiving mail at their residential address; and a sworn attestation as to certain qualifications to vote.[23]  The form also requires the applicant to provide either (i) a North Carolina driver's license or non-operator's identification number or (ii) the last four digits of their social security number.[24]  First-time North Carolina voting

---

[23] <u>North Carolina Voter Registration Application</u>,
https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf (last visited Oct. 11, 2023).
[24] *Id.*

19

registrants who do not provide a North Carolina driver's license, DMV ID card, or social security number are required to attach a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing their name and address.[25]

47.     The civilian voter registration deadline is 25 days before Election Day.  N.C.G.S. § 163-82.6(d).  Accordingly, for a completed voter registration form to be accepted, it must be submitted in person and received by the county board of elections by 5:00 p.m. on the twenty-fifth day before a primary or election.  If submitted by mail, the registration form must be postmarked by that date.  N.C.G.S. § 163-82.6(d).

48.     Significantly, if the voter failed to complete any required item on the registration form but provided enough information to enable the county board of elections to identify and contact the voter, the voter shall be notified of the omission and given the opportunity to complete the form by 5:00 p.m. on the day before the county canvass.  N.C.G.S. § 163-82.4(f).  If the voter corrected that omission by that time and was determined by the county board of elections to be eligible to vote, the board shall permit the voter to vote.  *Id.*  If the information is not corrected by Election Day, the voter shall be allowed to vote a provisional official ballot.  *Id.*  If the correct information is then provided to the county board of elections by at least 5:00 p.m. on the day before the county canvass, the board shall count any portion of the provisional official ballot that the voter is eligible to vote.  *Id.*

---

[25] *Id.*

20

(b)     Same-Day Registration

49.     Individuals qualified to register to vote, but who fail to register by the deadline (25 days before Election Day), may still register during the early voting period and vote at an early voting site utilizing "same-day registration."  N.C.G.S. § 163-82.6A. [26]

50.     Same-day registrants must attest to their eligibility and provide documented proof of their residential address.  N.C.G.S. § 163-82.6A(b).  A voter attests to their eligibility by completing and signing the North Carolina voter registration application and proves their residence by showing any of the following documents with their current name and address:  a North Carolina driver's license; any government issued photo ID that includes the voter's current name and address; or a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's name and address.  N.C.G.S. §§ 163-82.6A(b)(1), (2).  Without this documentation, a voter may not same-day register, and if not already registered in the county, may not cast a ballot.

51.     A college or university student may register and vote in the county where they attend school if they are physically present in the school community and do not intend to return to their former home after graduation.  N.C.G.S. § 163-57(12).  In addition to the documentation noted above, proof of residence for college students attempting to same-day register in the county where they attend school includes (i) a document originating with the educational institution and stating the student's name and on-campus housing address or facility name, or (ii) a current college/university photo identification card together with a current roster prepared by the

---

[26] Because the General Assembly never amended the Election Code following the Fourth Circuit's decision in *McCrory*, the controlling version of N.C.G.S. 163.82.6A (prior to the passage of SB 747) appears appended to the NCSBE's Numbered Memo 2016-15.  *See Same-Day Registration During One-Stop Early Voting*, Numbered Memo 2016-15 at Appendix A, NCSBE (Sept. 22, 2016), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2016/Numbered_Memo_2016-15_Same-Day_Registration.pdf.

21

college/university and transmitted to the county board of elections office listing all students residing in campus housing facilities.[27]

52.     A same-day registrant who attests to their eligibility and provides documented proof of residence can then immediately vote after satisfying the voter photo ID requirement, which requires presentation of an approved photo ID if not already presented for purposes of proving their address (such as a North Carolina DMV driver's license, which satisfies both the same-day registration and voter photo ID requirements).  A person who registers to vote utilizing same-day registration will vote a retrievable absentee ballot. N.C.G.S. § 163-82.6A(c).  If a person declines to vote immediately following the submission of their same-day registration, the registration will still be processed and the person may later vote at an early voting site in that election. *Id.*

(c)     <u>Verification of Qualifications and Address of Applicant</u>

53.     When a county board of elections receives a registration application within the normal registration period, the board must verify that the voter is qualified to vote at the address given. N.C.G.S. § 163-82.7(a).

54.     If the county board determines that the applicant is not qualified to vote at the address given, within two business days of that determination, the applicant must be sent a notice of denial of registration by certified mail informing them of alternatives they may pursue to register.  N.C.G.S. § 163-82.7(b).  The applicant may appeal such a denial, which results in a public hearing and opportunity to be heard.  N.C.G.S. § 163-82.18.

---

[27] <u>Register in Person During Early Voting</u>, NCSBE, https://www.ncsbe.gov/registering/how-register/register-person-during-early-voting; *see also Same-Day Registration During One-Stop Early Voting*, Numbered Memo 2016-15 at Appendix A, NCSBE (Sept. 22, 2016),
https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2016/Numbered_Memo_2016-15_Same-Day_Registration.pdf.

22

55. If the county board tentatively determines that the applicant is qualified to vote at the address given, it must, within a reasonable time after receiving the application, proceed with a mail verification process. N.C.G.S. § 163-82.7(a)(2).

56. The mail verification process under N.C.G.S. § 163-82.7 involves two rounds of notices sent by non-forwardable mail to the address provided on the application form. If the Postal Service does not return the First Notice as undeliverable, then the county board registers the applicant to vote. N.C.G.S. § 163-82.7(c)–(d). If the First Notice is returned as undeliverable, then the county board sends the Second Notice. N.C.G.S. § 163-82.7(e). If the Second Notice is not returned as undeliverable, then the county board registers the applicant to vote. *Id.* Only if both notices are returned as undeliverable does the county board deny the application based on a lack of verification of address. N.C.G.S. § 163-82.7(f).

57. The verification of same-day registration applications followed a similar process. Within two business days of the person's registration, the county board of elections would verify the registrant's driver's license or Social Security number, update the voter registration database, search for possible duplicate registrations, and begin to verify the registrant's address utilizing the same two-notice mail verification process outlined in N.C.G.S. § 163.82.7. *See* N.C.G.S. § 163-82.6A(d).

(d)    Voting When the Verification Process Is Incomplete

58. Prior to SB 747, in cases where an election occurs before the address mail verification process is completed, the applicant—regardless of whether they registered during early voting or not—was still permitted to vote. North Carolina law states that such a "person shall not be denied the right to vote in person in an election unless the Postal Service has returned

23

as undeliverable two notices to the applicant: one mailed pursuant to subsection (c) of this section and one mailed pursuant to subsection (e) of this section." N.C.G.S. § 163-82.7.

59. If the Postal Service returned as undeliverable a First Notice sent within 25 days before the election, then the applicant could vote in person, either on election day or at an early voting site, but not absentee-by-mail. *Id.* § 163-82.7(g)(2). In that scenario, the county board had to establish procedures to obtain the correct address of the person appearing to vote and ensure that the person votes in the proper polling place and in the proper contests. *Id.*

60. If a First or Second Notice is returned as undeliverable after a person has already voted by absentee ballot (in person at an early voting site or by mail), then that ballot may be formally challenged. *Id.* The challenge procedure requires a hearing in which the challenged voter is permitted to appear personally or through a representative. N.C.G.S. § 163-89(e). Written notice must be provided to the voter.[28]

61. If a First or Second Notice was returned as undeliverable after a person had already voted, the voter's ballot was still counted, but the county board was required to begin a confirmation mailing process to confirm the person's registration under N.C.G.S. § 163-82.14(d)(2) and could remove the registration only if the individual failed that separate, multi-step process. N.C.G.S. § 163-82.7(g)(3). Collectively, the protections in existing North Carolina law, prior to the passage of SB 747, adequately protect the electoral process and represent a reasonable compromise between securing elections and encouraging all voters to participate in this fundamental American right to cast a ballot in elections where the voter lives.

---

[28] *County Board Challenges to Ineligible Absentee Ballots*, Numbered Memo 2022-05 at 4, NCSBE (May 12, 2022), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-05_Absentee%20Voter%20Challenges%20by%20County%20Board.pdf.

## 2. Qualified Young Voters, Including Students, Experience High Rates of Failed Mail Verification, Which Threatens Their Ability to Vote

62. An analysis of NCSBE data regarding voter registration applicants who were rejected or otherwise not added to the official eligible voter list due to failed mail address verification demonstrates that nearly 50% of the approximately 91,000 denials that were recorded from January 2012 to January 2022 were attributed to registrants aged 18 to 25. This statistic alone is significant, as it shows that it is young voters who are impacted most by this form of voter verification. But what makes this statistic striking is that, over that same time period, the 18 to 25 age group was consistently the smallest group in terms of overall voter registration and ballots cast in any given election. Put differently, young voters—even though they are the smallest age group by any measure—constitute the largest share of all recorded registration rejections for failed mail verification in the last decade.

63. Street addresses associated with colleges and universities were some of the most frequently appearing addresses on the list of registration denials. Six of the top ten most frequent areas for denials were campus or university addresses, with registrations from addresses around North Carolina Central University[29] in Durham County, UNC Pembroke in Robeson County, and North Carolina A&T in Guilford County being the top three.

64. An analysis of provisional ballots cast by young voters proves the same point. Voters frequently cast provisional ballots when they experience problems with their voter registration, such as failed mail verification. These problems are most frequently faced by young voters.[30] In 2016, more than 300 young voters cast provisional ballots on Election Day in Durham

---

[29] Gunther Peck et al., Provisional Rights and Provisional Ballots in a Swing State: Understanding How and Why North Carolina College Students Lose Their Right to Vote, 2008-Present, 74 Rutgers L. Rev. 1799, 1813 (2022) (highlighting that mail is not deliverable at NCCU's street address).

[30] Id. at 1811 ("[T]he primary reason that young people in Durham have had their registration denied is the lack of a mailing address. In the last five years, all 923 young citizens with rejected registrations were denied because they did not have verifiable mailing addresses, documented as 'undeliverable.'").

25

County, only to have their votes discarded.[31]  Since then, ballot rejection rates for young voters have increased across North Carolina.[32]  In 2020, the youth provisional ballot rejection rate was 95% in Durham County and 73% in all of North Carolina.[33]

65.     Through their programs and activities on campuses across the state, Plaintiffs have witnessed the unique challenges faced by students attempting to navigate the complexities of North Carolina law and election administration, as well as the administration of their own schools.

66.     For example, on certain North Carolina campuses, students cannot receive mail at the address they are required to list as their place of residence—usually a centralized college/university address.  Instead, they must list a particular dorm room, P.O. Box, or college/university-specific modifier to their mailing address in order for mail to be successfully delivered and not returned as undeliverable.  If those students fail to list the correct mailing address or incorrectly list the place where they physically reside as their mailing address, or if the Postal Service cannot access or locate the listed residence, such as a dorm room, the voters will fail mail verification despite meeting all eligibility requirements for voting.

67.     Some of those colleges and universities have internal mail departments, separate and apart from the Postal Service, that further complicate this process and create more potential barriers to official election mail reaching its intended recipients.  In at least one case, a campus's mailroom policy was to contact a student by email when receiving mail for that student, and then return the mail to sender if the student does not retrieve it in a timely fashion.  As a result, even though a student voter is fully eligible to vote in North Carolina, the address where that voter

---

[31] *Id.* at 1800.
[32] *Id.* at 1801.
[33] *Id.* at 1827.

resides is not readily accessible to mail delivery in a manner that Defendants will accept, disqualifying that voter's lawful ballot for reasons beyond the voter's control.

68.     Upon information and belief, county boards of elections in counties with large university and college student populations are aware of the significant challenges of having official election mail consistently reach students.   So, too, are college/university administrators and groups, like Plaintiffs, who advocate for the rights of student voters throughout the state.

69.     Contributing to the significant challenges students face in timely receiving official election mail is the unreliability of using mail returned as "undeliverable" as an indicator of non-residency.   According to the Postal Service, mail can be undeliverable for reasons unrelated to a voter's potential eligibility to vote, such as "no postage," "incomplete, illegible, or incorrect address," "mail unclaimed," "mail refused by the addressee," and "minimum criteria for mailability not met."[34]   These circumstances are entirely beyond the voter's knowledge, let alone control.

70.     Moreover, a failure of mail verification does not necessarily mean that a voter was ineligible when they registered at that address.   Some voters—whose registration was denied in one election cycle because their address could not be verified by mail—later re-register and appear on the voter rolls registered under the same address that previously could not be verified. Additionally, voters sometimes change addresses in November of an election year.   The same-day registration process is designed to ensure that voters are eligible when they cast their ballot—a voter who presents qualifying documentation and presents to vote during same-day registration, in accordance with applicable law, and who moves the day after Election Day, is still an eligible voter for that election even if they later fail mail verification at their previous address.   In other words,

---

[34] 507 Mailer Services, USPS.com, https://pe.usps.com/text/dmm300/507.htm (last visited Oct. 11, 2023).

as written and as implemented, SB 747 treats new voters who move in November after voting as unqualified voters in North Carolina. The simple act of moving does not make that voter ineligible to vote, nor does it make their ballot improperly cast.

71. The NCSBE repeatedly has acknowledged that a failure of mail verification should not be equated with voter ineligibility. In an NCSBE Numbered Memo titled "Unverified Registrations," then-Executive Director Gary Bartlett, addressing voters who register by mail or in person at a one-stop site, observed that "[t]here are several reasons that could have been the basis for the unsuccessful verification mailings" and "[i]t must be emphasized that the failure of the verification process does not necessarily mean that the voter should not have cast a ballot."[35] And as noted by the Fourth Circuit in the case challenging House Bill 589, the NCSBE "acknowledged some of the conflicts between same-day registration and mail verification, but clarified that 'same day registration does not result in the registration of voters who are any less qualified or eligible to vote than' traditional registrants, and that 'undeliverable verification mailings were not caused by the nature of same-day registration.'" *N.C. State Conf. of the NAACP*, 831 F.3d at 237 (citations omitted); *see also N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 448 (M.D.N.C. 2016) ("Mail verification is admittedly 'not a precise verification system' for determining an applicant's residency"), *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016).

---

[35] *Unverified Registrations*, Numbered Memo 2012-28 at 1, NCSBE (Nov. 14, 2012), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2012/2012-28_UnverifiedRegistrations.pdf.

**D.** **SB 747 Places Onerous and Unnecessary Restrictions on the Same-Day Registration Process and Other Election Law Provisions**

**1.** **SB 747's Provisions**

72.     Filed on June 1, 2023, and enacted into law on October 10, 2023, SB 747 touches on almost every facet of voting in North Carolina.

73.     In particular—and as relevant here—the bill substantially overhauls the same-day registration process for North Carolina voters by re-writing N.C.G.S. § 163-82.6A and adding a new section, N.C.G.S. § 163-82.6B. This overhaul changes the law and guidance concerning same-day registration and voting, including (1) the steps county boards must take to verify the address of a person who registers using same-day registration and (2) the consequence to the voter should address mail verification fail. S.B. 747, 2023 Leg., Reg. Sess., §§ 9, 10(a) (N.C. 2023).

74.     As discussed above, prior to SB 747, the two-mailer address verification process applied to a qualified person registering to vote during both the normal registration period and same-day registration. Under this process, if the First Notice was returned undeliverable, the Second Notice was sent. If the Second Notice was returned, the registration could be denied, but depending on when the Second Notice was returned, the applicant's registration and ballot (if they had voted) were not automatically denied and discarded.

75.     Section 10(a) of SB 747 drastically changes this process. Now, an individual utilizing same-day registration will be sent only the First Notice under the mail verification process in N.C.G.S. § 163-82.7, and if that single notice returns as undeliverable "before the close of business on the business day before canvass, the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count." *Id.* County boards are under no obligation to provide notice or an opportunity to be heard to the voter before denying the registration application and canceling the cast ballot.

29

76.     Section 10(a) also places further restrictions on the types of identifying documents that can be utilized to satisfy the "proof of residence" requirement for same-day registration.  Prior to SB 747, an individual qualified to register could satisfy the "proof of residence" requirement by "presenting any of the following documents that show the person's current name and current residence address: a North Carolina driver's license, a photo identification from a government agency, or any of the documents listed in G.S. 163-166.12(a)(2)," which includes "a current utility bill, bank statement, government check, paycheck, or other government document."  N.C.G.S. §§ 163-82.6A(b)(2), 163-166.12(a)(2).   The NCSBE also had the delegated authority to "designate additional documents or methods that suffice and shall prescribe procedures for establishing proof of residence."  *Id*.  The NCSBE utilized that delegated authority to address the "specific challenge" facing "[s]tudents living in a campus housing facility, such as a dormitory, [who] may have particular difficulty producing a qualifying document displaying their on-campus address," by approving the pairing of a student photo identification with "a list of all students residing in a particular campus housing facility" provided directly to the county board of elections from the educational institution.[36]

77.     SB 747 strips that delegation of authority from the NCSBE, thus eliminating the "other documents and methods" approved to assist students, and then further narrows that list of approved documents, defined as "HAVA document[s]," to a current utility bill, bank statement, government check, paycheck, another government document, or a document "issued from the institution who issued the photo identification shown by the voter pursuant to G.S. 163-166.16." S.B. 747, 2023 Leg., Reg. Sess., § 10(a) (N.C. 2023).

---

[36] *See also Same-day Registration During One-Stop Early Voting*, Numbered Memo 2016-15, NCSBE (Sept. 22, 2016), https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2016/Numbered_Memo_2016-15_Same-Day_Registration.pdf.

30

78.     In addition to these changes, SB 747 makes it easier to challenge the eligibility of a voter casting a ballot during the early voting period by expanding who can bring the challenges and when they can be filed.

79.     Previously, voter challenges of absentee ballots (including ballots cast during the early voting period) could be filed only by (i) a voter registered in the same precinct as the challenged voter, (ii) a chief judge of the challenged voter's precinct, or (iii) an official conducting elections at an early voting site.  N.C.G.S. §§ 163-89(b), 162-227.2(i).[37]  To be considered timely, the challenge had to be filed between 12:00 p.m. and 5:00 p.m. on Election Day at the county board office.  N.C.G.S. § 163-89(a).[38]  Ballots cast during early voting could also be challenged during the early voting period at the county board office or when the voter presents to vote their ballot at their early voting site.  N.C.G.S. § 163-227.2(i).[39]  Sections 13(a) and 15 of SB 747 change those rules to allow any registered voter in the *same county* (not just precinct) as the challenged voter to file a challenge and also extends the time such challenges can be filed to as late as 5:00 p.m. on the fifth business day after the primary or election for absentee ballots.

80.     While extending the time to challenge absentee ballots, SB 747 shortens the time to return an absentee ballot.  Previously, absentee ballots would be counted so long as they were postmarked by the day of the election and received within three days of that election.  N.C.G.S. § 163-231(b).  But under Section 35 of SB 747, regardless of when the absentee ballot is postmarked, if it is not received by 7:30 p.m. on the day of election, the ballot will not be counted, subjecting ballots to the further vicissitudes of the Postal Service.

---

[37] NCSBE, Voter Challenge Procedures Guide 2, https://s3.amazonaws.com/dl.ncsbe.gov/Forms/2022/Voter%20Challenge%20Procedures%20Guide.pdf (last updated June 8, 2022).
[38] *See also id.* at 3.
[39] *See also id.*

31

81.     These provisions substantially impair the right to vote of eligible North Carolinians, especially young and student voters, while doing nothing to advance the goals of "election integrity" or improved election administration.

### 2.     The Legislative Process and Public Statements by Members of the General Assembly

82.     Eleven days after SB 747's introduction, the bill was referred to the Senate Committee on Redistricting and Elections (the "Senate Elections Committee"). The Senate Elections Committee considered SB 747 for less than two hours total on June 14 and 15, where one sponsor, who labeled the bill the "jumbo jet of election integrity," indicated that concerns about college voters facing difficulties voting were misplaced because he assumed "most college freshmen probably would remain registered in their home of residence and would vote absentee there." Regarding the new deadline for returning absentee ballots, another senator stated, "we don't see [moving the deadline to Election Day] as invalidating any votes. People just need to adjust." The Senate Elections Committee sent SB 747 to the Committee on Rules and Operations of the Senate (the "Senate Rules Committee") on June 15. That day, another senator stated that he was "still concerned about [students]."

83.     On June 20, SB 747 went before the Senate Rules Committee, which then forwarded the bill to the broader Senate after hearing from the public, including from a representative of the NCEIT.

84.     On June 21, SB 747 was presented for debate on the Senate floor. Bill proponents expressed their concern for election integrity, stating that North Carolina's inability to call elections on Election Day in prior cycles undermined "confidence and transparency in [North Carolina's] elections," "harm[ed] the integrity of the process," and would cause "far too many North Carolinians [to] question whether the 2024 elections will be free and fair." Proponents also

32

argued for a requirement that all votes arrive by Election Day, citing the need to "minimize the delay in declaring a winner" and "wrap up the election process in a more efficient manner."

85.     In the same debate, other senators expressed concerns about SB 747's restrictions on voters.  One senator stated that "voters are going to be dissuaded from voting . . . if they hear that they're going to need all this extra proof to show where they live" and that SB 747 will "have a disproportionate impact on voters of color, student voters, military members and young voters" because they "use same-day registration at a higher rate and are less likely to have that limited number of documents that you're allowing to prove their address."  That senator pointed out the fallacy in pursuing "final" election results on election day "because election results are always unofficial on election night . . . the vote tallies are preliminary by law, and they will remain so with this bill."  Another senator noted that SB 747 contains "impractical mechanical changes for the administration of our elections, particularly around . . . same-day voter registration . . . that will inject immense confusion, chaos and conflict into the voting process for North Carolinians and in so doing, massively erode faith in our elections."  Nevertheless, the bill passed its second and third readings and was sent to the House on June 22, despite concerns that the process was rushed and lacked sufficient opportunity for public comment.

86.     SB 747 passed its first reading in the House on June 26.  It sat dormant for nearly two months until it went before the House Election Law and Campaign Finance Reform Committee on August 15 as a "Proposed House Committee Substitute."  The Chair Representative noted that the Proposed House Committee Substitute "has changed quite a bit" in comparison to the version of SB 747 passed by the Senate on June 21.  At that committee meeting, representatives expressed concerns about the "significant" changes to same-day voting and the "inefficient, ineffective, and unfortunately unreliable" Postal Service, upon which SB 747 relies to determine

whether votes cast via same-day registration count. Proponents reiterated the importance of "bring[ing] certainty to our elections" with an Election-Day cutoff for mail-in ballots.

87. On August 16, SB 747 went before the House Committee on Rules, Calendar, and Operations of the House, where one of the bill sponsors identified the change to same-day registration as a "key substantive provision[] that . . . will increase election integrity." That same day, the House met for its only debate on the bill. One representative offered an amendment to remove the vote from the count only if a second notice was returned as undeliverable, reasoning that the return of the first notice could be the fault of Postal Service, not the voter. A proponent of the bill urged his colleagues to vote against the amendment, contending "[o]ne mailing is adequate and serves the purpose." After the amendment failed, a representative emphasized that the state should not be relying on "one chance" and "one postcard," as "mail can be undeliverable for a host of reasons that have nothing to do with whether someone is eligible to vote." That representative also called into question the "election integrity" rationale of the bill's proponents, noting that courts could not "identify a single individual who had ever been charged with committing in-person voter fraud in North Carolina."

88. Throughout the entire legislative process for SB 747, the General Assembly never produced, furnished, or otherwise relied upon any evidence, study, or data that could even begin to demonstrate the need for SB 747, and the burdens that the law places on North Carolina voters.

89. On August 17, SB 747 was ratified and passed to the Governor.

90. On August 24, the Governor vetoed SB 747. In his veto message, the Governor explained that SB 747 "work[s] to erect new barriers for younger and non-white voters, many of whom use early voting and absentee ballots."

34

91.     On October 10, supermajorities in both chambers overrode Governor Cooper's veto, enacting SB 747.

**E.      SB 747 Makes It Much More Difficult for Young North Carolinians To Vote and Have Their Vote Counted, Yet Fails To Increase Election Integrity or Improve Election Administration**

92.     Prior to SB 747, North Carolina election law protected the fundamental right to vote of its qualified citizens by offering, at minimum, a two-mailer notice process before denying a voter registration application and additional intervention points before rejecting a cast ballot, such as a challenge hearing or other opportunities to be heard, regardless of whether the address mail verification process had concluded.  These procedures, along with the additional proof requirements for same-day registrants, balanced a qualified voter's right to cast a valid ballot against the state's interest in administering elections efficiently and effectively and ensuring only qualified voters cast a ballot.

93.     By changing the mail verification process for same-day registrants to a single-mailer, no-notice, ballot rejection scheme, SB 747 upends the balance struck by the previous system and targets youth voters and their preferred method of voting.  The General Assembly's stated justifications for these additional and significant burdens—election security and administration—are not in fact advanced by SB 747.

<u>**CLAIMS**</u>

**COUNT ONE**

**(All Defendants)**
**(Denial of Plaintiffs' Right to Procedural Due Process in violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)**

94.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

35

95.     The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Where the government seeks to deprive someone of a liberty interest protected by due process, due process demands that certain procedural safeguards be provided." *United States v. Baker*, 45 F.3d 837, 843 (4th Cir. 1995). A liberty interest that is governed by due process can be created by the Constitution or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

96.     At a minimum, "procedural due process requires fair notice of impending state action and an opportunity to be heard." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

97.     "Proper notice is 'an elementary and fundamental requirement of due process,' and must be reasonably calculated to convey information concerning a deprivation.'" *Id.* at 146 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

98.     As for the opportunity to be heard, "*Mathews* set forth the familiar three-step inquiry for determining the adequacy of the opportunity to be heard: a balancing of the private interest and the public interest, along with 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Id.* at 146 (quoting *Mathews*, 424 U.S. at 335). "Fundamental to due process is an opportunity to be heard—'an opportunity which must be granted at a meaningful time.'" *Sciolino v. City of Newport News*, 480 F.3d 642, 653 (4th Cir. 2007) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

99.     Absent exigent circumstances, due process requires pre-deprivation procedures. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have described 'the root

36

requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'" (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

100.   North Carolina law gives all qualified North Carolina voters statutory rights to register to vote, including through same-day registration, and to cast a ballot that will be processed and counted, thereby vesting them with liberty interests.  Qualified voters enjoy an "individual and personal" right to vote under North Carolina law.  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

101.   Under SB 747, qualified voters may register on the same day they cast their ballot if they meet the requirements of N.C.G.S. § 163-82.6B(b).  S.B. 747, 2023 Leg., Reg. Sess., § 9, 10(a) (N.C. 2023).  If the county board of elections tentatively determines the individual voter is qualified at the address the voter supplied during same-day registration, the board then must seek to verify the voter's address by mailing them a non-forwardable notice.  If that single notice is returned as undeliverable by the Postal Service before the close of business on the business day before canvass, the county board, ***without notifying the voter***, cancels the voter's registration and removes the voter's ballot from the official count, denying the eligible voter their right to vote without due process of law.

102.   The risk of erroneous deprivation is high, as eligible North Carolina voters are entitled by law to register and to vote on the same day, and must be provided with procedural safeguards afforded to voters who vote by methods other than same-day registration in North Carolina:  notice of the cancellation of their registration and ballot, and the opportunity to be heard in response to the deprivation of their voting-based liberty interest.  Procedural due process requires notice of and an opportunity to be heard prior to the county board's removal of the eligible

37

voter's ballot. The lack of notice and a cure procedure frustrates the core mission of Plaintiffs to encourage voter participation because, without appropriate notice and hearing procedures in place, any efforts spent encouraging voters to register and vote during the early voting period could result in voters being disenfranchised if their address verification notice fails to reach them due to no fault of their own.

103. Defendants cannot advance any interests that outweigh the substantial risk of erroneous deprivation of the right to vote. The threat of disenfranchising Plaintiffs' members, constituents and other voters far outweighs any increased administrative burden in affording voters an opportunity to receive notice and be heard prior to the removal of their ballot from the official count. Defendants' interest in conducting fair election administration and preserving election integrity would not be compromised, and they would satisfy their weighty interest in abiding by federal constitutional requirements.

104. For the foregoing reasons, Defendants have violated and will continue to violate Plaintiffs' federal constitutional rights to procedural due process.

105. At all relevant times, Defendants have acted under color of state law.

106. Defendants have deprived and will continue to deprive young voters seeking to register and vote using same-day registration during the early voting period of their right to adequate notice and a meaningful opportunity to be heard prior to the removal of their ballot from the official count. Defendants accordingly fail to meet the minimum requirements of procedural due process guaranteed by the Fourteenth Amendment.

# COUNT TWO

**(All Defendants)**
**(Undue Burden on the Fundamental Right To Vote in Violation of the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983)**

107.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

108.    State election law and administration may not place burdens upon a person's right to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  "When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened." *Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019).  "If so, strict scrutiny applies." *Id.* at 258–59.  The court subjects to strict scrutiny laws that deny "the right to vote," "the right to appear on the ballot," or "the right to form or associate in a political organization." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016).

109.    For other laws, "the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests." *Alcorn*, 826 F.3d 258.  Notably, any burden on the constitutional right to vote—"[h]owever slight [it] may appear"—"must be justified by relevant and legitimate state interests '***sufficiently weighty to justify the limitation***.'" *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (emphasis added).

110.    The single-notice address verification process established for same-day registration in SB 747 imposes a severe burden on eligible North Carolina voters' right to vote.  Unlike voters who register outside of the early-voting period, those registering and voting during early-voting are subject to having their vote disqualified through no fault of their own—all it takes is one piece

39

of misdirected or returned mail to bar them from having their vote count.  This denies those eligible voters of their right to vote—the severest of burdens—without giving them any notice, opportunity to be heard, or other recourse.  These barriers disproportionately affect young and student voters, who heavily rely upon same-day registration when voting.

111.    None of the burdens imposed by the challenged provisions of SB 747 are reasonably related to, let alone necessary to achieve, any sufficiently weighty legitimate state interest. The burdens imposed by the challenged provisions of SB 747 accordingly lack any constitutionally adequate justification and must be enjoined.

112.    The state's interest in decreasing the administrative costs associated with providing notice or an opportunity to be heard must yield to the threat of disenfranchising Plaintiffs' members, constituents, and other voters.  An interest in conducting fair elections does not justify SB 747's nonexistent ballot removal notification process and lack of opportunity to be heard, and the one-letter address verification is a needlessly duplicative method of verifying the voter's address, as the same-day voter must already provide "proof of residency by presenting a HAVA document listing the individual's current name and residential address."  S.B. 747, 2023 Leg., Reg. Sess., § 10(a) (N.C. 2023).

113.    Accordingly, the challenged same-day voter provisions of SB 747 are not supported by any state interests sufficient to justify the resulting burdens on the right to vote, and unduly burden this right in violation of the First and Fourteenth Amendments.

**COUNT THREE**

**(All Defendants)**
**(Intentional Discrimination in Violation of the Twenty Sixth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)**

114.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

40

115. The Twenty-Sixth Amendment provides in relevant part: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by … any State on account of age." The goal of the Amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cty. Bd. of Elec.*, 294 A.2d 233, 243 (N.J. 1972).

116. SB 747 and, in particular, its same-day registration provision are intended to suppress the number of votes cast by young voters and discriminate on the basis of age.

117. SB 747 and the same-day registration provision are not justified by any legitimate state interest, much less narrowly tailored to a compelling state interest.

118. SB 747 and the same-day registration provision abridge and deny the right to vote for young voters on the basis of their age. Because of the system by which ballots cast using same-day registration fail with one failed-to-deliver notice, otherwise eligible young voters are denied the ability to register to vote and to have their vote count in violation of the Twenty-Sixth Amendment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that Section 10(a) of Senate Bill 747, codified at N.C. Gen. Stat. § 163-82.6B, is unconstitutional, illegal, and of no force or effect;

(c) Declare that Section 10(a) of Senate Bill 747, codified at N.C. Gen. Stat. § 163-82.6B, violates the right to procedural due process under the Fourteenth Amendment to the U.S. Constitution;

(d)      Declare that Section 10(a) of Senate Bill 747, codified at N.C. Gen. Stat. § 163-82.6B, violates the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

(e)      Declare that Section 10(a) of Senate Bill 747, codified at N.C. Gen. Stat. § 163-82.6B, violates the Twenty-Sixth Amendment to the U.S. Constitution;

(f)      Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with each or any of them from enforcing Section 10(a) of Senate Bill 747, including enjoining Defendants from conducting any elections utilizing that provision;

(g)      Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(h)      Order any other relief as this Court deems just and proper.

42

Dated:  October 17, 2023

Respectfully submitted,

*/s/ Jeffrey Loperfido*

Jeffrey Loperfido (State Bar #52939)
Christopher Shenton (State Bar #60442)
Katelin Kaiser (State Bar #56799)
Hilary H. Klein (State Bar #53711)
Mitchell D. Brown (State Bar #56122)
Lily A. Talerman (State Bar #61131)
Southern Coalition for Social Justice
5517 Durham-Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
jeffloperfido@scsj.org
chrisshenton@scsj.org
katelin@scsj.org
hilaryhklein@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

Michael Dockterman*
Geneva C. Ramirez*
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL  60606
Telephone: (312) 577-1300
mdockterman@steptoe.com
gramirez@steptoe.com

* *Notices of Special Appearance Forthcoming*

*Counsel for Plaintiffs*

43