DEMOCRACY NORTH CAROLINA,
NORTH CAROLINA BLACK ALLIANCE,
and LEAGUE OF WOMEN VOTERS OF
NORTH CAROLINA,

        Plaintiffs,

       v.

ALAN HIRSCH, in his official
capacity as Chair of the State
Board of Elections, JEFF CARMON
III, in his official capacity
as Secretary of the State Board
of Elections, STACEY EGGERS
IV, in his official capacity as
Member of the State Board of
Elections, KEVIN LEWIS, in his
official capacity as Member of
the State Board of Elections,
SIOBHAN O'DUFFY MILLEN, in her
official capacity as Member of
the State Board of Elections,
KAREN BRINSON BELL, in her
official capacity as Executive
Director of the State Board of
Elections, and NORTH CAROLINA
STATE BOARD OF ELECTIONS,

        Defendants,

       and

PHILIP E. BERGER, in his
official capacity as President
Pro Tempore of the North
Carolina Senate, and TIMOTHY
K. MOORE, in his official
capacity as Speaker of the
North Carolina House of
Representatives,

        Defendant-
        Intervenors.

1:23-CV-878

## <u>MEMORANDUM OPINION AND ORDER</u>

THOMAS D. SCHROEDER, District Judge.

In this action, Plaintiffs contest recent changes to North Carolina's rules for voters who register and cast a ballot during the State's seventeen-day same-day registration ("SDR") period that ends the Saturday before election day. Before the court are the motions to dismiss the complaint by the North Carolina State Board of Elections ("NCSBE") and its officers and members ("State Board Defendants") (Doc. 47) and Defendant-Intervenors Senator Philip E. Berger and Speaker Timothy K. Moore ("Legislative Intervenors") (collectively, "Defendants") (Doc. 45). Plaintiffs have responded in opposition (Doc. 50), and Defendants have replied (Docs. 51, 52). For the reasons set forth below, the motions will be denied.

## I.   BACKGROUND

### A.   Legislative and Litigation Background

In a January 21, 2024 memorandum opinion and order granting a preliminary injunction in two related actions, this court wrote at length on the statutory scheme that Senate Bill 747 ("S. 747") amends. See <u>Voto Latino v. Hirsch</u>, 1:23-CV-861, 1:23-CV-862, 2024 WL 230931, at *2-6 (M.D.N.C. Jan. 21, 2024). This background is repeated here in a limited fashion only to the extent necessary to resolve the motions before the court.

2

The North Carolina General Assembly passed S. 747, codified as 2023 N.C. Sess. Laws 140, over Governor Roy Cooper's veto on October 10, 2023. 2023 N.C. Sess. Laws 140, available at https://ncleg.gov/Sessions/2023/Bills/Senate/PDF/S747v6.pdf. The relevant provisions of S. 747, "[a]n act to make various changes regarding elections law," became effective January 1, 2024. Id. § 50. While the law amends several provisions of the election laws in Chapter 163 of the North Carolina General Statutes, this action specifically seeks to enjoin the enforcement of a portion of section 10.(a), codified as North Carolina General Statute § 163-82.6B, which makes changes to North Carolina's SDR procedures.

North Carolina offers two general methods of registration. Under the first method used by nearly all North Carolinians, an eligible voter may register 25 days or more before an election day. N.C. Gen. Stat. § 163-82.6(d). After an applicant submits his application, the county board makes a determination of the applicant's qualification to vote. Id. § 163-82.7(a). If the applicant is "tentative[ly] determin[ed]" to be qualified, the county board will implement the statutory procedures for "Verification of Address by Mail," or "address verification." Id. § 163-82.7(c).

As the first step of address verification, the county board will mail a "notice" (hereinafter "card") confirming the precinct

3

and voting place of the voter by non-forwardable mail to the address provided on the application. Id. If the mailing address differs from the residence address, the county board will mail the card to the mailing address. (Doc. 53-1 at 9-10 (Numbered Memo 2023-05 (January 29, 2024 Update)); N.C. Gen. Stat. § 163-57(1)(c) ("Residence shall be broadly construed to provide all persons with the opportunity to register and to vote, including stating a mailing address different from residence address.").

If the United States Postal Service does not return the card to the county board as undeliverable, "the county board shall register the applicant to vote." Id. § 163-82.7(d). If the card is returned, however, the county board will send a second card. Id. § 163-82.7(e). As with the first, if the Postal Service does not return the second card as undeliverable, "the county board shall register the applicant to vote." Id. But if the second card is returned as undeliverable, the county board will deny the application and "need not try to notify the applicant further." Id. § 163-82.7(f).

Under the second method of registration, implemented in 2007, an individual who is qualified to register to vote may register in person and simultaneously cast a ballot at an early voting site in the individual's county of residence during the period of early

4

voting.  Id. § 163-82.6B(a).[1]  This is commonly called "same-day registration," or "SDR."  To same-day register and vote, an individual must (1) complete a voter registration application; (2) provide proof of residence by presenting a HAVA[2]-compliant document listing the individual's current name and residence address; and (3) present photo identification pursuant to section 163-166.16.  Id. § 163-82.6B(b).  Upon completing these steps, an individual then "vote[s] a retrievable ballot."  Id. § 163-82.6B(c).

If the county board of elections tentatively determines that a same-day registrant is eligible to vote, the county board of elections proceeds to conduct address verification by mail as well.  Prior to S. 747, just as for non-SDR voters, if the first non-

---

[1] Same-day registration was enacted in North Carolina in 2007.  2007 N.C. Sess. Laws 253, § 1 (codified as N.C. Gen. Stat. § 163-82.6A).  Though section 163-82.6A once contained North Carolina's same-day registration rules, it was largely repealed by North Carolina Session Laws 2013-381, § 16.1.  After the Fourth Circuit held this repeal unlawful, N.C. State Conf. of the NAACP v. McCrory, 831 F.3d 204 (4th Cir. 2016), section 163-82.6A was given legal effect again.  However, Numbered Memo 2016-15 has effectively housed North Carolina's same-day registration laws from September 22, 2016, until January 1, 2024, because Chapter 163 was never amended to codify the holding in McCrory.  (See Doc. 49-2 at 4 (NCSBE Numbered Memo 2016-15, Appendix A).)  Section 163-82.6B now appears to abrogate the legal effect of Numbered Memo 2016-15's Appendix A.  N.C. Gen. Stat. § 163-82.6B(a) ("Notwithstanding any provision of law to the contrary . . . .").

[2] HAVA refers to the Help America Vote Act, 52 U.S.C. § 20901 et seq.  A HAVA-compliant document under S. 747 is one of the following: (1) A current utility bill; (2) A current bank statement; (3) A current government check; (4) A current paycheck; (5) Another current government document; (6) A current document issued from the institution who issued the photo identification shown by the voter pursuant to G.S. 163-166.16.  N.C. Gen. Stat. § 163-82.6B(e).

5

forwardable card was returned as undeliverable, the county board would send a second one. N.C. Gen. Stat. § 163-82.6A(d) (2012); N.C. Gen. Stat. § 163-82.7(c)-(f). However, given the short window between early voting and the county canvass, in some instances the second card was returned as undeliverable <u>after</u> the county canvass. In those instances, although those SDR voters failed address verification, their votes were counted. N.C. Gen. Stat. § 163-82.7(g); (Doc. 49-2 at 3 (NCSBE Numbered Memo 2016-15)).)

When the Postal Service returned the second card as undeliverable <u>before</u> the county canvass, however, the statute before S. 747 provided that the ballot (then considered a "retrievable absentee" ballot) could be challenged pursuant to section 163-89,[3] which authorizes a challenge procedure for absentee ballots to occur ten days after the election. N.C. Gen. Stat. §§ 163-82.7(g)(2), 163-182.5. If this occurred, the county board "need not try to notify the applicant further." <u>Id.</u> § 163-82.7(f).

S. 747 amends the address verification system for SDR voters. In pertinent part, the challenged "undeliverable mail provision"

---

[3] These section 163-89 challenges have not occurred for several years, based on the NCSBE's interpretation of an injunction issued by this court in 2018 against third-party voter challenges based on undelivered mail. <u>See</u> <u>Voto Latino</u>, 2024 WL 230931, at *5 (referencing injunction in <u>North Carolina State Conference of the NAACP v. Bipartisan Board of Elections & Ethics Enforcement</u>, No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018)).

now reads:

> Notwithstanding any other provision of this Chapter, if the Postal Service returns the first notice required under G.S. 163-82.7(c) as undeliverable before the close of business on the business day before canvass, the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count.

N.C. Gen. Stat. § 163-82.6B(d).

This court preliminarily enjoined the enforcement of this provision in two related actions. See Voto Latino, 2024 WL 230931, at *31. Specifically, the NCSBE and others are enjoined from

> utilizing the procedures of N.C. Gen. Stat. § 163-82.6B(d) to remove from the official count the votes of the ballot of any voter who has provided contact information in the registration process and whose first notice required under N.C. Gen. Stat. § 163-82.7(c) is returned by the Postal Service as undeliverable before the close of business on the business day before the canvass, without first providing such voter notice and an opportunity to be heard.

Id. (emphasis added).

Subsequent to the injunction, the NCSBE implemented a procedure that it represents is intended to comply with this preliminary injunction. (See Doc. 53-1 (Numbered Memo 2023-05 (Jan. 29, 2024 Update)).) NCSBE stated that this procedure was adopted pursuant to N.C. Gen. Stat. § 163-22.2, which provides that NCSBE may adopt interim rules and regulations if a court determines an election law is invalid or unenforceable. (Id. at 1 n.2.) Given the preliminary nature of the court's injunction and the interim nature of NCSBE's rules, the court will assess

7

Defendants' motions with respect to section 163-82.6B as written. Cf. Deal v. Mercer Cnty. Bd. of Educ., 911 F.3d 183, 192 (4th Cir. 2018) ("[A] defendant does not meet its burden of demonstrating mootness when it retains authority to reassess the challenged policy at any time." (internal quotation marks omitted)).

**B.  The Complaint**

The facts outlined in Plaintiffs' complaint (Doc. 1), which are taken as true for the purpose of the motions to dismiss, show the following:

Plaintiff Democracy North Carolina ("Democracy NC") is a 501(c)(3) "dedicated to increasing voter access and participation and reducing the corrupting role of money in politics through research, organizing, and advocacy." (Id. ¶ 14.) It advocates for early voting sites and times and engages with young voters through a leadership program on "all aspects of community organizing advocacy, and communications pertaining to voting rights." (Id.)

Plaintiff North Carolina Black Alliance ("NC Black Alliance") is a 501(c)(3) organization that "addresses policy and economic issues to enhance Black communities by developing and promoting systemic policy change as well as youth and leadership development." (Id. ¶ 15.) It engages college students, including by helping students register to vote. (Id.)

Plaintiff League of Women Voters of North Carolina ("League")

8

is a 501(c)(3) organization that "promotes political responsibility through informed and active participation in government, including by encouraging its members and the people of North Carolina to exercise the right to vote." (<u>Id.</u> ¶ 16.) It conducts voter registration, get-out-the-vote programs, and distribution of election information. (<u>Id.</u>)

Defendant NCSBE is the agency responsible for the administration of the election laws of the State of North Carolina. (<u>Id.</u> ¶ 22.) Defendants Alan Hirsch, Jeff Carmon III, Stacy Eggers IV, Kevin Lewis, Siobhan O'Duffy Millen, and Karen Brinson Bell are officers of the NCSBE and are sued in their respective official capacities. (<u>Id.</u> ¶¶ 22-28.)

Legislative Intervenors are Philip E. Berger, President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives. They have intervened in their respective official capacities pursuant to Federal Rule of Civil Procedure 42(a). (Doc. 19; Minute Entry, Nov. 15, 2023); <u>see also</u> N.C. Gen. Stat. 1-72.2(a) (granting General Assembly leadership authority to intervene in any state court action challenging the validity or constitutionality of an act of the General Assembly and requesting that a federal court allow for intervention in such actions).[4]

---

[4] The court denied motions to intervene by the Republican National

Plaintiffs allege that the bloc of "young voters" aged 18 to 25 has grown substantially since 2012. (Id. ¶ 30.) They point to HB 589 (2013), SB 824 (2018), and gerrymandering as recent "attacks on young voters and their preference for early voting and same-day registration." (Id. ¶¶ 32-38.)

Plaintiffs allege that S. 747 continues this trend. (Id. ¶ 39.) Plaintiffs contend that an allegedly influential advocate, Cleta Mitchell of the Conservative Partnership Institute and the Election Integrity Network, wishes to erect barriers to student voting. (Id. ¶ 39.) They allege that Mitchell has made a number of disparaging statements about young voters. (Id. (Mitchell advocating to "limit voting on college campuses [and] same-day registration" and stating that election boards "just put the polling place next to the student dorm so they just have to roll out of bed, vote, and go back to bed").) Plaintiffs allege that "the drafting and passage of SB 747 was influenced by Mitchell and members of the North Carolina Election Integrity Team" and that Mitchell was "seen repeatedly in the General Assembly halls in the lead up to the passage of SB 747." (Id. ¶ 40.)

Plaintiffs point to several comments made in the legislative record as evidence of animus toward student voters. Namely, a

---

Committee, North Carolina Republican Party, and two individual voters (Doc. 25). (Doc. 42.) These organizations and individuals, however, are parties to the other two related actions.

representative allegedly stated during debate on a different elections bill shortly before the veto override on S. 747, "the problem is that college students don't understand the issues of local politics or the local people. . . . [W]hen you have a big university in a college town, the college students effectively have the ability to completely eliminate essentially the representation of the local people because they don't understand the issues." (Id. ¶ 41.) Another allegedly stated that college voters "may or may not be as well versed in the issues or really have a right to say within those local communities." (Id.)

Plaintiffs allege that nearly 50% of North Carolinians whose voter registration applications were rejected due to failed address verification between 2012 and 2022 were between 18 and 25 years old, despite the fact that this age group constitutes the smallest share of total voters. (Id. ¶ 62.) Plaintiffs attribute this in large part to alleged complex mailing systems on college campuses, which they say often results in undeliverable mail. (Id. ¶¶ 65-68.)

Relying on these allegations, Plaintiffs allege that "Defendants have deprived and will continue to deprive young voters seeking to register and vote using same-day registration during the early voting period of their right to adequate notice and a meaningful opportunity to be heard prior to the removal of their ballot from the official count." (Id. ¶ 106.) Plaintiffs plead

11

three counts in the complaint: (1) denial of procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution; (2) undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution; and (3) intentional discrimination in violation of the Twenty-Sixth Amendment to the U.S. Constitution. (Id. ¶¶ 94-118.) They seek a declaration that N.C. Gen. Stat. § 163-82.6B is unconstitutional, an injunction preventing its enforcement, and costs and attorneys' fees. (Id. at 41-42.)

Defendants filed their motions to dismiss the complaint on December 15, 2023. (Docs. 45, 47.) The motions are fully briefed and ready for resolution.

## II. ANALYSIS

### A. Standing

Before turning to the Defendants' Rule 12(b)(6) motions, the court must first address Legislative Intervenors' motion to dismiss for lack of subject matter jurisdiction. Legislative Intervenors specifically assert that Plaintiffs lack standing to seek the requested relief. (Doc. 46 at 4.)

"No lawsuit may proceed in federal court unless the party seeking relief has Article III standing." Carolina Youth Action Project v. Wilson, 60 F.4th 770, 778 (4th Cir. 2023). The basic standing requirements that a plaintiff must show are: (1) he has suffered an "injury in fact," (2) the injury is "fairly . . .

12

trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted) (alteration and omission in original).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017). If there is such a plaintiff, the court need not consider whether other plaintiffs have standing to seek that same form of relief. Carolina Youth Action, 60 F.4th at 778.

The injury in fact "requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Lujan, 504 U.S. at 560).

"An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). When plaintiffs seek prospective relief, they must establish an

13

ongoing or imminent injury in fact. O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).

An organizational plaintiff can satisfy the standing requirements in two ways: either injury in its own right, or injury as a representative of its members. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). To have standing in its own right, the organization may show that an alleged illegal action "perceptibly impair[s]" its ability to carry out its mission, including by draining the organization's resources. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). An organization does not have standing, however, where injury results "not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices," such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation." Lane v. Holder, 703 F.3d 668, 674-75 (4th Cir. 2012) (internal quotation marks and citation omitted) (finding lack of standing where resource drain resulted from "inquiries [from members] into the operation and consequences of interstate handgun transfer provisions").

Some voter advocacy groups in this district have established standing on their own behalf under Havens Realty and Lane where they allege a link between their mission and the alleged illegal act, as well as resource expenditures beyond merely educating

14

voters and responding to inquiries. Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 182-83 (M.D.N.C. 2020) (finding standing where organization would divert resources to assist voters with registering to vote before 25-day deadline); Action NC v. Strach, 216 F. Supp. 3d 597, 617-18 (M.D.N.C. 2016) (finding standing where organization would divert limited time and resources to assist voters with registration after DMV allegedly failed to transmit voter registration information to NCSBE); N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections, 283 F. Supp. 3d 393, 402-03 (M.D.N.C. 2017) (finding standing where organization would divert resources to combat "en masse voter challenges").

Legislative Intervenors argue that Plaintiffs' allegations are "nothing more than generalized grievances" and are "speculative at best" because Plaintiffs have not identified anyone whose vote has yet been deprived. (Doc. 46 at 6.) They add that the alleged injuries are not "fairly traceable" to S. 747. (Id. at 8.)

Because all Plaintiffs seek the same form of relief, the court begins its analysis with the standing of the League which, if it meets its burden, eliminates the need for the court to examine the others further. Carolina Youth Action, 60 F.4th at 778. The League alleges that its mission is to "promote political responsibility through informed and active participation in

15

government, including by encouraging its members and the people of North Carolina to exercise the right to vote protected by the U.S. Constitution and the Voting Rights Act of 1965." (Doc. 1 ¶ 16.) More specifically,

> [The League] has 17 local leagues and approximately 1,800 members, who are registered North Carolina voters. With Leagues located throughout the state, [the League's] local leagues are engaged in numerous activities, including hosting public forums and open discussions on issues important to the community. Individual League members and volunteers invest hundreds of hours in activities that focus almost exclusively on efforts to inform voters. They regularly conduct civic engagement activities, such as voter registration, get-out-the-vote ("GOTV") programs and distribution of election information throughout the year, including during the early voting period. [The League] has developed a First Time Voter Engagement Program, which partners with local election boards and schools to encourage young voters to register and vote, including by informing high school and college students about the importance of voting and the rules governing elections. LWVNC works to develop productive relationships with local college campuses in order to most effectively perform this work. [The League] also devotes substantial time and effort to ensuring that government at every level in North Carolina works effectively and fairly in implementing voting regulations and procedures. To do so, [the League] advocates to make elections in the state more transparent, to support a strong and diverse judiciary, and to urge for appropriate government oversight.

(Id.)

The League alleges that S. 747 "directly impacts and frustrates [its] civic engagement missions and will result in a drain on their time and resources." (Id. ¶ 17.) Specifically, it contends that the alleged disenfranchisement will require its

16

members to "devote more resources to independent voter registration efforts" before the traditional twenty-five-day cutoff for registration because SDR voters "can no longer rely on their ballots being counted." (Id. ¶ 18.) Additionally, the League alleges that it will be "force[d] to divert time and resources away from their many other civic engagement activities in order to bolster their [get-out-the-vote], voter education, voter protection and voter registration efforts to counteract and overcome the harm caused by SB 747 to the communities they serve." (Id.)

The court finds that the League's allegations suffice to establish standing at this stage. In particular, the alleged erroneous disenfranchisement of SDR voters would hinder the League's mission of registering eligible voters and engaging in voter advocacy. Voto Latino, 2024 WL 230931, at *10 (finding Voto Latino alleged sufficient injury on substantially similar mission-hindrance theory). Moreover, the League has sufficiently alleged resource expenditures and diversions intended to address the change in law. Id. (finding Voto Latino alleged sufficient injury on substantially similar resource-diversion theory); Democracy N.C., 476 F. Supp. 3d at 182 (finding organizational standing where an organization would have to divert resources to warn voters about the risks of absentee voting and where efforts spent encouraging voter participation would be obviated by inadvertent

17

disenfranchisement).  Further, the League's alleged injury is traceable to the changes in S. 747 and would be redressable by the requested relief.  <u>Lujan</u>, 504 U.S. at 560-61.

Accordingly, the League has alleged facts at this stage to establish standing as an organization, which suffices for all Plaintiffs here.

**B.  Motion to Dismiss for Failure to State a Claim**

      **1.  Standard of Review**

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. (8)(a)(2).  A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  <u>Republican Party of N. C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's

18

favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570; see Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### 2. Counts One and Two

Defendants each move to dismiss counts one and two for failure to state a claim upon which relief can be granted. Count one alleges that the undeliverable mail provision violates same-day registrants' procedural due process rights. (Doc. 1 ¶ 95.) For this count, Plaintiffs argue that the test set out in Mathews v. Eldridge, 424 U.S. 319 (1976) should apply. (Id. ¶ 98; Doc. 50 at 16.) Count two alleges that the undeliverable mail provision is an undue burden on the right to vote. (Doc. 1 ¶ 108.) For this count, Plaintiffs argue that the test provided by Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992), commonly called "Anderson-Burdick," should apply.

19

(Id.; Doc. 50 at 21.) Defendants argue that Anderson-Burdick should apply to both counts and that under that test, Plaintiffs have failed to state a claim. (Doc. 48 at 13; Doc. 46 at 12.) State Board Defendants concede that if Eldridge is applied, Plaintiffs have stated a claim (Doc. 48 at 12-13), but Legislative Intervenors disagree (Doc. 46 at 16-20).

In Voto Latino, the court applied Anderson-Burdick to the plaintiffs' procedural due process claims and rejected the plaintiffs' request to apply Eldridge. Voto Latino, 2024 WL 230931, at *18. In doing so, the court found persuasive the reasoning of three circuit courts that faced similar procedural due process claims in the election regulation context. Voto Latino, 2024 WL 230931, at *17. In those cases, the courts all applied Anderson-Burdick exclusively and viewed application of Eldridge in the election context as contrary to Supreme Court precedent. Richardson v. Tex. Sec'y of State, 978 F.3d 220, 233 (5th Cir. 2020) (on motion to stay preliminary injunction); Ariz. Democratic Party v. Hobbs, 18 F.4th 1179, 1195 (9th Cir. 2021) (on review of entry of preliminary injunction); New Ga. Project v. Raffensperger, 976 F.3d 1278, 1282 (11th Cir. 2020) (on motion to stay preliminary injunction). Notably, the Ninth and Eleventh Circuits suggested that Anderson-Burdick may "conceptually duplicat[e]" Eldridge to some extent. Raffensperger, 976 F.3d at 1282; Hobbs, 18 F.4th at 1195 ("To the extent that

20

the Eldridge test would strike a different balance, we do not think that the Supreme Court's extensive jurisprudence on challenges to voting restrictions may be discarded merely by raising the same challenge under the banner of procedural due process."). Plaintiffs appear to agree with this view. (Doc. 50 at 18 (arguing that the Eldridge test "can be thought of within the Anderson-Burdick framework")); see also Voto Latino, 2024 WL 230931, at *22 (analyzing need for notice and opportunity to be heard within Anderson-Burdick analysis).

Plaintiffs have presented no persuasive reason to depart from the approach this court applied in Voto Latino. Plaintiffs cite to several district court opinions in this circuit that have applied Eldridge in the election context, but this court has already distinguished these preliminary injunction cases, which were decided without the full benefit of guidance from other circuit courts. Voto Latino, 2024 WL 230931, at *17 (discussing League of Women Voters of S.C. v. Andino, 497 F. Supp. 3d 59 (D.S.C. 2020), and Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158 (M.D.N.C. 2020)); see also Democratic Party of Va. v. Brink, 599 F. Supp. 3d 346, 361-62 (E.D. Va. 2022) (rejecting application of Eldridge on motion to dismiss).

Plaintiffs' citation to Barefoot v. City of Wilmington, 306 F.3d 113 (4th Cir. 2002), is similarly unavailing because the Fourth Circuit's observation there that due process "requires fair

21

and adequate procedures" was in the context of a land annexation dispute, not a political election. <u>Barefoot</u>, 306 F.3d at 124, 124 n.5. In fact, the court in <u>Barefoot</u> expressly noted that "there is no substantive constitutional right to vote on annexation." <u>Id.</u> at 121. Further, the <u>Barefoot</u> court did not discuss whether <u>Eldridge</u> or <u>Anderson-Burdick</u> should apply. <u>Id.</u> at 124. Indeed, applying <u>Anderson-Burdick</u> here comports with the approaches of other courts in an array of election litigation challenges. <u>See</u> <u>Fusaro v. Howard</u>, 19 F.4th 357, 364 (4th Cir. 2021) (applying <u>Anderson-Burdick</u> to Free Speech Clause claim where resident sought access to list of registered voters); <u>Obama for Am. v. Husted</u>, 697 F.3d 423, 430 (6th Cir. 2012) (concluding that <u>Anderson-Burdick</u> serves as "a single standard for evaluating challenges to voting restrictions"); <u>Weber v. Shelley</u>, 347 F.3d 1101, 1105-07 (9th Cir. 2003) (analyzing a due process challenge to a county's use of touch screen voting systems under the <u>Anderson-Burdick</u> framework); <u>Acevedo v. Cook Cnty. Officers Electoral Bd.</u>, 925 F.3d 944, 948 (7th Cir. 2019) (concluding that <u>Anderson-Burdick</u> applies "to all First and Fourteenth Amendment challenges to state election laws").[5] The court will accordingly apply <u>Anderson-Burdick</u> to

---

[5] This is not to say that <u>Anderson-Burdick</u> necessarily applies in every election-related matter. <u>See, e.g.</u>, <u>McIntyre v. Oh. Elections Comm'n</u>, 514 U.S. 334, 345 (1995) (not applying <u>Anderson-Burdick</u> where the statute at issue "[did] not control the mechanics of the electoral process").

counts one and two.[6]

After determining that <u>Anderson-Burdick</u> applies in <u>Voto Latino</u>, the court found that the plaintiffs there had shown that they were likely to prevail on the merits of their claims regarding the undeliverable mail provision. <u>Voto Latino</u>, 2024 WL 230931, at *28. Plaintiffs here have alleged an <u>Anderson-Burdick</u> claim substantially similar to that of the plaintiffs in <u>Voto Latino</u>. Accordingly, Plaintiffs have cleared the plausibility threshold for a Rule 12(b)(6) motion, which is lower than the likelihood of success standard for preliminary injunctions. <u>Ashcroft</u>, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement[.]'"); <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Defendants' motions to dismiss counts one and two for failure to state a claim will therefore be denied.

### 3. Count Three

Defendants have moved to dismiss Plaintiffs' third count, which alleges that the General Assembly adopted the undeliverable mail provision with the intent to discriminate on the basis of age, in violation of the Twenty-Sixth Amendment to the U.S.

---

[6] In a footnote in <u>Voto Latino</u>, the court observed that the outcome would likely be unaltered if the court applied <u>Eldridge</u> as well. <u>Voto Latino</u>, 2024 WL 230931, at *18 n.25. The same is likely true here on these motions.

23

Constitution.  (Doc. 1 ¶ 116.)

The Twenty-Sixth Amendment provides, "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."  U.S. Const. amend. XXVI, § 1.  The application of this amendment has not substantially developed since this court observed in 2016 that there is "a dearth of guidance on what test applies to Twenty-Sixth Amendment claims." N.C. State Conf. of the NAACP v. McCrory, 182 F. Supp. 3d 320, 522-23 (M.D.N.C. 2016), rev'd on other grounds, 831 F.3d 204 (4th Cir. 2016).

The Fourth Circuit has stated that a plaintiff bringing a Twenty-Sixth Amendment claim must "demonstrate an intent to discriminate on the basis of age."  Lee v. Va. State Bd. of Elections, 843 F.3d 592, 607 (4th Cir. 2016) (emphasis removed). The court added, however, that "it is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from the Fifteenth-Amendment jurisprudence."  Id.  A few other circuits have recently addressed this area of law.  Tex. Democratic Party v. Abbott, 978 F.3d 168, 190-91 (5th Cir. 2020) (discussing scope of the right to vote, denial, and abridgement at the time of Twenty-Sixth Amendment's ratification); Tully v. Okeson, 78 F.4th 377, 382-88 (7th Cir. 2023) (comparing similar language in the Fifteenth, Nineteenth,

24

and Twenty-Fourth Amendments, and the Voting Rights Act).

Plaintiffs third claim raises novel issues in this circuit. As a practical matter, though, there is a viable probability that this claim will become moot if the General Assembly codifies permanent changes to comply with this court's preliminary injunction order. As of January 29, 2024, the NCSBE has amended the undeliverable mail provision — notably, without any complaint thus far from any plaintiff across the three related cases before this court. (Doc. 53-1 (Numbered Memo 2023-05 (Jan. 29, 2024 Update)).) In doing so, the NCSBE has relied on its authority to "make reasonable interim rules and regulations" that become "null and void 60 days after the convening of the next regular session of the General Assembly." N.C. Gen. Stat. § 163-22.2. A more permanent change appears likely, as one would be consistent with the General Assembly's representation to this court that the intention of S. 747's undeliverable mail provision was for SDR voters to receive notice and an opportunity to be heard before their ballots are removed from the count. (Doc. 61 in 1:23-CV-861 at 108:21-25 (counsel for Legislative Intervenors stating at oral argument on preliminary injunction that "everybody assumed that the State Board would treat [the ballots of SDR voters who fail address verification] like the way they had treated one-stop absentee ballots and that [section] 163-89 would continue to apply"); Doc. 46 at 13-14 (Legislative Intervenors stating that

25

reading the statute to not provide notice and an opportunity to be heard is "an implausible reading").)

Additionally, the court would benefit from a more developed factual record and briefing. The parties dispute which legal framework the court should apply to determine if the undeliverable mail provision is intentionally discriminatory. (Doc. 51 at 9-11 (Legislative Intervenors advocating for application of Anderson-Burdick; Doc. 50 at 25-26 (Plaintiffs advocating for application of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977)).) A review of the cases they cite in support, however, fails to provide a consensus. Tex. Democratic Party, 978 F.3d at 190-91 (not discussing proper test to apply because law conferred benefit on those over 65 years old, rather than denying or abridging right of young voters to vote); Tully, 78 F.4th at 387-88 (same); Johnson v. Waller Cnty., 593 F. Supp. 3d 540, 614-17 (S.D. Tex. 2022) (finding right asserted was not the "right to vote" as understood at the time of amendment's ratification); Nashville Student Org. Comm. v. Hargett, 155 F. Supp. 3d 749, 757-58 (M.D. Tenn. 2015) (finding that exclusion of student IDs from list of acceptable voter IDs not to be the "type of state action the Twenty-Sixth Amendment is intended to protect against" and citing Crawford v. Marion Cnty. Election Bd., 553 U.S. 181 (2008), for the proposition that obtaining a voter ID is not a burden that triggers heightened scrutiny); League of Women Voters of Fla.,

26

Inc. v. Detzner, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (applying Arlington Heights on consent of the parties); One Wis. Inst., Inc. v. Thomsen, 198 F. Supp. 3d 896, 925-27 (W.D. Wis. 2016) (applying Arlington Heights and finding no discriminatory intent), rev'd on other grounds sub nom., Luft v. Evers, 963 F.3d 665 (7th Cir. 2020).

Consequently, there is good reason to avoid wading into this novel area of law at this preliminary stage. Cf. Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." (internal quotation marks omitted)). The court therefore elects to exercise its discretion to defer ruling on Defendants' motions regarding this claim until trial. Fed. R. Civ. P. 12(i); Design Res., Inc. v. Leather Indus. of Am., 900 F. Supp. 2d 612, 621 (M.D.N.C. 2012) ("Rule 12(i) of the Federal Rules of Civil Procedure grants a district court discretion to defer ruling on a motion under Rule 12(b)(6) until the time of trial."). Consequently, Defendants' motions to dismiss Plaintiffs' third claim will be denied.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motions to dismiss (Docs. 45, 47) are DENIED. A ruling on the legal sufficiency of

27

Plaintiffs' third claim under the Twenty-Sixth Amendment will
be deferred  pursuant to Federal Rule of Civil Procedure 12(i).


                                        /s/   Thomas D. Schroeder
                                     United States District Judge

April 2, 2024