# Exhibit 8

```
              UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
              CASE NO. 1:23CV00878-TDS-JEP


                                       )
DEMOCRACY NORTH CAROLINA;              )
NORTH CAROLINA BLACK ALLIANCE;         )
LEAGUE OF WOMEN VOTERS OF              )
NORTH CAROLINA,                        )
                                       )
                  Plaintiffs,          )
v.                                     )
                                       )
ALAN HIRSCH, in his official           )
capacity as CHAIR OF THE STATE         )
BOARD OF ELECTIONS; JEFF CARMON III,)
in his official capacity as            )
SECRETARY OF THE STATE BOARD OF        )
ELECTIONS; STACY EGGERS IV, in his     )
official capacity as MEMBER OF THE     )
STATE BOARD OF ELECTIONS; SIOBHAN      )
O'DUFFY MILLEN, in her official        )
capacity as MEMBER OF THE STATE        )
BOARD OF ELECTIONS; KAREN BRINSON      )
BELL, in her official capacity as      )
EXECUTIVE DIRECTOR OF THE STATE        )
BOARD OF ELECTIONS; NORTH CAROLINA     )
STATE BOARD OF ELECTIONS,              )
                                       )
                  Defendants.          )
                                       )



                      DEPOSITION
                         OF
                  ANDREW JOHN TAYLOR



       On Friday, March 28, 2025, commencing at
10:03 a.m., the deposition of ANDREW JOHN TAYLOR,
was taken on behalf of the Plaintiffs at Nelson
Mullins, 301 Hillsborough St., Suite 1400, Raleigh,
North Carolina 27603, pursuant to Rules 26 and 30
of the Federal Rules of Civil Procedure, before
Cynthia S. Boyd, RPR, and Notary Public in and for
the State of North Carolina.
```

1                MR. LOPERFIDO:  Good with everybody if
2        we take a quick break?
3                (Recess taken.)
4        BY MR. LOPERFIDO:
5             Q.   Welcome back, everybody.  As I noted
6        before the break, we're going to dive into section
7        III, which is "Response to, 'Young People
8        Constitute a Clearly Identifiable Class of Voter'."
9                  Dr. Taylor, correct me if I don't get this
10       quite right but it seems to be you're making two
11       primary points in this section; the first being
12       that there is no non arbitrary way to define young
13       voters and, No. 2, that young voters, however you
14       define them, don't have a distinct identity.  Is
15       that a fair characterization?
16            A.   Yes.
17            Q.   Okay.  I'm going to talk about each in
18       turn.  As to the first one, you're not offering an
19       opinion on what the correct age range is for young
20       voters, right?
21            A.   Only to the extent that I think 18 is the
22       bottom, I think most people would agree, is the
23       bottom or the minimum of that category.  But, yes,
24       that's correct.
25            Q.   And that's because that is the age

                                                              48

1  necessary to vote in the United States?
2       A.   Correct.
3       Q.   And North Carolina?
4       A.   Correct.
5       Q.   Do you have an opinion on what the upper
6  range should be to properly capture young voters?
7       A.   No.
8       Q.   And we just answered this but you agree
9  that the age range identified by plaintiffs are an
10 age range of individuals eligible to vote in North
11 Carolina elections?
12      A.   Yes.
13      Q.   Now, on page 5 of your report, you
14 identify commercial surveys, academic researchers,
15 and other sources that have talked about the issue
16 of young voters and used different age ranges.  Is
17 that a fair summary?
18      A.   Yes.
19      Q.   None of these resources cited
20 unequivocally state that 18- to 25-year-olds are
21 not young voters, right?
22      A.   Correct.
23      Q.   Several of them identify an 18 to 29
24 range?
25      A.   Yes.

49

1      Q.    And you would agree that plaintiffs' 18 to
2   25 range is encompassed in that range?
3      A.    Yes.
4      Q.    Do you know that the census breaks down
5   data by 18 to 24?
6      A.    Yes.
7      Q.    And that covers nearly the entirety of
8   plaintiffs' range as well?
9      A.    Yes.
10     Q.    I'm going to butcher these names but the
11  academic researchers Holbein, H-o-l-b-e-i-n, and
12  Hillygus --
13     A.    Holbein and Hillygus.
14     Q.    H-i-l-l-y-g-u-s.  They define young voters
15  at 18 to 29, right?
16     A.    Yes.
17     Q.    You note that there.  Would you say that
18  stopping at 29 is an arbitrary decision by them?
19     A.    Yes.
20     Q.    Is there an upper range that you could
21  provide as non arbitrary?
22     A.    As non arbitrary?  No.
23     Q.    Is a 40-year-old a young voter?
24     A.    Getting towards the end that I think you
25  could reasonably claim they were a young voter.

50

     1          Q.   Yeah.  Where do we start hitting the point
     2     in the age ranges where you can -- strike that.
     3     Let me ask that a different way.
     4          A.   If you are interested in having or doing
     5     an analysis where -- of voting behavior by age and
     6     you wanted relatively even sized groups hereby in
     7     terms of population, I think if you -- well,
     8     depending on how many groups you wanted, I suppose.
     9     But two groups is just too blunt of an instrument.
    10     Maybe you want at least three or four.  You know,
    11     if you go to 40 and you want four relatively
    12     comparably sized groups of voters, I think you're
    13     going probably a bit too far.  But, again, it
    14     depends on the type of analysis you want to do.
    15          Q.   Are you aware that the North Carolina
    16     State Board of Elections' election and registration
    17     data categorizes people into four age groups with
    18     the youngest being 18 to 25?
    19          A.   Not off the top of my head but, yes, I'll
    20     take your word for it.
    21          Q.   Does that change your view at all on
    22     whether 18 to 25 is an arbitrary designation?
    23          A.   No.
    24          Q.   And you're not saying that 18- to
    25     25-year-old voters are not young voters?

                                                              51

1  voters even though, as I've said, this is very
2  arbitrary.  The one thing I do write in the report
3  is -- and this is not synonymous.  But certainly
4  sometimes I think people consider when they say
5  young voters, they're really talking about maybe
6  first-time voters.  Of course you could be pretty
7  old and a first-time voter.  And if you do vote
8  habitually, you're really in your first election by
9  the time you're 21, 22, if we're just using
10 presidential races, and that might be a way to do
11 it.  But of course that would be lower than the 25
12 bar.  It would be 18s to 21s or 18s to 22s.
13      Q.   Would you dispute that evidence relating
14 to the experience of 18- to 25-year-olds is
15 evidence relating to young voters?
16      A.   If the experience has to do with voting
17 specifically, then I think you can make a case that
18 this is an experience that -- if you're between 18
19 to 25 and it has to do with you voting, I think you
20 can make a very strong case this has something to
21 do with a young voter, yes.
22      Q.   And if a law discriminates against a
23 subset of young voters, however defined, but not
24 all of them, would it be incorrect to say that the
25 law discriminates against young voters?

53

1            MS. RIGGINS: Objection. Go ahead.
2            THE WITNESS: We're making the
3    assumption, an uncontroversial assumption,
4    that the law discriminates against them?
5    BY MR. LOPERFIDO:
6        Q.   Yes, in this hypothetical.
7        A.   Yes. Then sure, that's right.
8        Q.   Now, switching to sort of the second point
9    which we summarized as young voters, however you
10   define them, don't have a distinct identity.
11       A.   Yes.
12       Q.   That picks up on page 6 of the report.
13       A.   Or 5, the last paragraph.
14       Q.   That's right. Bottom of 5, into 6. And
15   you note that there is some recent academics
16   studying which you identify as "age identity"?
17       A.   Yes.
18       Q.   Do you have a position on whether age
19   identity is a form of group identity?
20       A.   No. But I would say, as I write in the
21   report, that if you want to make the case there is
22   age identity, it's going to be a harder case to
23   make than, say, gender identity or racial identity
24   or other kinds of identities that people claim to
25   have.

                                                    54

1       Q.    Why is that?
2       A.    Because generally people themselves
3  independently or because of the frames that they
4  are presented broadly by society are less inclined
5  to think in those terms.  Age-related terms as
6  opposed to racial -- let's say, racial or gender or
7  ethnic terms.  Moreover, I think specifically with
8  regards to voting, the political science and social
9  science broadly and commentators have focused much
10 more on other kinds of identities as being
11 important in determining voting behavior than they
12 have age.
13      Q.    Like political party identity?
14      A.    Or mainly race and gender.  So a good
15 example of this with regards to gender and age
16 would be in the recent 2024 election where, you
17 know, the gender gap amongst particular age cohorts
18 was much larger in those lower age cohorts than it
19 was in the upper age cohorts.  And the treatment of
20 that is largely in terms of the gender gap rather
21 than any kind of age -- or gender identity in
22 voting rather than any kind of age identity in
23 voting.
24      Q.    You cite to the Trachtman Anzia and Hill
25 paper --

                                                         55

1  don't know that that exists exactly at the moment.
2       Q.   Most states in the United States require
3  registration to vote; is that fair?
4       A.   Yes.  There's one state that doesn't, I
5  think.
6       Q.   That's what I thought, too.
7       A.   I think it's Vermont.
8       Q.   Did you look at -- did you do a
9  comparative analysis of registration rates?
10      A.   No.
11      Q.   Is that something you think might shed
12 light on this question?
13      A.   Not really.  Because registration is a
14 necessary condition for voting.  And if you've got
15 high turnout, then registration doesn't seem to be
16 an impediment.  Relatively high turnout compared to
17 other states' registration doesn't seem to be an
18 impediment to that.  Now, if you've got a low one,
19 it may be because of excessively difficult
20 registration rules.  But we have got a high
21 turnout, as the data show, for younger voters
22 relative to a similar group in other states.
23      Q.   Did you look into whether youth turnout--
24 and I'm talking about the framework of youth
25 citizens in the CIRCLE data--was trending in any

89

 1     particular direction within North Carolina?
 2          A.   Whether turnout was trending?
 3          Q.   Yeah.
 4          A.   Well, in terms of its ranking, you can see
 5     it's a little bit all over the place in the 2022
 6     midterm -- excuse me -- in those three midterm
 7     elections that I look at.  So if you want to call
 8     that a trend analysis, you can.  But in all three
 9     instances, we're halfway or in the top half.  By
10     the way, I think the only state that doesn't have
11     registration is one of the Dakotas, not Vermont.
12          Q.   I think it is, too.  I forgot which.  And
13     then sort of the last question on this paragraph.
14     This comparison between states looking at midterm
15     elections for voters 18 to 29 years old, there's no
16     analysis here comparing those rates to voters
17     outside that age range, right?
18          A.   Correct.
19          Q.   Would that type of analysis shed light on
20     this question about historical attempts to restrain
21     youth voting in your opinion?
22          A.   I guess if, you know, we had our 50
23     pluses, the gap between the 50 pluses, let's say,
24     and the 18 to 29s or however you want to define
25     them, was much greater in North Carolina and that

                                                         90

1  understanding of what this bill is, which I
2  understand you're seeing it for the first time
3  today, consider this as a bill that could
4  potentially restrain the youth vote?
5           MS. RIGGINS:  Objection.  Go ahead.
6           THE WITNESS:  Could potentially.
7  BY MR. LOPERFIDO:
8       Q.   Yes.
9       A.   Possibly, yes, but not in a way that would
10 necessarily affect the overassessment that in
11 general, taking into account all voting practices,
12 practices related to elections, that North Carolina
13 has historically restrained the youth vote.  No, it
14 wouldn't alter that general assessment.
15      Q.   Okay.  Let's go to page 11.  It talks
16 about the second important provision which is
17 establishing preregistration processes for 16- and
18 17-year-olds and allowing states to expand their
19 processes to youth younger than 16.  You note that
20 North Carolina is one of maybe 18 states that
21 permit preregistration at 16?
22      A.   Yes.
23      Q.   Does the fact that North Carolina has
24 preregistration for 16- and 17-year-olds indicate
25 support for young voters in your mind?

                                                    125

1      A.    It seems to.   I think that would be a fair
2  assessment.   It doesn't necessarily have a material
3  effect on their voting, but it seems to be
4  consistent with that general idea.
5      Q.    Does an effort to remove the ability for
6  16- and 17-year-olds to preregister indicate the
7  absence of support for young voters?
8      A.    If that were to happen, it would place us
9  in a category with a large number of other states,
10 yes.  So it certainly would be in that opposite
11 direction, yes.  If it were to be enacted.  And
12 there are lots of people, I'm sure lots of
13 legislators in lots of states, who have different
14 views on preregistration that haven't been enacted
15 by their state legislatures.
16     Q.    Did you research the history of
17 preregistration in North Carolina when preparing
18 your report?
19     A.    The approach is that the data as of then,
20 as of the time I wrote the report.  So they're
21 not -- you know, it's not a broader historical
22 overview.  So I couldn't tell you exactly what
23 preregistration rules were in 1999, for example.
24     Q.    What about 2010?
25     A.    I'm assuming from the question that they

126

```
 1   were different.
 2       Q.   I can represent that in 2010 session laws,
 3   2009 NC session laws 541 originated the practice
 4   for preregistration in North Carolina.  Were you
 5   aware of that when preparing this analysis?
 6       A.   I mean, again, I know that preregistration
 7   -- you can preregister at 16.  And so by the
 8   practice, you mean the mechanics of doing so or
 9   whether you can --
10       Q.   The policy of permitting preregistration
11   originated in that session law in 2009 of the North
12   Carolina.
13       A.   I'll take your word for it.
14       Q.   You don't know one way or another if
15   that's the case?
16       A.   If it was in 2009?  No.
17       Q.   Okay.  And did you research the state of
18   that law from its origin to present day?
19       A.   No.
20       Q.   Okay.  Are you aware that in 2013, House
21   Bill 589 eliminated the ability for 16- and
22   17-year-olds to preregister?
23       A.   It's just a proposed bill.
24       Q.   No.  A passed legislation, passed Bill
25   589?
```

                                                        127

```
 1         A.   Yes.
 2         Q.   Are the members of the North Carolina
 3   legislature today exactly the same as the members
 4   of the North Carolina legislature in 2013?
 5         A.   No.
 6         Q.   Do you recall plaintiff's counsel asking
 7   you some questions about the time period of the
 8   year in which most people move?
 9         A.   Yes.
10         Q.   Do you have an understanding as to when
11   college students usually move onto campus?
12         A.   Yes, and I put that in the report.
13         Q.   And what month is that?
14         A.   Well, mainly it would be the month of
15   August.  Of course, if a student begins their
16   studies in the spring semester, it would be
17   January.
18         Q.   Do you recall plaintiff's counsel asking
19   you some questions about Pack the Polls at NC
20   State?
21         A.   Yes.
22         Q.   Can student-run organizations receive
23   funding at NC State from the University?
24         A.   Yes.
25         Q.   Do you recall very early this morning
```

222