# Exhibit 10

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 1:23CV00878-TDS-JEP


DEMOCRACY NORTH CAROLINA;

NORTH CAROLINA BLACK ALLIANCE;

LEAGUE OF WOMEN VOTERS OF

NORTH CAROLINA,

        Plaintiffs,

V.


ALAN HIRSCH, in his official

capacity as CHAIR OF THE STATE

BOARD OF ELECTIONS; JEFF CARMON III,

in his official capacity as

SECRETARY OF THE STATE BOARD OF

ELECTIONS; STACY EGGERS IV, in his

official capacity as MEMBER OF THE

STATE BOARD OF ELECTIONS; SIOBHAN

O'DUFFY MILLEN, in her official

capacity as MEMBER OF THE STATE

BOARD OF ELECTIONS; KAREN BRINSON

BELL, in her official capacity as

EXECUTIVE DIRECTOR OF THE STATE

BOARD OF ELECTIONS; NORTH CAROLINA

STATE BOARD OF ELECTIONS,


        Defendants.

_____/


DEPOSITION

OF

PAUL F. WHITE, Ph.D.


On Friday, April 4, 2025, commencing at

9:02 a.m., the deposition of PAUL F. WHITE, Ph.D., was taken on behalf

of Defendants via Zoom Videoconference, pursuant to Rules 26 and 30 of the Federal Rules

of Civil Procedure, before Taura J. Vulcano, RPR, CRR for the State of Georgia.

1      Q.   Great.  How would you describe your

2  professional background, Dr. White?

3      A.   I'm Ph.D. in labor economics and also got

4  my Ph.D. as sort of a joint major, if you will, in

5  labor economics and healthcare economics, and then a

6  minor in statistics.  And since I have received my

7  Ph.D., I've been a professional labor economist

8  working at two different firms since 1993, where my

9  work specializes in a couple of areas.  They're all

10  related to data analysis or calculations of

11  potential economic losses.  A lot of it is in the

12  context of employment issues, consistent with my

13  labor exhibition background.

14          In employment, a lot of work related to

15  disparate impact; also, some other work outside of

16  employment related to disparate impact.

17          Let me pause there and see if that gives

18  you what you need.

19      Q.   Yeah, you've anticipated my questions

20  pretty well.

21          Do you consider yourself to be primarily a

22  labor economist?  Is that how you describe your

23  work?

24      A.   I think that's a fair characterization,

25  yes.

14

Q.   And would it be fair to say that your work
on disparate impact and with disparate impact
concepts has come up primarily in the context of
your work as a labor economist?

A.   Yes, primarily but not entirely.

Q.   Got it.  Tell me a little bit more about
your work with disparate impact.  How did you first
come to an understanding and usage of disparate
impact concepts?

A.   Well, all right.  I'll just tell you about
my experience.  I don't want anything to make it
sound like I'm trying to interpret the law here.
But in disparate impact, take an employment example
where you have an employer who is either -- has
either conducted a reduction in force or is planning
on conducting a reduction in force and they're
choosing who to let go.  You can look at the data to
determine whether or not, for example, there is a
disproportionately high number of older employees
who are let go compared to the representation of
older employees in the workforce.

        So that's a very broad example, but a
common example?

Q.   Okay.  Thanks, that's helpful.  I want to
mark an exhibit here.  It's going to be your

15

1    without the Numbered Memo?

2         A.   Yeah.  I think the appendices in my

3    tables -- we can talk about specifics, if you would

4    like.  But I'll just start off by saying the

5    appendices in my tables, as you know, start off with

6    the pool of people who received the second mailer

7    and, of those people, who are ultimately denied or

8    not.  And you can look at the representation of the

9    youth among those who received a second mailer.

10   That gives you an indication of SB 747 by itself.

11             Does that make sense?

12        Q.   Okay.  Yeah, I think it does.  So you can

13   infer kind of what the results of Senate Bill 747

14   would be from your appendices -- or let me rephrase

15   for maximum clarity.

16             You could infer what the impact of Senate

17   Bill 747 without the Numbered Memo would be from the

18   appendices; is that right?

19        A.   You can.  And then we -- when we talk

20   about our results we say, "Okay, let's say the

21   second mailer or any other process like the second

22   mailer did exist, what would the outcome be?"  And

23   that's exactly what I report in certain parts of my

24   report.

25        Q.   Okay.  But fair to say the focus of your

35

1   analysis is Senate Bill 747 as modified by the

2   Numbered Memo?

3        A.    I don't know about the focus because we

4   look at, as you know, time periods before SB 747,

5   and then we do have two elections that are in play

6   after SB 747 was enacted and the notice-and-cure.

7   So I'm trying to report before SB 747 and after SB

8   747.

9        Q.   Okay.  We'll come back to that in a bit.

10        Okay.  I want to dig in a little bit into

11   your data construction processes and make sure I

12   understand them, and I have a few questions about

13   them.

14        A.   Okay.

15        Q.   To begin, can you give me a definition of

16   SDR relevant record as you implemented it?

17        A.   Sure.  All right.  Let me turn your

18   attention to page 6 of Exhibit 1.

19        Q.   Page 6 as tabulated or page 6 of the PDF

20   or document itself?

21        A.   As paginated.

22        Q.   All right.

23        A.   So under data construction section on page

24   6 of Exhibit 1.

25        Q.   Okay.

36

1    record.  I'm trying to keep myself straight, and I

2    know I'm bouncing back and forth, so thank you.

3                 I want to direct your attention to

4    paragraph 3 here.  It says:  My statistical tests

5    determine whether the number of younger registrants

6    who were denied is statistically significantly

7    different than the number we would expect to have

8    been denied given the representation of younger

9    registration among all registrants.

10               Did I read that right?

11        A.    You did read that right, yes.

12        Q.    Can you give me a brief synopsis of how

13   your statistical tests make this determination?

14        A.    Yeah.  I think when I was reviewing this

15   report, if I had had the chance to write it over

16   again, I would have been more specific by saying

17   "same-day registrants" not "all registrants" in that

18   paragraph.

19        Q.    Okay.

20        A.    Because our pools are limited to same-day

21   registrants.

22        Q.    Okay.  So accepting for purposes of this

23   question your limitation to same-day registrants

24   here, walk me through a little bit how your

25   statistical tests make that determination.

                                                      65

A.   Okay, sure.  We look at, for a given pool

of registrants -- and, again, they're same-day

registrants and, in our analysis, they're same-day

registrants who were sent the second mailer, what is

the representation of younger registrants in that

population?  And let's say they make up 20 percent

of that population.  Then we conduct statistical

tests to see if the denials, all the denials,

younger registrants make up roughly 20 percent of

all the denials in that same pool.  And then if the

percentages are close enough to each other, then

it's not statistically significant.

But if it's substantially higher than

20 percent or substantially lower than 20 percent,

then our test will identify it as being

statistically significant.

Q.   Okay, that's helpful.

I want to turn to page 10 of the report

where I think you get into this in a little more

detail.  Paginated number 10.

A.   Okay.

Q.   Are you there?

A.   I am.

Q.   Great.  That first full sentence at the

top of the page says:  Analyzing this second mailing

66

1    population allowed for comparison to the second

2    mailing population who were treated under the same

3    policy, GS   163-82.7, in elections prior to 2024.

4            Did I read that right?

5       A.    You did.

6       Q.    Who is the second mailing population here?

7    Do you mind defining that for the record?

8       A.    Yeah, those are the registrants who

9    received the second mailing prior to 2024.

10      Q.    Is it received or sent the second mailing?

11      A.    Good point.  Yeah, they were sent the

12   second mailing.

13      Q.    Okay.  Just want to be clear.  I do the

14   same thing all the time.

15      A.    Yeah, sorry about that.

16      Q.    All good.

17      A.    Thank you for clarifying that.

18      Q.    So saying it succinctly, this is limiting

19   to people who were sent a second verification

20   mailer, right?

21      A.    Yes.

22      Q.    Okay.  And SDR relevant records, as you've

23   defined them, who were sent a second mailing?

24      A.    That's right.

25      Q.    Okay.  I want to go a little further down

the page, not even that much farther.  The very next

sentence.  It says:  After limiting the data to the

relevant pool of the registration applications and

then identifying the denials from the same pool, and

I conducted my statistical analysis of denials using

the Fisher's Exact test and the Mantel-Haenszel

method for aggregation.

        Did I read that right?

    A.    You did.

    Q.    Okay.  So this is comparing the rate of

denials and the rate of acceptances within the same

pool of registrations, right?

    A.    That's right.

    Q.    Or registration attempts.

    A.    Yes, that's correct.

    Q.    And that pool is what we're calling the

relevant pool here?

    A.    Yeah.  So as I mentioned before, SDR

registrants who were sent a second mailing -- and

that's the largest population of people, but then we

split it up various ways, as you know, but that's

correct.

    Q.    Okay.  That relevant pool here is same-day

registrants, as you've defined them, who received a

second mailer -- or not received.  See, I did it

1    there -- who were sent a second mailer?

2        A.    Correct, who were sent a second mailer.

3        Q.    Perfect.  And then I want to go to the end

4    of that paragraph.  The final sentence, it says:

5    The goal of this analysis of denials was to

6    determine whether the representation of younger

7    registrants among those who were denied was

8    substantially above or below their representation

9    among registrants in the relevant pool, which in

10   this case was the pool of those who were sent the

11   second mailing.

12           Did I read that right?

13       A.    You did.

14       Q.    So do I understand it correctly this is

15   determining whether younger voters experienced a

16   higher rate of failure than older voters do for the

17   second mailing?

18       A.    No.  This is not whether they fail more in

19   the second mailing.  It's of those who were sent the

20   second mailing, were they ultimately verified or

21   denied; and are the denial rates significantly

22   different between older and younger registrants

23   among SDRs who are sent a second mailing.

24       Q.    Okay.  Talk me through the difference

25   between what I said and what you said.  Because I'm

69

1  second mailer, but only the rates at which those

2  younger voters who receive the second mailer and

3  those older voters who receive the second mailer

4  fail the second mailer?

5       A.   That is correct.  I have numbers in my

6  tables that will show those representation rates

7  among older and young registrants who receive the

8  second mailer.  But my analysis is on the denial

9  rates of those people.

10      Q.   Okay.  And your analysis shows that there

11  is no statistically significant difference between

12  the denial rates of younger voters of who were sent

13  the second mailer and the denial rates of older

14  voters who were sent the second mailer; is that

15  right?

16      A.   That's the general conclusion.  There are

17  some pockets here and there that I report in my

18  report -- that I report in my Exhibit 1, but that's

19  the general conclusion, yes.

20      Q.   Okay.  I want to turn back to page 2

21  again, paginated page 1 in that paragraph 3.  And so

22  accepting, also, your clarification earlier that

23  this is given the representation of younger

24  registrants among all same-day registrants, right,

25  not all registrants?

71

1   allegation of the Complaint.  And so SB 747 followed

2   by the notice-and-cure process is taking the process

3   all the way to the finish line, which is the finish

4   line being where the ballots are actually counted.

5   If you stop just with the representation of those

6   who received the second mailer, that's not the

7   finish line of what's actually happening to these

8   people.  It's a hypothetical world that the

9   notice-and-cure process didn't exist, but it does.

10      Q.   Okay.  I guess my question is a little

11  different, which is -- let me try to rephrase it

12  this way.  Even in the world with the

13  notice-and-cure process, which we both agree was in

14  effect for the 2024 elections, right?  We both agree

15  it was in effect for the 2024 elections?

16      A.   Yes, we agree.

17      Q.   Even in that world, isn't the rate at

18  which younger voters failed the first mailing and

19  thus get entered into the cure process and the rate

20  at which older voters fail the first mailing and get

21  entered into the cure process, isn't that a relevant

22  point to consider when determining whether or not

23  the policy of one mailer plus notice-and-cure has a

24  disparate impact?

25      A.   But if the -- if that rate by which

1    younger registrants and older registrants get sent

2    the second mailer under SB 747, so 2024, if that was

3    occurring before SB 747 as well, which it was, then

4    it's not relevant because it doesn't isolate the

5    effects of SB 747.  If this is a trend that was

6    happening before SB 747, then that's not because of

7    SB 747.

8           Q.   But you would agree with me that if the

9    trend was occurring before Senate Bill 747 and the

10   trend continues after Senate Bill 747, then the

11   differential treatment of Senate Bill 747 will have

12   an impact if that difference is large?

13          A.   I don't understand your question, because

14   if the trend was essentially the same before and

15   after SB 747, then it doesn't have an impact.  So

16   maybe I don't understand your question.

17          Q.   It doesn't have an impact or it doesn't

18   have a causal impact?

19          A.   The way I think about this is we can look

20   at the trends that were happening before SB 747.

21   And when I say "trends," I'm thinking primarily

22   about two things.  So the representation of younger

23   registrants who get the second mailer, you can look

24   at that.  And then you can look at the ultimate

25   outcomes of these people before SB 747.

1           Before SB 747, that would be the second

2    mailer; and after SB 747, that would be the

3    notice-and-cure process.  And that, to me, is what's

4    addressing the claims in the Complaint.  Has

5    something really materially changed before SB 747

6    and after SB 747 with respect to the ultimate

7    outcome of these people.

8           Q.   But that's not quite what your analysis

9    shows, does it?

10          A.   It does, very much so.

11          Q.   Doesn't your analysis just show that the

12   existence of the second mailer -- let me rephrase my

13   question.

14          Doesn't your analysis show that younger

15   voters and older voters do not fail the second

16   mailer at statistically meaningfully different

17   rates?

18          A.    It does show that, but it also -- from

19   that, you can conclude that -- and we can go to one

20   of my analyses and I can show you.  From that, you

21   can conclude that what was happening before SB 747

22   with respect to the pools of people and the effects

23   of the second mailer is pretty consistent with

24   what's happening after SB 747 with respect to the

25   pools of people and the effects of the

80

1    notice-and-cure process.  So, whereas, the Complaint

2    is saying so much has changed because of the

3    notice-and-cure process, not much has changed.

4         Q.    So you're --

5         A.    I have analysis -- I'm sorry.

6         Q.    I'm sorry.

7         A.    You know what my bad habit is?  I pause to

8    make you think I've stopped and after three or four

9    seconds, I start back over and I talk over you.

10   I'll try to stop doing that.

11             But yes, I have an analysis that will show

12   before and after SB 747.

13        Q.    Okay.  So is that another way of saying

14   that Senate Bill 747 did not affect the rates at

15   which younger voters and older voters would fail the

16   second mailing?

17        A.    Well, SB 747 doesn't address the second

18   mailing, right.  And so maybe another way of -- I'm

19   going to rephrase your question and make sure it's

20   what you're asking.

21             Does SB 747 change the ultimate outcome of

22   the registrants by age, right?  And I don't believe

23   it does.  I don't think the data shows that it does.

24   If you do an analysis before and after SB 747 and

25   take it to the finish line, which is whether their

81

1    ballots get counted or not, which I think is

2    consistent with the allegations in the Complaint, I

3    don't think much has changed.  I think the

4    notice-and-cure process is doing a lot of the same

5    work that the second mailer did before SB 747.

6         Q.   So it's your testimony here today that

7    younger voters using same-day registration before

8    Senate Bill 747 see their ballots counted at roughly

9    the same rate as they do after Senate Bill 747?

10        A.   I think that's a -- an accurate way of

11   characterizing it if I understand your question

12   correctly, yes.  Not much has changed after SB 747

13   because of the notice-and-cure process.

14        Q.   Okay.  I'm just thinking through all the

15   implications.  Give me a moment, Dr. White.

16        A.   Of course.

17        Q.   And you make that determination that

18   younger same-day registrants are more or less as

19   well off as they -- sorry.  Let me rephrase that to

20   be more clear.

21             You base that conclusion that younger

22   registrants who use same-day registration are seeing

23   their ballots accepted under Senate Bill 747 as

24   modified by the Numbered Memo at roughly the same

25   rates as they did see their ballots accepted pre

                                                     82

1    Senate Bill 747 when they received the two mailers?

2         A.    That's correct.    The trends are not very

3    different between those two time periods.

4         Q.    And you base that conclusion on the

5    showing that you make with the statistical analyses

6    that the second mailer does not have a differential

7    rate of failure for younger or older voters?

8         A.    That's -- the trends that I'm seeing

9    before SB 747 are similar to the trends I see after

10   SB 747.

11        Q.    And those trends specifically within the

12   context of the second mailer?

13        A.    It includes the representation of younger

14   registrants among the second mailers as well as the

15   denial rates for everybody, both before and after

16   SB 747.

17        Q.    Okay.    I think I understand.

18        A.    A shorthanded way of saying this is I

19   think the second mailer -- the effects of the second

20   mailer are similar to what I've seen in the data of

21   the effects of the notice-and-cure process.    That's

22   really what I think it boils down to.

23        Q.    Okay.    And where do you compare the

24   effects of the second mailer to the effects of the

25   notice-and-cure process in your reports?

83

1          A.    Let's go to Exhibit 1.

2          Q.    Okay.

3          A.    I've got it throughout, but I think the

4    easiest way to describe this is in Appendix F.

5          Q.    Okay.  Sorry.  Let me try and get there.

6    Okay.  I'm there.

7          A.    Okay.  And just to make it clear on the

8    record, Appendix F is our analysis of each election

9    across all counties.  So we've aggregated across all

10   counties so that we have one line per election, and

11   then there is really two parts of this exhibit,

12   because, as you know, we have two different age

13   comparisons.  One of them is 18 to 25.  The other

14   one is 18 to 29.  And so you could draw a line in

15   the middle.  One, two, three, four, five, six,

16   seven, eight, nine -- ten rows down, that's where we

17   go from one age comparison to the next.

18              Make sense so far?

19         Q.    Yes.

20         A.    Okay.  And to your earlier line of

21   questioning, we had the younger group pool and the

22   older group pool and those are the SDR registrants

23   who were sent a second mailer.

24         Q.    Right.

25         A.    Right?  And so that captures what you're

84

 1    asking about, the representation of younger

 2    registrants in that pool.   And then we can look at

 3    the denial rates of those people.

 4         Q.    Right.

 5         A.    And so pre-SB 747 are the first eight

 6    lines of that table, right?

 7         Q.    Uh-huh.

 8         A.    They capture 2016 to 2022.

 9         Q.    I'm following.

10         A.    And then post SB 747 are lines 9 --

11    capture March of '24 and November of '24.

12         Q.    Right.

13         A.    Okay.  So if you look at the denial rates,

14    the two little columns, you can see that the denial

15    rates for -- let's just take November of '24 -- for

16    younger registrants is 8.79 percent.

17         Q.    Yes.

18         A.    And older registrants, 8.63 percent.  So

19    the denial rates are very similar between the two.

20         Q.    Okay.

21         A.    And then you go one line up to March of

22    2024, there is 7.6 percent for younger, 7.3 percent

23    for older.  Then if you look higher up in those

24    columns, you can see that that 8 percent, the 7

25    percent, they're higher than some years, they're

85

1    lower than some years, but they're not unusually

2    different than the other years in the other

3    elections.

4         Q.    Uh-huh.

5         A.    Another way of saying that is of the SDRs

6    who are sent a second mailer or who didn't pass the

7    first one, over 90 percent are ultimately not

8    denied.

9         Q.    Okay.

10        A.    Right.  And that's for younger as well as

11   older.

12        Q.    Okay.

13        A.    And, you know, of course it changes from

14   one election to the next, but there is nothing

15   unusual about post SB 747 for those two years --

16   excuse me -- those two elections compared to the

17   other elections before SB 747.

18             And then to your earlier questions about

19   younger registrants and their representation in the

20   pool -- and this is where you asked questions

21   earlier, and this is what Dr. Quinn was talking

22   about -- in some cases there are more younger

23   registrants in the pool; in some cases there are

24   fewer, right?

25        Q.    I agree with that.

         A.    But that was the case before and after
SB 747.   So that's why I'm saying the trends don't
really change in the representation of younger
people in the pools, nor do they change in the
representation of younger people who were denied.
Therefore, if you compare the SB 747 elections which
include the notice-and-cure process, it seems like
the notice-and-cure process is doing a lot of the
same work the second mailers did pre SB 747.
         Q.    Okay.   Just a couple -- I appreciate that
explanation.   That's very helpful.   Just a couple
more questions and I think we'll be able to move on.
              You noted a moment ago -- I'll go in
reverse order -- you noted a moment ago that in some
election environments there are more younger voters
in the pool than older voters; and in some election
environments, there are more older voters in the
pool than younger voters; is that right?
         A.    That is right, yes.
         Q.    Do you have an understanding of whether
there are more voters under the age of 26 in the
North Carolina state electorate than there are
voters who are 26 or older?
         A.    Yes.   The number of voters 18 to 26 will
be a smaller percentage than the voters 26 and

                                                      87

1    higher.  But my point is the representation of

2    younger voters in the pools hasn't changed much pre

3    SB 747 versus post SB 747.  So it's not a phenomenon

4    that can be blamed on SB 747.

5         Q.   Right.  You're saying Senate Bill 747 does

6    not cause younger voters to fail the first mailing

7    at a higher rate than they did before Senate

8    Bill 747?

9         A.   That's correct.

10         Q.   Okay.  And then I want to turn now to the

11    denial rates that you were talking about a moment

12    ago.  You said that in some years -- some election

13    environments, excuse me, younger voters fail at a

14    higher rate than older voters and in some

15    environments, older voters fail at a higher rate

16    than younger voters; is that right?

17         A.   That is correct, yes.

18         Q.   So what that's demonstrating is that the

19    second mailer does not discriminate on the basis of

20    age, more or less?

21         A.   More or less.  And in SB 747, same thing

22    with the notice-and-cure process.

23         Q.   Okay.

24         A.   So when I look at those rates, that's --

25    before and after SB 747, that's what tells me that

88

1    trend is probably not caused by Senate Bill 747,

2    right?

3         A.   Right.

4         Q.   But can you also agree that if the trend

5    existed both before and after Senate Bill 747, that

6    Senate Bill 747 could still have an effect if it

7    were true that younger voters were sent the second

8    mailing disproportionally as compared to older

9    voters?

10        A.   And that's why we need to analyze the

11   entire outcome.  That's why we need to define what

12   the finish line looks like.  That's why we go into

13   the denial rate analysis, so that's why we did it

14   exactly the way we did.

15        Q.   But you would agree that it would still

16   have an effect even though it's not causing the

17   trend of disproportionally needing to be send a

18   second mailer?

19        A.   If the notice-and-cure process was not

20   having the same effect as the second mailer, that's

21   when I would conclude that it might be having an

22   effect.

23        Q.   In a world without the notice-and-cure

24   process?

25        A.   In a world without the notice-and-cure

                                                    92

1    process then, yes, things may be different.  In the,

2    again, hypothetical world without the

3    notice-and-cure process.

4        Q.   And you would agree with me that in the

5    hypothetical world without the notice-and-cure

6    process, if younger voters disproportionately

7    received a second mailer, Senate Bill 747 would have

8    a disparate impact on those voters even though it

9    did not cause the trend of younger voters

10   disproportionately being sent a second mailer?

11             MR. STRACH:  Objection.  Go ahead.

12       A.   I would have to look at the data

13   specifically for that question.  But, again, it's a

14   hypothetical world.  So what I'm analyzing is what

15   is actually happening to these people which is, I

16   think, what you all are alleging in your Complaint.

17       Q.   Is that a yes or is that a no?

18       A.   It's a -- I haven't done that analysis.

19       Q.   Okay.  I want to go back to Appendix B

20   just very briefly.  And I want to go to page 3 of

21   Appendix B, item number 10.

22       A.   Okay.

23       Q.   It says -- item number 10 says:  Calculate

24   age as of the election date.  And age is calculated

25   by assuming the 15th of the birth month/year