**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-CV-878**

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA; *et al.*,<br><br>                              *Plaintiffs*,<br><br>v.<br><br>ALAN HIRSCH, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS, *et al.*,<br><br>                              *Defendants*. | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION AND STATEMENT OF THE NATURE OF THE MATTER

Intervenor-Defendants Philip E. Berger, in his official capacity as President *Pro Tempore* of the North Carolina Senate, and Destin C. Hall, in his official capacity as Speaker of the North Carolina House of Representatives ("Legislative Defendants") submit this memorandum in support of their motion for summary judgment. Based on the undisputed material facts, summary judgment should be entered against Plaintiffs because (1) Plaintiffs lack standing post-*FDA v. Alliance for Hipp. Med.*, 602 U.S. 367 (2024) ("*Alliance*"); and (2) Plaintiffs' claims fail as a matter of law.

## STATEMENT OF FACTS[1]

It is undisputed that Plaintiffs challenge §10.(a) of Senate Bill 747 ("S.B. 747"), codified at N.C.G.S. §163-82.6B, which changes the mail verification process for same-

---

[1] Additional material facts are provided throughout the argument section and, in the interest of brevity, are not repeated here. Nor is the S.B. 747 statutory scheme and change covered in great detail due to previous briefing and orders, D.E. 63.

day registration ("SDR") applicants (hereinafter, the "Undeliverable Mail Provision"). Specifically, Plaintiffs challenge the change that requires the county boards of election to retrieve a SDR voter's ballot if one address verification mailer is returned as undeliverable by the business day before canvass, as opposed to two.[2] [Compl.[3] Prayer for Relief]. If the verification card comes back as undeliverable *after* the day before the date of county canvass, the ballot is counted. N.C.G.S. §163-82.6B.[4]

The initial draft of S.B. 747 was introduced in the Senate on June 1, 2023, with the goal of enhancing public confidence in elections. [Daniel[5] 22:5-15]. The Undeliverable Mail Provision stemmed from concerns with difficulties in verifying addresses close in time to the election. [Daniel 39:10-19, 177:20-178:22]. Under the pre-747 scheme, there was little time for completion of two mailers before canvass—especially for voters using SDR towards the end of early voting. [NCSBE 88:18-89:9]. Indeed, the normal lag time with two mailers frequently meant the second mailer was returned as *undeliverable* after canvass, resulting in counted votes from *unregistered* persons. [NCSBE 89:10-14, Ex.8, p.3].

---

[2] S.B. 747 did not change the requirements that an SDR applicant (1) complete a voter registration application; (2) provide proof of residence by presenting a HAVA-compliant document; (3) present a valid photo identification, and (4) review and sign the voter application under penalty of perjury. N.C.G.S. §163-82.6B. [Ex.1 to Mtn. for Summary Judgment ("NCSBE") 27:15-29:1]. S.B. 747 also did not change the requirement that the first mail verification be sent within two business days of the SDR voter application. [NCSBE 76:14-77:11].

[3] D.E. 1.

[4] This was enjoined in *Voto Latino v. Hirsch*, 712 F.Supp.3d 637 (M.D.N.C. 2024) and expanded to two days in updated Numbered Memo 2023-05.

[5] Ex. 2 to Mtn. for Summary Judgment ("Daniel").

Plaintiffs attempt to minimize these real concerns and paint a picture of legislation designed to target 18–25-year-olds. The undisputed facts show otherwise. It is undisputed that the *NCSBE*, after careful thought, *suggested* moving to a one verification mailing system, which the General Assembly adopted. [NCSBE 138:15-139:17, 161:5-8, 214:8-24, Ex.25]. Plaintiffs also ignore several substantive recommendations made by *NCSBE* which were adopted in full that enhanced the Undeliverable Mail Provision's administrative practicability—including a specific recommendation that a HAVA document serve as proof of residence, which was aimed at helping college students. [NCSBE 212:4-213:3, Ex.28 p.5; Mills[6] 210:1-22].

Central to Plaintiffs' case are allegations that the General Assembly enacted S.B. 747 in order to obstruct or limit young voters from utilizing SDR. But the factual record shows that age was never a consideration when drafting S.B. 747. [Daniel 231:9-235:8; Mills 246:1-15, 248:20-249:20]. In fact, it is undisputed that the sponsors of S.B. 747, Representative Mills and Senator Daniel, did not request any study or data on SDR mail verification failure rates or any age-based breakdowns of SDR usage. [Daniel 265:1-22, 266:8-11; Mills 241:21-242:21]. Representative Mills testified that he never believed young or college voters would be disproportionately affected by changes to the Undeliverable Mail Provision. [Mills 217:20-218:12]. The bill became law on October 10, 2023, when the General Assembly overrode the Governor's veto. N.C. Sess. Law 2023-140. Notably, S.B. 747 did not alter North Carolina's large number of early voting days

---

[6] Ex. 3 to Mtn. for Summary Judgment ("Mills").

(17), or the requirement that early voting include weekends, and hours outside of normal business hours. N.C.G.S. §163-166.35(d).

As a result of a preliminary injunction order regarding the Undeliverable Mail Provision in parallel related actions, *Voto Latino v. Hirsch*, 712 F.Supp.3d 637 (M.D.N.C. 2024) ("*Voto Latino*"), the State Board issued an updated Numbered Memo 2023-05 on January 29, 2024, detailing a cure process. [NCSBE Ex.29]. As part of the process, SDR applicants are asked to include an email address and/or phone number in case mail is returned undeliverable, and County Boards are instructed to use that contact information in the cure process. [*Id.*].

Plaintiffs Democracy North Carolina ("Democracy NC"), North Carolina Black Alliance ("NCBA"), and League of Women Voters of North Carolina ("LWVNC") filed this case on October 10, 2023, alleging that S.B. 747 violates voters' procedural due process rights (Count I), creates an undue burden on the right to vote (Count II), and discriminates against young voters on the basis of age under the 26th Amendment (Count III). [Compl.¶¶94-118].

Plaintiffs' 26th Amendment claim rests on an arbitrary class of young voters aged 18-25. [Compl.¶3]. But discovery revealed that Plaintiffs inconsistently define "young" voters and often conflate young voters with college voters. [Dem.NC[7] 61:8-63:9; NCBA[8] 56:10-18; LWVNC[9] 35:7-22; Compl.¶¶14-16, 63-68]. But not all college voters are 18-25,

---

[7] Ex. 4 to Mtn. for Summary Judgment ("Dem.NC").
[8] Ex. 5 to Mtn. for Summary Judgment ("NCBA").
[9] Ex. 6 to Mtn. for Summary Judgment ("LWVNC").

and not all 18–25-year-olds attend college. [Grumbach[10] 125:24-126:9]. The definition of young voters is amorphous, as shown by surveys, academic researchers, the Census Bureau, and other highly regarded sources that use age ranges 18-24, 18-29, and 18-34. [Taylor[11] 48:5-50:22; Grumbach 51:23-52:3, 214:1-23].

Even so, it is undisputed that Plaintiffs' purported class receives extra help with SDR—both before and after S.B. 747. It is undisputed that, unlike most voters, college students can vote either at their home or college address. [Mills 247:8-10; Forsyth[12] 97:1-11]. If a college student chooses to vote at their college address, they can utilize SDR by providing a student ID and either (a) a printout from their student portal showing the residence hall in which they reside, or (b) their address can be verified using a list of students and their residential addresses provided by the college/university. [NCSBE 225:17-227:5]. In the NCSBE's experience, the county boards regularly ask colleges and universities in their counties for such lists. [NCSBE 227:6-8].

In addition, the NCSBE encourages county boards of election to partner with local universities and colleges to create templates for student residential and mailing addresses. [NCSBE 227:19-228:4]. Wake, Durham, Guilford, and Forsyth are just a few examples of county boards with such templates. [NCSBE 227:19-228:4, Ex. 30; Forsyth 97:19-98:22, Ex.9]. The cure process in Numbered Memo 2023-05 also helps students with proper addressing. For example, if a poll worker did not properly enter a campus address, the

---

[10] Ex. 7 to Mtn. for Summary Judgment ("Grumbach").
[11] Ex. 8 to Mtn. for Summary Judgment ("Taylor").
[12] Ex. 9 to Mtn. for Summary Judgment ("Forsyth").

county board would correct it in the system, send a new verification card, and change the applicant's registration status to active pending the new verification. [NCSBE 231:19-233:13].

Finally, Plaintiffs cannot prove that S.B. 747 disproportionately burdens young voters, as defined by Plaintiffs. Legislative Defendants engaged Dr. Paul White, an expert in disparate impact analysis, to assess whether the Undeliverable Mail Provision has a disproportionate impact on young voters. [White[13] 14:1-15:21]. Dr. White used statistical tests to determine whether a second mail verification card disproportionately impacted younger SDR registrants compared to their older counterparts. [White 65:4-69:23]. Dr. White concluded that there is no statistically significant difference between the denial rates of voters under 26 and voters over 26 who were sent the second mailer. [White 71:10-19, 82:21-88:17]. Indeed, it is undisputed that Dr. White's analysis shows that of the SDR applicants sent a second mailer from 2016-2022, over 90% were ultimately verified, regardless of age. [White 86:5-88:17; Quinn[14] 127:20-131:2]. The same was true based on 2024 data using the notice and cure process in effect. [*Id.*]. Plaintiffs' expert, Dr. Kevin Quinn, did not perform any statistical tests on age and is not an expert in disparate impact. [Quinn 37:8-19, 195:19-196:11].

## STATEMENT OF QUESTIONS PRESENTED

I.    Whether Defendants are entitled to summary judgment.

---

[13] Ex. 10 to Mtn. for Summary Judgment ("White").
[14] Ex. 11 to Mtn. for Summary Judgment ("Quinn").

## ARGUMENT

### I. Standard.

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Where, as here, the trial burden rests on the non-moving party, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When that occurs, the non-moving party must respond with evidence "showing that there is a genuine issue for trial." *Id.* at 324. The issue must be material, i.e. based on substantive law, and genuine, allowing a "rational finder of fact to find" for the plaintiff under the requisite standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). In arguing summary judgment, Plaintiffs are bound by the claims in the Complaint. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009); *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) ("[A] court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.").

### II. Plaintiffs lack organizational and third party standing.

Since Defendants' Motions to Dismiss, D.E. 45, 47, Plaintiffs disclaimed associational standing and proceed only on organizational and third-party standing. [Compl.¶¶17-20; LWVNC 18:22-19:25]. However, both recent U.S. Supreme Court

7

precedent[15] and the undisputed evidence demonstrate that Plaintiffs cannot establish either form of standing.

### A. Plaintiffs lack organizational standing post-*Alliance*.

To establish Article III standing, a plaintiff must show "(i) that [they have] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Alliance*, 602 U.S. at 380. At summary judgment, a plaintiff must produce "specific facts" supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Organizations must show the same elements of Article III standing as an individual, including that an organization's core mission is harmed by the challenged action. *Alliance*, 602 U.S. at 395-96. Organizational standing requires more than objecting based on a generalized setback or "strong opposition to the government's conduct[.]" *Id.* at 394. Notably, in *Alliance*, the Supreme Court clarified that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* Strong interest in or strong opposition to governmental conduct is not enough. *Id.*

### i. Plaintiffs suffer no injury in fact.

An injury in fact must be both concrete and particularized, meaning it cannot be abstract and must impact the plaintiff in a "personal and individual way." *Alliance*, 602

---

[15] Since this Court's Order on Legislative Defendants' Motion to Dismiss [D.E. 63], the U.S. Supreme Court issued its opinion in *Alliance* which clarified and narrowed organizational standing. 602 U.S. 367. For the reasons discussed *infra*, the undisputed evidence reveals that Plaintiffs lack organizational standing post-*Alliance*.

8

U.S. at 381. This "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id*. An injury is concrete when it is actual and specific, not speculative. *Doe v. Va. Dept. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). Likewise, an injury is particularized when it impacts the plaintiff in an individualized manner. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "The injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Alliance*, 602 U.S. at 382 (citation omitted).

Each Plaintiff claims the challenged provisions of S.B. 747 harm their "civic engagement missions[,]" which "will result in a drain on their time and resources." [Compl.¶¶17-18]. In support, Plaintiffs offer several self-defined organizational missions, each one broader than the last. Democracy NC defines its mission as "promot[ing] public discussion about the vitality of democracy in North Carolina." [Dem.NC 23:15-24:9]. Democracy NC claims it focuses on "pro-democracy reforms," which includes voter education, registration, civic participation, and campaign finance reform. [Dem.NC 17:11-18:5, 24:2-26:5]. Similarly, LWVNC describes its purpose as "defending Democracy and empowering voters." [LWVNC 29:4-17]. But, like Democracy NC, LWVNC's policy positions span a variety of areas, including "natural resources" such as offshore oil and gas exploration and air quality, "social polic[ies]" including public education and elder care, and "fiscal polic[ies]" encompassing income tax, highway fund taxes, and sales tax. [LWVNC 50:9-51:12, Ex.5]. Likewise, NCBA identifies several general fields it works in, including education, economic justice, access to healthcare, and "democracy." [NCBA

9

18:8-14]. NCBA claims to be a universal support system for these categories, "connecting" and "sustaining" a variety of issue-specific organizations. [NCBA 54:10-55:22].

Plaintiffs argue that informing and registering "young" voters naturally falls within these missions, and the challenged portions of S.B. 747 affects their ability to advocate in other areas. [LWVNC 79:5-14; NCBA 87:8-89:6; Dem.NC 88:20-90:10]. But at their core, each Plaintiff merely alleges injury based upon routine expenditures in educating voters generally, which each Plaintiff admits they do before every election. [LWVNC 78:13-16; NCBA 77:22-73:20; 89:7-90:20; Dem.NC 89:8-17]. In fact, none of Plaintiffs' efforts are focused on educating 18–25-year-old voters specifically. At best, Plaintiffs are only interested in undergraduate college students on certain campuses. [NCBA 18:25-21:13; LWVNC 35:7-25; Dem.NC 21:8-22:12]. Both the evidence and precedent make clear that these claims are not sufficient to confer organizational standing. *Alliance*, 602 U.S. at 394-96

Each of Plaintiffs' missions share a common thread: they are speculative and focused on generally educating others. As Plaintiffs themselves cannot register to vote, they instead claim to advocate for the rights of all North Carolina voters. [Dem.NC 29:5-8; LWVNC 29:25-30:16, NCBA 17:2-18:4]. But Plaintiffs' claims belie their own standing arguments, as they admit they are often several layers removed from the very people they allegedly advocate for. [NCBA 26:10-27:21, 38:21-39:10; LWVNC 28:9-29:1; Dem.NC 26:17-27:13, 35:18-36:8]. For example, LWVNC does not actually work directly with college campuses and instead relies on local leagues, all of which are separate entities with their own boards. [LWVNC 16:1-6, 22:1-4, 35:7-36:9]. Meanwhile, Democracy NC's

10

work is limited to their summer internship program, which is itself limited to only certain college students. [Dem.NC 21:8-22:14]. Similarly, NCBA likens themselves to the head of a network, connecting various affiliates and partners that actually work with certain interest groups throughout the community. [NCBA 26:10-27:21]. These varying levels of selective involvement advocating for the rights of others illustrates the lack of cognizable harm. *Alliance*, 602 U.S. at 385-86 (a desire to impact change on others does not confer standing, nor does challenging the injury or regulation of others result in a direct injury).

The absence of any cognizable injury is even more palpable when compared to that of *Havens Realty Corp. v. Coleman*. 455 U.S. 363 (1982). In *Havens*, the plaintiff organization, HOME, operated an issue-specific counseling and placement service for moderate and low-income home seekers. 455 U.S. at 368, 378-79. However, because the defendant, Havens Realty Corporation, engaged in unlawful racial steering and provided HOME with false information concerning apartment availability, HOME was unable to effectively provide services. *Id.* at 379. As a result, HOME alleged it had to identify and counteract Havens' unlawful practices. *Id.* Thus, Havens' actions directly affected and interfered with HOME's core business of providing counseling and referral services. *Id.* Because of their intensely specific mission HOME established concrete and particularized harm to itself, directly linking the challenged actions to an unplanned demand for additional resources. *Id.*; *see also Alliance*, 602 U.S. at 395. This distinct purpose was central to *Alliance*'s admonition that organizational standing requires harm to the group's "core" mission. *Alliance*, 602 U.S. at 395.

In contrast to *Havens*, Plaintiffs here partner with other organizations who, in turn, work with North Carolinians across a range of areas. [NCBA 54:22-55:22, 67:20-68:11; Dem.NC 26:17-27:13; LWVNC 24:17-25:7, 28:2-29:1]. Many of these partners' advocacy efforts are unrelated to voter registration. [Dem.NC 25:1-23; LWVNC 29:18-30:16, NCBA 44:9-50:9]. Even in the instances where Plaintiffs assist partners on select college campuses, their advocacy efforts are limited to general education and responding to inquiries. [Dem.NC 69:8-70:20; NCBA 20:10-21:13, 41:11-42:10, 81:6-83:12; LWVNC 33:22-36:9]. To the extent Plaintiffs identify any resources diverted because of S.B. 747, each organization concedes that they expend the same or similar resources updating candidate guides and educating voters on *any* change in election law and for virtually *every* election. [NCBA 72:22-73:20, 89:7-90:20; Dem.NC 88:20-90:10; LWVNC 78:9-79:1].

In both form and function, Plaintiffs' allegations mirror the general education efforts and abstract budgetary concerns that the Fourth Circuit rejected in *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012), and which the Supreme Court recently rejected in *Alliance*. 602 U.S. at 394-96. As with both *Lane* and *Alliance*, there is simply no evidence that Plaintiffs are hindered in their ability to continue pursuing avenues of advocacy. [Dem.NC 14:4-15:18; NCBA 27:22-28:25, 54:10-55:22; LWVNC 35:7-36:9]. Thus, Plaintiffs cannot establish standing, even by "the barest of threads." *RNC. v. NCSBE*, 120 F.4th 390, 408-10 (4th Cir. 2024) (Diaz, C.J. concurring).

As the Supreme Court clarified, *Havens* is a narrow exception, not the general rule. *Alliance*, 602 U.S. at 396. Plaintiffs' generalized grievances under broad missions and diversions of unidentified resources amount to little more than "general legal, moral,

ideological, or policy objection[s]" to S.B. 747. *Id*. at 381. The Supreme Court carefully confined *Havens* to its specific context, and Plaintiffs offer no evidence supporting their expansive theory of standing.[16] Plaintiffs' attempts to liken routine spending choices to injury is exactly what *Alliance* forbids. *Id.* at 370.

### ii. Plaintiffs' alleged injuries are not fairly traceable to S.B. 747.

The causation element of standing requires a sufficiently close nexus between an alleged injury and the defendant's conduct. *Alliance*, 602 U.S. at 382; *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Causation is "substantially more difficult" to establish when the challenged action is of the government's regulation of a third party. *Alliance,* 602 U.S. at 382. A party cannot satisfy causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the courts." *Id.* at 383-84 (collecting cases).

Even if Plaintiffs' broad missions could fit into the narrow exception of *Havens*, the undisputed evidence reveals they cannot establish causation. Instead, Plaintiffs resort to "several complicated causation theories" attempting to show S.B. 747 led to their alleged injuries. *Alliance*, 602 U.S. at 386.[17]

---

[16] Since *Alliance*, other circuits and district courts have expressed increased skepticism at organizational injuries grounded in *Havens*. *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 904-05 (6th Cir. 2024); *N. Carolina All. for Retired Americans v. Hirsch*, 741 F. Supp. 3d 318, 330-32 (E.D.N.C. 2024); *Citizens Project v. City of Colorado Springs*, No. 1:22-CV-01365-SKC-MDB, 2024 WL 3345229, at *4-7 (D. Colo. July 9, 2024) (collecting cases where plaintiffs lacked organizational standing to challenge state voting laws).

[17] These "complicated causation theories" are also speculative. For example, Plaintiffs' expert Dr. Quinn and Legislative Defendants' expert Dr. White agree that there is no data that reveals how S.B. 747 would impact elections absent the cure provision from Numbered Memo 2023-05. [Quinn 142:1-11; White 35:25-36:8, 92:23-93:3].

Case 1:23-cv-00878-TDS-JEP    Document 120    Filed 04/11/25    Page 13 of 27

Plaintiffs' standing is premised on allegations that changes to SDR "forced" them to alter their advocacy efforts. [Compl.¶¶17-18, 102]. This causal chain is severed several times over. Not only do Plaintiffs admit they would have published the same voter guides, printed the same resources, and engaged with the same community partners regardless of S.B. 747, [NCBA 72:22-73:20, 89:7-90:20; Dem.NC 88:20-90:10; LWVNC 78:9-79:1], their claims of harm to young voters are entirely speculative. Indeed, Plaintiffs' theory of causation is reliant upon independent, intervening actions of third parties—i.e., 18–25-year-old voters—none of whom are before the court. The Fourth Circuit has repeatedly found this insufficient to establish causation. *Frank Krasner Enters., Ltd. V. Montgomery Cnty.,* 401 F.3d 230, 234-36 (4th Cir. 2005). Plaintiffs cannot establish any causal nexus between their actions and S.B. 747's Undeliverable Mail Provision. *McMaster,* 24 F.4th at 901.

### iii. Plaintiffs' claims are not redressable.

Redressability requires showing that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Alliance,* 602 U.S. at 380-81. Although causation and redressability often go together, the latter becomes "problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Doe,* 713 F.3d at 755.

Plaintiffs' claims are not redressable because of the injunction against the SDR provision of S.B. 747 in *Voto Latino,* 712 F.Supp.3d at 684,[18] and the cure provision in

---

[18] That injunction is a continuing obligation and is not subject to any temporal limitations or expiration date.

Numbered Memo 2023-05[19], which Plaintiffs have not challenged here. Both the Voto Latino injunction, which is a continuing obligation and is not subject to any temporal limitations or expiration date, and the updates to Numbered Memo 2023-05 directly address Plaintiffs' concerns with address errors, notice, and an opportunity to cure. Plaintiffs could have amended their Complaint if they had concerns with the use of Numbered Memo 2023-05 during the 2024 election, but they did not. As such, any complaints or evidence regarding the cure are not properly before the Court. *Wahi*, 562 F.3d at 617; *Quillen*, 789 F.2d at 1044. Another court order on the same issues does nothing to redress Plaintiffs' alleged injuries.

In light of the injunction preventing the removal of any SDR voter's ballot under the Undeliverable Mail Provision, Plaintiffs' speculative claims are not redressable. The only expert to perform a disparate impact analysis in this case, Dr. White, found that removing the second mailer had a minimal impact on all SDR voters, regardless of age. [White 78:17-82:13; 86:5-88:17]. Plaintiffs' expert Dr. Quinn failed to do a statistical analysis and admitted that Dr. White's statistical analysis showed similar fail rates between 2016 and 2024. [Quinn 127:20-131:2, 195:19-196:11].

Plaintiffs' theory of redressability is also woefully attenuated. Plaintiffs cannot show that removing the challenged provisions of S.B. 747 would allow their ill-defined group of voters to behave in a different manner, thus allowing Plaintiffs to spend their

---

[19] Plaintiffs might attempt to argue that Numbered Memo's cure is only interim under N.C.G.S. § 163-22.2. But the *Voto Latino* injunction still prevents the Undeliverable Mail Provision, as codified, from going into effect.

resources differently. [Dem.NC 88:20-90:10; NCBA 87:8-91:19; LWVNC 75:23-79:1]. Put differently, Plaintiffs' allegations are "conjectural [and] hypothetical," relying on several layers of unsupported presumptions, none of which establish redressability. *Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025).

### B. Plaintiffs lack third-party standing for similar reasons.

In limited circumstances, a plaintiff may assert the legal rights or interests of third parties. To do so, the burden is on the plaintiff to prove: (1) the named plaintiff was injured in fact; (2) the named plaintiff has a "close relationship" to the injured third party; and (3) there was some hindrance to the third parties in asserting their own rights. *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan,* 504 U.S. at 562 (quotation omitted). Typically, this requires some type of fiduciary duty or link between the plaintiff and the third party. *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). The Supreme Court looks upon third-party standing with disfavor. *Id.* at 130.

As shown *supra*, Plaintiffs were not harmed by S.B. 747. And any harm Plaintiffs might have suffered was eradicated by the injunction in *Voto Latino*. Furthermore, Plaintiffs do not have a "close relationship" to young voters, no matter the definition. Each organization's generalized goals apply to all North Carolina voters. They are not youth-centric organizations suing on behalf of youth. They are broad, democracy-focused organizations advocating on a wide range of topics. While LWVNC does list more specific

16

goals, such as certain goals for elder care and school-aged children, they do not include college students or 18–25-year-olds among them. [LWVNC 51:25-52:3, 62:9-22, 63:21-65:12].

Finally, there is no hindrance to young voters asserting their own rights. Take the parallel case of *Voto Latino,* in which named plaintiffs included organizations and an individual plaintiff, Sophie Mead.

## II. Plaintiffs' 26th Amendment claim fails as a matter of law.[20]

### A. Plaintiffs failed to identify a cognizable, protectable class.

To state a claim under the 26th Amendment, Plaintiffs must identify an age-based class. U.S. Const. amend. XVI, §1; *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 610 n.18 (E.D. Va.), *aff'd*, 843 F.3d 592 (4th Cir. 2016). Here, Plaintiffs' purported class of "young voters" is defined inconsistently and rests on characteristics that are too fluid to constitute a class.

Plaintiffs nominally define a class of young voters as those who are ages 18-25. [Compl.¶¶29-30]. But what is "young" is amorphous. Indeed, according to social scientists, "young voters" as a category may reasonably include ranges as small as 18-19 or as large as 18-34. [Taylor 48:9-51:23; Dem.NC Ex.11, p.2; Grumbach Ex.13]. Plaintiffs' own expert, Dr. Grumbach, relies upon sources with a variety of age ranges to make conclusions about "young Americans" throughout his report. [Grumbach 53:8-22, 64:21-65:22, 103:21-

---

[20] As this court has already noted, Plaintiffs' claims are novel. [D.E. 63]. Now that discovery is closed, it is clear that Plaintiffs' already murky claim fails as matter of law under any applicable standard.

Case 1:23-cv-00878-TDS-JEP    Document 120    Filed 04/11/25    Page 17 of 27

104:1, 118:20-119:17, Ex.5]. Furthermore, Plaintiffs themselves previously classified young voters as ages 35 and under. [Dem.NC 49:13-50:1, Ex. 4 pp. 3-4]. More tellingly, Plaintiffs spend much of their Complaint (and discovery) discussing college students. [*see, e.g.*, Compl.¶¶29-30]. Iterations of the words "college," "university," and "student" appear 144 times in Plaintiffs' Complaint. Referring to "students" as a heuristic for the 18-25 age range is both under and over inclusive, since not all individuals in that age group attend college, and many college students fall outside of that range. Plaintiffs also describe their class as "new voters" [Compl.¶6], without acknowledging that voters who are over 25 may also be new to voting, or that some college students might not be new. [Taylor 53:3-12]. Plaintiffs' identified "class" is in fact not age-based, but rather is based on college students, which is not a protectable class under the Twenty-Sixth Amendment.

### B.      S.B. 747 neither abridges nor denies young voters the right to vote.

Under the Twenty-Sixth Amendment: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XVI, §1.

The right to vote is denied when the law "absolutely prohibits" someone from voting. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 188 (5th Cir. 2020) (quoting *Goosby v. Osser*, 409 U.S. 512, 521 (1973)) ("*TDP II*"). S.B. 747 does not prohibit young voters from voting, nor does it prohibit them from utilizing SDR.

The right to vote is abridged only where the restriction on voting is put in place because of a voter's age. *TDP II*, 978 F.3d at 189. So, a plaintiff bringing a Twenty-Sixth Amendment claim must "demonstrate an intent to discriminate on the basis of age." *Lee*,

843 F.3d at 607. A law is facially neutral and nondiscriminatory when all individuals are subject to the same requirements. *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016).

Legislative Defendants maintain that *Anderson-Burdick* supplies the proper test for discrimination under the 26th Amendment: weigh the severity of a law's burden on voting rights against the legitimacy and strength of the state's interests. *Id.* at 716. Plaintiffs would prefer this Court apply the *Arlington Heights* factors for identifying discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). However, the Court need not decide which framework applies, as Plaintiffs' claim fails regardless.[21]

### i.    S.B. 747 survives scrutiny under the *Anderson-Burdick* framework.

Under *Anderson-Burdick*, heightened scrutiny applies only if the burden is severe, while more modest burdens are typically upheld if supported by important state interests. *Alcorn*, 826 F.3d at 716-17. And "when a state election law provision imposes only reasonable, nondiscriminatory restrictions…the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takshi*, 504 U.S. 428, 434 (1992) (quotation omitted).

Contrary to Plaintiffs' allegations, that a single verification mailing for SDR is a "severe burden" [Compl.¶110] the mailing is in fact a uniformly applied, non-mandatory *option* for registration that, when followed properly, almost always verifies eligible voters.

---

[21] As this Court noted, there is no consensus on which test applies. [D.E. 63 at 26-27]. *See also TDP II*, 978 F.3d at 194; *Tully v. Okeson*, 977 F.3d 608, 614 (7th Cir. 2020).

[Daniel Ex.31 p 6; Quinn 139:22-140:8].[22] There is also no special protection of a voter's "preference for early voting and same-day registration," Compl. ¶¶32-42,82-91, nor is there special protection for voter inaction or negligence. *See Rosario v. Rockefeller*, 410 U.S. 752, 757–58 (1973) ("[I]f their plight can be characterized as disenfranchisement at all, it was not caused by [the challenged voting regulation], but by their own failure to take timely steps to effect their enrollment."); *Burdick*, 504 U.S. at 438 (emphasizing that reasonable election regulations can require voters to act in a timely manner). In North Carolina, all individuals who are eligible to vote may choose to register either during the 340-day pre-election period, receiving two mailer verifications, or during the early voting window, receiving one. N.C.G.S. §§163-166.35(d); 163-166.40(b). [Quinn 23:20-25:13]. These rules apply equally regardless of age. More importantly, the number of mailers does not alter the requirement that voters provide a correct mailing address and retrieve their mail.

Any analysis of the state's interest begins with the presumption that legislatures act within their constitutional authority. *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961). The state need not prove its method is least burdensome or most efficient, so long as any "modest burden" is justified by important regulatory interests. *Nelson v. Warner*, 12 F.4th 376, 390 (4th Cir. 2021). As such, courts consistently recognize preserving election integrity and public confidence as legitimate state interests. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (recognizing the need to protect confidence "in the

---

[22] It is undisputed that verification rates are similar under the pre-747 regime and the post 747 regime with the notice and cure. [White 86:5-88:17; Quinn 127:20-131:2].

integrity and legitimacy of representative government"); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes."). S.B. 747 advances these interests by verifying that registrants reside where they vote and promoting election finality through timely verification before canvass closes. *See Democracy N.C. v. NCSBE*, 476 F.Supp.3d 158, 208 (M.D.N.C. 2020). [Mills 52:6-55:15].

S.B. 747 still allows North Carolinians ample opportunities to vote, while also ensuring county boards can verify SDR voter addresses before canvass. Because S.B. 747 does not present a significant burden on the right to vote, and the General Assembly has a compelling interest in the rights protected by S.B. 747, Legislative Defendants are entitled to summary judgment on Count III under *Anderson-Burdick*.

> **ii.     S.B. 747 survives scrutiny under the *Arlington Heights* framework.**

Under *Arlington Heights*, courts assess factors like historical context, legislative process, and disparate impact to determine discriminatory intent. *Arlington Heights*, 429 U.S. at 265-66. Heightened scrutiny applies only if an "invidious discriminatory purpose" was a motivating factor. *Id.* Mere "rancorous legislative history" cannot establish intent where the central facts show no discriminatory purpose. *South Carolina v. United States*, 898 F. Supp. 2d 30, 45 (D.D.C. 2012). Disproportionate impact alone is also insufficient. *One Wisconsin Institute, Inc. v. Thomsen*, 198 F.Supp.3d 896, 926 (W.D. Wis. 2016), *aff'd in part, vacated in part on other grounds, Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). Plaintiffs must show the law imposes burdens that voters cannot overcome with reasonable effort. *Id.*

21

Recently, North Carolina has been in the top half of states in youth voter turnout rankings. [Taylor 89:23-90:18]. In 2024, North Carolina youth registration increased compared to 2020, and youth turnout exceeded the 2024 national average. [Dem.NC 96:21-98:21, Ex.11, p.1]. Indeed, North Carolina is one of just eighteen states to offer preregistration beginning at age 16. [Taylor 125:15-126:4].

Looking to S.B. 747 specifically, the legislative process does not reveal a discriminatory purpose. As Plaintiffs admit, the legislative history for S.B. 747 reflects the General Assembly's efforts to balance public confidence in elections and finality with voter access. [Compl.¶¶82-84]. Indeed, Plaintiffs—as advocacy groups themselves—mostly criticize not the legislative process, but the efforts of other organizations to allegedly influence S.B. 747. [Compl.¶¶39-40].[23]  And though Plaintiffs point to two comments by unnamed legislators who may or may not have any involvement with S.B. 747, Compl.¶41, this minimal "rancorous legislative history" was related to an entirely different bill and does not change the central fact that S.B. 747 was enacted for legitimate, nondiscriminatory purposes of verifying voter residency and ensuring election finality. [Mills 52:6-55:15]. Plaintiffs cannot point to actual indicia of intent to discriminate against young voters, and Plaintiffs' expert, Dr. Grumbach, disclaimed any effort to wade into the minds of legislators. [Grumbach 127:21-128:23]. As the primary bill sponsors, Representative Mills

---

[23] The individuals and organizations that Plaintiffs lambast for alleged influence over SB 747 deny involvement in the drafting process of the challenged portions of the bill. [Ex. 12 to Summary Judgment Motion 65:1-9, 229:2-22; Ex. 13 to Summary Judgment Motion 71:20-72:12].

and Senator Daniel, both testified, age was not a consideration when drafting SB 747. [Daniel 231:9-235:8; Mills 246:1-246:15, 248:20-249:20].

Finally, there is no demonstrated disproportionate impact and, even if there were, any burden can be overcome with reasonable effort. Plaintiffs claim that "nearly 1/3" of same-day registrants are young voters. [Compl.¶4]. But they derive this statistic by dividing one percentage by another, using the "sort of statistical manipulation" that courts routinely reject for presenting a "distorted picture" of what are, in absolute terms, only small differences. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 680-81 (2021); *Holmes v. Moore*, 886 S.E.2d 120, 140 (N.C. 2023). Only 3% of **all** North Carolina voters used SDR in the November 2024 general election. [Quinn 38:16-39:7]. Even if Plaintiffs are technically correct that 7% of SDR votes were youth voters, this represents only 42,000 of the 5.7 million votes cast, or 0.7% of the total vote. [Quinn 91:21-92:20]. What's more, after accounting for notice-and-cure, less than 10% of this small pool of voters ultimately failed verification in the November 2024 election. [Quinn 129:21-131:13].

Plaintiffs' arguments about why young voters disproportionately rely on SDR are equally unavailing. Although Plaintiffs say young voters rely on SDR due to frequent moves [Compl.¶5], they fail to provide credible evidence on relocation rates based on age. Instead, they ask the court to make assumptions based on nothing but supposition. Moreover, while emphasizing that many young voters are students, Plaintiffs overlook that most students move in January or August—well before the SDR window opens— undermining the claim that standard registration is inaccessible to them. [Taylor 222:10-17]. Plaintiffs also say that young voters have "inflexible and irregular school or work

23

schedules" [Compl.¶5], without any comparison to the flexibility of older voters to choose standard registration versus SDR or without regard for 17 days of early voting, including weekends, and early/late hours. [Quinn 23:20-26:1]. Finally, Plaintiffs suggest that, because "many" young voters have only recently become eligible, the process is harder for them to navigate. [Compl.¶5]. Yet, the vast majority of 18–25-year-olds have not *recently* become eligible—all North Carolinians who are otherwise eligible to vote can register on or before their 18th birthday. [Taylor 53:3-12; 127:2-7].

The central facts concerning the history, legislative process, and potential discriminatory impact of S.B. 747 reveals no discriminatory intent. S.B. 747, therefore, does not violate the 26th Amendment, even under Plaintiffs' preferred test.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered against Plaintiffs on all claims.

Respectfully submitted, this the 11th day of April, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach (NCSB # 29456)
Alyssa M. Riggins (NCSB # 52366)
Nathaniel J. Pencook (NCSB # 52339)
Cassie A. Holt (NCSB # 56505)
Jordan A. Koonts (NCSB #59363)
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3779
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
nate.pencook@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Legislative Defendants*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 6,184/6,250

words as counted by the word count feature of Microsoft word.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By:<u>/s/ Phillip J. Strach</u>
        Phillip J. Strach
        N.C. State Bar No. 29456

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 11th day of April, 2025, the foregoing was filed and served upon all counsel of record via the Court's CM/ECF system.

**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach (NCSB # 29456)