**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-cv-00878-TDS-JEP**

DEMOCRACY NORTH CAROLINA; NORTH
CAROLINA BLACK ALLIANCE; LEAGUE OF
WOMEN VOTERS OF NORTH CAROLINA,

       *Plaintiffs,*

    v.

ALAN HIRSCH, in his official capacity as
CHAIR OF THE STATE BOARD OF
ELECTIONS; JEFF CARMON III, in his official
capacity as SECRETARY OF THE STATE
BOARD OF ELECTIONS; STACY EGGERS IV,
in his official capacity as MEMBER OF THE
STATE BOARD OF ELECTIONS; KEVIN
LEWIS, in his official capacity as MEMBER OF
THE STATE BOARD OF ELECTIONS;
SIOBHAN O'DUFFY MILLEN, in her official
capacity as MEMBER OF THE STATE BOARD
OF ELECTIONS; KAREN BRINSON BELL, in
her official capacity as EXECUTIVE DIRECTOR
OF THE STATE BOARD OF ELECTIONS;
NORTH CAROLINA STATE BOARD OF
ELECTIONS,

       *Defendants,*

    and

PHILIP E. BERGER, in his official capacity as
PRESIDENT *PRO TEMPORE* OF THE NORTH
CAROLINA SENATE; and TIMOTHY K.
MOORE, in his official capacity as SPEAKER OF
THE NORTH CAROLINA HOUSE OF
REPRESENTATIVES,

       *Intervenor Defendants.*

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

## <u>NATURE OF THE MATTER BEFORE THE COURT</u>

Defendants predicate their Motions on a revisionist history of the passage of SB 747—one that conceals the role of "election integrity" advocates, Cleta Mitchell and North Carolina Election Integrity Team ("NCEIT"), in restricting same-day registration ("SDR"). (Dkts. 119-22). Instead, Defendants attribute the change to the State Board of Elections. But the record is replete with interactions between NCEIT and the legislature, the product of a monthslong, successful influence campaign to enact several legislative priorities, including a crackdown on youth voting by SDR. The State Board never wanted this change, only offering an alternative proposal after realizing the legislature was determined to curb SDR. While Defendants now assert the timing of the two-mailer system as the motivation for SB 747, the record indicates this was a post-hoc justification.

Defendants also attempt to discount substantial evidence of disparate impact against young voters—the predominant users of SDR and the most affected by its changes—through dueling expert testimony, but summary judgment is not the proper forum for a battle of the experts.

Because the Court must decide genuine issues of material fact to grant Defendants' motions, the Court should deny those motions and set this matter for trial.

1

## STATEMENT OF FACTS[1]

### A. The Legislature Sought to Restrict SDR at Cleta Mitchell and NCEIT's Behest

#### 1. *Senator Daniel admits that he adopted NCEIT's SDR proposal*

Senator Warren Daniel was the co-chair of the elections and redistricting committee and SB 747's primary sponsor/bill handler in the Senate. Daniel 16:16-24, 125:6-18. In January 2023, during the initial framing of SB 747, NCEIT shared its "Post-Election Analysis," labeling SDR and "out of state college registration" as "challenges" and presenting the "eliminat[ion of] [SDR] during early voting" as Cleta Mitchell's recommendation.[2] Daniel 54:17-57:21; Ex. O at 19, 25, 27 (cleaned up). NCEIT's proposals were among "about 75 policy recommendations" from "election integrity groups" that the election chairs reviewed to "decide what to include in an election reform bill." Ex. P at 2, Daniel 85:16-86:20. Daniel considered James Womack, leader of NCEIT,

---

[1] Material facts are based on the excerpted transcripts of Warren Daniel (Ex. A, "Daniel"), Grey Mills (Ex. B, "Mills"), and Cleta Mitchell (Ex. C, "Mitchell"), and the 30(b)(6) representatives for NCEIT (Ex. D, "Womack"), the State Board of Elections (Ex. E, "SBE"), the Cumberland County Board of Elections (Ex. F, "Cumberland"), the New Hanover County Board of Elections (Ex. G, "NH"), the Forsyth County Board of Elections (Ex. H, "Forsyth"), Plaintiffs' experts Jacob Grumbach and Kevin Quinn (Ex. I, J "Grumbach", "Quinn"), Defendants' expert Andrew Taylor (Ex. K, "Taylor"), and each Plaintiff (Ex. L, M, N, "NCBA", "DemNC", and "League" respectively). Expert reports, deposition exhibits, and other case materials (described in Plaintiffs' accompanying Index) are also cited utilizing sequential lettered exhibits.

[2] Cleta Mitchell is the Senior Legal Fellow at Conservative Partnership Institute and founder and is the Founder of the Election Integrity Network ("EIN"). Dkt. 96-1 ¶9-10. She was a volunteer attorney for the 2020 Trump legal team in Georgia. *Cleta Mitchell*, Conservative Partnership Institute, https://cpi.org/staff/cleta-mitchell/ (last accessed May 9, 2025).

a "reliable" source on elections. Daniel 59:22-60:7. Daniel shared NCEIT's materials with his staff. Daniel 66:7-67:16, 74:2-76:7, 85:16-86:20; Ex. Q.

Daniel, the other Senate election chairs, and legal staff met with Womack and Mitchell on May 24, 2023 for two hours. Daniel 107:9-24; Womack 202:9-203:23. Womack and Mitchell presented a PowerPoint containing their recommendation to "eliminate" SDR or "at least" make all SDR ballots provisional. Ex. R at 7, 18 (cleaned up). Thereafter, Womack reiterated via email the "important features," including SDR, that NCEIT wanted "prioritized in the upcoming Omnibus bill," and offered "to assist with proposed language." Ex. S; Daniel 117:7-118:3. Daniel confirmed this concept was included in SB 747 because of groups like NCEIT: "the election integrity groups, this was a concern of theirs, same-day registrations. And so we felt like if it was a concern, then it made it into the bill." Daniel 113:19-114:10, 148:6-14.

Daniel testified that SDR wasn't "on [his] radar" and he didn't consider it a "significant aspect" or "major feature[] of the bill." Daniel 66:15-25, 135:2-6, 140:9-18. Daniel thought the SDR change would "give more confidence to the public" that only "legitimate" votes would count, Daniel 139:15-140:1, but had no evidence for this belief. Instead, he explained that sometimes bills are "not necessarily evidence driven as much as common sense driven," and that "sometimes we get focused on what we think is the right policy, and we don't necessarily have all of the background on what the logistical implications would be." Daniel 141:8-16, 148:19-149:4.

3

### 2. Rep. Mills sponsored and advanced numerous NCEIT priorities, including SDR

On March 1, 2023, Womack sent Representative Grey Mills (chair of the House elections committee, Mills 17:13-20) legislative priorities and proposed bill text. Ex. Q; Mills 86:15-89:25. Rep. Ted Davis later sent Mills the same proposals to "review" "so we can decide whether or not to file [them]." Mills 90:17-92:14; Ex. T. Womack suggested that Mills and Davis meet with him and Mitchell "to address the suite of proposed statutory changes we have submitted." Ex. U. Womack "applaud[ed] the House initiatives to limit [early voting and] to compel [SDR] to use a provisional ballot," even though such legislation had not yet been filed. *Id.* Soon thereafter, Mills sponsored HB 485, which made SDR ballots provisional, an idea Mills knew Womack supported. Mills 96:20-97:3, 113:18-115:11, Ex. V. Mills also sponsored HBs 770 and 772, which mirrored almost verbatim the proposed bill text NCEIT had sent him. *Compare* Exs. W-X *with* Exs. Y-Z.

SB 747 reached the House in June 2023. While Mills attested he had no knowledge of SB 747's genesis in the Senate, he agreed it mirrored NCEIT's SDR proposal. *See* Mills 49:12-18, 145:23-25. Mills understood that there was a concern about the timing of the two mailings. Mills 51:16-52:18.

When asked to explain the reasoning behind the SDR changes, Mills gave generic statements about needing a "better process" or "do[ing] better," Mills 51:16-23, 181:7-22, 193:19-194:5, 229:20-230:5; that it was a "good bill," Mills 31:23, 181:19, 230:10; and that the State Board requested it, Mills 30:6-7, 192:11-22, 194:10-16, 229:4-12. His reasoning for adopting the State Board's idea was "everybody seemed to like that a lot

4

better and it did seem to be more workable." Mills 209:15-210:7. He said what serves "election integrity" is "common sense." Mills 28:2-4. Womack "was shocked" that Mills was "unaware" of some basics of NC election law despite being election committee chair. Womack 129:6-21, 180:9-21.

### 3. Daniel and Mills did not study SB 747's effects

Neither Daniel nor Mills studied how SB 747 would affect SDR users or what interest it would serve. They did not (1) request data on SDR usage, Daniel 192:7-193:5, 232:17-233:3; Mills 241:21-243:8; (2) speak to any election workers, school administrators, or postal workers, Daniel 150:8-10, 262:5-24; Mills 240:4-10; or (3) investigate potential impacts on students, even when confronted with such concerns in legislative debate, Daniel 174:6-175:17, 181:10-182:9; Mills 217:2-24, 240:4-10, 246:1-15. Neither reviewed any evidence of pre-SB 747 SDR fraud. Daniel 186:20-187:4, 189:3-22, 234:2-5, 255:4-25; Mills 53:6-16, 56:2-57:13, 239:15-240:3. They also acknowledged SB 747 could disenfranchise eligible voters through clerical and postal errors, or other issues outside the voter's control. Daniel 223:3-9, 253:20-258:5; Mills 223:1-5.

### 4. Mitchell and Womack sought to eliminate SDR to obstruct and deny youth voting

#### i. Mitchell and Womack played a vital role in enacting SB 747

Mitchell carries significant political clout on election policy. *See* Dkt. 96-1 ¶1-8. She is a "trusted source for information by conservatives," and "people who support election integrity invoke" her name when advocating for election integrity policies. Mitchell 27:3-14, 114:8-19, 256:2-14. Womack credits EIN and Mitchell as influential in

5

forming NCEIT (a state affiliate of EIN) and calls Mitchell his "boss." Womack 29:25-30:4, 156:4-22.

NCEIT repeatedly invoked Mitchell while advocating for SB 747. Exs. O, S, U. Her "recommendations" suggesting restrictions to SDR—ranging from complete elimination to making SDR votes provisional—appeared in each set of materials provided. Mitchell 213:8-17 (regarding Ex. O); Mitchell 232:7-12 (regarding Ex. AA). The materials "were based on a review that Cleta had done of the North Carolina statutes" and recommendations that she wanted legislators to address. Womack 157:2-158:14. Womack was "able to finally coerce the three senate co-chairs to sit and take a meeting after a bunch of House bills" had been introduced, Womack 190:19-22, including bills that NCEIT "had some pretty significant impact on." Womack 141:17-142:23. Mitchell was motivated for the meeting because "she's a resident of North Carolina" and "wants us to be the model state for election integrity." Womack 159:3-160:2.

Womack met with other legislators in connection with SB 747. Womack 130:12-131:24, 143:5-144:14, 150:10-151:10. He also met with Joseph Coletti for two hours on behalf of Speaker Tim Moore, Womack 137:20-139:2. Coletti was "keenly interested in trying to get some of the more important points that we had in our priorities list done," Womack 181:17-183:11.[3] While NCEIT and Mitchell wanted to eliminate SDR completely, legislators said this was "mission impossible" "because of lawsuits." Womack

---

[3] Womack also met with Sam Hayes of the Speaker's office, at the behest of "donor friends." Womack 139:5-12, 182:1-183:25. Hayes "promised [NCEIT] that they were going to take up some stuff for action." *Id.* 183:17-18. Hayes is the State Board's new Executive Director.

6

162:19-163:21, 175:3-21, 183:13-15. NCEIT thought making SDR ballots provisional would be "a reasonable compromise." Womack 174:5-25.

NCEIT took credit when Senate Bill 747 was filed, announcing "Look what WE did!" Womack 140:3-25, Ex. BB. Womack acknowledged SB 747 included several NCEIT priorities, including the change to SDR. Womack 211:21-213:6. Womack took credit for "restor[ing] some of the good parts" between bill versions, Womack 230:14-231:17, Ex. CC, and claimed it as an NCEIT "Legislative Success." Womack 145:21-146:7, Ex. DD.

      ii. <u>NCEIT's SDR proposal was motivated by anti-youth, anti-student animus</u>

Mitchell is an outspoken critic of SDR. Mitchell 77:24-78:5, 86:2-87:8, 88:5-8. She views "the participation of college students [as] contribut[ing] to the manipulation of election outcomes." Mitchell 129:11-14. She argues that "Democrats seized upon" these voters over the last decade to give a "preferred voting block" "preferential treatment," characterizing their motivation as "the easier you can make it for their demographics to be able to participate, that's more votes for the Democrats." Mitchell 129:16-18, 129:22-131:23, 129:18-21. She views the "location of polling places," "use of student IDs," and "same-day registration" as "giving special privileges to a class... not entitled to" them. Mitchell 133:9-18, 143:8-22, 147:16-25. As she puts it, these laws enable "colleges students [to] roll out of bed, vote, and get back into bed." Mitchell 145:4-23. These are Mitchell's longstanding opinions, *see* Mitchell 131:2-23, consistent with her prior statements in the public record. Dkt. 1 ¶39.

Womack espouses similar views, stating that college students are not "a vulnerable population" yet "we bend over backwards in the country and particularly in the State of North Carolina to make sure college students have every opportunity to vote." Womack 63:4-64:1. He noted the limited "attention span" of "young voters" who are "social butterflies" and are motivated to vote at the last minute by "beer drinking buddies or college student friends." Womack 87:5-15. He also questioned whether students should vote at school if "they're going to go home to mommy and daddy" in another state. Womack 166:2-7. He acknowledged the argument "that it's not fair to the local taxpayers that their vote get diluted by students who really have no interest in the local affairs[.]" Womack 241:18-22.[4]

### 5. The State Board of Elections did not suggest SB 747

The State Board "didn't know specifics [of SB 747] until it was introduced" in June 2023 and was not consulted in advance. SBE 133:12-13; Exs. EE; FF. The State Board did not advocate for changes to SDR and did not believe that SDR needed to be treated differently than other registrations with respect to mail verification. SBE 106:12-107:13, 143:8-22, 154:2-157:22.

The State Board understood SB 747 to be addressing a "perceived… policy problem at the General Assembly… that too many people were failing mail verification" after canvass and "that a lot of same-day registrants turn out not to be confirmed residents." SBE 118:4-11, 141:16-142:17, Ex. GG. The State Board noted "this happen[ed] quite

---

[4]  Legislators endorsed a similar argument in public debate around HB 770. Compl. ¶41; Womack 238:23-241:22.

8

infrequently,"[5] SBE 142:20, and that failed mail verification does not necessarily mean a person lacks the qualifications to vote. SBE 115:7-11, 172:13-173:6.

The State Board worried making SDR ballots provisional would be "incredibly difficult to administer." SBE 138:4-139:17. It communicated these concerns, highlighting that the provision would harm voters who move frequently—"renters, people who were of lower income, students, [and] military personnel"—and push thousands of ballots into the canvass period which conflicted with other provisions "the legislators were advocating for" to "get[] results earlier." SBE 138:4-139:17, 151:4-152:16, Exs. GG, II. Nonetheless, the State Board "got the impression" "that [a change to SDR] was going to stay in some form or another." SBE 155:11-157:14 ("[O]bviously, it was... some level of policy priority among leadership[.]"). The State Board then proposed the one-mailer approach. SBE 153:1-154:14, Exs. II, JJ; *see also* SBE 209:5-25.

## B. SB 747 Will Cancel Eligible Ballots

The State Board uses "mail verification" to verify that a registrant "actually lives at the residence they claim," but admits it is "an imprecise effort to ascertain that information." SBE 114:19-115:4, 116:22-117:5. People in multiunit dwellings and apartment complexes fail verification more frequently than single family residences. SBE 116:7-18. College dorms have verification issues because "addressing conventions may not always be obvious" and are "not all uniform." SBE 124:9-25; Ex. KK.

---

[5] Data presented to a House committee in June 2023 showed a "98-99%" verification rate for SDR. Ex. OOO at 7. Other data available to legislators showed SDR fail rates lower than those for updated registrations. SBE 109:22-110:7; Ex. HH at 7. It also showed Democrats and Black voters failed more than Republicans and white voters. *Id.* at 7-8

County board testimony reinforces these facts.

- In New Hanover it was "well known that university students can struggle" with how to list their addresses and get mail, and it was "a continual challenge that we have with the university." New Hanover had 231 verification cards returned in the 2024 General Election—the most in the state—and very few cures. Exs. LL, MM. This did not surprise the Director given "historically the challenges we've seen with UNCW students." NH 20:12-21:11, 44:19-45:18, 99:14-18, 100:5-9, 100:12-16; *see also* Ex. NN.

- Forsyth County addresses the challenge of their large college student population with several "best practices" (not required by law): university outreach and the collection of college rosters, poll worker training, back-end address corrections, and the creation of public resources outlining the steps for successful registration. Forsyth 32:23-35:15, 36:10-16, 45:1-10, 68:21-69:12, Exs. OO, PP, QQ. Even with these procedures in place, Forsyth saw 89 failed verification cards returned in the 2024 General Election and few cures. Exs. RR, SS.

- Cumberland County routinely had registration challenges with soldiers at Fort Liberty. To assist these voters, the Board attempts to convert barracks addresses to physical ones using internal GIS software. But the County Board lacks a contact at Fort Liberty "to know how these mail-in addresses are supposed to go in" and never confirmed that these converted addresses receive mail. Cumberland 30:12-25, 33:6-18, 44:25-45:14, 46:7-22, 49:1-10. 25 of the 68 verifications returned in the 2024 General Election were from a Fort Liberty

10

address, suggesting that the County Board is incorrectly converting barracks addresses. Exs. TT, UU. *See also* Ex. VV (affidavit of disenfranchised soldier).

Postal errors can also result in undeliverable mail. SBE 66:16-69:10 (describing failed mail verification for SDR student voters caused by incorrect stamping at the Greensboro mail facility); *see also* Ex. WW (describing election mail challenges); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 671-72 (M.D.N.C. 2024) (discussing USPS error).

Finally, historical data on two-mailer verification rates shows the one-mailer system will harm eligible voters, because tens of thousands of registrants have relied on the second mailer for verification, and thousands more who failed both mailers then re-registered or voted provisionally at that same address, suggesting the verification failure was erroneous. Ex. XX ¶23; Ex. YY ¶¶12, 17-21, 22-25.

## C. SB 747 Has a Disparate Impact on Young Voters

Young voters are a growing segment of North Carolina's electorate and disproportionately utilize SDR. Ex. XX ¶¶19-21, 67-78, 83-97. Data from 2010 to 2025 shows that youth voters relied more heavily on the second mailer to verify their addresses than other age groups, and were disproportionately more likely to fail verification under the two-mailer system. Ex. YY ¶¶25-30. Registrants at high-density addresses who received a second mailer (and thus failed the first) were approximately four times more likely to reside at a college address than registrants at high-density addresses overall. Ex. YY ¶¶14, 41. SB 747's elimination of the second mailer exacerbates these harms and will have a disparate impact on youth registrants. Ex. XX ¶157; Ex. ZZ ¶8. The White Report is consistent with all these points. Ex. ZZ ¶¶10-11.

The 2024 General Election exemplifies this historical pattern. Ex. XX ¶¶123-143. Youth voters accounted for nearly 40% (541/1379) of SDR registrants who failed mail verification and were not judged to have an erroneous address. Ex. XX ¶132. Only 14% (76/541) of youth voters were able to cure their ballots, the lowest age group rate. *Id*. Youth voters also made up 50% (86/172) of registrants flagged as having a mailing address error after a failed mailing. Ex. XX ¶133. When a corrected mailing was sent, the substantial majority of registrants verified. Ex. XX ¶138. But this procedure was not required by SB 747's initial framing (nor by the consent judgment). Further, only 27 of 100 counties had a record of using it in 2024, raising uniformity concerns. Ex. XX ¶142 & tbl.19; *see also* Ex. AAA (statewide undeliverable info 2024 elections).

Consistent with this data, witnesses acknowledged young voters are a mobile population. Daniel 196:5-197:6; Womack 87:16-88:8; SBE 125:3-19, 152:9-14; Ex. BBB ¶¶42-44; Ex. CCC at 16 (not disputed). This leads to more frequent SDR use. Mills 217:20-25, 246:1-7 ("people who move" may be most impacted by SDR changes); SBE 125:3-19; *see also* SBE 126:6-10 (acknowledging college students use SDR at a high volume); Grumbach 159:13-18 (connecting greater rates of residential mobility with need to update voter registration).

Finally, restrictions on SDR reduce the turnout of younger Americans and make it more difficult for young people to vote, creating a long-term impact on affected voters' willingness to vote. Ex. BBB ¶¶45-51; *see also* Ex. XX ¶¶92-97; Grumbach 203:18-213:18. SB 747 made SDR more restrictive, especially for younger voters who disproportionately face barriers to voting related to residential mobility. Ex. BBB ¶¶48-50.

12

## QUESTIONS PRESENTED

1.      Do Plaintiffs have standing to challenge S.B. 747?

2.      Have Plaintiffs demonstrated genuine issues of disputed fact as to their claims?

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is proper if the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Where qualified experts on both sides of the case offer competing opinions[,]... summary judgment is improper." *Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14CV954, 2019 WL 4773908, at *10 (M.D.N.C. Sep. 30, 2019); *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 417 (4th Cir. 2015).

### II.   PLAINTIFFS HAVE STANDING TO CHALLENGE S.B. 747.

#### A. Plaintiffs Satisfy Article III.

To establish Article III standing, a plaintiff must show (1) "that she has suffered or likely will suffer an injury in fact," that (2) "likely was caused or will be caused by the defendant," and (3) "likely would be redressed by the requested judicial relief." *FDA v. All. For Hippocratic Medicine*, 602 U.S. 367, 380 (2024) ("*Alliance*"). Where there are multiple plaintiffs, only one must satisfy standing. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023).

1. *Plaintiffs have suffered an injury-in-fact.*

An organization establishes injury-in-fact when (1) "an action perceptibly impairs an organization's ability to carry out its mission" and (2) "consequently drains the organization's resources." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-96 (4th Cir. 2024) ("*RNC*") (cleaned up). Under this standard, "voter engagement" organizations who "counsel[] interested voters and volunteers on election participation" have regularly been deemed to have suffered injuries from voting policies. *See id.* at 396-97.

Plaintiffs show that here. NCBA's mission is to work toward systemic change by collaborating on issues of social and economic empowerment and public policy initiatives to improve the Black community. Exs. DDD, EEE. NCBA conducts a variety of programs to engage, counsel, and assist voters generally and youth/student voters specifically. *Id.* NCBA's programming includes "Youth Voter Engagement," which aims to increase voter participation among HBCU students; "Raising the B.A.R.," which trains students as community advocates to increase student voting; and "GOTV Engagement," which provides voters with information about the voting process and mobilizes them to the polls. Ex. FFF. The majority of NCBA's programming and programmatic expenditures relate to its voting work. NCBA 40:11-14.

NCBA had to spend "a considerable amount of time and energy and staff capacity" working with students to inform them of SB 747's changes and help them navigate the process, speaking with postmasters and student affairs professionals, and identifying ways in which campus mail processes inadvertently result in mail being returned. NCBA 87:12-

14

89:6. This made it "more difficult... to actually do the robust voter turnout and mobilization during the early voting cycle with the assurance that those voters that participate[d]" could vote. NCBA 87:23-88:3.

Democracy NC was organized in part to "increase voter education" and "increase voter registration and civic participation within the state." Ex. GGG. It conducts programs designed to counsel and assist voters—including young voters—through the voting process, including a "statewide voter assistance hotline," a poll monitoring program, and distribution of voter guides. DemNC 15:11-18, 33:6-35:7, 38:11-39:20; Exs. HHH, III. It also has programs specifically targeted at young leaders. Ex. JJJ; DemNC 68:5-69:1. Like NCBA, Democracy NC's work has been frustrated by the SDR provision. DemNC 88:20-90:10, 93:6-12; Ex. LLL.

The League's core mission is to "empower voters and defend Democracy." League 28:16-18, 29:2-12, 79:7-10. It accomplishes this through state and local programming, information resources, registering voters, on-campus voter engagement, and county board monitoring. League 12:21-13:9, 29:13-31:16, 32:7-18, 35:7-25, 40:16-25. SB 747 caused the League to re-allocate its budget to do more voter outreach—particularly to students—and to do more volunteer training on the SDR changes. League 75:23-76:18, 77:4-79:1.

Defendants' arguments that *Alliance* and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), foreclose standing here, Mot. 8-15, misconstrue those cases and other controlling precedent.

The *Alliance* plaintiffs "incurr[ed] costs to oppose" and "advocate against" FDA's actions "simply because they object[ed] to FDA's actions." *Alliance*, 602 U.S. at 394. By

15

contrast, the injury in *Havens Realty* interfered with the plaintiff's core business of counseling home-seekers. 455 U.S. at 379. As with the injury to preexisting programmatic work in *Havens Realty*, Plaintiffs engaged in voter counseling and empowerment long before SB 747 was first proposed. The Supreme Court found "no question" that such allegations constitute "far more than simply a setback to the organization's abstract social interests." *Id.* (citation omitted).

The Fourth Circuit ruled similarly in *RNC*. There, plaintiffs alleged core missions involving "election security and providing services aimed at promoting Republican voter engagement[.]" *RNC*, 120 F.4th at 396-97. Like Plaintiffs here, their work included "counseling interested voters and volunteers on election participation," "voter registration events," and "staffing voting protection hotlines." *See id.* at 397. Forced to "divert significantly more of their resources into combatting election fraud" and away from "their organizational and voter outreach efforts," plaintiffs had standing. *Id.*

Defendants also try to paint Plaintiffs' missions as too broad, arguing that the mission must be "intensely specific." Mot. 9-12. This argument has no foundation in law. The plaintiff in *Havens Realty* had a wide-reaching mission to "eliminat[e] unlawful, discriminatory housing practices," with several programming avenues beyond counseling. *Coles v. Havens Realty Corp.*, 633 F.2d 384, 385 (4th Cir. 1980). The *RNC* plaintiffs, too, had far-reaching missions. *See* 120 F.4th at 394, 396-97.

Defendants also claim that Plaintiffs' work is too removed from voters, not targeted to youth, and always changing year-to-year. Mot. 10, 12. This too is unavailing. Plaintiffs' work directly touches voters—specifically young voters. NCBA 57:10-18; Ex. FFF;

16

DemNC 68:5-69:1; Ex. III; League 12:21-13:9, 35:7-25, 38:6-39:19, 48:7-49:10. While Plaintiffs ensure that their programming is current every election, SB 747 forced a fundamental shift in work beyond routine expenditures. NCBA 87:23-89:6, 90:21-91:25; League 75:23-76:18, 77:4-79:14; DemNC 88:20-90:10, 93:6-12.

Their core missions impeded, each Plaintiff satisfies the injury-in-fact requirement.

### 2. *Plaintiffs' injury is traceable to Defendants' actions.*

As discussed, Plaintiffs shifted resources from their regular voter engagement and turnout activities to the "predictable" harms SB 747's enforcement caused—substantiating traceability. *See Alliance*, 602 U.S. at 384-85. The record demonstrates the precise harms Plaintiffs anticipated when filing suit: the rejection of eligible voters' ballots due to circumstances outside their control and the targeting of youth voters.

### 3. *A decision in Plaintiffs' favor would likely redress their injury.*

"[I]t is likely, and not merely speculative" that a favorable decision "will remedy [Plaintiffs'] injury." *RNC*, 120 F.4th at 397. This prong's burden is not onerous. *Id.*

Plaintiffs seek a total bar of the challenged provision, not just an order allowing enforcement if a notice-and-cure process is employed. Compl. ¶¶94-113. At minimum, Plaintiffs' Twenty-Sixth Amendment claim affords that possibility. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016). This remains true after this Court's Consent Judgment permanently *modifying* but *not* invalidating the challenged law.[6]

---

[6] Should Defendants argue the Consent Judgment moots this litigation—an argument for which they carry the burden, *West Virginia v. EPA*, 597 U.S. 697, 719 (2022)—Plaintiffs request an opportunity to fully brief the issue. *See Friends of the Earth, Inc. v. Laidlaw*

17

*Voto Latino*, Dkt. 101. The record supports inferences of discriminatory intent and undue burden, and the 2024 General Election shows the notice-and-cure process failed to eliminate SB 747's harms. Further Court relief will benefit Plaintiffs by eliminating the risk of haphazard disenfranchisement for SDR users.

**B. Plaintiffs Have Prudential Standing.**

Given the overlapping elements of injury-in-fact and prudential standing, the same facts demonstrate Plaintiffs' third-party standing. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002). Defendants' only new argument—that young voters can assert their own rights, Mot. 17—is unavailing. By the law's own terms, a voter is unlikely to have knowledge that their ballot is in jeopardy until after the election is over and the harm done. Low cure rates from the 2024 General Election further bolster this reality. And Defendants' invocation of Sophie Mead proves the point, since they disputed Mead's standing elsewhere. *Voto Latino*, Dkt. 52 at 15-17.

**III. PLAINTIFFS HAVE SHOWN A TRIABLE ISSUE OF FACT ON BOTH THEIR TWENTY-SIXTH AMENDMENT AND ANDERSON-BURDICK CLAIMS.**

Defendants' motion only addresses Plaintiffs' Twenty-Sixth Amendment claim, Mot. 17-24, inviting the Court to apply either *Arlington Heights* or *Anderson-Burdick*. Mot. 19. But there is no occasion to choose. Under each count as pled—using *Arlington Heights* for Plaintiffs' intentional discrimination claim and *Anderson-Burdick* for Plaintiffs' undue burden claim—Plaintiffs show triable fact issues.

---

*Env't Servs., Inc.*, 528 U.S. 167, 170 (2000) (distinguishing mootness and standing as separate issues).

### A. Plaintiffs Demonstrate Triable Fact Issues on Their Twenty-Sixth Amendment Claim.

> 1. *Plaintiffs identified a class of voters protected by the Twenty-Sixth Amendment.*

Knowing the Court already deferred this claim until trial, *see* Dkt. 63 at 27-28, Defendants now contest whether "young voters" is an identifiable class and if "college students" fall within that class. Mot. 17-18. These arguments fail.

First, there is no caselaw to support the assertion that a "purported class of 'young voters'" is too "amorphous[.]" Mot. 17. Defendants' only citation, *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016), refers to "[y]oung people generally and college students in particular." Ex. MMM ¶67. The *Lee* court accepted "young voters as the pertinent class" at trial. 188 F. Supp. 3d at 609 n.18. Similar classes survived summary judgment elsewhere. *See, e.g.*, *Allen v. Waller Cnty.*, 472 F. Supp. 3d 351, 364-65 (S.D. Tex. 2020); *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 976 n.8 (W.D. Wis. 2016) ("young voters" are a sufficient class where plaintiffs' claims concern high school and college students). And most youth voting cases involve college students. *See, e.g.*, *League of Women Voters of Fla. Inc. v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015).

Second, Defendants cannot factually dispute that an 18 to 25 age range captures a reasonable understanding of "young voters." *See* Taylor 48:5-53:22. Defendants' own expert indicates that college students typically fall in Plaintiffs' range. Ex. CCC at 17. Dr. Grumbach also identified young Americans between 18 and 25 years old as a coherent

19

community with distinct political attitudes and priorities formed through shared experiences. Ex. NNN ¶2; Grumbach 49:3-50:24.

Finally, Defendants' argument would render the Twenty-Sixth Amendment functionally nonjusticiable. Any class, young or old, is susceptible to similar line-drawing questions. Plaintiffs need not prove that every student is young or that every young voter will be disenfranchised to state a claim that these voters were targeted at least in part on account of their age.

2. *The Arlington Heights factors show discriminatory purpose.*

Defendants' two out-of-circuit decisions suggesting an alternative notwithstanding, "[a] consensus has been emerging… appl[ying] the *Arlington Heights* standard for Twenty-Sixth Amendment claims." *Detzner*, 314 F. Supp. 3d. at 1221. This comports with Fourth Circuit precedent. *See Lee,* 843 F.3d at 607; Dkt. 50 at 17-18.

Under *Arlington Heights*' "sensitive inquiry" into whether "invidious discriminatory purpose" motivated the SDR provision, 429 U.S. at 266, genuine issues of fact foreclose summary judgment.

The record is clear that young voters rely disproportionately on SDR and face an outsized risk that their ballots will be wrongfully discarded based on postal error or mailing address confusion. *See supra* p. 11-12. Unlike *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), where voters still had many options for casting a ballot and so restricting methods could not, standing alone, be unlawful, the threat of disenfranchisement here comes entirely after a voter has cast their ballot. This is a burden voters "cannot overcome" by making a different choice. *See* Mot. 21. Nor is it constitutional to condition a voter's

20

ability to successfully cast a ballot on the method of voting they choose. *Compare* Mot. 19-20 *with McCrory*, 831 F.3d at 232-33 (rejecting argument that law was constitutional because it "simply eliminated" a "more convenient" voting option).

The legislative record, taken as a whole, also reflects a sincere desire to curb young voters' participation. *See supra* p. 5-8. A legislature cannot "avoid the strictures of [the Constitution] by deferring to the wishes or objections" of outside parties. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). In such a scenario, Plaintiffs "need not prove that the [decision-making body] *itself* intended to discriminate… in order to establish… discriminatory intent." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1125 (2d Cir. 1987) (emphasis added). It is sufficient that "animus was a significant factor in the position taken by the persons whose position the official decision-maker [was] knowingly responsive." *Id.* at 1226; *see also Smith v. Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding "ample evidence" defendants acted with discriminatory intent in responding to third parties).

This is precisely what the record shows here. The responsible legislators consulted with NCEIT and Mitchell for SB 747, reviewing proposals and taking multiple meetings to incorporate their priorities. *See supra* p. 5-7. NCEIT and Mitchell proposed specific legislative changes, even seeing their own draft language incorporated into what became SB 747. *Id.* at 2-7. The change to SDR grew from these interactions, with the concept— eliminating or limiting SDR—coming directly from NCEIT and Mitchell. *Id.*

Afterwards, NCEIT claimed credit, consistent with the bill sponsors' understanding: Daniel admitted it was designed to be responsive to the "election integrity groups" and that

21

it was not a "significant aspect" of the bill to him, while Mills knew it was an NCEIT priority and could offer only generic explanations for its inclusion. *Id.* at 3-4. That the State Board offered a technical change to the policy does not make it the policy's progenitor. The true framers, NCEIT and Mitchell, have well-documented views on the (un)desirability of youth voting. NCEIT's labeling SB 747 as a legislative success underscores this point: SB 747 was intended to squelch youth voter participation.

Compare this case to *Mi Familia Vota v. Fontes*, where the involvement of a third-party that expressed discriminatory intent in advocating for voting changes "support[ed] a conclusion that the Voting Laws were the product of intentional discrimination." 129 F.4th 691, 727-28 (9th Cir. 2025). Like Mitchell and NCEIT, the third-party there "helped author" the bill, sent legislators materials, and "was involved with the [bill's] enactment from start to finish." *See id.* Also like here, legislators and the organization itself credited the organization for the bill. *Id.* at 727 & n.8. *Stout v. Jefferson County Board of Education* is also illustrative, where community members "translated their discriminatory purpose into official action" when they met with city officials and pushed them to secede from the county's integrated school system. 882 F.3d 988, 1007 (11th Cir. 2018) (citation omitted).

At most, Legislative Defendants have proffered a dueling factual narrative for the SDR change—a quintessential dispute of material fact that warrants a trial, not summary judgment. *See Smith v. Wellpath, LLC*, No. 2:20cv77, 2023 U.S. Dist. LEXIS 234998, at *33 (E.D. Va. Mar. 30, 2023) ("the existence of competing evidentiary narratives... creates a triable issue of fact[.]"). This is particularly true under *Arlington Heights*: "'[W]hen the disposition of a case turns on a determination of intent, courts must be especially cautious

22

in granting summary judgment,' as 'the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination.'" *N.C. State Conf. of NAACP v. Hirsch*, 720 F. Supp. 3d 406, 416 (M.D.N.C. 2024) (quoting *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979)).

**B. Plaintiffs Have Shown Triable Fact Issues on Their Undue Burden Claim.**

Count II challenges the SDR provision as an undue burden on the right to vote, referred to as an *Anderson-Burdick* claim. The *Anderson-Burdick* framework applies a sliding scale of scrutiny based on the severity of a law's burden on the right to vote. *Voto Latino*, 712 F. Supp. 3d at 664.

Here, the sliding scale balances whether the state interests proffered for the SDR provision justify the burden it imposes.[7] That burden is severe and is imposed on a class that includes critical first-time voters constitutionally enfranchised by the Twenty-Sixth Amendment. The elimination of the second verification mailer would have caused thousands of rejected registrations in the last 15 years for individuals who were conclusively established as eligible pre-SB 747. Quinn 43:18-21; Ex. YY ¶20-21 & tbl. 7.[8] Especially troublingly, this deprivation is likely to occur through no fault of the voter,

---

[7] This is true even with the existence of the Numbered Memo, whose efficacy and completeness as a remedy the parties dispute, as well as with the existence of the Consent Judgment in the related cases permanently implementing only part of that Numbered Memo. *See supra* n.5.

[8] That Dr. White and Dr. Quinn adopt different methodologies and reach different conclusions on various points goes to the weight of their testimony at trial and is not germane to summary judgment.

23

*supra* p. 9-11, and will likely permanently depress future voter participation. Grumbach 208:15-209:7. Those burdens must be weighed against any *evidence* adduced (not assumed) by Defendants about election integrity.

Defendants contend that the SDR provision promotes voter confidence and finality in elections. *E.g.*, Mot. 21. But the bill sponsors did zero study of the SDR provision's impact before enacting it, with no analysis of whether the burdens were "necessary" to advance actual state interests, *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). *See supra* p. 5. This was not a change the State Board wanted and was not warranted by any data, study, or election administration experience. *Id.* at 8. Tellingly, the SDR provision conflicted with other supposed legislative goals around election finality. *Id.* at 9. Claiming that the bill was simply "common sense," despite conceding that it was not "evidence-based," is not an assumption that can support summary judgment.[9]

## <u>CONCLUSION</u>

Plaintiffs request that the Court deny Defendants' Motions for Summary Judgment.

---

[9] This is particularly true in light of the significant evidence of discriminatory intent in the record, since discriminatory intent is *never* a valid state interest.

24

Dated: May 9, 2025                    Respectfully Submitted,

*/s/ Christopher Shenton*
  Jeffrey Loperfido (State Bar #52939)
  Christopher Shenton (State Bar #60442)
  Hilary H. Klein (State Bar #53711)
  Mitchell D. Brown (State Bar #56122)
  Lily A. Talerman (State Bar #61131)
  Helena C. Abbott (State Bar #62225)
  Adrianne M. Spoto
  SOUTHERN COALITION FOR SOCIAL JUSTICE
  PO Box 51280
  Durham, NC 27717
  Telephone: 919-794-4213
  Facsimile: 919-908-1525
  jeffloperfido@scsj.org
  chrisshenton@scsj.org
  hilaryhklein@scsj.org
  mitchellbrown@scsj.org
  lily@scsj.org
  helena@scsj.org
  adrianne@scsj.org

  Michael Dockterman
  Laurel Taylor
  Kristin Hendriksen
  Wesley B. Ward
  STEPTOE LLP
  227 West Monroe Street, Suite 4700
  Chicago, IL 60606
  Telephone: (312) 577-1300
  mdockterman@steptoe.com
  lataylor@steptoe.com
  khendriksen@steptoe.com
  wward@steptoe.com

  *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 7.3(d) and 56.1(c), I hereby certify that this brief contains 6,224 words as counted by the word-count feature of Microsoft Word.

*/s/ Christopher Shenton*

Christopher Shenton (State Bar #60442)

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all parties of record.

*/s/ Christopher Shenton*
Christopher Shenton (State Bar #60442)
