# Exhibit A

```
        IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMOCRACY NORTH CAROLINA; NORTH CAROLINA      )
BLACK ALLIANCE; LEAGUE OF WOMEN VOTERS        )
OF NORTH CAROLINA,                            )
                                              )
                        Plaintiffs,           )
                                              )
           -vs-                               )
                                              )
ALAN HIRSCH, IN HIS OFFICIAL CAPACITY AS      )
CHAIR OF THE STATE BOARD OF ELECTIONS;        )
JEFF CARMON, III, IN HIS OFFICIAL CAPACITY    )
AS SECRETARY OF THE STATE BOARD OF ELECTIONS; )
STACY EGGERS, IV, IN HIS OFFICIAL CAPACITY AS )
MEMBER OF THE STATE BOARD OF ELECTIONS;       )
KEVIN LEWIS, IN HIS OFFICIAL CAPACITY AS      )
MEMBER OF THE STATE BOARD OF ELECTIONS;       )
SIOBHAN O'DUFFY MILLEN, IN HER OFFICIAL       )
CAPACITY AS MEMBER OF THE STATE BOARD OF      )
ELECTIONS; KAREN BRINSON BELL, IN HER         )
OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF    )
THE STATE BOARD OF ELECTIONS; NORTH CAROLINA  )
STATE BOARD OF ELECTIONS,                     )
                                              )
                        Defendants.           )
---------------------------------------------)
```

VIDEOTAPED DEPOSITION

OF

SENATOR WARREN T. DANIEL

(Taken by Plaintiffs)

Raleigh, North Carolina

Wednesday, September 11, 2024

Reported in Stenotype by
Lisa A. DeGroat, Registered Professional Reporter
Transcript produced by computer-aided transcription

1

1        Q.    Is that what it will be after the next --

2    the maps come into -- in the -- sorry.  Strike that.

3              Is that the district that you were elected

4    under?

5        A.    Yes.

6        Q.    Okay.

7        A.    But -- yes.  I mean, I was elected -- those

8    are the counties that are in my current district.

9        Q.    Have you ever represented Avery County?

10       A.    Avery.

11       Q.    Avery.

12       A.    Yes.

13       Q.    Okay.  Do you remember when that was?

14       A.    Let me think.  I would say roughly 2019

15    through 2022.

16       Q.    What are your current committee assignments,

17    if any?

18       A.    So I am cochair of the redistricting

19    election committee.  I am a cochair of the judiciary

20    committee.  I'm a vice chair of the rules committee.

21    I think I'm a member of the transportation committee.

22              I am a cochair of the justice and public

23    safety appropriations committee, and I am on the -- I

24    think I'm on appropriations based budget.

25              Those are the ones that I can remember off

16

1       Q.    Why are you sure you voted for it?

2       A.    Because I'm a member of the majority, and

3   when the majority -- when a bill like that gets to the

4   floor, the majority votes for it.

5       Q.    Is it because you wanted it to be passed?

6       A.    Well, I mean, I'd have to see the bill to --

7   I'm sure I would have agreed with most of the content.

8       Q.    We can -- and I can -- we can talk about

9   that a little bit later, and I can show you the text

10  to further that, if we have time.

11            Outside of bills you've sponsored, are there

12  any activities you've engaged in that you believe

13  would further election integrity as you defined it?

14      A.    Outside of legislating?

15      Q.    Yeah.

16      A.    Not in recent years.  No.  Not since 2011.

17      Q.    How do you determine if something,

18  specifically a proposed piece of legislation, will

19  further election integrity?

20      A.    Well, I think any bill is just -- it's

21  subject to the legislative process.  There's a lot of

22  input from various angles.  There -- you know,

23  legislator input.  There's partisan staff input.

24  There are nonpartisan staff input, constituent input.

25            And so I think it's -- you know, just as the

                                                            21

1  bill goes through the legislative process, you know,

2  there's sort of a gleaning process, and I guess an

3  amendment process that eventually gets to a bill that

4  both chambers can agree upon.

5       Q.    But how do you determine if after that

6  process you've just described a bill will increase

7  election integrity?

8       A.    Well, for example, you know, in the current

9  bill, 747, there are some provisions that deal with

10  poll observers.  And so I think one of the things that

11  we felt -- or I felt, I would say, is that the more

12  kind of public observation of an election is something

13  that can enhance election integrity and also give the

14  public confidence that, you know, they're not being

15  excluded from the process.

16       Q.    If the electorate doubts the results of an

17  election based on false information, would you

18  consider that an election integrity issue?

19            MR. STRACH:  Objection.

20            You can answer that, if you can.

21            THE WITNESS:  Can you repeat the

22       question?

23  BY MS. KLEIN:

24       Q.    I'll rephrase a bit.

25            If a significant number of voters doubts the

                                                      22

1          MS. KLEIN:  We'll go off the record.

2     Thank you.

3          THE VIDEOGRAPHER:  Off record at

4     11:02 a.m.

5          (RECESS FROM 11:02 A.M. TO 11:14 A.M.)

6          THE VIDEOGRAPHER:  On record at

7     11:14 a.m.

8   BY MS. KLEIN:

9     Q.    Senator Daniel, you understand that you're

10    still under oath?

11    A.    Yes.

12          MS. KLEIN:  Okay.  I'd like to show

13    another document to you, doc 12, and we'll mark

14    this as Plaintiffs' Exhibit 5.

15          (PLAINTIFFS' EXHIBIT 5 WAS MARKED FOR

16    IDENTIFICATION.)

17    Q.    All right.  I'll represent to you that this

18    is a document produced by your attorneys in this

19    matter.  And you can tell that because of the Bates

20    stamping that's on the lower right-hand --

21    A.    Uh-huh.

22    Q.    -- corner.  It's an e-mail for Jillian [sic]

23    Empie to Andy Perrigo, within parentheses, "Senator

24    Warren Daniel."  And that's your legislative

25    assistant; correct?

                                                    54

1    A.    That's correct.

2    Q.    And it was sent on January 17th, 2023.  The

3 subject is, "Bill drafting."  And it has an

4 attachment, "NCEIT Post-Election Analysis 12-2-22."

5         And in the e-mail Ms. Empie says, "Hello,

6 Andy.  Thank you for your input.  NCEIT," which I'll

7 refer to as NCEIT, and they stand for the

8 North Carolina Election Integrity Team, "has been

9 working on a list.  I hope it will be shared soon.

10 The attached document is currently available, which

11 you may already be aware of, but further work has been

12 done.  Joanne."

13         Do you recall ever seeing this e-mail?

14    A.    I don't know that I did, other than in

15 reviewing the discovery materials.

16    Q.    And if we -- if you turn the page to that

17 doc -- and I won't have you look through the whole

18 thing, but there's -- the attachment is included, and

19 it's the PowerPoint.

20         It's titled, "North Carolina Election

21 Integrity Team Postelection Analysis."  And if you'd

22 just briefly skim through that?  Do you recall ever

23 seeing this attachment?

24    A.    I would just say that I probably saw it.

25    Q.    How do you think it was shared -- if you had

55

1    to -- how -- what's the most likely way it was shared

2    with you?

3         A.    Either -- it would either have been an

4    e-mail or a hard copy.

5         Q.    So Mr. Perrigo might have printed this out

6    and put it on your desk, for example?

7         A.    Or it's possible that they could have

8    dropped it off.  Sometimes organizations drop things

9    off.

10        Q.    And do you recall looking through it at any

11   point?

12        A.    I would -- all I can say is I probably

13   skimmed it, but I don't remember when.

14        Q.    Would it likely have been around the time it

15   was provided to your office?

16        A.    Yes.

17        Q.    Do you know Ms. Joanne Empie?

18        A.    Yes.

19        Q.    What -- how do you know her?

20        A.    She's -- well, she's either my constituent

21   or close to it.  I think she lives in the Buncombe

22   County area.  So --

23        Q.    What have -- what's been the nature of your

24   communications with her?

25        A.    She's someone who is -- she's kind of

56

1    passionate about election integrity, and so she

2    communicates.  I guess she's somehow involved with

3    this group a little bit, and --

4         Q.    How frequently would you say you communicate

5    with her?

6         A.    Not very often.

7         Q.    If you had to estimate, once a month or a

8    couple times a year?  Can you give an estimation like

9    that?

10        A.    Probably -- more likely two or three times a

11   year.

12        Q.    Do you consider her a reliable source of

13   information about election-related information?

14        A.    I think she just kind of parrots what the

15   parent organization tells her.

16        Q.    And when you say, "the parent organization,"

17   you mean NCEIT?

18        A.    Uh-huh.

19        Q.    NCEIT.

20              Sorry.  Can you give a verbal answer?

21        A.    Yes, uh-huh.

22        Q.    And how would you have communicated with her

23   in the past?

24        A.    The only thing I remember is she may have

25   come to Raleigh probably in-person.  Yeah, I think it

1  presentation?

2      A.    I wouldn't have sought her out.  If she

3  wanted to have a phone conversation, I might have

4  given her the courtesy of doing that.

5      Q.    What do you know about the North Carolina

6  Election Integrity Team?

7      A.    I think that it's sometimes hard to keep who

8  is who straight and who is, you know -- but I think

9  Jim Womack is, like, the major leader of it.

10      Q.    Have you worked with them in the past?

11      A.    Not worked with.  No.

12      Q.    Have you communicated with them in the past?

13      A.    I think only -- well, only by mostly by

14  e-mail.  They may have -- it's usually a one-way

15  conversation.  They would send us their

16  recommendations or their information, and then I think

17  there was one meeting with Jim Womack.

18      Q.    And do you remember when that meeting was?

19      A.    It was around the time this -- that this

20  bill was being considered, 747, but I don't remember

21  the date.

22      Q.    Do you consider Mr. Womack a reliable source

23  of information about election-related issues?

24      A.    I think -- I don't think he misrepresents

25  anything.

                                                        59

1    Q.    Do you consider him a reliable source of

2  information?

3    A.    Well, I think I would need to distinguish

4  between -- so I think he's a reliable source -- source

5  of information.  I don't think that their

6  recommendations are always things that should be

7  passed into law, I guess, for various reasons.

8    Q.    Are you able to generally speak on those

9  reasons?

10    A.    Yes.

11    Q.    What are those reasons?

12    A.    I think some of the election integrity

13  groups, they don't always analyze the constitutional

14  case law surrounding issues.  They don't understand

15  the logistical problems that could be caused with some

16  of the proposals they make.  And I think sometimes

17  some of their recommendations could be just

18  ineffective, I guess.

19    Q.    And everything you just said, is that true

20  of the North Carolina Election Integrity Team?

21    A.    Well, as I said before, I take every -- all

22  of their -- any -- any groups' recommendations in this

23  area with a grain of salt and really rely more on our

24  staff than on outside influences.

25    Q.    But with regards to the issues that you had

                                                    60

1          Q.     Two pages away.  Under bullet number four it

2     says, "Eliminate same-day registration during early

3     voting."

4          A.     Uh-huh.

5          Q.     Do you see that?

6          A.     Yes.

7          Q.     What, if anything, was done in response to

8     your office receiving this information?

9          A.     The only thing we might have done would be

10    to share it with our pro tem staff.

11         Q.     How would you --

12         A.     Like we did with other materials.

13         Q.     How would you have shared it?

14         A.     Most likely by e-mail.

15         Q.     And do you recall -- so the date of this

16    e-mail is January 17th --

17         A.     Uh-huh.

18         Q.     -- 2023.  Do you recall if same-day

19    registration issues were on your radar before you

20    received -- your office received this document?

21         A.     Well, over the years it's been on the radar

22    of the General Assembly in prior sessions.  It wasn't

23    really on my radar, and I didn't consider it really a

24    significant aspect of this bill.  So it wasn't

25    something that I focused much attention on.

66

1      Q.    Do you recall speaking with any staff about

2  any of the recommendations made in this PowerPoint

3  that your office received in January?

4      A.    So generally I guess what I would say is

5  that when recommendations came in from outside groups,

6  then I let staff filter them.  You know, so I would

7  send -- send these things to staff, ask them to kind

8  of catalog them into categories, and then, you know,

9  make recommendations to us as to which things they

10  thought were something that should go into the bill.

11     Q.    Do you remember specific to this

12  presentation whether that process you described as

13  generally occurring happened?

14     A.    Well, I have no reason to believe that my

15  practice would have been different, that I would have

16  considered it to go into the pool, I guess.

17            MS. KLEIN:  Let's look at another

18       document.  We'll go to doc 14.  I'll represent

19       that this one, Phil, was also produced by y'all,

20       but for some reason it didn't print with that --

21       or it was -- I think it was produced by -- sorry.

22            The state board produced it, but for

23       some reason it wasn't printed with that.  But we

24       can get -- we can get you via e-mail the Bates

25       for that, but you definitely have it.

67

1    correspondence, I don't know if I saw it.

2        Q.    Yeah, the correspondence.  And then that's

3    a -- and then if you turn the page, there is an

4    attachment.  And the title says, "North Carolina

5    Election Integrity Team legislative priorities list."

6    Do you recall seeing this document?

7        A.    Not specifically, but I would think that

8    probably I had a copy of it at some point.

9        Q.    Why do you think that?

10       A.    Because NCEIT would have wanted all of the,

11   you know, election committee chairs to have a copy and

12   probably would have either sent it to us or brought --

13   brought a copy by.

14       Q.    And it's dated February 25th, 2023; correct?

15       A.    The document?

16       Q.    The attachment.

17       A.    Yes, uh-huh.

18       Q.    And if you look to the next page, on bullet

19   number eight, it says, "Early voting and same-day

20   registration"?

21       A.    Uh-huh.

22       Q.    And then the first line under that says,

23   "Reduce early voting duration to ten days."  The

24   second line says, "Make same-day registrants eligible

25   only for provisional ballots, which can be researched

74

1   and challenged prior to canvass."

2           And then the third says, "Retain electronic

3   images of photo ID and address verification documents

4   used in SDR at local BOE.  Make them inspectable as

5   public records after redactions."

6           Do you see that?

7       A.     Yes.

8       Q.     And, just for the record, SDR you understand

9   to be same-day registration --

10      A.     Yes.

11      Q.     -- correct?

12      A.     Uh-huh.

13      Q.     And, BOE, Board of Elections?

14      A.     Board --

15      Q.     Okay.  Yes?

16      A.     Yes.

17      Q.     Okay.  You said you probably received this.

18  Is this something that you would have passed on to

19  staff considering an election law bill in -- such --

20  similar to the processes you've already talked about

21  that generally occur?

22      A.     If I got a copy, and if I didn't consider it

23  redundant to other things they sent, then I probably

24  would have given it to staff.

25      Q.     Do you recall specifically doing that with

75

1    this document?

2        A.    No.

3        Q.    Okay.  But you have no reason to think you

4    wouldn't have followed your general process --

5        A.    No.

6        Q.    -- with this document specifically?

7        A.    Right.

8        Q.    So this -- that second point, "Make same-day

9    registrants eligible only for provisional ballots,"

10   that is -- to your recollection, that is the change

11   that was made to same-day registration in the first

12   filed version of Senate Bill 747; correct?

13       A.    I think that's correct.

14       Q.    Do you recall any earlier information your

15   office received or could have received mentioning that

16   suggested change?

17       A.    I don't have a recollection of it.

18       Q.    Can you point me to any document that --

19   from anybody else that would have requested that

20   change to election law leading up to Senate Bill 747's

21   filing?

22            MR. STRACH:  Objection.

23            Go ahead.

24            THE WITNESS:  The only other -- I mean,

25   I think you have -- I think we've produced some

                                                         76

1    specifically, do you recall ever doing that?

2         A.    No.

3         Q.    And then he -- it looks like he's -- his

4    e-mail says he's from the Electoral Education

5    Foundation.  Are you familiar with that organization?

6         A.    I really just know Major Dave, and I can't

7    keep track of which group calls themselves what and

8    who is who.  So --

9         Q.    Are you -- do you interact with anybody else

10   from that organization, to your knowledge?

11        A.    I think at one time Hal Weatherman may have

12   been involved before he became a candidate.

13        Q.    Do you recall who that is?

14        A.    Hal Weatherman.

15        Q.    Hal Weatherman.  Sorry.

16              All right.  In the e-mail you said the

17   election chairs -- just to clarify for the record, you

18   meant your fellow cochairs on the senate election and

19   redistricting committee?

20        A.    Yeah.  I meant just the senate chairs.

21        Q.    And that term election integrity groups,

22   you're meaning in this e-mail is the same as the

23   meaning that we discussed earlier in this deposition?

24        A.    The different groups that we've seen

25   documents from today.

                                                        85

1      Q.    But, also, in addition to that, also the

2   discussion we had earlier about what you consider an

3   election integrity group -- I just don't want to have

4   to rehash that -- is that discussion that we had

5   earlier --

6      A.    When recommendations were -- were sent to

7   us, whether it was by a constituent or a group in,

8   like, a formal form, these -- these are things we

9   think would help election laws, then I filtered it to

10  staff, because some of them are redundant.

11          You know, some of the recommendations are

12  redundant, and I wanted them to sort of create a list

13  that we could then -- sort of a menu, I guess, so that

14  we could decide what we were going to include in the

15  bill and what we weren't going to include in the bill.

16     Q.    So NCEIT would be included in the election

17  integrity groups you're referring to here?

18     A.    Yes.

19     Q.    And Jim Womack?

20     A.    Yes.

21          MS. KLEIN:  Okay.  And we'll mark the

22      attachment to this, which we'll also hand over.

23      It's --

24          MS. TALERMAN:  It's included.

25          MS. KLEIN:  Oh, it's included.  Okay.

86

1    Integrity Project.

2          And I'll represent that this was produced by

3    NCEIT as part of their -- as part of this litigation.

4    So this did not come from your counsel.

5          So these three groups you see on the cover,

6    fair to say those are within the umbrella of election

7    integrity organizations that we've been talking about?

8    A.    Yes.

9    Q.    And do you recognize -- just based on the

10   title page, do you recognize this presentation?

11   A.    It looks similar to the one that was in one

12   of the earlier documents.

13   Q.    Do you recall a meeting -- attending a

14   meeting on May 24th, 2023?

15   A.    I would assume that that's the meeting with

16   Jim Womack.

17   Q.    Can you tell me who else was in that

18   meeting?

19   A.    Well, if it's the same meeting that we

20   talked about before, it would have been Cleta

21   Mitchell, Jim Womack, the three elections chairs on

22   our side and then one or more of the four staff

23   members that I mentioned, which was Brent Woodcox,

24   Josh Yost, Brian Fork and Nathan Babcock.

25   Q.    Anybody from the state board there?

107

1        Q.    But it doesn't squarely tell you that

2    they're an ineligible voter; correct?

3        A.    Well, it's -- it's sort of been the age-old

4    mechanism by which all voting systems use to verify

5    voter eligibility.

6        Q.    All right.  Do you -- just going through the

7    rest of this presentation, if you go all of the way to

8    the page with -- on the lower right-hand corner NCEIT

9    000024.

10            This is in a section titled, "Election

11   integrity legislative recommendations from EIN's Cleta

12   Mitchell and NCEIT president Jim Womack."

13            And then on page 24 it says, "Four" --

14       A.    22 --

15            MR. STRACH:  That's the cover sheet.

16            THE WITNESS:  Okay.

17            MR. STRACH:  And then she's on 24.

18   BY MS. KLEIN:

19       Q.    And then on 24 it says, "Four, eliminate

20   same-day registrations, SDRs, during early voting or

21   at least require SDRs be issued provisional ballots,

22   so that addresses can be verified and challenges

23   permitted prior to canvas."

24            Do you see that?

25       A.    I do.

113

1    Q.    So this language squarely suggests that

2  either eliminates same-day registration or make them

3  all provisional; correct?

4    A.    Correct.

5    Q.    And this is the suggestion of making all

6  ballots provisional that ended up in the filed --

7  first filed version of Senate Bill 747; correct?

8    A.    Well, I guess that -- the concept did.  I

9  don't know whether they gave us any language for it or

10  not.

11    Q.    So after this presentation do you recall any

12  followup steps that were taken by anyone to get more

13  information about the same-day registration issues

14  raised by the folks giving the presentation?

15    A.    To my knowledge, no one followed up with

16  this group.

17    Q.    What about following up with the State Board

18  of Elections?

19    A.    I believe they were involved later in the

20  process after the bill had gone to the house.

21    Q.    But they were not involved before the bill

22  was filed; correct?

23    A.    They may have given us feedback, but I don't

24  remember.

25    Q.    You --

1    Thinking -- you know, talking with central

2    staff about, you know, something that -- things that

3    would pass legal scrutiny, things that would have

4    practical -- practical improvements of the election

5    system but wouldn't be too burdensome for the Board of

6    Elections.

7              MS. KLEIN:  All right.  One more doc,

8         and then we can break for lunch.  Document 23,

9         which we'll mark as Plaintiffs' Exhibit 12.

10             (PLAINTIFFS' EXHIBIT 12 WAS MARKED FOR

11        IDENTIFICATION.)

12   BY MS. KLEIN:

13        Q.    So this is a followup e-mail from Jim

14   Womack, dated May 24th, 2023 at 10:37 p.m., to Brent

15   Woodcox.  So it was produced by your counsel in this

16   matter.

17             And in the first paragraph Mr. Woodcox --

18   Womack -- excuse me -- says, "Thanks again for

19   participating in today's roundtable on election law.

20   Cleta, Jay and I stand ready to assist with proposed

21   language and statutory citations wherever you might

22   need our assistance."

23             And then he lists again the suggestions.

24   And number five is, "Same-day registrants may only

25   vote provisionally, and the ballot cannot be counted

117

1    until identity, eligibility and address are verified

2    prior to canvas."

3         A.    Uh-huh.

4         Q.    To your knowledge did anybody followup on

5    Mr. Womack's offer of providing proposed language?

6         A.    Not that I know about.

7         Q.    What about any other followup from anybody

8    from senate staff, to your knowledge?

9         A.    Not that I'm aware of.

10        Q.    Okay.  Did -- and you didn't?

11        A.    No, uh-uh.

12        Q.    Okay.  Did you forward this -- these

13   suggestions to Major Goetze for his thoughts?

14        A.    I don't -- I'm not sure I was copied on

15   this.  It's --

16        Q.    Did you -- do you remember otherwise

17   discussing these ideas with Major Goetze?

18        A.    No.  I assume he was probably aware of them,

19   because they kind of work in the same space, but --

20        Q.    But you don't recall personally talking with

21   him about any of it?

22        A.    No.

23             MS. KLEIN:  Okay.  We can pause there

24   for lunch.  Go off the record.

25             THE VIDEOGRAPHER:  Off record at

                                                          118

1  were responsible for?

2      A.    No.  We really divided the work more

3  between, like, you know, Daniel, you're responsible

4  for this bill, and, Newton, you're responsible for

5  this bill.

6      Q.    So, for example, like, I noticed that in the

7  public records you did most of the introductions for

8  Senate Bill 747.  Does that mean that you were

9  responsible for Senate Bill 747?

10     A.    I was the bill handler.

11     Q.    You were the bill handler.  Does that mean

12  that you were leading the bill drafting as well?

13     A.    I would say we were equal partners in the --

14  the three chairs.

15     Q.    But you --

16     A.    But I was -- the bill handler would be

17  making more on top of the intricate details than the

18  others.

19     Q.    Okay.  And -- well, you didn't split it up

20  by area?

21     A.    No.

22     Q.    Everyone just had the opportunity to weigh

23  in on the filed draft?

24     A.    Yes.

25     Q.    Okay.  So overall -- without disclosing

125

1    that was highlighted in the first sentence?

2         A.    Because it was one of the most -- really

3    same-day registration was just sort of -- it was just

4    sort of a -- it wasn't one of the major features of

5    the bill in my point of view, but same-day absentee

6    ballot deadline was.

7         Q.    How did that same-day absentee ballot

8    deadline provision increase confidence in elections?

9         A.    Well, it -- first of all, it's the -- it's

10   the most common practice among a majority of states in

11   the country.  And I think after what we kind of saw in

12   the last -- one of the last elections, where the Board

13   of Elections extended it nine days until -- to nine

14   days, that it just made sense for us to say, we're

15   just going to cut it off, so that all ballots are in

16   at the same time.  And they can start counting all --

17   you don't have to wait three more days to know what's

18   going to come in.

19        Q.    So you mean that having to wait extra time

20   to count ballots decreases confidence in elections, so

21   making the cutoff deadline as election day increases

22   the confidence; is that --

23        A.    Well, election day should be election day.

24   Yes.

25        Q.    Okay.  Making same-day registrations

135

1          just be that -- you could have 500 less

2          provisional ballots from other sources in any

3          given year, and if -- you know, so if you had 500

4          and 500, it would be a wash.

5   BY MS. KLEIN:

6          Q.      Yeah, but, assuming everything else equal,

7   making all same-day registration ballots provisional

8   increases the number of provisional ballots compared

9   to if that -- if they were not provisional?

10         A.      Like I said, it could.

11                 MR. STRACH:  Objection.

12                 (COURT REPORTER'S CLARIFICATION.)

13                 THE WITNESS:  It could.

14  BY MS. KLEIN:

15         Q.      So did you -- did you include this provision

16  to encourage people not to use same-day registration

17  anymore?

18                 MR. STRACH:  Objection.

19                 THE WITNESS:  I think we included it --

20         I'd say I included it, because we thought that it

21         would give more confidence to the public that

22         people who were waiting until the very last

23         minute, even as late as Saturday before the

24         election to register and vote, that their vote

25         would only be counted if they were a legitimate

139

1      voter.

2    BY MS. KLEIN:

3        Q.    Is --

4        A.    It's just as important in my view that a

5    person who is eligible to vote is -- knows that

6    they're allowed to vote, as it is that when you and I

7    vote we know that our vote is not going to be canceled

8    out by somebody who is not eligible to vote.

9        Q.    When you formed that -- and that -- and that

10   was your opinion when you had filed this bill on

11   June 1st; correct?

12       A.    Well, I agreed with the provision, but,

13   again, I don't -- I didn't see it as a major -- the

14   same -- I didn't see the same-day registration

15   provision as a major piece of the bill, nor was it

16   really a topic of a lot of discussion between the two

17   parties.  It wasn't one of the things that was really

18   highlighted.

19       Q.    What evidence at that time did you have that

20   individuals using same-day registration, that any of

21   them were ineligible to vote?

22            MR. STRACH:  Objection.

23            THE WITNESS:  I'm not sure that that

24       was the point.  The point is that it just made

25       common sense that if we're going to have a

                                                    140

1       process where we allow people to register three

2       days before an election that there should be a

3       better safeguard than there currently was.

4   BY MS. KLEIN:

5       Q.    So the point was not to have evidence that

6   that was needed.  It was to -- I didn't quite

7   understand.

8             The point wasn't to have evidence that that

9   was needed?  The point was to tell the public that

10  that would be done?

11      A.    Sometimes bills are -- they're not

12  necessarily evidence driven as much as common sense

13  driven.

14      Q.    Okay.

15      A.    And I would say that that provision was more

16  common sense.

17      Q.    And is -- is adding a new statutory

18  requirement the only way to address issues of public

19  confidence regarding a certain part of election

20  administration?

21            MR. STRACH:  Objection.

22            Go ahead.

23            THE WITNESS:  No.  I mean, one way

24      would be to get the Board of Elections to comply

25      more with the spirit of the law than trying to

                                                      141

1    provision was not what we -- what I considered a major

2    feature of the bill.  So it wasn't something that drew

3    a lot of our focus.

4         Q.    So is the answer to my question, no?

5         A.    Can you restate the question?

6         Q.    So were -- was there a reason that you

7    were -- like, were you not comfortable with the

8    documentary proof of residence that was already being

9    provided by same-day registrants?

10        A.    I think I would just say that, you know, I

11   think all of the election integrity groups, this was a

12   concern of theirs, same-day registrations.  And so we

13   felt like if it was a concern, then it made it into

14   the bill.

15        Q.    So you were being responsive to their

16   concerns by including this provision in there?

17        A.    Yeah, to theirs and other constituents.

18   Just individual constituents.

19        Q.    Fair to say you just didn't think some of

20   those details through, because that wasn't a focus of

21   this bill for you?

22              MR. STRACH:  Objection.

23              THE WITNESS:  I would say that in --

24        in -- just in bills in general, you know,

25        legislature is a policy-making body.  And

                                                        148

1      sometimes we get focused on what we think is the

2      right policy, and we don't necessarily have all

3      of the background on what the logistical

4      implications would be.

5   BY MS. KLEIN:

6       Q.    And -- so that general principal, is that

7   applicable to the same-day registration provisions in

8   Senate Bill 747?

9       A.    I would -- I don't think we probably thought

10  about the -- the point they're raising.  You know, it

11  doesn't mean I think anything less of the provision,

12  because, you know, sometimes you just have to tell

13  agencies, you know, well, this is how the state -- the

14  legislature wants it to be.  Not how the bureaucracy

15  desires it to be.

16           MS. KLEIN:  All right.  We can move on

17      to the next document.  This is doc 28, and we'll

18      mark it as Plaintiffs' Exhibit 17.

19           (PLAINTIFFS' EXHIBIT 17 WAS MARKED FOR

20      IDENTIFICATION.)

21  BY MS. KLEIN:

22      Q.    So this is an e-mail produced by your

23  attorneys.  It's from Robert Waldrop, and it's sent to

24  several legislators, including yourself.  And the

25  subject is, "Comments on proposed new voting laws from

149

1  an election worker."

2          And Mr. Waldrop says, "I'm writing to urge

3  you not to proceed with several parts of bill, which

4  is now being worked on and which you plan to

5  introduce.  Please hear me out."

6          Are you familiar with Mr. Waldrop?

7      A.    No.  No, I'm not.

8      Q.    Had you spoken with any election workers

9  about Senate Bill 747 before it was filed?

10     A.    I don't believe so.

11     Q.    In bullet number two he says, "You want to

12 propose same-day registrations to use a provisional

13 ballot, rather than same-day registration standard

14 ballot."

15          And he writes, "What this will require is a

16 lot more effort than you realize.  Provisional ballots

17 require much greater amount of time by election

18 workers, BOE members and BOE staff."

19          "When registering and issuing ballots to new

20 voters, we carefully apply the law and scrutinize the

21 evidence presented.  The system works well as is."

22          Do you recall receiving this information?

23     A.    No.  I've reviewed it in the discovery

24 packet, but I don't remember seeing it before.

25     Q.    Do you -- you don't recall seeing it.  So

150

1      Q.    So did you recognize that first voice as

2  Senator Mayfield again?

3      A.    Yes.

4      Q.    And you took the response; correct?

5      A.    Yes.

6      Q.    So in responding to Senator Mayfield's

7  question you said, "I would think that most college

8  freshman probably would remain registered in their

9  home of residence and would vote absentee there."

10         What was the basis for that assumption?

11      A.    Just all of the people that I -- probably

12  the people that I'm aware of that had college students

13  that I know, that would have been what they did.

14      Q.    Can you --

15      A.    Including mine.

16      Q.    Can you point me to any study or data or

17  other non-anecdotal set of information that would

18  support the basis for your assumption there?

19      A.    No.

20      Q.    And later you said, "When I was in college,

21  I did have a credit card, which was tied to a P.O. box

22  that was on campus.  So I think that would qualify as

23  a HAVA document."

24         Is it your understanding that a P.O. box is

25  the same as an address for a residence?

174

1        A.    No.  It can be used as a mailing address,

2   but not as a residence.

3        Q.    So if you're trying to show a HAVA document

4   for a residence, a P.O. box actually wouldn't qualify

5   for that; correct?

6        A.    I think that's probably correct.

7        Q.    Did you -- you know, after these -- in both

8   days of committees these issues related to students in

9   this provision.  Do you recall as any part of followup

10  to this, you know, asking from anyone for information

11  about, you know, how many eligible voters in North

12  Carolina would be adversely impacted by, you know, the

13  restrictions as they were drafted in the version of

14  the bill being considered?

15       A.    I didn't ask, and I'm not sure there would

16  be any way to know.

17       Q.    Did you try?

18       A.    No.

19            MS. KLEIN:  We can go to the next

20       document, and this will be doc 66.  And we'll --

21       it'll be titled Plaintiffs' Exhibit 26.

22            (PLAINTIFFS' EXHIBIT 26 WAS MARKED FOR

23       IDENTIFICATION.)

24  BY MS. KLEIN:

25       Q.    And so you'll see this is an e-mail --

                                              175

1        for me personally, that I don't put a lot of

2        emphasis on e-mails that I get from out-of-state

3        organizations that don't even identify where

4        their address is.  I mean, this one has no

5        address that I can see.

6    BY MS. KLEIN:

7        Q.    So is it your recollection that you didn't

8    read this letter?

9        A.    I don't know one way or the other.

10       Q.    On the second -- the last page of the

11   exhibit, with Bates 3263, at the top of the first full

12   paragraph it said, "This will have an especially

13   adverse effect on college student voters in

14   North Carolina."  And the topic of the letter is,

15   "Senate Bill 747, same day voter registration

16   provisions."

17            Do you recall if any effort was made to get

18   more information on the impact of the bill at that

19   time on student voters?

20       A.    It sounds like, whether I read this or not,

21   Senator Mayfield did and conveyed their sentiments to

22   me.

23       Q.    But do you recall if you or any of your --

24   or any of the pro tem staff, Mr. Woodcox, Mr. Yost,

25   sought any information that would help address or

1    understand an adverse effect on college students of

2    the bill as it was then drafted?

3        A.    I don't know whether I read this letter.  I

4    don't think I did any -- took any actions in response

5    to its content, but whether the staff did I don't

6    know.

7        Q.    All right.  You don't recall any, though;

8    correct?

9        A.    No.

10              MS. KLEIN:  Okay.  We're going to

11       listen to another audio transcript.  This is of

12       the senate floor.  And we'll mark the audio as

13       Plaintiffs' Exhibit 28.

14              (PLAINTIFFS' EXHIBIT 28 WAS MARKED FOR

15       IDENTIFICATION.)

16              THE WITNESS:  Can you tell me, was this

17       the initial bill passage or the concurrence vote?

18              MS. KLEIN:  I think this is the initial

19       bill passage.  So it's on June 21st.

20              And we can just go really quickly to

21       the legislative -- if you still have it,

22       Plaintiffs' Exhibit 13, I think, is the

23       legislative -- or the -- the bill summary page.

24              But we're talking about June 21st, and

25       it's the transcript, I think, for the afternoon.

                                                    182

 1                    MR. STRACH:  Objection.

 2                    THE WITNESS:  Well, I think my

 3          understanding is that HAVA doesn't allow those

 4          two documents to be used, and -- unless I'm wrong

 5          about federal law.

 6     BY MS. KLEIN:

 7          Q.    But is there any reason you can think of

 8     that you would not think that that is a -- that is a

 9     valid proof of residence that should be added?

10                    MR. STRACH:  Objection.

11                    THE WITNESS:  Well, I see a distinction

12          between the two.  I think a mortgage statement

13          would be more legitimate than a residential

14          lease.

15          Q.    Did you -- why?

16          A.    Because I could go on Google and Google a

17     form and fill in a lease and forge signatures, but a

18     mortgage statement would be probably more difficult

19     to -- to do that, to fabricate a document.

20          Q.    Do you have -- do you have any evidence that

21     that -- that process, of forging a HAVA document, had

22     ever occurred in North Carolina?

23                    MR. STRACH:  Objection.

24                    THE WITNESS:  No, but I think, you

25          know, the reason HAVA has certain documents is

                                                        186

1    because, you know, the HAVA law makes judgment

2    calls about what are more likely to be reliable

3    documents.  We -- I don't see a need to expand

4    the list, I guess.

5  BY MS. KLEIN:

6    Q.    You didn't see a need to expand the list,

7  even after hearing all of the concerns about the

8  difficulty for students to be able to meet the ID

9  requirements that were brought up by Senator Mayfield?

10   A.    And the other thing is that -- no.  And the

11 other thing is that we still know that in this process

12 this is just the senate bill that's going to go

13 through the whole house process.

14         It's going to come back to us.  We might go

15 to conference, you know.  So we're basically in the

16 first quarter of the bill process.

17   Q.    Did you -- do you recall, you know, these

18 documents being considered later in the process as a

19 form of HAVA proof that could be provided by a voter?

20   A.    I'm not sure.  I don't have any recollection

21 of it.

22   Q.    And just -- just to your point about fraud,

23 is it possible for someone to mockup a -- you know, an

24 example utility bill and provide that?

25   A.    I think you could -- in today's day and age

187

 1      Q.    So she -- I'm going to go one by one and ask

 2  you about some of the comments she made.

 3            She mentioned there's no evidence of fraud

 4  here.  Do you agree with that?

 5            MR. STRACH:  Objection.

 6            THE WITNESS:  Well, there is -- I

 7     believe there is 0% chance that there's not fraud

 8     in every election of some sort.

 9  BY MS. KLEIN:

10      Q.    But she said there's no evidence of fraud

11  here.  So do you disagree with that?

12            MR. STRACH:  Objection.

13            THE WITNESS:  I mean, I think a lot of

14     election fraud is -- it's sort of a hidden crime.

15     It's hard to detect.

16      Q.    But are you aware of any evidence that

17  there's fraud related to same-day registration

18  specifically?

19            MR. STRACH:  Objection.

20            THE WITNESS:  No, but, I mean, so

21     the -- but the issue is not just fraud.  It's

22     just people who -- it might not be intentional.

23  It might just be inadvertent, and they --

24            Whether they believe -- they want to

25  vote, but they shouldn't be allowed to vote

                                              189

1    normal timeframes.

2        Q.    Did you have any studies to support that

3    understanding?

4        A.    No.  Again, I guess I would just reiterate

5    that, you know, it was a policy-based discussion.  It

6    wasn't always based on criminal data or other data.

7        Q.    At the end she mentions disproportionate

8    impact on voters of color, student voters, military

9    members and young voters.  All of whom use same-day

10   registration at a higher rate.

11            Do you have any reason to disagree with that

12   statement, about who this change in same-day

13   registration would impact?

14       A.    I wouldn't take her word at face value.

15       Q.    Do you have any reason to -- do you have any

16   basis for disagreeing with it?

17            MR. STRACH:  Objection.

18            THE WITNESS:  I mean, I wouldn't --

19        Senator Marcus says a lot of things on the floor

20        that -- that aren't necessarily accurate.  So

21        without seeing some data from the Board of

22        Elections I wouldn't just take her statement at

23        face value.

24   BY MS. KLEIN:

25       Q.    At that point in the process had you

192

1    requested that kind of data from the State Board of

2    Elections?

3        A.    No, and didn't think it was necessary.

4        Q.    Why not?

5        A.    Just didn't.

6        Q.    Do you think using same-day registration is

7    irresponsible?

8        A.    I think it depends on the circumstances.

9        Q.    What circumstances would it be

10   irresponsible?

11       A.    If you're -- if you -- if you're a new

12   resident, and you've moved to the county -- or to

13   your -- that location within, you know, the last

14   30 days, then I think that's -- you know, that's

15   appropriate.

16            But if you've, you know, been there

17   significantly longer than that, then I think you

18   should have -- of course, our DMV, every time you go

19   to the DMV, you know, they offer you the opportunity

20   to register to vote.  So --

21       Q.    So you think it's irresponsible to use

22   same-day registration if you've lived at your current

23   residence you're voting from for more than 30 days?

24       A.    I think when you move to a location, one of

25   the first things you do, you should get a new driver's

193

1      Q.    Do you have any reason to dispute that

2   that's correct?

3      A.    No.  I think Mr. Cox probably gave accurate

4   information.

5      Q.    Okay.  At the end of that paragraph, the

6   last sentence, he says, "That seems likely if you

7   consider some of the population that may need to use

8   same-day registration the most.  Military personnel,

9   students and renters, those who move frequently."

10         Do you have any reason to disagree that

11   these are the populations that need to use same-day

12   registration the most?

13      A.    Where are you looking at?

14      Q.    That's the third --

15      A.    Oh.

16      Q.    The third paragraph.  The first long

17   paragraph, the last sentence.

18         Do you have any reason to disagree that

19   those are the populations that need same-day

20   registration the most?

21      A.    I would agree that they're the ones that

22   move frequently.

23      Q.    But you would not agree that they're the

24   ones that need to use same-day registration the most?

25      A.    Not necessarily renters, because they could

                                                    196

1   be moving within the same county.

2        Q.     So you would disagree with this?

3        A.     With parts of it.

4        Q.     Okay.

5        A.     I think military personnel and students

6   do -- do move from other areas.

7        Q.    So you think military -- okay.  I think I

8   understand.

9             And then -- all right.  Otherwise you don't

10  recall ever reviewing any of the attachments to this?

11       A.    I don't think I've seen that.

12            MS. KLEIN:  Okay.  All right.  Let's go

13       to the next document, 42, which we'll title

14       Plaintiffs' Exhibit 31.

15            (PLAINTIFFS' EXHIBIT 31 WAS MARKED FOR

16       IDENTIFICATION.)

17  BY MS. KLEIN:

18       Q.    So this is a presentation titled,

19  "Presentation House Oversight and Reform Committee,

20  June 22nd, 2023."

21            Do you recognize this presentation deck,

22  just skimming through it?

23       A.    No.

24       Q.    To your knowledge, were you present during

25  this presentation on June 22nd to the House Oversight

                                                    197

1   it's possible the voter wouldn't know.  Yes.  I think

2   that's accurate.

3        Q.    And what about the fact that a postcard

4   might be marked undeliverable and come back for

5   reasons that have nothing to do with the voter's

6   eligibility to vote in that jurisdiction, do you

7   disagree with that possibility?

8        A.    I think there -- there's chances that

9   administrative errors could contribute to that.

10              MS. KLEIN:  All right.  I just have a

11       few more documents, and then it's a good time to

12       take another brief break, if that works.

13              MR. STRACH:  Uh-huh.

14              MS. KLEIN:  All right.  Let's go to doc

15       52, and we'll mark this as Plaintiffs'

16       Exhibit 40.

17              (PLAINTIFFS' EXHIBIT 40 WAS MARKED FOR

18       IDENTIFICATION.)

19   BY MS. KLEIN:

20       Q.    So this is an e-mail between you and your

21   assistant, Andy Perrigo.  And if we look at the -- the

22   first e-mail in the chain, and that is from Walter

23   Joseph Reinke to Senator Warren Daniel, on Monday,

24   August 28th.

25              And this was produced by your counsel in

223

1          I mean, you know, there's 100 ways somebody

2     could get to -- you can do absentee -- no excuse

3     absentee mailing -- or voting.

4          Q.    So I'm going to -- I'm going to ask you a

5     series of more questions.  For every one of them I

6     want you to limit it to, you know, did you develop an

7     understanding in preparation for voting for Senate

8     Bill 747 and finally approving it or as your role

9     shepherding that legislation.

10          Did you develop an understanding of -- of

11     any issues student face in the state of obtaining

12     necessary documentation to prove residence for voting?

13          A.    No.

14          Q.    What about necessary documentation to

15     satisfy the photo ID -- the voter ID requirement?

16          A.    No.

17          Q.    What about -- any understanding about how

18     young voters vote?  What -- by what methods they vote?

19          A.    Not what percentage of types of method they

20     use.

21          Q.    What about the proportion of young voters

22     among the broader electorate?

23          A.    What percentage they are?

24          Q.    Of registered voters.  Yes.

25          A.    No.  I haven't looked at the statistics.

1    Q.    What about their proportion of voter

2    turnout?

3    A.    No.

4    Q.    Did you develop any understanding of, you

5    know, demographic trends with young voters, as far as

6    what race they're more likely to be as compared to

7    older voters?

8    A.    No.

9    Q.    Did you -- you know, as part of your

10   legislative work on Senate Bill 747 did you develop

11   any concerns about student voting?

12   A.    No.

13   Q.    You know, as a general matter do you think

14   that college students should be permitted to vote in

15   their college community?

16   A.    If they want to.

17             MR. STRACH:  Objection.

18             Go ahead.

19             THE WITNESS:  If they want to.

20   BY MS. KLEIN:

21   Q.    You know, when you were working on Senate

22   Bill 747, and as part of your work, did you think that

23   election laws made it too easy for college students to

24   vote?

25   A.    No.  That was never anything that we

                                                      233

considered.

Q.    Did you have -- as part of that work did you
have any greater concerns about fraud within, you
know, large college campuses and student voters?

A.    I didn't personally.

Q.    Other than what other legislators have
communicated to you, are you aware of other people
having those concerns?

A.    No, uh-uh.

Q.    Okay.  You know, as part of your work in
developing Senate Bill 747 do you have any kind of
understanding -- did you develop any kind of
understanding of whether college students are capable
of appreciating the issues that their, you know,
community they're living in might need addressed
before the legislature?

A.    Can you restate the question?

Q.    Sure.

As part of your work on Senate Bill 747 did
you develop any understanding of whether college
students are -- can appreciate the issues in their
local community where they're going to school that
might need to be addressed from the General Assembly?

A.    I'm not sure I understand the question.

Q.    Okay.  I'll move on.

234

1          There were several of the documents that

2     we've gone through where people, both the Board of

3     Elections and others, recommended some changes to it.

4     So, you know, we -- we thought -- I guess, in the end

5     the General Assembly thought some of those made sense.

6          Q.    At any point did you try to shorten the

7     early voting period instead?

8          A.    Not in this bill.  I think most -- well --

9          Q.    Why --

10         A.    I think most -- a lot of people believe that

11    it's too long.

12         Q.    Why didn't you try to do that in this bill?

13         A.    It's just -- it was a policy decision.

14         Q.    Why didn't you try to require additional

15    documentation from same-day registration voters,

16    instead of voting on this bill that just has a single

17    verification mailer?

18         A.    I mean, again, it was just a policy decision

19    that was made between the house and the senate.

20         Q.    So can you guarantee that the new same-day

21    registration provision in Senate Bill 747 would not

22    cancel the ballot of an otherwise eligible voter?

23              MR. STRACH:  Objection.

24              THE WITNESS:  No.

25    BY MS. KLEIN:

                                                      253

Q.    So how do you think -- so what's your understanding of the tradeoff between, you know, preventing potentially ineligible ballots versus cancelling eligible ones?

A.    Say that again, please?

Q.    Like, what's your understanding of the tradeoff between, you know, preventing potentially ineligible ballots versus cancelling eligible ones in this, you know, same-day registration changes?

A.    I think it's just the policy decision the General Assembly made, that same-day registration is kind of a, you know, unique privilege to register late and vote late.

And that was the tradeoff that was made to -- because of the difficulty in -- or the impossibility of getting two mailings out when somebody registers three days before the election.

Q.    So I'm going to ask you a series of questions.  And I've asked you these questions about, like, certain points in the legislative timeline, but now I'm asking you for, like, overall.

And the point of this is just to make sure I haven't missed anything or there's nothing that you considered that I haven't missed.  Okay?

So some of these are going to sound a bit

254

1   familiar.  And I'm mostly talking to your lawyer here.

2   So he doesn't give me a bunch of asked and answered.

3   But that's what I'm getting at.

4            So, you know, looking at the -- the record

5   for Senate Bill 747, thinking about all of the

6   considerations and all of the information that you had

7   when it was being drafted, can you point me to any

8   evidence you are aware of during that process that

9   same-day registration provisions as they were before

10  they were changed in this bill caused any noneligible

11  voters to be able to successfully cast a ballot?

12       A.    Are you saying were eligible voters not able

13  to vote previously under the prior law?

14       Q.    I'm saying, can you point me to any evidence

15  that noneligible voters had successfully same-day

16  registered and had their ballot count under the old

17  provisions before they were modified by this bill?

18       A.    No.

19       Q.    So you don't have any examples since

20  same-day registration, you know, became possible in

21  North Carolina of a confirmed ineligible voter using

22  it successfully to vote?

23            MR. STRACH:  Objection.

24            Go ahead.

25            THE WITNESS:  No.

BY MS. KLEIN:

Q.    Are you aware that the state board has previously acknowledged that mail verifications should not be equated to voter eligibility in its prior guidance?

A.    Say that again, please?

Q.    So are you aware that the state board had previously acknowledged that, you know, mail verification should not be equated to voter eligibility in its prior guidance to county boards?

A.    I think it could be or it couldn't be, depending on the circumstances.

Q.    But are you aware that the state board had acknowledged that those two things aren't equivalent?

A.    Well, I think they probably acknowledge that it could or it couldn't indicate an ineligible voter. It might or it might not.

Q.    So did you -- did you -- did you consider that fact in the legislative process for Senate Bill 747, that a failed mail verification might not reflect ineligibility?

A.    No.

Q.    Can you point me to any evidence that a single undeliverable confirmation mailing would mean that a voter did not actually live in their precinct?

256

1          A.     Say that again, please?

2          Q.     So I'll rephrase it.

3                 You know, is it possible that if a same-day

4     registrant's mail verification comes back

5     undeliverable that it could be because their

6     residence, like, just does not receive mail?

7          A.     There -- I -- I would say that there could

8     be, yeah, some reasons, other than that they don't

9     live there, that the mail is returned.

10         Q.     You agree that it could come back -- the

11    mail verification for a same-day registrant could come

12    back undeliverable because the US Postal Service has

13    delivery issues?

14         A.     Yes.  There could be postal error.

15         Q.     You agree that it could be due to -- it

16    could come back undeliverable because of a clerical

17    mistake by elections staff?

18         A.     Yes.  That's possible.

19         Q.     And you agree it could come back deliverable

20    [sic] because the mailbox is just over full and can't

21    receive any more mail?

22         A.     That might be a reason, but the card is

23    pretty small.

24         Q.     And is it fair to say that, except for the

25    full mailbox, all of the other three things I

257

1    mentioned, the residents not receiving mail by the

2    USPS, the USPS having delivery issues or clerical

3    mistakes, those all are outside of the voter's

4    control; correct?

5        A.    Yes.

6        Q.    It's also possible that a voter has moved

7    within the 30 days of an election, so they have to

8    vote at their old residence, but because they've moved

9    a mail verification to their old residence might

10   actually bounce and be undeliverable?

11       A.    I'm not sure I follow all of that, but

12   it's -- I guess it's possible.

13       Q.    I'll work up to it.

14             So you have to vote where -- if you're

15   voting in North Carolina, you agree that you have to

16   establish residency for at least 30 days; correct?

17       A.    Yes.

18       Q.    So if you're a North Carolina resident, and

19   so you move within that 30 days right before an

20   election, you technically have to vote where you used

21   to live; correct?

22       A.    Are you saying you move out of state or just

23   move?

24       Q.    Within the state.

25             So if you've moved, and you're not

                                                          258

1    with the state board?

2         A.    No.

3         Q.    Did you do it yourself?

4         A.    No.

5         Q.    At any point in the legislative process for

6    Senate Bill 747 did you or anyone from your office

7    communicate with educational institutions about mail

8    deliverability issues with student addresses?

9         A.    I don't think so.

10        Q.    Are you aware if anybody else or their staff

11   did that at the General Assembly?

12        A.    I'm not aware of any.

13        Q.    Did you look at any studies about the

14   issues, deliverability issues, mail deliverability

15   issues, for students?

16        A.    No.

17        Q.    Okay.  Did you look at any studies about

18   mail deliverability issues generally?

19        A.    No.

20        Q.    At any point in the legislative drafting

21   process for Senate Bill 747 did you or anyone from

22   your office communicate with a representative of the

23   US Postal Service about mail deliverability issues?

24        A.    No.

25        Q.    Are you aware that anybody else did that?