# Exhibit B

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
                       1:23CV00878-TDS-JEP
```

```
DEMOCRACY NORTH CAROLINA;            )
NORTH CAROLINA BLACK ALLIANCE;       )
LEAGUE OF WOMEN VOTERS OF            )
NORTH CAROLINA,                      )
             Plaintiffs,             )
                                     )
        vs.                          )
                                     )
ALAN HIRSCH, in his official capacity )
As CHAIR OF THE STATE BOARD OF       )
ELECTIONS; JEFF CARMON III, in his   )
official capacity as SECRETARY OF THE )
STATE BOARD OF ELECTIONS; STACY EGGERS)
IV, in his official capacity as MEMBER)
OF THE STATE BOARD OF ELECTIONS;     )
SIOBHAN O'DUFFY MILLEN, in her       )
official capacity as MEMBER OF THE   )
STATE BOARD OF ELECTIONS; KAREN      )
BRINSON BELL, in her official capacity)
as EXECUTIVE DIRECTOR OF THE STATE   )
BOARD OF ELECTIONS; NORTH CAROLINA   )
STATE BOARD OF ELECTIONS,            )
             Defendants              )
```

                            DEPOSITION

                               OF

                       PAUL GREY MILLS, JR.

                  September 13, 2024 - 10:02 a.m.

                       301 Hillsborough Street
                       Raleigh, North Carolina

PREPARED BY: Susan A. Hurrey, RPR
Discovery Court Reporters
and Legal Videographers, LLC
4208 Six Forks Road
Suite 1000
Raleigh, North Carolina 27609
919-424-8242
www.discoverydepo.com

1

1       Q.  Sure.  I mean, this kind of substance of the work and

2   the tasks that you y'all were tasked with on the board, did it

3   change how you went about your work with him?

4       A.  No.  I think -- I mean, the role is to do the best you

5   can.  And I think he tried to do that.  I know I tried to do

6   that, regardless of what party you're with.

7       Q.  Would you say that dynamic was common during your time

8   on the board?

9       A.  Yeah.  Yeah.  Because Alan Carpenter, he was also on

10  the board.  He was a democrat.  He was chairman.  He was a

11  local attorney.  I think he did a lot of real estate stuff.  He

12  was a fine fellow.

13      Q.  What are your current committee assignments in the

14  general assembly?  I won't hold you to it.

15      A.  I co-chair the Joint Legislative Ethics Committee and

16  I chair the House Elections and Campaign Finance Committee.  I

17  am vice chair of Ted Davis's, I think, Judiciary 1 House

18  Committee.  I'm on appropriations.  But the ones that take up

19  my time are the ones that you -- you know, like the elections

20  and the ethics because those are the ones you chair.

21      Q.  What goes into being a committee chair?

22      A.  Just -- I mean, you want to make sure you have got a

23  good process.  You want to a make sure that you run an

24  effective committee meeting where members can do what they need

25  do as members.  You want a good legislative product at the end

17

1      A.  Yeah.

2      Q.  How do you determine whether or not something serves

3  election integrity when you're looking at a proposal?

4      A.  Common sense.  You know, I mean, we hear a lot from

5  the people back home.  We have constituents that contact us

6  with concerns.  Every member does.  And you work with your

7  members through the legislative process to hopefully produce

8  the best bill that's good for everybody.

9      Q.  Do you do any kind of your own research into these

10  issues when people bring them to you?

11      A.  What do you mean, research?

12      Q.  So if someone raises a concern to you, what do you do

13  with that?  Do you investigate it to see what the problem might

14  be?

15      A.  Possibly.  I mean, we might talk about it with other

16  members.  Things of that nature.  But I mean, research, I don't

17  go out and conduct poles or anything.

18      Q.  Sure.  Would you ask for any data on a particular

19  issue if you were trying to understand it better?

20      A.  People will sometimes bring you data, but I'm not in

21  the habit of going out and asking for data.

22      Q.  So you don't solicit it, but people bring it to you?

23      A.  Give me an example.

24      Q.  So if you were going to make a change to -- let's take

25  the deadline for receiving absentee ballots, the county board

28

1    let's say, doesn't get to vote because the postal service made

2    a mistake.  Is that an election integrity issue?

3        A.  I would characterize that as something that happens

4    very rarely.  That language with the one mailer, I think, is

5    good language.  I think it's -- it makes our -- the way that we

6    handle same-day registration better.  I agree with it.  It

7    actually came from the board, that idea of the one mailer.  I

8    mean, you can always find -- you can hypothetically talk about

9    a lot of things, well, this could happen or that could happen.

10   What we have to do is pass the best legislation we can for the

11   entire state and I think that that bill does that.

12       Q.  Okay.  So a couple things going to talk a little bit

13   more there.  And we're going to definitely talk about where it

14   came from, how you interfaced with the board on it.  So we'll

15   get to that for sure.  So you described it as something that

16   happens rare, right, that one bouncing back?

17       A.  Yeah, what you just described I would say happens

18   rare.  And I think that the language that we have in that bill

19   is good, and I think it improved our elections process.

20       Q.  Even in that rare circumstance, do you think it's an

21   election integrity issue for that person?

22       A.  What you just described is something that happens

23   rare.  Would I describe it as elections integrity?  I don't

24   know what you are trying to get to with that.  I mean, I think

25   it's a situation that rarely happens.  It's unfortunate, but

30

1    A.  I would say it's rare.

2    Q.  What do you base that belief on?

3    A.  Well, I use the post office.  Based off of personal

4 experience.  I mean, I practiced law for 20 years.  We used the

5 post office.  As an elected official I use the post office.  I

6 use it in our -- what I do for a living now, I use the post

7 office.

8    Q.  Your experience on the Iredell County Board of

9 Elections influence that belief at all?

10    A.  I was not aware of any issues with the post office.  I

11 can't recall ever thinking that's a terrible post office or

12 anything like that during my service on the Iredell County

13 board.

14    Q.  Okay.  Would you say election fraud is also rare in

15 North Carolina?

16          MR. STRACH:  Objection.  Go ahead.

17          THE WITNESS:  You know, some people -- I mean,

18 election fraud might happen.  Mistakes happen is what happens.

19 BY MR. SHENTON:

20    Q.  So yes, you would describe it as rare?

21    A.  Honestly, I don't know.

22    Q.  Would you describe it as common?

23    A.  I would not describe it as common.

24    Q.  How does the number and experience of elections staff

25 who are running an election impact election integrity, in your

32

1      A.  When I was on the board in Iredell County I did not

2  see anything that undermined election integrity.  Not that I

3  recall.

4      Q.  That's all I'm asking.  If I said to you that the law

5  that was in place for same-day registration during your time on

6  the county board of elections was the law around same-day

7  registration up until the passage of Senate Bill 747 into law,

8  would that sound right to you?

9      A.  I don't know.

10     Q.  Okay.  Any reason to doubt that?

11     A.  No.

12     Q.  Just a few more questions about your time on the

13  board.  Do you ever notice college students having a hard time

14  registering to vote with the county board of elections?

15     A.  No.

16     Q.  Any issues that young voters had during your time

17  there?

18     A.  No.

19     Q.  Did you ever experience or hear of any issues with

20  voters forging a HAVA document?

21     A.  No, not that I recall.  Are you talking about when I

22  was -- my time on the board?

23     Q.  Correct.

24     A.  Not that I recall.

25     Q.  And just for the record, you know what a HAVA document

41

1   family law, which is way outside of my area.  Never did file

2   it, but it came from a constituent.  They had an issue in their

3   family law and so I got with the appropriate staff and was

4   working on a bill for that.  But I never did file it.

5   Sometimes you get things from constituents.  Some election

6   issues can come from constituents.  And other things you have

7   an interest in.  You know, it might be -- you know, it could be

8   anything.

9       Q.  When you talk to a constituent about an idea for a

10  bill, do they ever propose bill language to you?

11      A.  That has happened.  Sometimes they'll say this needs

12  to be changed.  This -- and needs to be or, or something.

13      Q.  Yeah.  But you take the ideas wherever they come and

14  you evaluate them on their own merits, is that right?

15      A.  I mean, if you think it's a good idea.  It could come

16  from an interest group.  It can come from a constituent.  It

17  can come from anywhere.  If it's a good idea you might -- a

18  memory might decide to work on that with staff and develop a

19  bill for it.

20      Q.  When it comes time to draft bill language, do you work

21  with the nonpartisan staff in bill drafting?

22      A.  Yeah.  Is there an example?

23      Q.  Just in general.

24      A.  Yeah.  So if I had a bill that I was interested in

25  drafting I would -- probably my first phone call would be to

46

1      Q.  So give you an idea of kind of the time frame you're

2  working in?

3      A.  Yeah.

4      Q.  Do they take an interest in particular pieces of

5  legislation?

6      A.  The speaker may.  When it comes to this, he never

7  really has.

8      Q.  Okay.

9      A.  Not to me directly.  He doesn't come to me and say,

10  hey, you got a bill in your committee and you need to hear it.

11  Nothing like that.

12      Q.  Okay.  When did the idea to do an elections omnibus

13  bill in this session come about?

14      A.  You would have to ask the senate.  It's a senate bill.

15  It came from them.  And then we thought well, let's just make

16  it better.

17      Q.  So the senate kind of came up with the idea?

18      A.  Yeah, the senate bill crossed over when?  In May or

19  June.  And then it's in my committee.  And there's some stuff

20  on there that was of interest to me, to members of the

21  committee, and so that's when I started working on it.

22      Q.  Okay.

23          MR. SHENTON:  We're at about an hour.  Do you

24  need a break?  Let's take a quick break.  You guys want to take

25  five, seven minutes?

49

1     A.  Making election day the date that all ballots are due,

2   I think, actually passed the session before, at least in the

3   house.  The no private money -- I mean, it's a big bill.  It

4   ended up being 43 pages.  No private money in the public

5   elections.  That had been discussed the previous session.  So

6   there were parts of the bill that had been passed and/or

7   debated and/or discussed previously.

8     Q.  What about the same-day registration provisions?

9     A.  I would think that that had been discussed.  I can't

10  remember a bill number.

11    Q.  Okay.

12    A.  From the prior session.

13    Q.  Okay.

14    A.  Or, you know, that session.  But I would -- yeah, I

15  would have been -- that was a topic in the chambers.

16    Q.  Okay.  What do you remember about the discussions

17  around same-day registration in the prior session?

18    A.  Not much.  I mean, just that people had concerns,

19  legitimate concerns.  We can do better and we need do better.

20    Q.  What were those concerns?

21    A.  That with -- with same-day voter registration?  That

22  we needed a better process.  The elections procedures could be

23  improved to make sure that the integrity of vote was protected.

24    Q.  Okay.  And improved how?

25    A.  To make sure that every legal vote is counted.

51

1      Q.  Sure.  I guess I'm a little bit confused by what you

2   mean by improved.  Because you say, sure, you're only going to

3   pass legislation if you think something can be made better.  Is

4   that fair to say?

5      A.  Absolutely.

6      Q.  So making things better in the context of same-day

7   registration would seem to suggest that you have identified a

8   problem or an issue or a concern that needed to be improved

9   about same-day registration, is that right?

10      A.  The issue and problem of concern was the two mailings

11   and notification coming back too late to the board.

12      Q.  Okay.  Tell me a little bit more about that.

13      A.  Just as I described it.

14      Q.  So the concern was that the mailings were coming back

15   too late to the county boards?

16      A.  Correct.

17      Q.  For same-day registrants?

18      A.  So you would have an improper vote count.

19      Q.  An improper vote how?

20      A.  It shouldn't have been counted.  It was improper.

21      Q.  Why was it improper though?

22      A.  Well, a vote can be improper for any number of

23   reasons.  You have got to be a -- you have to be a registered

24   voter to vote and to be a registered voter you have got to be a

25   citizen.  You need to live for the districts -- for instance, I

                                                              52

1    represent House District 95.  It ought to be the people in

2    House District 95 who are voting for that -- for me in that

3    seat, who are voting for my opponent in that seat.

4        Q.  Okay.

5        A.  You can have improper votes for --

6        Q.  And the same-day registration process was producing

7    improper votes?

8        A.  It could be better.  We needed to improve the process.

9        Q.  Because it was producing improper votes or for some

10   other reason?

11       A.  Because it could and did produce improper votes being

12   counted.  If you can improve something, you need to do it.

13       Q.  So it did produce improper votes being counted and

14   that's why it needed to be improved, is that fair?

15       A.  Yes.  But also you have got to protect the integrity

16   of the vote.  You need people to feel good about the vote.

17       Q.  Okay.  So is the people feeling good about the

18   integrity of vote, is that -- how does that relate to whether

19   or not improper votes are being counted?  I guess to rephrase

20   my question slightly since I recognize that was a little

21   confusing.  Could someone be concerned about the integrity of

22   vote in a situation where there weren't improper votes actually

23   being counted?

24       A.  Could someone be concerned about the integrity of the

25   vote where there weren't improper votes being counted?

53

1      Q.  Which votes were those?

2      A.  I think 747 improves our voting process.

3      Q.  Which votes were those that were being counted under

4  the old same-day registration system improperly?

5              MR. STRACH:  Objection.  Go ahead.

6              THE WITNESS:  If you have someone who did not

7  live in the correct district, gave the wrong address.  Could be

8  any number of reasons.

9  BY MR. SHENTON:

10     Q.  Any others you've identified?

11     A.  I mean, here today?  I mean, it could be for any of

12  the reasons that make a vote improper.  I mean, I think more

13  times than not it would be a mistake.  Oh, I live in that

14  district or I don't, when they really don't or something of

15  that nature and they might vote in the wrong district.

16     Q.  Okay.  So someone might vote in the wrong place on

17  accident.  Any other things this came up in that context of the

18  previous session discussion around same-day registration?

19     A.  Came up in the -- are we talking about what happened

20  in the session before?

21     Q.  We're talking about both.

22     A.  Okay.  So what's your question?

23     Q.  So you identified one possible category of voters,

24  people who were mistaken about where they lived and using

25  same-day registration.

55

1      A.  Yeah.  I was giving my -- okay.  What's your question?

2      Q.  Any other examples like that where someone might use

3  same-day registration to cast an improper vote?

4      A.  To me that's the biggest problem, people getting it

5  wrong and the card doesn't go back.  That's the reason one-card

6  mailing is better than the two-card mailing.

7      Q.  And people getting it wrong, people writing down the

8  wrong address?

9      A.  Giving the wrong address, putting the wrong address on

10  the application, whatever.  It could be some people trying to

11  commit fraud.  I don't know.  You know, those things could

12  happen.

13      Q.  Do you know of any specific examples of a time when

14  someone wrote the wrong address down under same-day

15  registration?

16      A.  I don't know any -- I do not know personally, no.

17      Q.  Don't have any knowledge of any such case?

18      A.  No.  But there's people that do.

19      Q.  Okay.

20      A.  I don't know anyone personally.

21      Q.  Or know of one that happened somewhere elsewhere where

22  you might not have known personally but you heard about it?

23      A.  I do not know personally, no.

24      Q.  Okay.  Do you know of any examples where someone

25  intentionally wrote the wrong address to try and vote in a

56

1    place where they shouldn't have?

2        A.  Personally?  No, I do not know anyone.

3        Q.  Do you know of any examples?

4        A.  No.  You know, you have people present examples all

5    the time when you're down here.  When you're a member of the

6    general assembly, people bring you information.

7        Q.  So people brought you examples of times where people

8    intentionally wrote the wrong address down?

9        A.  You get a lot of emails.  You get a lot of people

10   telling you stuff.

11       Q.  Did you investigate any of those to see if they were

12   -- if they bore out --

13       A.  No.  No.

14       Q.  Okay.  I'm going to introduce a document that's been

15   previously marked as plaintiff's Exhibit-2, it's document four.

16       A.  Thank you.

17       Q.  Take a moment to take a look at that.

18       A.  Okay.

19       Q.  Flip through it real quick.  Have you ever seen this

20   article before?

21       A.  I don't recall seeing this article before.

22       Q.  Okay.  Are you familiar with Dr. Andy Jackson?

23       A.  I do know Dr. Andy Jackson.

24       Q.  What do you know about Dr. Jackson?

25       A.  He works at John Locke.

                                                          57

1      Q.  -- the change, but the house did not?

2      A.  No.  And that wasn't the board's recommendation.

3      Q.  So did you review any election data on same-day

4   registration before starting the house process on Senate Bill

5   747?

6      A.  I do not recall.  Maybe.

7      Q.  Would you have asked for any such data?

8      A.  No.

9      Q.  So if you reviewed it, it was because someone brought

10  it --

11     A.  It was because a member would have brought it to me.

12  Maybe a staff person would have brought it to me.

13     Q.  Do you remember any conclusions you took from any data

14  like that?

15     A.  I don't remember.  I don't remember.

16     Q.  Don't remember any specifics?

17     A.  No.

18     Q.  So fair to say you didn't factor it in heavily if you

19  did look at it?

20              MR. STRACH:  Objection.

21              THE WITNESS:  No.  No.

22  BY MR. SHENTON:

23     Q.  No, you did not factor it in heavily, correct?

24     A.  I don't recall that happening.

25     Q.  Okay.  All right.  Without getting into any content of

65

 1      A.  Which email?

 2      Q.  This email, the --

 3      A.  This email?  No.

 4      Q.  Did you discuss it with Mr. Barefoot?

 5      A.  I don't recall.

 6      Q.  Anyone on the speaker's staff?

 7      A.  I wouldn't think so, no.  Certainly don't recall doing

 8  that.

 9      Q.  Anyone on the committee staff?

10      A.  No.

11      Q.  No one on central staff?

12      A.  No.  I don't know who Tiger Lily is.

13      Q.  Okay.

14      A.  They didn't put their name.

15      Q.  All right.  I'm going to introduce a new exhibit now.

16  It's a document number 10.  We'll mark it as -- oh, no, I'm

17  sorry this has already previously been marked as plaintiff's

18  Exhibit-7.  Excuse me.

19      A.  Thank you.

20      Q.  Take a moment to familiarize yourself with the

21  document.

22      A.  Okay.  I see it.  It's an email.

23      Q.  Do you recognize this email?

24      A.  No.  But I can see it was sent on March 1, 2023.

25      Q.  It's addressed to you, right?

86

1        A.   It's addressed to me.

2        Q.   And it's from Mr. Jim Womack?

3        A.   Yes, it is.

4        Q.   And then turn you to page two.

5        A.   Uh-huh.  Page two.

6        Q.   Look likes we have got another list of legislative

7   priorities also purporting to be from the North Carolina

8   Election Integrity Team, is that right?

9        A.   Yes, that's what it appears to be.

10        Q.   Just real briefly, I'll direct you to near the bottom

11   of item number one it's got that same language about

12   out-of-state students that we just discussed?

13        A.   It appears to be the same or similar language, yes.

14        Q.   And then turn you to the next page, just real briefly.

15   You see item number eight it's also early voting, same-day

16   registration?

17        A.   Okay.  Yes.

18        Q.   And it's not got those same three ideas that we were

19   just talking about before?

20        A.   It appears to, yes.

21        Q.   I'll represent to you that these are substantially

22   similar recommendations as the last email that we just looked

23   at.

24        A.   Okay.

25        Q.   And these are coming from Mr. Womack, who as we

87

1    discussed is someone you're familiar with?

2       A.  Yes, I know who he is.

3       Q.  I'm going to take you through a couple things in this

4    email.  In that first paragraph, last sentence of that

5    paragraph, Mr. Womack writes in the past several months we

6    briefed both Speaker Moore and Joe Coletti on these priorities

7    and both seemed receptive to helping improve the quality of our

8    election laws.

9         Were you present in either of those meetings?

10      A.  I was not.

11      Q.  Were you aware of these meetings?

12      A.  I was not.

13      Q.  Do you know what was discussed in those meetings other

14    than what Mr. Womack writes here?

15      A.  No.  I have no knowledge of those meetings.

16      Q.  Point you to the last paragraph on this page right

17    before he signs warm regards.  The last sentence of that starts

18    I would welcome the opportunity.

19      A.  I see it.

20      Q.  So it's an invitation by Mr. Womack to meet with you

21    to discuss potential legislation, is that right?

22      A.  It says I would welcome the opportunity to meet with

23    you and discuss potential legislation at your convenience.

24      Q.  Did you ever take him up on that invitation?

25      A.  I remember having one meeting with Mr. Womack.

88

1    Q.  Do you remember about when that would have been?

2    A.  I do not.  It would have been early in the session.

3  It would have been -- I cannot give you a date, but I would say

4  that it was well before 747.  So he wrote that in March.  It

5  could have been around that time, but I have no idea.

6    Q.  So sometime before the bill crossed over between March

7  and June?

8    A.  It could have been before or after March.  I don't

9  know when I met him.  And it could have been the session

10  before.  I know I met him one time in my office.

11    Q.  Okay.

12    A.  I assume it was after this email, but I don't know.

13    Q.  Okay.  That's fair.  Like you said, a lot of people

14  want to talk to you.  Turn you to page two of that document

15  real quick.

16    A.  Okay.

17    Q.  Right at the very top under title.  It says the NCEIT

18  team is drafting legislation in these major categories for

19  consideration by the NCGA.

20    Did you ever see any draft language from NCEIT?

21    A.  I don't recall seeing draft language or draft

22  legislation from NCEIT, no.

23    Q.  Did you ever see any draft language or legislation

24  from Mr. Womack?

25    A.  No.  The drafts we use are from our staff.

89

1    Q.  Yeah.

2    A.  I don't know what he's referring to.

3    Q.  Okay.  But you mentioned sometimes you get draft

4  language from people outside?

5    A.  People will suggest --

6    Q.  Yeah.

7    A.  -- things.  And the example I gave you was somebody in

8  a family law issue.  They actually had a specific change this

9  and I thought that -- I mean, that stuck out, right?  But I

10  don't recall getting any drafts from NCEIT.

11    Q.  Or Mr. Womack?

12    A.  No.

13    Q.  Okay.  Are you aware of anyone who -- in the

14  legislature who did see information from NCEIT or Mr. Womack?

15    A.  No.

16    Q.  Okay.  All right.

17          MR. SHENTON:  Turn to another document which

18  I'll mark as plaintiff's Exhibit-55.  It's document number 11.

19          (Document marked as Exhibit-55 for

20  identification.)

21  BY MR. SHENTON:

22    Q.  Take a moment to familiarize yourself with that and

23  let me know when you're ready.

24    A.  Okay.  I see it.

25    Q.  Have you seen this email before?

90

1      A.  No.  But it looks like I was copied on it.

2      Q.  Yeah.  You were cc'd on that.

3      A.  Yeah.

4      Q.  This is an email from Representative Davis to Mr.

5  Womack, is that right?

6      A.  This is an email from Representative Davis to Jim

7  Womack, yes.

8      Q.  And it was sent on March 11, 2023?

9      A.  It was sent on March 11, 2023, yes.

10     Q.  So in that first paragraph of Representative Davis's

11  email at the top of page one, the last two sentences of that

12  paragraph.  Starts by copy of this email.  Do you see that?

13     A.  Which line?

14     Q.  It's the fourth line, about midway through.  By copy

15  of this email.

16     A.  Yes.

17     Q.  Yeah.  By copy of this email to Representative Grey,

18  I'm asking that he review the attachments so we can decide

19  whether or not to file either or both of your suggested

20  legislation.

21     A.  Okay.

22     Q.  We may want you to meet with us to discuss.

23     A.  Okay.

24     Q.  To the best of your recollection, did you ever review

25  the attachments by Representative Davis?

91

1      A.  If Representative Davis sent me a sample language that

2  was drafted by staff, I would imagine that I would have

3  reviewed that, yes.  Representative Davis is a member of the

4  committee and we also are on J1 together.

5      Q.  You specified that if he reviewed anything that was

6  drafted by central staff you would have taken a look at it, is

7  that right?

8      A.  Yes.

9      Q.  In this email he's not talking about something drafted

10 by central staff --

11     A.  I would have looked at it.  If Representative Davis

12 sent me something, I would have looked at it.  I didn't mean to

13 imply at all it was not central staff.  No, I would have paid

14 attention to his emails.

15     Q.  Gotcha.  Didn't think you were.  Just wanted to make

16 sure that it's clear for us and for the record.

17     A.  Sure.  Yeah.

18     Q.  And then in that last sentence of that first paragraph

19 he said we may want to meet with you to discuss.  Did you

20 ever --

21     A.  I can only -- go ahead and finish your question.

22     Q.  Did you ever meet with Representative Davis and Mr.

23 Womack at the same time?

24     A.  I don't think so.  I have met with Representative

25 Davis on numerous occasions about various things because we're

92

1       Q.  Sure.

2       A.  -- computer to see if we actually took action as a

3   committee.  There were a couple of bills filed to limit early

4   voting.  But I don't recall us taking those up in committee.

5   Now, I could be wrong, but --

6       Q.  Is it your understanding that Mr. Womack supported

7   these initiatives from that sentence?

8       A.  Well, based on the things that you have sent me, I

9   would say he supports those, yes.

10      Q.  Did you have that understanding at the time?

11      A.  At what time?

12      Q.  During March of 2023.

13      A.  I don't know when I met with Jim Womack.  It could

14  have been during that time and he would have expressed the

15  things that he was interested in.

16      Q.  So when you met with him he would have expressed --

17      A.  He would have expressed what they were working on and

18  what they wanted to see passed, just like anybody else would

19  have.

20      Q.  To the best of your knowledge, did the idea to -- I'll

21  quote it directly from the email mail here -- to compel

22  same-day registrants to use a provisional ballot, end quote,

23  did that idea come from Mr. Womack?

24      A.  That the senate -- what are you talking about?

25      Q.  The idea to --

96

1    A.  I don't know where that idea came from.

2    Q.  But you know that Mr. Womack supported it?

3    A.  Yeah.

4    Q.  Yeah.

5            MR. SHENTON:  We're at about two hours right

6    now.  We can break for lunch now if you want to do that now.

7            MR. STRACH:  Is that okay with you?  Yeah.  All

8    right.  Let's just do 30 minutes.

9            MR. SHENTON:  Okay.

10            VIDEOTAPE TECHNICIAN:  Going off the record.

11    The time is 12:14 p.m.

12            (Lunch break.)

13            VIDEOTAPE TECHNICIAN:  Going back on the

14    record.  The time is 1:13 p.m.

15    BY MR. SHENTON:

16    Q.  Representative Mills, good afternoon.

17    A.  Good afternoon.

18    Q.  Just before we begin, did you discuss the substance of

19    your testimony here today with anyone over the lunch break?

20    A.  No.

21    Q.  Great.

22            MR. SHENTON:  I'm going to introduce another

23    exhibit.  I'm going to mark it as plaintiff's Exhibit-57,

24    document 13.

25            (Document marked as Exhibit-57 for

97

1      Q.  So you think it's a mitigated disaster?

2      A.  No, I'm not saying that.  I just said I don't agree

3  with the statement.

4      Q.  So you don't think it's an unmitigated disaster.

5  Okay.  Let me direct you to -- see there's some bullets just

6  below that.  Solution number two.

7      A.  I see it.

8      Q.  That first bullet point.  It says change 163-82.7 to

9  make clear what is expected and when it is expected.  Mail the

10  new voter verification to the residential address within one

11  day of receiving the VR application.

12         Did I read that right?

13      A.  Yeah, it looks like you read that right.

14      Q.  I'll represent to you that 163-82.7 is the statutory

15  number in the election code that talks about sending

16  verification mailers to same-day registrants like we have been

17  talking about today.

18      A.  Okay.

19      Q.  So do you think -- back up.  Do you have an

20  understanding of what the pre-747 law required as far as the

21  timing of verification mailers for same-day registrants?

22      A.  I cannot tell you offhand.

23      Q.  Do you have any general sense?

24      A.  We were -- when we were working on the bill, you know,

25  we looked at past legislation.

104

1      Q.  And what did you find?

2      A.  Well, like I said, I don't have -- I can't tell you

3   offhand.

4      Q.  Sure.  Do you remember this being an issue when you

5   were you discussing it?

6      A.  An issue?  No.

7      Q.  Okay.  If I told you that past law only required that

8   county boards sending out the verification mailer within a

9   reasonable time after a same-day registrant applied for

10  registration, would that sound right to you?

11            MR. STRACH:  Objection.  Go ahead.

12            THE WITNESS:  If you tell me it said that.

13  BY MR. SHENTON:

14     Q.  Do you have any reason to believe that wouldn't be

15  true?

16     A.  No, I have no reason.

17     Q.  Were you aware that county boards did not take a

18  uniform interpretation of what a reasonable amount of time was

19  to send those mailers out before 747?

20     A.  I don't recall discussing that with anyone.

21     Q.  So you were never discussing the timing of the

22  verification mailers with anybody?

23     A.  I do not recall discussing the timing of verification

24  mailers.

25     Q.  And to your recollection, that wasn't a focus in the

                                                            105

1    it from starting on the third Thursday before an election to

2    the second Saturday before an election?

3        A.  Yes, it would reduce the number of days.  Not a

4    constitutional amendment.

5        Q.  Which I'll represent to you that would be eight days.

6    So this might be the one you were thinking of.

7        A.  Maybe.

8        Q.  Flip back to page one.

9        A.  Okay.

10       Q.  See the last activity was that it was assigned to the

11   Election Law Committee on March 9, 2023?

12       A.  Yeah.  This was the whole history, then March -- March

13   9th it would have been signed to committee.

14       Q.  So that one hasn't been passed, right?

15       A.  No.  That indicates that it's still sitting in

16   committee.

17       Q.  Okay.

18              MR. SHENTON:  Going to introduce another

19   exhibit here, which I'll mark as plaintiff's Exhibit-61,

20   document 18.

21              (Document marked as Exhibit-61 for

22   identification.)

23              THE WITNESS:  Thank you.

24   BY MR. SHENTON:

25       Q.  I'll represent that this is same version of what we

1    were just looking at but for a different bill, House Bill 485.

2        A.  Okay.

3        Q.  Flip to page two.

4        A.  Yes.

5        Q.  So this one, sponsored by Representative Davis.  And

6    this would have required certain individuals seeking to

7    register and vote on the same day must vote a provisional

8    ballot.  Do you see that?

9        A.  Yes.

10       Q.  Makes a provisional ballot required for same-day

11   registrants?

12       A.  Yes.

13       Q.  So flip back to page one real quick.  This bill was

14   filed on March 27, 2023, is that right?

15       A.  Yes, it appears so.

16       Q.  If we look at the sponsors list, second line of that

17   middle box.  Your name is listed as one of the sponsors, s

18   right?

19       A.  Yes, it is.

20       Q.  Do you remember sponsoring this legislation?

21       A.  I remember sponsoring several pieces of legislation.

22   This is obviously one of them.

23       Q.  This bill was introduced after some of these emails

24   that we have been looking at, right?

25       A.  I think you're right, yes.

114

1      Q.  Where various folks, Dr. Jackson, Carol Snow, Mr.

2  Womack had been suggesting various things, some of which

3  included --

4      A.  I have never talked to Carol Snow.

5      Q.  Right.  Not saying you did.  Just that they had sent

6  these ideas and these ideas were percolating, fair to say?

7      A.  These ideas had been -- yeah, I would say had been

8  around for the time I was in the general assembly, yes.

9      Q.  And this language is also pretty similar to the

10  language that the first version of Senate Bill 747 used, right?

11      A.  Yes, it would be probably consistent.

12      Q.  Okay.  Do you remember anything about why you decided

13  to sponsor this legislation?

14      A.  You sponsor a legislation a lot of times to -- I'm

15  chairman of the committee.  It would be nice to have a say on

16  what's going on with some of the bills and also to have a

17  vehicle because there's certain deadlines that you have to

18  meet.  So a lot of times you file bills so you have got

19  something to work with.

20      Q.  Sure.  Do you remember if any of those factors were at

21  play with this bill specifically?

22      A.  No, I don't recall.  But I see it was filed in 27,

23  went to -- if this is the complete history, it went to

24  committee on 3/28 and it's been sitting there.

25      Q.  Right.

115

1      Q.  And then that second option says upon providing a copy

2   of a current utility bill, bank statement, government check,

3   paycheck, or other government document showing name and address

4   of the voter at the county board of elections where the voter

5   resides before the close of poles on election day.  Did I read

6   that right?

7      A.  Yes, you did.

8      Q.  That list of documents, that's the HAVA documents,

9   right?

10     A.  Yes.

11     Q.  So to summarize, this statutory language would require

12  same-day registrants to either pass mail verification under

13  82.7 or provide a HAVA document to their county board of

14  elections before the close of polls on election day in order

15  for their ballot to be counted, is that fair?

16     A.  Yes.

17     Q.  Is that similar to Dr. Jackson's language that we were

18  talking about earlier?

19     A.  I would have to go back and look, but there's probably

20  similarities.

21     Q.  General concept sounds pretty similar?

22     A.  Yeah.

23     Q.  General concepts also pretty similar to the NCEIT

24  proposal we were talking about, right?

25     A.  Yeah, they all sound pretty similar.  Provisions,

1      Q.  So you see the middle of that first paragraph there,

2  same-day registration and voting is abused.  It's underlined.

3      A.  Where do you -- I see -- yeah, it's the one, two,

4  three -- it's the fourth thing underlined.

5      Q.  One, two, three, four.  That looks right to me.

6      A.  Yeah.

7      Q.  Do you agree that same-day registration is abused?

8      A.  I think that it could be improved and I think that's

9  what House Bill 747 did and we did it with the board's

10  cooperation.  Like I said, I think in North Carolina, overall,

11  our elections are run pretty well, but you can always try to

12  make things better.  I don't know this person.  I haven't read

13  this email, so I don't know -- it's hard for me to characterize

14  what Mr. -- I guess it's Mr. Patrick T. McDonnell in Leland is

15  referring to.  I don't know him.

16      Q.  So fair to say you don't think same-day registration

17  was being abused before 747?

18      A.  As I said, I look at it as can we do better.  And I

19  think that's what 747 did.  I think it's a good bill.  I think

20  we got it right.  I think that we followed an excellent process

21  to make the bill.  We got the board's input and we made it

22  better.

23      Q.  Let's go a little bit further down.

24      A.  On this email?

25      Q.  Yeah.  Just this one.

181

1    Q.  And then you see that next sentence, we have drafted

2  language which would directly address what we understand to be

3  the problem:  Same-day registrants who fail --

4    A.  I'm sorry, it's been a long day.  Tell me --

5    Q.  Very next sentence right after that.

6    A.  We've drafted -- okay.  I see where you're at.

7    Q.  We've drafted language which would directly address

8  what we understand to be the problem:  Same-day registrants who

9  fail mail verification.  Do you see it?

10   A.  Okay.  I see where he wrote that.

11   Q.  Yeah.  And then the next sentence, under this

12  proposal, the registrant would get one verification mailing

13  and, if that is returned by the day before canvass, the county

14  board would be instructed to retrieve and discount the ballot.

15   A.  I see where he wrote that.

16   Q.  That's pretty similar to what the house ended up

17  putting in for the same-day registration provision for 747,

18  right?

19   A.  Yeah.

20   Q.  And you said that you put that in at the

21  recommendation of the state board?

22   A.  Yeah, it came from them.

23   Q.  Okay.

24   A.  One-day mail came straight from the state board.

25   Q.  Do you agree with the state board's characterization

1    here that this proposal would still directly address what we

2    understand to be the problem?

3        A.  Okay.  Where are we at?  I'm sorry.

4        Q.  You remember how this document from the state board

5    said --

6        A.  Which document?

7        Q.  The document we're looking at right now.  This one.

8        A.  Okay.  Where are you at?

9        Q.  They said they drafted language which would directly

10   address what we understand to be the problem.

11       A.  We have drafted language which would -- I see where he

12   says that.

13       Q.  Yeah.  And it's same-day registrants who fail mail

14   verification.

15       A.  Okay.  I see that.

16       Q.  Do you agree that that's the problem that the same-day

17   registration provision, the 747 were designed to address?

18       A.  Now repeat the question.

19       Q.  Basically this document identifies the problem that

20   747 is trying to solve is same-day registrants who fail mail

21   verification?

22       A.  Yeah, we wanted to improve same-day registration.

23       Q.  Do you agree that that's the problem that you were

24   trying to fix with same-day registration?

25       A.  We were trying to make it better for every voter in

193

1    the state.  I don't understand your question.

2         Q.  Specifically by addressing same-day registrants who

3    fail mail verification, right?  That's the problem that 747 --

4         A.  That's one problem that he states.  So how can we do

5    same-day registration better.

6         Q.  Do you agree with that characterization?  Yes or no?

7         A.  I don't -- I'm sorry, it's been a long day.

8         Q.  Okay.

9         A.  Ask it another way.

10        Q.  The state board says they interpret the 747 language

11   at this point, which is what you -- the house has gotten from

12   the senate, to be trying to be address the issue of what

13   happens to a same-day registrant who fails mail verification.

14   And they propose the one-mailer system instead of a provisional

15   system?

16        A.  That's where the idea came from.

17        Q.  Because they thought that it still addressed the same

18   problem, but it was more workable.  Do you agree that that's

19   the problem that the same-day registration provision --

20        A.  The problem was you had ballots that were probably

21   going to be -- that were counted and then you find out later

22   that it wasn't -- it shouldn't have been counted.

23        Q.  Shouldn't have been counted.  What do you mean by

24   that?

25        A.  Meaning that they weren't a resident.

194

1 There's page numbers --

2  A. Yes.

3  Q. -- on the attachment?

4  A. Yes.

5  Q. And it's got -- page four is the one we're looking at.

6  A. Page four.

7  Q. Maybe I'm wrong.

8  A. It's been a while since --

9  Q. Page three.  I'm sorry.

10  A. Page three?

11  Q. Yeah.  So it says 782 in the bottom right-hand corner.

12  A. Okay.

13  Q. So you see section 10 there at the bottom of the page?

14  A. Yes, I see it.

15  Q. Talks about revising same-day registration during

16 early voting.  And then it says would require CBE to remove a

17 same-day registrant's ballot from the tabulation if their

18 initial address verification mailing is returned as

19 undeliverable by the business day before the canvass.

20   That's the change that the house ended up proposing

21 and passing for same-day registration, right?

22  A. Yeah, I believe so.

23  Q. And then you see the state board notes on the

24 right-hand column.  Right at the top it says this proposal is

25 much more workable than what it would replace.

1          Do you agree with that?

2     A.  I think it was more workable than the senate version.

3  I think we made it better, yeah.

4     Q.  Is that why you made the change, to make it more

5  workable?

6     A.  That's the reason I was onboard.  Everybody seemed to

7  like that a lot better and it did seem to be more workable.

8     Q.  And then you see in that green highlighting which they

9  label suggestions at the top, they have a recommendation to

10 allow students who have a current identification card for an

11 educational institution and appear on a current list of

12 students residing in on-campus housing to qualify under the

13 HAVA documents provision.

14    A.  Yeah.  A writing from the school?

15    Q.  Yeah.

16    A.  Yeah.

17    Q.  Then they said this would match the current law, the

18 pre-747 law?

19    A.  Yeah.  It would be consistent.

20    Q.  Did you adopt that recommendation?

21    A.  I think our final version has that as the last thing

22 listed, a letter from an institution.

23    Q.  Okay.

24    A.  I think it does.

25    Q.  Do you see anywhere in that section, which does

210

1       A.  Okay.

2               (Audio played.)

3       Q.  So we stopped at 41 minutes, 58 seconds.  Do you

4   recognize the voices that were speaking there?

5       A.  That was Representative Harrison asking the question.

6       Q.  And do you recognize the voice that was responding to

7   it?

8       A.  That was Jessica, central staff.

9       Q.  So that question and answer was talking about how

10  college students were going to vote under this same-day

11  registration provision.

12          Did you consider how college students were going to

13  vote under the new same-day registration provision?  Was that

14  something you specifically considered?

15      A.  Yes.  That's the reason this item six was in there.

16  If I remember correctly, Representative Harrison had spoken to

17  staff and myself and others previously.

18      Q.  And did you think that was a good change to the bill?

19      A.  I think we have a good bill.

20      Q.  Do you think it's reasonable to believe that young

21  voters or college voters would be disproportionally affected by

22  changes in same-day registration?

23              MR. STRACH:  Objection.  You can answer.

24              THE WITNESS:  No.  People who move may be.

25  BY MR. SHENTON:

                                                              217

1    A.  Listen, there's errors in the system.  It's not a

2  perfect system.  There's no perfect system.  What we try to do

3  is make it the best that we can.  We try to perfect it and

4  improve it as we go along.  But, you know, humans evolve.

5  There's going to be errors.

6    Q.  Do you view it as less responsible to use same-day

7  registration than regular registration?

8    A.  How so?

9    Q.  Do you think it would be -- let me say it the other

10  way.  Do you think it would be more responsible of someone --

11    A.  I think that people are responsible for making sure

12  that they get registered if they want to vote.  And we have two

13  processes to do that, same day and 25 days out the regular way.

14    Q.  So they're both responsible ways to vote?

15    A.  And they're both -- yes.

16    Q.  Okay.  Let's turn to the house floor debate which was

17  the next day, August 16, 2023.  So this is the bill comes to

18  the floor.  Reported favorably at a committee.

19    A.  Okay.

20    Q.  Going to do the same thing we did.  Just play a few

21  more audio clips and talk about it.

22    A.  All right.

23    Q.  Want to go to two hours, three minutes, 18 seconds.

24         (Audio played.)

25    Q.  Stopped at two hours, six minutes, 25 seconds.  Was

223

1        A.  I don't think it did.

2        Q.  It didn't end up in the final bill text?

3        A.  No.

4        Q.  And you asked representatives to oppose the amendment

5    because the one mailer provision was negotiated with the state

6    board, is that right?

7        A.  Yeah.

8        Q.  And are those negotiations the kind of documents that

9    we have gone through today where they sent over --

10       A.  No.  You're on the house floor.  You're speaking.  You

11   know, maybe negotiated was -- it was their input.  What I

12   should have said was the idea came from the state board.  But

13   when you're on the house floor you're carrying a -- to me it's

14   a pretty big piece of legislation.  I chaired a committee.  I

15   mean, you're going to misspeak at some time.  There was no

16   negotiation.  I wasn't going, hey, Paul, what will you give me

17   for this or something like that.  Negotiated was probably not

18   the right term to use.  It was input.  It was guidance that

19   they suggested and we went with it.

20       Q.  You also said one mailing is adequate and serves the

21   purpose.  You said serves the purpose.  Do you mean serves the

22   purpose of --

23       A.  What we're trying to achieve.  One day -- with -- I'm

24   sorry, it's getting late.  But to me it served the purpose of

25   what we're trying to achieve.

229

1      Q.  Which was to --

2      A.  Make it better.

3      Q.  The goals we talked about before, make is so that

4  everybody who is eligible to vote can vote?

5      A.  Yeah.  Make it better.

6      Q.  Make sure that election administrators have easy time

7  --

8      A.  It came from the board.  I agreed with it.  I think

9  everybody who worked on the bill with me agreed with it.  I

10  think we have got a good bill.  It seemed to have worked well

11  in the primary.

12              MR. SHENTON:  Can we take a quick just

13  two-minute break?  Go off the record real quick.

14              VIDEOTAPE TECHNICIAN:  Going off the record.

15  The time is 4:31 p.m.

16              (A break was taken.)

17              VIDEOTAPE TECHNICIAN:  Going back on the

18  record.  The time is 4:37 p.m.

19              MR. SHENTON:  I'm going to introduce a document

20  which I'll call plaintiff's Exhibit-88.  This is document 63.

21              (Document marked as Exhibit-88 for

22  identification.)

23  BY MR. SHENTON:

24      Q.  I'm not going to take too much time with this one.  If

25  you go to I believe it's the fourth page.  It's got 601 at the

230

1      A.  No, I don't recall.

2      Q.  But you might have?

3      A.  If somebody brought it to the meetings that we had, we

4   looked at that time.  If members would have brought it to my

5   attention, we would have looked at it.  But I do not recall.

6   To say I didn't look at any, I wouldn't agree with that.

7      Q.  Why not?

8      A.  That's a broad statement.  I can't agree to that.

9      Q.  Okay.

10      A.  I can't remember what all people brought.

11      Q.  But you wouldn't identify any particular information

12   that you said, oh, yeah, that was important when we were

13   considering this provision?

14      A.  No.

15      Q.  Okay.  Do you have -- are you aware of any verified or

16   I should say any confirmed example of someone who was

17   ineligible using same-day registration to nonetheless vote even

18   though they were ineligible?

19      A.  I am not personally -- I do not personally know of an

20   example.

21      Q.  And no evidence of any HAVA document being forged or

22   altered by someone using same-day registration?

23      A.  Me personally, I am not aware of that.  Others

24   expressed interest in those things and concern in those things,

25   other members.

1      Q.  Did anyone present evidence of someone forging a HAVA

2  document in the legislative process?

3      A.  I do not recall that.

4      Q.  Okay.  At any point during the drafting process for

5  your Senate Bill 747 did you or someone under your direction

6  contact colleges about mail deliverability issues for students?

7      A.  I did not contact colleges.

8      Q.  Did you contact the U.S. Postal Service about

9  deliverability issues?

10      A.  I did not contact the U.S. Postal Service.

11      Q.  I'll represent to you that there's a United States

12  Postal Service study that found that 23 percent of

13  undeliverable mail can be attributed to errors by the postal

14  service.  Does that number sound surprising to you?

15      A.  I'm unaware of that study.

16      Q.  Does that number surprise you?

17      A.  I am unaware of that study.

18      Q.  Does 23 percent sound high?

19      A.  I don't know the document you're referring to.  I

20  don't know the study you're referring to.  I don't know if

21  that's accurate or not.

22      Q.  If it were accurate, would it surprise you?

23      A.  Repeat it again.

24      Q.  23 percent of undeliverable mail is the result of a

25  postal service failure.

240

1      A.  Okay.  Of undeliverable mail.  Okay.  Yeah, I don't

2  know.

3      Q.  If that were true, would it surprise you?  I guess

4  that's my question.

5           MR. STRACH:  Objection.  Go ahead.

6           THE WITNESS:  Yeah, I don't know.  I have had

7  -- look, I have told you earlier today that we use the postal

8  service.  We were before this bill.  Long before this bill.

9  That's what the county boards use.  That's what the state board

10  uses.  We use the postal service.  We use it in other aspects

11  of our lives.  We didn't change that aspect of the bill.

12  BY MR. SHENTON:

13      Q.  Okay.  Do you think the two mailer system has more

14  margin for error than the one-mailer system?

15      A.  I don't have an opinion to that.  As I said, you know,

16  I've used the mail all my life.  We used mail before this bill.

17      Q.  So one is just as good as two?

18      A.  I think -- yes, I think that it's reliable service and

19  that's the reason we use it.  That's the reason why we use it

20  in the legal field too.

21      Q.  Did you commission a study on same-day voting at any

22  point during the 747 process?

23      A.  Did I commission a study?  No, I did not commission

24  any studies.

25      Q.  Did you direct anyone to commission a study?

241

1     A.  A study of what?

2     Q.  Of same-day registration statistics in North Carolina.

3     A.  No, I did not -- I did not ask anyone to study

4  anything.

5     Q.  Did you review any such study?

6     A.  I'm not sure.

7     Q.  Do you remember reviewing any such study?

8     A.  It's possible.

9     Q.  But no specific recollection comes to mind?

10     A.  No.

11     Q.  Did you ever see any demographic breakdowns of

12  same-day registration usage in North Carolina?

13     A.  No, not that I recall.

14     Q.  Didn't request any?

15     A.  No.

16     Q.  Didn't request any data on how many people fail the

17  first mailer but pass the second mailer?

18     A.  I did not request any data.

19     Q.  Didn't request any data on people who failed both

20  mailers?

21     A.  I didn't request any data.

22     Q.  Didn't request any data on people who make

23  reregistration attempts at the same address where they failed

24  verification previously?

25     A.  I did not make any such request.

242

1      Q.  Didn't request any data on people who vote
2  provisionally at addresses where they had failed mail
3  verification?
4      A.  Can you repeat that?
5      Q.  You didn't request any data on registrants who vote
6  provisionally at addresses where they had failed mail
7  verification?
8      A.  I did not request anything.
9      Q.  And didn't request any data -- strike that.  I'm
10  sorry.  We are almost done, Representative Mills.  I'm going to
11  turn to my last document which has previously been marked
12  plaintiff's Exhibit-43.  It's document six.  I know it's long,
13  but there's only a few questions.
14          I'll represent to you that this is the legal opinion
15  from the United States Court of Appeals for the Fourth Circuit
16  in the case -- the North Carolina State Conference of the NAACP
17  v. McCrory.  This was issued in 2016.  This was litigation
18  challenging the 2013 election omnibus bill.  I'm going to
19  direct you to page 23 of this document.  Going to look at one
20  paragraph.  The third paragraph from the bottom.  Starts
21  concerning same-day registration.  And then halfway through
22  there's a sentence that starts the board acknowledged.  Do you
23  see that?
24      A.  I see that.
25      Q.  I'm going to read a couple of these sentences.  And

243

1      Q.   Okay.  Without having requested any information, were

2  you generally aware of the demographics of the people who use

3  same-day registration in North Carolina?

4      A.   That could be anybody.  I mean, I think it's probably

5  most people that move.  If you move you -- and you move at a

6  time close to election, you're probably going to be the person

7  using same-day voter registration.  That's what it's for.

8      Q.   You didn't have any understanding that that was people

9  who were more men than women or older people than younger

10 people?

11     A.   People who move.  Everybody moves.  Women move.  Men

12 move.

13     Q.   No understanding of any demographic breakdowns like

14 that?

15     A.   No.

16     Q.   Just got one more line of questions for you and then I

17 think we can wrap it up.  I unfortunately don't have a

18 recording for this one, but I'll represent to you that in the

19 committee meeting for the House Elections Committee a

20 representative said, quoting their daughter, she said the

21 problem is that college students don't understand the issues of

22 the local politics or the local people.  And she says

23 effectively, when you have a big university in a college town

24 the college students effectively have the ability to completely

25 eliminate essentially the representation of the local people

246