# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMOCRACY NORTH CAROLINA;
NORTH CAROLINA BLACK ALLIANCE;
LEAGUE OF WOMEN VOTERS OF            CASE NO.
NORTH CAROLINA,                      1:23CV00878-TDS-
                                     JEP
          Plaintiffs,

     vs.

ALAN HIRSCH, in his official
capacity as CHAIR OF THE STATE
BOARD OF ELECTIONS; JEFF
CARMON III, in official
capacity as SECRETARY OF THE
STATE BOARD OF ELECTIONS;
STACY EGGERS IV, in his
official capacity as MEMBER OF
THE STATE BOARD OF ELECTIONS;
KEVIN LEWIS, in his official
Capacity as MEMBER OF THE
STATE BOARD OF ELECTIONS;
SIOBHAN O DUFFY MILLEN, in her
official capacity as MEMBER OF
THE STATE BOARD OF ELECTIONS;
KAREN BRINSON BELL, in her
official capacity as EXECUTIVE
DIRECTOR OF THE STATE BOARD OF
ELECTIONS; NORTH CAROLINA
STATE BOARD OF ELECTIONS,

          Defendants.


          VIDEOTAPED 30(b)(6) DEPOSITION OF
     NORTH CAROLINA ELECTION INTEGRITY TEAMS
            By JAMES K. WOMACK, JR.

              (Taken by Plaintiffs)

            Raleigh, North Carolina

              September 19, 2024


Reported by Andrea L. Kingsley, RPR

1

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS:

4            Christopher Shenton, Esquire
             Jeffrey Loperfido, Esquire
5            Hillary Klein, Esquire
             Lily Talerman, Esquire
6            SOUTHERN COALITION FOR SOCIAL JUSTICE
             5517 Durham-Chapel Hill Boulevard
7            Durham, North Carolina 27707
             (919) 794-4213
8            Chrisshenton@scsj.org
             Jeffloperfido@scsj.org
9            Hilaryhklein@scsj.org
             Lily@scsj.org

10

11   ON BEHALF OF THE LEGISLATIVE DEFENDANT-INTERVENORS:

12           (Via Zoom)
             Alexandra M. Bradley, Esquire
13           Cassie A. Holt, Esquire
             NELSON MULLINS RILEY & SCARBOROUGH, LLP
14           301 Hillsborough Street, Suite 1400
             Raleigh, North Carolina 27603
15           (919) 329-3800
             Alex.bradley@nelsonmullins.com
16           Cassie.holt@nelsonmullins.com

17

     ON BEHALF OF THE STATE BOARD DEFENDANTS:
18
             Stephanie Brennan, Esquire
19           NORTH CAROLINA DEPARTMENT OF JUSTICE
             114 Edenton Street
20           Raleigh, North Carolina 27603
             (919)716-6860
21           Sbrennan@ncdoj.gov

22

23

24

25
                                                          2
```

1           A P P E A R A N C E S (Cont'd.)

2

  ON BEHALF OF THE WITNESS:

3

          B. Tyler Brooks, Esquire

4         LAW OFFICE OF B. TYLER BROOKS, PLLC
          100 East Lake Drive, Suite 6

5         Greensboro, North Carolina 27403
          (336) 707-8855

6         Btb@btylerbrookslawyer.com

7

8   VIDEOGRAPHER:  Kyle Roeder

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1              VIDEOTAPED 30(b)(6) DEPOSITION OF

2       NORTH CAROLINA ELECTION INTEGRITY TEAMS by

3       JAMES K. WOMACK, JR., a witness called on

4       behalf of the Plaintiffs pursuant to the

5       Federal Rules of Civil Procedure, before

6       Andrea L. Kingsley, Notary Public, in and for

7       the State of North Carolina, at Southern

8       Coalition for Social Justice, 5517

9       Durham-Chapel Hill Boulevard, Durham, North

10      Carolina, on Thursday, September 19, 2024,

11      commencing at 11:08 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    4

1    more active entities?

2         A.    Well, there are a number of

3    nongovernmental organizations that are very active

4    in that space.

5         Q.    Like who?

6         A.    Southern Coalition of Social Justice.

7         Q.    I was going to wonder if you --

8         A.    I would say the Democracy Now.  The

9    Voter Participation Center.  And then there are

10   groups that are on the right side of the fence that

11   are in that space like Election Transparency

12   Initiative and Election Integrity Network,

13   Restoring Integrity and Trust in Elections.  The

14   RNLA.  I mean, innumerable organizations that are

15   very active in that space that exist exclusively to

16   or at least a chief part of their operation is for

17   elections.

18        Q.    Are there any that you would identify as

19   influential in the formation of NCEIT?

20        A.    Yes.  Election Integrity Network, yes.

21        Q.    How were they influential in the

22   formation?

23        A.    Our first meeting up there was during

24   the big storm of January 2022.  We were called to

25   Washington or invited to Washington to participate

28

1  in a two-day seminar that described the Virginia

2  experience of 2021 and what they did to secure the

3  election, and being more than casually interested

4  in election integrity, I took the opportunity to

5  travel up there and for two days we were immersed

6  in citizen activism and what was done in Virginia

7  in 2021.

8       Q.    Were you talking about things like the

9  eight pillars?

10      A.    At that time there was a book and,

11 actually, you can pull that resource down if you're

12 interested, it's publicly available on our website.

13 It's how to build infrastructure for election

14 integrity, it's Cleta Mitchell's book and it was

15 being distributed at that time, and it's available

16 on our website, as well as the Virginia Experience

17 which was handed out at that seminar.  Those two

18 documents were very helpful in us creating what we

19 call the eight lanes of election integrity.

20      Q.    Is the eight lanes, is that something on

21 N --

22      A.    That's an NCEIT specific term and it's

23 what we use in defining the organization for people

24 that are coming into it.

25      Q.    So the Election Integrity Network and

                                                    29

1    Cleta Mitchell's book, the Virginia Experience book,

2    those are things that are kind of influential in

3    shaping those eight pillars?

4         A.    Certainly was.

5         Q.    Just a couple of personal questions very

6    quickly.

7               You graduated from West Point; is that

8    correct?

9         A.    I did.

10        Q.    Approximately when was that?

11        A.    Specifically June 6, 1977.

12        Q.    What did you study there?

13        A.    I was an engineer.

14        Q.    Any other degrees that you received?

15        A.    I have a -- we have -- at that time we

16   had what they called a secondary or specialty area,

17   national security and public affairs.

18        Q.    Anything else that you --

19        A.    (Indicating).

20        Q.    Then you served in the military after

21   that?

22        A.    20 years.

23        Q.    Thank you for your service.

24        A.    Thank you.

25        Q.    And then what did you do after your

                                                    30

1    obviously -- if it's brought to our attention, we

2    certainly try to make sure that they have the

3    opportunity to vote.

4        Q.    Would you say college students are a

5    vulnerable population of voters?

6        A.    No, I wouldn't actually.

7        Q.    Why not?

8        A.    As a matter of fact, I think we bend

9    over backwards in the country and particularly in

10   the State of North Carolina to make sure college

11   students have every opportunity to vote.

12       Q.    Bend over backwards how?

13       A.    We set up precincts in student unions,

14   set up voting sites.  We allow them to use student

15   IDs instead of driver's licenses for voter ID.  I

16   got to tell you, just a number of methods that we

17   make for students to make -- give them the

18   opportunity to go vote and to make it really easy

19   to vote.

20       Q.    Do you think those are opportunities

21   that -- is it your view that those are opportunities

22   that are disproportionately given to college

23   students as kind of a special favor?

24       A.    It's not mine to judge what's

25   disproportionate.  I just don't think they're a

63

1    vulnerable population.

2         Q.    Any other vulnerable groups you

3    identify?

4         A.    Not off the top of my head, but I

5    mentioned three.

6         Q.    Has NCEIT seen a growth in interest from

7    members in the public in election integrity

8    recently?

9         A.    Yes.  And by the media.  Yes.

10        Q.    What would you attribute that increased

11   interest to?

12        A.    Sometimes it's just curiosity.  We're in

13   an election season right now so people that are

14   otherwise engaged in plenty of other things, work,

15   family, church all of a sudden are now concerned

16   about the election and what they've seen or heard

17   in the past comes to mind and they think how can I

18   plug in, how can I make a difference and maybe --

19   they find out about our work and they ask or they

20   get recruited by some of our members to come in and

21   participate.  That's -- we're seeing a renewed

22   interest but it's not unexpected because we had the

23   same experience in 2022 as we got into September,

24   October, people are naturally interested in getting

25   involved in making sure the elections are fairly

                                                    64

1          Q.     Would it surprise you if I told you that

2     young voters disproportionately use SDR?

3          A.     Not at all.

4          Q.     Why not?

5          A.     Because young voters tend to be like

6     social butterflies.  They bounce around and their

7     attention span, as a general rule, their attention

8     span is focused on other things until just before

9     the election and all of a sudden they're motivated

10    to -- beer drinking buddies or college student

11    friends or whatever say, hey, have you registered,

12    let's get registered right now.  It's perfectly

13    logical, that's the way it work knowing that they

14    have all these other activities that merit their

15    attention.

16         Q.     Do you think it has anything to do with

17    them moving around more frequently for jobs, school,

18    things like that?

19         A.     Sure.  That too.  Yeah.

20         Q.     Maybe renting more and so moving year to

21    year because they didn't renew their lease

22    somewhere?

23         A.     Very plausible.

24         Q.     Would it surprise you if I told you

25    college voters also use SDR more than other groups

87

1    of voters in North Carolina?

2         A.    It wouldn't surprise me at all.  They're

3    a very mobile population, particularly out-of-state

4    kids that moving into the state and since

5    college dorms -- most people don't go to college

6    and live in the dorm where they -- in the city that

7    they live.  They commute if they're in the city.

8    So, yeah, it wouldn't surprise me at all.

9         Q.    Would it surprise you if a lot of those

10   college students don't receive mail at their dorm

11   rooms specifically?

12        A.    Well, that's an interesting question.

13   When I was in college it was a different college, I

14   got all my mail in my dorm room.  So that's my

15   frame of reference.  But, no, I hadn't really

16   thought about it.

17        Q.    How does a college student's domicile

18   and kind of determining where that is interact with

19   the same day registration usage in your view?

20             MR. BROOKS:  Objection to the form

21        but you can answer.

22        A.    So I'm not sure I follow your question.

23        Q.    Do you think there's a relationship

24   between how a college student is kind of flexible in

25   determining their domicile, maybe trying to figure

                                                      88

1    back on several of the things that were in our

2    presentation.  Senator Hise in particular and

3    Senator Daniel both pushed back on several of the

4    issues we were pressing and, you know, we respected

5    that.

6        Q.    How about Representative Grey Mills?

7        A.    I met with Grey two or three times.

8    Never more than five to seven minutes on a

9    particular issue.  The one time we spent about five

10   minutes together was pretty intense.  I educated

11   him on some election law stuff he wasn't aware of

12   that I was shocked about.  He was unaware that

13   there's a different treatment of the -- in the

14   early voting sites than there is for in-person

15   voting on election day.  He didn't realize that the

16   staffing is done differently and that the

17   allegiances are different.  I thought, you know, as

18   the chairman of the elections committee he knew --

19   he was thoroughly familiar with the law.

20   Apparently he wasn't.  And he actually did correct

21   that in one of the bills after we talked about it.

22       Q.    So a handful of times?

23       A.    Yeah.  I'd say -- he hasn't really

24   responded to any of my e-mails, but his LA has

25   responded to me a few times and I have been able to

129

1    meet with him two or three times.

2          Q.    How about Speaker Moore?

3          A.    Zero contact with Speaker Moore other

4    than, you know, smiling and saying hi to each

5    other.

6          Q.    Senator Berger?

7          A.    Even less.  He won't even smile.

8          Q.    How about Representative Hugh Blackwell?

9          A.    No meetings and he's been cc'd on some

10   of my exchanges but I don't remember him

11   responding.

12         Q.    We talked about Representative Cleveland

13   a little bit.

14         A.    Yeah.  It's pretty intense with George.

15   He's on his way out, but we were trying to milk him

16   for everything we could on his way out the door.

17   He's a wonderful civil servant and he was the most

18   approachable of all the legislators when we were

19   talking election law.

20         Q.    Would you say you met with him regularly

21   on election law issues?

22         A.    Yes.

23         Q.    And there was a give and take, a back

24   and forth, he was interested in what you had to say?

25         A.    Absolutely.  Not always agreeing but he

                                                    130

1    was very receptive of the things that we were

2    advocating.

3         Q.    How about Representative Ted Davis, Jr.?

4         A.    I would say similar to Cleveland, a

5    little less accessible but every bit as effective

6    in presenting materials.  And I've met with Ted at

7    least three times, all brief meetings, but he was

8    very good about using the material that we

9    provided.  So yeah, I would say he was very

10   resourceful.

11        Q.    Similarly interested in what --

12        A.    He was.  He was.

13        Q.    Representative Pike?

14        A.    I met -- he was on -- Joe was on the --

15   there's a group in the legislature that's not on

16   the election committee, but pre-session they had

17   working groups in various topical areas, and Joe

18   Pike, of course, lives real close to me down in the

19   Sand Hills, Joe volunteered to be on the election

20   coordinating group.  So I met with him twice before

21   session, this last session, and he was interested

22   in what we were doing and he was providing feedback

23   back to Speaker Moore on things that they ought to

24   be doing.

25        Q.    Do you remember which items in

131

1    it on 747.  Not totally untrue because it happened

2    the morning after the bill came out.

3         Q.    Oh, man.

4         A.    It was tough.  I was up all night trying

5    to write a response to a bunch of stuff.

6              Anyhow, the life of the 747 -- I don't

7    remember exactly -- off the top of my head, I don't

8    remember -- I don't recall what happened right

9    after it passed out of Senate and came over to the

10   House.  I don't remember that.  I want to say that

11   there was quite a few changes that occurred as it

12   came over.  Maybe that third iteration was what it

13   was that finally corrected a bunch of stuff or

14   improved it.  But I remember that we were okay with

15   the first version and the second version was really

16   bad.  I think that's when they added the opening

17   the primaries and some other stuff.  It was a

18   tortuous evolution.

19        Q.    First off, I'm glad you're okay.

20              Second, would your meeting with Joe have

21   been after that first version crossed over from the

22   Senate to the House?

23        A.    I don't recall.  I don't remember

24   exactly when it was.  I remember -- now that I

25   think about it though, it may have been before

                                                    137

1   747 -- I know there was -- he wanted to have a

2   meeting because we had sent a lot of correspondence

3   to Speaker Moore and to Sam Hayes and we had -- and

4   Joe was given the task of pulling to -- of

5   getting -- sitting down and going through all of

6   our material in preparation for what they were

7   going to do, and I can't remember the timing now,

8   it might have been just before 747 popped --

9   because I think there were a bunch of House bills

10  that were all scattered around at the time that

11  weren't going anywhere and they were trying to

12  figure out what are we going to do and they were

13  also -- I remember Joe specifically said, look, I'm

14  not really sure what the Senate's going to do.  So

15  it may have been just before 747 came out and it

16  may have actually been before our meeting with the

17  Senate, the co-chairs.

18          But whenever it was, I remember it was a

19  two-hour meeting, we had a long, long conversation,

20  and one area it was in particular and, again, I

21  don't remember which topic it was, but there was --

22  we spent a good half hour, 45 minutes on one topic.

23  Again, I would have to go back to Jay to recall

24  what that was.  I didn't take any notes.  I just

25  remember taking some of these materials to him and

138

1    talking.  Again, I don't remember where it was in

2    the timing of 747.

3        Q.    You mentioned the last person on my list

4    here, Sam Hayes --

5        A.    I've actually exchanged a good amount of

6    correspondence with Sam.  He's connected to some

7    donor friends that I have up in Raleigh, and I

8    think that's the reason why Sam was interested in

9    talking to me, because the donors were interested

10   in him talking to me.  Sam, he didn't really do a

11   lot with our materials other than help facilitate

12   getting meetings and that sort of thing.

13       Q.    Going back to Brent Woodcox for a

14   second, do you have any sense of who was kind of

15   giving him instructions --

16       A.    No idea.  He operates in the shadows

17   over there.  I really have no idea.

18       Q.    And then for Joe you mentioned that it

19   was the Speaker who had kind of tasked him --

20       A.    The Speaker and Sam, the two of them

21   gave the task to Joe.

22       Q.    The task to just kind of filter through

23   the materials that you and folks like Jay DeLancy,

24   Carol Snow were kind of sending?

25       A.    The only two people I know that were

139

1    providing details to Joe Coletti were myself and

2    Jay.

3         Q.    I will introduce another exhibit here.

4    We will mark it as Plaintiff's Exhibit 89.

5                   (Exhibit 89, social media post

6         dated 6/1/23, "Look what WE did!", marked for

7         identification, as of this date.)

8         A.    I see my logo.  Nice logo, huh?

9         Q.    Not bad.  I like the flag reference.

10   Take a moment to familiarize yourself with it.

11            Do you recognize this?

12        A.    I do.

13        Q.    What is it?

14        A.    It's apparently a social media post.

15        Q.    About what?

16        A.    About -- this is -- this came out right

17   after 747 I think.  I can't remember exactly when

18   it came out, I just remember Jane putting it out

19   and I remember it triggered some -- the headline

20   obviously I remember.  "Look What We Did."  I told

21   Jane I thought this was a little overzealous and I

22   don't know that there's anything in here -- by the

23   way, I didn't review this before coming in today, I

24   just remember when she posted it, I remember it was

25   going around.

                                                    140

1        Jane's really good about producing --

2    doing a little chest thumping after we do things

3    and putting information out on the internet.  She's

4    really good about most of the material.  This one

5    may have been just a hair overzealous.  I think

6    that I would not have said that the way she said

7    it, "Look At What We Did," because, frankly, there

8    wasn't a lot in there that we did.

9        But I remember when it got posted and I

10   remember it raised a little concern.

11   Q.    Let me direct you to the bottom of that

12   first page, that last paragraph.  It looks like

13   these are quotes from that WRAL article that is

14   linked at the top and you're quoted there at the

15   beginning of that paragraph.  Do you see that?

16   A.    Yeah.  Yeah, I see that quote.

17   Q.    It says, "From talking to leaders in the

18   House and Senate, it appears they're going to bundle

19   all these meritorious changes and put them in an

20   omnibus bill."

21   A.    Yeah.  So that's actually a quote that I

22   gave them.  The context of that quote is probably

23   important.

24        I wasn't referring to a presentation we

25   gave to the senators, I was talking about that we

                                                    141

1    were given indication that they were going to

2    bundle everything -- rather than the House that at

3    the time had put all these individual bills

4    together, some of which we had some pretty

5    significant impact on.  But those bills went

6    nowhere and weren't going anywhere because of the

7    division between the House and the Senate.  So the

8    Senate decides they're going to do an omnibus bill.

9    And that was the reason why they granted the

10   meeting to Cleta, Jay and myself before they

11   released 747.

12              And the context of this quote that I

13   gave WRAL was it looks like they're going to take

14   all the meritorious changes that they found and put

15   them into one omnibus bill.  In other words, we

16   were concerned the House bills weren't moving, the

17   Senate wasn't going to do anything and now, all of

18   a sudden, the Senate says we're going to do an

19   omnibus bill.

20              So we were expecting a lot of great

21   things to be incorporated into 747 or whatever it

22   was going to be, and that's what the source of that

23   quote was.

24        Q.    You mentioned at the end of the

25   paragraph it's something you had been pushing for,

142

1    your group.  Fair to say?

2         A.    It's fair.  It is.  We had been

3    advocating for a better part of a year at that

4    point to try to get things done.

5         Q.    Do you remember where your understanding

6    that the Senate was going to do an omnibus bill came

7    from?

8         A.    I don't remember -- you know, we were

9    having dozens of conversations everyday.

10             The first indication I think came back

11   from my senator.  I'm not one hundred percent sure.

12   But I know Jim Bergen actually had written a bill

13   on the removal of noncitizens for the jury duty,

14   the piece I explained before, and I was really

15   surprised that that was going to get incorporated

16   into the master bill.  That's the only thing that

17   really, out of the Senate, that was even sitting

18   there that had any chance of moving.  It got

19   incorporated.  I think Jim's the one who told me it

20   was going to be incorporated into a larger bill.

21             But we were told, the first formal

22   information I had about an omnibus bill was when we

23   met with the three Senate co-chairs where they told

24   us that's what Brent Woodcox was putting together,

25   was an omnibus bill.  That's the first indication I

143

1   had formally that it was going to happen, when they

2   granted that meeting.

3        Q.    You also mentioned kind of discussions

4   with leaders in the House and the Senate.  So we've

5   talked about talking with Joe and we've talked about

6   the meeting with the Senate co-chairs.  Is there

7   anything else you would put in that bucket?

8        A.    Yes.

9        Q.    Who?

10       A.    So we mentioned Ted -- Grey Mills,

11  George Cleveland.  Who was our sponsor?  I had some

12  conversations with Neal Jackson out of Moore

13  County.  Now that I think about it, that's probably

14  it.  There weren't any others that actually

15  sponsored any of our legislation, but the

16  individual conversations we had with bill sponsors

17  would have been the House leaders that I talked

18  about.  It wouldn't have been anybody else that

19  hadn't shown an interest in election integrity or

20  sponsoring one of our bills.

21       Q.    I'm going to introduce another exhibit

22  here which I think we're going to mark as Exhibit

23  90.

24            (Exhibit 90, website post, "NCEIT

25       Accomplishments since 2021", marked for

                                              144

1          identification, as of this date.)

2          Q.    Take a moment to familiarize yourself

3     with that.  Let me know when you're ready.

4          A.    That's off our website.

5          Q.    You've anticipated my first question.

6     So this is a post from your website?

7          A.    It is.

8          Q.    Have you seen this post before?

9          A.    Yeah.  This is the updated -- this is an

10    undated version.  It's being maintained by Jane

11    Bilello and Maryann Brain.  They're the ones that

12    maintain our site.  It's been slightly updated

13    since -- I wrote the original language that was up

14    there on the accomplishments and they've updated

15    it.

16         Q.    Do you have any input into the updates

17    that happen on the website?

18         A.    I guess I should be more responsive.

19    Yeah, I do have input to it and I can adjust or

20    modify anything I disagree with.

21         Q.    Let's go down to that -- it's about

22    halfway down the first section, it says,

23    "Legislative Success."  Do you see that bullet

24    point?

25         A.    Yes.

                                                      145

1    Q.    It lists Senate Bill 747, Election Law

2    Changes.  Do you agree with that?

3    A.    I agree that there's a piece of 747 that

4    we certainly had an impact on.

5    Q.    Would you characterize 747 as a

6    legislative success?

7    A.    Yeah, I would.  Certainly.  It moved in

8    the right direction.  I don't know that I agree

9    with everything in it.  I certainly disagree with

10   one piece of it, but, yeah, I think overall, on

11   balance, it's a success.

12   Q.    And then looking at the bullet just

13   above that, it says, "Wrote the language included in

14   the past bills below using affidavits to

15   substantiate the changes."

16   A.    Okay.  So what that is -- I'm glad you

17   raised that question because one of the things we

18   used in our presentation for Senate Bill 747 was

19   reports into our statewide election integrity

20   reporting system.

21   We maintain a pretty nifty reporting

22   system, it's interactive, where a poll observer can

23   see something that's inappropriate in a voting

24   place and then record that in our system and we

25   compile that by category.  So let's say there's a

146

1    You will note that almost none of that got into

2    747, but those were the specific legislative

3    recommendations.

4         Q.    Did you ever offer draft bill text on

5    any of those?

6         A.    Obviously, I would.  I did -- to answer

7    your question specifically, I did offer to write

8    bill text if they wanted it and Woodcox was not

9    interested in that.

10        Q.    When did your advocacy effort for the

11   2023 legislative session start?  Would that have

12   been right after the 2022 election, different time?

13        A.    Well, we were -- we spent the better

14   part of November, December 2022 compiling the SEIRS

15   reports to identify what are our chief aims in

16   2023.  And we began some dialog, oral dialog with a

17   couple of legislators in January prior to the start

18   of the session, but I think our meetings actually

19   really didn't kick into gear until after they got

20   settled in probably mid February 2023.

21        Q.    Do you remember who those legislators --

22        A.    Early on were George Cleveland, Ted

23   Davis.  We were sending materials to Grey Mills,

24   chairman of the elections committee.

25        Q.    Anybody else that comes to mind?

150

1    A.    Yeah, we were -- I don't remember

2  exactly when I made my first visit down to the

3  legislature, but we were looking for anybody on the

4  elections committee or the rules committee to talk

5  to.  So I had chance meetings with several people.

6  I think Joe Pike was probably -- he was on the

7  working group that was meeting before session.  So

8  Joe I talked to a little bit because he's a local

9  guy and I was trying to get him to advocate for

10  some stuff.  That's probably about it.

11    Q.    The working group that met before

12  session, is that a working group in the legislature

13  that was working specifically on election issues?

14    A.    Yeah.  Believe me, it's like I'm not

15  privy to anything they're doing, I just know the

16  members of working group.  In fact, that's not even

17  published anywhere.  We were told here are the

18  people that are going to be working on that working

19  group if you want to talk to them.

20    Q.    Who's on that working group?

21    A.    George was on it, Joe Pike was on it.  I

22  can't remember.  I think there were seven that were

23  on the House working group.  But only -- there was

24  almost no correspondence with the elections

25  committee.

151

1        Q.    The next few pages --

2        A.    You will see the exact same slides that

3    are from my presentation.

4        Q.    Fair to say Cleta Mitchell worked on

5    these recommendations?

6        A.    That's a fair statement.

7        Q.    Did you work with her on them?

8        A.    I did.

9        Q.    Assisted her in drafting them?

10        A.    I drafted this slide based on her input,

11    yes.

12        Q.    So she was kind of working with you to

13    develop these slides?

14        A.    Yes.  In preparation for the Senate

15    briefing.

16        Q.    Did you work with her regularly before

17    this?

18        A.    She's my boss.

19        Q.    How so?

20        A.    My organization is an extension of the

21    Election Integrity Network for the nation.  I run

22    the statewide team for North Carolina.  I'm one of

23    50 states and I work for Cleta as her national

24    director on the national working group for election

25    machines and technology.  So we interact almost

                                                    156

1   daily.

2       Q.    So you were working at her direction on

3   these slides?

4       A.    No.  I was working on -- these slides

5   were based on a review that Cleta had done of the

6   North Carolina statutes and the discussions we had

7   had about North Carolina's problems.  She was

8   putting her recommendations together that were a

9   part of our whole package.  I had my issues and

10  concerns and then she drafted them from her --

11  using her expertise as an attorney and election law

12  expert.  So she was providing her inputs as well.

13      Q.    So fair to say that she was taking some

14  of the materials you had given her and some of the

15  materials she developed from her own study to

16  generate this list?

17      A.    Very good statement, yes.

18      Q.    Was she involved in NCEIT's efforts

19  throughout the 747 legislative process?

20      A.    No.

21      Q.    How would you describe her involvement

22  in the 747 process?

23      A.    Again, Cleta runs the national group.

24  She only has a small amount of time to commit to

25  North Carolina.  That's my job, is to run the North

157

1    Carolina operation.  So Cleta took a keen interest

2    because we were -- North Carolina is on a different

3    kind of legislative cycle than other states are.

4    We were at that critical point going into our cycle

5    and she had a potential to influence or to help us

6    influence the legislators on 747.  So when the

7    three Senate co-chairs elected to meet with us,

8    then she put those recommendations together and

9    said, well, I want to address these when we go see

10   them.

11        Q.    So she put these recommendations

12   together specifically for the Senate chair's

13   committee?

14        A.    Um-hmm.

15        Q.    Why are they attached to the e-mail from

16   January 17?  Isn't that before the -- if you flip

17   back to that first page.

18        A.    Yeah, that's a problem.  I don't

19   remember her doing that before -- hmm -- that's a

20   good point.  My presentation said December 22.  So

21   my recollection may not be right.  She may have put

22   it together before the meeting.  I just know -- the

23   presentation for the Senate co-chairs is that and

24   those are word-for-word the same as the slides we

25   had here.  So maybe she did them earlier.  That's

158

1    interesting.  I don't remember her doing it that

2    early but maybe she did.  That's a good point.

3        Q.    What is the kind of working relationship

4    between NCEIT and the Election Integrity Network

5    generally?  Do they supervise the work?  Do you kind

6    of pull resources from them?

7        A.    So it's a -- Peters and Waterman did a

8    thing back in the 1970s called "Simultaneous

9    loose-tight properties" where you have some things

10   you watch real close and some things you just leave

11   other people to do.  That's kind of the way our

12   relationship is with EIN.  She provides overarching

13   guidance and information about what other states

14   are doing and she creates a forum for us to

15   interact, but there's only a certain number of

16   things that she really closely monitors.  I think

17   legislation is one of those things.

18           She monitors what each of the states is

19   doing with respect to election legislation, and if

20   she sees or hears about somebody doing something

21   particularly noteworthy, then she makes sure

22   everybody else is aware of it and shares it.

23   Because she's a resident of North Carolina, she has

24   a keen interest in us because she want us to be the

25   model state for election integrity.  And so she was

                                                      159

1  pretty involved in the run-up to the 2023 long

2  session.

3          I apologize, I didn't recall that she

4  had done those slides that early, I thought it was

5  just done in preparation for the Senate meeting,

6  but apparently it was done earlier.

7          Q.   It's totally fine.  As we go through

8  things, like I said, at the outset, if something

9  refreshes your recollection, totally fine.

10          You mentioned she kind of provides these

11  overarching principles and then NCEIT, is it fair to

12  say, takes those lessons and then applies them

13  throughout North Carolina not just in a rote way but

14  blended with your own --

15          A.   Sure, where it makes sense.  I mean,

16  there are some things where we kind of lead the way

17  in the country.  I will give you a good example.

18          The voter registration form.  Every

19  state has a slightly different voter registration

20  form.  There's federal guidelines but then your

21  interpretation of federal guidelines and you put

22  your form together.  We had a form that was really

23  corrupt.  It was improperly prepared in one section

24  because it didn't require, it didn't say it was

25  mandatory to provide a Social Security number or

160

1    We've shared our affidavit with other states on

2    voter registration and Tennessee's adopting it and

3    several other states are looking at it.  It would

4    be really good if we all did the best practice and

5    we could all tighten up our election laws in a way

6    that's uniform around the country.  Part of what

7    Cleta does is she monitors that stuff and helps us

8    improve.

9         Q.    So she offers expertise where it's

10   relevant and then pulls expertise from places to

11   share with other parties?

12        A.    That's correct.

13        Q.    All the while kind of helping people

14   understand how they think about elections, what the

15   vulnerabilities are?

16        A.    Yes.

17              You're going to have a good time with

18   Cleta.

19        Q.    Let me flip to that small number.  564.

20   It's a page or two just after that slide we were

21   just looking at about the recommendation from Cleta.

22   You will see the number 4 there.

23        A.    Absolutely.

24        Q.    "Eliminate the same day registration

25   during early vote."

162

1          A.     I agree with that.

2          Q.     Is that something that came from Cleta?

3          A.     No.  That actually -- we had concluded

4    in -- early on and, again, some of it stems from my

5    personal experience with same day registration as

6    well as analysis of the voter laws and the way it

7    was attempted -- and it's got a checkered history

8    anyway.  I think we went over that.  Going all the

9    way back to 2007, it's got a checkered history of

10   attempts and failures.

11          I think Judge Schroeder would agree with

12   it as well, that might be the easiest way to fix

13   same day registration, just eliminate it

14   altogether.  If someone can make it so that it's

15   less vulnerable for exploitation then maybe it

16   would be acceptable.

17          But that did not come from Cleta --

18   that's in her slide and it's her recommendation but

19   it was something we had already arrived at anyway.

20          Q.     Is that something she agreed with --

21          A.     Absolutely she agrees with that.  She

22   might offer you some other things that ought to be

23   eliminated.

24          Q.     Let me flip to 566 which is two pages

25   after that one.  Actually 568 is the one I have

                                                    163

1    here.  Do you see the number 13?

2         A.    Um-hmm.

3         Q.    That's the revocation affidavit that you

4    were talking about, right, or something like it?

5         A.    Yep.  You know that was Cleta's writing

6    because she uses the BOE term and I use NCSBE.

7         Q.    Got it.

8               Let me flip you to 556 which is 10 pages

9    earlier.  Challenge number 1.

10        A.    Okay.  This is my slide.

11        Q.    So you wrote this one?

12        A.    Yes.  These are my words.

13        Q.    If you want to go a little over halfway

14   down there's that "Same Day Registration" bullet.

15   "Same day registration during early voting is

16   inadequately scrutinized, electronic documents

17   allowed."

18        A.    That's correct.

19        Q.    You still agree with that?

20        A.    I do.

21        Q.    For the reasons we were talking about

22   earlier about the utility bills?

23        A.    Yes.

24        Q.    Let me direct you to the bullet second

25   from the top, "Out-of-state college student

                                                    164

1    registration to vote in North Carolina remains

2    problematic."

3         A.    Where are you?

4         Q.    Same page.  Did I read that right?

5         A.    Yeah.  It is correct.

6              So when I did the presentation for the

7    senators, the explanation of that bullet is that

8    the state residency, the state residence definition

9    is weak, and so we're permissive by its nature and

10   allows -- in the conversation that we had with the

11   senators was this, we said, you know, if you're

12   going to declare someone an in-state registrant for

13   voting then why aren't they in-state for college

14   tuition?  If you're going to say that they are --

15   they're going to be given permission to vote as a

16   permanent legal resident of North Carolina, they

17   should not have to pay out-of-state tuition.  And

18   you're not going to do that.  And they all agreed,

19   well, there is a difference.

20              I said, yeah, but how about some equal

21   treatment here.  If they're claiming -- that's in

22   effect what the law says, if they're claiming this

23   is their permanent legal residence then they should

24   not be paying out-of-state tuition, they should be

25   in-state tuition.  So, you know, you can't have it

165

1   both ways.

2          It's problematic because the students

3   are traveling here, they're dual-registered in

4   another state and they're going to go home to mommy

5   and daddy and they're going to go somewhere else to

6   go into employment and they're just voting here as

7   a convenience.  By law they should be voting in

8   their home states.  So we need to fix that.  Either

9   grant them in-state tuition or make them vote back

10  home by absentee ballot.  That was the thrust of

11  that conversation.

12      Q.    Any reason to think that that applies

13  specifically to college students and not other

14  people who are in the state?

15      A.    Well, it's because of the -- the subject

16  was students here.  It wasn't extended to other

17  people.  Other people that come into this state for

18  work or other purposes vote in their home state.

19  They're not allowed to vote here.  We tend to be a

20  little more permissive for students.  Remember I

21  said earlier, we bend over backwards to make it

22  easy for students to vote.  By the way, I'm not

23  opposed to student voting, so it's on the record,

24  I'm not opposed to student voting, I think we

25  should encourage and try to get all students who

166

1    the home state and use of tools and accepting

2    citizen inputs where we know people that have moved

3    or that have died that need to be taken off the

4    voter rolls.

5         Q.    Going back to the e-mail, the list of

6    priorities from Tiger Lily on page 3.  Number 8.

7    Early voting and same day registration.

8         A.    Yes.

9         Q.    The second item there is, "Make same day

10   registrants eligible only for provisional ballots

11   which can be researched and challenged prior to

12   canvass."

13        A.    Yeah.  And that was a recommendation I

14   made because at the time I didn't think there was

15   any way we were going to get rid of same day

16   registration.  So I said at least make it a

17   provisional ballot and then that would give us

18   ample time to do a little check on that person

19   through the digital resources we had and if

20   everything was fine, their vote would count at

21   canvass; but if we did find something, we could

22   provide a challenge on the voter prior to canvass.

23   So we thought that was a reasonable compromise.  We

24   didn't get it, but we thought it would be a

25   reasonable compromise.

174

1          Q.    Was that your idea?

2          A.    Yes.

3          Q.    How did you develop the understanding

4     that same day registration going away was probably

5     not on the table?

6          A.    I don't remember how we knew it, but I

7     think we had a couple of legislators roll their

8     eyes and say that ain't happening.

9                Actually, I take it back.  There was

10    some discussion about the fact this is all tied up

11    in the courts right now.  It had been back and

12    forth.  Again, we talked about the checkered

13    history of same day registration this morning.  Who

14    knows what the Fourth Circuit will do with it.  And

15    so we -- someone said it's a mission impossible,

16    we're not going to get rid of it so what can we do

17    to limit the potential exploitation, and that's

18    kind of what this idea was is to make it a

19    provisional ballot, at least it could be challenged

20    if we find evidence that the person shouldn't have

21    voted.

22                MR. SHENTON:  We've been going for

23          about an hour and a half.  It's a good time

24          for a five-minute break if you would like to

25          take a break.

                                                    175

1    an e-mail to Ted Davis.  So, obviously, I was busy

2    that day.  I sent this note to Grey Mills.  But,

3    yeah, it's the same day as the one I sent to Davis

4    he responded to.

5         Q.    And then Representative Davis responded

6    to your e-mail after looping in Representative

7    Mills --

8         A.    Right.

9         Q.    Had you been able to get in touch with

10   Representative Mills up to that point?

11        A.    I really don't remember the precise date

12   that I met with him, I just know that it was not

13   long after this and it might have been I met with

14   him subsequent to this note that I remember going

15   in and educating him about a couple of his election

16   laws that he was completely unaware of because they

17   were innocuous to him, but they were really

18   important to my workers.  So he agreed to help us

19   get that fixed where we treated in-person voting

20   during the early voting period the same as we did

21   on election day.

22        Q.    What was your impression of

23   Representative Mills' attitude to those changes?

24   Was he interested in them?

25        A.    He seemed so.

                                                  180

1        Q.    Did you ever discuss same day

2    registration with him?

3        A.    You know, I don't recall.  I don't

4    recall.

5        Q.    It's possible?

6        A.    It's certainly possible.  And I

7    certainly had him on my list of legislative

8    priorities.  So, yeah, he would've at least known

9    that it was high on our priority list.

10       Q.    You can see there in the attachments on

11   this e-mail had those priorities attached to it as

12   well --

13       A.    Yeah, it did.

14       Q.    If you flip through you can see those

15   are those priorities --

16       A.    Agree.  Agree.  Yes.

17       Q.    I want to direct your attention to the

18   first paragraph of the e-mail to Representative

19   Mills, last sentence, it says, "In the past several

20   months we briefed both Speaker Moore and Joe Coletti

21   on these priorities and both seemed receptive to

22   helping improve the quality of our election laws."

23       A.    Yeah, and you know... yeah... I'm trying

24   to remember when we would have spoken to Tim Moore.

25   It's in March.

                                                      181

1          Joe Coletti, I remember the specific

2    meeting with Joe.  I don't remember the meeting

3    with Moore.  I'm drawing a blank on this one, I

4    really am.  I wouldn't have lied to Greg Mills so I

5    must have spoken to Moore at some point, but I

6    don't remember him in the room.

7         Q.    You don't have any recollection of that

8    meeting?

9         A.    I don't remember.  Honestly, I don't.  I

10   have no idea when I would have spoken to Moore

11   unless he -- I know I talked to Sam Hayes in his

12   office, he's adjacent to Moore, but I don't

13   remember Moore being in the room.  He may have been

14   but I don't remember that.

15        Q.    Then you reference that the meeting you

16   had with Joe Coletti was about kind of --

17        A.    That meeting was down in the basement --

18   down in the -- in the LOB down in the restaurant

19   area down there.  He's got an office adjacent to

20   the restaurant.  That's where I met with Joe.  I

21   remember meeting with Sam in his office adjacent to

22   the Speaker's office but I don't remember the

23   Speaker being in there.  Obviously, if I said this

24   to Grey Mills I must have talked to the Speaker at

25   some point but I don't remember what the conditions

182

1    were for that.  I can tell you this, it wasn't an

2    appointment that I had with the Speaker because I

3    don't have any record of that.

4         Q.    Any idea why you would have said they

5    seemed receptive to improving the quality of our

6    election laws?

7         A.    Yeah.  I know Joe was keenly interested

8    in trying to get some of the more important points

9    that we had made in our priorities list done, but

10   he couldn't tell me exactly what they would take

11   up.  Similar in some ways to the 747 meeting that

12   we had where they seemed interested but they really

13   didn't commit to any one thing.  They did tell us a

14   few things they wouldn't do or couldn't do because

15   of lawsuits.  But it's just a general receptive

16   meeting that we had with Joe and with Sam.  Sam

17   Hayes had promised us that they were going to take

18   up some stuff for action so.

19        Q.    And they were interested in kind of

20   hearing your priorities and what you might like to

21   see in that bill?

22        A.    Yeah.  Again, I would tell you the main

23   reason that they had a keen interest at the senior

24   levels was because of the donors, because they were

25   interested in making the donors happy.

183

1      A.     Yeah.

2      Q.     But you did get to meet --

3      A.     I did.  I actually did have a really

4   good conversation with him.

5      Q.     Great.  Let me go to the next line of

6   that e-mail.  It says, "Cleta is supposed to be

7   having a meeting with Speaker Tim Moore in the next

8   week or so."

9      A.     Yeah, that never happened.  I can tell

10  you that never happened.

11     Q.     Do you know why?

12     A.     I can only speculate.  I mean, I will

13  only go so far.

14         So there's two people that legislatures

15  are responsive to, their constituents and their

16  donors, okay?  And Cleta is neither one of those to

17  Speaker Moore.  So, I mean, she had offered,

18  open-ended offered to come up and brief legislators

19  on both sides, both chambers, and we were able to

20  finally coerce the three Senate co-chairs to sit

21  and take a meeting after a bunch of House bills had

22  already been introduced.  So our real focus was on

23  the Senate at that time.  We really weren't

24  pressing the house so much as we were the Senate

25  because they hadn't done anything at that point.

190

1          Q.    I'm going to go to another exhibit now.

2    This is one that we've been talking about a little

3    bit.  Previously marked as Plaintiff's Exhibit 11.

4    I think you will recognize it, but you tell me if

5    that's right.

6          A.    Oh, yeah.  I recognize it already.

7          Q.    So you recognize this document?

8          A.    Absolutely.  It's mine, my work.

9          Q.    This is the presentation to the Senate

10   election chairs we've been talking about a few times

11   today?

12         A.    Right.

13         Q.    You were definitely present for this

14   when it was presented?

15         A.    I was.

16         Q.    Do you remember who else was in the

17   room --

18         A.    I gave you that list earlier.  It was

19   Senators Hise, Daniel and Newton, Paul Newton, and

20   it was Brent Woodcox, Cleta Mitchell, myself and

21   Jay DeLancy.

22         Q.    Anybody else in the room?

23         A.    Not to my knowledge.  If they were in

24   there, they were hiding.

25         Q.    No one in there from the State Board of

1    Elections?

2         A.    No, not at all.

3         Q.    Let's flip to page 8 which has a number

4    ending in 15 at the bottom.  It starts "Challenge 1"

5    at the top.

6         A.    All right.

7         Q.    If you look at that bullet second from

8    the bottom, you've got that same language we

9    discussed a little bit earlier, "Out-of-state

10   college student registration to vote in North

11   Carolina remains problematic."

12              Fair to say it's the same things that

13   were motivating as we talked about that language

14   before?

15        A.    Exactly.

16        Q.    Did they have any specific reaction to

17   that language at all in the meeting that you can

18   recollect?

19        A.    Not on that particular bullet, no.

20   Again, when you're going through a set of slides

21   this in-depth for a period of two hours, you're

22   going to have -- only occasionally are they going

23   to raise an issue.

24        Q.    You had done your homework, you had a

25   lot of things you wanted to talk to them about?

                                                    203

1    Q.    I will represent that, just like the

2    other ones, legislative defendants sent this one

3    over.

4    A.    Yeah, I have no reason to doubt and it

5    would be something I would do in a followup.

6    Q.    Did you have any conversations with any

7    legislators after this meeting before Senate Bill

8    747 was introduced?

9    A.    Not on the Senate side.

10    Q.    On the House side?

11    A.    Yeah.  So this would have been May --

12    mid May -- do you have the date of 747's

13    introduction?

14    Q.    I believe it was June 1.  So not too

15    much time.

16    A.    I don't imagine in that one week lapse

17    period I had much interaction beyond just general

18    coordination on 770 and 772 that we still were

19    hoping were moving.  And we really didn't know what

20    to expect when they -- with 747.

21    Q.    Let's take a look at that first filed

22    version.  We will introduce what's been previously

23    marked as Plaintiff's Exhibit 14.  I will represent

24    to you this is the first filed version of that

25    legislation downloaded straight off the General

211

1   Assembly website.  Let me make sure I go to the

2   right part here.  While I'm flipping to it, do you

3   remember anything about your reaction generally to

4   the bill when you first saw it without -- no need to

5   reference any specifics, just your recollection at

6   the time?

7        A.    Yes.  So like I say, there were three

8   editions to the bill.  The first edition, I think

9   my reaction was we were generally encouraged as a

10  first edition bill, had some interesting language

11  in it, we were really happy to see that there was

12  poll observer language, happy to see that there was

13  some attempt being made to remove noncitizens from

14  the ballots.  So, yeah, there was some general

15  encouragement in there, yes.

16       Q.    Let me direct you to page 10 now that

17  I've got it and it's line 27, about halfway down.

18       A.    All right.

19       Q.    It says, "Part 8 required provisional

20  ballot for same day registration."  And then it adds

21  some statutory language about when a provisional

22  ballot is going to be required pretty much for

23  someone who uses same day registration.

24            Do you see that language?

25       A.    Yes, I do.

212

1        Q.    Does that look similar to the proposal

2   we've been discussing?

3        A.    It sure does.  At least the first part

4   of it.

5        Q.    Fair to say it's pretty similar; right?

6        A.    It is.  It is.

7        Q.    Do you remember being in that first

8   filed version?

9        A.    I didn't recall it being in there, but

10  there were 45 parts or whatever.  I didn't remember

11  it being in there but, yeah.  Obviously they were

12  copying Representative Davis's work; huh?

13       Q.    Looks that way.

14       A.    I know I was surprised when I found out

15  George Cleveland told me that some of his work got

16  in there too but, obviously, they did borrow some

17  stuff from some of the House Bills.

18       Q.    What is your recollection of what

19  happened in the Senate after the bill was

20  introduced?  What was your impression of the process

21  on that side?

22       A.    It was murky.  We didn't know what was

23  going to happen with this thing.  Obviously, we

24  knew the House was interested in seeing some action

25  taken on election reform and we were encouraged

                                                    213

1    the Committee for Rules and Operations in the

2    Senate."  This is prior to the passage.  He picked

3    up -- I don't know who this guy is but he picked up

4    an earlier critical document of 747 while it was

5    still sitting in the Senate before passage and

6    that's why the lines don't measure up and why it

7    doesn't make sense, because he's commenting on a

8    different bill and he's attaching it to something

9    where it's already passed through the Senate.

10        Q.    So he's just talking about the wrong

11   version of the bill here?

12        A.    Right.

13        Q.    Got you.

14              Is it fair to say that the version that

15   did pass the Senate, does it still have that concern

16   about the vagueness of when that provisional ballot

17   will count or do you think it had been addressed?

18        A.    No, it's been addressed under (c).  (c)1

19   and 2.

20        Q.    Do you have any memory of discussing

21   that with any legislator in the Senate side?

22        A.    No.  In fact, I'm not sure that the

23   Senate actually fixed that.  That may have been a

24   compromise.  There may have been a House

25   conversation with the senators to get that done.  I

                                                    230

1    don't know.  I have no idea how they came to that

2    final language.

3         Q.    But this version of the bill was before

4    it had crossed offer to the House at all?

5         A.    Yeah, but that doesn't mean there

6    weren't conversations because I absolutely do

7    believe there were conversations because the House

8    knew that we were very upset with the second

9    edition of this bill and wanted to get some things

10   in there before it came over because they were at a

11   point where they wanted to get something done and

12   I'm sure there was some conversations at least

13   within the staff between Woodcox and Hayes or

14   Woodcox and Coletti or somebody, but they restored

15   some of the good parts in here, and a lot of that I

16   think was lobbying, the advocacy that we were

17   doing.

18        Q.    Fair to say.

19             Tell me a little bit about your

20   recollection of what happened when the bill did

21   cross over to the House.  How did the House process

22   go?

23        A.    I really don't remember now.  I really

24   don't.  It's all a blur.  I just know that we were

25   really happy that we got some restoration of good

231

1    remember that neither Ted Davis who sponsored the

2    bill, the one bill on same day registration, nor

3    George Cleveland or anybody else offered to say

4    we're going to stop same day registration.  Nobody

5    offered to take that up.

6         Q.    If we go to the first e-mail in the

7    thread from Carol snow.  She says, "I'd prefer to

8    stop the same day registration nonsense which only

9    opens the door to allow unverified voters to

10   participate in elections that are required by law to

11   be conducted fairly."

12            Do you see that?

13        A.    Yes.

14        Q.    Do you agree with that characterization?

15        A.    Maybe it's not artfully stated, but I

16   agree generally with the characterization that I

17   think, as I've said all day long, same day

18   registration I think is fraught with vulnerability

19   and there's a better way.

20        Q.    So maybe not artfully stated but in the

21   right place?

22        A.    Yeah, I agree.

23        Q.    Just one more thing I want to ask about.

24   Do you remember when House Bill 770 was heard in the

25   House elections committee in 2023?

                                                      238

1      A.    I may have spoken at that.

2      Q.    I think you did.

3      A.    Yes.

4      Q.    Do you remember anything from the

5 committee hearing generally?

6      A.    No.  They all run together.  If you want

7 to refresh my memory about something, I would be

8 glad to comment on it.

9      Q.    There was a comment that one of the

10 legislators made in the committee hearing that I

11 wanted to run by you.  It was about 45 minutes in.

12          They said, "My daughter came to me and

13 she said, you know, Dad, what's really interesting,

14 and she said it's really not fair, she said we do a

15 lot of work on the campus to register voters, and

16 she goes and that's great, we want people to vote,

17 and she said when they vote in the Senate, they vote

18 in the president, great, she goes, but here's what's

19 not fair, they vote in the local elections, and she

20 said the problem is that college students don't

21 understand the issues of the local politics or the

22 local people.  She says effectively, when you have a

23 big university in a college town, the college

24 students effectively have the ability to completely

25 eliminate the representation of the local people

239

1    because they don't understand the issues."

2              What do you make of that?

3         A.    Well, okay.  I completely understand her

4    line of thinking, but there are other issues at

5    play here.

6              I have the same discussion with military

7    members.  Military members have a home of record

8    typically in a state that doesn't charge income tax

9    so they stay registered where their home of record

10   is.  I say, well, you don't have to do that, under

11   the law you can register and influence the tax laws

12   and the boards of education where you're living

13   because you really want to influence where you're

14   living, that's where your vote means the most.

15             So I take the contrarian view to what

16   she said, that if you are living, literally living

17   in a place and you're residing there for a period

18   of time and you're either a taxpayer or you're a

19   recipient of government services, you want to

20   impact your local elections because that's fair.

21             However, if you're there only for the --

22   only there temporarily and you're only there for

23   the purpose of receiving an education then in my

24   mind you should be voting where you're going to

25   return to because that's really what the law

240

1  provides for, and you should vote absentee there

2  where you can influence the local election there.

3  Because you're insular on an institution campus

4  there.  You're going to get those services, you

5  don't have to vote to get those services, you're

6  going to get those services.  Voting for the school

7  board in Wake County or Durham County or whatever,

8  you're impacting the election.

9          But to her point, they are unnecessarily

10  weighting or moving the center of the gravity left

11  or right based on their political proclivity as

12  opposed to their real sincere interest in changing

13  education or tax policy or whatever.  And, yeah, we

14  all agree if they're voting for president, vice

15  president or Senate, that's a different thing, but

16  in the local elections, you are shifting that.

17          I understand her's, I don't necessarily

18  agree with her, but I do understand the line of

19  thinking that it's not fair to the local taxpayers

20  that their vote gets diluted by students who really

21  have no interest in the local affairs because they

22  don't really understand the interest.

23      Q.    Is there anything you feel like in our

24  conversation today that I am missing that you think

25  is important to what we've discussed?

                                                    241