# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case no. 1:23CV00878-TDS-JEP

DEMOCRACY NORTH CAROLINA; NORTH      )
CAROLINA BLACK ALLIANCE; LEAGUE      )
OF WOMEN VOTERS OF NORTH             )
CAROLINA,                            )
                                     )
              Plaintiffs,            )
      vs.                            )
                                     )
ALAN HIRSCH, in his official         )
capacity as CHAIR OF THE STATE       )
BOARD OF ELECTIONS; JEFF CARMON      )
III, in his official capacity        )
as SECRETARY OF THE STATE BOARD      )
OF ELECTIONS; STACY EGGERS IV,       )
in his official capacity as          )
MEMBER OF THE STATE BOARD OF         )
ELECTIONS; KEVIN LEWIS, in his       )
official capacity as MEMBER OF       )
THE STATE BOARD OF ELECTIONS;        )
SIOBHAN O'DUFFY MILLEN, in her       )
official capacity as MEMBER OF       )
THE STATE BOARD OF ELECTIONS;        )
KAREN BRINSON BELL, in her           )
official capacity as EXECUTIVE       )
DIRECTOR OF THE STATE BOARD OF       )
ELECTIONS; NORTH CAROLINA STATE      )
BOARD OF ELECTIONS,                  )
                                     )
              Defendants.            )


                30(b)(6) DEPOSITION OF THE
                STATE BOARD OF ELECTIONS by
                        PAUL COX


            NELSON MULLINS RILEY & SCARBOROUGH
                 301 HILLSBOROUGH STREET
                   RALEIGH, NC  27603
        _____
                      10:03 A.M.
              MONDAY, FEBRUARY 24, 2025
        _____


By:  Denise Myers Byrd, CSR 8340, RPR

1

1         what happened on the ground.

2    Q.   Sure.   That makes sense.

3              Are there any other kind of specific

4         archetypes or examples of a way in which you or

5         the state board are aware of an error being made

6         in the -- or a unique situation that might not

7         be captured by how the system was designed to

8         work did in fact occur?

9    A.   There is a unique situation that happened in

10        Watauga County during the election with regard

11        to same-day registrants.  I'm not sure that it

12        would lead to sort of anomalies or, you know,

13        data that would give a misleading picture in the

14        data that we produced, but it's possible it

15        could have.

16              There was a group of same-day

17        registrants who failed mail verification, I want

18        to say 20 to 30, and the county board identified

19        all of these verification cards that were

20        returned as undeliverable and noticed, to their

21        great credit, there was no problem whatsoever

22        with how these cards were addressed, and they

23        should have been delivered because a lot of them

24        were Appalachian State University addresses and

25        they're very familiar with how those should be

                                                        66

1    addressed and how those can be delivered.

2              I think there were some others that

3    were around the Boone area as well, but the

4    county identified this and were -- you know,

5    they brought it to me and said, look, you know,

6    we have this group of verification mailings that

7    have come back as undeliverable, but they

8    actually weren't stamped as undeliverable, they

9    were stamped with some different status, like

10   return to sender, some other designation that

11   would lead you to believe that it's misaddressed

12   or, you know, can't be delivered at this

13   address.

14             And I also know that the county board

15   spoke with the Postmaster for the university, or

16   for Boone, I don't remember which one it was,

17   and that person indicated, yeah, these are

18   correctly addressed, I don't know why they

19   didn't go through.

20             The mail for Watauga County gets routed

21   through the Greensboro postal processing center,

22   or distribution center, I forget what they call

23   if for the US Postal Service, and we brought

24   this to the attention of the Greensboro

25   facility -- especially during the voting process

                                                    67

1      we're in regular communication with the postal

2      service on a variety of issues -- and asked them

3      to look into it to see why did these get stamped

4      this particular way, were these stamped

5      incorrectly, and I elevated as well with the

6      general counsel's office to the postal service

7      in DC.  To their credit, they turned around and

8      got back to us, and they did identify that that

9      labeling was misapplied by the Greensboro

10     facility.

11              And I'm not remembering exactly how it

12     resolved, but the gist is that the county board

13     worked with the postal service and was able to

14     resend the verification mailings, and I don't

15     know exactly how that's represented in the data.

16     It may -- for the same-day registration

17     verification.

18              So that's a long way of saying there's

19     another example of where the process was

20     intending a certain way, and I don't know if the

21     data is going to represent it 100 percent the

22     way that we intended the process to show.

23  Q.  Are there any other examples that come to mind,

24     things like that, or are those the two that kind

25     of jump out?

                                                        68

```
 1   Q.   But it was the state board's instruction that
 2        counties should challenge voters who failed
 3        same-day verification under the two-mailer
 4        system at the time?
 5   A.   My understanding is that is correct prior to the
 6        2018 decision in NAACP case.
 7   Q.   Right.  So it's fair to say that the pre 747
 8        scheme applied the same two-mailer system to
 9        both regular registration applicants and to
10        same-day registration applicants?
11   A.   Yes.
12   Q.   Did the state board have any reason to believe
13        that same-day registrants needed to be treated
14        differently than regular registrants with
15        respect to mail verification?
16   A.   The state board did not, no.
17   Q.   Did the state board have any --
18   A.   Well --
19   Q.   Go ahead.
20   A.   I'll put it this way, so we're in a deposition
21        talking about changes that were made in
22        Senate Bill 747, and the state board did not
23        advocate for there to be any changes to the
24        same-day registration process through
25        legislation.
```

106

1              The General Assembly, I believe,

2        started -- yeah, we'll just start on the senate

3        side.  The senate had some -- introduced

4        Senate Bill 747 that would have changed how

5        same-day registration applicants verified their

6        status, verified their details, and at that

7        point the state board got engaged, tried to

8        advocate for a workable solution as to what the

9        General Assembly was seeking.

10              But to answer your question, the

11        state board did not initiate any sort of request

12        or advocacy with regard to changing mail

13        verification for same-day registrants.

14   Q.  The state board didn't have any study or inquiry

15        that demonstrated a need for such changes?

16   A.  My understanding is that it may have been

17        state board data that led to -- certain people

18        to advocate or members of the legislature to

19        seek a change in the way same-day registration

20        occurred, but the state board did not produce

21        any analysis or come to any conclusions from any

22        such analysis that led to the state board

23        advocating that.

24   Q.  Got it.

25              ATTORNEY SHENTON:  I'm going to

                                                    107

1    introduce what I'll mark as Exhibit 10, and this

2    is one that I'm going to share my screen on as

3    well, but I will read the Bates number into the

4    record just as soon as I get it up.

5              (WHEREUPON, Exhibit 10 was marked for

6    identification.)

7    BY ATTORNEY SHENTON:

8    Q.   Yes.  So this is a document that's been produced

9         by the state board in this litigation.  It's

10        Bates-Stamped NCSBE 479, and hopefully you can

11        see my screen in just a moment here.

12   A.   Uh-huh.

13   Q.   Do you see that?

14   A.   I do.

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is a data report that we produced, we the

19        state board, to provide information on address

20        verification for same-day registrants over -- in

21        previous elections.

22   Q.   In those four elections at the top, 2016, 2018,

23        2020, and 2022?

24   A.   Correct.

25   Q.   And it was breaking it down by various

108

1        demographic categories; is that right?

2   A.   Yes.

3   Q.   Do you recall which categories you examined?  We

4        can go through it if you need to.

5   A.   It's whatever's on this document.

6   Q.   Right.  I want to focus here at the very top on

7        the right-hand side where statewide verified

8        addresses and failed mail verifications by

9        registration type and election.

10            Can you see that, or do you need me to

11       zoom in a little bit?

12  A.   I can see it.

13  Q.   So if I'm reading this right, it shows the

14       number of verifications, the number of failed

15       verifications for both new registrants and

16       updated registrations in each of those four

17       general elections that we were talking about,

18       and then it gives a failure rate for each of

19       those elections in that registration type; is

20       that right?

21  A.   Yes.

22  Q.   And take a moment to review those numbers and

23       tell me if you'd agree with me that it appears

24       the new registrants in each election examined

25       here failed mail verification at a lower rate

1      than those updating their registration.

2  A.   I agree with that.

3  Q.   And you would agree with me that the average

4      rate across those four elections is lower for

5      new registrants than it is for updated

6      registrants?

7  A.   Yes.

8  Q.   Did the state board produce this data at the

9      request of a particular individual or

10      individuals?

11  A.   I believe this data was produced for the House

12      Government Operations Committee, specifically

13      staff director Joe Coletti requested some

14      information about same-day registration

15      statistics.  If I'm remembering correctly.  I

16      don't know.  You would have the mails to show

17      who it went to.

18  Q.   But it's your recollection that this was

19      produced for the house committee that you

20      referenced?

21  A.   Yes.

22  Q.   And was each of these data categories

23      specifically requested by Joe Coletti or whoever

24      it was?  I can represent to you that it was

25      Joe Coletti.

                                        110

1   A.   It should be, yeah.  If it's not, let us know.

2   Q.   Will do.

3             I want to ask some questions about the

4        kind of rationale for the purpose of the mail

5        verification system in the North Carolina

6        election administration process.

7             If you had to define it in a sentence

8        or two, what would you say is the purpose of

9        mail verification in the North Carolina election

10       code?

11  A.   Well, I'll start just by saying, you know, mail

12       verification has been part of registration in

13       North Carolina for decades, and it was, you

14       know, enacted a long time ago under a long-ago

15       legislature, you know, with potentially

16       different -- I mean, obviously, in a different

17       era where we didn't have sort of instantaneous

18       communications.

19             But my understanding of what mail

20       verification does is it is an effort to as best

21       as possible verify that a person seeking to

22       register as a voter in North Carolina actually

23       lives at the residence they claim.

24  Q.   In your professional judgment, how well

25       calibrated is mail verification to that goal of

114

1          determining that someone lives where they claim

2          they live?

3     A.   It is an imprecise effort to ascertain that

4          information.  It does provide some information

5          that is useful; namely, you know, if it bounces

6          back as undeliverable is some indication that

7          perhaps that person doesn't live there.  It's

8          not always true because we know that mail

9          verification can fail for other reasons,

10         independent of whether the person lives there or

11         not.

12              So I guess that's the way I would say

13         it.  It's a method that gives you some

14         information about where someone resides, but it

15         is imprecise information.

16    Q.   What makes it imprecise?  What are some of the

17         known imprecisions of the mail verification

18         system?

19    A.   Well, to start with, you know, to succeed at

20         mail verification, mail just has to get

21         delivered.  It doesn't necessarily mean that,

22         you know, the person who registered at a

23         particular place lives there; it just means that

24         mail can be delivered when it's addressed to

25         that person there.

115

1           And, you know, I don't know if you

2      experience this, but I get mail addressed to

3      different people who don't live at my house all

4      the time, so it's not that the postal service

5      won't deliver things that are addressed to

6      someone who doesn't live there.

7           From anecdotal conversations with

8      county board directors, I understand that, you

9      know, people who live in multiunit dwellings,

10     apartment complexes, et cetera, they can fail

11     mail verification more frequently, and part of

12     that is because I think at, you know,

13     single-family home residences, there isn't quite

14     as much -- my understanding is that mail can get

15     delivered even if it's misaddressed to those

16     single-family homes more easily than mail is

17     delivered to somebody who doesn't reside at a

18     multiunit dwelling.  That's just anecdotal.

19     That's my understanding from what I've heard

20     from, for example, the Guilford county director

21     was explaining this to me.

22           Other issues with it are that, you

23     know, it relies upon -- the successful mail

24     verification relies upon the voter knowing

25     exactly how to address mail to where they can

1    receive it and data to be entered 100 percent

2    accurately into the system so that the mail gets

3    sent to the right place.  Both of those places

4    are places you could have a breakdown and lead

5    to the mail not getting delivered correctly.

6         And then, you know, we do experience,

7    you know, occasional problems with mail getting

8    delivered even when it's addressed correctly.  I

9    mentioned the situation with Watauga County

10   during the general election.

11        I think in general the postal service

12   does a really good job of delivering election

13   mail, including voter registration cards, but,

14   you know -- and I think that's why we have the

15   two-mailing system for new registrants, to avoid

16   a situation where you have a postal mishap the

17   first go round, but then to -- if it was

18   actually correctly addressed, that in the second

19   one, you have a chance to get it right that

20   time.

21   Q.   Is that -- is that likelihood of a mistake being

22        corrected by a second mailer higher or lower for

23        any reason in the context of same-day

24        registration?

25   A.   No.

117

1    Q.    But the same-day registrants in the post 747

2          scheme do still only get that one mailer,

3          correct?

4    A.    Right.  And that's addressing a situation --

5          that's addressing what's perceived to be a

6          policy problem at the General Assembly under my

7          perception that too many people were failing

8          mail verification and it being under the pre 747

9          scheme and it being too late to do anything

10         about their ballots because the second mail

11         verification came back after the canvass.

12   Q.    Okay.  We'll talk about that in a little bit.

13               So we've talked a little bit about

14         these various imprecisions in the mail

15         verification system.

16               Would it be fair to say there's some

17         correlation there with the discrepancies that we

18         were talking about earlier in the context of

19         SOSA and the voter making a mistake or a voter

20         changing a name, that sort of thing, could

21         impact the mail verification process by some

22         times rendering that mail non-deliverable?

23   A.    It could.  I wouldn't say that all of those

24         discrepancies would.  I mean, I think the most

25         likely discrepancy would be a mistake in

                                                    118

1          might experience that problem?

2     A.    Yes.

3     Q.    Have you heard reports of college dormitories

4           experiencing issues with mail verification?

5     A.    Yes.

6     Q.    Do you have any understanding, general or

7           specific, about how widespread that issue is on

8           college dormitories in North Carolina?

9     A.    I can't give you -- I can't like quantify it,

10          but I can say, you know, anecdotally we do run

11          across -- in particular with college

12          dormitories, their addressing conventions may

13          not always be obvious.  And I think we produced

14          in discovery like what Wake County does for its

15          poll workers.  They have a sheet that shows all

16          the universities and colleges in Wake County and

17          how they address residential housing -- I mean,

18          on-campus residences.  And you can see from that

19          that there are widely varying ways that students

20          are supposed to address mail to themselves.

21                I know that, you know, Guilford County,

22          which is home to a number of college and

23          universities, also has a number of different

24          conventions, and it's not all -- like I say,

25          it's not all uniform.  So it sort of depends on

124

1          the university and how it routes mail that

2          gets -- is being sent to its residents.

3     Q.   Do you have any understanding, general or

4          specific, about how same-day registration is

5          used on college campuses, how widespread it

6          might be?

7     A.   I can't quantify it, but I can give you a couple

8          of facts of life that may bear on this.  One is

9          that, you know, college students are, you know,

10         of the age where they may be registering to vote

11         for the first time.  They are more likely than

12         the general population to move, like, every year

13         and may experience, you know, different -- may

14         more frequently experience differences in how

15         they perceive their domicile to be established

16         with regard to whether their original home they

17         move from to their college versus their

18         university town in terms of where there actual

19         residence and domicile shall be.

20              So for all those reasons, I think

21         college and university students are more likely

22         to have to register -- update their registration

23         more frequently than the general population, and

24         that is likely -- just as a sort of logical

25         exercise likely to lead to more use of same-day

                                                      125

1      registration than the general population, but I

2      don't have a way to quantify it.

3   Q.   Does that logical understanding track with kind

4      of the factual experience of the state board

5      over the past few election cycles?

6   A.   Yeah.  We hear from -- anecdotally, we hear from

7      directors and counties that have a large college

8      student population that college students are

9      using same-day registration pretty -- at a

10     pretty high volume.

11  Q.   But you mention you haven't done any

12     quantitative data driven study about what the

13     usage rate of a college student in a particular

14     county or across the state would be as compared

15     to the population as a whole?

16  A.   No.

17  Q.   Has anyone ever requested that you do such a

18     study?

19  A.   Not that I'm aware of.

20  Q.   All right.  I want to turn now to the

21     legislative process for Senate Bill 747.

22  A.   If you'll excuse me, I'm just going to fill up

23     my ice.

24  Q.   So as an initial matter, I'm going to give you a

25     bunch of names.  You tell me if you've ever

126

1    A.   I'm sure I had conversations with Ann Webb from

2         Common Cause.  I know I had conversations

3         with -- I think with Bob Hall, but I don't think

4         it was about same-day registration.  I think it

5         was about some other aspect of Senate Bill 747,

6         the election observers part.

7              I had a lot of conversations with

8         Gerry Cohen who was a former legislative

9         nonpartisan staff person who is now on the

10        Wake County Board of Elections, a number of

11        county directors of elections and, of course,

12        state board staff, but that's not really what

13        your question is about.

14   Q.   Did you ever have any discussions with Andy

15        Jackson?

16   A.   No.

17   Q.   Jim Womack?

18   A.   No.

19   Q.   Cleta Mitchell?

20   A.   No.

21   Q.   Jay DeLancy?

22   A.   Not about this.

23   Q.   Carol Snow?

24   A.   No.

25   Q.   When did you first see a draft of

                                                    132

1          Senate Bill 747?

2    A.    Probably when it was introduced.

3    Q.    Introduced on the senate side?

4    A.    Right.

5    Q.    Was that your first awareness that there would

6          be elections legislation in the 2023 session?

7    A.    We had heard that there was likely going to be

8          some elections legislation.  I think it was

9          publicly record as well from members of the

10         legislature or publicly stated by members of the

11         legislature, the majority, that there would be

12         some elections legislation, but we didn't know

13         the specifics until it was introduced.

14   Q.    Do you remember approximately when you learned

15         that there would be legislation?

16   A.    Sometime earlier in 2023.

17   Q.    And you received some data requests, as you

18         mentioned, from Joe Coletti.  Was that early in

19         2023?

20   A.    I don't remember, but, you know, you have the

21         documents in discovery.

22   Q.    He first reached out via email?

23   A.    That's right.

24   Q.    Did you understand those data requests to be

25         calibrated for the drafting of legislation?

133

1          that it's going to lead to lots of consequences

2          that you haven't thought about it, then we'll

3          say that.

4    Q.    Do you recall what the initial version of

5          Senate Bill 747 proposed for same-day

6          registration changes?

7    A.    Yeah.  It would have changed same-day

8          registration to a method of provisional voting

9          where I believe the voter -- most voters would

10         have to come back with additional proof of their

11         residence at the county board of elections

12         office prior to election day, maybe.  I can't

13         remember exactly, but, you know, you have the

14         bill draft.  You could see what it is.

15   Q.    And what do you remember your initial reaction

16         to that proposal being?

17   A.    This is going to be incredibly difficult to

18         administer.  Provisional voting is -- it's

19         time-consuming at the voting location and it's

20         time-consuming on the back end, when county

21         board staff are researching and making

22         recommendations to each of their respective

23         county boards of elections about whether to

24         approve any provisional ballot.

25                The other challenge with provisional

1          voting is that -- at least until this past year,

2          provisional ballots were not counted until right

3          before canvass.  Some counties might have

4          counted some earlier than that, but generally

5          speaking, you would have a provisional meeting

6          right before your canvass meeting which is 10

7          days -- the canvass meeting is 10 days after the

8          election.

9                 So one of the big reactions we had is

10         wait a second, you're going to all of a sudden

11         take hundreds of thousands of ballots that would

12         be included in the count on election day and

13         move them ten days later so you have this huge

14         vote dump ten days after the election which

15         seems to be at odds with other provisions in the

16         bill that the legislators were advocating for in

17         terms of getting results earlier.

18    Q.   Were any of those changes that seemed designed

19         to get results earlier that come to mind?

20    A.   Yeah.  The elimination of the grace period for

21         absentee-by-mail ballots.

22    Q.   So it seems those were at cross-purposes.  One

23         was trying to move the date by which you know

24         which ballots were in the count up and another

25         was moving that date fairly significantly back.

                                                        139

```
1    A.    Right.

2               ATTORNEY SHENTON:  Okay.  I'm going to

3          introduce an exhibit which I think is

4          Exhibit 11.

5               (WHEREUPON, Exhibit 11 was marked for

6          identification.)

7    BY ATTORNEY SHENTON:

8    Q.    This is a document that has been produced by the

9          state board in this litigation.  It's

10         Bates-stamped NCSBE 1145.

11              Take a moment to familiarize yourself

12         with the document and let me know when you're

13         ready.

14   A.    I'm ready.  And this reminds me that another

15         third party that we provided information about

16         during the legislative process with the

17         governor's office.  Shouldn't forget them.

18   Q.    So I take it you recognize this email.

19   A.    Yes.

20   Q.    And it's an email from you to Kristen Guillory

21         of the governor's office?

22   A.    That's right.

23   Q.    And then if you flip to the second page there's

24         a memo attached to the email that goes on for a

25         few pages.
```

140

1              Do you recognize the memo?

2    A.   Yes.

3    Q.   What is the memo?

4    A.   The memo was our notes on what the various

5         sections of Senate Bill 747 as introduced would

6         do and any concerns we had on how they would

7         affect the administration of elections.

8    Q.   And this memo touched on the same-day

9         registration proposal, correct?

10   A.   It did.  I believe you have to go to

11        Section 8.1.

12   Q.   Turn with me there.  It's on page 5, Bate stamp

13        1149.  So I want to talk a little bit about this

14        section which starts on this page and then

15        proceeds on to the following page.

16             I want to start with the bottom of the

17        first paragraph there.  The last three sentences

18        say:

19             "This provision seems premised

20          on an idea that a lot of same-day

21          registrants turn out not to be

22          confirmed residents, when the county

23          board sends back address confirmation

24          cards after they vote and they bounce

25          back as undeliverable."

141

1          What about the provisions seem premised

2      on that idea?

3  A.  Well, so the reason we came to that conclusion

4      was because of the interactions we had with Joe

5      Coletti prior to that and Andy Jackson at the

6      John Locke Foundation had done his own study and

7      produced a blog post or something that called

8      voters who fail mail verification and then have

9      same-day registration ballots count called ghost

10     voters, that's in quotes because they're not

11     actual ghosts, they're actual real people.

12          So that was our assumption that the

13     reason for this must have been because people

14     were worried that you had people -- you had

15     voters who had not verified their residence

16     address who were having their ballots count and

17     using same-day registration.

18  Q.  Then proceeding from there to the rest of the

19     paragraph:

20          "This happens quite infrequently.

21      Over every general election between

22      2008 and 2022, around 1 percent of

23      same-day registrants later have their

24      mail verification cards bounce back."

25          Was that based on an analysis that the

142

1       state board did internally?

2   A.   Yes.

3   Q.   Did you share that analysis with Mr. Coletti?

4   A.   Well, it would have been in that previous

5        exhibit that you showed the data on same-day

6        registration and verification.

7   Q.   Because of -- or let me step back for a moment.

8            Did the infrequency of that occurrence

9        have anything to do with the state board's

10       assessment of the mail verification system?  Did

11       it bear on the state board's assessment of the

12       effectiveness of mail verification?

13  A.   I can't say one way or another.  You know, I

14       can't say that there was any time that we sort

15       of stopped and thought, you know, what about

16       this whole mail verification thing, let's look

17       at this data, does it make sense, so it's just

18       mail verification was law and that's what we

19       implemented.

20  Q.   Is it fair to say the state board didn't have

21       those concerns independently?

22  A.   Right.

23  Q.   And then the next paragraph kind of goes in to

24       how the initial proposal for same-day

25       registration in Senate Bill 747 would work, the

                                                   143

1           it's conceivable that our data folks just did

2           it, but I don't know exactly.

3    Q.    So you have no specific recollection as to any

4           discussion of why those categories?

5    A.    No.

6    Q.    And then we were discussing the memo that you

7           and a few others had provided input on about the

8           initial senate version of Senate Bill 747.

9                    Would it be fair to say that that memo

10          represents the kind of analysis and position of

11          the state board on that draft of the

12          legislation?

13   A.    Yes.

14                   ATTORNEY SHENTON:  All right.  I'm

15          going to introduce another exhibit, which I'll

16          mark as Exhibit 12.

17                   (WHEREUPON, Exhibit 12 was marked for

18          identification.)

19   BY ATTORNEY SHENTON:

20   Q.    So this is a document that was produced by the

21          state board in this litigation, beginning with

22          the Bates stamp NCSBE 1343.

23                   Mr. Cox, take a moment to review the

24          email chain and tell me when you're ready.

25   A.    Okay.

                                                      149

1    Q.    Do you recognize this?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's an email trail where I and my deputy

5          general counsel were conferring with Senator

6          Berger's staff about the draft bill 747, and

7          after reviewing the Proposed Committee

8          Substitute, or PCS, of Senate Bill 747, we

9          provided those same staff members additional

10         feedback, and then I forwarded that on to

11         Gerry Cohen, who I referred to earlier, and he's

12         responding saying "This is great."

13   Q.    Awesome.

14               And that forwarded email thread is

15         between you and Josh Yost and Brent Woodcox; is

16         that right?

17   A.    Yes.

18   Q.    With Lindsey Wakely cc'd?

19   A.    Yes.

20   Q.    And you mentioned this was in response to the

21         PCS of Senate Bill 747?

22   A.    Right.

23   Q.    And PCS stands for Proposed Committee

24         Substitute?

25   A.    That's what I think it means, yeah.

150

1    Q.    I want to focus on that first section, same-day

2          registration/provisionals, there at the bottom

3          of the first page.

4                  I want to -- can you walk me through

5          what that first sentence means, "We're afraid

6          that requiring the photo ID via DMV-issued ID."

7    A.    So the Proposed Committee Substitute changed the

8          draft of how a person would verify their

9          residence address during same-day registration

10         to -- I can't remember exactly, but I remember

11         that there -- it would have to both be a photo

12         ID that was eligible for photo ID use and be a

13         document that could confirm their residence

14         address.

15                 And the problem we were trying to

16         explain is that for same-day registrants, we --

17         you know, a lot of people -- well, not just for

18         same-day registrants, but not everybody has a

19         driver's license, most people do, but not

20         everybody has a driver's license, but even those

21         who do have a driver's license, there's plenty

22         of people who don't have their current address

23         on their driver's license.  And so we were

24         worried that if you require the proof of

25         residence to be what is the only valid photo ID

1        that we're aware of, you know, common photo ID

2        used for voting that we're aware of, that it

3        also includes an address, which is a DMV-issued

4        ID, if you require that to be the case for

5        proving your residence for same-day

6        registration, it's going to cut out a lot of

7        people who don't have their current address on a

8        DMV-issued identification.

9    Q.   Did you have any understanding of which voters

10       that would be likely to be?

11   A.   Our sort of understanding would be it would be a

12       lot of people who move frequently, so renters,

13       people who were of lower income, students,

14       et cetera.

15   Q.   Would military personnel be in that group?

16   A.   Yes.

17   Q.   Would it be fair to say that young people are

18       more likely to move more frequently?

19   A.   That's an assumption that I would make just

20       about the general state of the world, but I

21       don't have any data to back it up.

22   Q.   Does it track with your anecdotal experience at

23       the state board, that younger voters tend to

24       move more frequently?

25   A.   Yes.

1    Q.    Then I want to turn to the bottom of that

2          paragraph, sentence that begins "A better

3          approach."  Can you walk me through what that

4          sentence is recommending.

5    A.    Yes.  Give a little background, at this point I

6          think to us at the state board it was very clear

7          that the legislature wanted to do something

8          about same-day registration, they wanted to do

9          something about the fact that some people fail

10         mail verification and still have their ballot

11         count, and so our biggest concern with what was

12         being drafted in the various proposals in the

13         senate was that what they were -- what they were

14         drafting as a solution to what they perceived to

15         be a problem was going to impact negatively a

16         lot of voters who were not a source of that

17         problem, in other words, it was going to have an

18         oversized impact for the problem it was seeking

19         to address.  It was going to make a lot of

20         people who would have no problem doing mail

21         verification, trip them up during the same-day

22         registration process.

23               So that was our chief concern because,

24         you know, same-day registration is something

25         that a lot of voters rely on.  As I said, in a

153

1    presidential election, there's 200,000 voters

2    who make use of it.  And so, you know, we

3    were -- we wanted to -- realizing that this was

4    a legislative policy choice that was going to be

5    undertaken, we wanted to see if we could sort of

6    steer the legislature toward a way that would

7    address the actual population they were trying

8    to address rather than have negative

9    ramifications upon other voters who were not

10   really part of that perceived problem.

11          And so this last sentence is what we're

12   suggesting to the legislative drafters to be an

13   alternative to what they were proposing to

14   change same-day registration procedures.

15   Q.   So it's a recommendation that's made in light of

16   the assumption that the legislature wanted to do

17   something on this issue?

18   A.   Yes.

19   Q.   But it's not a recommendation made pursuant to

20   the state board's determination that something

21   should be done about this issue --

22   A.   No.

23   Q.   -- the state board's own determination?

24   A.   That's correct.

25   Q.   And it's also fair to say that the state board

154

1       didn't have any analysis or study internally

2       that indicated that this was a topic that needed

3       to be addressed as a matter of election

4       administration?

5  A.   That's correct.

6  Q.   And so when you say a better approach, you mean

7       a better approach to address the issue that you

8       are wanting to address?

9  A.   Yeah.  And "you" being the legislative drafters,

10      yes.

11 Q.   And you mentioned a moment ago that you were

12      operating under the assumption that the

13      legislature wanted to do something about this

14      same-day registration mail verification

15      intersection.

16            What gave you that impression?

17 A.   It must have been through -- I mean, first of

18      all, it was part of the initial draft of

19      Senate Bill 747 which was, you know, something

20      that leadership staff in the senate was

21      proposing.  So obviously, it was some -- at some

22      level of policy priority among leadership in the

23      senate.

24            And in -- I don't remember exactly our

25      conversations, but we left with an impression in

155

1          conversations with legislative staff that this

2          was something that was a priority and it

3          wasn't -- it wasn't something that like -- there

4          were aspects of Senate Bill 747 that we were

5          able to successfully convince members of the

6          legislature and their staff that would not be a

7          very good policy idea for the administration of

8          elections and those aspects were removed from

9          the bill.  This was not one of those.

10              I mean, this was an objective that we

11         got the impression in our discussions with the

12         legislature and in the various iterations of the

13         drafts of Senate Bill 747 that this was going to

14         stay in some form or another.

15    Q.   Okay.  So it was at least in part based on the

16         kind of receptivity of changes or omission

17         entirely from the omnibus that eventually became

18         747?

19    A.   Right.

20    Q.   And then also in part on the conversations and

21         interactions you had with legislative staff

22         about whether or not something could or couldn't

23         come out of the bill?

24    A.   Right.  I want to -- I want to be clear that I

25         don't remember any specific statement, you know,

                                                        156

1        this is going to stay in, this has to be -- this

2        is going to end up in the final bill that we

3        enact, but, you know, I remember having the

4        distinct impression after conversation that this

5        was going to be a priority.

6              And whenever we are doing legislative

7        advocacy, you kind of have to read the tea

8        leaves on those sort of things, like how far can

9        you push on certain things, you know, are we

10       just going to be barking up the wrong tree by

11       pushing something when you can focus your energy

12       and advocacy efforts on something that you

13       actually have a possibility of making a

14       difference on.

15   Q.   Is the same-day registration provision in

16       Senate Bill 747 something that the state board

17       would have pushed harder on in a world where the

18       state board was the one setting the policy?

19             Maybe stated differently, these changes

20       are not something the state board would have

21       adopted or advocated for of their own accord?

22   A.   Correct.

23             ATTORNEY SHENTON:  I am going to

24       introduce another exhibit which we'll mark as

25       13.

                                                    157

1         eligible to vote in North Carolina?

2    A.   I think -- I think the article may give that

3         impression.

4    Q.   Do you think it's a justified conclusion from

5         the article, and do you think the article is

6         justified in reaching that conclusion?

7    A.   Can you break that up.

8    Q.   Sure.  Do you think it's a justified

9         interpretation of the article that Dr. Jackson

10        is saying these are ineligible voters?

11   A.   I would have to look at the article again.  I'm

12        not sure what he was trying to project here.

13   Q.   Do you think it would be fair to conclude from

14        the fact that those voters having failed mail

15        verification that they were in fact ineligible

16        to vote in North Carolina?

17   A.   Not necessarily.

18   Q.   What would it depend on?

19   A.   It would depend on them actually lacking the

20        substantive qualifications to vote in an

21        election.  As we talked about before, you know,

22        mail verification is our statutory process

23        for -- it's one statutory process for attempting

24        to verify someone's residence address which

25        is -- which plays into their qualifications,

172

1          their substantive qualifications to vote, but it

2          is imprecise.  So a person failing of mail

3          verification does not necessarily mean they lack

4          the substantive qualifications to vote in an

5          election.  It could, but, you know, that fact

6          alone doesn't actually prove it.

7                    ATTORNEY SHENTON:  I want to introduce

8          another exhibit here.  This is Exhibit 18.

9                    (WHEREUPON, Exhibit 18 was marked for

10         identification.)

11   BY ATTORNEY SHENTON:

12   Q.    This is a document produced by the state board

13         in this litigation, Bates-stamped NCSBE 1410.

14                    Take a moment to familiarize yourself

15         with the document, and let me know when you're

16         ready.

17   A.    Okay.

18   Q.    Do you recognize this?

19   A.    Yes.

20   Q.    What is it?

21   A.    So this is some more correspondence further down

22         the email thread between me and Joe Coletti from

23         the government operations staff and -- the house

24         government operations staff, and then two emails

25         between me and Pat Gannon on our staff about the

                                                        173

1    Q.    Has anyone ever indicated to you or to anyone

2          else at the state board of the existence of such

3          evidence that same-day registrants weren't

4          providing bona fide proof of residence at

5          same-day registration?

6    A.    I know of one case from like 2018, and I don't

7          know all the details of this, but this is based

8          on our records, this is something that we looked

9          at in preparation for this deposition, looked at

10         investigations records, and we know -- we

11         identified one case from 2018 where the Moore

12         County Board of Elections referred to their

13         local DA someone who they believe misrepresented

14         their address during same-day registration.

15                And our understanding -- and the

16         records are a little spotty because it wasn't

17         our investigation, it was Moore County

18         submitting to the DA.

19                Our understanding of what happened was

20         that a person claimed a former residence that

21         they had, so I don't know if the person moved

22         within county or they moved out of county or

23         what, but that was what the conclusion that the

24         Moore County Board of Elections drew is they

25         were falsely claiming a residence that was their

207

1     former residence and presumably -- I don't know,

2     but presumably showing some sort of documentary

3     proof of that former residence.  And then that

4     was referred to the district attorney.  And our

5     records demonstrate -- our records suggest it

6     didn't go forward to a prosecution.  But that's

7     the only instance that we could identify of what

8     you asked.

9  Q.  Is the state board aware of any instance where a

10     same-day registrant forged a documentary

11     proof-of-residence document to use for same-day

12     registration?

13 A.  Not that I'm aware of.

14 Q.  Has anyone ever asked the state board to study

15     that issue, the prevalence of it?

16 A.  I think you guys asked in discovery whether we

17     have anything like that, and we didn't identify

18     anything.

19 Q.  But no one prior to those discovery requests?

20 A.  No.

21 Q.  Just one last set of questions here.

22          Is it the state board's view that

23     SB 747 same-day registration scheme serves to

24     level the playing field -- is it the state

25     board's view that the Senate Bill 747 same-day

208

1    registration scheme serves to level the playing

2    field between same-day registrants and regular

3    registrants?

4  A.   The state board's never stated that during the

5    debate of Senate Bill 747.  You know, the

6    records on that speak for themselves.  They show

7    that the state board was suggesting a way for

8    the legislature to address a perceived problem

9    in voters failing mail verification after

10   same-day registration and yet having their

11   ballot counted in the election in a way that

12   would not visit collateral consequences on the

13   broader same-day registration population.

14 Q.   Would it be fair to say that in the post 747

15   same-day registration scheme, same-day

16   registrants now must both present documentary

17   proof of residence and pass same day -- or pass

18   mail verification in order to be successfully

19   registered whereas a regular registrant only

20   must pass mail verification?

21 A.   Well, that was always the case under the -- the

22   way that same-day registration was enacted; it's

23   just that the mail verification is a single mail

24   verification versus two mail verifications which

25   is what the prior statutory scheme was.

209