# Exhibit I

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF NORTH CAROLINA
              CIVIL ACTION NO. 1:23-CV-878

DEMOCRACY NORTH CAROLINA, et al.,)
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
ALAN HIRSCH, in his official     )
capacity as CHAIR OF THE STATE   )
BOARD OF ELECTIONS, et al.,      )
                                 )
          Defendants.            )
_____



                  REMOTE DEPOSITION OF

               JACOB M. GRUMBACH, PhD

_____

                 10:01 A.M. PACIFIC TIME

                 Tuesday, April 1, 2025

                   Morning Session

_____




By:  Lisa Taylor, RPR
```

1  are you referring to particular age range of
2  Americans?
3          A.     I would say group categorization in
4  societies is challenging and changes over time and
5  space, but I think a good sharp definition around
6  this could be the age 18 through 25, which does
7  appear to be sort of what's legally contested in
8  this case as a conceptualization.
9                 But, again, measurement is difficult
10 and measurement of, for example, racial groups in
11 voting rights and civil rights law has been
12 contentious for, you know, well over a century in
13 American history, and drawing that sharp boundary
14 can be challenging.  Right?
15                 So how -- you know, for example, the
16 development of the category of Latino or Hispanic
17 was a late 20th century development in the U.S. or
18 the group boundaries around who constitutes a Black
19 American in a civil rights case or things like that,
20 how people dealing with racially mixed individuals
21 and so forth, those boundaries are very difficult,
22 but you kind of do have to create a sharp
23 circumscription for a particular application.
24                 And here I think a decent sharp
25 circumscription would be 18 to 25, but I would

49

DISCOVERY COURT REPORTERS      www.discoverydepo.com        1-919-424-8242
Case 1:23-cv-00878-TDS-JEP     Document 124-10     Filed 05/09/25     Page 3 of 17

1  say -- would I fully reject a definition that is 18
2  to 27 or 24?  I would have to consider that against
3  those other sort of measurement-based definitions.
4        Q.    Okay.  So why do you think 18 to 25 is
5  a good sharp categorization of the term?
6        A.    Right.  Again, there are trade-offs in
7  any of these definitions.  We could imagine
8  trade-offs in racial categorization that involve,
9  you know, if you have any ancestors throughout, you
10 know, 10 generations from a particular racial group,
11 you are a member of that racial group or not.
12              Those are challenging sort of
13 discussions that involved trade-offs of conceptually
14 stretching the concept or lumping it in and
15 sharpening it.
16              I think 18 to 25 creates a good
17 balance here.  People between 18 and 25,
18 particularly when it comes to being a political
19 community of relevance here, have a set of shared
20 experiences, form a group consciousness and shared
21 preferences and have a position within American
22 politics and the political economy that political
23 elites see pretty clearly and does involve that age
24 range from 18 to 25 that you mentioned.
25              Like I said, I would not fully rule

50

```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
                           Case no. 1:23-CV-878


DEMOCRACY NORTH CAROLINA; NORTH    )
CAROLINA BLACK ALLIANCE; LEAGUE    )
OF WOMEN VOTERS OF NORTH           )
CAROLINA,                          )
                                   )
               Plaintiffs,         )
     vs.                           )
                                   )
ALAN HIRSCH, in his official       )
capacity as CHAIR OF THE STATE     )
BOARD OF ELECTIONS; JEFF CARMON    )
III, in his official capacity      )
as SECRETARY OF THE STATE BOARD    )
OF ELECTIONS; STACY EGGERS IV,     )
in his official capacity as        )
MEMBER OF THE STATE BOARD OF       )
ELECTIONS; KEVIN LEWIS, in his     )
official capacity as MEMBER OF     )
THE STATE BOARD OF ELECTIONS;      )
SIOBHAN O'DUFFY MILLEN, in her     )
official capacity as MEMBER OF     )
THE STATE BOARD OF ELECTIONS;      )
KAREN BRINSON BELL, in her         )
official capacity as EXECUTIVE     )
DIRECTOR OF THE STATE BOARD OF     )
ELECTIONS; NORTH CAROLINA STATE    )
BOARD OF ELECTIONS,                )
                                   )
               Defendants.         )


                       REMOTE DEPOSITION OF

                       JACOB GRUMBACH, Ph.D.

                         AFTERNOON SESSION
      _____

                       2:01 P.M. PACIFIC TIME

                       TUESDAY, APRIL 1, 2025
      _____

By:  Denise Myers Byrd, CSR 8340, RPR
```

1       more valuable to cast your ballot than
2       overcoming those costs, right, that differ among
3       people -- different types of people have more
4       greater or lower costs based on, for example,
5       residential mobility -- do you end up casting
6       your ballot, yes or no, is about the relative
7       cost and benefits.
8              And this is saying the cost of the
9       registration stage tend to be higher for young
10      Americans than for older Americans.
11   Q. Okay.  And so what specifically are those costs
12      for younger Americans that may differ?
13   A. So an example would be greater rates of
14      residential mobility means you have to update
15      your registration.  That step constitutes
16      probably the key consequential increase in cost
17      for young voters and explains why a substantial
18      number of young people do not vote.
19   Q. Okay.  Other than residential mobility, are
20      there any other costs that you can think of?
21   A. Yes.  There are other costs related to sort of
22      even -- this is also related to residential
23      mobility, but something like campaign contact.
24      If you are a frequent campaign donor or actively
25      known, you know, business owner or something

                                                         159

```
 1        you cite, do you recall supporting the notion
 2        that habits form when people vote?
 3   A.   Supporting the notion that habits form when
 4        people vote.
 5   Q.   Yes.
 6   A.   I think it -- yeah, I would consider it
 7        supportive of that notion.
 8   Q.   Okay.  Does the study to your recollection also
 9        support the notion that habits are broken when
10        people's votes are not counted due to an
11        administrative issue?
12   A.   I don't -- it is my recollection that this study
13        does not cover that.
14   Q.   And do you know -- do you recall whether
15        North Carolina was one of the states that they
16        analyzed in that study?
17   A.   I do not recall off the top of my head.
18   Q.   Let's flip ahead to paragraph 55.  And here
19        you're citing to that Miller study that we
20        mentioned earlier to support the notion that an
21        individual is less likely to vote in subsequent
22        elections if that individual's ballot is
23        rejected due to administrative procedure.
24                Is this the only study that you're
25        aware of that supports this statement?
```

203

1   A.   To my -- that is the only study I can recall off
2        the top of my head right now.
3   Q.   Okay.  We'll go ahead and introduce this as
4        Exhibit 12.
5             (WHEREUPON, Exhibit 12 was marked for
6        identification.)
7   BY ATTORNEY PENCOOK:
8   Q.   Does this appear to be the Miller study that you
9        cited?
10  A.   Yes, sir.
11  Q.   And it's entitled Restrictive Mail Voting Rules
12       Burden Minority Voters:  Evidence from Texas,
13       right?
14  A.   Correct.
15  Q.   What is the main conclusion of this study?
16  A.   I would say the main conclusion or finding, I
17       would say for me the headline conclusion is
18       probably the -- just the descriptive finding
19       about ballot rejection rates in Texas in the
20       2022 primary and sort of racial distribution of
21       rejections, but for me the headline finding is
22       the reduction of turnout in a subsequent
23       election which they describe later in that
24       abstract.
25  Q.   But the focus of this study is Texas, correct?

204

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242
Case 1:23-cv-00878-TDS-JEP    Document 124-10    Filed 05/09/25    Page 8 of 17

```
 1    A.    Not the focus of that study.  This is using
 2          Texas as a case to make a general point about
 3          what happens when there's a procedural rejection
 4          of somebody's ballot.
 5                    This is again the -- you know, social
 6          science we're trying to create generalized
 7          findings about things that happen in the world
 8          to understand if we took that and implemented it
 9          somewhere else what would happen, but the
10          context geographically is Texas, absolutely.
11    Q.    Was this a study about young voters?
12    A.    It was not focused on young voters.
13    Q.    Pages 3 and 4 discuss Texas SB 1.  And is that
14          the law that was the basis of the case study
15          here?
16    A.    Yes.  So that was the policy that created this
17          particular category of ballot rejections that
18          then this study is focusing on those rates of
19          rejection and their downstream effects, yes.
20    Q.    And going off of at least what Professor Miller
21          includes here, SB 1 seems like it was far
22          broader in scope than SB 747 here in
23          North Carolina.  Is that fair?
24                    ATTORNEY HENDRIKSEN:  Objection.
25                    THE WITNESS:  Yeah, I'm not sure of the
```

205

1  relevance to this, but I would say I guess it's
2  fair to say it's larger in scope than at least
3  the provisions of SB 747 that I've focused on.
4  BY ATTORNEY PENCOOK:
5  Q.  Just one example, this article says that SB 1
6  banned 24-hour and drive-thru voting.
7       Did SB 747 do that?
8  A.  That is not my understanding.
9  Q.  And there's some discussion of the impact of
10 SB 1 on the distribution and submission of
11 absentee ballots, and specifically they note
12 that Texas did not have permissive policies with
13 respect to mail ballots even prior to SB 1.  And
14 as an example -- and this is bottom of page 3,
15 onto page 4 -- they note that, for instance,
16 while people 65 or older were allowed to cast
17 mail ballots with no documented hardship, in
18 order to receive a mail ballot, all other voters
19 had to demonstrate absence from the jurisdiction
20 or a documented illness or disability that would
21 have made in-person voting difficult.
22 A.  Correct.
23 Q.  In North Carolina, we don't have those same
24 restrictions, correct?
25 A.  That's my understanding, that those restrictions

1  that you described are part of Texas's absentee
2  ballot system.
3  Q.  And SB 1 added ID requirements for voting by
4      mail, requiring voters to submit either their
5      state ID number or partial social security
6      number on the application for mail ballots and
7      then again on the underside of a ballot envelope
8      flap upon submission.
9          Does SB 747 do anything like that?
10 A.  Not in my understanding.
11 Q.  In your report, the next sentence on
12     paragraph 55 says, "The most likely causal
13     mechanism here is that individuals whose ballots
14     are rejected experience 'alienation from the
15     political process.'"
16         And you're citing specifically to
17     Miller page 28, correct?
18 A.  Correct.
19 Q.  I want to look at that statement in context.  If
20     we could pull up page 28 of the Miller report.
21         It states that -- are you there?
22 A.  Yes, sir.
23 Q.  It states:
24         "That their turnout should
25     decline even upon receipt of a mail

207

1            ballot provides strong evidence that
2            some level of alienation from the
3            political process occurred when their
4            ballot was rejected in March.  Like
5            individuals whose applications were
6            rejected, voters whose ballots were
7            rejected but did participate in the
8            general switched to in-person options
9            at marked rates."
10                   Do you see that?
11      A.   Yes, sir.
12      Q.   Do you know based on this study whether the
13           effect was different for young voters than any
14           other voters?
15      A.   I believe I do, and key to this is that it's
16           very difficult to generalize from these Texas
17           post SB 1 mail voting and pre SB 1 mail voting,
18           young people in Texas, because of the particular
19           excuse submission that you have to do to become
20           eligible for mail voting in Texas, this means
21           it's a very selected group of individuals who go
22           through that process.
23                   So comparisons across younger versus
24           older groups where everybody who's older becomes
25           more greatly eligible in Texas for absentee

208

DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242
Case 1:23-cv-00878-TDS-JEP    Document 124-10    Filed 05/09/25    Page 12 of 17

1   voting.  Because of that, it's really hard to
2   generalize across groups within this study, but
3   rather, this study instead just shows that, yes,
4   including young people, but also non-young
5   people and people of different racial groups get
6   discouraged when their ballot is procedurally
7   rejected.
8              It is really hard to infer differences
9   in the effect of that discouragement across
10  groups from this study because of the
11  particularities that are relevant in absentee
12  permission in Texas.
13  Q.   On page 27 of that article, it says -- first
14       sentence of the last paragraph:
15              "We also argue that a ballot
16          rejection reduced turnout by 1.5
17          points."
18              Is that -- in your opinion, is that a
19  significant reduction in turnout?
20  A.   Statistical significance is related to but not
21       defined by an effect size like that so I
22       can't -- statistically significant I cannot
23       determine, but I believe elsewhere in the paper
24       they show it's statistically significant.  That
25       also has to do with its uncertainty.

209

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242
Case 1:23-cv-00878-TDS-JEP   Document 124-10   Filed 05/09/25   Page 13 of 17

1           But in terms of substance, they're
2      concluding in that paragraph, as experts in the
3      author, they say the magnitudes of that effect
4      1.5 is smaller than earlier effects they're
5      talking about from this but is in some ways more
6      striking.  That suggests they think of it as
7      substantively important.  That's different than
8      statistical significance which we can check
9      elsewhere in the paper.
10  Q.  Okay.  Are you aware of -- so when we're talking
11      about ballot rejections in this study, the
12      ballot rejection occurred at the primary
13      election and then we're observing the effects
14      onto the general election in the same year,
15      correct?
16  A.  Correct.
17  Q.  Do you know whether this study controlled for
18      whether a voter was in a district where there
19      was only one candidate on the ballot that they
20      maybe cared about or an area that sort of leans
21      heavily one side or another?
22  A.  You know, I actually do think, first, that the
23      research design here already kind of accounts
24      for that because it's looking at changes within
25      an individual, right.  So already baked in is

                                                    210

1  that individuals in uncompetitive primary
2  districts are less likely to try to vote in that
3  primary, so that is kind of controlled for in
4  this way.
5           At the same time, I would like to look
6  through their supplemental appendices, which is
7  very long last time I looked at this paper, and
8  there may be some, you know, direct addressing
9  of that question, but generally, in this type of
10 before-and-after design, it kind of accounts
11 for -- it's about changes in voting within an
12 individual who's in the same district so it kind
13 of accounts for that.
14 Q. And then the last paragraph -- we're done with
15    the Miller report.  You can set that to the
16    side.
17           The last paragraph in your report
18 before conclusions, you sort of end this section
19 by saying that creating new barriers, even a
20 minor one, can have lasting consequences for
21 those who have not yet developed voting as a
22 habit.
23           I'm just curious why you qualified the
24 statement here as new barriers, even minor ones.
25           Why did you include that language?

211

1   A.   I think the cost of voting can be increased in
2        large or small ways or decreased in large or
3        small ways, and they affect different
4        individuals differently.  And I think some
5        people -- you know, a change like in the mail
6        verification procedures of SB 747, it may affect
7        some young people greatly and some young people
8        very little.
9                  The point is for people that are in a
10       perfect storm where it does affect them and put
11       their cost of voting above a threshold where
12       it's discouraging, that can have lasting
13       effects.  It can also have lasting effects on
14       people's feelings of political inclusion.  Even
15       if they successfully cast their ballot but they
16       perceive it being burdensome can generate
17       feelings of political alienation and exclusion
18       that I don't talk about as clearly in this
19       report but as a general political science
20       finding.
21  Q.   Do you have any opinions about whether the
22       changes caused by 747 are minor barriers?
23  A.   You know, I would say in the grand scheme, it
24       depends on what the comparison is which is way
25       before lunch we talked about a comparison prior

1    to the 19th Amendment, you know, Jim Crow
2    disenfranchisement, not even in the same league,
3    right, then compared to as we talked about it's
4    not as big as abolishing the entire SDR program,
5    certainly not, but I would say it's important,
6    right.  Certainly larger than other things in
7    other contexts that have affected the cost of
8    voting and minor in big ways, relocations of
9    polling places, all types of election
10   administration based changes.
11           The fact that, you know, weather shuts
12   down polling places and lines become longer and
13   alternative, just all types of things that
14   affect the cost of voting, we can compare them.
15           I would say SB 747's provisions
16   increased the cost of registration in a way
17   disproportionally among young North Carolinians
18   and that that's important.
19   Q.   Okay.  I want to pull up another exhibit.  This
20        is going to be Exhibit 13.
21              (WHEREUPON, Exhibit 13 was marked for
22        identification.)
23   BY ATTORNEY PENCOOK:
24   Q.   Let me know when you've got it pulled up.
25   A.   Great.

                                                    213