# Exhibit P



**From:** Sen. Warren Daniel [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3A984FE2240F4EA7973EA3AE75B06F96-SEN. WARREN]
**Sent:** 3/15/2023 6:41:42 PM
**To:** Major Dave Goetze [majordave@electoraleducationfoundation.com]
**Subject:** RE: Recommended NC Election Law Changes for the 2023-2024 Sessions

Just FYI, the election chairs have been going over about 75 policy recommendations from you and other election integrity groups to decide what to include in an election reform bill. Thanks for your input.

Sincerely,

Senator Warren Daniel
District 46 Buncombe, Burke, McDowell Counties
Legislative Office Building Room 627
919-715-7823
Visit my Member Page at NCLeg.gov

-----Original Message-----
From: Major Dave Goetze <majordave@electoraleducationfoundation.com>
Sent: Friday, February 10, 2023 11:04 AM
To: Rep. Mike Clampitt <Mike.Clampitt@ncleg.gov>; Rep. Ben Moss <Ben.Moss@ncleg.gov>; Rep. Harry Warren <Harry.Warren@ncleg.gov>; Rep. Keith Kidwell <keith.Kidwell@ncleg.gov>; Rep. Jeffrey C. McNeely <Jeffrey.McNeely@ncleg.gov>; Rep. Tim Longest <Tim.Longest@ncleg.gov>; Rep. John Bell <John.Bell@ncleg.gov>; Rep. Donnie Loftis <Donnie.Loftis@ncleg.gov>; Rep. Karl Gillespie <Karl.Gillespie@ncleg.gov>; Rep. Jeffrey Elmore <Jeffrey.Elmore@ncleg.gov>; Rep. Vernetta Alston <Vernetta.Alston@ncleg.gov>; Sen. Sydney Batch <Sydney.Batch@ncleg.gov>; Rep. Joe Pike <Joe.Pike@ncleg.gov>; Sen. Kandie D. Smith <Kandie.Smith@ncleg.gov>; Rep. Reece Pyrtle <Reece.Pyrtle@ncleg.gov>; Sen. Michael Lee <Michael.Lee@ncleg.gov>; Sen. Gale Adcock <Gale.Adcock@ncleg.gov>; Rep. Amos Quick <Amos.Quick@ncleg.gov>; Rep. Julia Howard <Julia.Howard@ncleg.gov>; Sen. Mary Wills Bode <MaryWills.Bode@ncleg.gov>; Rep. James Roberson <James.Roberson@ncleg.gov>; Sen. Mujtaba Mohammed <Mujtaba.Mohammed@ncleg.gov>; Rep. Rosa Gill <Rosa.Gill@ncleg.gov>; Sen. Vickie Sawyer <Vickie.Sawyer@ncleg.gov>; Rep. Kristin Baker, M.D. <Kristin.Baker@ncleg.gov>; Rep. Neal Jackson <Neal.Jackson@ncleg.gov>; Rep. Ya Liu <Ya.Liu@ncleg.gov>; Rep. Shelly Willingham <Shelly.Willingham@ncleg.gov>; Rep. Wesley Harris <Wesley.Harris@ncleg.gov>; Sen. Dan Blue <Dan.Blue@ncleg.gov>; Rep. Allison A. Dahle <Allison.Dahle@ncleg.gov>; Sen. Michael Lazzara <Michael.Lazzara@ncleg.gov>; Rep. Wayne Sasser <Wayne.Sasser@ncleg.gov>; Rep. Jake H. Johnson <Jake.Johnson@ncleg.gov>; Rep. Grey Mills <Grey.Mills@ncleg.gov>; Rep. Steve Tyson <Steve.Tyson@ncleg.gov>; Rep. Jeff Zenger <Jeff.Zenger@ncleg.gov>; Rep. Brandon Lofton <Brandon.Lofton@ncleg.gov>; Sen. Benton Sawrey <Benton.Sawrey@ncleg.gov>; Rep. Celeste Cairns <Celeste.Cairns@ncleg.gov>; Rep. Chris Humphrey <Chris.Humphrey@ncleg.gov>; Rep. Julie von Haefen <Julie.vonHaefen@ncleg.gov>; Sen. Danny Britt <Danny.Britt@ncleg.gov>; Rep. Stephen Ross <Stephen.Ross@ncleg.gov>; Rep. Maria Cervania <Maria.Cervania@ncleg.gov>; Sen. Paul Newton <Paul.Newton@ncleg.gov>; Sen. Tom McInnis <Tom.McInnis@ncleg.gov>; Rep. Pricey Harrison <Pricey.Harrison@ncleg.gov>; Rep. Dudley Greene <Dudley.Greene@ncleg.gov>; Rep. Jennifer Balkcom <Jennifer.Balkcom@ncleg.gov>; Rep. Sarah Crawford <Sarah.Crawford@ncleg.gov>; Rep. Phil Shepard <Phil.Shepard@ncleg.gov>; Sen. Gladys Robinson <Gladys.Robinson@ncleg.gov>; Rep. Kanika Brown <Kanika.Brown@ncleg.gov>; Sen. Dean Proctor <Dean.Proctor@ncleg.gov>; Rep. Donna White <Donna.White@ncleg.gov>; Sen. Eddie Settle <Eddie.Settle@ncleg.gov>; Rep. Larry Potts <Larry.Potts@ncleg.gov>; Rep. Howard Penny <Howard.Penny@ncleg.gov>; Rep. Terence Everitt <Terence.Everitt@ncleg.gov>; Rep. Bill Ward <Bill.Ward@ncleg.gov>; Sen. David Craven <David.Craven@ncleg.gov>; Sen. Bobby Hanig <Bobby.Hanig@ncleg.gov>; Rep. Lindsey Prather <Lindsey.Prather@ncleg.gov>; Rep. Brian Biggs <Brian.Biggs@ncleg.gov>; Rep. Ashton Wheeler Clemmons <Ashton.Clemmons@ncleg.gov>; Rep. Mitchell Setzer <Mitchell.Setzer@ncleg.gov>; Rep. Ted Davis <Ted.Davis@ncleg.gov>; Rep. Carson Smith <Carson.Smith@ncleg.gov>; Rep. Todd Johnson <Todd.Johnson@ncleg.gov>; Rep. Marvin Lucas <Marvin.Lucas@ncleg.gov>; Sen. Phil Berger <Phil.Berger@ncleg.gov>; Rep. Carl Ford <Carl.Ford@ncleg.gov>; Rep. Charles Miller <Charles.Miller@ncleg.gov>; Rep. John Autry <John.Autry@ncleg.gov>; Sen. Joyce Krawiec <Joyce.Krawiec@ncleg.gov>; Sen. Warren Daniel <Warren.Daniel@ncleg.gov>; Sen. Brad Overcash <Brad.Overcash@ncleg.gov>; Rep. Val Applewhite <Val.Applewhite@ncleg.gov>; Rep. Frank Sossamon <Frank.Sossamon@ncleg.gov>; Sen. Tim Moffitt <Tim.Moffitt@ncleg.gov>; Rep. Carla Cunningham <Carla.Cunningham@ncleg.gov>; Rep. Dennis Riddell <Dennis.Riddell@ncleg.gov>; Rep. Abe Jones <Abe.Jones@ncleg.gov>; Rep. Allen Buansi <Allen.Buansi@ncleg.gov>; Rep. Renee Price <Renee.Price@ncleg.gov>; Rep. Michael Wray <Michael.Wray@ncleg.gov>; Sen. Amy Galey <Amy.Galey@ncleg.gov>; Rep. Frank Iler <Frank.Iler@ncleg.gov>; Rep. Mary Belk <Mary.Belk@ncleg.gov>; Rep. Larry Strickland <Larry.Strickland@ncleg.gov>; Rep. Brenden Jones <Brenden.Jones@ncleg.gov>; Rep. Robert Reives <Robert.Reives@ncleg.gov>; Rep. Allen Chesser <Allen.Chesser@ncleg.gov>; Rep. Charles Smith

LEG_DEFS_0004927
LEG_DEFS_0004927

<charles.smith@ncleg.gov>; Rep. Dean Arp <Dean.Arp@ncleg.gov>; Rep. Garland Pierce
<Garland.Pierce@ncleg.gov>; Rep. Kelly Hastings <Kelly.Hastings@ncleg.gov>; Rep. Terry Brown
<Terry.Brown@ncleg.gov>; Rep. Caleb Rudow <Caleb.Rudow@ncleg.gov>; Rep. Tim Moore <Tim.Moore@ncleg.gov>;
Sen. Julie Mayfield <Julie.Mayfield@ncleg.gov>; Sen. Michael Garrett <Michael.Garrett@ncleg.gov>; Sen.
Natasha Marcus <Natasha.Marcus@ncleg.gov>; Rep. Ralph Hise <Ralph.Hise@ncleg.gov>; Rep. Jarrod Lowery
<Jarrod.Lowery@ncleg.gov>; Rep. Cynthia Ball <Cynthia.Ball@ncleg.gov>; Sen. Brent Jackson
<Brent.Jackson@ncleg.gov>; Sen. Steve Jarvis <Steve.Jarvis@ncleg.gov>; Rep. Marcia Morey
<Marcia.Morey@ncleg.gov>; Rep. Mark Pless <Mark.Pless@ncleg.gov>; Rep. Kelly M. Alexander
<Kelly.Alexander@ncleg.gov>; Rep. Edward C. Goodwin <Edward.Goodwin@ncleg.gov>; Rep. Ray Jeffers
<Ray.Jeffers@ncleg.gov>; Rep. Jay Adams <Jay.Adams@ncleg.gov>; Rep. John Torbett
<John.Torbett@ncleg.gov>; Rep. Carolyn G. Logan <Carolyn.Logan@ncleg.gov>; Rep. Ken Fontenot
<Ken.Fontenot@ncleg.gov>; Sen. Jim Perry <Jim.Perry@ncleg.gov>; Rep. Zack Hawkins
<Zack.Hawkins@ncleg.gov>; Sen. Norman Sanderson <Norman.Sanderson@ncleg.gov>; Rep. Kevin Crutchfield
<Kevin.Crutchfield@ncleg.gov>; Rep. Jason Saine <Jason.Saine@ncleg.gov>; Sen. Natalie Murdock
<Natalie.Murdock@ncleg.gov>; Rep. John Sauls <John.Sauls@ncleg.gov>; Rep. Ray Pickett
<Ray.Pickett@ncleg.gov>; Rep. Erin Pare <Erin.Pare@ncleg.gov>; Sen. Paul Lowe <Paul.Lowe@ncleg.gov>; Rep.
Diane Wheatley <Diane.Wheatley@ncleg.gov>; Rep. Kyle Hall <Kyle.Hall@ncleg.gov>; Rep. Jimmy Dixon
<Jimmy.Dixon@ncleg.gov>; Rep. Laura Budd <Laura.Budd@ncleg.gov>; Sen. Lisa Grafstein
<Lisa.Grafstein@ncleg.gov>; Sen. Rachel Hunt <Rachel.Hunt@ncleg.gov>; Rep. Becky Carney
<Becky.Carney@ncleg.gov>; Rep. Sam Watford <Sam.Watford@ncleg.gov>; Rep. Nasif Majeed
<Nasif.Majeed@ncleg.gov>; Rep. William Brisson <William.Brisson@ncleg.gov>; Sen. Ted Alexander
<Ted.Alexander@ncleg.gov>; Rep. Cecil Brockman <Cecil.Brockman@ncleg.gov>; Rep. Timothy Reeder, MD
<Timothy.Reeder@ncleg.gov>; Rep. Matthew Winslow <Matthew.Winslow@ncleg.gov>; Rep. Eric Ager
<Eric.Ager@ncleg.gov>; Sen. Lisa S. Barnes <Lisa.Barnes@ncleg.gov>; Sen. Jim Burgin
<Jim.Burgin@ncleg.gov>; Rep. Hugh Blackwell <Hugh.Blackwell@ncleg.gov>; Rep. George Cleveland
<George.Cleveland@ncleg.gov>; Rep. Mark Brody <Mark.Brody@ncleg.gov>; Sen. Graig Meyer
<Graig.Meyer@ncleg.gov>; Sen. Joyce Waddell <Joyce.Waddell@ncleg.gov>; Sen. Kevin Corbin
<Kevin.Corbin@ncleg.gov>; Sen. Jay Chaudhuri <Jay.Chaudhuri@ncleg.gov>; Rep. Jon Hardister
<Jon.Hardister@ncleg.gov>; Rep. Gloristine Brown <Gloristine.Brown@ncleg.gov>; Rep. Joe John
<Joe.John@ncleg.gov>; Sen. Mike Woodard <Mike.Woodard@ncleg.gov>; Rep. Diamond Staton-Williams
<Diamond.Staton-Williams@ncleg.gov>; Sen. Bill Rabon <Bill.Rabon@ncleg.gov>; Rep. Tricia Cotham
<Tricia.Cotham@ncleg.gov>; Rep. John Faircloth <John.Faircloth@ncleg.gov>; Rep. Frances Jackson
<Frances.Jackson@ncleg.gov>; Rep. David Willis <David.Willis@ncleg.gov>; Rep. Amber Baker
<Amber.Baker@ncleg.gov>; Sen. Buck Newton <Buck.Newton@ncleg.gov>; Sen. DeAndrea Salvador
<DeAndrea.Salvador@ncleg.gov>; Rep. Destin Hall <Destin.Hall@ncleg.gov>; Rep. Sarah Stevens
<Sarah.Stevens@ncleg.gov>; Rep. John Bradford <John.Bradford@ncleg.gov>; Rep. Donny Lambeth
<Donny.Lambeth@ncleg.gov>; Rep. Deb Butler <Deb.Butler@ncleg.gov>; Rep. Hal Weatherman
<halcweatherman@gmail.com>; Ian Richardson <ianrichardson1191@gmail.com>
Subject: Recommended NC Election Law Changes for the 2023-2024 Sessions

Apparently the email I sent earlier today was blocked at the NCGA because the file attachments were in
.zip format so am resending it now with plain text files attached.

Ongoing research into NC election statutes, data, policy and practices of the NC State Board of Elections
(NCSBE) by The Electoral Education Foundation has yielded our top dozen recommendations for legislative
changes for your consideration in the current session.  There are also five separate, additional issues
we believe require further inquiry by the NCGA to determine if they have any adverse effect on NC
elections or the voters of NC..

This White Paper begins with a simple bullet list of those 12 points, followed by a narrative discussing
each of them in greater detail.
The TABs contain examples from NCSBE data files and other documentation that support our requests.  We
offer these because we believe your action on them will both improve how elections are conducted in NC as
well as bolster public confidence in our processes that has been eroded statewide and nationally over the
last few years.
NC continues to lead the nation in election transparency through the amount of data made public, online
at no cost to our citizens.

We invite your comments, criticisms and concerns over these issues and are prepared to host Zoom meetings
online for you and your colleagues at your convenience to explain in further detail any aspect of these
recommendations or to provide any additional documentation and supporting evidence you may require.
Thank you for your kind attention to this matter.

For a better North Carolina,

"Major Dave"

--
David W. Goetze
Vice President For Research
Electoral Education Foundation
(919) 616-4601

--
David W. Goetze
Vice President For Research
Electoral Education Foundation
(919) 616-4601

LEG_DEFS_0004928
LEG_DEFS_0004927

# ELECTORAL EDUCATION
## FOUNDATION



Election Integrity for North Carolina

N★C

EEF

# RECOMMENDATIONS TO THE NORTH CAROLINA
# GENERAL ASSEMBLY TO IMPROVE STATE ELECTION LAWS
# FOR THE 2023-2024 SESSION

Prepared by:

Hal C. Weatherman
President

Ian Richardson
Executive Director

David W. Goetze
Vice-President for
Research

LEG_DEFS_0006718

# TABLE OF CONTENTS

Recommendations for Statutory Changes  (Bullet Points) ....................................... Page 01
Recommendations for Further Inquiry (Bullet Points)............................................. Page 02

Discussion of Issue #1 ..................................................................................Page 03
Discussion of Issue #2 ..................................................................................Page 04
Discussion of Issue #3 ..................................................................................Page 05
Discussion of Issue #4 ..................................................................................Page 06
Discussion of Issue #5 ..................................................................................Page 06
Discussion of Issue #6 ..................................................................................Page 07
Discussion of Issue #7 ..................................................................................Page 08
Discussion of Issue #8 ..................................................................................Page 08
Discussion of Issue #9 ..................................................................................Page 09
Discussion of Issue #10 ................................................................................Page 10
Discussion of Issue #11 ................................................................................Page 10
Discussion of Issue #12 ................................................................................Page 10

Recommendation  #13 ..................................................................................Page 11
Recommendation  #14 ..................................................................................Page 12
Recommendation  #15 ..................................................................................Page 13
Recommendation  #16 ..................................................................................Page 13
Recommendation  #17 ..................................................................................Page 14

LEG_DEFS_0006720

Case 1:23-cv-00878-TDS-JEP     Document 124-17     Filed 05/09/25     Page 5 of 63

This page intentionally left blank.

LEG_DEFS_0006721

Based on an analysis of voter history data and our personal archives of election data files dating back to the 2020 election, the Electoral Education Foundation suggests making the following changes to election law to improve voting integrity in North Carolina. Then follows a discussion of each recommendation to explain the rationale for each, with tabbed annexes to give supporting examples of why these changes are recommended. Other subjects listed are topics for further inquiry by the Joint Oversight Committee on Elections since they pertain more to the internal processes used by the NCSBE in data management and publication and do not necessarily lend themselves to statutory revision.

## RECOMMENDATIONS FOR STATUTORY CHANGES:

1. *Affirm that the Absentee Ballot Application Number declared to be a public record in accordance with current election law, NCGS §163-228 is published in all relevant election data files:* NCBoE not in compliance w/ state Law, But not consistent. S/t they have published + s/t not

2. *Issue the unique voter NCID numbers in chronological & sequential order:*

3. *Block entry of additional voter registration data into Absentee Ballot Data Files once the deadline for reporting them to the NCSBE on Election Night has passed:*

4. *Prohibit the use of Same-Day Registration provisions as a means of avoiding the casting of a Provisional Ballot during Early Voting:*

5. *Prohibit Certification until County and State Records are reconciled:* state data — there is no req'm't for counties to verify that state be verified by each county.

6. *No Updates to Previously Certified Election Files without written notice to the Election Oversight Committee:* In May 2017 in 3.5 min. someone changed provisional ballot

7. *Mandatory Archiving of Certified Election Results with the Office of State Archives.*

8. *Accountability Needed for Who Conducts Updates to Election Data:* — need to know who is making the change.

9. *Eliminate the use of "virtual precincts" in the tabulation of vote totals:* 53 counties report election results by precinct or elect. nt. (47 counties use V.P.'s

10. *Consider revision of who is eligible to file protests or challenges to voters and/or ballots, and who has standing to file suit over discrepancies:* 1963 statute. county parties submit to county BOE's

11. *Review state law allowing 16-year olds to pre-register to vote:* Repeal. Takes a burden off DMV.

12. *Stop the elimination of data servers at the County level and their migration to "the cloud":* — Servers are either Barcelona or Frankfurt. — If a server crashes we lose everything. Election IG office — we can furnish an aux Server.

LEG_DEFS_0006722

## RECOMMENDATIONS FOR FURTHER INQUIRY:

13. Create a master key to the NCSBE data field codes: *date label printed.*
— *date mailed should = date mailed, not date label printed.*

14. North Carolina should cease participation with ERIC: *Tab H*
*they require Last 4 + DOB.*

15. Insure the public notice from each County for unsealing provisional ballots is posted conspicuously on the NCSBE website: *List of county canvass*
*mtgs, place + time.*

16. Inquire why and how DemocracyLive was chosen to manage online voting in NC and why the Absentee Ballot Data does not include codes to indicate which voters are voting via that portal: *military, overseas + ADA*
— *code needs to*

17. Explore how i3Logix is able to match By-Mail voters with Absentee Ballot Data and verify Dates of Birth via the BallotTrax System they administer on behalf of NC voters:

• *need uniform data fields + sequence from yr. to year to facilitate comparison.*

LEG_DEFS_0006723

**1. Affirm that the Absentee Ballot Application Number declared to be a public record in accordance with current election law, NCGS §163- 228 is published in all relevant election data files:**

NCGS §163- 228 requires the NCSBE to make the ballot application number for all absentee ballot requests public. Despite the Legislature declaring this data a matter of public record, the NCSBE has adopted a contrary policy, inconsistently redacting that unique Absentee Ballot Request Identification number from the public record for some elections and publishing it at other points. This inconsistency has been noted since 2016.

In our communications with the SBOE, they have stated that if a ballot application number is made public, anyone in a Canvass meeting could discover how a voter voted when that number is called out, violating the secrecy of that ballot. While that is conceivably true, we believe that such an occurrence would be very infrequent. Furthermore, from a strictly legal perspective, the State Board lacks the authority to make such a unilateral, binding determination via memo that contravenes a General Statute from the Legislature. The emails between the EEF and the NCSBE on this topic are at TAB A.

There are sufficient statutes already that make it a crime for anyone to attempt to discover how any other person voted, and it seems best to use those statutes where warranted instead of the wholesale redaction of information the Legislature has chosen to declare a matter of public record.

We believe the greater harm occurs if the public has no way to discern if records in the data files are true duplicates or clerical errors. In the 2020 election, the ballot application number was published daily in the Absentee Ballot Data File until October 8th, just before the onset of Early Voting and was then redacted from all later versions of that file. With access to ballot application numbers, one could reconcile the voter history to ensure accuracy in the record and validate that no voter had cast more than one ballot.

LEG_DEFS_0006724

## 2. *Issue the unique voter NCID numbers in chronological and sequential order.*

The NCSBE issues an identification number to each voter in the voter rolls. Known as the NCID#, this number is used to insure that each voter can be identified separately from every other voter and is the means by which their voter history can follow them should they move from one county to another. Traditionally, NCID#s are issued in a very orderly and sequential process of [last number +1]. However, our research has identified multiple cases of numbers being issued in batches that break the chronological sequence. TAB B shows an example of such a batch. The voter on the top line has the lowest NCID# (Column D) among that group with CJ192923 and a registration date of 3/1/2019. The last line at the bottom of that group shows NCID# CJ192942 and a registration date 3 days later.

But what is significant is that the records highlighted in yellow in between those two NCID#s all show a backdated date of registration. These records were also NOT in the voter rolls just three weeks prior in the Nov 26th weekly report. The voter's age in Column AH says they are all now 21 years old, so these were all 16 years old 5 years ago and appear to have pre-registered to vote when they got their initial Drivers License. If they became eligible to vote at 18 years of age, these records should have been in the file during the last 3 years but are not. This is a weakness that lends itself to the fabrication of potentially phantom voters that have the prima facia appearance of legitimacy but may in fact be fictitious voters.

Of the NCID#s skipped over in this sequence of new records, we find that NCID# CJ192924 is found as a registered voter in Vance County since Oct 1, 2019, CJ192932 has been registered in Mecklenburg County since Oct 26th of 2021 and CJ192938 has been registered in Harnett County since Mar 8th of 2022, even though their NCID# prefix (CJxxxxxx) shows their registration originated in Johnston County. This disparity in how and why some of the 16 year old pre-registrants get their registration perfected at one point and others see years of delay in theirs highlights the lack of a consistent system administered by the NCSBE to insure their record matures at the appropriate date.

**4. Prohibit the use of Same-Day Registration provisions as a means of avoiding the casting of a Provisional Ballot during Early Voting:**

The EEF has recently detected numerous cases of voters registering as an SDR during Early Voting only to later see the NCID# assigned to them at that point being changed to an NCID# they were previously assigned in the same or a different County. This has become a way to avoid casting a Provisional Ballot based on prior removal or there being no record of a prior registration. Since the prior registrations are later being found, it suggests little to no research is being done at that point at One-Stop to determine if they are properly registered elsewhere and instead simply signing them up with a new NCID#.

Of particular note were two SDRs registered in Robeson County and assigned a new NCID#. Their records reflected campus addresses at Pembroke University, one which proved to be a parking lot and the other, a fictitious address according to mapquest.com. Their Absentee Ballot record remained unchanged and their addresses were coded as "Verified" until just before the Canvass. At that point, their NCID#s were changed to reflect the one previously given to them, one in Mecklenburg County and one in Durham County. Now that Robeson ballot appears in their Voter History in their respective records in the original Counties and there is no longer any record in the voter rolls of them ever having been registered to vote in Robeson County, but those two ballots were still counted and votes awarded to candidates based on them.

We hold that any discrepancies like this we find in our research could be found and known much more timely by the NCSBE staff if they only bothered to look. There is no evidence they screen the data for any such anomalies unless and until some third party files a challenge over it.

**5. Prohibit Certification until County and State Results Records are Reconciled:**

Our conversations with several County Board of Elections members and County Directors of Elections found no requirement for any County to compare what they have uploaded to the State with what the NCSBE publishes on their behalf to insure accuracy. We recommend an inclusion of this requirement into statute so that the Secretary of State can rely not only on a certification from the NCSBE as to any election outcome but also the individual validation of each County that the published results are in fact accurate. It should also address a process for reconciliation should it be determined that some inaccuracy exists.

LEG_DEFS_0006727

### 3. Block entry of additional voter registration data into Absentee Ballot Data Files once the deadline for reporting them to the NCSBE on Election Night has passed:

In North Carolina, a voter can register to vote and vote on the same day during the Early Voting period at One-Stop locations in each County. They are known as Same-Day Registrants (SDRs). We believe that current NCSBE policy requires each County to upload all voting results from Early Voting to them no later than 5 pm on Election Day. This is why we often see in the early returns on Election Night votes being shown for candidates even though it says zero precincts have reported.

What we find to be problematic is that even though the votes from the tabulation machines are reported on Election Night, the Absentee Ballot Data file showing who cast all those votes continues to grow long after Election Day. TAB C reflects a chronology by day from the November 2020 General Election of how many SDRs appeared in the data file each day. What we documented is that of the 114,401 SDRs who cast a ballot in that election, 17,749 of those new voters did not appear in the Absentee Ballot Data file until AFTER Election Day, including 287 that did not appear at all until November 11th, 8 days after Election Day, despite the record saying they had registered and cast their ballot more than a week prior. This large number exceeds the threshold of the 10k vote or greater margin of victory in statewide races needed to avoid an automatic recount at State expense and is of itself greater than the margin of victory in the Attorney General's race.

When we have votes being counted and awarded to candidates and we do not yet know even who the voters are that cast those ballots, this becomes another instance of a discrepancy that can have a high correlation to voter fraud. We recognize that backlogs can occur, but if so, it is a staffing issue that can be addressed and should be well before any election gets underway. But our recommendation more directly addresses the need for substantive documentation of these instances when they occur so that additional records cannot be added to the data without written justification.

LEG_DEFS_0006726

**6. Prohibit Updates to Previously Certified Election Files without written notice to the Joint Oversight Committee on Elections:**

A review of the election data files from past elections in NC has yielded some disturbing results. The listing of files for each election contains the file name, the file size and the date it was last modified. There is considerable evidence that these files are often changed months and years after that election's results were finalized and certified. TAB D shows a listing of Provisional Ballot Data files from a series of past elections, mostly held in 2009. What this listing shows is that in the span of 3 1/2 minutes on the afternoon of May 11th, 2017, someone modified all 16 of those files in exact reverse chronological order by election date. No file was open for more than a few seconds, suggesting they were either replaced by a new file or data was copied and pasted into them. Someone then came back later that same night after normal business hours and modified the history_stats files for 6 past elections.

When data alteration of this nature is allowed to take place with no oversight, then no past election data can be presumed to be currently accurate of what occurred.

The most recent instance took place on the Saturday evening following the November 2020 General Election. At 11:42 PM that night, just before midnight on a weekend, someone modified the Absentee Ballot Data file for the 2016 General Election. We agree that many of the staff were working remotely from home due to the pandemic, but this change bears no relevance to the normal course of processing election data, particularly while another election is underway. If the file had merely been opened and read for some reason, the "date_modified" would not have changed in the system as is shown in the TAB D graphic. This at best gives the appearance of impropriety that data records were being harvested for inclusion in the files of the current election then underway.

On a related note, the County Status Report from the 2020 General Election shows that both Pitt and Stokes Counties were allowed to make amended uploads of their election data in February of 2021, long after the results have been certified. To date, none of the election data files have been updated to reflect what changes were made or why this late amendment to their data was necessary.

LEG_DEFS_0006728

## 7. *Mandate Archiving of Certified Election Results with the Office of State Archives:*

The NC General Assembly should mandate as a matter of law that once an election's results are certified, that those related election data files created and published by the NCSBE, including all interim versions of those files, be transferred and placed under the custody and control of the Office of State Archives. Currently, interim versions of election data files are typically overwritten when the next day's files are posted, obscuring the prior versions from public access and scrutiny. These files should all be maintained as part of the official archive that cannot be later modified in any way, and that they be made available to the public via the Internet. The NCSBE currently rents and utilizes data storage space online from Amazon Web Services according to the URL listed for some files, and that on information and belief, that the server is not even located within the continental United States.

Our experience with purchasing physical hard drives of the size to hold the entire history of files created since 2006 when automation was more fully undertaken to be in the hundreds of dollars, a very affordable option to the ongoing rental costs of CPU time and storage space on a server in a foreign country.

## 8. *Accountability Needed for Who Conducts Updates to Election Data:*

The EEF believes there are insufficient internal controls enforced by the NCSBE to document who makes changes to election data and voter registration files such as those cited above in Issue #6 at both the County and State levels.

TAB E shows an example of a voter's Absentee Ballot data (last name redacted to protect privacy) as it appeared in each day's report. That report day is in Column B. We appended that date to each line in each day's Absentee Ballot Data file records so that when they were merged, we could then sort the records by NCID# and Report Date to discern how any voter's record changed from one day to the next. As this listing shows for this voter, as reported on Nov 1st, a single One-Stop ballot was cast by this voter as an an SDR (Column AR) and "Accepted" (Column AP) on Oct 15th, 2020 (Column AM). We reasonably conclude at that point that the ballot was fed into a tabulator and counted as the voter departed. However, the following day, Nov 2nd, it now says this voter attempted twice to cast a ballot but both then showed a status of "Conflict" (Column AP) on Oct 15th. These two records remained unchanged until after the Thanksgiving holidays. There was no Absentee Ballot Data file update made by the NCSBE between Nov 25th and Dec 9th. But in the Dec 9th report, it now says one ballot was "Accepted" and the other as "Cancelled" (sp).

Without the unique Absentee Ballot Application Number discussed in Issue #1 above, it is impossible to know if these two entries actually represent two distinct ballots or are a duplication of each other. However it does raise the questions of :

1) which ballot was fed into the tabulator on Oct 15th if there were two,
2) which ballot was fed into the tabulator on or about Dec 9th,
3) where have these two ballots been during the interim period and
4) when were they actually marked by the voter?
5) who made these changes and why?

This ability to insert additional Absentee Ballot records into the data file weeks after an alleged voting attempt took place also has a high correlation to voter fraud if it is abused.

LEG_DEFS_0006729

### 9. Eliminate the use of "Virtual Precincts" in the tabulation of vote totals:

Forty-seven of NC's 100 Counties continue to create and define "virtual" precincts to report vote totals by voting method rather than by the actual precinct of the voter. Current statutes require those counties to submit an amended Results report within 30 days after an election that reports all votes by the real precinct of the voter. Our research has revealed that this is necessitated by the limits imposed by the capacity of the older ballot tabulation machines. Those limits in the number of different ballot styles the machines can be programmed to read are easily reached in the larger counties during Early Voting when every ballot style in that county must be programmed into them to accept voted ballots from a voter in any precinct in that county. Wake County is a prime example. Mecklenburg however, now having purchased newer machines since doing away with their older DRE equipment does not have this problem. This issue first arose when we discovered thousands of votes being awarded to candidates in the 2012 General Election on the basis of "Accumulated Ballots". That virtual precinct name was not used in any prior or subsequent election for which automated data files are available.

In September of 2017 when our now Vice-President for Research met with former NCSBE Executive Director Kim Strach and her 5 top Deputies in her office at the NCSBE, no one at that table could explain what an Accumulated Ballot was. We have since identified 588 unique Virtual Precinct names that have been used and rarely are the same names used by a county from one election to the next (e.g. OS-BoE in the Primary and BoE-OS in the General). TAB F shows by County who used them and how many they used in both the Primary and General elections in 2022. Clearly the smaller counties can function fully with the older equipment.

According to machine specifications we found on the ES&S website, those counties who are still using the equipment initially purchased circa 2006 are using machines that run on Intel x386 and x486 processors that were replaced in the market by their Pentium CPU chip in 1995, so they were decade-old technology when they were purchased and are still in use now nearly two more decades later. They will not work with any operating system newer than Windows 7 which Microsoft ceased to support to rectify vulnerabilities several years ago.

We strongly recommend further inquiry by the Legislature into how this issue can be eliminated to include increased funding for the purchase of new equipment that takes advantage of the most modern technology available.

LEG_DEFS_0006730

**10. Consider revision of who is eligible to file protests and/or challenges to voters and/or ballots, and who has standing to file suit over discrepancies:**

Our research reveals that current statutes limit who can challenge a voter or a ballot to any other registered voter in the same County and Precinct as that of the challenged. This law may have been adequate to the times when most voted in-person at their Precinct on Election Day and were inclined to recognize a "stranger" waiting in line to vote. However, in today's election cycles with the different methods and times for casting a ballot, that is no longer an effective remedy.

Discrepancies worthy of review are now often found in the data by private citizens or organizations like our own, given the advances in technology since that time, but are prevented from submission because they lack "standing" before the Courts and/or the NCSBE to do so.

**11. Review state law allowing 16-year olds to pre-register to vote:** As discussed above in Issue #2, the pre-registration of 16 year-olds has presented additional problems in the management of voter rolls and serves no obvious advantage to the voter. The information provided often changes for many of them by the time they turn 18, especially for those who pursue higher education at some distant campus. Removing this opportunity does not disenfranchise anyone and removes an additional burden on the staff of the DMV. We also consider that given the many decisions they are not yet allowed by law to make because of their tender years, perhaps which political party and its Platform they are poised to consider should be among them. We suggest a brief study of secondary education across the state to determine at what grade/age these students actually participate in an appropriate Civics class that would at least give them a basic understanding of our political system before they are called upon to choose between them.

**12. Stop the elimination of election data servers at the County level and their migration to "the cloud":**

Recent announcements by the NCSBE explain their undertaking of a multi-year project to migrate all County election data server operations to "the cloud" via the Internet at a cost of roughly $3M USD. We find no suitable justification for incurring this additional and recurring expense to remove the custody and control of this privileged data from the Counties to a third-party vendor who then rents the State data storage space on its servers and charges for the CPU time used to manage that data by the Counties.

NCGS § 163-33 insures the Counties remain the primary Master of their own elections, subject to the general rules and regulations promulgated by the NCSBE, but removing their direct control and management of their own data takes them further from it. We also consider the attendant risk of placing the whole of NC election and voter registration data in "the cloud" where it is more susceptible to hackers and other malicious operators that need only to breach one website to gain access to our data as opposed to currently having to hack into each of the county servers independently. We believe the risk is heightened when the failure of a single server would deny the State access to all of its data. Server failure is currently limited to the County level and does not have any effect on the data of the other 99 Counties.

We ask the Legislature to consider instead using that $3M to provide increased data security at the existing County level by providing whatever hardware and software upgrades are needed in each County to elevate their security posture to current industry standards.

LEG_DEFS_0006731

## *RECOMMENDATIONS FOR FURTHER INQUIRY:*

### *13. Create a Master Key to the NCSBE data field codes:*

Previous communications between the EEF and the NCSBE have revealed some disparity in what a data field code or label actually means from one County to the next. For example, when we were questioning when Alamance County had ballots printed for the Nov 2021 Municipal election and mailed them out, we were told by the NCSBE that the [date_sent] which is declared by NCGS § 163-228 to be a matter of public record reflecting the date an Absentee By-Mail ballot was mailed to the voter is actually the date the mailing label was printed. Other Counties inform us they use the actual date the ballot was deposited with the USPS for delivery as the data field label implies.

TAB G contains the email exchanges between us in this regard. We find their explanation unsatisfactory since it is inconsistent with the actual data for other By-Mail voters in that election. If their statement is true, then the data says of all the pending By-Mail ballot requests reported as being made prior to that date, the mailing labels were only printed to honor some but not all of those requests pending on that date. Others with the same date of request show their label being printed days later. We find this inconsistency alarming.

We began this inquiry when the Nov 2021 Municipal election data for Alamance County suggested that ballots for it were being printed and mailed out to the voters before the results of the October Municipal Primary election had been certified, determining who would appear on those November ballots. Their County BoE initially responded with undated purchase requests to the ballot printer for the November ballots which we deemed unresponsive. Senator Amy Galey was instrumental in obtaining relevant documentation from the County's Purchasing Department of when the ballots were actually purchased, delivered and available for mailing and we appreciate her assistance in that regard. However that documentation shows that the approval date for that Purchase Order (PO) is after the November election had already been held, so it is impossible to determine if the November ballots contained a premature (and thus unofficial) listing of the winning candidates from the Primary. We invite you to also inquire about the practice of obligating funds without an approved PO, especially where election ballots are concerned. We are prepared to provide you with all relevant documentation at your request.

We believe uniformity among all the Counties to be of paramount importance. Mandating each data element by definition would enhance the ability to compare apples to apples in the data files and insure data declared to be public record by law is provided to the public and not substituted at local discretion.

### 14. North Carolina should cease participation in ERIC:

Recent efforts by the NCSBE to acquire funding for NC's participation as a member of the Electronic Registration Information Center, Inc. (ERIC) subject the State to an elevated risk of disclosure of privileged personal information for each of our voters. Ostensibly, the purpose is to help identify voters registered and voting in more than one state.

The budget request they submitted apparently did not disclose any of the substantial obligations NC would incur as a result of joining ERIC  Most notably is that upon joining, NC must migrate its voter registration system to an online-only voter registration platform to "eliminate" wet-signed voter registration applications. This would have a direct and negative impact on any future program of signature matching to validate By-Mail ballots should NC choose to move in that direction. NC would also become obligated to make all state agencies that register our citizens to vote capable of the same online registration functions as is currently available to the DMV. We believe there are 8 other such agencies. Thus the request seemed benign on its face because it did not seek any new appropriations but rather only the approval to spend existing funds for this purpose and did not disclose any of these additional obligations that the NCSBE would be agreeing to on the State's behalf.

ERIC is a 501(C)(3) like our own Foundation with no unique qualifications or standing to have or hold restricted data on our voters. Yet, the Membership Agreement (TAB H) makes clear that in order to accurately match data between voter registration records in the different Member States, the data must include the last 4 of the SSAN, Date of Birth, and State Drivers License Number, all protected from disclosure to 3rd parties by existing NC statutes. With this in mind, our Foundation recently submitted a request to the NCSBE for the same data they would be providing to ERIC and were immediately denied, citing several State and Federal Statutes that precluded them doing so. This email exchange is at TAB I.

Appendix D to that Membership Agreement also details the additional data they are now requesting from the State of Illinois that greatly expands their data harvesting attempts to obtain data from several other State agencies there having little to nothing to do with voter registrations.

Our conclusion is that if the data cannot be provided to the EEF, it cannot be provided to ERIC, and that redaction of privileged data under state law makes our participation in ERIC useless since exact matches then are not possible. Several States that had joined have since resigned. Louisiana has now withdrawn for similar reasons while Alabama and Virginia have taken this issue under review.

LEG_DEFS_0006733

**15. Insure the Public Notice from each County for the unsealing of Provisional Ballots is posted conspicuously on the NCSBE website:**

Currently there is no central resource for candidates, particularly those running for statewide office, to learn when any County BoE has scheduled their meeting(s) to inspect and vote on Provisional Ballots. We believe this would be an essential and valuable tool for candidates of any Party to consult in deciding if they or a representative from their campaign should attend.

We appreciate the Legislature previously including in HB 1169 (SL 2020-17) the requirement that the NCSBE publish the number of outstanding Provisional Ballots pending adjudication by noon on Thursday following an Election Day so that candidates at least have an idea of how many ballots could potentially affect the outcome in their race. However, the Provisional Ballot data files for the November 2022 General Election as posted in compliance with that requirement show that report as having been short by several hundred ballots statewide.

When a system cannot even count ballot envelopes correctly, it calls the integrity of the entire operation into question and serves to undermine public confidence in the accuracy of any report.

**16. Inquire why and how DemocracyLive was chosen to manage online voting in NC and why the Absentee Ballot Data does not include codes to indicate which voters are voting via that portal:**

Currently, Absentee Ballot Data only indicates if a person requested their ballot in-person, via mail, via email or via fax. This system has been in use now for over two years and appears to be used by our overseas civilian and military voters as well as the disabled and visually handicapped.

We can conclude from the brief period between the ballot request dates and their return dates for overseas voters that the ballots could not have been sent and returned via the USPS since many show being requested, sent and returned on the same day. Most show they were requested via email but that is at best an incomplete reflection of the actual method of voting used.

We strongly recommend that the Legislature require the NCSBE to create not only a relevant code for the ballot request method but also create a fourth 3-letter prefix to the unique Absentee Ballot Request ID# (e.g. CIV, MIL, OVR) to further segregate this additional manner of voting from the other three currently in use.

LEG_DEFS_0006734

**17. Explore how i3Logix is able to match By-Mail voters with Absentee Ballot Data and verify Dates of Birth via the BallotTrax system they administer on behalf of NC voters:**

Our research had revealed that the BallotTrax system currently in use by the NCSBE to allow By-Mail voters to track the status of their ballot online is run by a third-party vendor, i3Logix, Inc of Denver, CO. The BallotTrax website they own and manage requires our voters to provide their full name, County and Date of Birth (DOB) in order to access the status of their ballot. Our question arises as to how they are able to access the DOB in SEIMS to confirm the Requestor's identity since that data is restricted from disclosure as discussed in Recommendation #14 above.

The voter's request is submitted via a link on the NCSBE website that redirects them to the BallotTrax website, so either i3Logix has the NC voter rolls to include the DOB resident on their server or they have direct access to SEIMS to make the comparison. We hold the potential risk to restricted data to be self-evident.

We recommend that the Legislature exercise their oversight authority and review the contract with i3Logix to determine just how this data is being used, what contractual language exists that addresses security concerns and whether this arrangement is actually permissible under relevant NC statutes that restrict what data can be made available to 3rd parties, even via contract language. It is a fundamental premise of both State and Federal contracting statutes that you cannot contract to do something that is otherwise not permissible under law to do.

Our concerns were elevated when we read from the i3Logix website how they were formed in 2008 and began with a lucrative federal contract to track the distribution and administration of the Flu Vaccine. Clearly any company in possession of both personal medical and voting information would be a prime target for exploitation.

 Gmail

## Request For Unredacted Public Election Data
18 messages

**Major Dave Goetze** <majordave@electoraleducation.com>                    Mon, Jan 24, 2022 at 5:18 AM
To: Patrick Gannon <Patrick.Gannon@ncsbe.gov>
Cc: Allison Dahle <Allison.Dahle@ncleg.gov>, Bill Rabon <Bill.Rabon@ncleg.gov>, Dan Blue <Dan.Blue@ncleg.gov>,
Dennis Riddell <Dennis.Riddell@ncleg.gov>, Destin Hall <Destin.Hall@ncleg.gov>, Grey Mills <Grey.Mills@ncleg.gov>, Jeff
Zenger <Jeff.Zenger@ncleg.gov>, Jim Perry <Jim.Perry@ncleg.gov>, John Szoka <John.Szoka@ncleg.gov>, Jon Hardister
<Jon.Hardister@ncleg.gov>, Kathy Harrington <Kathy.Harrington@ncleg.gov>, Larry Pittman <Larry.Pittman@ncleg.gov>,
Michael Garrett <Michael-Garrett@ncleg.gov>, Paul Newton <Paul.Newton@ncleg.gov>, Pricey Harrison
<Pricey.Harrison@ncleg.gov>, Ralph Hise <Ralph.Hise@ncleg.gov>, Shelly Willingham <Shelly.Willingham@ncleg.gov>,
Warren Daniel <Warren.Daniel@ncleg.gov>, Wiley Nickel <Wiley.Nickel@ncleg.gov>, lawyerstevenwalker@gmail.com,
Electoral Education Foundation <hello@electoraleducationfoundation.com>, Keith Kidwell <Keith.Kidwell@ncleg.gov>,
Jeffery McNeely <Jeffrey.McNeely@ncleg.gov>, Bobby Hanig <Bobby.Hanig@ncleg.gov>, "Bell, Karen B"
<Karen.Bell@ncsbe.gov>, Bob Steinburg <Bob.Steinburg@ncleg.gov>, Ted Alexander <Ted.Alexander@ncleg.gov>,
John.Bell@ncleg.gov

Mr. Gannon,

Our research has uncovered what appears to be duplicate Absentee Ballot data records for hundreds of voters from the
November 3rd, 2020 General Election in your data files found here: https://dl.ncsbe.gov/index.html?
prefix=ENRS/2020_11_03/

On the 8th of October, 2020, just a week before Early Voting began, the NCSBE curiously ceased reporting the unique
Absentee Ballot Application ID# in that daily file despite it having been reported daily by you for over a month up to that
point, consistent with it being declared a matter of public record pursuant to NCGS §163-228 (attached), and then
claiming some unspecified need for "confidentiality" in doing so. Clearly any need for confidentiality has long
since abated. We believe that having that number now will help us to discriminate between true clerical (duplicate) errors
and other reasons for multiple ballot records for the same voter.

We respectfully request that you publish an un-redacted version of that file in the same directory online (appropriately
titled so as not to overwrite the existing file) that includes each Absentee ballot application ID# so that we may download
it and continue with our research. Please notify us by return email when that file is available  Your prompt response to
this request is greatly appreciated.

--
David W. Goetze
Vice President For Research
Electoral Education Foundation
(919) 616-4601

➡

**163-228 - Absentee Ballot Request # is Public Record.jpg**
219K

➡

**Gannon, Patrick** <Patrick.Gannon@ncsbe.gov>        Wed, Jan 26, 2022 at 12:40 PM
To: Major Dave Goetze <majordave@electoraleducationfoundation.com>
Cc: Allison Dahle <Allison.Dahle@ncleg.gov>, Bill Rabon <Bill.Rabon@ncleg.gov>, Dan Blue <Dan.Blue@ncleg.gov>,
Dennis Riddell <Dennis.Riddell@ncleg.gov>, Destin Hall <Destin.Hall@ncleg.gov>, Grey Mills <Grey.Mills@ncleg.gov>, Jeff
Zenger <Jeff.Zenger@ncleg.gov>, Jim Perry <Jim.Perry@ncleg.gov>, John Szoka <John.Szoka@ncleg.gov>, Jon Hardister
<Jon.Hardister@ncleg.gov>, Kathy Harrington <Kathy.Harrington@ncleg.gov>, Larry Pittman <Larry.Pittman@ncleg.gov>,
Michael Garrett <Michael-Garrett@ncleg.gov>, Paul Newton <Paul.Newton@ncleg.gov>, Pricey Harrison
<Pricey.Harrison@ncleg.gov>, Ralph Hise <Ralph.Hise@ncleg.gov>, Shelly Willingham <Shelly.Willingham@ncleg.gov>,
Warren Daniel <Warren.Daniel@ncleg.gov>, Wiley Nickel <Wiley.Nickel@ncleg.gov>, "lawyerstevenwalker@gmail.com"
<lawyerstevenwalker@gmail.com>, Electoral Education Foundation <hello@electoraleducationfoundation.com>, Keith
Kidwell <Keith.Kidwell@ncleg.gov>, Jeffery McNeely <Jeffrey.McNeely@ncleg.gov>, Bobby Hanig
<Bobby.Hanig@ncleg.gov>, "Bell, Karen B" <Karen.Bell@ncsbe.gov>, Bob Steinburg <Bob.Steinburg@ncleg.gov>, Ted
Alexander <Ted.Alexander@ncleg.gov>, "John.Bell@ncleg.gov" <John.Bell@ncleg.gov>

Mr. Goetze,


We are reviewing this request and will respond as soon as possible.


Thanks,


Pat



**Patrick Gannon**

*Public Information Director*

O:  (919) 814-0765

M: (984) 204-0767



Gannon, Patrick <Patrick.Gannon@ncsbe.gov>                    Tue, Feb 8, 2022 at 3:00 PM
To: Major Dave Goetze <majordave@electoraleducationfoundation.com>
Cc: Allison Dahle <Allison.Dahle@ncleg.gov>, Bill Rabon <Bill.Rabon@ncleg.gov>, Dan Blue <Dan.Blue@ncleg.gov>,
Dennis Riddell <Dennis.Riddell@ncleg.gov>, Destin Hall <Destin.Hall@ncleg.gov>, Grey Mills <Grey.Mills@ncleg.gov>, Jeff
Zenger <Jeff.Zenger@ncleg.gov>, Jim Perry <Jim.Perry@ncleg.gov>, John Szoka <John.Szoka@ncleg.gov>, Jon Hardister
<Jon.Hardister@ncleg.gov>, Kathy Harrington <Kathy.Harrington@ncleg.gov>, Larry Pittman <Larry.Pittman@ncleg.gov>,
Michael Garrett <Michael-Garrett@ncleg.gov>, Paul Newton <Paul.Newton@ncleg.gov>, Pricey Harrison
<Pricey.Harrison@ncleg.gov>, Ralph Hise <Ralph.Hise@ncleg.gov>, Shelly Willingham <Shelly.Willingham@ncleg.gov>,
Warren Daniel <Warren.Daniel@ncleg.gov>, Wiley Nickel <Wiley.Nickel@ncleg.gov>, "lawyerstevenwalker@gmail.com"
<lawyerstevenwalker@gmail.com>, Electoral Education Foundation <hello@electoraleducationfoundation.com>, Keith
Kidwell <Keith.Kidwell@ncleg.gov>, Jeffery McNeely <Jeffrey.McNeely@ncleg.gov>, Bobby Hanig
<Bobby.Hanig@ncleg.gov>, "Bell, Karen B" <Karen.Bell@ncsbe.gov>, Bob Steinburg <Bob.Steinburg@ncleg.gov>, Ted
Alexander <Ted.Alexander@ncleg.gov>, "John.Bell@ncleg.gov" <John.Bell@ncleg.gov>

Mr. Goetze,

The longstanding interpretation of the State Board of Elections is that the retrievable ballot identifier associated with an absentee ballot (also sometimes called the CIV number) is confidential. See Numbered Memo 2016-25 and Numbered Memo 2020-25 on this topic. The identifier must therefore be redacted prior to disclosing documents or data files that contain it.

The solemn obligation to protect the secrecy of how voters voted is of utmost importance to the State Board. Elections officials are required to protect the secrecy of ballots and electronic records of individual ballots. Knowing disclosure of how a voter voted is a misdemeanor. G.S. § 163-165.1(e) provides:

> (e)    Voted ballots and paper and electronic records of individual voted ballots shall be treated as confidential, and no person other than elections officials performing their duties may have access to voted ballots or paper or electronic records of individual voted ballots except by court order or order of the appropriate board of elections as part of the resolution of an election protest or investigation of an alleged election irregularity or violation. Voted ballots and paper and electronic records of individual voted ballots shall not be disclosed to members of the public in such a way as to disclose how a particular voter voted, unless a court orders disclosure. Any person who has access to an official voted ballot or record and knowingly discloses in violation of this section how an individual has voted that ballot is guilty of a Class 1 misdemeanor.

The retrievable ballot identifier of a voter's absentee-by-mail application is part of the official absentee register. G.S. § 163-226(a)(3). The register is initially confidential, but becomes a public record at the time of the opening of the polls on Election Day. G.S. § 163-228(c). However, because it is not possible to always prevent a voter's retrievable ballot identifier from being associated with how the voter voted, the State Board treats the identifier as continuing to be confidential even after the election. For example, county boards at times must duplicate ballots at a meeting to allow proper tabulation, and this requires that a voter's selections on the ballot be called out by the duplication team. The CIV number on such a ballot is often either visible or is called out as part of this process. There may also be instances when a provisional ballot or absentee ballot is counted at a board meeting, and the CIV number is either visible or is called out as part of this process. If the identifier were released to the public in a way that were associated with a particular voter, it would be possible to determine how the particular voter voted based on how the vote tabulation changed. These meetings may take place before or after Election Day, and are closely monitored by members of the public, political parties, and the media, and are sometimes recorded. Therefore, releasing the identifier in a way that associates it with a particular voter at any time could allow the public to determine how a voter voted.

Provisions addressing the disclosure of records cannot trump provisions mandating the secrecy of an individual's ballot, which are enforced through the criminal code.

Thanks,


Pat


**Patrick Gannon**

*Public Information Director*

O:  (919) 814-0765

M: (984) 204-0767



**Major Dave Goetze** <majordave@electoraleducationfoundation.com>                Mon, Feb 14, 2022 at 2:52 PM
To: Patrick Gannon <Patrick.Gannon@ncsbe.gov>
Cc: Allison Dahle <Allison.Dahle@ncleg.gov>, Bill Rabon <Bill.Rabon@ncleg.gov>, Dan Blue <Dan.Blue@ncleg.gov>,
Dennis Riddell <Dennis.Riddell@ncleg.gov>, Destin Hall <Destin.Hall@ncleg.gov>, Grey Mills <Grey.Mills@ncleg.gov>, Jeff
Zenger <Jeff.Zenger@ncleg.gov>, Jim Perry <Jim.Perry@ncleg.gov>, John Szoka <John.Szoka@ncleg.gov>, Jon Hardister
<Jon.Hardister@ncleg.gov>, Kathy Harrington <Kathy.Harrington@ncleg.gov>, Larry Pittman <Larry.Pittman@ncleg.gov>,
Michael Garrett <Michael-Garrett@ncleg.gov>, Paul Newton <Paul.Newton@ncleg.gov>, Pricey Harrison
<Pricey.Harrison@ncleg.gov>, Ralph Hise <Ralph.Hise@ncleg.gov>, Shelly Willingham <Shelly.Willingham@ncleg.gov>,
Warren Daniel <Warren.Daniel@ncleg.gov>, Wiley Nickel <Wiley.Nickel@ncleg.gov>, Steven Walker
<lawyerstevenwalker@gmail.com>, Electoral Education Foundation <hello@electoraleducationfoundation.com>, Keith
Kidwell <Keith.Kidwell@ncleg.gov>, Jeffery McNeely <Jeffrey.McNeely@ncleg.gov>, Bobby Hanig
<Bobby.Hanig@ncleg.gov>, "Bell, Karen B" <Karen.Bell@ncsbe.gov>, Bob Steinburg <Bob.Steinburg@ncleg.gov>, Ted
Alexander <Ted.Alexander@ncleg.gov>, John.Bell@ncleg.gov

Mr. Gannon,

We have reviewed your response of Feb 8th to our request for the Absentee Ballot Application ID#s and still believe
your position is inconsistent with state law. We would like to address several of the statements you made and pose
additional questions we believe were not answered or appear to be contrary to state law.

In the first instance, you claim a "longstanding interpretation" of NCGS §163-165.1(e) by the NCSBE as justification for
overriding the requirement in NCGS §163-228(c), that the Absentee Ballot Application Number be treated as a matter
of public record. We have reviewed Numbered Memo 2016-25 you cited as a basis for treating that number as
"confidential" and find it interesting that it was published on November 16th, 2016 just 8 days after the November 2016
General Election. We would like to know if this was a unilateral decision made and authored by the Executive Director
based on some event arising out of that election, or was it issued on the basis of deliberation and a vote by the actual
State Board of Election members? If it is the latter, may we be provided with an electronic copy of the Minutes of such
meeting(s) as may have been held in that regard? We are not aware of any effort by the NCSBE to address this issue
with the Legislature at any point in the last 5 1/2 years to resolve what you portray as an equally "longstanding" conflict
of statutory requirements.

Our reading of NCGS §163-165.1(e) says it applies only to electronic records that contain the actual votes of the voter
and not to the electronic record of the ballot application itself, but agree it is less than clear on that point since we both
read it differently. We will stipulate that while the statutes do not specifically mandate the NCSBE to publish the data,
we believe that in the interest of maximum transparency in election data reporting, which we believe you also support,
that anything mandated by statute to be published by the County would necessarily extend to the NCSBE.

We also reviewed the existing Absentee Ballot data files for each election going back to 2016 and find that in most
instances, the Absentee Ballot Application Number was not publicly reported at any point with the exception of both
the first and second Primaries of 2020 and in the November 2020 General Election up until October 7th, just a week
before the onset of Early Voting. This inconsistent application of policy from one election to the next is clear cause for
concern, especially in light of the claimed "longstanding" policy. Is there a reason an exception was made for those
elections, and if so, what was it?

Publication of the Absentee Ballot application number as we requested would only pose a potential risk in the rare
event that any person or organization sought access to the actual voted Absentee ballots. We seek no such access
and have no plans to request such in the future. That potential risk would also evaporate 22 months after the election
when ballots are destroyed pursuant to 52 USC 20701. We specifically request that these application numbers be
retained so at the latest, they can be provided to us once the ballots are destroyed beginning in September of this year
when no compromise of ballot secrecy is then possible.

We can continue to go back and forth over this, but besides the specific questions asked above, we would strongly
encourage you in the alternative to further discussion between us, to take this matter before the Joint Legislative
Oversight Committee on Elections at your earliest opportunity since they have the ultimate authority and duty to
resolve this issue of conflicts between statutes.

Respectfully,


Hal C. Weatherman
President, Electoral Education Foundation
[Quoted text hidden]

**TAB A4**

H1 — last_name

| | RPT DATE | county_desc | voter_reg_ncid | registr_dt | CURRENT COUNTY | CURRENT REG DATE | first_name | middle_name | status_cd | voter_status | reason_cd | voter_status_reason_des | res_street | res_city_desc | state_cd | zip_code | mai |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 431 | 17-Dec-22 | JOHNSTON | 33183103 | CJ192817 | 12/28/2017 | | | CODY | EDWARD | A | ACTIVE | AV | VERIFIED | 577 JORDA | SELMA | NC | 27576 | 577 |
| 432 | 17-Dec-22 | JOHNSTON | 33183104 | CJ192818 | 12/29/2017 | | | TYLER | | A | ACTIVE | AV | VERIFIED | 116 MANT | CLAYTON | NC | 27527 | TMi |
| 433 | 17-Dec-22 | JOHNSTON | 33200801 | CJ192819 | 5/7/2020 | | | TORRENCE | MACKENZIE | A | ACTIVE | AP | VERIFICATION PENDING | 103 RUNN | PRINCETON | NC | 27569 | 103 |
| 434 | 17-Dec-22 | JOHNSTON | 33183106 | CJ192820 | 2/12/2018 | | | BENJAMIN | | A | ACTIVE | AV | VERIFIED | 211 WATSI | CLAYTON | NC | 27527 | 811 |
| 435 | 17-Dec-22 | JOHNSTON | 33183107 | CJ192821 | 6/5/2018 | | | BRANDON | LEE | A | ACTIVE | AV | VERIFIED | 103 PREAK | ARCHER LODGE | NC | 27527 | 103 |
| 436 | 17-Dec-22 | JOHNSTON | 33183108 | CJ192822 | 8/24/2017 | | | AIDAN | DIANE | A | ACTIVE | AV | VERIFIED | 114 BRANK | ANGIER | NC | 27501 | 114 |
| 437 | 17-Dec-22 | JOHNSTON | 33183109 | CJ192823 | 4/13/2018 | | | JAMES | DALE | I | INACTIVE | IN | CONFIRMATION NOT RETI | 5437 NC 2 | KENLY | NC | 27542 | 543 |
| 438 | 17-Dec-22 | JOHNSTON | 33183112 | CJ192825 | 2/25/2019 | | | SHANAY | NINA | I | INACTIVE | IN | CONFIRMATION NOT RETI | 115 FORES | WILLOW SPRINGS | NC | 27592 | 115 |
| 439 | | | | | | | | | | | | | | | | | | |
| 440 | 17-Dec-22 | JOHNSTON | 33183320 | CJ192923 | 3/1/2019 | | | ALEX | | A | ACTIVE | AV | VERIFIED | 6162 SWIF | SMITHFIELD | NC | 27577 | 616 |
| 441 | 17-Dec-22 | JOHNSTON | 33183322 | CJ192925 | 3/1/2019 | | | SHANA | ANN | A | ACTIVE | AV | VERIFIED | 213 TRENT | FOUR OAKS | NC | 27524 | 213 |
| 442 | 17-Dec-22 | JOHNSTON | 33183323 | CJ192926 | 8/28/2018 | | | BENJAMIN | | A | ACTIVE | AV | VERIFIED | 161 HUNTI | ZEBULON | NC | 27597 | 161 |
| 443 | 17-Dec-22 | JOHNSTON | 33183324 | CJ192927 | 2/16/2018 | | | DAISY | AGUILAR | A | ACTIVE | AV | VERIFIED | 2725 NC 9 | FOUR OAKS | NC | 27524 | 272 |
| 444 | 17-Dec-22 | JOHNSTON | 33183325 | CJ192928 | 9/27/2018 | | | ZOE | DRUSILLA | A | ACTIVE | AV | VERIFIED | 249 BAILE | BENSON | NC | 27504 | 249 |
| 445 | 17-Dec-22 | JOHNSTON | 33183326 | CJ192929 | 9/21/2017 | | | KESSLER | ELAINE | A | ACTIVE | AV | VERIFIED | 221 KERI | GARNER | NC | 27529 | 221 |
| 446 | 17-Dec-22 | JOHNSTON | 33183328 | CJ192931 | 11/30/2017 | | | ANDREW | SLADE | A | ACTIVE | AV | VERIFIED | 51 OAKFIEI | CLAYTON | NC | 27520 | 51 ( |
| 447 | 17-Dec-22 | JOHNSTON | 33183331 | CJ192934 | 8/15/2018 | | | JENNA | MICHELLE | A | ACTIVE | AV | VERIFIED | 108 COBEI | CLAYTON | NC | 27520 | 108 |
| 448 | 17-Dec-22 | JOHNSTON | 33183332 | CJ192935 | 12/29/2017 | | | BENNETT | | A | ACTIVE | AV | VERIFIED | 212 S FAYE | CLAYTON | NC | 27520 | 212 |
| 449 | 17-Dec-22 | JOHNSTON | 33224056 | CJ192936 | 7/23/2021 | | | MARETHA | | A | ACTIVE | AV | VERIFIED | 82 SKYE CI | CLAYTON | NC | 27520 | 82 ' |
| 450 | 17-Dec-22 | JOHNSTON | 33183334 | CJ192937 | 4/21/2017 | | | TATYANA | H'KHIYA ELOUIA | A | ACTIVE | AV | VERIFIED | 530 COMM | CLAYTON | NC | 27520 | 530 |
| 451 | 17-Dec-22 | JOHNSTON | 33183336 | CJ192939 | 3/24/2017 | | | CAROLINE | SUZETTE | A | ACTIVE | AV | VERIFIED | 2101 CANI | CLAYTON | NC | 27520 | 210 |
| 452 | 17-Dec-22 | JOHNSTON | 33183337 | CJ192940 | 7/30/2018 | | | TRINITY | MAYN | I | INACTIVE | IN | CONFIRMATION NOT RETI | 106 E RICH | SELMA | NC | 27576 | 106 |
| 453 | 17-Dec-22 | JOHNSTON | 33183338 | CJ192941 | 3/4/2019 | | | SARAH | CATHERINE | A | ACTIVE | AV | VERIFIED | 559 SAND | FOUR OAKS | NC | 27524 | 559 |
| 454 | 17-Dec-22 | JOHNSTON | 33183342 | CJ192942 | 3/4/2019 | | | JERRY | JEAN | A | ACTIVE | AV | VERIFIED | 205 NELSO | CLAYTON | NC | 27527 | 205 |
| 455 | | | | | | | | | | | | | | | | | | |
| 456 | 17-Dec-22 | JOHNSTON | 33183420 | CJ192994 | 2/28/2019 | | | BOYD | RANDALL | A | ACTIVE | AV | VERIFIED | 704 EAST ‹ | GARNER | NC | 27529 | 704 |
| 457 | 17-Dec-22 | JOHNSTON | 33183427 | CJ192996 | 8/24/2017 | | | JESSICA | MARIE | A | ACTIVE | AV | VERIFIED | 542 LOOP ‹ | ARCHER LODGE | NC | 27527 | 542 |
| 458 | 17-Dec-22 | JOHNSTON | 33183428 | CJ192997 | 4/10/2018 | | | WILLOW | ELIZABETH | A | ACTIVE | AV | VERIFIED | 110 RAVEN | GARNER | NC | 27529 | 110 |

*handwritten note:* Back dated recod ?

LEG_DEFS_0006742

TAB B

Case 1:23-cv-00878-TDS-JEP    Document 124-17    Filed 05/09/25    Page 25 of 63

# Daily Increase in Reported Same-Day Registrations



Why SDR's after last day of early voting?

LEG_DEFS_0006744

TAB C

## Suspicious Alteration of Election Data Archive Files

| Date of Change | Time of Change | File Changed | for Election Date |
|---|---|---|---|
| 5/10/2017 | 4:24:53 PM | Absentee | 9/15/2015 |
| 5/10/2017 | 4:24:56 PM | Absentee_by_County | 9/15/2015 |
| 5/11/2017 | 9:12:55 AM | Absentee_counts_county | 9/15/2015 |
| 5/11/2017 | 9:12:58 AM | Absentee_counts_state | 9/15/2015 |
| 5/11/2017 | 11:56:42 AM | Provisional | 11/5/2013 |
| 5/11/2017 | 1:20:15 PM | Provisional | 6/22/2010 |
| 5/11/2017 | 1:20:34 PM | Provisional | 5/4/2010 |
| 5/11/2017 | 1:20:48 PM | Provisional | 11/3/2009 |
| 5/11/2017 | 1:21:03 PM | Provisional | 10/6/2009 |
| 5/11/2017 | 1:21:18 PM | Provisional | 9/15/2009 |
| 5/11/2017 | 1:21:53 PM | Provisional | 8/18/2009 |
| 5/11/2017 | 1:22:05 PM | Provisional | 7/28/2009 |
| 5/11/2017 | 1:22:18 PM | Provisional | 6/23/2009 |
| 5/11/2017 | 1:22:30 PM | Provisional | 6/16/2009 |
| 5/11/2017 | 1:22:41 PM | Provisional | 6/2/2009 |
| 5/11/2017 | 1:22:54 PM | Provisional | 5/19/2009 |
| 5/11/2017 | 1:23:04 PM | Provisional | 5/5/2009 |
| 5/11/2017 | 1:23:15 PM | Provisional | 3/10/2009 |
| 5/11/2017 | 1:23:24 PM | Provisional | 2/3/2009 |
| 5/11/2017 | 1:23:33 PM | Provisional | 1/6/2009 |
| 5/11/2017 | 7:36:21 PM | History_stats | 5/12/2015 |
| 5/11/2017 | 7:42:39 PM | History_stats | 10/8/2013 |
| 5/11/2017 | 7:43:52 PM | History_stats | 9/10/2013 |
| 5/11/2017 | 7:45:09 PM | History_stats | 10/11/2011 |
| 5/11/2017 | 7:46:08 PM | History_stats | 9/13/2011 |
| 5/11/2017 | 7:47:23 PM | History_stats | 6/24/2008 |

In a span of 3 ½ minutes on May 11th, 2017, someone modified the Provisional Ballot Data files for 16 past elections in exact, reverse chronological order. This strongly suggests an automated program was written to make the changes since no file was open for more than a few seconds. Later that same night, someone then modified the history_stats files for 6 past elections.

*Why is anyone changing past election data files..?*

LEG_DEFS_0006746

LEG_DEFS_0006748

Spreadsheet: 29-Dec SDR Change Analysis - Microsoft Excel non-commercial use

| COUNT | RPT DATE | county_desc | voter_reg_num/cid | voter_first_name | voter_middle | gender | age | APP ID# | _party | ballot_req_d | ballot_req_t | ballot_req_d | ballot_send | ballot_rtn_d | ballot_rtn_st | site_name | sdr | mail_veri_status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | 3-Nov-20 | DUPLIN | 30037334 DL374128 | RONNIE | D | M | 66 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | ACCEPTED | AMERICAN L! | Y | NEW VOTER |
| 9 | 3-Nov-20 | HERTFORD | 4443S CD33572 | MELVIN | DEWAYNE | M | 43 | | REP | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | ACCEPTED | MURFREE CE | Y | NEW VOTER |
| 10 | | | | | | | | | | | | | | | | | | |
| 11 | 1-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | ACCEPTED | EAST MECKL | Y | 1ST VFY |
| 12 | 2-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | ACCEPTED | EAST MECKLE | Y | 1ST VFY |
| 13 | 3-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 14 | 3-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 15 | 4-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 16 | 4-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 17 | 5-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 18 | 5-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 19 | 6-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 20 | 6-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 21 | 7-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 22 | 7-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 23 | 9-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 24 | 9-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | 1ST VFY |
| 25 | 10-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 26 | 10-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 27 | 13-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 28 | 13-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 29 | 14-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 30 | 14-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 31 | 23-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 32 | 23-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 33 | 24-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 34 | 24-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 35 | 25-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 36 | 25-Nov-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CONFLICT | EAST MECKLE | Y | VERIFIED |
| 37 | 9-Dec-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | CANCELLED | EAST MECKLE | Y | VERIFIED |
| 38 | 9-Dec-20 | MECKLENBURG | 1000640875 CW1362793 | JABEZ | I | M | 18 | | DEM | IN PERSON | ONE-STOP | 10/15/2020 | 10/15/2020 | 10/15/2020 | ACCEPTED | EAST MECKLE | Y | VERIFIED |

Handwritten notes:
- Need Ballot identifier
- How did 1 ballot change to 2 ?

# NC GENERAL ELECTION - November 8th, 2022

## USE OF VIRTUAL PRECINCTS BY COUNTY - 2022 PRIMARY vs GENERAL COMPARISON

| COUNTY | PRIMARY | GENERAL | GAIN/LOSS | COUNTY | PRIMARY | GENERAL | GAIN/LOSS | COUNTY | PRIMARY | GENERAL | GAIN/LOSS | COUNTY | PRIMARY | GENERAL | GAIN/LOSS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALAMANCE | 4 | 0 | -4 | CUMBERLAND | 10 | 0 | -10 | JOHNSTON | 7 | 11 | 4 | RANDOLPH | 0 | 0 | 0 |
| ALEXANDER | 0 | 0 | 0 | CURRITUCK | 3 | 4 | 1 | JONES | 3 | 4 | 1 | RICHMOND | 3 | 3 | 0 |
| ALLEGHENY | 4 | 3 | -1 | DARE | 6 | 7 | 1 | LEE | 5 | 4 | -1 | ROBESON | 8 | 0 | -8 |
| ANSON | 0 | 0 | 0 | DAVIDSON | 8 | 8 | 0 | LENOIR | 0 | 0 | 0 | ROCKINGHAM | 7 | 0 | -7 |
| ASHE | 4 | 0 | -4 | DAVIE | 4 | 6 | 2 | LINCOLN | 0 | 0 | 0 | ROWAN | 0 | 0 | 0 |
| AVERY | 4 | 4 | 0 | DUPLIN | 4 | 0 | -4 | MACON | 5 | 5 | 0 | RUTHERFORD | 0 | 0 | 0 |
| BEAUFORT | 6 | 7 | 1 | DURHAM | 11 | 11 | 0 | MADISON | 0 | 0 | 0 | SAMPSON | 4 | 0 | -4 |
| BERTIE | 4 | 4 | 0 | EDGECOMBE | 5 | 6 | 1 | MARTIN | 3 | 3 | 0 | SCOTLAND | 4 | 4 | 0 |
| BLADEN | 6 | 6 | 0 | FORSYTH | 0 | 0 | 0 | McDOWELL | 4 | 0 | -4 | STANLY | 6 | 0 | -6 |
| BRUNSWICK | 0 | 0 | 0 | FRANKLIN | 0 | 0 | 0 | MECKLENBURG | 2 | 2 | 0 | STOKES | 5 | 5 | 0 |
| BUNCOMBE | 13 | 15 | 2 | GASTON | 7 | 0 | -7 | MITCHELL | 0 | 0 | 0 | SURRY | 8 | 6 | -2 |
| BURKE | 0 | 0 | 0 | GATES | 4 | 0 | -4 | MONTGOMERY | 0 | 0 | 0 | SWAIN | 4 | 0 | -4 |
| CABARRUS | 4 | 6 | 2 | GRAHAM | 0 | 0 | 0 | MOORE | 2 | 4 | 2 | TRANSYLVANIA | 0 | 0 | 0 |
| CALDWELL | 5 | 5 | 0 | GRANVILLE | 0 | 0 | 0 | NASH | 7 | 7 | 0 | TYRRELL | 4 | 4 | 0 |
| CAMDEN | 3 | 4 | 1 | GREENE | 0 | 0 | 0 | NEW HANOVER | 8 | 8 | 0 | UNION | 0 | 0 | 0 |
| CARTERET | 0 | 0 | 0 | GUILFORD | 3 | 3 | 0 | NORTHAMPTON | 6 | 5 | -1 | VANCE | 0 | 0 | 0 |
| CASWELL | 0 | 0 | 0 | HALIFAX | 6 | 6 | 0 | ONSLOW | 0 | 0 | 0 | WAKE | 11 | 72 | 61 |
| CATAWBA | 0 | 0 | 0 | HARNETT | 6 | 0 | -6 | ORANGE | 8 | 9 | 1 | WARREN | 0 | 0 | 0 |
| CHATHAM | 0 | 0 | 0 | HAYWOOD | 4 | 3 | -1 | PAMLICO | 0 | 0 | 0 | WASHINGTON | 4 | 4 | 0 |
| CHEROKEE | 0 | 0 | 0 | HENDERSON | 7 | 7 | 0 | PASQUOTANK | 4 | 0 | -4 | WATAUGA | 9 | 9 | 0 |
| CHOWAN | 0 | 0 | 0 | HERTFORD | 4 | 0 | -4 | PENDER | 0 | 0 | 0 | WAYNE | 5 | 6 | 1 |
| CLAY | 0 | 0 | 0 | HOKE | 5 | 5 | 0 | PERQUIMANS | 0 | 4 | 4 | WILKES | 4 | 7 | 3 |
| CLEVELAND | 0 | 0 | 0 | HYDE | 5 | 5 | 0 | PERSON | 0 | 4 | 4 | WILSON | 0 | 0 | 0 |
| COLUMBUS | 7 | 0 | -7 | IREDELL | 0 | 0 | 0 | PITT | 8 | 8 | 0 | YADKIN | 4 | 4 | 0 |
| CRAVEN | 0 | 0 | 0 | JACKSON | 3 | 0 | -3 | POLK | 4 | 4 | 0 | YANCEY | 0 | 0 | 0 |

All data https://dl.ncsbe.guv/index.html?prefix=ENRS/2022_05_17/ & https://dl.ncsbe.gov/index.html?prefix=ENRS/2022_11_08/

*why are virtual precincts changing? who decides?*

LEG_DEFS_0006750

TAB F

 Gmail

## Response to your rebuttal regarding Alamance County ballots

7 messages

**Gannon, Patrick** <Patrick.Gannon@ncsbe.gov>                    Thu, Dec 16, 2021 at 7:01 PM
To: "hello@electoraleducationfoundation.com" <hello@electoraleducationfoundation.com>
Cc: "majordave@electoraleducationfoundation.com" <majordave@electoraleducationfoundation.com>, "Bell, Karen B"
<Karen.Bell@ncsbe.gov>, "Cox, Paul" <paul.cox@ncsbe.gov>, "Wakely, Lindsey" <Lindsey.Wakely@ncsbe.gov>,
"Amy.Galey@ncleg.gov" <Amy.Galey@ncleg.gov>, "Bob.Steinburg@ncleg.gov" <Bob.Steinburg@ncleg.gov>,
"Robert.Hanig@ncleg.gov" <Robert.Hanig@ncleg.gov>, "Brenden.Jones@ncleg.gov" <Brenden.Jones@ncleg.gov>,
"Carl.Ford@ncleg.gov" <Carl.Ford@ncleg.gov>, "Chris.Humphrey@ncleg.gov" <Chris.Humphrey@ncleg.gov>,
"Chuck.Edwards@ncleg.gov" <Chuck.Edwards@ncleg.gov>, "Deanna.Ballard@ncleg.gov" <Deanna.Ballard@ncleg.gov>,
"Dennis.Riddell@ncleg.gov" <Dennis.Riddell@ncleg.gov>, "Destin.Hall@ncleg.gov" <Destin.Hall@ncleg.gov>,
"Donnie.Loftis@ncleg.gov" <Donnie.Loftis@ncleg.gov>, "Edward.Goodwin@ncleg.gov" <Edward.Goodwin@ncleg.gov>,
"Erin.Pare@ncleg.gov" <Erin.Pare@ncleg.gov>, "Rep. George Cleveland" <George.Cleveland@ncleg.gov>, "Rep. Grey
Mills" <Grey.Mills@ncleg.gov>, "Jake.Johnson@ncleg.gov" <Jake.Johnson@ncleg.gov>, "Jason.Saine@ncleg.gov"
<Jason.Saine@ncleg.gov>, "Rep. Jeffrey C. McNeely" <Jeffrey.McNeely@ncleg.gov>, "Jim.Perry@ncleg.gov"
<Jim.Perry@ncleg.gov>, "John.Bradford@ncleg.gov" <John.Bradford@ncleg.gov>, "John.Szoke@ncleg.gov"
<John.Szoke@ncleg.gov>, "John.Torbett@ncleg.gov" <John.Torbett@ncleg.gov>, "Rep. Jon Hardister"
<Jon.Hardister@ncleg.net>, "Joyce.Krawiec@ncleg.gov" <Joyce.Krawiec@ncleg.gov>, "Julia.Howard@ncleg.gov"
<Julia.Howard@ncleg.gov>, Keith Kidwell <Keith.Kidwell@ncleg.net>, "Kelly.Hastings@ncleg.gov"
<Kelly.Hastings@ncleg.gov>, "Kyle.Hall@ncleg.gov" <Kyle.Hall@ncleg.gov>, "Larry.Pittman@ncleg.gov"
<Larry.Pittman@ncleg.gov>, "Lisa.Barnes@ncleg.gov" <Lisa.Barnes@ncleg.gov>, "Mark.Brody@ncleg.gov"
<Mark.Brody@ncleg.gov>, "Mike.Clampitt@ncleg.gov" <Mike.Clampitt@ncleg.gov>, "Norman.Sanderson@ncleg.gov"
<Norman.Sanderson@ncleg.gov>, "Phil.Berger@ncleg.gov" <Phil.Berger@ncleg.gov>, "Phil.Shepard@ncleg.gov"
<Phil.Shepard@ncleg.gov>, "Ralph.Hise@ncleg.gov" <Ralph.Hise@ncleg.gov>, "Ray.Pickett@ncleg.gov"
<Ray.Pickett@ncleg.gov>, "Steve.Jarvis@ncleg.gov" <Steve.Jarvis@ncleg.gov>, "ted.alexander@nceg.gov"
<ted.alexander@nceg.gov>, "todd.johnson@ncleg.net" <todd.johnson@ncleg.net>, "Sen. Vickie Sawyer"
<Vickie.Sawyer@ncleg.gov>, Senator Warren Daniel <Warren.Daniel@ncleg.net>, Philip Thomas
<philip.thomas@ncgop.org>

Mr. Weatherman,

On behalf of Executive Director Karen Brinson Bell, please see the attached "Correspondence" document, which is the
State Board staff's response to your organization's "Rebuttal" document, also attached. Also attached are supportive
documents referenced in our correspondence. We respectfully request that you post these documents to your website
and social media accounts so your audience can have a complete and accurate picture of these issues.

As always, please feel free to reach out if you have any questions.

Thanks,

Pat

## Patrick Gannon

*Public Information Director*

O:  (919) 814-0765

**TAB G1**

LEG_DEFS_0006752

M: (984) 204-0767


NORTH CAROLINA

**7 attachments**

Correspondence_Weatherman_Alamance2_12162021.pdf
296K

Print Elect Ballot Order Dates.pdf
144K

UPS NOV MUNICIPAL BALLOTS.pdf
546K

Invoice 11.2.21 Burlington Ballots.pdf
27K

Proof of Delivery UPS Nov Burl Ballots.pdf
15K

UPS Burlington November Ballots.pdf
238K

20211204 - NCSBE Letter #4 - Rebuttal to NCSBE Response on Alamance Ballots.pdf
302K

**Major Dave Goetze** <majordave@electoraleducationfoundation.com>                    Wed, Jan 12, 2022 at 6:55 PM
To: "Gannon, Patrick" <Patrick.Gannon@ncsbe.gov>
Cc: "hello@electoraleducationfoundation.com" <hello@electoraleducationfoundation.com>, "Bell, Karen B"
<Karen.Bell@ncsbe.gov>, "Cox, Paul" <paul.cox@ncsbe.gov>, "Wakely, Lindsey" <Lindsey.Wakely@ncsbe.gov>,
"Amy.Galey@ncleg.gov" <Amy.Galey@ncleg.gov>, "Bob.Steinburg@ncleg.gov" <Bob.Steinburg@ncleg.gov>,
"Robert.Hanig@ncleg.gov" <Robert.Hanig@ncleg.gov>, "Brenden.Jones@ncleg.gov" <Brenden.Jones@ncleg.gov>,
"Carl.Ford@ncleg.gov" <Carl.Ford@ncleg.gov>, "Chris.Humphrey@ncleg.gov" <Chris.Humphrey@ncleg.gov>,
"Chuck.Edwards@ncleg.gov" <Chuck.Edwards@ncleg.gov>, "Deanna.Ballard@ncleg.gov" <Deanna.Ballard@ncleg.gov>,
"Dennis.Riddell@ncleg.gov" <Dennis.Riddell@ncleg.gov>, "Destin.Hall@ncleg.gov" <Destin.Hall@ncleg.gov>,
"Donnie.Loftis@ncleg.gov" <Donnie.Loftis@ncleg.gov>, "Edward.Goodwin@ncleg.gov" <Edward.Goodwin@ncleg.gov>,
"Erin.Pare@ncleg.gov" <Erin.Pare@ncleg.gov>, "Rep. George Cleveland" <George.Cleveland@ncleg.gov>, "Rep. Grey
Mills" <Grey.Mills@ncleg.gov> <Jake.Johnson@ncleg.gov> <Jake.Johnson@ncleg.gov>, "Jason.Saine@ncleg.gov"
<Jason.Saine@ncleg.gov>, "Rep. Jeffrey C. McNeely" <Jeffrey.McNeely@ncleg.gov>, "Jim.Perry@ncleg.gov"
<Jim.Perry@ncleg.gov>, "John.Bradford@ncleg.gov" <John.Bradford@ncleg.gov>, "John.Szoka@ncleg.gov"
<John.Szoka@ncleg.gov>, "John.Torbett@ncleg.gov" <John.Torbett@ncleg.gov>, "Rep. Jon Hardister"
<Jon.Hardister@ncleg.net>, "Joyce.Krawiec@ncleg.gov" <Joyce.Krawiec@ncleg.gov>, "Julia.Howard@ncleg.gov"
<Julia.Howard@ncleg.gov>, Keith Kidwell <Keith.Kidwell@ncleg.net>, "Kelly.Hastings@ncleg.gov"
<Kelly.Hastings@ncleg.gov>, "Kyle.Hall@ncleg.gov" <Kyle.Hall@ncleg.gov>, "Larry.Pittman@ncleg.gov"
<Larry.Pittman@ncleg.gov>, "Lisa.Barnes@ncleg.gov" <Lisa.Barnes@ncleg.gov>, "Mark.Brody@ncleg.gov"
<Mark.Brody@ncleg.gov>, "Mike.Clampitt@ncleg.gov" <Mike.Clampitt@ncleg.gov>, "Norman.Sanderson@ncleg.gov"
<Norman.Sanderson@ncleg.gov>, "Phil.Berger@ncleg.gov" <Phil.Berger@ncleg.gov>, "Phil.Shepard@ncleg.gov"
<Phil.Shepard@ncleg.gov>, "Ralph.Hise@ncleg.gov" <Ralph.Hise@ncleg.gov>, "Ray.Pickett@ncleg.gov"
<Ray.Pickett@ncleg.gov>, "Steve.Jarvis@ncleg.gov" <Steve.Jarvis@ncleg.gov>, "ted.alexander@ncleg.gov"
<ted.alexander@ncleg.gov>, "todd.johnson@ncleg.net" <todd.johnson@ncleg.net>, "Sen. Vickie Sawyer"
<Vickie.Sawyer@ncleg.gov>, Senator Warren Daniel <Warren.Daniel@ncleg.net>, Philip Thomas
<philip.thomas@ncgop.org>, Debra.Bechtel@alamance-nc.com, dan.blue@ncleg.gov, Michael.Garrett@ncleg.gov,
Kathy.Harrington@ncleg.gov, Paul.Newton@ncleg.gov, Wiley.Nickel@ncleg.gov, Bill.Rabon@ncleg.gov,
lawyerstevenwalker@gmail.com

Mr. Gannon,

**TAB G2**

We have digested the materials you provided regarding the appearance that some November 2nd 2020 Municipal Election ballots may have been ordered, printed and mailed to voters prior to the conclusion of the October 5th Primary that chose who would appear on them, and continue to find them inconclusive.

We requested our staff attorney to reach out to Ms. Debra Bechtel, Interim County Attorney for Alamance for additional information which she has since provided that does provide greater insight into when the Burlington Municipal election ballots (N0005) were ordered and printed. Attached are the documents provided to us by her office. The only change we made was to append an enclosure number at the beginning of each filename for clarification and ease of reference to the explanations below. We request that you forward this e-mail to each member of The NC State Board of Elections for their review and comment.

We did not bother with the UPS shipping documents she included since they do not show package contents nor do they tie tracking numbers to specific purchase orders and thus hold no probative value.

Encl 1: (1 page) Purchase Order #20220320 that does appear to be for the 15,010 N0005 Burlington Municipal Ballots showing an order date of Nov 10th, 2021 but that is more than a week after the Nov 2nd election was held in which those ballots were purportedly used, and roughly a month after they admit the first ballots were actually mailed out to the voters.

Encl 2: (1 page) PrintElect Billing Invoice #26578 dated November 4th, 2021 for the N0005 Burlington Municipal Ballots, but that means they were invoiced 6 days before Encl 1 says they were even ordered.

Encl 3: (4 pages) Undated screenshots from PrintElect showing the order for N0005 ballots. Proves nothing except that the ballot coding had already been done at the time the order was placed and was being forwarded on to the print shop for printing.

Encl 4: PrintElect screenshot showing unspecified Nov 2nd election materials being ordered on Sept 22nd, 2021 for the Nov 2nd election which would be consistent with premature ballot configuration and ordering. We have not seen this document previously. This requires further investigation to determine what was ordered then since all documentation received to date purports to account for all Alamance County November ballots being ordered well after that date.

Encl 5: PO #20220285 dated Oct 26th, 2021 for all Alamance Ballots styles other than N0005. We still question this because hundreds of By-Mail ballots are shown in your data files as going out to the other voters not involved in the Primary well before this date. There is no readily apparent need to have delayed the ordering of these ballots since they were under a statutory (NCGS §163-227-10(a) ) 30-day deadline to have them available.

Encl 6: PrintElect Billing Invoice #26283 for all Alamance Ballot styles other than N0005 dated Oct 12th, 2021, 14 days prior to the date shown in Encl 5 that those ballots were allegedly ordered.

Encl 7: (3 pages) PrintElect undated screengrabs showing the breakdown of ballot styles ordered except N0005. We can tell this from the column headed "SEQ" that 0005 is missing from that list.

Ballots not ordered until after Election Day (Encl 1)?
Ballots invoiced before they were even ordered (Encl 2 & 6)?
Ballots not ordered in time to meet the deadline for mailing (Encl 5)?

We need to determine if the actual ballot configuration is designed at the county level or at the state level. Either way, there should be a screenshot we can get of your or their system files showing the date each of those ballot styles was created for forwarding to the printer. That would be the best determinant of just when the primary winners were actually decided.

We hope you share our ongoing concern that after more than 6 weeks of exchanges between us and the various parties that we seem to be no closer to a definitive answer on this issue, bearing in mind that we await responses from the other four counties in a similar situation (Cleveland, Henderson, Iredell and Moore). Any assistance you can provide is greatly appreciated.

[Quoted text hidden]

--
David W. Goetze
Vice President For Research
Electoral Education Foundation
(919) 616-4601

**TAB G3**

LEG_DEFS_0006754

*Rest assured our analysis of your data is very complex and detailed to insure we do not raise questions for which there is an obvious and simple explanation, or perhaps the result of something we do not yet know about how elections work.*

*We always look first for any reasonable and rational explanation, and have dismissed numerous other questions from being raised on that basis alone. No one at the Electoral Education Foundation has any interest in recklessly impugning the integrity of the State Board of Elections, its staff or the system(s) they use to capture and report election data, but we are obliged to hold those systems accountable to the public for any irregularities that are inconsistent with accuracy, transparency or state law.*

Again, we would welcome the opportunity to answer questions your organization may have
before it disseminates incorrect or misleading information about elections. Your organization has not been providing the State Board that opportunity, however.

Please see our written response to your November 30, 2021, letter about Inactive voters (attached) To our knowledge, you did not provide the State Board an opportunity to answer your organization's questions about the list maintenance process before you sent inaccurate information to numerous state legislators and the public through your organization's letter and the video on the Electoral Education Foundation's official website and Facebook page. Questions posed in that video about "Inactive" voters – which you suggested could be "sloppy bookkeeping," among other things – are answered by the text of federal and state statutes, and by consulting the State Board's list maintenance policy, which has been available at NCSBE.gov for several years: Maintaining the Voter Registration Database in North Carolina

In addition, your organization's "rebuttal" to our response about Alamance County absentee data includes numerous assumptions and inaccuracies, which we explain below; yet you sent it to numerous individuals without first asking questions or seeking clarification from the State Board.

The State Board routinely answers questions about elections data from data scientists, researchers, political parties, students, and voters to avoid the possibility that data are misinterpreted or misrepresented. We welcome such dialogues, as we do with your organization.

*In her response, she made several statements that still are inconsistent with the data and the documentation that have been provided to us by the Alamance County Board of Elections and their County Purchasing Department, so we seek additional clarification to resolve this. We hasten to add that we do not challenge her personal integrity or truthfulness because we do believe she only has whatever information is provided to her by the staff or the various County Boards of Elections.*

*She states that the "ballot_send_dt" is generated from the date the mailing labels for those ballots are printed and not the actual date they are deposited with the USPS, and we find that troubling from a transparency standpoint because the data field label in the daily Absentee Data file suggests it represents the latter, not the former, and is contrary to N.C.G.S. § 163-228(a)(8) that specifies the date a ballot is sent to a voter to be a matter of public record, not the date the mailing label was produced.*

**TAB G4**

Purchase Order #20220285 is an invoice sent by Printelect to the Alamance board multiple weeks after the ballots were received by the county board. The date on the purchase order, October 26, is the date that the invoice was sent to the county board (i.e., it is the date that county board was billed).

More specifically, the Alamance board ordered the ballots in Purchase Order #20220285 (i.e., all ballots except City of Burlington ballots) on **September 22**, and UPS delivered these ballots to the Alamance board on **September 28**. Please see the attached documents ("Print Elect Ballot Order Dates.pdf" and "UPS NOV MUNICIPAL BALLOTS.pdf") which confirm these two dates. As such, it makes sense that the data would show ballot send dates as early as September 29, since that was the day after the Alamance board received the ballots.

Lastly, in response to your question about daily label printing (i.e., the 13 days): Yes. It is the common, legal, and necessary practice for county boards to print absentee-by-mail mailing labels daily, since the county boards receive absentee requests daily throughout the absentee voting period.

> *We would like to also renew our original request for your assistance in obtaining a copy of the Purchase Order and shipping or material receipt documents for the N0005 ballots that the County has twice failed to provide us with so that we may both be assured of just when that order was placed and when those ballots were received by the Alamance BoE for issuance.*

Please see the attached Printelect invoice ("Invoice 11.2.21 Burlington Ballots.pdf"), UPS tracking ("UPS Burlington November Ballots.pdf"), and UPS proof of delivery ("Proof of Delivery UPS Nov Burl Ballots.pdf"). Although these are not the State Board's records under Chapter 132, we nonetheless obtained them from the county board in this instance.

* * *

As always, we are happy to answer any additional questions about this issue or any others to help ensure that voters receive accurate information about elections

Sincerely,

*Karen Brinson Bell*

Karen Brinson Bell
Executive Director, State Board of Elections

**TAB G5**

LEG_DEFS_0006756

# ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# BYLAWS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LEG_DEFS_0006758

# TABLE OF CONTENTS

**Page**

ARTICLE I      OFFICES ................................................................................................ 1

     Section 1.      Location ........................................................................... 1

ARTICLE II      MEMBERS ............................................................................ 1

     Section 1.      Members ........................................................................... 1

     Section 2.      Admission of Members ...................................................... 1

     Section 3.      Membership Agreement .................................................... 1

     Section 4.      Membership Fee ............................................................... 1

     Section 5.      Dues ................................................................................ 2

     Section 6.      Term of Membership; Good Standing ................................. 2

     Section 7.      Resignation ...................................................................... 2

     Section 8.      Removal ........................................................................... 2

     Section 9.      Meetings of Members ........................................................ 3

     Section 10.      Notice ............................................................................. 3

     Section 11.      Waivers of Notice ............................................................. 3

     Section 12.      Quorum, Vote, Proxy ........................................................ 3

     Section 13.      Written Consent of Members ............................................. 4

ARTICLE III      BOARD OF DIRECTORS ..................................................... 4

     Section 1.      Power of Board and Qualification of Directors ...................... 4

     Section 2.      Appointment of Directors ................................................. 4

     Section 3.      Non-Voting Seats on Board of Directors .............................. 4

     Section 4.      Resignation ...................................................................... 4

     Section 5.      Removal of Directors ........................................................ 4

     Section 6.      Vacancies ......................................................................... 4

     Section 7.      Meetings of the Board ....................................................... 5

     Section 8.      Notice ............................................................................. 5

     Section 9.      Quorum and Voting ......................................................... 5

     Section 10.      Written Consent of Directors; Meetings by Conference Telephone .......... 5

     Section 11.      Compensation of Directors ................................................ 6

ARTICLE IV      COMMITTEES ..................................................................... 6

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

LEG_DEFS_0006759

Case 1:23-cv-00878-TDS-JEP      Document 124-17      Filed 05/09/25      Page 36 of 63

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
| Section 1. | Committees of the Board | 6 |
| Section 2. | Committee Rules | 6 |
| Section 3. | Service of Committees | 6 |
| Section 4. | Records | 6 |
| Section 5. | Advisory Board | 6 |
| Section 6. | Executive Committee | 7 |
| Section 7. | Finance Committee | 7 |
| ARTICLE V | OFFICERS, AGENTS AND EMPLOYEES | 8 |
| Section 1. | General Provisions | 8 |
| Section 2. | Term of Office, Vacancies and Removal | 8 |
| Section 3. | Powers and Duties of Officers | 8 |
| Section 4. | Executive Director | 9 |
| Section 5. | Agents and Employees | 9 |
| Section 6. | Compensation of Officers, Agents and Employees | 9 |
| ARTICLE V | MISCELLANEOUS | 10 |
| Section 1. | Fiscal Year | 10 |
| Section 2. | Corporate Seal | 10 |
| Section 3. | Checks, Notes, Contracts | 10 |
| Section 4. | Books and Records | 10 |
| Section 5. | Amendments to Certificate, Bylaws and Membership Agreement | 10 |
| Section 6. | Privacy | 10 |
| Section 7. | Indemnification and Insurance | 10 |

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

-ii-

Case 1:23-cv-00878-TDS-JEP     Document 124-17     Filed 05/09/25     Page 37 of 63

LEG_DEFS_0006760

# ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
## BYLAWS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ARTICLE I

### Offices

**Section 1.     Location.**  The principal office of Electronic Registration Information Center, Inc. (the "Corporation") shall be located within or without the State of Delaware, at such place as the Board of Directors shall from time to time designate.  The Corporation may also maintain additional offices at such other places as the Board of Directors may from time to time designate.  The Corporation shall have and maintain within the State of Delaware a registered office at such place as may be designated by the Board of Directors.

## ARTICLE II

### Members

**Section 1.     Members.** The members of the Corporation shall consist solely of state, territorial governmental units, or the District of Columbia.  Each member shall be represented by the chief election official or a chief election official's designee to act on the member's behalf for all purposes related to the Corporation, including service on the Board of Directors or as an Officer (the "Member Representative").  A chief election official may designate a new or replacement Member Representative at any time for any reason, at their discretion, upon written or electronic notice to the ERIC Executive Director who shall, in turn, notify the Membership.

**Section 2.     Admission of Members.**  Any jurisdiction seeking membership shall apply to the Executive Director of ERIC.  The Executive Director shall provide written notice to the Membership of ERIC's intent to admit a new jurisdiction, and members shall have five (5) business days to submit objections to the Executive Director in writing.  If there are no objections, the new jurisdiction shall be automatically admitted to Membership effective upon execution of the Membership Agreement and payment of the Membership Fee as required by Article II, Section 4 of these Bylaws.  If one or more members object to the admission of the new jurisdiction, then the jurisdiction shall be admitted to Membership upon a majority vote of the entire Board of Directors, effective upon execution of the Membership Agreement and payment of the Membership Fee.

**Section 3.     Membership Agreement.**   Each member shall sign a Membership Agreement that sets forth the terms and conditions of membership in the Corporation, which is attached as Exhibit A to these Bylaws.

**Section 4.     Membership Fee.**  Upon admission and execution of the Membership Agreement, each member shall pay a one-time Membership Fee of $25,000 to the Corporation.

1

With respect to individual members, the schedule for payment of the Membership Fee may be modified by the Board of Directors.

**Section 5.  Dues.** Each member shall pay annual Membership Dues. Each year, the Membership shall approve the annual dues (the "Dues Schedule"), which shall form the basis of the Corporation's budget to be set annually by the Board of Directors. The Dues Schedule may be amended, modified, or substituted by a vote of the Membership, however, the schedule for payment of dues by individual members may be modified by the Board of Directors. The Executive Director shall set the schedule for payment of Membership Dues in accordance with section 1 of the Membership Agreement. Any member of the Corporation who is delinquent in the payment of Membership Dues shall be notified of the delinquency and suspended from certain privileges of membership as provided for in the Membership Agreement.  If dues are ninety (90) days delinquent, the delinquent member shall forfeit all rights and privileges of membership and be automatically removed from Membership. No dues will be refunded after payment, absent an overpayment or other payment error.

**Section 6.  Term of Membership; Good Standing.** Members shall remain members provided they remain in good standing with the Corporation. Each member shall remain in good standing by complying with all of the terms and conditions of the Membership Agreement and paying annual dues on a timely basis, as described in Section 5 of this Article. A member that is out of compliance with the requirements for good standing may be subject to removal, including automatic removal, as set forth in Section 8 of this Article.

**Section 7.  Resignation.** A member may resign by mailing or delivering written notice to the Secretary of the Corporation and ERIC's Executive Director, who shall, in turn, notify the Membership. A member must provide a minimum of 91 days notice before their resignation is effective, provided however, that any notice of resignation that would otherwise become effective during the 91 days preceding a federal general election will not be effective until the first business day following the federal general election.  Any paid Membership Dues will not be refunded, and a member shall be responsible and liable for any dues assessed prior to notice being received. However, if a member who has resigned reapplies for membership in the same fiscal year, dues previously paid will be credited to their Membership Dues for that fiscal year. If the sole reason for member's resignation is a material breach by ERIC of the Membership Agreement, member may not issue a notice of resignation in accordance with this section unless a) it has provided written notice to ERIC of the alleged breach; and b) within thirty (30) days (or such other time specified in the Membership Agreement) of receiving such notice from member, ERIC is unable to cure the breach or determines the breach cannot be cured.

**Section 8.  Removal.**

**(a) Automatic Removal:** A member shall be automatically removed from Membership for failure to comply with the "automatic removal" provisions as set forth herein or in the Membership Agreement. Such automatic removal shall be effective upon written notice by the Chair of the Board of Directors and/or ERIC's Executive Director to the non-compliant member.

2

**(b) Other Grounds for Removal:** Any member may be removed at any time, with or without cause, by a three-fourths vote of the entire Board of Directors. The Board of Directors may vote to remove a member solely for a breach of the provisions of the Membership Agreement (with the exception of those provisions that trigger automatic removal) only if the breach cannot be cured or, if curable, is not cured by the member within thirty (30) days (or such other time as may be specified in the Membership Agreement) of receiving notice of the breach from the Corporation.

**(c) Dues Upon Removal:** Any paid dues will not be refunded following removal.

**(d) Readmission to Membership:** After termination of membership pursuant to this Section, the member may reapply for membership at any time, without penalty, subject to remedying the cause for termination. Any dues assessed to the member upon reapplication shall be credited the amount of dues paid previously for the same fiscal year.

**Section 9.** **Meetings of the Members.** An annual meeting of the members shall be held each year at such time and place as shall be fixed by the Board of Directors for the appointment of directors, as necessary, and the transaction of other business as may properly come before the members.

Regular or special meetings of the members may be held at such times as may be fixed by the Board of Directors. The annual meeting of the members shall be open to the public, except as provided by law.

Meetings of the members may be held at such places within or without the State of Delaware as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings. The Board of Directors may authorize that meetings of the members may be held by means of remote communication in accordance with Section 211(a)(2) of the General Corporation Law of the State of Delaware, and other applicable laws. Minutes of any meeting of the Membership shall be published following the meeting.

**Section 10.** **Notice.** Annual and special meetings of the members shall be held upon at least ten (10) days' notice by first-class mail, personal delivery, or by telephone, facsimile, electronic transmission or other similar means of communication to the members, and publication by appropriate means. The notice shall be given by or at the direction of the Chair or the Secretary, who shall call a meeting on the request of two or more directors, or a majority of the entire Membership. In the case of a meeting at which amendments to the Certificate of Incorporation, bylaws or Membership Agreement will be submitted to the members, the notice of such meeting shall set forth the proposed amendment or a summary of the changes to be effected thereby.

**Section 11.** **Waivers of Notice.** Whenever any notice is required to be given to a member, a waiver thereof in writing, signed by the person or persons entitled to such notice, or by electronic transmission, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Such waiver need not specify the purpose or purposes of the meeting.

**Section 12.** **Quorum, Vote, Proxy.** A majority of the members of the Corporation, as represented by their respective Member Representatives, shall constitute a quorum at a meeting of members, and the affirmative vote of a majority of such members present at the meeting and

3

entitled to vote on the subject matter shall be the act of the members, except as otherwise provided herein. As permitted by Delaware law, a member entitled to vote on matters reserved to the Membership may do so by identifying a proxy for the Member Representative, who shall be a part of the Member Representative's staff or department. The Member Representative shall provide written notice to ERIC's Executive Director of the proxy within a reasonable period of time in advance of the meeting of the members.

**Section 13.** **Written Consent of Members.** Any action required or permitted to be taken at a meeting of the members may be taken without a meeting if the members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting of the members consent in writing or by electronic transmission to the adoption of a resolution authorizing such action. Each resolution so adopted and the writings or electronic transmissions evidencing such consent by the members shall be filed with the minutes of the proceedings of the members.

## ARTICLE III

### Board of Directors

**Section 1.** **Power of Board and Qualification of Directors.** The business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors.

**Section 2.** **Appointment of Directors.** All members of the Corporation have a right to appoint their Member Representative to serve as a director on the Board of Directors. Upon admission to Membership under Article II, Section 2 or in the event of a vacancy, member shall inform ERIC's Executive Director in writing whether it wishes to have its Member Representative serve or continue to serve on the Board of Directors. Declining to have a Member Representative serve on the Board of Directors shall have no effect on the Member's other rights under these Bylaws, and such member shall have the right to appoint or reinstate their Member Representative to the Board of Directors at any time by providing written notice to ERIC's Executive Director who shall, in turn, notify the Board of Directors.

**Section 3.** **Non-Voting Seats on Board of Directors.** The Board of Directors may include up to two non-voting members of the Board for individuals who are experts in voting and elections but not governmental employees. Such non-voting directors shall serve two-year, renewable terms.

**Section 4.** **Resignation.** Any director may resign from office at any time by delivering a resignation in writing to the Corporation. Such resignation shall take effect at the time specified therein, and unless otherwise specified, acceptance of such resignation shall not be necessary to make it effective.

**Section 5.** **Removal of Directors.** Any director may be removed from office at any time, with or without cause, by a vote of three-fourths of the entire Board of Directors.

**Section 6.** **Vacancies.** If a Member Representative position on the Board of Directors becomes vacant for any reason including resignation or removal, the chief election official shall appoint a replacement in accordance with Article II, section 1 and shall notify the Executive

LEG_DEFS_0006764

Case 1:23-cv-00878-TDS-JEP   Document 124-17   Filed 05/09/25   Page 41 of 63

Director in writing whether it wishes to have its replacement Member Representative serve as a director on the Board of Directors.

**Section 7.     Meetings of the Board.**  An annual meeting of the Board of Directors shall be held each year at such time and place as shall be fixed by the Board of Directors, for the election of officers and for the transaction of such other business as may properly come before the meeting.

Regular meetings of the Board of Directors shall be held at such times as may be fixed by the Board of Directors.  Special meetings of the Board of Directors may be held at any time whenever called by the Chair of the Board, any two directors, or ERIC's Executive Director.  Any Member Representative who is not a director may attend any meeting of the Board of Directors.

Meetings of the Board of Directors may be held at such places within or without the State of Delaware as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings. Minutes of any meeting of the Board of Directors shall be published following the meeting.

**Section 8.     Notice.**  Annual and special meetings of the Board of Directors shall be held upon at least five (5) days' written notice by first-class mail or twenty-four (24) hours' notice given personally or by telephone, facsimile, electronic transmission or other similar means of communication to all members.

Any such notice shall be addressed or delivered to each member at such member's address as it is upon the records of the Corporation or as may have been given to the Corporation by the member for purposes of notice.

**Section 9.     Quorum and Voting.**  Unless a greater proportion is required by law, the Certificate of Incorporation or these Bylaws, a majority of the entire Board of Directors shall constitute a quorum for the transaction of business or of any specified item of business and, except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the directors present at a meeting at the time of the vote, if a quorum is present at such time, shall be the act of the Board of Directors. Directors are not permitted to give a proxy to someone to act on his or her behalf with respect to actions of the Board of Directors.

**Section 10.     Written Consent of Directors; Meetings by Conference Telephone.**  Any action required or permitted to be taken by the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or such committee consent in writing or by electronic transmission to the adoption of a resolution authorizing such action.  Each resolution so adopted and the writings or electronic transmissions evidencing such consent by members of the Board of Directors or such committee shall be filed with the minutes of the proceedings of the Board of Directors or such committee.

Any one or more members of the Board of Directors or of any committee thereof may participate in a meeting of such Board or committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time.  Participation by such means shall constitute presence in person at a meeting.

5

LEG_DEFS_0006765

**Section 11.    Compensation of Directors.** Directors shall receive neither compensation nor reimbursement of expenses for their services as such.

## ARTICLE IV

### Committees

**Section 1. Committees of the Board.** The Board of Directors, by resolution adopted by a majority of the entire Board, may designate from among its members an Executive Committee and other standing committees, each consisting of two or more directors, and each of which, to the extent provided in the resolution and to the fullest extent of the law, shall have and may exercise all the powers and authority of the Board. No committee may a) take any action expressly reserved under these Bylaws and Membership Agreement to the members for approval; b) amend the certificate of incorporation, these Bylaws, or the Membership Agreement; c) approve or remove members; d) elect or remove officers; e) remove directors; f) elect or remove non-voting members of the Board of Directors; g) elect members of committees; h) hire or discharge an executive director; i) adopt an agreement of merger or consolidation; j) recommend to the Membership the sale, lease or exchange of all or substantially all of the Corporation's property and assets; or k) recommend to the Membership a dissolution of the Corporation or a revocation of a dissolution of the Corporation. The Board of Directors shall have the power at any time to designate a member of such committee as its chair, fill vacancies, change the membership or discharge a committee.

**Section 2.    Committee Rules.** Unless the Board of Directors otherwise provides, each committee designated by the Board may make, alter and repeal rules for the conduct of its business, except with respect to quorum.  In the absence of a contrary provision established by the Board of Directors, a majority of the entire authorized number of members of each committee shall constitute a quorum for the transaction of business, the vote of a majority of the members present at a meeting at the time of such vote if a quorum is then present shall be the act of such committee, and each committee shall otherwise conduct its business in the same manner as the Board of Directors conducts its business under Article III of these Bylaws.

**Section 3.    Service of Committees.** Each committee of the Board of Directors shall serve at the pleasure of the Board.  The designation of any such committee and the delegation thereto of authority shall not alone relieve any director of his or her duty under law to the Corporation.

**Section 4.    Records.** Minutes shall be kept of each meeting of each committee.  Copies of the minutes of each such meeting shall be filed with the corporate records and supplied to each member of the Board of Directors.

**Section 5.    Advisory Board.** The Board of Directors shall create a Privacy and Technology Advisory Board, and may create such other advisory boards and appoint to them such persons as it deems appropriate.  Persons serving in such advisory capacity shall not exercise any of the powers granted to the Board of Directors in these Bylaws.

6

**Section 6.**      **Executive Committee.**

(a) *Ex Officio* **Membership:** The Executive Committee shall consist of the Chair, Vice Chair, Immediate Past Chair, Treasurer, and Secretary of the Board of Directors, and the Executive Director shall serve as a non-voting member of the Executive Committee (collectively the "*ex officio* members"). Vacancies in the *ex officio* membership of the Executive Committee shall be addressed in accordance with Article V.

(b) **Elected Membership:** In addition to the *ex officio* members, until the Membership reaches thirty-four, the Executive Committee shall include two voting members of the Board of Directors elected by the Board of Directors. When the Membership reaches thirty-five, the number of voting members of the Board of Directors serving on the Executive Committee shall increase to four, with the election of the additional members occurring within a reasonable time following the admission of the thirty-fifth member. Such committee members shall serve in this capacity for terms of one year, not to exceed two consecutive one-year terms. In the event of a vacancy among the elected membership of the Executive Committee, in accordance with sub-section d below, the Executive Committee shall take reasonable steps to propose a replacement to fill the unexpired term of his or her predecessor.

(c) **Chair of Executive Committee:** The Chair of the Board of Directors shall be the Chair of the Executive Committee.

(d) **Role and Powers of Executive Committee:** Except as set forth in Article IV, Section 1 above, or as otherwise proscribed by the Board of Directors, the Executive Committee shall have the authority to exercise all powers of the Board of Directors between meetings of the Board. In addition, the Executive Committee's responsibilities shall include preparing and proposing to the Board of Directors a slate of candidates for officer positions and elected members of the Executive and Finance Committees, including in the event of a vacancy, and the Executive Director; and, in consultation with the Finance Committee, reviewing the compensation and performance of the Executive Director. The Executive Committee shall hold regular meetings at such times as it shall determine and special meetings as requested by the Chair, the Executive Director, or any two of its members. Actions of the Executive Committee shall be reported to the Board of Directors.

**Section 7. Finance Committee.**

(a) *Ex Officio* **Membership:** The Finance Committee shall consist of the Treasurer and Secretary of the Board of Directors, and the Executive Director shall serve as a non-voting member of the Finance Committee (collectively, the "*ex officio* members"). Vacancies in the *ex officio* membership of the Finance Committee shall be addressed in accordance with Article V.

(b) **Elected Membership:** The Finance Committee shall include one voting member of the Board of Directors elected by the Board. This committee member shall serve in this capacity for terms of one year, not to exceed two consecutive one-year terms. In the event the voting member position on the Finance Committee becomes vacant, in accordance with sub-section d below, the Executive Committee shall take reasonable steps to propose a replacement to fill the unexpired term of his or her predecessor.

7

LEG_DEFS_0006767

**(c) Chair of Finance Committee:** The Treasurer shall be the Chair of the Finance Committee.

**(d) Role and Powers of Finance Committee:** Except as set forth in Article IV, Section 1 above, or as otherwise proscribed by the Board, the Finance Committee shall have the authority to exercise all powers of the Board of Directors between meetings of the Board. The Finance Committee will assist the Board of Directors with its financial oversight responsibilities including reviewing and recommending approval of the annual operating budget; reviewing periodic financial reports; and overseeing the management of financial assets and audits. The Finance Committee shall hold regular meetings at such times as it shall determine and special meetings as requested by any of its members. Actions of the Finance Committee shall be reported to the Board of Directors.

## ARTICLE V

### Officers, Agents and Employees

**Section 1.     General Provisions.** The officers of the Corporation shall be a Chair, a Vice Chair, the Immediate Past Chair, a Secretary, a Treasurer and may include such other officers as may be deemed necessary.

**Section 2.     Term of Office, Vacancies and Removal.** The officers shall be elected by the Board of Directors from among its membership at the annual meeting of the Board. The Board of Directors may appoint other officers, who shall have such authority and perform such duties as may be prescribed by the Board. Each officer shall hold office for a term of one year, until the next annual meeting of the Board of Directors after his or her appointment and until his or her successor has been appointed and qualified. Any two or more offices may be held by the same person, except the offices of Chair and Secretary. If an office becomes vacant for any reason, the Board of Directors may fill such vacancy. Any officer so appointed or elected shall serve only until such time as the unexpired term of his or her predecessor shall have expired unless re-elected by the Board of Directors. Any officer may be removed by a vote of the majority of the entire Board of Directors with or without cause. Such removal without cause shall be without prejudice to such person's contract rights, if any, but the appointment of any person as an officer of the Corporation shall not of itself create contract rights.

**Section 3.     Powers and Duties of Officers.**

**(a)     Chair.** The Chair shall preside at all meetings of the Board of Directors. The Chair shall perform all duties customary to that office and shall supervise and control all of the affairs of the Corporation in accordance with the policies and directives approved by the Board of Directors.

**(b)     Vice Chair:** The Vice Chair shall serve as advisor to the Chair and shall substitute for the Chair in his or her absence or inability to serve.

**(c)     Immediate Past Chair:** The Immediate Past Chair shall serve as advisor to the Chair, the Executive Director and the Board of Directors.

8

LEG_DEFS_0006768

**(d)     Secretary.** The Secretary shall be responsible for the keeping of an accurate record of the proceedings of all meetings of the Board of Directors, shall give or cause to be given all notices in accordance with these Bylaws or as required by law, and, in general, shall perform all duties customary to the office of Secretary. The Secretary shall oversee the custody of the corporate seal of the Corporation, if any; and shall have authority to affix or cause to be affixed the same to any instrument requiring it; and, when so affixed, it may be attested by his or her signature. The Board of Directors may give general authority to any officer to affix the seal of the Corporation, if any, and to attest the affixing by his or her signature.

**(e)     Treasurer.** The Treasurer shall be chair of the Finance Committee. The treasurer shall oversee the custody of, and be responsible for, all funds and securities of the Corporation; shall keep or cause to be kept complete and accurate accounts of receipts and disbursements of the Corporation; and shall deposit or cause to be deposited all monies and other valuable property of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board of Directors may designate. Whenever required by the Board of Directors, and at the annual membership meeting, the Treasurer shall render a statement of accounts. The Treasurer shall at all reasonable times exhibit or cause to be exhibited the books and accounts to any officer or director of the Corporation, and shall perform or cause to be performed all duties incident to the office of Treasurer, subject to the supervision of the Board of Directors, and such other duties as shall from time to time be assigned by the Board. The Treasurer shall, if required by the Board of Directors, give such bond or security for the faithful performance of his or her duties as the Board may require.

**Section 4.     Executive Director.** The Board of Directors shall hire an Executive Director who shall serve as the chief executive officer of the Corporation. The Executive Director shall have day-to-day responsibility for the management of the staff and programs of the Corporation, including carrying out the Corporation's goals and Board-approved policies. The Executive Director shall serve as an ex-officio, non-voting member of the Board of Directors; report on the progress of the Corporation's activities, publish by appropriate means all data received from the Members pursuant to the Membership Agreement, provide notice to members regarding any changes in their standing with regard to the Corporation, answer questions of Board members and carry out the duties described in the job description. The Board of Directors may designate other duties as necessary. The Executive Director shall report to the Chair of the Corporation.

**Section 5.     Agents and Employees.** The Board of Directors may hire or appoint agents and employees who shall have such authority and perform such duties as may be prescribed by the Board. The Board of Directors may remove any agent or employee at any time with or without cause. The foregoing powers may be delegated to the Executive Director. Removal without cause shall be without prejudice to such person's contract rights, if any, and the appointment of such person shall not itself create contract rights.

**Section 6.     Compensation of Officers, Agents and Employees.** Salaries or other compensation of officers, agents and employees may be fixed from time to time by the Board of Directors, or this power may be delegated to the Executive Director; provided, however that such salaries and compensation shall not be excessive in amount and shall be for services which are reasonable and necessary for performance of the Corporation's purposes.

9

## ARTICLE VI

### Miscellaneous

**Section 1.    Fiscal Year.**  The fiscal year of the Corporation shall be determined by resolution of the Board of Directors.

**Section 2.    Corporate Seal.**  The seal of the Corporation shall be circular in form and contain the name of the Corporation, the words "Corporate Seal" and "Delaware" and the year the Corporation was formed in the center.  The Corporation may use the seal by causing it or a facsimile to be affixed or impressed or reproduced in any manner.

**Section 3.    Checks, Notes, Contracts.**  The Board of Directors shall determine who shall be authorized from time to time on the Corporation's behalf to sign checks, notes, drafts, acceptances, bills of exchange and other orders or obligations for the payment of money; to enter into contracts; or to execute and deliver other documents and instruments.

**Section 4.    Books and Records.**  The Corporation shall keep at its principal office (1) correct and complete books and records of accounts, (2) minutes of the proceedings of its Board of Directors and any committee of the Corporation, and (3) a current list or record containing the names and addresses of all members, directors and officers of the Corporation.  Any of the books, records and minutes of the Corporation may be in written form or in any other form capable of being converted into written form within a reasonable time.

**Section 5.    Amendments to Certificate, Bylaws and Membership Agreement.**  The Certificate of Incorporation may be amended in whole or in part by the members.  These Bylaws may be amended or repealed, in whole or in part, by a two-thirds vote of the entire Membership. The Membership Agreement may be amended, in whole or in part, by a four-fifths vote of the entire Membership.

**Section 6.    Privacy.**  The protection of individual's privacy being of significant importance to the Corporation, the Corporation shall take all reasonable and prudent actions to prevent and/or contest the disclosure of any personal or individual data held within the Corporation's control to anyone other than the members.

**Section 7.    Indemnification and Insurance.**  The Corporation may, to the fullest extent permitted by law, indemnify any present or former director, officer, employee or agent or any person who may have served at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, whether for profit or not for profit, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative, or investigative, to which he or she may be or is made a party by reason of being or having been such director, officer, employee or agent if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. However, there shall be no indemnification in respect of any claim, issue or matter as to which he

10

Case 1:23-cv-00878-TDS-JEP    Document 124-17    Filed 05/09/25    Page 47 of 63

or she shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

The Corporation shall have the power to purchase and maintain insurance to indemnify the Corporation and its directors and officers to the full extent such indemnification is permitted by law.

The Corporation may pay expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such officer or director to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation under this Article. Such expenses (including attorneys' fees) incurred by other employees and agents may be paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

In no case, however, shall the Corporation indemnify, reimburse, or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of § 509 of the Code then, during such time, no payment shall be made under this Article if such payment would constitute an act of self-dealing or a taxable expenditure, as defined in § 4941(d) or § 4945(d), respectively, of the Code.

If any part of this Article shall be found in any action, suit, or proceeding to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

11

LEG_DEFS_0006771

# OFFICER'S CERTIFICATE

I, _____, _____ of the Electronic Registration Information Center, formed and existing under the laws of the State of Delaware, do hereby certify that the foregoing is a true and complete copy of the Bylaws of this not-for-profit corporation as submitted and read to, and adopted by, the Board of Directors on _____, 20__.

IN WITNESS THEREOF, I have hereunder ascribed my name and affixed the Seal of the Corporation on this ____ day of _____, 20__.

_____

Name: _____

Title: _____

[Corporate Seal]

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

# EXHIBIT A

## ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

### MEMBERSHIP AGREEMENT

This membership agreement (this "Agreement") is made and entered into as of the ____ day of _____ 20___ (the "Effective Date"), by and between Electronic Registration Information Center, Inc., a Delaware nonstock corporation ("ERIC") and _____ (the "Member").

**WHEREAS**, ERIC was formed for charitable and educational purposes to engage in meaningful, evidence-based reform of the election system in the United States; and

**WHEREAS**, ERIC seeks to lessen the burdens of government by facilitating the collaboration of states and local government units to conduct research, develop technology, and perform other charitable and educational activities designed to reduce the costs and increase the accuracies and efficiencies associated with their use of voter registration systems; and

**WHEREAS**, ERIC seeks the direct involvement of states and local government units in furthering its charitable and educational purposes by such states and local government units becoming members of ERIC and furnishing voter registration and other data to help ERIC understand the needs of states and local government units with respect to their use of voter registration systems, and assist state and local government units in making their voter registration lists and processes more accurate, more complete, and fully compliant with federal, state and local laws; and

**WHEREAS**, in consideration for the Member's performance as described below, ERIC will provide the service to the Members of sharing and processing data that relates to the maintenance of their voter registration lists and provide regular (at least on a monthly basis) reports to the Member.

**NOW THEREFORE**, in consideration of the foregoing, the terms and conditions hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Annual Dues</u>. The Member shall pay annual dues to ERIC as determined by the ERIC Membership, pursuant to Article II, Section 5 of ERIC's Bylaws. The Executive Directors shall invoice Members for dues and set a reasonable payment deadline. If the Member fails to pay dues by the payment deadline, ERIC shall not deliver, nor shall the Member receive, any services or data from ERIC until such payment is received. Any Member that fails to pay dues within ninety (90) days of a payment deadline shall be *automatically removed* as a Member in accordance with ERIC's Bylaws (the "Bylaws").

2. <u>Voter Files and Motor Vehicle Records</u>. The Member shall transmit to ERIC the following data related to its voter files and motor vehicle records (collectively, the "Member Data").

   a. A reasonable time after admission, the Corporation and the Member will agree upon a 'Certification Date' that obligates the Member to the following two sections

13

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

herein. The Member shall be notified in writing by the Corporation of the Certification Date.

b. Within sixty (60) days of the Certification Date, and at least every sixty (60) days thereafter, the Member shall transmit: (1) all inactive and active voter files (excluding those records that are confidential or protected from disclosure by law), including those fields identified in Exhibit B, and (2) all licensing or identification records contained in the motor vehicles database (excluding those fields unrelated to voter eligibility, such as fields related to an individual's driving record), including those fields identified in Exhibit B. Under no circumstances shall the Member transmit an individual's record where the record contains documentation or other information indicating that the individual is a non-citizen of the United States. Should Member believe it has an alternative source of data that is equivalent to or better than the motor vehicle database ("Alternative Data Source"), Member may apply in writing to the Executive Director of ERIC to substitute the Alternative Data Source for motor vehicle data. Such written application shall explain the basis for Member's assertion that the Alternative Data Source is equivalent or better and why using it will effectively serve the goals of ERIC. If, in the Executive Director's assessment, the request is reasonable, the Executive Director shall submit the Member's request to the ERIC Board of Directors ("ERIC Board" or "Board") for approval. If membership in ERIC is contingent upon a jurisdiction's ability to use an Alternative Data Source, the jurisdiction may seek approval of a data substitution request in advance of joining ERIC.

c. If the Member fails to transmit the required Member Data as described above, ERIC shall not deliver, nor shall the Member receive, any Data or services from ERIC until ERIC receives the required Member Data from the Member. Should Member fail to transmit Member Data in any sixty (60) day period as provided in sub-section b, Member shall, upon written notice from ERIC, have a thirty (30) day grace period in which to provide such Member Data. Should this grace period expire without a transmission to ERIC of Member Data from the Member, the Member shall be *automatically removed* from membership in accordance with the Bylaws. Member may submit a written appeal to the Executive Director of ERIC for a reasonable extension of the grace period deadline if Member is unable to meet that deadline because of a technical issue or a problem accessing or receiving the Member Data. Whether or not to grant the extension or to proceed to automatic removal shall be in the sole discretion of ERIC's Executive Director.

3. <u>State Agency Records</u>. The Member shall use its best efforts to transmit, on a regular basis, data relating to individuals that exists in the records of other agencies within its jurisdiction that perform any voter registration functions, including, but not limited to, those required to perform voter registration pursuant to the National Voter Registration Act, 43 U.S.C. 1973gg-5 ("Additional Member Data"). Notwithstanding this section, a state's failure to transmit Additional Member Data under this section shall not affect the Member's compliance with this Section or its standing as a member of ERIC.

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

## EXHIBIT A

4. <u>Privacy; Use of Data</u>.

    a. **Use and Protection of Data**: The Member and ERIC shall use their best efforts to prevent the unauthorized use or transmission of any private or protected Member Data; Additional Member Data; and data included in reports provided by ERIC ("ERIC Data") (Member Data, Additional Member Data and ERIC Data shall be collectively referred to as "Data") in its possession. The Member represents and warrants that all uses and transmissions of Data originating from the Member to ERIC and/or ERIC's agents, contractors or subcontractors comply fully with applicable state, federal and local laws, rules and regulations. The Member shall not use or transmit any ERIC Data for any purpose other than the administration of elections under state or federal law. Should a Member receive a request to disclose ERIC Data and determines that it is legally obligated, in whole or in part, to comply with such request, it shall not make the disclosure without first obtaining a court order compelling it to do so, a copy of which shall be provided to ERIC.

    b. **Unauthorized Use or Disclosure of Data--Member:** Should there be an unauthorized or impermissible use, disclosure or transmission of Data, regardless of whether it is accidental or intentional (for example, Member intentionally sells, distributes, publishes or uses any ERIC Data for any purpose other than election administration, including any commercial purpose) or the responsibility of a third party (collectively, "Unauthorized Disclosure"), Member shall, within ninety (90) days of ERIC receiving notice of the Unauthorized Disclosure a) explain in writing to ERIC that such Unauthorized Disclosure has been cured and how it was cured or, if the breach is not curable, provides a written explanation to ERIC of what steps it has taken to mitigate the risks to ERIC and its Members resulting from such breach; and b) provide a written explanation of what processes it has implemented to prevent such Unauthorized Disclosure in the future. Upon written application, the Executive Director of ERIC, in consultation with the Board Chair, may extend the deadline for Member to comply with this section. At its first meeting following the Member's compliance with sub-sections a and b above, the Board will consider the information submitted by the Member and vote on Member's continued membership. Should Member fail to provide any information in response to sub-sections a and/or b above, Member shall be *automatically removed*. To the extent permitted under each Member's state law, the Member agrees to indemnify, defend and hold harmless ERIC against any claims related to the Unauthorized Disclosure.

    c. **Notice to ERIC:** Each Member shall report to the Executive Director of ERIC as soon as is practicable if a Member is required by law to sell, distribute, publish, disclose or use any ERIC Data for any purpose other than election administration. Each Member shall report to the Executive Director of ERIC immediately upon learning of any Unauthorized Disclosure.

    d. **Unauthorized Disclosure of Data-ERIC:** Should there be an unauthorized disclosure of motor vehicle data by ERIC, whether accidental or intentional or the

15

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

responsibility of a third party ("ERIC Unauthorized Disclosure"), ERIC shall immediately give notice to Members. Understanding that ERIC's primary source of funds are fees and dues paid by Members, and subject to consultation and approval by the Board, ERIC agrees to indemnify, defend and hold harmless state motor vehicle agencies against any claims related to an ERIC Unauthorized Disclosure of Data.

This provision 4 shall not be construed to limit any Member's sovereign immunity, rights, claims or defenses which arise as a matter of law or pursuant to any other provision of this Agreement.

5.  <u>State Voter Registration Systems.</u>  To foster ERIC's goal of improving the accuracy of state voter registration data, Members are strongly encouraged to establish a regular schedule for requesting ERIC Data with a minimum of one request every calendar year. When a Member Representative requests ERIC Data, upon receipt of such ERIC Data, the Member shall take the following actions in connection with the improvement of its state voter registration systems. (If Member rescinds in writing its request for ERIC Data within seven (7) business days of making its original request, the following requirements will not apply.) If a Member fails to make at least one request for ERIC Data for 425 days, ERIC will automatically provide ERIC Data within seven (7) business days of the 425th day, thereby triggering the following requirements.

    a.  When the Member receives ERIC Data regarding eligible or possibly eligible citizens who are not registered to vote, the Member shall, at a minimum, initiate contact with each and every eligible or possibly eligible citizen and inform them how to register to vote. Each Member shall have until October 1 or fifteen (15) days before the close of registration, whichever is earlier, of the next Federal General Election year to initiate contact with at least 95% of the eligible or potentially eligible citizens on whom data was provided and address validation was performed, as described above. Members shall not be required to initiate contact with eligible or possibly eligible voters more than once at the same address, nor shall Members be required to contact any individual who has affirmatively confirmed their desire not to be contacted for purposes of voter registration or is otherwise ineligible to vote in the Member's jurisdiction. Should a Member need a brief extension in order to comply with the requirements of this section 5(a), Member may submit a written request to ERIC's Executive Director setting forth the reasons for the extension request and providing a specific date when the required mailing will be sent. Members shall make every effort to submit extension requests at least two weeks before the deadline. Whether or not to grant an extension request or to proceed to automatic removal is in the sole discretion of ERIC's Executive Director, and the timeliness of the request shall be a factor in the Executive Director's determination. Members are entitled to request only one extension per Federal General Election cycle.  No later than December 1 (or, if December 1 falls on a weekend, the next business day) following the Federal General Election, the Member Representative shall provide a written certification

16

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

to the Executive Director of ERIC that Member has or has not complied with the provisions of this section. Members that have not complied with this section, or do not provide the written certification, shall be *automatically removed* from membership. If a Member adopts legislation or policies that have the potential to accomplish the objectives of this section by alternative means, Member may apply to ERIC for an exemption from the requirements of this section of the Membership Agreement by sending a written request to the Executive Director of ERIC and the Chair of the Board. Such written application shall explain the basis for Member's assertion that the alternative means will effectively achieve the objectives of this section. If the Executive Director of ERIC and the Chair of the Board believe the request is reasonable, it shall be presented to the Board for a vote and, if granted, a determination on the timing of implementation of the exemption.

b. When the Member receives credible ERIC Data (meaning the state has validated the data) indicating that information in an existing voter's record is deemed to be inaccurate or out-of-date, the Member shall, at a minimum, initiate contact with that voter in order to correct the inaccuracy or obtain information sufficient to inactivate or update the voter's record. Each Member has ninety (90) days after the data was sent to initiate contact with at least 95% of the voters on whom data indicating a record was inaccurate or out-of-date, as described above, was provided.

Within ten (10) business days of the ninetieth day, the Member Representative shall provide a written certification to the Executive Director of ERIC that Member has complied or not complied with this section and, if out of compliance, the extent of such non-compliance. If Member is out of compliance, Member shall have a 30-day grace period, which begins on the 91st day, within which to complete the required contacts. Within ten (10) business days following the expiration of the grace period, the Member Representative shall provide a written certification to the Executive Director of ERIC that Member has complied or not complied with this section. If Member is still out of compliance, or fails to provide the certification, Member shall be *automatically removed.*

c. The Member shall use its best efforts to provide for a mechanism by which any eligible voter whose registration appears to have been erroneously processed or unprocessed shall be offered the opportunity to cast a ballot that will be counted, unless the voter is otherwise ineligible.

d. The Member shall use its best efforts to provide for a mechanism by which an eligible voter may register to vote over the internet without need to complete and/or deliver a paper voter registration form.

e. The Member shall use its best efforts to provide for a mechanism by which voter registration transactions performed at state agencies is more fully automated and reduces or eliminates paper transactions.

17

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

**EXHIBIT A**

6. <u>Voter Participation Data.</u> ERIC recognizes that the appearance of improper voting, allegations of improper voting, and actual improper voting undermines public confidence in the electoral process and election outcomes. ERIC can be a tool to identify potentially improper votes, and refer them to Members for further investigation consistent with each state's laws. For the purposes of this Agreement, "improper votes" means votes cast by an individual who may have voted more than once in the Member jurisdiction at the same election, voted in more than one Member jurisdiction at the same election, or voted on behalf of a deceased voter within the Member jurisdiction.

   Upon the written request of a Member Representative, ERIC shall provide the Member with data identifying voters who appear to have cast improper votes in a preceding election. Members shall not be required to request these data. Use or acceptance of these data shall not be a condition of membership.

   To receive these data, Members shall submit a written request to the Executive Director at least 30 calendar days before the applicable election. In the written request, the Member must: (1) specify the election for which it requests data identifying voters who appear to have cast improper votes, (2) affirm that it will submit to ERIC voting history data for the applicable election in a manner consistent with how voter files and motor vehicle records are submitted to ERIC, (3) affirm that it will accept the requested data from ERIC, (4) affirm that it will complete a reasonable internal investigation of any possible improper votes before publicly releasing information about the data, and (5) affirm that it can protect the confidentiality of the individual-level data, either by state law or administrative rule, until the internal investigation is complete and the findings are turned over to law enforcement.

7. <u>Single Point of Transfer.</u>  The Member shall designate and maintain a single point of transfer of data and a single data source/point of data per data feed.

8. <u>Performance Data.</u>  Within 30 days of the date of execution of this agreement, and every one hundred eighty (180) days thereafter, the Member shall report to ERIC data relating to performance under this Agreement, as described in Exhibit C.

9. <u>State Specific Requirements.</u>  From time to time, legislation or implementing regulations enabling states to become members of ERIC will contain state-specific membership requirements not applicable to all Members.  Such state-specific requirements are set forth in Exhibit D.

10. <u>Publicity.</u>  The Member shall not make or permit any person connected with it to make any announcement or statement purporting to be on behalf of ERIC, or use any logo, trademark, service mark, or business or trading name of ERIC or any other Member of ERIC without the prior written approval of ERIC or the affected Member, as applicable. Furthermore ERIC shall not make or permit any person connected with it to make any announcement or statement purporting to be on behalf of any Member, or use any logo, trademark, service

18

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

mark, or business or trading name of any Member of ERIC without the prior written approval of the affected Member.

11. <u>Waiver</u>. No waiver by any party for any breach by the other of any of the provisions of this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other provisions hereof. No such waiver shall be effective unless in writing and then only to the extent expressly set forth in writing.

12. <u>Severability</u>. The provisions of this Agreement are separate and severable, and the invalidity of any of them shall not affect or impair the validity or enforcement of the remaining provisions.

13. <u>Assignment</u>. ERIC may not sell, assign, or otherwise transfer any of its rights or interests or delegate any of its duties or obligations in this Agreement, without a majority vote of the entire Membership. The Member may not sell, assign, or otherwise transfer any of its rights or interests or delegate any of its duties or obligations in this Agreement, without the prior written consent of ERIC. Any sale, assignment, or transfer in violation of this Section is void and without effect.

14. <u>No Partner or Agency</u>. This Agreement does not constitute or create a partnership or joint venture with any Member or among the Members; appoint any Member as an agent for ERIC or any other Member, or appoint ERIC as an agent for any Member; or create any fiduciary obligations among the Members, except as may be expressly set forth in this Agreement.

15. <u>Amendments</u>. Amendments or modifications of this Agreement shall be effective immediately upon approval of such changes by the entire Membership in accordance with Article VI, Section 5 of the Bylaws.

16. <u>Communications; Notices</u>. All communications and notices that are required to be given by ERIC or a Member pursuant to this Agreement must be in writing and sent to the recipient either by electronic mail, personal delivery, overnight commercial courier service, or facsimile. Members may request a preferred method of delivery and the Corporation will make all reasonable efforts to oblige such requests. Communications and notices must be sent using the Notice Details set forth on the signature page of this Agreement, unless these details are changed by delivery of a written notice to ERIC, if the change related to a Member, or the Member, if the change relates to ERIC. The Executive Director of ERIC shall maintain or cause to be maintained a roster of Members that contains a compilation of Notice Details for each Member, and which shall be distributed periodically to the Members.

17. <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which when fully executed shall be an original, and all of said counterparts taken together shall be deemed to constitute one and the same agreement.

19

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

## EXHIBIT A

## ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

By: _____
Name: _____
Title: _____
Date: _____


Notice Details:                    With a copy to:

Name:                              Name:
Title:                             Title:
Address:                           Address:
Phone:                             Phone:
Fax:                               Fax:


## [MEMBER]

By: _____
Name: _____
Title: _____
Date: _____


Notice Details:                    With a copy to:

Name:                              Name:
Title:                             Title:
Address:                           Address:
Phone:                             Phone:
Fax:                               Fax:

21

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

LEG_DEFS_0006780

Case 1:23-cv-00878-TDS-JEP     Document 124-17     Filed 05/09/25     Page 57 of 63

# EXHIBIT A

18. <u>Complete Agreement</u>. This Agreement is the parties' final and binding expression of their agreement and the complete and exclusive statement of its terms. This Agreement cancels, supersedes and revokes all prior negotiations, representations and agreements between the parties, whether oral or written, relating to the subject matter of this Agreement.

19. <u>Headings and Subsections.</u>  Section headings are provided for reference and do not constitute part of this Agreement.

20. <u>Definitions.</u>  As used herein, the term "state" includes the fifty (50) states, the District of Columbia, and the territories of the United States.

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

**EXHIBIT C**

## ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

### Performance data to be submitted to ERIC by each participating jurisdiction

Each jurisdiction will have two types of performance data submission:
- A. Prior to receiving the first ERIC reports, the jurisdiction will submit a set of baseline data for a representative period of time to use for comparisons.
- B. After receiving the first ERIC reports, the jurisdiction will begin submitting data for the activity within the specified time period.

Performance Data Points

1. Number of voter registration applications new to the Member's jurisdiction submitted by the voter on a paper form
2. Number of new voter registration applications new to the Member's jurisdiction submitted by the voter electronically
3. Number of updates to a voter's existing voter registration submitted by the voter on a paper form
4. Number of updates to a voter's existing voter registration submitted by the voter electronically
5. Number of records reported from ERIC on In-state Movers report who updated through the jurisdiction's online voter registration system (if available)
6. Election statistics, totals for any federal elections within the period of:
   a. Number of new voters to the Member's jurisdiction who registered and voted on the same day, where applicable
   b. Number of updates to a voter's existing registration submitted on the same day on which they voted, where applicable
   c. Total number of provisional ballots cast
   d. Total number of provisional ballots counted
   e. Total number of provisional ballots uncounted, by reason (if available)
   *Note: for context, ERIC will use voter turnout data from the United States Elections Project (www.electproject.org)*
7. Number of individuals for whom contact was initiated and invited to register as a result of reports received from ERIC within the period
8. Number of individuals for whom contact was initiated and invited to correct their registration as a result of reports received from ERIC within the period

23

LEG_DEFS_0006782

Case 1:23-cv-00878-TDS-JEP    Document 124-17    Filed 05/09/25    Page 59 of 63

**EXHIBIT B**

## ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

**Voter Registration and motor vehicles data fields to be submitted to ERIC by each participating jurisdiction, if collected by the Member State**

1. All name fields
2. All address fields
3. Driver's license or state ID number
4. Last four digits of Social Security number
5. Date of birth
6. Activity dates as defined by the Board of Directors
7. Current record status
8. Affirmative documentation of citizenship
9. The title/type of affirmative documentation of citizenship presented
10. Phone number
11. E-mail address or other electronic contact method

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

LEG_DEFS_0006783

**Exhibit D**

## ELECTRONIC REGISTRATION INFORMATION CENTER, INC.

### State-Specific Requirements

**Illinois:**

In addition to the voter files and motor vehicle records Members must provide to ERIC under section 2 of the Membership Agreement, Illinois, in accordance with state law, is required to transmit to ERIC identification records contained in the Department of Human Services, the Department of Healthcare and Family Services, the Department of Aging, and the Department of Employment Security databases (excluding those fields unrelated to voter eligibility, such as income or health information).

Last updated on March 28, 2014; May 21, 2015; October 28, 2015; December 16, 2016; November 30, 2018; February 3, 2020; June 3, 2022

**Gannon, Patrick** <Patrick.Gannon@ncsbe.gov>                    Fri, Aug 19, 2022 at 2:29 PM
To: Major Dave Goetze <majordave@electoraleducationfoundation.com>, "Bell, Karen B" <Karen.Bell@ncsbe.gov>
Cc: Hal Weatherman <halcweatherman@gmail.com>, Ian Richardson <ianrichardson1191@gmail.com>

Mr. Goetze,

Thank you for reaching out on this matter. The State Board is not authorized to share confidential voter registration data with a private party. *See* G.S. §§ 163-82.10(a1) & (e), -82.10B, -82.14(a); *see also* 18 U.S.C. § 2721; G.S. § 20-43.1.

Thanks,

Pat

## Patrick Gannon

*Public Information Director*

O:  (919) 814-0765

M: (984) 204-0767

 NORTH CAROLINA

**TAB 12**

LEG_DEFS_0006787





## Request For NC Voter Registration Data
5 messages

**Major Dave Goetze** <majordave@electoraleducationfoundation.com>                    Fri, Aug 19, 2022 at 1:08 PM
To: "Bell, Karen B" <Karen.Bell@ncsbe.gov>
Cc: Patrick Gannon <Patrick.Gannon@ncsbe.gov>, Hal Weatherman <halcweatherman@gmail.com>, Ian Richardson
<ianrichardson1191@gmail.com>

Ms. Karen Brinson-Bell

Executive Director, NC State Board of Elections

PO Box 27255
Raleigh NC 27611-7255

//via e-mail only//


Dear Ms. Bell,


In light of the recent decision by the NCSBE to participate in ERIC and the funding for this by the Legislature in the revised State Budget just passed, we are requesting that the same information be provided to our 501(C)(3) non-profit Foundation to assist us in our research of NC's election data and in our mission of educating the public on election data management. We are prepared to offer the same level of data security as that provided by ERIC to protect sensitive voter data from unauthorized disclosure to other parties. We would also insure that voter registration and election data not made a matter of public record pursuant to NCGS §163-228 nor published by you already on your website would be redacted from any report we made public prior to publication.


We would anticipate receiving this data in the same format and at the same frequency as updates are made to ERIC. Our data team is prepared to accept this data via FTP file transfer or any other common means of internet sharing of such large files as you may offer. Please indicate in your response who the point of contact will be among your staff so that direct coordination between our data teams can be made to facilitate this exchange, and when you expect uploads to ERIC to begin. Thank you in advance for your timely consideration of this request.

Best regards,

//signed
--
David W. Goetze
Vice President For Research
Electoral Education Foundation
(919) 616-4601

**TAB I1**

LEG_DEFS_0006788