# Exhibit EE

To: "Rep. Allen Buansi" <Allen.Buansi@ncleg.gov>
Subject: RE: [External] Time to chat?
Date: Fri, 02 Jun 2023 18:06:29 +0000
Importance: Normal
Attachments: SB_747_notes.docx



EXHIBIT
4

---

Good afternoon Representative Buansi,

I'm away from the office today (assisting a family member who had surgery yesterday), but happy to schedule a call next week if that would be helpful.

In the meantime, our office has begun to pull together an analysis of the bill. I've attached a copy. This shares agency perspective and administrative challenges we've already identified. The agency was not consulted in advance, and given the length, we're obviously still digesting and will continue to refine. While SB 747 incorporates much of what we've already seen introduced this session, there are many "new" provisions as well.

Hope this information is helpful. Please let me know if you'd like to schedule a further conversation next week. Happy to answer any questions you may have.

Thank you,

**Lindsey Wakely | Deputy General Counsel**
NORTH CAROLINA STATE BOARD OF ELECTIONS
430 N SALISBURY STREET
RALEIGH, NC 27611
DIRECT: 919.814.0729
www.ncsbe.gov


From: Rep. Allen Buansi <Allen.Buansi@ncleg.gov>
Sent: Friday, June 2, 2023 11:01 AM
To: Wakely, Lindsey <Lindsey.Wakely@ncsbe.gov>
Subject: [External] Time to chat?

**CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Dear Ms. Wakely,

Good morning. Do you have some time today to chat about SB 747, which was filed yesterday afternoon?

Best,
Allen

---

Allen Buansi
Representative
N.C. State House District 56

919-733-7208
allen.buansi@ncleg.gov

If you would like to receive occasional updates from our office, please sign up here.

NCSBE_0000605

Below are some preliminary notes on the provisions of SB 747 and any concerns for administration of elections.

**Section 1.1(a):** Eliminates the 3-day grace period for absentee ballots that are cast by Election Day to be delivered by the mail. All absentee ballots would have to be received by the county boards by the close of the polls on Election Day. This provision does not apply to uniformed and overseas citizen voters who vote using special provisions provided for in federal law and whose mailed-in ballots may arrive up to a day before canvass (i.e., nine days after Election Day).

Because tens of thousands of voters typically rely on the postal grace period, based on recent elections, it is important for voters to be fully informed on this change, and to be urged to place their ballot in the mail before the week of the Election, at the latest. The bill does not, however, include any provision requiring such voter education or funding to accomplish that.

**Section 1.1(c):** Requires all absentee ballots received by 7:30 pm on Election Day to be counted that night. Currently, all absentee ballot delivered by the day before the election are counted by Election Day, while ballots received on Election Day are counted at a later date.

This provision will make it more difficult for counties to stop double voters and be burdensome for many counties because it would add an additional task that must be completed on an election day – which is already a demanding day for county staff, and would likely require the hiring of additional staff to handle the pre-processing required to count these ballots Election Day night.

Processing absentee ballots that arrive on Election Day that same day will eliminate the ability to identify double voters before absentee ballots are inserted into tabulators. Currently, counties are able to determine who voted in person on Election Day before approving any absentee applications that arrive on or after Election Day, because they have a few days to compare Election Day voter records with absentee ballots that have yet to be approved. But under the bill, it would not be possible to know who also voted on Election Day and in-person if the county has to process absentee ballots that arrive that same day. That is because data on in-person Election Day voters does not get uploaded into the election management system until after Election Day. That process involves the county boards collecting precinct-site laptops and paper pollbooks at the end of Election Day and *then* going through the process of loading that information into the system back at the county board office, typically in the days following Election Day and before canvass. Under the bill, the only option for discounting double votes for Election Day would be a county-board initiated absentee ballot challenge. That solution is a less ideal option to disapproving the absentee envelope before opening and counting it, because a challenge after approval of the envelope requires the board to locate the ballot among stacks of processed ballots, and then to deduct the challenged ballots' votes from the already-reported unofficial results.

Additionally, the same-day counting requirement adds a significant administrative challenge for an already-burdened county staff on Election Day. Currently, county boards hold an absentee

1

NCSBE_0000606

meeting on Election Day, where they adjudicate envelopes and count all ballots that arrived by the end of the prior day—the Monday before the election. Ballots that arrive on Election Day and thereafter are adjudicated and counted at an absentee meeting subsequent to Election Day (often three or more days after Election Day). In large counties, the Election Day absentee meetings already last up to three hours, with the five-member county board adjudicating thousands of absentee applications (envelopes) that arrived in the final days before Election Day. Thousands more may arrive on Election Day, and the number that would arrive on Election Day is likely to increase if this bill were enacted and there was no postal grace period. Therefore, the five-member county board would now need to stay in session for many additional hours, possibly late into Election Day night, adjudicating absentee applications that arrived that day. In states with laws requiring receipt of absentee-by-mail ballots on Election Day, absentee-by-mail results often are not uploaded until around midnight or later.

Under current laws and practices, county board staff are already focused on the many other administrative tasks that must be accomplished on Election Day. These tasks are complex and require careful attention to detail, and those processes will be even more complex this year and next with the implementation of photo ID. Requiring all absentee envelopes that arrive on Election Day to now be processed would increase the staff workload and require many counties to hire additional staff who can process absentee ballots while other staff handle typical Election Day tasks involving the conduct of voting or the return of results. The processing of absentee ballots is, itself, a complex task that must be handled with care, and has become more complex this year with the photo ID requirement. In many counties, their most experienced staff will be managing the conduct of in-person voting or the collection of results and materials from the precincts. In small- to mid-size counties, which are the vast majority of the counties, staff wear all these hats (and more) on Election Day and are limited in their ability to divide duties because their staff is so small. So, adding another complex task to Election Day raises the real possibility of errors.

**Section 1.1(d):** Provides that absentee ballots delivered by Election Day must be challenged by 5 pm, and with the revisions to the statutory references, it has the perhaps unintended consequence of making any absentee ballots that arrive between 5pm and 7:30 pm on Election Day impossible to challenge.

**Section 1.2(a) and (b):** Requires the State and county boards to publish on the web and "on any materials sent to voters" two dates that are <u>not</u> being changed by this legislation: (1) the date that absentee ballots are available for voting (typically 60 days before a general election, 50 days before a primary, and 30 days before a municipal election); and (2) the date that absentee ballot requests must be received by a county board (Tuesday the week before Election Day). An outreach effort should be focused on informing voters of the ballot receipt deadline, which would be changed.

Even if the outreach requirement were changed to reflect the date that the bill is changing—the new receipt deadline for absentee ballots—State Board staff does not recommend including this on "any materials" sent to voters, for multiple reasons. Typically, the only

2

NCSBE_0000607

Case 1:23-cv-00878-TDS-JEP   Document 124-32   Filed 05/09/25   Page 5 of 12

materials the county boards send to voters are (1) verification cards (the pocket-size voter registration cards that include the voter's information, polling place, and voting jurisdictions); (2) address confirmation cards sent to inactive voters for voter list maintenance; and (3) notifications of polling place/precinct changes. These cards and notices are not good fits for this information, because they are not intended to be limited to only one election. A voter registration card may not be reissued to the same voter ever again, assuming they never update their address, name, or party affiliation. Therefore, putting the relevant dates for only the upcoming election on these cards and notices would require frequent amendment of standardized communications to include unrelated topics. Additionally, there are multiple dates even for the coming election year that would apply under these provisions. For this year, a county board holding municipal primaries and elections would have to print 4, possibly 6, such dates, because the dates are different for each election. And the dates may be different for different municipalities within the same county, if their election methods and dates do not align, which is common. Also, verification and confirmation cards are pocket-sized and space is already limited. Placing these dates—especially multiple such dates—will be difficult to include on the current cards. Finally, counties regularly keep thousands of preprinted verification and confirmation cards in stock, and any redesign would require the reprinting of their current stock—costs that have not been accounted for.

**Section 1.3:** Imposes additional absentee ballot reporting requirements for elections officials during early voting and after Election Day.

**Section 1.4:** Makes the legislative effective when passed. Municipal elections are in September, October, and November 2023. Voting for the September elections begins in mid-August. Depending on when this legislation were to be enacted, there would be very little time left to prepare for these changes, or prepare the voters. Absentee ballot envelopes must be procured in July for the first elections, and those ballots have to include instructions on when the ballot must be delivered, which this bill would change.

**Sections 2.1, 2.2, and 2.3:** Prohibits the counties and State Board from taking any private monetary donations, directly or indirectly, for conducting elections or employing individuals on a temporary basis. The wording of these provisions could be interpreted to prohibit facilities from being donated at no charge for use as voting sites, since that would be considered part of conducting elections. If this were the interpretation, it could make it more difficult to provide adequate voting sites and opportunities in some counties.

This legislation is presumably in response to grants that were made to the State and county boards in 2020 from nonpartisan organizations. Much false information has been spread about those grants. Here are the facts: Those grants helped election officials maintain the protective equipment and staffing necessary to carry out safe elections during the pre-vaccine pandemic. They came with no strings attached, leaving nonpartisan election officials in control of how the funds were spent. And they were offered to all jurisdictions, no matter each jurisdiction's political leanings. It is our recommendation that policymakers address the real funding

3

challenges facing elections operations in our state, thus making it unnecessary to ever consider nonprofit grant funds to support election administration.

**Sections 3.4 and 3.5:** Requires the state and county boards to remove from the voter rolls anyone who is reported by the Administrative Office of the Courts, on a quarterly basis, to have been excused from jury service due to lack of citizenship status. Notwithstanding the laws that would typically make such a list nonpublic (or at least many aspects of such a list), the list would be made public, along with the personal identifying information (PII) of such individuals; and juror lists do contain PII. If a person were identified for removal from the voter rolls, they would have notice and 30 days to object to their removal, but would have to participate in a challenge proceeding to prove their citizenship to remain on the rolls. We have concerns with how reliable such lists would be for definitively determining one's citizenship, especially given that there is no official legal determination of lack of citizenship through this process (unlike, for example, the notices of felony convictions we receive for list maintenance, or the notices of death we receive from DHHS and registers of deeds). This is instead a reporting of what someone verbally claimed. Quarterly reporting also ensures that a person's lack of citizenship status, assuming it is accurate at the time of jury excusal, may have changed by the time the report is acted on by the board of elections (i.e., the person gained citizenship). Example: a person is going through naturalization in January, gets called for jury service, gets excused for not being a citizen, and then in February or March they gain citizenship and register to vote. That person <u>will</u> be flagged for removal under this bill and will be forced to come to their county board to prove they are a citizen. The process envisions the State Board using state or federal databases to check the accuracy of the information. In the State Board's experience, those databases are regularly outdated and otherwise inaccurate.

**Section 4.1:** Makes absentee ballots public where they are being reviewed for approval at county board absentee meetings (typically five meetings leading up to Election Day). Based on the heading, this looks like a drafting error, and certainly the plan is not to make the voted "ballots" publicly available, thereby compromising the secrecy of the ballot and contradicting GS 163-165.1(e), but instead make the ballot *application/envelopes* available. Even if this were the actual intent, it is burdensome for the county boards, which usually are minimally staffed, to properly supervise a very delicate activity: members of the public inspecting official voting records pertaining to an ongoing election. These envelopes are already public records, but the Public Records Act and the cases interpreting it acknowledge that records that are in active use need not be diverted to public disclosure, if such disclosure can be done at a reasonable later time.

**Section 5.2:** Makes it unlawful for anyone other than the county or State Board to affix a barcode on an absentee ballot request form or ballot return envelope. We're unsure what this is trying curtail. But the way it is drafted, it appears to criminalize the postal service placing mail-tracking barcodes on mail pieces, which seems to exceed the authority of the state legislature. Perhaps this is trying to avoid third-party advocacy groups organizing and tracking ballot requests from their affiliates. Technically this can occur as long as the groups are using the State

4

NCSBE_0000609

Case 1:23-cv-00878-TDS-JEP    Document 124-32    Filed 05/09/25    Page 7 of 12

Board's request form. Third-party groups shouldn't be involved with the actual ballot return envelope, though.

**Section 6.1, 6.2, 6.3, 6.5, and 6.6:** Requires certain election records to be retained by boards of elections for 22 months or as long as federal law requires, whichever is greater. This does not change current practice, since federal law already requires 22 months for most such records.

**Section 6.4:** Requires the State Board to populate the public voter registration records with the type of ID a voter provides to comply with the federal Help America Vote Act (HAVA). For voters who register by mail and do not provide their SSN digits or DL number, they have to show proof of identity and residence when voting for the first time—i.e., HAVA ID. It would take the State Board a significant amount of time to develop the processes and software coding to ensure that this information gets populated in the public voter registration records.

**Section 7.1:** Requires every polling place to now maintain a log of individuals who lawfully assist voters in casting their ballots, with the person's name, address, and signature.

**Section 8.1:** Makes same-day registration voting provisional voting. When the legislature sought to eliminate same-day registration in 2013, the Fourth Circuit struck that provision down. So the preexisting law on same-day registration went back into effect. *See* NCSBE Numbered Memo 2016-15. Under that law, a person must provide documentary proof of their residence in order same-day register and vote a regular ballot. This provision seems premised on an idea that a lot of same-day registrants turn out not to be confirmed residents, when the county board sends address-confirmation cards after they vote, and they bounce back as undeliverable. This happens quite infrequently. Over every general election between 2008 and 2022, around 1% of same-day registrants later have their mail verification cards bounce back.

The legislation's proposed solution to this infrequently occurring issue is to require all same-day registration ballots to be cast provisionally. This ensures that tens of thousands of lawful ballots will not be counted until 9 or 10 days after Election Day, when provisional ballots are counted, which will sow doubt among the public about election results. The bill also allows such a provisional ballot to count only in one of two ways. First, the provisional ballot will count if the voter's address is verified through the mail verification process. Because this process can take a couple weeks, it guarantees that certain voters who same-day register at the beginning of early voting will have their votes counted, but voters who same-day register toward the end of early voting are less likely to have their votes counted, which is an arbitrary distinction for counting ballots. Second, the provisional ballot will count if the voter presents certain documents proving their residence "at the county board of elections" by the end of voting on Election Day. Recall that providing such proof of residency is already part of same-day registration, but the voter can do that at the polls when they're voting. Under this bill, the voter would have to make a separate trip to the county board of elections—assuming they are early voting at a different location—and would be providing the same proof that they currently provide, but could not have their ballot counted for weeks. (Example: an Ocracoke voter would have to take a ferry to show their ID). If the drafters are comfortable with the documentary proof of residence that is

5

already provided now as being sufficient to count a same-day registrant's ballot, why change the law at all and make it so that tens of thousands of ballots are going to be counted well after Election Day?

This also becomes effective immediately, raising questions about how the county boards, and the State Board through the coding of the election management system, could turn around this significant process change before voting begins in the municipal elections.

**Section 9.1:** Requires the State Board to report to a legislative committee on any revisions made to election records after certification. It's unclear what this is getting at. It is written so broadly—"any revisions made to elections records"—that it could encompass any manner of records. We would need more time to understand what this might possibly entail and what the drafters are trying to address, to hopefully tailor this provision better.

**Section 10.1:** Expands who is eligible to challenge an absentee ballot (which includes by-mail and early voting ballots), from any voter in the same precinct to any voter in the county. Currently, voters countywide can challenge Election Day ballots, but only voters in the same precinct can challenge an absentee ballot. This will likely have the effect of increasing challenges to early voters and by-mail voters, although it would align the law so that all methods of voting are subject to the same breadth of potential challengers.

**Section 11.1 and 11.2:** Requires absentee ballot envelopes to include a space for the two witnesses' printed names, and not just their address and signature. We already do this.

**Section 12.1:** Requires the county boards to use software to verify the signature of voters on their absentee ballot envelopes. Presumably this would mean the software would need to compare the signature on an absentee envelope with the voter's signature that is maintained within their voter registration records. This provision has lots of problems.

The comparison signatures the county boards have on file are of wildly varying quality. Because the most popular method of voter registration is through the DMV, many voter signatures on file are the product of a stylus on a signature pad, not pen to paper, which makes matching these two signature methods problematic. Many signatures on a voter's file are also years—perhaps decades—old. And disabled voters are not all required to provide a physical signature on their absentee ballot, so would those voters' ballots simply not count because they couldn't be checked?

Procuring this software is expensive, and the rollout and training takes months. If this bill passes before the municipal elections, or even before the presidential primary in March, it would be impossible to put into place a software-based signature matching system in 100 county boards. This sort of software is also expensive, and the bill provides no funds for the State or county boards to procure it.

NCSBE_0000611

Case 1:23-cv-00878-TDS-JEP     Document 124-32     Filed 05/09/25     Page 9 of 12

The State Board is aware of other states that use some software-based methods of checking signatures on absentee ballots—typically as an initial check to determine which signatures need to go to further review. In all those states, signature matching is *the method* to verify the identity of the voter—they do not use live witnesses who attest under penalty of perjury that the voter is who they claim to be, like we do. North Carolina would, as far as we know, be the only state that uses both signature matching and the use of live witnesses to verify an absentee voter's identity.

The State Board issued a lengthy declaratory ruling addressing this issue last year, which is available [here](). It dealt with whether such verification is permitted under state law, an analysis that this bill would render moot. Nonetheless, the ruling goes through the many ways voter identity is carefully verified through our current processes and identifies some of the problems with trying to verify signatures with our current records.

**Section 13.1:** Requires precinct officials serving at one-stop early voting to be "allocated in the same manner as those allocated at voting places on election day." It is unclear what this means. Our assumption is that this is trying to impose a partisan diversity requirement for one-stop workers. Precinct officials on Election Day cannot all be of the same political party, unless that cannot be avoided. The problem is that the selection of one-stop workers does not go through a nomination process with the county political parties, which makes it different from precinct officials on Election Day. Most counties just select their best election workers to work at one-stop, alongside their own staff, with or without regard to partisan affiliation. Although, the language of the bill suggests that the allocation is only referring to those "precinct officials" who are also serving as one-stop workers. So perhaps it only means that if Election Day workers are also serving at one-stop, there should be some partisan diversity among those workers only when serving at the same site. Anyway, this provision could use some more clarity and some input from county boards to determine if it is actually workable. Staffing one-stop voting can be quite difficult for a county board under current conditions. Placing further restrictions on who can work the shifts would make it even more difficult. And since one-stop workers are technically county staff, inserting political affiliation requirements there could present problems with personnel laws and policies.

**Section 14.1:** Requires that if an appeal from a voter challenge decision is made by the State Board, then the appeal must be heard in the county where the challenge originated. This is puzzling. The State Board is never involved in voter challenges. Under current law, those are decided by the county boards and may be appealed only to the superior court in the same county. So this is a venue provision addressing a legal proceeding that is impossible under current law.

**Section 15.1:** Makes it a misdemeanor to impersonate an election official in the registration of voters or conducting an election. We are not aware of this being a problem, but we also do not want people to impersonate election officials.

**Section 16.1**: If a court extends the closing of the polls on Election Day in one county, the polls stay open in all 99 other counties for the same amount of time. Although court-ordered poll extensions are quite rare (State Board-ordered extensions are much more common), this would pose a significant and unnecessary burden on all counties that are unaffected by whatever disruption would have led a court to extend the polls in one county. It also subverts the purpose of extending the polls based on a disruption—to ensure that the voters in the location where the disruption occurred have the same duration of time to cast their ballots as voters elsewhere. This blanket extension would guarantee that such voters have less time to cast their ballots than the voters in 99 other counties.

**Section 17.1**: Requires the SBI to investigate the 17 crimes that are classified as felonies under GS 163-275. This would create concurrent jurisdiction to investigate such crimes between the State Board and district attorneys, which are authorized under GS 163-278 to investigate all elections crimes, and the SBI, which would now have similar authorization but only for the crimes listed under GS 163-275. It could lead to divergent investigative priorities among these entities. The SBI also lacks the same institutional expertise as the State Board regarding election administration and election records which are necessary to properly evaluate allegations of wrongdoing with regard to elections.

**Section 18.1**: Clarifies that an election observer can serve multiple four-hour shifts at different voting places in the county. We're not aware that this is disallowed currently.

**Section 19.1**: Eliminates the requirement that Election Day judges of election (the principal poll workers) must serve the entirety of Election Day. Allowing for shifts on Election Day may allow more workers to be recruited, although it raises the question of whether county boards will be authorized to appoint more than 3 judges of election for a particular precinct, if there are going to be shifts that require more than 3 per site per day. Currently, GS 163-41 only allows 3 judges of election total per site. This also could create chain of custody problems for election materials (including ballots and machines). The judges must sign poll tapes and pollbooks documents at the beginning and end of voting on Election Day. But different people would be signing for the same item's custody, breaking the chain. We'd have to consider how we would account for these breaks in custody.

**Section 20.1:** Requires the State Board to implement two-factor authentication for absentee ballots that are delivered by mail to a county board. We are unclear what is intended by this provision. Typically, two-factor authentication refers to a process for a live person to become credentialed to access a particular system or file. It uses methods of live communication to authenticate that person's identity (*e.g.*, phone call, text message, email message, timed password entry, randomly generated digits on security key). It is unclear how an inanimate object like an absentee ballot can participate in such an authentication procedure. Taking this concept out of the common usage of the phrase two-factor authentication and using its plain language, absentee ballots are currently authenticated using at least two factors: witness number 1 and witness number 2. In sum, we would need to understand better what this provision is looking for.

8

NCSBE_0000613

**Section 21.1**: Revises the crime of voting while serving a felony sentence, which currently requires no knowledge or intent of the crime, to require knowledge that one's rights had not been restored when voting. We support this revision. It doesn't do justice to prosecute someone for a felony that they did not mean to commit.

**Section 22.1**: Clarifies confusion in the law about when write-in votes are permitted to be counted without a write-in candidate petitioning to have their votes tallied, specifically with respect to special district and nonpartisan school board elections. This provision was requested by the State Board.

**Section 22.2**: Clarifies that county boards are to certify winners in municipal elections that cross county boundaries. This avoids the argument that the State Board needs to be involved in canvassing those elections, which leads to delays in issuing certificates of election in a handful of contests across the state. This provision was requested by the State Board.

**Section 22.3**: Provides a statutory process to allow absentee voters who have deficiencies in their absentee ballots to be notified and have an opportunity to fix those deficiencies before canvass after the election. This provision was requested by the State Board, and such a process is required by a court ruling from 2020 (*Democracy NC v. NCSBE*, MDNC) but has not been formalized in any way other than through administrative guidance to county boards of elections.

**Section 22.4**: Amends the Electoral College provisions of state law to conform with the changes made to the federal Electoral Count Act in in Public Law 117-328, sections 101 – 111. These provisions were requested by the State Board.

NCSBE_0000614

Case 1:23-cv-00878-TDS-JEP    Document 124-32    Filed 05/09/25    Page 12 of 12