# Exhibit JJ

**From:** "Cox, Paul" <paul.cox@ncsbe.gov>
**To:** "Gerry Cohen" <ger.cohen@gmail.com>
**Subject:** FW: SB 747 - additional fixes suggested
**Date:** Fri, 14 Jul 2023 15:30:29 +0000
**Importance:** Normal
**Attachments:** SB_747_suggestions_to_House_elections.docx

---

**From:** Cox, Paul
**Sent:** Monday, July 3, 2023 3:30 PM
**To:** Rep. Grey Mills <Grey.Mills@ncleg.gov>; Mason Barefoot (Rep. Grey Mills) <Mason.Barefoot@ncleg.gov>; Sam Hayes (Speaker Moore's Office) <Sam.Hayes@ncleg.gov>
**Cc:** Erika Churchill (Legislative Analysis) <Erika.Churchill@ncleg.gov>; Jessica Sammons (Legislative Analysis) <Jessica.Sammons@ncleg.gov>; Susan Barham (Legislative Analysis) <Susan.Barham@ncleg.gov>; Hillary Woodard (Legislative Analysis) <Hillary.Woodard@ncleg.gov>; Wakely, Lindsey <Lindsey.Wakely@ncsbe.gov>
**Subject:** SB 747 - additional fixes suggested

Rep. Mills, Sam, and Mason,

I hope you're enjoying (or are about to enjoy) the Fourth holiday.

Lindsey and I wanted to share a couple of additional items that we would suggest revising in the Senate-passed version of SB 747, after conferring further with our subject-matter experts on staff and county staff. These additional items are listed and highlighted at the end of the attached document, which otherwise is the same document we shared when we met last week.

Please let us know if you have any questions on this or any other item pertaining to elections.

Best regards,

**Paul Cox**
General Counsel
NORTH CAROLINA STATE BOARD OF ELECTIONS
RALEIGH, NC 27611
919.814.0700
www.ncsbe.gov



EXHIBIT 19
WIT: P. Cox
DATE: 2/24/25
DENISE MYERS BYRD

NCSBE_001453

## SB 747

1. **Same-day registration / provisional voting (Sec. 6):** We're concerned with the administrability of the multiple-ID provisions and the likelihood that it will make a lot of the traditional same-day registration population less likely to be able to successfully register and vote. We've drafted language which would directly address what we understand to be the problem: same-day registrants who fail mail verification. Under this proposal, the registrant would get one verification mailing and, if that is returned by the day before canvass, the county board would be instructed to retrieve and discount the ballot. The advantages of this approach are: (1) it would be familiar for county boards and poll workers to administer; (2) it would shorten the verification period so that the county board could determine address verification for all registrants by the canvass without creating new processes for visiting county board offices to sort out IDs/documents; and (3) it would streamline the process to discount a ballot for a registrant who fails mail verification, to avoid the "challenge" issue with the court decision from 2018. And importantly, it would directly address the population that fails mail verification, which is a fairly small population of same-day registrants (1-2%, per attached stats), and would not lead to outsized collateral consequences on the population of same-day registrants who would pass mail verification under current law.

   <u>Effective date</u>: If the bill's new procedures and ID requirements for SDR are not significantly simplified, like as suggested, we would need to push out implementation to 2024.

2. **Extension of hours (Sec. 11)** – Any precinct's extension would extend voting statewide. That's a significant burden to spread to all 2700 voting sites. We recommend limiting this to extensions of voting for an entire county only.

3. **One-stop worker allocation (Sec. 17):** There's a significant concern with how the provision is drafted that it would make it very difficult to staff all days of early voting, if the pool of workers is limited to appointed Election Day precinct officials and there's a requirement that 3 such precinct officials attend each one-stop site at all times. Lots of Election Day workers have full-time jobs, making it sometimes difficult to draw on them for enough one-stop shifts to make it work. This issue could be resolved with some clarifying language that provides some flexibility to ensure sites can be properly staffed.

   <u>Suggested alternative:</u> "<u>At each one-stop site, there shall be officials to conduct voting which shall be designated as follows:</u>

   (1) <u>One chief judge and two judges of election, who shall be allocated **by party affiliation** to each voting place in the same manner as allocated to each precinct in the county as provided in G.S. 163-41.</u>

   (2) <u>Assistants shall be allocated **by party affiliation** to each voting place, **where possible,** in the same manner as allocated to each precinct in the county as provided in G.S. 163-42.</u>

   (3) <u>The provisions of G.S. 163-41.1 apply.</u>"

1

NCSBE_001454

4. **Signature verification (Sec. 21):** Given the significant ground work that has to be done to prepare this, we recommend piloting this program in the 2024 general election and then going live in 2025. Also, this is a significant cost for the State and/or county boards. Our current estimate is at least $16,500,000 million in the first year of implementation, followed by $3,500,000 to $4,000,000 each following year to maintain the software license and equipment. We hope that there can be some method to ensure that such funds would be available to roll this out in the coming months. With procurement, IT development, training, and rollout, the need to expend funds for this purpose will arrive very soon for it to be ready for voting in 2024.

5. **Two-factor authentication (Sec. 22):** We're concerned about how this could be implemented as written, which requires the authentication of the "executed absentee ballot" thorough two factors. Presumably this would entail authenticating a ballot once it has left the hand of the voter (i.e., "executed"), which raises the questions of who would be participating in the authentication of the ballot and by what means. We remain concerned that many voters in the absentee-by-mail voting population may not have the wherewithal to use a technology-based authentication procedure—especially the elderly and disabled. We recommend the sponsors consider whether this additional requirement would be necessary, given the PII that a voter must provide upfront to authenticate their identity before receiving a ballot, the two-witness authentication procedure for the ballot itself, the signature verification that will be added to the ballot itself, and the photo ID requirement that will now be part of the process of approving the ballot.

6. **Removing uniformity from list maintenance (Sec. 30.(e)):** We're concerned that the bill strikes the requirement that voter list maintenance practices be uniform across the state. This could run into problems with federal law, namely the NVRA, which requires the designated state official, the Executive Director of the State Board, to be responsible for statewide compliance with federal law, which includes a requirement to implement a "general program" to remove ineligible voters. You could also run into *Bush v. Gore* equal protection issues if voters are being removed (or not removed) differently in one county versus another. We recommend keeping the requirement that the State Board adopt a "uniform program" for list maintenance, and for the county boards to perform list maintenance "in accordance with this section and with the program adopted by the State Board."

7. **Allowing documented proof of citizenship to stop removal process short of a public hearing (Sec. 30.(e)):** If a voter has documentation proving they are eligible to remain on the voter rolls on account of their US citizenship, we don't recommend requiring such a voter to proceed to a public hearing. So we recommend revising the new GS 163-82.14(c1)(2)b to add the following at the end: "<u>If the person provides the county board of elections federal documentation of citizenship at any time prior to the start of a challenge hearing, no challenge hearing shall proceed and the process to remove the person's name from the registration records shall be cancelled.</u>"

2

NCSBE_001455

8. **Flexibility on Photo ID Messaging (Sec. 31):** The State and county boards are engaged in a multifaceted communications plan to ensure the word is getting out on photo ID before municipal voting and before the next general election cycle. This includes traditional methods of communication like a text-heavy webpage or mailing, but also more up-to-date methods of communication like social media and (hopefully, with funding) web advertisements, radio and TV PSAs, and billboards. We are also working on palm-cards and other short-format messaging efforts. Prescribing a lengthy message for "any notice" given to a voter by mail or on the web could make an outreach campaign less effective. We recommend striking this provision, since the State Board's existing messaging and any future messaging will certainly communicate the law's requirements, and an effective outreach campaign recognizes that a different message format may be called for in different media.

9. **SBI investigations clarity (Sec. 28)** – In Section 28.(b), the State Board is directed to report violations of the elections laws to the SBI for further investigation and prosecution. However, the SBI is not a prosecuting authority. If the intent is to require reporting of violations to the SBI for investigation, striking the reference to prosecution would provide clarity that this change is not intended to affect criminal referrals to prosecuting authorities. 28.(c) creates concurrent jurisdiction of the State Board and SBI to investigate all elections and campaign finances offenses and requires SBI to be involved in all criminal investigations under Chapter 163 (including misdemeanors). If the General Assembly is looking to further involvement of the SBI, we recommend focusing Section 28.(c) so the SBI is only required to be involved in felony violations of Chapter 163. This is consistent with the new language added by Section 28.(a) requiring the SBI to investigate felony violations under G.S. 163-275. We also suggest directing the agencies to enter an MOU to facilitate collaboration on investigations. Suggested language in 28.(c): "<u>(b2) The State Bureau of Investigation shall be involved in any investigation involving the commission or attempted commission of a felony under Chapter 163 of the General Statutes. The State Board of Elections and State Bureau of Investigations are directed to enter into a memorandum of understanding regarding the assistance to be provided by the State Bureau of Investigations consistent with this section.</u>"

10. **Unfunded Mailings (Sec. 31.(a))** – Requires the State Board to send three statewide mailings to inform voters of the new absentee deadline receipt deadline. Each such mailing costs over $750,000. If this is required, the State Board will need funding to carry it out. Perhaps if the full Voter ID funding request is granted in the budget, this notification could be folded into mailings for photo ID.

NCSBE_001456