# Exhibit YY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 1:23-cv-00878-TDS-JEP

DEMOCRACY NORTH CAROLINA;
NORTH CAROLINA BLACK ALLIANCE;
LEAGUE OF WOMEN VOTERS OF
NORTH CAROLINA,

*Plaintiffs,*

vs.

ALAN HIRSCH, in his official capacity as
CHAIR OF THE STATE BOARD OF
ELECTIONS; JEFF CARMON III, in his
official capacity as SECRETARY OF THE
STATE BOARD OF ELECTIONS; STACY
EGGERS IV, in his official capacity as
MEMBER OF THE STATE BOARD OF
ELECTIONS; KEVIN LEWIS, in his official
capacity as MEMBER OF THE STATE
BOARD OF ELECTIONS; SIOBHAN
O'DUFFY MILLEN, in her official capacity
as MEMBER OF THE STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL, in
her official capacity as EXECUTIVE
DIRECTOR OF THE STATE BOARD OF
ELECTIONS; NORTH CAROLINA STATE
BOARD OF ELECTIONS,

*Defendants.*

**SUPPLEMENTAL EXPERT REPORT OF DR. KEVIN M. QUINN**

March 20, 2025

## I. SUPPLEMENT INTRODUCTION

1. I have a Ph.D. and an A.M. in political science from Washington University in St. Louis as well as a B.A. in political science from the Johns Hopkins University. My qualifications are laid out in detail in my Expert Report of March 5, 2025, and remain unchanged.

2. I have been retained by the plaintiffs to examine how early voting and same-day registration have been utilized by North Carolinians in past elections, with special attention to how usage varies with age. The scope and subject of my inquiry also remains unchanged from my Expert Report of March 5, 2025.

3. I am submitting this supplemental report to update Section VII (Empirics of Mail Verification in North Carolina) of my initial Expert Report, in light of an updated understanding of the data files produced by the State Board in this litigation.

## II. DATA AND METHODOLOGY

4. I am supplementing my original report because several new facts about the data structure came to light.

5. First, I became aware that a number of registrants have a " DENIED" verify step immediately following a " VERIFIED" verify step if the mailer was returned to the elections office after a sufficiently long delay, contrary to expectations. This was noticed in the data itself while preparing further analyses for the rebuttal.

6. I am aware from counsel that representatives for the State Board testified that a " VERIFIED" step meant that a registrant had been successfully mail verified. I relied on that representation to conduct my initial analysis.

7. Because I discovered in the data that a " VERIFIED" step did not always mean a registrant was necessarily finally verified, only the mailer had not been returned within a specific timeframe, I need to adjust analyses in the report that relied on this verify step's presence in order to more accurately capture the number of registrants who were verified on the second mailer, as some should be excluded. Similarly, because of these new denials, these should be reflected in the various analyses that tabulated voters who were denied on the second mailer and overall. I have provided an updated Section VII that reflects this understanding, as well as updated conclusions about these data.

8. In modifying the above analyses, I noted that the two versions of the Highly Confidential "status_list" and "voter_list" files provided by NCSBE also meaningfully differ in terms of their composition and using each separately gives an incomplete picture. Specifically, the "1stVFY" version of files (which I understand was produced in response to a request for a list of voter registration applicants whose first mail verification notice was returned as undeliverable) was expected to only contain registrants who failed the first mail verification, and therefore should be the place to examine status changes regarding second mailers and contain all those in the "Denied" version of files (which I understand was produced in response to a request for a list of voter registration applicants who were rejected or otherwise not added to the officials list of eligible voters due to lack of verification of address).

9. However, there are a number of statuses and registrants unique to only one file or the other, potentially because certain statuses that the files were generated based on were never recorded for some registrants. When I initially examined the files and the SQL queries that generated these datasets, I believed keeping them separate was the best course of action, but when this significant lack of overlap came to light, I realized I needed to restructure the data. As a result, I took the step

3

of combining the two "status_list" files and combining the two "voter_list" files and removing any cases that were duplicates on all variables. This gives me a more complete picture of the status history for all affected registrants based on the data available from NCSBE.

10. Finally, when the high-density address data were tabulated initially, percentages reported in paragraph 122 of the initial report reflected the percentages of different addresses present in those data rather than the percentages of registrants at those addresses. I have updated the percentages to represent the percentages of registrants here.

### III. UPDATED SUMMARY OF FINDINGS

11. My summary of findings remain largely the same as my initial report, with the following modifications:

12. Paragraph 22 of my initial report is amended to the following: The second mailer in the pre-SB-747 verification system played an important role in verifying many voter registrations. Over the past 15 plus years, county boards sent nearly 160,000 second mailers after an initial failed mail verification and nearly 45,000 North Carolina voters relied on that second mail verification step to successfully register to vote.

13. Paragraph 24 of my initial report is amended to the following: Individuals under the age of 26 are the largest group of voters who had a second mailer sent or who rely on post-change-of-address forwarding (another method by which verification has occurred historically). 44.0% of the individuals who were verified on a second mailer were youth voters; and, since 2010, the second mailer was responsible for nearly 20,000 verifications of youth voter registrations. If the second mailer were not available, it is almost certain that these individuals would have failed verification and thus had their registration denied.

14. Paragraph 26 of my initial report is amended to the following: Moreover, among individuals who live at high-density addresses (i.e., those with more than 25 attempted voter registrations), those who were either verified or denied on the second mailer (and who thus failed the first mailer) are approximately 4 times more likely to reside at a college address than new registrants at such high-density addresses overall (48.00% to 12.58%).

15. The summary of findings from my initial report is otherwise unchanged.

## IV. EMPIRICS OF MAIL VERIFICATION IN NORTH CAROLINA

16. This updated section is intended to replace the Section VII of the same title in my initial report. The findings are contained in the exact same format, with updated numbers and conclusions where warranted.

17. As noted above, mail verification plays an important role in the North Carolina voter registration process. Further, SB 747 changed how mail verification works for same-day registrants. Prior to SB 747, same-day registrants were verified using essentially the same two-mailer process used for non-same-day registrants. SB 747 changed the verification process so that same-day registrants are verified using only one mailer. Under this system, a same-day registrant does not have a second chance at mail verification if the first mailer to the voter's address is returned as undeliverable.

18. To gauge the effect that this change in the mail verification process may have, I look at data from the mail verification process going back to 2010. From highly confidential data provided to the plaintiffs, I can reconstruct the full voter verification history for all voters registered since January 1, 2010, who were not verified on the first mail verification step or who were denied registration due to address verification. In addition to the verification history, I have information about these voters' ages and demographics from a combination of highly confidential and publicly-

available State Board of Elections sources. Because I do not know exactly which voters used same-day registration prior to November 2016 (for the reason noted above *supra* n.11 & 12), the tables below are for all registrants since 2010. Note also that in response to a preliminary injunction, the State Board of Elections issued Numbered Memo 2023-05 which provides for a notice-and-cure process with a one-mailer verification system for same-day registrants. North Carolina elections began using this system beginning with the March 2024 primary election. I analyze the one-mailer system with the notice-and-cure process for same-day registrants separately in Section VIII.

### A. Two-Mailer Verifications from 2010 to 2025

19. The changes made to the same-day registration system by SB 747 sharply narrow the possible pathways for a new registrant's address to be successfully verified. Because SB 747 eliminates the second mailer for same-day registrants, same-day registrants would not have the opportunity to be verified on a second verification mailer, unlike regular registrants (and pre-SB 747 same-day registrants). Under SB 747, same-day registrants are also not afforded the opportunity to receive an additional mailing (used in certain circumstances where the initial verification mailer is returned undeliverable but the Postal Service has a valid forwarding address for that registrant at that address). Both of these methods were historically used to verify registrants' addresses prior to the law change, but are now unavailable to same-day registrants.

20. Table 7 presents data[1] on voter registrations that were verified after either a second mailer or after a change-of-address-related forward from January 2010 to January 2025 as well as the total number of second mailers and forwarding mailers sent. These two categories of verifications

---

[1] Data from Gaston County was not substantially present in the data I received electronically from the defendants in February 2025 ("2025-02-01 litigation_ticket_124972_Parts1-2.zip"). Three voters from Gaston County from October/November 2024 were present in one of these files, but no others were present. I reserve the right to supplement my analysis if data from Gaston County becomes available.

are defined by sequences of status codes in the voter status files provided by the State Board of Elections. The first category consists of individuals verified on the second mailer.[2] The second category contains those individuals who were verified after the mailer was returned due to an address change and a mailer was sent to a forwarding address provided by the postal service.[3]

| Calendar Year | Verified on Second Mailer | Verified after Forward | Total Second Mailers | Total Forwarding Mailers |
|---|---|---|---|---|
| 2010 | 1559 | 121 | 5378 | 2101 |
| 2011 | 2373 | 244 | 6314 | 2670 |
| 2012 | 5761 | 1037 | 19702 | 6845 |
| 2013 | 1986 | 375 | 6775 | 3459 |
| 2014 | 2399 | 305 | 10767 | 3488 |
| 2015 | 1201 | 179 | 4572 | 1993 |
| 2016 | 4175 | 515 | 15058 | 4532 |
| 2017 | 2156 | 232 | 7104 | 2695 |
| 2018 | 3181 | 320 | 11126 | 4078 |
| 2019 | 2813 | 383 | 9803 | 4994 |
| 2020 | 3471 | 691 | 12036 | 5926 |
| 2021 | 2321 | 429 | 7109 | 5084 |
| 2022 | 2592 | 310 | 9715 | 3423 |
| 2023 | 2566 | 223 | 8627 | 3147 |
| 2024 | 5069 | 296 | 22437 | 3512 |
| 2025 | 641 | 15 | 1640 | 443 |
| Total | 44264 | 5675 | 158163 | 58390 |

*Table 7. Verifications on Second Mailer and After Forwarded Mailer by Year, 2010-2025.* Tabulated from "2025-02-01 litigation_ticket_124972_1stVFY_status_list.txt", "2025-02-01 litigation_ticket_124972_1stVFY_voter_list.txt", "2025-02-01 litigation_ticket_124972_Denied_status_list.txt", and "2025-02-01 litigation_ticket_124972_Denied_voter_list.txt".

---

[2] Voters who are verified on second mailer are voters who had two sequential "verify steps" in the status file and did not have a third verify step indicating a denial. These verify steps were " 2ND VERIFICATION PENDING" AND " VERIFIED". A second mailer would only go out if the first failed. Voters were removed from this category if a verify step of " DENIED" immediately followed the " VERIFIED" verify step.

[3] Voters who are verified after forwarding have the verify step " FWD ADDRESS CHANGE (CONFIRMATION PENDING)" and then have a verify step of " VERIFIED" within 60 days and did not have a subsequent " DENIED" verify step within the 60 day window. A time bound is used here because intervening mailers and steps may occur.

21. Looking at Table 7[4] we see that, overall, the largest category of verifications is the "Verified on Second Mailer" category, which has 44,264 voter records. This shows that over the past 15 plus years, county boards sent nearly 160,000 second mailers after an initial failed mail verification and nearly 45,000 North Carolina voters relied on that second mail verification step to successfully register to vote.

22. Table 8 below presents data on four categories relating to mail verification denials: individuals who were denied after two mailers were sent out;[5] individuals whose registration was denied after the mailer was forwarded due to an address change;[6] individuals whose registration was denied but later verified at the same address that they were denied at;[7] and individuals whose registration was denied but who later attempted to vote provisionally at the same address at which

---

[4] This table is constructed from the files "2025-02-01 litigation_ticket_124972_1stVFY_status_list.txt", "2025-02-01 litigation_ticket_124972_1stVFY_voter_list.txt", "2025-02-01 litigation_ticket_124972_Denied_status_list.txt", and "2025-02-01 litigation_ticket_124972_Denied_voter_list.txt". The two status files were combined with duplicate observations removed and the two voter files were combined with duplicate observations removed. Verified on second mailer voters were voters who had a "verify step" field of " 2ND VERIFICATION PENDING" followed immediately by a field of " VERIFIED" and did not have a third " DENIED" verify step immediately following. Verified after forward voters were voters who had a "verify step" field of " FWD ADDRESS CHANGE (CONFIRMATION PENDING)" and then a field of " VERIFIED" fewer than 60 days afterwards without a subsequent " DENIED" verify step in the time window. Total second mailers is the number of times a verify step of " 2ND VERIFICATION PENDING" appeared in the status list, and the Total forwarding mailers is the number of times a verify step of " FWD ADDRESS CHANGE (CONFIRMATION PENDING)" appeared in the status list.

[5] Voters who are denied after two mailers have a verify step of " 2ND VERIFICATION PENDING" and then have a verify step of " DENIED" one or two steps after.

[6] Voters who are denied after forwarding have a verify step of " FWD ADDRESS CHANGE (CONFIRMATION PENDING)" and then have a verify step of " DENIED" within 60 days. A time bound is used here because intervening mailers and steps may occur.

[7] Voters who are denied and then eventually get verified at that same address consist of anyone who has a verify step of " DENIED" and then at any point in the future has a verify step of " VERIFIED" with no intervening address change in registration or mailing address between the two based on date.

they were denied.[8] Individuals who were denied and later verified at the same address are individuals who seemingly had their same-day registration incorrectly rejected under the pre-SB-747 two mailer verification process. Similarly, individuals who were denied and attempted to vote provisionally at the same address at which they were denied also appear to have been incorrectly rejected under the pre-SB-747 two mailer verification process.

| Calendar Year | Denied after Two Mailers | Denied after Forward | Denied & Later Verified at Same Address | Denied & Attempted to Vote Provisionally |
|---|---|---|---|---|
| 2010 | 2764 | 1085 | 73 | 204 |
| 2011 | 3627 | 2040 | 68 | 183 |
| 2012 | 11607 | 4598 | 802 | 637 |
| 2013 | 4884 | 3039 | 77 | 199 |
| 2014 | 6419 | 2878 | 103 | 246 |
| 2015 | 4340 | 1841 | 41 | 124 |
| 2016 | 9002 | 2734 | 565 | 389 |
| 2017 | 5082 | 2575 | 55 | 102 |
| 2018 | 6684 | 3274 | 188 | 173 |
| 2019 | 6703 | 4387 | 58 | 143 |
| 2020 | 7153 | 4563 | 359 | 165 |
| 2021 | 5012 | 4462 | 45 | 110 |
| 2022 | 6169 | 3083 | 125 | 96 |
| 2023 | 5993 | 2918 | 22 | 60 |
| 2024 | 15083 | 2755 | 280 | 134 |
| 2025 | 2175 | 280 | 0 | 0 |
| **Total** | 102697 | 46512 | 2861 | 2965 |

*Table 8. Denied Registrations After Two Mailers or Forwarded Mailer by Year, 2010-2025.* This table was constructed from the same data as Table 7 as well as address history files and public provisional data.[9]

---

[8] These are individuals who were denied and have a record of attempting to vote provisionally in a subsequent election with the same address, regardless of whether their vote was counted.

[9] This table is constructed from the same data as Table 7. Denied after two mailer voters have a verify step of " 2ND VERIFICATION PENDING" followed by a field of " DENIED" either one or two steps following. Denied after forward voters have a verify step of " FWD ADDRESS CHANGE (CONFIRMATION PENDING)" and a field of " DENIED" fewer than 60 days afterwards. Denied and later verified at same address voters are voters who have a verify step of

9

23. Here we see that the "Denied after Two Mailers" category has 102,697 voter records, which is 64.9% of the total number of second mailers sent (see Table 7). And that the "Denied after Forward" category has 46,512 voter records, which shows a much higher rate of failure given that 58,390 total forwarding mailers were sent (see Table 7). This high failure rate is present even though forwarding mailers are sent to addresses provided directly to the U.S. Postal Service by the voter.

24. As to the other two categories, there are 2,861 instances of individuals being denied after two mailers only to later have their registration verified at the address at which they were previously denied and 2,965 individuals who attempted to vote provisionally at the address at which their registration was denied. These categories both indicate that even the pre-SB-747 two-mailer verification process results in some voters having their registration denied (seemingly) incorrectly. As to the latter category, there is no record that any of these ballots were counted. Accordingly, the opportunity to vote a provisional ballot has not functioned as a safeguard for anyone whose registration was erroneously denied.

25. Table 9 below breaks the data in Table 7 down by age group.

---

"DENIED" and then at any point in the future have a verify step of "VERIFIED" with no intervening address change in registration or mailing address between the two statuses. Voters who are denied and attempted to vote provisionally are voters who have a verify step of "DENIED" and then have a record of attempting to vote provisionally in an election after the denial date.

10

| Age | Verified on Second Mailer | Verified after Forward | Total Second Mailers | Total Forwarding Mailers |
|---|---:|---:|---:|---:|
| **Under 26** | 19498 | 2322 | 76429 | 29422 |
| **26-35** | 9501 | 921 | 32014 | 11017 |
| **36-45** | 5345 | 678 | 18428 | 6842 |
| **46-55** | 4326 | 671 | 14778 | 5305 |
| **56-65** | 3356 | 581 | 10214 | 3483 |
| **66 or older** | 2238 | 502 | 6300 | 2321 |
| **TOTAL** | 44264 | 5675 | 158163 | 58390 |

*Table 9. Verifications on Second Mailer and After Forwarded Mailer by Age, 2010-2025.* This table was constructed from the same data as Table 7. Age is constructed from the year of the occurrence of the column event (verified status change or when the second or forwarding mailer was sent) minus the year of birth. As a result, this is an approximate age.

26. Individuals under the age of 26 are the largest group of voters who have a second mailer sent or who rely on post-change-of-address forwarding. 44.0% of the individuals in the "Verified on Second Mailer" category are youth voters. Again, these are individuals who relied on the second mailer to verify their registration. If the second mailer were not available, it is almost certain that these individuals would have failed verification and thus had their registration denied.

27. Similarly, the largest age group in the "Verified after Forward" category are individuals under the age of 26. These youth voters make up over 40.9% of this category.

28. Table 10 below breaks the data in Table 8 down by age group.

11

| Age | Denied after Two Mailers | Denied after Forward | Denied & Later Verified at Same Address | Denied & Attempted to Vote Provisionally |
|---|---|---|---|---|
| Under 26 | 51490 | 24881 | 1200 | 1337 |
| 26-35 | 20536 | 8599 | 519 | 509 |
| 36-45 | 11825 | 5228 | 300 | 351 |
| 46-55 | 9334 | 3870 | 305 | 337 |
| 56-65 | 6006 | 2427 | 315 | 263 |
| 66 or older | 3506 | 1507 | 222 | 168 |
| TOTAL | 102697 | 46512 | 2861 | 2965 |

*Table 10. Denied Registrations After Two Mailers or Forwarded Mailer by Age, 2010-2025.* This Table was constructed from the same data as Table 8. Age is constructed from the year of the occurrence of the column event (denied status change for the first three columns or, for the last column, when the provisional vote was attempted) minus the year of birth. As a result, this is an approximate age.

29. Over half of the individuals whose registration was denied, either after two mailers or after a change-of-address-related forward, are youth voters. Youth voters are also approximately 41.9% of those who were initially denied but later verified at the same address.

30. Taken together, these facts indicate that the mail verification process is a relatively difficult process for youth voters to successfully navigate, and that SB 747 is likely to exacerbate those difficulties. Those under 26 years of age are disproportionately more likely to fail the mail verification process than those in older age groups. The number of individuals under 26 with failed mail verifications would be even larger without the use of a second mailer given the rates at which individuals under 26 use that second mailer to verify. Historically, individuals under the age of 26 are the largest group of individuals receiving a second mailer. Since 2010, this second mailer was responsible for nearly 20,000 verifications of youth voter registrations.

### B. Presence of Secondary Mailing Address and Verification Status

31. Related to the question of whether status as a youth voter is associated with being verified on the second mailer or after a forwarded mailer is whether other voter characteristics are

associated with these modes of verification. Given the importance of being able to reliably receive mail for the mail verification process, I investigate information on the addresses provided by potential registrants.

32. The North Carolina voter registration form requires registrants who "do not receive mail at [their] residential address" to provide a separate mailing address on their registration form.[10] To investigate the possibility that the presence of a mailing address distinct from a residential address is somehow related to the verification status after a second mailer is sent out, I reconstruct tables analogous to Tables 9 and 10 but composed of only those records that include a separate mailing address. This results in Tables 11 and 12.

| Age | Verified on Second Mailer | Verified after Forward | Total Second Mailers | Total Forwarding Mailers |
|---|---|---|---|---|
| Under 26 | 2549 | 289 | 9517 | 2176 |
| 26-35 | 733 | 113 | 2510 | 1617 |
| 36-45 | 432 | 89 | 1563 | 1084 |
| 46-55 | 382 | 110 | 1382 | 865 |
| 56-65 | 391 | 108 | 1228 | 678 |
| 66 or older | 311 | 88 | 931 | 491 |
| TOTAL | 4798 | 797 | 17131 | 6911 |

*Table 11. Verifications on Second Mailer and After Forwarded Mailer by Age Among Individuals with a Non-Blank Mailing Address Field, 2010-2025.* This table was constructed from the same data as Table 7 and restricting attention to those records with a non-blank mailing address field.

---

[10] North Carolina Voter Registration Application, *supra* n.6 [Mar. 5, 2025 Report].

| Age | Denied after Two Mailers | Denied after Forward | Denied & Later Verified at Same Address | Denied & Attempted to Vote Provisionally |
|---|---|---|---|---|
| **Under 26** | 6224 | 1649 | 178 | 242 |
| **26-35** | 1519 | 1395 | 30 | 87 |
| **36-45** | 914 | 891 | 18 | 63 |
| **46-55** | 801 | 668 | 28 | 66 |
| **56-65** | 627 | 490 | 28 | 62 |
| **66 or older** | 475 | 346 | 39 | 42 |
| **TOTAL** | 10560 | 5439 | 321 | 562 |

*Table 12. Denied Registrations After Two Mailers or Forwarded Mailer by Age Among Individuals with a Non-Blank Mailing Address Field, 2010-2025.* This table was constructed from the same data as Table 8 and restricting attention to those records with a non-blank mailing address.

33. The first fact that is immediately apparent from an inspection of Tables 11 and 12 is that most of the registration records in Tables 9 and 10 that involve either a second mailer or a change-of-address-related forward do not have a mailing address in addition to a residential address. This can be seen in the fact that the column totals in Tables 11 and 12 are between 10% and 19% of the corresponding column totals in Tables 9 and 10. In other words, the vast majority of denials—whether by two mailers or a forwarding mailer—involved registrants who only listed a single address: their residential address.

34. Second, if we look back to Table 9, we see that 21,820 youth voters were verified after either a second mailer or a forwarded mailer—this is out of the 105,851 second mailers and forwarded mailers sent. This corresponds to an overall youth verification rate from second mailers and forwarded mailers of 20.6% (21,820 / 105,851). The equivalent numbers for those youth voters who included a mailing address on their registration are 2,838 youth voters verified after either a second mailer or a forwarded mailer out of 11,693 total second mailers and forwarded mailers, which is a verification rate of 24.3%, which is only a modest increase in the verification rate.

14

35. Computing these numbers for all voters, we see that 49,939 voters were verified after either a second mailer or a forwarded mailer out of the 216,553 second mailers and forwarded mailers sent (23.1%). The equivalent numbers for all voters who included a mailing address on their registration are 5,595 voters verified after either a second mailer or a forwarded mailer out of 24,042 total second mailers and forwarded mailers, which is a verification rate of 23.3%. Similar to youth voters, the presence or absence of a mailing address in addition to a residential address does not result in a substantively meaningful difference in the two-mailer or forwarded-mail verification rate for voters overall.

36. To summarize, among those same-day registrants (across all age groups including among youth registrants) who receive a second mailer or a change-of-address-related forward, most of the verification denials are of voters who listed a single address (their residential address) without providing an additional mailing address. For those same-day registrants who have put both a mailing address and a residential address on their registration form and receive a second mailer or a change-of-address-related forward, there is no substantively meaningful difference in verification rates.

## C. High-Density Addresses and Verification Status

37. I next investigate whether registrants who (a) are sent a second mailer (and thus have failed the first mailer verification step) and (b) live at a location where many other individuals have attempted to register during the 2010-2025 time period are more likely to be youth registrants. I undertake this analysis to determine whether certain types of living situations are positively associated with youth registrants and with receiving a second mailer (and thus a failure of the first mail verification step). Such an association would highlight how individuals in some types of

15

living situations are particularly likely to rely on the presence of a second mailer to verify their registration.

38. I begin by looking at all new registration records that are linked to a "general address."[11] I restrict attention to just those registration records that are linked to general addresses that have more than 25 registration records over the 16 years covered in the 2010-2025 data. I call these addresses "high-density addresses." Within these records I then tabulate the number of registrants that were either verified on the second mailer or denied on the second mailer. This information is presented in Table 13.

| Age | Verified on Second | Denied on Second | Total New Registrants (2010-2025) at an Address with More than 25 Registrants |
|---|---|---|---|
| Under 26 | 927 | 6875 | 511461 |
| 26-35 | 35 | 1344 | 283927 |
| 36-45 | 10 | 989 | 105717 |
| 46-55 | 11 | 944 | 83446 |
| 56-65 | 7 | 536 | 66097 |
| 66+ | 3 | 110 | 82576 |
| Total | 993 | 10798 | 1050648 |

*Table 13. Second Mailer Verification Status Among Individuals Attempting to Register at Addresses with More than 25 Registrants.* Table constructed from the same data as Table 7 and Table 8 as well as public voter snapshot files from 2010 through 2025. The total new registrants comes from all registrants from January 1, 2010 to January 1, 2025.

39. Looking at Table 13 we see that youth registrants make up a larger fraction of the records from these addresses than any other age group. 511,461 records come from those under 26 years of age. The next largest age group is the 26-35 group and that group contributes only 283,927

---

[11] By "general address" I mean an address composed of a city, zip code, street name, and street number but that does not include apartment or unit identifiers. Thus, all apartments in an apartment building would have the same general address. Similarly, all rooms in a college dormitory or residence hall would have the same general address.

records. In other words, youth registrants are nearly twice as numerous as the next largest age group.

40. With the help of a research assistant, I investigated the type of residences that correspond to the high-density addresses in Table 13. There are 14 unique high-density addresses among the 993 individuals in the "Verified on Second" column. 9 of these 14 correspond to a college address (64.29%).[12] There are 122 unique high-density addresses among the 10,798 individuals in the "Denied on Second" column. 46 of these 122 correspond to a college address (37.70%). There are 15,099 unique high-density addresses among the 1,050,648 individuals in the "Total New Registrants" column. I asked my research assistant to sample 50 of these addresses using simple random sampling. In other words, 50 addresses were randomly selected (with equal probability) from the 15,099 unique addresses in the "Total New Registrants" column. 3 of these 50 randomly sampled addresses are college addresses. 3 out of 50 is 6%. We thus estimate that 6% of the 15,099 unique addresses in the "Total New Registrants" column correspond to college addresses. This percentage of college addresses in the sample is statistically significantly different from the smallest percentage in the other two columns (37.70%) at the 0.001 level.[13]

---

[12] To determine whether or not the address corresponded to a college address, the address was searched in Google Maps. If it returned a building or address on the physical campus of a public or private college or university, it was counted as a college address. While there were no ambiguous addresses in the list, addresses were not counted as a college address unless there was affirmative evidence it was a campus-owned property. Off-campus commercial residences, even if they were physically extremely close to a college or university were not included as a college address, so these estimates are conservative.

[13] Using the binom.test() function in the R language for statistical computing to conduct an exact binomial test, the *p*-value for the test of the null hypothesis that this sample was drawn from a population in which 37.70% of addresses are college addresses is 0.0000004557. The alternative hypothesis was that this sample was not drawn from a population in which 37.70% of addresses are college addresses. The test was conducted as binom.test(x=3, n=50, p=0.3770).

17

41. In other words, the vast majority of individuals who are attempting to register at a high-density address do not reside at a college address. These individuals are also not failing the first mailer (i.e., they are not being sent a second mailer). However, those high-density residents in Table 13 who were either verified or denied on the second mailer (and who thus failed the first mailer) are approximately 4 times more likely to reside at a college address than new high-density registrants generally (48.00% to 12.58%). Indeed, 64.29% and 37.70% of the addresses in the two second mailer columns (Verified and Denied, respectively) correspond to college addresses. Within this group of high-density registrants, those who fail the first mail verification step (and who would thus need the availability of the second mailer to verify their registration) are disproportionately individuals who reside at college addresses.

## V. UPDATED CONCLUSION

42. My conclusions remain largely the same as my initial report, with the following modifications:

43. Paragraph 150 is amended to the following: The second mailer in the pre-SB-747 verification system played an important role in verifying many voter registrations. Over the past 15 plus years, county boards sent nearly 160,000 second mailers after an initial failed mail verification and nearly 45,000 North Carolina voters relied on that second mail verification step to successfully register to vote.

44. Paragraph 152 is amended to the following: Individuals under the age of 26 are the largest group of voters who had a second mailer sent or who rely on post-change-of-address forwarding. 44.0% of the individuals who were verified on a second mailer were youth voters, and, since 2010, the second mailer was responsible for nearly 20,000 verifications of youth voter registrations. If

18

the second mailer were not available, it is almost certain that these individuals would have failed verification and thus had their registration denied.

45. Paragraph 155 is amended to the following: Among individuals who live at an address with more than 25 attempted voter registrations, those who were either verified or denied on the second mailer (and who thus failed the first mailer) are approximately 4 times more likely to reside at a college address than new registrants at such high-density addresses overall (48.00% to 12.58%).

\* \* \*

46. The conclusions in this Report are based upon the facts and information available to me as of the time of its drafting. I reserve the right to amend and supplement the opinions expressed in this Report in light of additional facts or information brought to my attention concerning this matter.

47. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct in substance and in fact to the best of my knowledge and belief.

Executed on: March 20, 2025

_____
Kevin M. Quinn, Ph.D.