# Exhibit CCC

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:23-CV-878**

|  |  |
|---|---|
| DEMOCRACY NORTH CAROLINA; et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALAN HIRSCH, in his official capacity as | ) |
| CHAIR OF THE STATE BOARD OF | ) |
| ELECTIONS; et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**<u>EXPERT REPORT OF DR. ANDREW TAYLOR</u>**

I.      Introduction and Qualifications

Legislative Defendants have hired me to write this report in the case *Democracy North Carolina et al v. Hirsch et al*. More specifically, they have asked me to provide my opinion regarding the provisions of Senate Bill 747 (S. 747) dealing with changes to same-day registration rules that the plaintiffs state in their complaint impact young voters disproportionately. Plaintiffs assert this constitutes several violations of the United States Constitution, including the Twenty-Sixth Amendment.

I am a Professor of Political Science at North Carolina State University. I received my Ph.D. from the University of Connecticut in 1995 and have taught at NC State for 30 years since then—the past eighteen as a full professor. I teach an array of courses in American politics. I served as chair of the Department of Political Science from 2006 to 2010 and President of the North Carolina Political Science Association in 2012-13. I have written five books and published extensively in academic political science journals.

I have expertise in matters related to this case. I use a diverse array of methodologies in my work, including different statistical techniques. I have been interviewed by scores of media outlets about issues relating to North Carolina elections, politics, and policy and given dozens of talks to political and civic groups on these topics over the past quarter century. Some of my academic research analyzes these matters, including work on congressional and presidential elections, public opinion, and North Carolina public life. I believe the principal reason I have been invited to write this report is that I have knowledge of voting and elections, North Carolina political history and constitutional law, and American national and state politics, policy, and the law. My experience and broad interests in U.S., North Carolina, and state politics permit an

2

integrated and panoramic social scientific understanding of this question before the court. I attach my CV, which lists my complete credentials, to this report as Appendix A.

I have previously served as an expert witness in elections-related cases. I provided a report and testimony for the legislative respondents in the consolidated cases of *Harper et al v. Hall et al* and *North Carolina League of Conservation Voters et al v. Hall et al* (File No 21CVS 015426). I wrote reports and testified via deposition in two other cases related to redistricting and the Voting Rights Act, *Pierce v. NCSBE* and *Williams/NC NAACP v. Hall*. I later testified at the *Pierce* trial. I also provided a report for the legislative respondents regarding a preliminary injunction in another case related to S. 747, *Voto Latino et al v. Hirsch* and was deposed.

The analysis and opinions I provide in this report are consistent with my education in social science methods and knowledge of the relevant academic literature. These skills are well suited to this analysis. I base the conclusions stated herein upon my review of the information available to me at this time and in the period given to write this report. I reserve the right to alter, amend, or supplement these conclusions based upon further study or based upon the availability of additional information. My compensation in preparing this report is at the rate of $425/hour. It is in no way contingent on the conclusions reached. The opinions in this report are my own, and do not represent the view of North Carolina State University or the University of North Carolina system.

II.     Outline of the Report

I will evaluate one component of S. 747 that is of interest to the plaintiffs. This regards changes to same-day registration (SDR) procedures and its alleged disproportionate impact on young voters, which plaintiffs define as those between the ages of 18 and 25. Indeed, the

3

plaintiffs claim the reforms to SDR in S. 747 strategically "target" this group of voters and as such constitute a violation of the United States Constitution. They point to changes in the address verification or "undeliverable mail" requirement that they argue will materially increase the number of SDR voters subject to the cancelation of their registration and rescinding of their ballot by the election board through no fault of their own.

I discussed any effect this change would likely have on voters generally in my report in *Voto Latino*. The report here proceeds as a series of direct responses to the major claims that appear to be important to the plaintiffs' argument about the negative effects of S. 747 on the voting rights of young North Carolinians. These claims appear in quotation marks at the beginning of each section. As stated in Count Three of the complaint, the plaintiffs assert these effects amount to intentional discrimination in violation of the XXVI Amendment to the United States Constitution.

III.     Response to "Young People Constitute a Clearly Identifiable Class of Voter"

The plaintiffs refer to "young voters" as those aged 18 to 25 years old consistently throughout the complaint. This is presumably to imply they constitute a distinctive group of voters. Although 18 years old is the minimum voting age in the United States, placing an upper limit on who is a young voter is arbitrary. Indeed, political scientists, practitioners, and journalists define the term "young voters" in many different ways. It might make more sense to talk about individuals who are eligible to vote in their first election. This would be 18-19 year olds for federal or state elections, or 18-21 year olds for presidential elections. The voting age in the United States at the time of the ratification of the XXVI Amendment in 1971 was essentially

4

21—only three states permitted 18 year-olds to vote, Alaska, Georgia, and Kentucky.[1] If the XXVI Amendment effectively gave young Americans the right to vote, it conceived those aged 18-20 as young voters. Most commercial survey research outfits—including Gallup, *New York Times*/Siena, Pew Research, and YouGov—use 18-29 year olds when asking respondents to put themselves in an age cohort or summarizing results by age.[2] Established, highly regarded surveys that are frequently used by academic researchers also use the 18-29 categorization. These include the Cooperative Election Study (CES) and the National Opinion Research Center's General Social Survey (GSS).[3] The American National Election Studies (ANES) survey merely asks respondents how old they are.[4] Throughout their extensive study of young people's participation in elections and civic engagement more generally, Holbein and Hillygus define "young voters" as those 18-29.[5] The Bureau of the Census often uses 18-29 as well, although it sometimes breaks down data into 18-24 year olds, 18-34 year olds, or 18-44 year olds when summarizing results by age groups.[6]

Political scientists are extremely interested in the role identity plays in contributing to individuals' sense of group or belonging. There is unsurprisingly a great deal of literature on race, ethnic, and gender identity; it is too large to represent adequately in a footnote. Motivated by the emerging "urban-rural divide" in American politics, researchers have also started to

---

[1] John W. Finney, "Senate Approves 18-Year Old Vote in All Elections," *New York Times*, March 11, 1971, 1, 20.
[2] See, electionstudies.org, gallup.com, www.nytimes.com/news-event/times-siena-poll-coverage, pewresearch.org, today.yougov.com for many examples.
[3] See, cces.gov.harvard.edu and gss.norc.org.
[4] See, electionstudies.org.
[5] John B. Holbein and D. Sunshine Hillygus, *Making Young Voters: Converting Civic Attitudes into Civic Action*, New York: Cambridge University Press, 2020.
[6] https://www2.census.gov/library/publications/decennial/2020/census-briefs/c2020br-06.pdf.

5

explore something they call "place identity."[7]  However, it is only very recently academics have discovered the inclination to study "age identity."  Trachtman, Anzia, and Hill are perhaps the first to do so in a systematic and empirical fashion in a 2023 paper.[8]  Interestingly, they show that to the extent people in their late teens, twenties, and early thirties identify with others their age, they do so considerably less than do senior citizens.  Despite extensive media coverage of the attitudes and behavior of groups like Gen Z, Millennials, and Baby Boomers, Munger shows younger individuals do not identify particularly with generational labels either.[9]

In conclusion, the term "young voters" does not describe a delineated and conspicuous group of North Carolinians with a distinct identity and particular vulnerability to strategic discrimination by the state.  It is a term that defies consistent meaning to political scientists and practitioners.

IV.    Response to "North Carolina Has Historically Attempted to Restrain the Youth Vote"

Congress extended the Voting Rights Act in 1970 with a provision to lower the national voting age to 18.  Four states—Arizona, Idaho, Oregon, and Texas—challenged the constitutionality of the federal government's action in court.  In *Oregon v. Mitchell* (400 U.S. 112 (1970)), the U.S. Supreme Court upheld the legislation's voting age provision regarding

---

[7] Nicholas F. Jacobs and B. Kal Munis, "Place-Based Imagery and Voter Evaluations: Experimental Evidence on the Politics of Place," *Political Research Quarterly* 72 (2019): 263-77, Nicholas F. Jacobs and B. Kal Munis, "Place-Based Resentment in Contemporary U.S. Elections: The Individual Sources of America's Urban-Rural Divide," *Political Research Quarterly* 76 (2023): 1102-18, B. Kal Munis, "Us versus Them over There… Literally: Measuring Place Resentment in American Politics," *Political Behavior* 44 (2020): 1057-78.
[8] Samuel Trachtman, Sarah F Anzia, and Charlotte Hill, "Age-Group Identity and Political Participation," *Research and Politics*, Volume 10, Issue 2, April-June 2023, https://doi.org/10.1177/20531680231166838.
[9] Kevin Munger, *Generation Gap: Why the Baby Boomers Still Dominate American Politics and Culture*. New York, NY: Columbia University Press.

federal elections but determined the government in Washington lacked the authority to impose one for state and local elections. Justice Hugo Black provided the crucial vote, asserting that a federal mandate for a minimum voting age in state and local elections violated the Tenth Amendment. For purposes of consistency, therefore, the decision necessitated an amendment to the Constitution if federal law was to provide blanket protection to the voting rights of citizens aged 18-20.

North Carolina did not stand in the way of these efforts to reduce the voting age. As it ratified the Twenty-Sixth Amendment with Ohio on June 30, 1971, the provision collected the support of the required three-fourths of states.[10] The twelve states that either followed North Carolina or did not ratify at all are in the Plains, Southwest, and Southeast. When proposed by Congress, the Amendment went unopposed in the Senate and attracted only 19 votes in opposition in the House.[11] Not one member of the North Carolina delegation voted against—even though there were a number of Southerners among the 'no' voters. Despite some hostility to lowering the voting age among states with similar cultures and political traditions, therefore, North Carolina did not formally object to the federal government's effort to protect the voting rights of people ages 18-20.

Turnout among young people is no lower in North Carolina than it is elsewhere. The Center for Information and Research on Civic Learning and Engagement (CIRCLE) at Tufts University's Tisch College of Civic Life considers itself "the preeminent national research center on youth voting."[12] CIRCLE publishes a Youth Voting and Civic Engagement in America data

---

[10] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States*, New York: Basic Books, 2000.
[11] See: https://voteview.com/rollcall/RH0920016
[12] See: https://circle.tufts.edu/

tool that provides estimated percentages of "young citizens," ages 18-29, who cast a ballot in recent elections. For the 40 states for which it had data, over the past three midterm-elections of 2014, 2018, and 2022, it ranked North Carolina 11th, 25th, and 14th in the proportion of eligible voters 18-29 years old who turned out to vote. CIRCLE estimated that at 55 percent of eligible voters in the cohort, the turnout among 18-29 year olds in North Carolina in the 2020 presidential election was tenth out of forty states for which there were data, second of eleven states in the Southeast (only Virginia at 56 percent did better), and exceeded that of Connecticut, Illinois, Massachusetts, Michigan, New York, Pennsylvania, and Ohio.[13] North Carolina's rate was also higher than the national average, which for 2020 was fifty percent. As if to suggest the presence of SDR has limited capacity to explain the turnout rate among young voters, some states without SDR, like New Jersey and Oregon, experienced higher turnout among the cohort than did North Carolina in 2020.

We can also use proposed federal legislation to help us understand what kinds of state policies some might consider to be efforts to restrain the youth vote. Sen. Elizabeth Warren, a Democrat from Massachusetts, introduced S. 2985, the Youth Voting Rights Act, in the Senate on September 28, 2023.[14] She describes the bill as a response to an attack on voting rights and an effort to help the XXVI Amendment fulfill its promise.[15] The bill has numerous components,

---

[13] For the 2014 data, see: https://circle.tufts.edu/latest-research/state-state-youth-voter-turnout-data-and-impact-election-laws-2022. For data since then, see CIRCLE's data search tool at: https://youthdata.circle.tufts.edu/. As of writing, researchers are still collecting precise data about the 2024 election, but CIRCLE estimates that although overall turnout among younger voters was down from 2020 it was highest in "battleground" states like North Carolina. See: https://circle.tufts.edu/2024-election#overall-youth-turnout-down-from-2020-but-strong-in-battleground-states

[14] See: https://www.congress.gov/bill/118th-congress/senate-bill/2985. As of March 5, 2024, the bill had ten cosponsors.

[15] See: https://www.warren.senate.gov/newsroom/press-releases/senator-warren-rep-williams-to-introduce-bill-to-expand-youth-access-to-voting

but when Sen. Warren first introduced the legislation with her colleague Rep. Nikema Williams (Democrat from Georgia) in the previous 117th Congress in July 2022, an accompanying press release identified five provisions that were especially important and would force states to adopt practices to "expand youth access to voting."[16]

The first is to "expand voter registration services at public colleges and universities" by designating "offices at all public institutions of higher education as 'voter registration agencies' under the National Voter Registration Act of 1993" and "imposing voter registration obligations on these institutions." Public colleges and universities in North Carolina appear leaders in this regard. The non-profit Fair Elections Center's Campus Vote Project designates Appalachian State University, Durham Technical Community College, East Carolina University, Elizabeth City State University, Fayetteville State University, North Carolina A&T, North Carolina Central University, North Carolina State University, UNC-Asheville, UNC-Chapel Hill, UNC-Pembroke, and UNC-Greensboro as 2023-24 "voter friendly" campuses in a recent report.[17] The North Carolina Campus Voting Challenge organized by You Can Vote, North Carolina Campus Engagement, and All-In Campus Democracy Challenge reports that the voter registration rate among students at North Carolina colleges and universities was 89.5 percent in 2020. This exceeded the national average, calculated by the National Study of Learning, Voting, and Engagement (NSLVE) run by the Institute for Democracy and Higher Education at the Jonathan

---

[16] *Id*
[17] See: https://www.campusvoteproject.org/_files/ugd/85cfb4_e9c915b2f12c4b649694894182dcbd54.pdf or https://www.voterfriendlycampus.org/campus-designees-2024. The private institutions Elon University and High Point University were also considered "voter friendly."

M. Tisch College of Civic Life at Tufts University, by 6.5 percentage points.[18] The equivalent

2022 figures were 87 percent for North Carolina campuses and 76 percent nationwide.[19]

The national Campus Vote Project highlights UNC-Pembroke as exemplary in its efforts

to give students opportunities to register to vote.[20] UNC-Chapel Hill's Carolina Votes program,

a component of its Democracy Initiative, has the specific objective of encouraging students (and

faculty) to vote. It has a sprawling website that lists numerous resources for the purpose and

several endorsements, including from prominent figures like the university's former football

coach, Mack Brown.[21] My own institution, North Carolina State University, has a program

called "Pack the Polls" which provides students with resources to help them register to vote.

Student ambassadors are also available to help with the process and students can sign a "Civic

Engagement Pledge" to promise to register and receive a follow-up email or text to ensure they

do. There is also an accompanying course they can take, USC 298 (Introduction to Civic

Engagement and Social Change).[22] The Division of Academic and Student Affairs runs the

program. Roughly 29 percent of NC State's annual budget comes from state appropriations.[23]

These UNC-system programs are the closest North Carolina has to a statewide taxpayer-funded

get-out-the-vote program for any specific age group.[24]

---

[18] For the North Carolina Campus Voting Challenge data, see:
https://www.nccampuschallenge.org. The NSLVE data can be found at:
https://tufts.app.box.com/v/democracy-counts-2020
[19] See: https://www.nccampuschallenge.org/#2024.
[20] See p. 23 of the Campus Vote Project report.
[21] See: https://democracy.unc.edu/
[22] For more, see https://packthepolls.dasa.ncsu.edu/
[23] For more on NC State University's budget, see:
https://budget.ncsu.edu/budgetcentral/documents/Brochure.pdf
[24] Some county boards of elections have Multi-partisan Assistance Teams (MATs) made up of
volunteers who visit older adults in care homes and hospitals who themselves do not have near-
relatives or others to help them with the process of voting.

The second important provision of S. 2985 is "to establish pre-registration processes for 16- and 17-year-olds and allow states to expand their processes to youth younger than 16." According to the National Conference of State Legislatures (NCSL), North Carolina is one of just eighteen states (along with Washington, D.C.) that permits preregistration beginning at 16 years old.[25] The group of eighteen includes California, Maryland, New York, and Sen. Warren's home state of Massachusetts. Thirty-one states permit pre-registration at 17 years old, between 17 and 18 years old, or if the individual will be 18 by the next general election—depending on the definition of "general election" that means some of the states in this category do permit pre-registration as young as 16 years old.

Third, S. 2985 wishes to ensure "the availability of polling places on campuses of institutions of higher education, removing one of the most significant barriers to youth voting access." This is important because research has shown the further an individual's residence from an early voting place, the less likely they are to use this method of voting.[26] On this metric, North Carolina again does better than most states. As the Fair Elections Center reports, an MTV Entertainment Studios-Duke University Master in Interdisciplinary Data Science study found that for the 2020 general election, 90 percent of college campuses had no early in-person voting place.[27] Authenticated archived data regarding North Carolina's 2020 and 2024 early-voting polling places for the general election reveals twelve of the seventeen (or 70 percent of) UNC campuses had early-voting in-person polling places in both elections (Appalachian State,

---

[25] See: https://www.ncsl.org/elections-and-campaigns/preregistration-for-young-voters
[26] Michael Bitzer, Tyler Dukes, and Christopher A. Cooper, "Substitution Effect, Turnout Effect, or Both? Changes in Distance to the Early Voting Site and Voter Turnout." *Election Law Journal: Rules, Politics, and Policy*, 22(2023): 278-85, https://doi.org/10.1089/elj.2022.0065
[27] See: https://fairelectionscenter.org/media/mtv-partners-with-campus-vote-project-on-early-vote-program/

11

Asheville, NC A&T, Central, Charlotte, Elizabeth City State, ECU, Greensboro, NC State, Western, and Winston-Salem State).  Two private institutions, Duke University and Elon University had early in-person voting sites.  There were a couple of sites very close to the UNC-Chapel Hill campus and one adjacent to the Fayetteville State campus.  A number of community colleges (Cape Fear, Central Carolina, Durham Tech, Guilford Tech, and Wake Tech) hosted sites, as did several high schools.[28]

Fourth, the proposed federal legislation intends to "prohibit durational residency requirements for all federal elections" by, among other things, codifying "the right to vote from a college domicile."  States have a legitimate interest in mandating durational residency requirements.  According to the courts, these are largely to prevent district-hopping and increase the opportunities for voters to attain information about the community in which they now live and the candidates who seek to serve it.[29]

In addition to ruling on the voting age, the U.S. Supreme Court's interpretation of the 1970 amendments to the Voting Rights Act in *Oregon v. Mitchell* also effectively prohibited lengthy durational residency requirements, creating a 30-day state residency length to qualify for federal elections as the maximum.[30]  This is the standard used by North Carolina.  The state is

---

[28] For the 2020 sites, see: https://s3.amazonaws.com/dl.ncsbe.gov/One-Stop_Early_Voting/2020/One-Stop%20Site%20List%20-%20November%202020%20General%20Election.pdf.  For the 2024 sites, see: https://s3.amazonaws.com/dl.ncsbe.gov/One-Stop_Early_Voting/2024/Early-Voting-Site-List-2024-General.pdf

[29] Kevin Frazier, "Residence Hopping: Protecting the Principle of One Person, One Vote, One Place." *Appalachian Journal of Law*, 22(2: 2023), 1-14, 9, https://appalachian.scholasticahq.com/article/67907-residence-hopping-protecting-the-principle-of-one-person-one-vote-one-place

[30] Eugene D. Mazo, "Residency and Democracy: Durational Residency Requirements from the Framers to the Present." *Florida State University Law Review*, 43(2: 2017), https://ir.law.fsu.edu/lr/vol43/iss2/8

not unique in this regard, however.  According to Eugene D. Mazo, as of 2015 (the latest date for which I could find a comprehensive dataset), 13 other states had either a 30-day residency requirement or voter registration cut-off at 30 days with no same-day registration procedure.[31] Like all other states, North Carolina permits students to register their college domicile as their address so long as they meet other requirements.

Finally, the sponsors state it is the intent of S. 2985 that states accept student IDs to meet voter-identification requirements in federal elections.  According to NCSL, as of 2024, 21 states, including North Carolina, require a photo ID for voting.[32]  The Campus Vote Project reported in 2023 that six of these do not consider a student ID an acceptable form of identification.[33]  This list does not include North Carolina.[34]  Indeed, the North Carolina State Board of Elections (NCSBE) has stated some student IDs are acceptable forms of identification for voting.[35]

It is clear from the data presented in this section of the report that North Carolina does not disadvantage young voters, however defined, as compared to the majority of other American states.

---

[31] The states are Alaska, Arkansas, Georgia, Indiana, Louisiana, Mississippi, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Tennessee, and Texas.  Since registrants must provide a current address, a 30-day cut-off for registration is effectively a residency requirement if the state does not permit same-day registration during early voting or on the day of the election.

[32] See: https://www.ncsl.org/elections-and-campaigns/voter-id

[33] See: https://www.campusvoteproject.org/student-id-as-voter-id

[34] The six are Idaho, Missouri, Ohio, South Carolina, Tennessee, and Texas.

[35] See: https://www.ncsbe.gov/voting/voter-id/student-and-public-employee-ids-approved-voting

Response to "S. 747 Seriously Undermines Same-Day Registration (SDR), A Method of Voting Disproportionately Used by Young Voters"

SDR permits unregistered residents of a county to vote at the same time they register when they take advantage of North Carolina's in-person early voting procedure. The plaintiffs argue S. 747 reduces the appeal of SDR voting, however, because it alters the mail verification requirement for registration from two notices returned to the county board of elections as undeliverable to one notice returned as undeliverable between the day of registration and the day before canvassing. If the USPS returns the notice as undeliverable, the county board retrieves the individual's ballot and excludes it from the count. It should be noted that NCSBE recommends election administrators record the SDR voter's email and phone number so that they can be contacted quickly to provide any clarifications and the necessary Help America Vote Act (HAVA) document needed to verify their address and therefore record their ballot.[36]

The plaintiffs argue this unfairly and negatively affects young voters because they use SDR disproportionately. Indeed, there is research to show that SDR increases the overall voter turnout rate and, especially, among the young.[37] Data from Michael P. McDonald's United States Election Project are consistent with this. Between 1990 and 2006 (that is the last federal election year before the institution of SDR in North Carolina) the state's voting-eligible

---

[36] See:
https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2023/Numbered%20Memo%202023-05%20Same-Day%20Registration.pdf

[37] Barry C. Burden, David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan, "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58(2014): 95-109. Burden et al show that whereas SDR appears to increase aggregate turnout, early in-person voting results in lower turnout. Jacob M. Grumbach and Charlotte Hill. "Rock the Registration: Same Day Registration Increases Turnout of Young Voters," *Journal of Politics* 84(2022): 405-17. https://doi.org/10.1086/714776

population (VEP) turnout was about four percentage points lower than the national rate.[38]  From 2008 to 2022 (but excluding 2014 when there was no SDR) it was about 2.5 percentage points higher.[39]

These findings need to be placed in perspective, however.  Recent work by Justin Grimmer and Eitan Hersh shows that, using data and methods from the Grumbach and Hill study cited above in footnote 37, SDR increases turnout by 0.67 percentage points in Mississippi (a state chosen because of its purported particularly high barriers to voting), an effect that is not statistically significant.[40]  Moreover, only a very small minority of North Carolina voters use SDR.  The Election Assistance Commission Election Administration and Voting Survey reveals SDR votes in presidential election years (2008, 2012, 2016, and 2020) constitute approximately 3 percent of those cast for the office in the state.[41]  There have also been a number of years in recent decades, including 2014 when SDR was not used, that the North Carolina turnout rate exceeded that of the nation—1990 and 2002 are others in the period I analyzed.  In fact, SDR appears to have a greatly attenuated impact on turnout in midterm years.[42]  As a percentage of

---

[38] See: https://www.electproject.org/home

[39] https://www.electproject.org/home. At the same time, there have been other developments that have helped increase North Carolina's turnout relative to other states.  The state has emerged as a battleground in federal elections and this has attracted considerable amounts of media attention and money from the national parties and other organizations.  The state's population is also better educated.  According to Census data, North Carolina ranked 37th of U.S. states by the proportion of its adults with a college degree in 1990, in 2022 it was 22nd.

[40] Justin Grimmer and Eitan Hersh, "How Election Rules Affect Who Wins," *Journal of Legal Analysis* 16(2024): 1-25, https://doi.org/10.1093/jla/laae001.  Grimmer and Hersh apply the Grumbach and Hill method to Mississippi using a regression model to account for state and election-specific fixed effects.

[41] See: https://www.eac.gov/research-and-data/studies-and-reports.  As of writing, 2024 SDR data were unavailable.

[42] Grumbach and Hill, "Rock the Registration"

North Carolinians who voted for the highest office, those who used SDR were 0.8% in 2010, 1.4% in 2018, and 2.8% in 2022.[43]

Because States' rules concerning SDR are complex and varied. According to NCSL, however, 26 states do not permit voters to register and vote at the same time.[44] These include "model" state democracies such as Massachusetts and Oregon.[45] It is true that of the 23 states and Washington D.C. with SDR only New York and North Carolina do not permit the practice on election day itself, but one or two others appear to have provisions on address verification similar to North Carolina's S. 747—New Hampshire being the closest according to my reading of NCSL's data.[46]

VI. Response to "Since SDR is Disproportionately Used by Young Voters, Its Degradation by S. 747 Effectively Constitutes Their Disenfranchisement"

If indeed it is, why would SDR be particularly attractive to younger voters? The plaintiffs suggest it is a function of their geographic mobility. Students, especially, move around regularly and find the flexibility of SDR—which effectively reduces the 25-day registration requirement for election-day voters—appealing.

---

[43] I calculate these figures using data from McDonald's website. The highest office in a midterm year is either U.S. Senate or U.S. House.
[44] See: https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration. North Dakota does not have voter registration and therefore is excluded from this analysis.
[45] The "democratic backsliding" literature has identified a number of states as having exemplary election practices. This is what I mean by a so-called "model" democracy. These states can generally be found in the northeast, around the Great Lakes, or on the west coast. See, for example, Jacob M. Grumbach, *Laboratories against Democracy: How National Parties Transformed State Politics*, Princeton, NJ: Princeton University Press.
[46] See: https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration. Until court action in 2024, Montana's rules regarding SDR were similar to North Carolina's too (that is, SDR was permitted only during the early-voting period).

According to the Census Bureau's 2023 American Community Survey (ACS) five-year estimates, a greater proportion of 18-24 year-olds moved both across county lines within North Carolina and from a different state into North Carolina than did any other age cohort.[47] It is estimated 9.9 percent of people in the group moved to a different county and 7.0 percent came from outside the state. The 25-34 year-old group had the second highest proportion of voters at 6.0 percent for cross-county moves and 5.1 percent for those into the state from elsewhere in the country. For comparison, in third place was the 1-4 year-old cohort with 3.7 percent for inter-county moves within North Carolina and 3.1 percent for inter-state moves.

These data are for year-on-year moves, monthly equivalents do not exist. This is problematic for an argument that, as frequent movers, S. 747's changes to SDR disproportionately and adversely affect young people because the durational residency requirement for voting is just thirty days. As a result, it would be very helpful to know when in the year people tend to move. We can make an informed guess as to what months North Carolinians in the 18-24 year-old cohort change residence, however. If we assume this age group moves at higher proportions because most of them are students—54.4 percent of North Carolinians 18-24 years old have either a bachelor's degree or some college experience—we should expect to see the majority of changes of residence just before the academic semesters start.[48] This is August for most students and January for the remainder who move between semesters or commence their studies in the spring. In both cases, students have considerable time to register for the November general election or primary that historically takes place in either March or May.

---

[47] See: https://data.census.gov/table/ACSST5Y2023.S0701?g=040XX00US37
[48] The education data come from the same ACS 2023 5-year survey. See: https://data.census.gov/table/ACSST5Y2023.S1501?g=040XX00US37.

Interestingly, different plaintiffs in another suit are directly challenging North Carolina's 30-day residency requirement for voters—that, I have noted, is a common rule. The North Carolina Alliance for Retired Americans claims standing in their case not least because it violates "the Alliance's members' voting rights" under the Voting Rights Act and the U.S. Constitution.[49] The group's actual and potential members, it argues, move frequently throughout the year, including, they are eager to note, in the month leading up to an election when, presumably, other citizens are not moving as much. The group also asserts North Carolina is a popular state for relocation among senior citizens.[50] The plaintiffs in the Alliance for Retired Americans case suggest that residency and registration requirements disproportionately and unfairly affect the rights of the very oldest of us, not those between about 18 and 30 years-old.

I can find no evidence to conclude that SDR was established with a particular age group of voters in mind. If there was a "type" of voter the procedure was directed towards, I would guess it was procrastinators and those who move across county lines or into the state very close to an election. According to the 2023 ACS 5-year estimates used above, about 550,000 North Carolinians of voting age move into a different county within the state or into the state from another U.S. state in each year. Most probably do not worry about the durational residency requirement for voting if they come in an odd-numbered year. Most of those that move in any year, including the even-numbered ones when we hold federal and major state elections, do so

---

[49] See the complaint of the North Carolina Alliance for Retired Americans in *North Carolina Alliance for Retired Americans v. Hirsch*, https://www.democracydocket.com/wp-content/uploads/2023/10/1-2023-10-02-complaint.pdf

[50] According to a 2023 Annual Social and Economic Supplement of the Current Population Survey cited by the National Reverse Mortgage Lenders Association, only 3 percent of retirees who moved across state lines the same year came to North Carolina. That amounts to about 10,000 people. See https://www.nrmlaonline.org/2024/01/26/seniors-flocked-to-these-states-in-2023

18

between Memorial Day and Labor Day, outside the period immediately prior to primary and general elections.[51]  Within a month of an election, North Carolina also does not compel the revocation of registration at a previous address.[52]  All potential voters who have not moved into North Carolina from another state within 30 days of an election can therefore still use the state's no-excuse absentee voting (vote by mail), early in-person voting, or in-person voting on the day of the election if they do not wish to use SDR.

VII.     Response to "Young Voters Experience Disproportionately High Rates of Failed Address Verification"

As noted, S. 747 alters the process of address verification for SDR.  The plaintiffs report an analysis of NCSBE data on "registration applicants who were rejected or otherwise not added to the official eligible voter list due to failed mail address verification" revealed "nearly 50 percent of the approximately 91,000 denials that were recorded from January 2012 to January 2022 were attributed to registrants aged 18 to 25."[53]  They argue this demonstrates the change particularly disadvantages young North Carolinians.

I offer two points by way of a response.  First, if we assume residents 18-25 years old submitted approximately 45,000 of the registration applications denied because the address could not be verified, the number, according to data from the state's Office of State Budget and

---

[51] The National Association of Realtors' figures show that a majority of home sales occur at this time.  See, for example,  https://www.nar.realtor/blogs/economists-outlook/seasonality-in-the-housing-market
[52] See: NC General Statutes § 163-55.
[53] See the plaintiffs' complaint in *Democracy NC et al v. Hirsch et al*, civil action No. 23-878, p. 25.

Management, constitutes around 3.5 percent of all North Carolinians in that age group in 2022.[54] Note, moreover, the plaintiff's figures are totals for a full decade in which there were numerous elections including three high-turnout presidential contests (2012, 2016, and 2020). For additional perspective, around 150,000 state residents turned 18 years old annually over that decade.

Second, although under state law students should only register at their college address if they do not intend to return home following their studies, presumably a sizeable proportion of them register using their college domicile. The reason plaintiffs claim young people are disproportionately affected by the address verification requirement is that many students who register using their college residence acquire a "particular dorm room, P.O. Box, or (with a) college/university-specific modifier" that can create delivery problems.[55] In these instances, undeliverable mail is the fault of the United States Postal Service (USPS) and not the voter. I have no way to evaluate the extent to which this happens, but in a previous expert report (submitted in *Voto Latino v. Hirsch*) I assessed the frequency with which the USPS made mistakes when mail was considered undeliverable. In May 2015, the Office of the Inspector General, citing a 2006 Major Mailers Association study, reported that up to 23 percent of all undelivered mail is the result of USPS error. The mail had a valid address but was not delivered because of a sorting error or because a carrier could not locate the proper place to hand over the item. The remaining undeliverable mail was presumably the fault of the sender or addressee and their failure to report or write an eligible and correct address. Since only 4.3 percent of mail is

---

[54] See: https://www.osbm.nc.gov/population-projections-state-single-age-2029
[55] See the plaintiffs' complaint in *Democracy NC et al v. Hirsch et al*, civil action No. 23-878, p. 26.

Case 1:23-cv-00878-TDS-JEP    Document 124-56    Filed 05/09/25    Page 21 of 27

actually undelivered, about 99 percent of all mail is therefore either deliverable or undeliverable as the result of user, not USPS, error.[56]

The concerns plaintiffs have about deliverable mail are in stark contrast to the recommendations they give North Carolinians. Democracy NC characterizes voting by mail as "easy" on its website and frequently proposes residents do it, or take advantage of SDR, in its social media feeds.[57] We should note, moreover, that unlike address verification under SDR, absentee voting by mail is subject to a kind of "double jeopardy" since the NCSBE both sends and receives the ballot through the postal service. There do not seem, therefore, to be the same kinds of concerns about the USPS's role in voting by mail.[58] Indeed, eight states, in addition to the District of Columbia, conduct their elections for all offices entirely by mail and two states permit counties to opt into such a process.[59]

---

[56] The report containing these data is "Strategies for Addressing Undeliverable as Addressed Mail" from the Office of the Inspector General, USPS, May 1 2015, report number MS-MA-15-006. See: https://www.uspsoig.gov/sites/default/files/reports/2023-01/ms-ma-15-006.pdf. USPS periodically updates UAA data. The use of 2015 seems dated but I do not believe there is a more recent study estimating the proportion of UAA that is USPS error. USPS keeps annual data on UAA, but it is impossible to discern from them whether the various classes can be considered USPS or user error. Although the proportion of all mail that is UAA has gone down marginally since 2015, for most years since then it remains at about 4 percent. For very recent figures, see: https://postalpro.usps.com/UAARollup.

[57] See: https://democracync.org/wp-content/uploads/2017/05/AbsenteeGuideCard.pdf.

[58] Both political parties encourage vote by mail, suggesting they do not perceive any problems with the process. The Republican National Committee, for example, recently launched the "Bank Your Vote" campaign to address perceived advantages Democrats have in voting by mail. Biden for President and the DNC also jointly launched an effort to increase vote by mail ahead of the 2020 election. See: https://democrats.org/news/biden-for-president-dnc-announce-new-vote-by-mail-features-on-iwillvote-com/

[59] The eight states that conduct all of their elections entirely by mail are: California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont, and Washington. The two states that permit counties to opt-in are Nebraska and North Dakota. See: https://www.ncsl.org/elections-and-campaigns/table-18-states-with-all-mail-elections

VIII.    Response to "While S. 747 Makes it More Difficult for Young North Carolinians to Vote, It Fails to Increase Election Integrity or Improve Election Administration"

I note four things in response to the claim S. 747 does nothing to increase election integrity and improve election administration.  This is an argument I made in my report in the *Voto Latino* case.  First, everything we know about in-person voter fraud is through documented instances.  These are nearly always the result of prosecutions brought by law enforcement.  They suggest instances are low.  However, we have no real idea of how much uninvestigated voter fraud occurs.  Prosecuting voter fraud appears low priority—presumably because it is time and resource consuming, often politically sensitive, and potentially interested individuals do not dispute the election outcome.  In-person election-day voter fraud is also relatively easy to detect.  Investigators can match prior registration data—that officials have already checked and made publicly available online for anyone to inspect—with information provided by the citizen at the time of voting, including their formal ID.  Without existing registration information—as is the case with SDR—any fraud is more challenging to find.  This necessitates an effort to verify the SDR voter's address following their registration and casting of a ballot.

Second, it is important that election administrators know the precise address of the voter.  Proof of state residency can determine eligibility to vote in statewide elections such as U.S. President or Governor, but for most contests, from U.S. House down to many municipal offices, it is necessary to determine a street address within North Carolina.  This enables administrators to assign a voter to the correct precinct and therefore present them with the correct ballot.  North Carolina's provisional ballot rules—that, according to the NCSL and non-partisan Movement Advance Project, are similar to those in many other states—permit a voter to cast a ballot outside

22

their precinct in certain circumstances.[60]  However, it is critical, for the purposes of tallying votes accurately, that administrators know exactly where voters live.  If a central feature of voter fraud is its capacity to contribute illegitimately to candidate vote tallies, then, to ensure that people vote in the correct district, knowledge of a voter's address is as critical to the determination of their eligibility as their age and citizenship.

Third, Americans are clearly concerned about voter fraud.  Gallup surveys show that since 2008, only 60-70 percent of respondents are "very" or "somewhat" "confident" that "votes will be accurately cast and counted" in the upcoming election.[61]  A September 2016—and therefore pre-Trump presidency—Associated Press/National Opinion Research Center poll reported 35 percent of respondents believed there was a "great deal" of voter fraud, an additional 39 percent "only some."[62]  On the eve of the 2024 election, a NPR/Marist poll reported 58 percent of respondents were either "concerned" or "very concerned" that the upcoming election would experience "voter fraud."[63]  Fraud may trouble North Carolina policymakers and the public's confidence in election integrity, especially following the 2018 election in the state's Ninth Congressional District, appears dented.  With the two major-party candidates in that contest separated by less than one thousand votes after tallying, NCSBE unanimously refused to certify the results following accusations of widespread fraud.  After an extensive hearing, it conducted an entirely new general election.

---

[60] On the Movement Advance Project and its comparison of state laws governing provisional ballots, see: https://www.lgbtmap.org/democracy-maps/provisional_ballot_policies.  North Carolina potentially counts votes cast in the wrong precinct but not the wrong county.  Thirty states do not do even allow this.
[61] https://news.gallup.com/poll/404675/confidence-election-integrity-hides-deep-partisan-divide.aspx
[62] See: https://apnorc.org/wp-content/uploads/2020/02/Elections-and-Fraud-Topline_FINAL.pdf
[63] See: https://maristpoll.marist.edu/polls/the-u-s-presidential-contest-october-2024/

23

Fourth, the plaintiffs are concerned that S. 747's address verification requirement will effectively disenfranchise many SDR voters. A fraudulent vote disenfranchises when it is cast for a candidate who opposes the candidate a legitimate voter selected. However onerous plaintiffs allege S. 747's address verification requirement is, it does not disenfranchise a voter in this way—and as do imposture, false registration, duplicate voting, or ineligible voting. The rule is transparent and applied prospectively meaning good-faith voters who use SDR in future elections understand the risks. If they cannot tolerate the possibility of their registration canceled and ballot retrieved, the individual can register and later vote in-person or absentee as do around 97 percent of others who cast ballots in North Carolina elections.

In fact, since 2000, North Carolinians have been able to vote early in person without an "excuse" at a polling place that was not their county board of elections office.[64] The candidates and parties quickly realized what this meant. They now regularly appeal to citizens to "bank" votes by casting an absentee vote or voting in person early. The suggestion is the voter's car might breakdown, child get sick or boss unwilling to grant them leave; any number of things could prevent them from going to the polls on the official day of the election. Campaigns warn voters that should they choose to wait and vote on the last day, there is a chance their vote might not count—and potentially for reasons beyond their control. Many voters presumably understand this risk and take advantage of one of the other means of voting available to them. Indeed, according to NCSBE, in 2022, only 41.6 percent of voters in the North Carolina U.S.

---

[64] According to NCSL, even today only fifteen states have neither all-mail nor no-excuse absentee voting. See: https://www.ncsl.org/elections-and-campaigns/voting-outside-the-polling-place

Senate election cast their ballots in person on November 8.  In 2024, only 20.5 percent of North Carolinians who voted in the presidential contest did so on election-day.[65]

IX.    Conclusion

This report constitutes my evaluation of S. 747's effects on the voting rights of young North Carolinians, particularly since the plaintiffs claim they disproportionately take advantage of North Carolina's SDR procedure.  I conclude:

1.  Young people do not constitute a clearly identifiable group of voter,

2.  North Carolina has not historically attempted to restrain the youth vote,

3.  S. 747 does not materially undermine same-day registration (SDR),

4.  Young people use SDR out of choice rather than necessity,

5.  If young people do experience disproportionate incidents of non-user-error failed address verification in the SDR process, the effect is negligible,

6.  It is not clear S. 747 fails to increase election integrity or improve election administration.

---

[65] These data can be found by searching at: https://er.ncsbe.gov/

Date: 3/5/25

I, Dr. Andrew Taylor, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a)(2)(B), and Federal Rules of Evidence 702 and 703, hereby declare that the foregoing is true and accurate to the best of my knowledge.

26