# Exhibit MMM



## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

BARBARA H. LEE; GONZALO J. AIDA
BRESCIA; and THE DEMOCRATIC PARTY
OF VIRGINIA,

               Plaintiffs,

        v.

VIRGINIA STATE BOARD OF ELECTIONS;
JAMES B. ALCORN, in his capacity as
Chairman of the Virginia State Board of
Elections; DR. CLARA BELLE WHEELER, in
her capacity as Vice-Chair of the Virginia State
Board of Elections; SINGLETON B.
MCALLISTER, in her capacity as Secretary of
the Virginia State Board of Elections; the
VIRGINIA DEPARTMENT OF ELECTIONS;
and EDGARDO CORTÉS, in his capacity as
Commissioner of the Virginia Department of
Elections,

               Defendants.

Civil Action No. **3:15-cv-357**

---

## COMPLAINT

1.     Barack Obama's victory in Virginia in the 2008 presidential election represented a sea change in Virginia politics. President Obama was the first Democrat to carry the Commonwealth in a presidential election in over 40 years. His success was based in part on significant increases in turnout among African-American, Latino,[1] and young voters. President Obama won the overall vote of each of these groups in Virginia by a margin of more than 20%.[2]

---

[1] The term "Latino," as used in this Complaint, means Hispanic and/or Latino.
[2] Many of the figures in this Complaint regarding candidates' election results among particular demographic groups are based on exit polls.

1

Case 1:23-cv-00878-TDS-JEP   Document 124-65   Filed 05/09/25   Page 2 of 39

2. In the 2012 presidential election, President Obama again carried Virginia. In that election, President Obama won more than 60% of the vote among 18-29 year olds and Latinos and over 90% of the African-American vote in Virginia.

3. Determined to stall, if not reverse, the growing success of the Democratic Party in Virginia, the Republican majorities in both houses of the Virginia General Assembly (the "General Assembly") in 2013 passed a law designed to reduce disproportionately the turnout of these core Democratic constituencies and Democratic voters more broadly: Virginia's law requiring voters to show photographic identification ("photo ID") when voting. Revealingly, that law does not materially further any legitimate state interest. While proponents of voter ID laws claim that such laws prevent voter impersonation, Judge Richard Posner recently explained that "[t]he one form of voter fraud known to be too rare to justify limiting voters' ability to vote by requiring them to present a photo ID at the polling place is in-person voter impersonation." *Frank v. Walker*, 773 F.3d 783, 788 (7th Cir. 2014) (Posner, J., joined by four other judges of the Seventh Circuit, dissenting from denial of rehearing en banc). In addition, the Republican majority in the General Assembly has not taken action that will resolve Virginia's recurring problem of long wait times to vote—a problem that disproportionately burdens African Americans, Latinos, young voters, and Democrats.

4. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Indeed, the Constitution does not permit the right to vote to be burdened or denied without sufficient reason or with the intent to discriminate on the basis of race, ethnicity,

2

age, or partisan affiliation. Section 2 of the Voting Rights Act also proscribes the denial or abridgement of the right to vote on account of race.

5.      To protect thousands of Virginians from having their right to vote burdened, abridged, or denied, Plaintiffs challenge Virginia's voter ID law and long wait times to vote, as well as Virginia's requirement that its governor re-enfranchise nonviolent felons who have served their sentences on an individual basis rather than through a single executive action. Specifically, Plaintiffs request a declaratory judgment holding that Virginia's voter ID law, long wait times to vote, and requirement that nonviolent felons be re-enfranchised on an individual basis are unlawful; injunctive relief pertaining to the voter ID law and Virginia's requirement that nonviolent felons be re-enfranchised on an individual basis; and that evidence be taken to determine what changes must be made to prevent long wait times to vote from recurring in future elections and that the Court order that such changes be implemented and effectuated.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and in this division.

## PARTIES

8.      Plaintiff Barbara H. Lee is a lifelong resident of Staunton, Virginia. She is African American and has been registered to vote in Virginia since 1971. She is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future.

3

She was the Chair of the Staunton Democratic Committee for a two-year period beginning in 2006, she has done volunteer campaign work, and she was an alternate delegate to the 2008 Democratic National Convention. She has also been involved in voter-registration, voter-education, and get-out-the-vote ("GOTV") efforts. Virginia's voter ID law, long wait times to vote, and requirement that nonviolent felons be re-enfranchised on an individual basis disproportionately suppress the vote of Democrats and thereby harm Lee's efforts to help elect Democratic candidates. In addition, Lee believes that the voter ID law will negatively impact her GOTV efforts.

9.      Plaintiff Gonzalo J. Aida Brescia ("Aida") is a 29-year-old Latino resident of Richmond, Virginia, who is registered to vote in the Commonwealth of Virginia. He became a United States citizen in 2008. He is a Democrat, has voted for Democratic candidates, and intends to vote for Democratic candidates in the future. He has volunteered and been employed to work on the campaigns of Democratic candidates for office. He has served as the President, the Director of Campaigns, and a board member for the Virginia Young Democrats, and he is a member of the Metro Richmond Area Young Democrats. He has been involved in voter-registration, voter-education, and GOTV efforts. He has done a substantial amount of GOTV and voter-registration work with young Virginians, and, during a campaign in which he was a field organizer, he provided information pertaining to voting to a number of Latino citizens. Aida also serves on the Virginia Latino Advisory Board, for which he is a member of the civic engagement subcommittee. Aida anticipates that, during his time on the board, the board's work will include communicating information to members of the Latino community to assist Latino citizens in Virginia in registering to vote and voting.

4

10.     Virginia's voter ID law, long wait times to vote, and requirement that nonviolent felons be re-enfranchised on an individual basis burden Aida's efforts to help elect Democratic candidates because they disproportionately suppress the vote of Democrats. In addition, because of the long lines for the general election in 2012, some individuals in the GOTV effort in which Aida was involved were responsible for encouraging voters to stay in line to vote. But for the long wait times to vote, those individuals could have spent their time working on getting people out to vote. Aida also believes that the voter-registration efforts in which he has been involved could have registered more people to vote if all nonviolent felons who have paid off all fees, fines, and restitution had been able to register to vote.

11.     Plaintiff the Democratic Party of Virginia ("DPVA") is a political organization dedicated to electing candidates of the Democratic Party to public office throughout the Commonwealth of Virginia. The DPVA has members from across the Commonwealth, including many eligible voters, who regularly support and vote for candidates affiliated with the Democratic Party. Virginia's voter ID law, long wait times to vote, and requirement that nonviolent felons be re-enfranchised on an individual basis harm the DPVA by disproportionately reducing the turnout of Democratic voters and decreasing the likelihood that the DPVA will be successful in its efforts to help elect candidates of the Democratic Party to public office. The DPVA has also devoted resources that otherwise would have been, and will devote resources that otherwise would be, put to other productive uses educating Virginians about the voter ID law. And long lines at the polls have caused the DPVA to divert resources that otherwise would have been put to other productive uses.

12.    Defendant Virginia State Board of Elections (the "SBE") is responsible for the regulation of Virginia elections, including issuing rules and regulations for the conduct of all elections in the Commonwealth.

13.    Defendants James B. Alcorn, Dr. Clara Belle Wheeler, and Singleton B. McAllister are sued in their respective official capacities as Chairman, Vice-Chair, and Secretary of the SBE.

14.    Defendant Virginia Department of Elections is the agency responsible for promoting and supporting accurate, fair, open, and secure elections for the citizens of the Commonwealth.  It is charged with implementing election laws and regulations for all elections in the Commonwealth.

15.    Defendant Edgardo Cortés is sued in his official capacity as Commissioner of the Virginia Department of Elections.

## FACTUAL ALLEGATIONS

### I.    Virginia's History of Discrimination Against Racial and Ethnic Minorities

16.    Virginia has a lengthy history of discrimination against racial and ethnic minorities.

17.    For over 200 years, African Americans were enslaved in Virginia.

18.    Overt discrimination against African Americans continued long after slavery was ended.  As two leading historians, Earl Black and Merle Black, have written, "For many generations, Southern racism involved an intricate code of interracial etiquette that symbolized white supremacy and black inferiority, the legalization of racial segregation in every important institution, the attempted (and largely successful) repression of educational and economic achievement among blacks, the routine denial of full human dignity to blacks, and the

6

rationalization of legal and extralegal force to maintain the norms of the system." Merle Black & Earl Black, "Deep South Politics: The Enduring Racial Division in National Elections," *in The Oxford Handbook to Southern Politics* 401 (Charles S. Bullock III & Mark J. Rozells, eds., 2012) (internal quotation marks omitted).

19.     Virginia's constitutional convention of 1901-02, for example, resulted in provisions, including a poll tax, an understanding clause, and literacy tests, designed to disenfranchise—and that were effective in disenfranchising—African Americans. One delegate to that constitutional convention, Alfred P. Thom, asserted, "We do not come here prompted by an impartial purpose in reference to negro suffrage. We come here to sweep the field of expedients for the purpose of finding some constitutional method of ridding ourselves of it forever." With respect to the suffrage proposal at that convention, which included felon disenfranchisement as well as the provisions mentioned above, delegate Carter Glass said the plan "will eliminate the darkey as a political factor in this State in less than 5 years, so that in no single county . . . will there be the least concern felt for the complete supremacy of the white race in the affairs of government."

20.     More than 50 years later, in the wake of *Brown v. Board of Education*—and within the lifetime of many African Americans in Virginia who are currently registered to vote—Virginia actively resisted desegregation. Virginia Senator Harry Byrd, Sr., urged "Massive Resistance" to school desegregation, and he and Virginia's other U.S. Senator, A. Willis Robertson, "were last-ditch opponents of racial change." Earl Black & Merle Black, *The Rise of Southern Republicans* 98 (2002).

21.     In 1956, the General Assembly, among other things, passed a law that prohibited the popular election of schools boards in order to prevent a school district from desegregating,

*see Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1356 (4th Cir. 1989), and declared that school authorities in Virginia's political subdivisions would "be faced with unprecedented obstacles if and when ordered" to integrate public schools and that such integration "could destroy the efficiency of the [integrated] school . . . and would tend to disturb the peace and tranquility of the community in which such school is located," 1956 Va. Extra Session Acts Ch. 68 § 1.  That same year, every member of Virginia's congressional delegation signed the "Declaration of Constitutional Principles," commonly known as the "Southern Manifesto," which pledged resistance to school desegregation.  102 Cong. Rec. 4515-16 (1956).  As late as 1968, the Supreme Court held that New Kent County's school system "remain[ed] a dual system," that "[t]he New Kent School Board's 'freedom-of-choice' plan [could not] be accepted as a sufficient step to 'effectuate a transition' to a unitary system," and that the board had to "fashion steps which promise[d] realistically to convert promptly to a system without a 'white' school' and a 'Negro' school, but just schools." *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 441-42 (1968).

22.     In addition, Virginia's poll tax remained in effect until 1966.  Its law prohibiting interracial marriage remained in effect until the following year.  Its state constitutional requirement that individuals registering to vote present proof of literacy was in effect until 1974.  And these laws were not repealed by the General Assembly; they were invalidated by federal courts.  *Loving v. Virginia*, 388 U.S. 1 (1967); *Harper v. Va. State Bd.*, 383 U.S. 663 (1966); *Virginia v. United States*, 386 F. Supp. 1319 (D.D.C. 1974), *aff'd*, 420 U.S. 901 (1975).

23.     As of July 1980, only four members of the 100-member Virginia House of Delegates were African American.  In 1981, according to the United States Senate report for the 1982 extension of the Voting Rights Act, Petersburg, Virginia, "drew a redistricting plan that

8

virtually insured white control even though blacks ma[d]e up 61 percent of the city." S. Rep. 97-417, 1982 U.S.C.C.A.N. 177, 188 (capitalization altered).

24.     As of 1990, less than five percent of Virginia's judges were African American. At the time, approximately 19% of Virginia's population was African American. In 1995, Virginia filed a suit arguing that the National Voter Registration Act—a law intended in part to address the lingering effects of and ongoing discrimination—was unconstitutional under the Tenth Amendment. In 1995-97, then-Governor George Allen declared April Confederate History and Heritage Month.

25.     In October 2007, in the midst of a large increase in its Latino population, Prince William County adopted a policy requiring police officers to investigate the immigration or citizenship status of any person they detained for a violation of state law or county ordinance if there was probable cause to believe the person was in violation of federal immigration law and the investigation would not unlawfully expand the length of detention. In April 2008, that policy was modified to require officers to investigate the citizenship or immigration status of any person subject to a physical custodial arrest for a violation of state law or county ordinance.

26.     Although approximately one in five Virginians is African American, Virginia has elected very few African Americans to major offices. Virginia has the distinction of having elected the first African-American governor in the United States; but it has not elected another African-American governor since then. Virginia has never elected an African American to the United States Senate. Nor has it ever elected an African-American attorney general. Congressman Robert Scott is the only African American to have been elected to represent Virginia in the United States House of Representatives since Reconstruction, and he was elected only after the General Assembly, in response to direction from the United States Department of

9

Justice, created a majority-black congressional district. Virginia has never had a Latino governor, attorney general, or member of Congress.

27.      Virginia has a history of racially polarized voting as well. In *Collins v. City of Norfolk*, 883 F.2d 1232, 1240 (4th Cir. 1989), for example, the Fourth Circuit wrote that it was "apparent from the record that the white majority [in Norfolk] normally voted sufficiently as a bloc to defeat the combined strength of strong minority support plus white crossover votes for minority preferred candidates who sought a second seat on the [city] council." In support of this conclusion, the court noted, among other things, that a candidate in 1980 had received 92.9% of the black vote and 9.5% of the white vote, and that in 1982 the same candidate received 87.6% of the black vote and 11.2% of the white vote. *Id.* at 1241.

28.      In Virginia's 1994 election for United States Senate, Republican Oliver North won 50% of the white vote but just 5% of the black vote. In Virginia's 1996 election for United States Senate, Republican John Warner won 58% of the white vote and 20% of the black vote. And in Virginia's 2000 election for United States Senate, Republican George Allen won 60% of the white vote and 16% of the black vote.

29.      Courts have recognized Virginia's history of discrimination. In *Collins*, the Fourth Circuit noted that the district court had "found that black voters in Norfolk were effectively disenfranchised by the Virginia Constitution of 1902" and wrote that "the devices used to limit black participation in elections" included the literacy test and the poll tax. 883 F.2d at 1235. The Fourth Circuit has also written that "the Virginia legislature clearly acted with a discriminatory purpose in passing the 1956 law forbidding popularly elected school boards anywhere in the state." *Irby*, 889 F.2d at 1356. The law was passed "to impede one school

10

district's willingness to comply with the desegregation mandate of *Brown v. Board of Education*." *Id.*

30.     In *McDaniels v. Mehfoud*, 702 F. Supp. 588, 594 (E.D. Va. 1988), this Court pointed to "a few relevant examples" of Virginia's "past racial laws," including "the requirement, in effect until 1963, that names on voter registration and poll tax lists be separated by race[] and the requirement, until 1963, that the races be segregated in places of public assemblage" (internal citations omitted).  In *Loving*, the Supreme Court wrote that there was "patently no legitimate overriding purpose independent of invidious racial discrimination which justifie[d]" Virginia's ban on interracial marriage and that "the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy." 388 U.S. at 11.

## II.     The Ongoing Effects of Virginia's History of Discrimination

31.     African Americans and Latinos in Virginia have suffered from, and continue to suffer from, the effects of discrimination in a number of areas, including education, health, housing, employment, income, transportation, and criminal justice.

32.     According to the U.S. Census Bureau's 2009-2013 American Community Survey 5-Year Estimates, the African-American and Latino unemployment rates exceeded (the African-American rate more than doubled) the white unemployment rate, and the African-American and Latino poverty rates exceeded the white poverty rate, in Virginia for the period from 2009-2013. In Virginia as of the 2000 census, African Americans, as compared to whites, were less likely to have a bachelor's degree; less than half as likely to have a graduate or professional degree; and more than three times as likely to live in a household without a vehicle.

33.     As of the 2010 census, whites were more likely than African Americans or Latinos to own a house in Virginia.  Moreover, the practice of redlining continues to harm

11

minorities in Virginia, as evidenced by the U.S. Justice Department's allegations that from 2006 to 2009, Chevy Chase Bank charged African-American and Latino borrowers more than white borrowers and that, while these practices were spread across the country, particular disparities were found at branches in Virginia Beach, the Springfield-Tysons Corner area, and Newport News.

34.    In Virginia from 2007-2009, infant mortality rates for African Americans more than doubled and for Latinos exceeded those for whites. One conclusion drawn by a 2008 report from the Virginia Department of Health was that "the effect of socioeconomic disadvantage and racial marginalization on negative health outcomes is evident." Va. Dep't of Health, Office of Minority Health & Public Health Policy, *Unequal Health Across the Commonwealth: A Snapshot*, Virginia Health Equity Report 2008, Executive Summary, *available at* http://www.vdh.virginia.gov/omhhe/documents/health-equity-report-summary.pdf.

35.    African-Americans are far more likely than whites are to be incarcerated in Virginia.

36.    In addition, voting in Virginia continues to be racially polarized. In recent presidential elections, minority voters in Virginia have strongly favored Democratic presidential candidates, while white voters in Virginia have clearly favored Republican candidates. In the 2004 election, for instance, President George W. Bush won 68% of the white vote and then-Senator John Kerry won 87% of the African-American vote in Virginia. Indeed, in January 2013, Republican State Senator John C. Watkins said, "No one can dispute that racially polarized voting is present in Virginia."

37.    Virginia political officials have continued to make racially charged public statements in recent years as well. In 2006, George Allen, who was then a U.S. Senator

12

campaigning for reelection, referred to a minority staff member of his opponent's campaign as "macaca"—a racial slur—and said, "Let's give a welcome to macaca, here. Welcome to America and the real world of Virginia." Allen won 58% of the white vote but only 15% of the African-American vote that year.

38.     In 2010, Governor Robert McDonnell declared April 2010 Confederate History Month. Governor McDonnell initially omitted a reference to slavery's role in the Civil War. When he was elected in 2009, Governor McDonnell won the white vote by a margin of 67% to 32% and lost the African-American vote by a margin of 90% to 9%.

### III.    Virginia's Recent Political History

39.     In 2008, President Barack Obama became the first Democrat to carry Virginia in a presidential election since 1964. President Obama won the African-American vote in Virginia by a margin of 92% to 8%, and African-American turnout increased from 52% in 2004 to 68-69% in 2008. Latino turnout in Virginia increased from 50-51% in 2004 to 56-58% in 2008. President Obama won the Latino vote in Virginia in 2008 by a margin of 65% to 34%, whereas Senator Kerry's margin in 2004 was 51% to 47%. Among 18-29 year olds in Virginia, turnout increased from 43% in 2004 to 59% in 2008. Senator Kerry had won this group by a margin of 54% to 46%. President Obama won it by a margin of 60% to 39%.

40.     Republican Robert McDonnell was elected Governor of Virginia the following year. At the time, Republicans were in the majority in the Virginia House of Delegates, and Democrats were in the majority in the Virginia Senate.

41.     The 2011 elections, which returned a Republican majority to the House of Delegates, resulted in a 20-20 split in the Senate, with Republicans taking control of that body because the Lieutenant Governor at that time was a Republican. Republicans thus had control of

13

the governor's office and both houses of the Virginia General Assembly from January 2012 until January 2014.

42.      In 2012, President Obama was re-elected and he again carried Virginia.  He won 93% of the African-American vote and 64% of the Latino vote in Virginia, while former Governor Mitt Romney won 61% of the white vote.  President Obama won 61% of the vote in Virginia among 18-29 year olds.

## IV.      Virginia's Voter ID Law

### A.      Background

43.      As of 2011, a Virginia voter was permitted to vote if he or she (1) presented an accepted form of identification—specifically, a Virginia voter registration card; a social security card; a valid Virginia driver's license, or any other ID card issued by a government agency of Virginia, one of its political subdivisions, or the United States; or a valid employee ID card containing a photograph of the voter that was issued by an employer of the voter in the ordinary course of business—or (2) signed "a statement, subject to felony penalties for false statements . . . , that he is the named registered voter who he claims to be." Va. Code § 24.2-643.B (2011).  In April 2012, concealed handgun permits were added to the list of acceptable IDs.  2012 Va. Laws Ch. 723 (SB 663).

44.      In May 2012, Virginia enacted legislation that eliminated the option for proving identity through a sworn statement and expanded the list of IDs that could be used for voting to include valid student ID cards issued by any four-year institution of higher education in Virginia and "a copy of a current utility bill, bank statement, government check, or paycheck that shows the name and address of the voter." 2012 Va. Laws Ch. 839 (SB 1).  Under this legislation, any voter who did not show a permissible form of ID was required to cast a provisional ballot, which

14

was counted only if the voter submitted a copy of an acceptable ID to the local electoral board no more than three days after the election (absent receipt of a time extension from the board). *Id.* Thus, as a result of this legislation, voters were required to show ID to vote, but they could show any of many different types of ID and were not required to show a photo ID.

45.      In 2013, Virginia enacted a new voter ID law, 2013 Va. Laws Ch. 725 (SB 1256) (the "voter ID law"), that sharply curtailed the types of ID that can be used for voting. The bill passed the Virginia Senate on a party-line vote with Republicans voting in favor.

46.      As a result of the passage of the voter ID law, Virginia law now provides that an officer of election "shall ask the voter to present any one of the following forms of identification: his valid Virginia driver's license, his valid United States passport, or any other photo identification issued by the Commonwealth, one of its political subdivisions, or the United States; any valid student identification card containing a photograph of the voter and issued by any institution of higher education located in the Commonwealth; or any valid employee identification card containing a photograph of the voter and issued by an employer of the voter in the ordinary course of the employer's business." Va. Code § 24.2-643.B.  Effective January 2, 2016, Virginians, in order to vote, will also be able to present a valid student ID card issued by a private school located in Virginia and containing a photograph of the voter.  2015 Va. Laws Ch. 571 (HB 1653).

47.      Any voter at the polls who does not show one of the forms of ID specified in the voter ID law will be offered a provisional ballot, Va. Code § 24.2-643.B, and "[a]n officer of election, by a written notice given to the voter, shall . . . inform a voter voting provisionally . . . that he may submit a copy of one of the forms of identification specified . . . to the electoral board by facsimile, electronic mail, in-person submission, or timely United States Postal Service

or commercial mail delivery, to be received by the electoral board no later than noon on the third day after the election." Va. Code § 24.2-653.A.  In other words, a voter who does not show one of the specified forms of ID at the polls will not have his or her provisional ballot counted unless he or she submits a copy of one of the specified forms of ID to be received by the electoral board by noon of the third day after the election.

48.    Virginia voter registration cards, social security cards, concealed handgun permits, and copies of current utility bills, bank statements, government checks, and paychecks that show the name and address of a voter can no longer be used as ID for voting.  Voters are required to present a photo ID.  In addition, IDs issued by states other than Virginia and universities outside of Virginia cannot be used as ID for voting.

49.    A voter who does not have an acceptable form of ID may obtain a voter photo ID card free of charge through a general registrar's office or the Virginia Department of Elections if the voter signs a completed application for such an ID, the voter's information is correct in the voter-registration system, and a photograph of the voter is taken and the voter's signature is captured by a general registrar or otherwise-authorized person.  1 VAC 20-40-90; *see also* 2013 Va. Laws Ch. 725 (SB 1256).

50.    On June 10, 2014, the SBE defined the term "valid" in the voter ID law as a document "containing the name and photograph of the voter [and] appearing to be genuinely issued by the agency or issuing entity appearing upon the document."  *See* 30 Va. Reg. Regs. 2516 (June 30, 2014).  The definition further provided that "[o]ther data contained on the document, including but not limited to expiration date, shall not be considered in determining the validity of the document."  *Id.*

16

51.     In a letter to then-Secretary of the SBE Donald Palmer dated June 16, 2014, Republican State Senator Mark Obenshain criticized this interpretation of the word "valid." On June 24, the SBE proposed a regulation that would have revised the definition of "valid" to include only unexpired IDs and IDs that had expired no more than 30 days earlier. 30 Va. Reg. Regs. 2553 (July 14, 2014).

52.     Then, on August 6, by a 2-0 vote (both of which votes were cast by Republican-appointed members of the SBE), the SBE revised the definition of "valid" for purposes of the voter ID law to mean "(i) the document appears to be genuinely issued by the agency or issuing entity appearing upon the document, (ii) the bearer of the document reasonably appears to be the person whose photograph is contained thereon, and (iii) the document shall be current or have expired within the preceding 12 months." 30 Va. Reg. Regs. 2770 (Aug. 25, 2014).  Then-Secretary Palmer said, "We thought the law provided more flexibility.  Thirty days was arbitrary."

53.     As a result of the adoption of this definition of "valid," certain forms of ID, including Virginia driver's licenses and United States passports, cannot be used as voter ID in Virginia if they have been expired for more than a year.

54.     Neither the voter ID law nor any rules issued by the SBE or Virginia Department of Elections state that the address on a voter ID must match the address for the voter in the poll book.  On the contrary, a guidance document on the Virginia Department of Elections' website states that "[a]n address upon an ID that does not match the address listed for the voter in the poll book does not make it unacceptable for proving the voter's identity" and notes that "[s]ome acceptable forms of photo ID do not include a residence address." *See* Dep't of Elections Guidance Document, *What If . . .* at 3 (rev'd 8/11/14) ("*What If*"), *available at*

17

http://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\GuidanceDocs\132\GDoc
_SBE_5567_v1.pdf.

B.    The Voter ID Law Burdens, Abridges, and Denies the Right to Vote

55.    The voter ID law severely burdens the right to vote. Registered voters in Virginia
who do not have a form of ID that can be used for voting must expend the time necessary to
obtain such an ID in order to vote. Individuals who do not obtain such an ID—whether because
it is too burdensome for them to do so, they are unaware of the voter ID law, or they mistakenly
believe they possess an ID that can be used for voting—are disenfranchised under the voter ID
law.

56.    The experience of other states that have enacted voter ID laws strongly indicates
that Virginia's voter ID law has suppressed and will suppress turnout. A "quasi-experimental
analysis" conducted by the Government Accountability Office ("GAO") and described in a 2014
GAO report regarding issues related to state voter identification laws found that there was a
greater decrease in turnout from 2008 to 2012 in Kansas and Tennessee, which had adopted voter
ID laws during that period, than in comparison states that had not adopted voter ID laws during
that time period. Government Accountability Office, *Elections: Issues Related to State Voter
Identification Laws*, GAO-14-634, Report to Congressional Requesters 48-49, Sept. 2014 ("GAO
Voter ID Report"), *available at* http://www.gao.gov/assets/670/665966.pdf. Further, M.V. Hood
III, an expert witness for the State of Wisconsin in its defense of its voter ID law, "testified that
Georgia's voter ID law . . . 'had the effect of suppressing turnout.'" *Frank*, 773 F.3d at 792
(Posner, J., dissenting).

57.    Indeed, upon information and belief, tens of thousands of registered voters in
Virginia do not have an ID that can be used to vote. According to work done by the Department

18

of Elections, as of October 6, 2014, 196,902 (slightly more than 4% of) active, registered

Virginia voters did not have a Department of Motor Vehicles ("DMV") record. Yet data from

the Department of Elections indicates that, as of May 13, 2015, the Department of Elections had

printed only 4,117 free voter photo ID cards.

58.     In the November 2014 election, which was conducted under the current voter ID

law, well over 700 ballots were cast provisionally because the voter did not present a required

form of ID, and preliminary numbers indicated that nearly half of those ballots were not counted.

The number of votes rejected in the 2016 general election will surely be much larger given that

turnout is higher for presidential elections than it is for mid-term elections.

59.     The voter ID law also interacts with the ongoing effects of Virginia's history of

discrimination against African Americans and Latinos disproportionately to abridge, to deny, and

to burden the right to vote of African Americans and Latinos in Virginia.

60.     Plainly, individuals without ID that can be used for voting are more greatly

burdened and more likely to have their right to vote abridged or denied by the voter ID law than

are individuals who possess an ID that can be used for voting. And upon information and belief,

African Americans and Latinos in Virginia are less likely than the population of Virginia as a

whole to have a form of ID that can be used for voting.

61.     As noted, according to the Department of Elections, slightly more than 4% of

active, registered Virginia voters did not have a DMV record as of October 6, 2014. The

Department of Elections also found that, as of that date, in Richmond, the population of which is

slightly over 50% African American, over 5.4% of active voters did not have a DMV record; in

Fairfax County, which has a disproportionately large Latino population, over 5.2% of active

19

voters did not have a DMV record; and in Arlington County, which also has a disproportionately large Latino population, over 7.3% of active voters did not have a DMV record.

62.    Further, a national survey conducted in 2006 and sponsored by the Brennan Center for Justice "showed that millions of American citizens do not have government-issued photo identification, such as a driver's license or passport" and "that certain groups—primarily poor, elderly, and minority citizens—are less likely to possess these forms of documentation than the general population." Brennan Center for Justice, *Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification* 1 (2006) ("*Citizens Without Proof*"), *available at* www.brennancenter.org/sites/default/files/legacy/ d/download_ file_39242.pdf.

63.    These disparate rates of ID ownership are themselves an effect of discrimination and are linked to other effects of discrimination. As discussed above, the ongoing effects of discrimination in Virginia include that African Americans are more likely than other Virginians to live in poverty and, relatedly, that African Americans in Virginia are over three times more likely than whites in Virginia to live in a household without a vehicle. Given that "access to transportation" has been identified as a factor that "could affect ID ownership rates," GAO Voter ID Report at 26, it is clear that the voter ID law's disparate impact on African-American voters is linked to the ongoing effects of discrimination.

64.    In addition, a large body of research has shown that costs of voting depress turnout especially for racial and ethnic minorities. Thus, even putting aside differential rates of possession of IDs that can be used for voting, Virginia's voter ID law, by adding a cost to voting for individuals who do not possess an ID that can be used for voting, disproportionately suppresses the vote of African Americans and Latinos in Virginia.

65.    The disparate impacts that the voter ID law imposes upon African Americans and Latinos, alone and in combination with the limited time period that voters have to provide ID after casting a provisional ballot, Virginia's requirement that absentee voters have a specified reason for voting absentee, *see* Va. Code § 24.2-700, the fact that Virginia does not have early voting or same-day registration, and Virginia's frequently long wait times to vote, have resulted, based on the totality of the circumstances, in African Americans and Latinos in Virginia having unequal access to the polls and having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

66.    The voter ID law also disproportionately burdens the right to vote of young people and people in poverty in Virginia.  Upon information and belief, citizens in poverty and young people in Virginia are less likely than the population of Virginia as a whole to have a form of ID that can be used for voting.

67.    Young people generally and college students in particular are materially less likely than the population as a whole to have photographic IDs that reflect their current legal name and address.  In addition, data from the U.S. Department of Transportation shows that as of 2006, younger and older citizens were much less likely to be registered to drive (and thus to possess a driver's license) than were adult citizens in other age groups.

68.    Nevertheless, as of May 13, 2015, the average age of applicants for Virginia's free voter photo IDs was 64.

69.    The GAO Voter ID Report found that the decreases in turnout in Kansas and Tennessee from 2008 to 2012, relative to the decreases in turnout in comparison states that did not adopt voter ID laws during that time period, "were larger among registrants who were younger, African-American, or recently registered" and that this "analysis suggests that these

21

changes are attributable to the states' changes in voter ID laws, because [the study] held other facts constant that could have otherwise affected turnout." GAO Voter ID Report at 51-52.

70.     In addition, the previously mentioned 2006 survey sponsored by the Brennan Center for Justice found that "[c]itizens earning less than $35,000 per year [we]re more than twice as likely to lack current government-issued photo identification as those earning more than $35,000." *Citizens Without Proof* at 3. And obtaining an ID is likely to be disproportionately burdensome for individuals in poverty, because such individuals are less able than wealthier individuals to expend time that could be put to other productive uses, tend to have less flexible job schedules, and have less access to convenient means of transportation.

71.     Moreover, upon information and belief, Democratic voters in Virginia are disproportionately likely not to have a form of ID that can be used for voting under the voter ID law and are disproportionately likely to be burdened by that law. In recent elections, as set forth above, Democratic candidates have received strong support from African Americans, Latinos, and young voters, all of whom are disproportionately likely to be burdened by the voter ID law.

C.     The Voter ID Law Does Not Further State Interests

72.     The voter ID law does not materially benefit Virginia. And any benefit to Virginia from the voter ID law is clearly outweighed by the burden the law imposes on voters generally and on specific classes of voters.

73.     Careful research has discredited the notion that there is a significant amount of voter-impersonation fraud at the polls—the type of fraud that voter ID laws are purportedly intended to address. As Judge Posner wrote, voter-impersonation fraud "is by all accounts a tiny subset, a tiny problem." *Frank*, 773 F.3d at 788 (Posner, J., dissenting). Indeed, "'[a] study of 2,068 alleged cases conducted by the News21 journalism consortium found that since 2000 there

22

have been only ten cases of in-person voter fraud that could have been prevented by photo ID laws. . . . [T]his is a ratio of one case of voter fraud for every 14.6 million eligible voters-more than a dozen times less likely than being struck by lightning.'" *Id.* at 791 (Posner, J., dissenting) (quoting Richard Sobel, *The High Cost of 'Free' Photo Voter Identification Cards* 7 (2014), *available at* www.charleshamiltonhouston.org/wp-content/uploads/2014/08/FullReportVoterID June2014.pdf).

74.     In addition, "[t]he Director of the Elections Crimes Branch of the Public Integrity Section of the Criminal Division for the United States Department of Justice stated that a review of data from DOJ's case management systems . . . and certain publicly available and related court records indicated that there were no apparent cases of in-person voter impersonation charged by DOJ's Criminal Division or by U.S. Attorney's offices anywhere in the United States, from 2004 through July 3, 2014." GAO Voter ID Report at 70 (citing *Veasey v. Perry*, No. 13-193, ECF No. 390-2 (S.D. Tex. July 7, 2014)).

75.     Further, because Virginia provides free voter photo IDs to citizens without requiring them to provide any documentation confirming their identity, an individual who wished to commit in-person voting fraud could obtain a free ID that permitted him or her to do so.

76.     Senator Obenshain, who sponsored the voter ID bill, argued that the bill was necessary in part to increase confidence in the election process. Yet Stephen Ansolabehere and Nathaniel Persily have found based upon survey results that "[w]hether the state or local election administration frequently asks for voter identification or not seems to have no relationship to individuals' beliefs about the frequency of" voter-impersonation fraud or the casting of illegal votes by noncitizens or of multiple ballots. *Vote Fraud in the Eye of the Beholder: The Role of*

23

*Public Opinion in the Challenge to Voter Identification Requirements*, 121 Harv. L. Rev. 1737, 1756 (2008). Thus, upon information and belief, the voter ID law has not materially increased and will not materially increase confidence in the election process.

77.     The voter ID law's exclusion of IDs issued by states other than Virginia, universities outside of Virginia, and certain expired IDs does not serve any state interest and is not rational. The asserted purpose of the voter ID law is to confirm voters' identity; it is not to confirm their residence. When he was Secretary of the SBE, Donald Palmer stated that "[t]he use of the photo ID is the gold standard in confirming the identity of the voter and is not to be used to confirm the address of the individual." And for purposes of confirming a voter's identity, it is irrelevant where an ID was issued and whether it is expired.

78.     Moreover, even if the voter ID law's exclusion of IDs issued by states other than Virginia, universities outside of Virginia, and certain expired IDs served some state interest, that interest would clearly be outweighed by the burden on voters who possess such IDs but do not possess IDs that can be used for voting. The GAO Voter ID Report noted one study that found that 98.6% of eligible voters in Pennsylvania reported owning a photo ID but that this number dropped to 87% when respondents were asked follow-up questions about whether the ID had an expiration date and was current, and it mentioned another study that "reported that estimated rates of reported driver's license ownership dropped by 11 percent nationwide (from 91 to 80 percent) when considering if the license was expired, or showed a different name or address than the one they had registered under." GAO Voter ID Report at 26. In light of these statistics, it is clear that the voter ID law's exclusion of IDs issued by states other than Virginia, universities outside of Virginia, and certain expired IDs increases the number of Virginians who are burdened by the voter ID law.

24

79.     While there is no justifiable, non-discriminatory basis for the voter ID law, there is an evident explanation for the law.  As Judge Posner has explained, "There is only one motivation for imposing burdens on voting that are ostensibly designed to discourage voter-impersonation fraud, if there is no actual danger of such fraud, and that is to discourage voting by persons likely to vote against the party responsible for imposing the burdens." *Frank*, 773 F.3d at 796 (Posner, J., dissenting).

80.     Indeed, one scholar who has conducted in-depth research into voter fraud has found that there is a long history in the United States of voter-fraud allegations being used to restrict and shape the electorate; that historically disenfranchised groups are often the target of voter-fraud allegations; and that "the use of baseless voter fraud allegations for partisan advantage has become the exclusive domain of Republican party activists." Lorraine C. Minnite, *The Politics of Voter Fraud* 3-4 (2007), *available at* http://www.projectvote.org/images/publications/Policy%20Reports%20and%20Guides/Politics_of_Voter_Fraud_Final.pdf.

81.     In addition, a study by Keith G. Bentele and Erin E. O'Brien found "a very substantial and significant association between the racial composition of a state's residents or active electorate and both the proposal and passage of voter restriction legislation" and that "the emergence and passage of restrictive voter access legislation is unambiguously a highly partisan affair, influenced by the intensity of electoral competition." *Jim Crow 2.0?: Why States Consider and Adopt Restrictive Voter Access Policies* 26, 11 Perspectives on Politics 1088, 1103 (2013).

82.     Upon information and belief, the voter ID law was intended to suppress disproportionately the vote of African-American, Latino, young, and Democratic voters in Virginia.

## V.  Virginia's Long Wait Times to Vote

83.  Virginia has had long wait times to vote in multiple elections.  Some voters waited for 1-2 hours to vote in the 2004 presidential election.  In the 2012 presidential election, some voters had to wait in line for several hours before they could vote.  Guy Anthony Guiffré, Secretary of the Prince William County Elections Board, said on Election Day for the 2012 presidential election that several precincts had two-hour lines when the polls closed and that, at one point that morning, one precinct had a 4 1/2 hour line.  Moreover, according to the report of the Presidential Commission on Election Administration (the "Presidential Commission"), the percentage of Virginia voters who waited more than 30 minutes to vote in 2012 (27.9%) was *lower* than the percentage of such voters in 2008 (30.5%).  Virginia, in short, has had a recurring problem with long wait times to vote, and long lines are likely to recur in the 2016 general election.

84.  Long wait times to vote, including the long wait times that Virginia has had, severely burden the right to vote.  Long wait times require voters to expend time that could have been put to other productive uses, discourage some individuals from voting, and undermine confidence in the electoral process.  The Presidential Commission concluded that as a general rule, voters should not have to wait longer than 30 minutes to vote.

85.  The long wait times to vote in Virginia disproportionately abridge, deny, and burden the right to vote of African Americans, Latinos, citizens in poverty, young people, and Democrats.  In general, long wait times to vote disproportionately burden minorities.  As noted above, costs of voting depress turnout especially for racial and ethnic minorities.  In addition, minorities make up a disproportionate percentage of the Virginians in poverty, and long wait times to vote burden poor individuals in particular because such individuals are less able than

wealthier individuals to afford to expend time that could be put to other productive uses, tend to have less flexible job schedules, and have less access to convenient means of transportation.

86.     Upon information and belief, moreover, the Virginia precincts with long wait times to vote have disproportionately been precincts with large minority and/or college-student populations.  While he was still serving as Secretary of the SBE, Donald Palmer stated that some common characteristics among precincts in Virginia with long lines in the 2012 presidential election included that the precincts were in urban, high-growth areas and had highly transient voters or were university precincts.  And because minority and young voters in Virginia overwhelmingly vote Democratic, long wait times to vote disproportionately burden Democratic voters.

87.     To the extent that the wait times are a product of policies that save money, such cost savings are far outweighed by the burden these policies impose on voters generally and on specific classes of voters, including African-American, Latino, young, poor, and Democratic voters.

88.     That wait times to vote disproportionately burden minorities is a product of socioeconomic disparities between whites and minorities in Virginia—including, as noted above, that minorities are more likely to live in poverty, tend to have less flexible job schedules, and have less access to convenient means of transportation—which have resulted from Virginia's history of discrimination.  In other words, the policies that result in long lines to vote in Virginia interact with the effects of discrimination to impose disproportionate burdens on minority voters. And these disproportionate burdens are exacerbated by the current policies in Virginia, which have resulted in long lines in heavily minority precincts in particular.

27

89.     These disparate impacts on African Americans and Latinos, alone and in combination with Virginia's voter ID law, Virginia's limited absentee voting, and the fact that Virginia does not have early voting or same-day registration, have resulted, based on the totality of the circumstances, in African Americans and Latinos in Virginia having unequal access to the polls and having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

90.     No legislation passed since at least 2009 will prevent long wait times to vote from recurring in the 2016 election.  Indeed, in January 2013—just a few months after voters were forced to stand in long lines to vote in the 2012 general election—the Virginia Senate Privileges and Elections Committee voted against bills that had the potential to reduce wait times to vote. On January 15, 2013, the Senate Privileges and Elections Committee, by an 8-7 party-line vote (with Republicans in the majority), failed to report on SB 702, which would have permitted no-excuse in-person absentee voting.  On January 18, that committee, by an 8-5 party-line vote (with Republicans in the majority), failed to report on SB 964, which would have kept the polls open an extra hour (until 8:00 p.m., rather than 7:00 p.m.).  On the same day, the committee, by a 7-5 vote (with all Republicans in the majority and one Republican and four Democrats in the minority), passed by indefinitely SB 1150, which (among other things) would have required each electoral board to "develop a plan for minimizing the amount of time a voter has to wait to cast his vote on election day in order to ensure that no voter waits more than one hour to vote and" to "submit to the State Board and the governing body for the city or county of the electoral board a list of the resources necessary, including the optimum number of officers of election, poll books, ballots, and other voting equipment, to implement such plan."

28

91.     Upon information and belief, the General Assembly has not taken action to prevent long wait times to vote from recurring in the 2016 election because the voters who have had, and in the future will have, to wait a long time to vote are disproportionately minorities, students, and Democrats.  In other words, the General Assembly's decision not to take action to address long wait times to vote was made with the intent to suppress the vote of minorities, young voters, and Democrats.

## VI.    Virginia's Requirement that Nonviolent Felons Be Re-Enfranchised on an Individual Basis

92.     Under the Virginia Constitution, "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1.  Virginia is one of a few states that permanently (absent restoration of rights by the governor) disenfranchises all felons.

93.     Hundreds of thousands of Virginians, over half of whom are African American, are disenfranchised pursuant to Virginia's felon-disenfranchisement law.

94.     In 2013, Governor McDonnell took action to restore voting rights to felons whose crimes were designated as nonviolent and who have paid off all fees, fines, and restitution. Governor McAuliffe subsequently expanded the definition of nonviolent felonies in this context to include drug crimes.

95.     Notwithstanding these actions, a large number of nonviolent felons are still disenfranchised.  Slightly over 8,000 people had their right to vote restored during Governor McDonnell's term in office, and Governor McAuliffe has restored the right to vote of nearly as many Virginians.  But Governor McDonnell had said—even before Governor McAuliffe's expansion of the definition of nonviolent felony—that up to 100,000 individuals could have their rights restored.

29

96.     The continued disenfranchisement of a large number of nonviolent felons stems from the understanding that Virginia's governor must restore civil rights on an individual-by-individual basis and the fact that the Commonwealth simply does not know precisely who meets the criteria for rights restoration and where those individuals reside.

97.     Then-Secretary of the Commonwealth Janet Kelly explained, "The biggest challenge involved locating felons who had been out of the legal system for years or even decades"; the Commonwealth "could easily find the felons who were currently in the system or who had previously expressed an interest in getting their rights back." She also described the issue as follows: "If you're sitting in prison right now, we know where you are," but "[i]f you got out of prison 20 years ago, we don't know where you are."

98.     Consistent with these statements, the website for the Secretary of the Commonwealth (now Levar Stoney) states that offenders "currently incarcerated under the Department of Corrections or on supervised probation" do not need to contact the Secretary's office because "[t]he Department of Corrections provides a monthly listing to the Secretary's Office of those offenders who may qualify for restoration of rights" and individuals who "meet[] the criteria will be mailed a letter and grant order to either their last known address or their home plan address." However, other individuals eligible to have their right to vote automatically restored must submit a form to the Secretary.

99.     There is no rational basis for Virginia's requirement that nonviolent felons be re-enfranchised on an individual basis. To the extent that such individuals have served their sentences and paid all fees, fines, and restitution, the Commonwealth *wants* to restore their voting rights.

30

## CAUSES OF ACTION

### COUNT I

### (Violations of Section 2 of the Voting Rights Act)

100.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

101.    Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

102.    The voter ID law has had and, if not declared illegal and enjoined, will continue to have an adverse and disparate impact on African-American and Latino citizens of Virginia.

103.    African Americans and Latinos in Virginia have suffered from, and continue to suffer from, discrimination on the basis of race. The ongoing effects of this discrimination include socioeconomic disparities between African-American and Latino Virginians and whites in Virginia.

104.    The interaction of the voter ID law with the effects of discrimination in Virginia—including that African Americans and Latinos in Virginia are less likely than whites to have ID that can be used for voting—has caused and will continue to cause an inequality in the opportunity of African Americans and Latinos to vote in Virginia. Under the totality of the circumstances, African Americans and Latinos in Virginia have had and will continue to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice as a result of the voter ID law. African Americans and Latinos in Virginia therefore have had and will continue to have their right to vote abridged or denied on account of race due to the voter ID law.

31

105.   Virginia's long wait times to vote have had and, absent a finding that these wait times are illegal and an order directing Virginia to take the steps necessary to ensure that wait times will not abridge or deny the right to vote, will continue to have an adverse and disparate impact on African-American and Latino citizens of Virginia.

106.   The interaction of long wait times to vote with the effects of discrimination in Virginia—including that minorities, as compared to whites, are more likely to live in poverty, tend to have less flexible job schedules, have less access to convenient means of transportation, and are therefore more severely burdened by long wait times to vote—has caused and will continue to cause an inequality in the opportunity of African Americans and Latinos to vote in Virginia.  This inequality is exacerbated by the fact that policies currently in place in Virginia have disproportionately resulted in long wait times to vote in areas with disproportionately large minority populations.

107.   Under the totality of the circumstances, these long wait times to vote—and the policies that resulted in these long wait times—have resulted and will continue to result in less opportunity for African Americans and Latinos than for other members of the electorate to participate in the political process and to elect representatives of their choice.  The long wait times to vote in Virginia therefore have abridged or denied and will continue to abridge or deny the right to vote of African Americans and Latinos on account of race.

## COUNT II

### (Undue Burdens on the Right to Vote and
### Disparate Treatment of Voters Without a Rational Basis)

108.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

Case 1:23-cv-00878-TDS-JEP   Document 124-65   Filed 05/09/25   Page 33 of 39

109.    Under the First Amendment and the Equal Protection Clause of the Fourteenth
Amendment, a court considering a challenge to a state election law must carefully balance the
character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff
seeks to vindicate against the justifications put forward by the State for the burdens imposed by
the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S.
780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant
and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion
Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal
quotation marks omitted).  Further, all laws that distinguish between groups must at least be
rationally related to a legitimate state interest in order to survive scrutiny under the Equal
Protection Clause. *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

110.    The voter ID law imposes burdens on voters generally and severe burdens on
African-American, Latino, young, poor, and Democratic voters, as well as the class of voters
who lack an ID that can be used for voting.  Given that the law does not materially benefit
Virginia or plausibly further any other permissible interest, the burdens imposed by the voter ID
law outweigh the benefits of the law and it must therefore be invalidated under the Equal
Protection Clause.

111.    The voter ID law does not permit certain expired IDs or IDs issued by states other
than Virginia or universities outside of Virginia to be used for voter identification, and it thereby
distinguishes between individuals who have an ID that can be used for voting in Virginia and
individuals who do not have such ID but do have certain expired IDs or an ID issued by a state
other than Virginia or a university outside of Virginia.  The asserted purpose of the voter ID law
is to confirm voters' identity and prevent fraud.  But there is no rational relationship between this

33

interest and a law that distinguishes between expired and unexpired IDs and between IDs issued
in Virginia and IDs issued elsewhere.  For the purpose of confirming a voter's identity, it is
irrelevant whether an ID is expired or where it was issued.  In addition, these aspects of the voter
ID law burden citizens who do not have an ID that can be used for voting but who do have
certain expired IDs or an ID issued by another state or an out-of-state college.  Accordingly,
these aspects of the voter ID law are not rationally related to a legitimate state interest; the
burdens outweigh the benefits of these aspects of the voter ID law; and, for each of these reasons,
these aspects of the voter ID law violate the Equal Protection Clause.

112.    Virginia law is currently understood to prevent voting rights from being restored
to any class of felons with a single action of the governor and instead to require that such rights
be restored on an individual basis.  The effect of this rule is that where the governor seeks to
restore the voting rights of a class of individuals, he can do so only to the extent that the State
can individually identify and physically locate such individuals.  Individuals who do not submit a
form to the Secretary of the Commonwealth and are not otherwise identified and located by the
State accordingly will not have their voting rights restored even though the governor, who has
the authority to restore voting rights, wants to do so.

113.    This rule is arbitrary and not rationally related to any interest of the
Commonwealth, and preventing from registering to vote any individual who has served his or
her sentence for a nonviolent felony and paid off all fees, fines, and restitution is therefore a
violation of the Equal Protection Clause.

34

## COUNT III

### (Partisan Fencing)

114.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

115.   In *Carrington v. Rash*, 380 U.S. 89, 94 (1965), a case brought under the Equal Protection Clause, the Supreme Court held that "'[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

116.   Upon information and belief, the General Assembly, in enacting the voter ID law and failing to take action to prevent long wait times to vote from recurring, intended to suppress (that is, fence out), has suppressed, and will continue to suppress the vote of Democrats because of the way they are expected to vote. Accordingly, the voter ID law and policies that result in long wait times to vote have violated and, absent the relief requested, will continue to violate the First Amendment and the Equal Protection Clause.

## COUNT IV

### (Intentional Discrimination on the Basis of Race)

117.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

118.   Legislation intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth and Fifteenth Amendments. *See, e.g., City of Mobile v.*

*Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

119.    The General Assembly, in enacting the voter ID law and failing to take action to prevent long wait times to vote from recurring, intended, at least in part, to suppress the number of votes cast by African Americans and Latinos.

120.    The General Assembly's consideration of race in enacting the voter ID law and failing to take action to reduce wait times to vote was not justified by any legitimate state interest, much less narrowly tailored to a compelling state interest.

121.    The voter ID law and long wait times to vote, individually and jointly, have resulted and, absent the remedies requested below, will continue to result in the abridgement and denial of the right to vote for African Americans and Latinos on account of race.  Accordingly, the voter ID law and policies that result in long wait times to vote have violated and, absent the relief requested, will continue to violate the Fourteenth and Fifteenth Amendments.

## COUNT V

### (Intentional Discrimination on the Basis of Age)

122.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

123.    The Twenty-Sixth Amendment provides in part that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."  The goal of the amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather

36

than remain outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 345 (1972).

124.    In enacting the voter ID law and failing to take action to reduce wait times to vote, the General Assembly intended, at least in part, to suppress the number of votes cast by young voters.

125.    The General Assembly's consideration of age in enacting the voter ID law and failing to take action to reduce wait times to vote was not justified by any legitimate state interest, much less narrowly tailored to a compelling state interest.

126.    The voter ID law and long wait times to vote, individually and jointly, have resulted and, absent the remedies requested below, will continue to result in the abridgement and denial of the right to vote for young voters on account of age. Accordingly, the voter ID law and policies that result in long wait times to vote have violated and, absent the relief requested, will continue to violate the Twenty-Sixth Amendment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the voter ID law violates Section 2 of the Voting Rights Act and the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments; that Virginia's long wait times to vote and failure adequately to address that issue violate Section 2 of the Voting Rights Act and the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments; and that Virginia's requirement that voting rights be restored to nonviolent felons on an individual basis has no rational basis and violates the Equal Protection Clause of the Fourteenth Amendment;

B.    Issue a permanent injunction enjoining Defendants and their agents, employees, and successors, and all persons acting in concert with any of them, from enforcing or giving any

effect to (1) the voter ID law and (2) all laws that prevent an individual convicted of a nonviolent felony who has served his or her sentence (including having completed any probation and parole time), and paid off all fees, fines, and restitution imposed as part of his or her sentence, from registering to vote and voting;

      C.     Hold hearings, consider briefing and evidence, and/or otherwise take actions necessary to determine what changes must be made to prevent long wait times to vote from recurring in future elections and order that such changes be implemented and effectuated; and

      D.     Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated:  June 11, 2015

Respectfully submitted,

By_____

Marc Erik Elias (*pro hac vice* to be filed)
Bruce V. Spiva (*pro hac vice* to be filed)
Elisabeth C. Frost (*pro hac vice* to be filed)
Aria C. Branch  (VSB# 83682)
Amanda R. Callais (VSB #85891,
application for admission forthcoming)
Perkins Coie, LLP
700 13th St. N. W., Suite 600
Washington, D.C.  20005-3960
Phone:  (202) 434-1627
Fax:  (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: EFrost@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: ACallais@perkinscoie.com

Joshua L. Kaul (*pro hac vice* to be filed)
Perkins Coie, LLP
1 East Main Street, Suite 201
Madison, WI  53703-5118
Phone:  (608) 663-7460
Fax:  (608) 283-1007
Email: JKaul@perkinscoie.com

*Attorneys for Plaintiffs*
