IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-CV-878

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA; *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAN HIRSCH, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS, *et al.*, <br><br> *Defendants*. | **REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

While accusing Legislative Defendants of "revisionist history", Plaintiffs ignore the inconvenient truth that Jim Womack and Cleta Mitchell testified that they had no input in drafting the challenged undeliverable mail provision ("UMP"). [NCEIT[1] 71:18-72:12; Mitchell[2] 196:14-25]. But, instead of dealing with this reality, Plaintiffs attempt to muddy an otherwise clear record by pointing to discarded or unchallenged bill drafts. The Court should grant Legislative Defendants' Motion for Summary Judgment.

## ARGUMENT

A case need not go to trial "merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). To show a genuine dispute, the opposing party must

---

[1] Exhibit 1, NCEIT 30(b)(6) deposition excerpts.
[2] Exhibit 2, Mitchell deposition excerpts.

offer more than bare allegations or conclusory claims. *Reddy v. Buttar*, 38 F.4th 393, 403 (4th Cir. 2022). Thus, summary judgment is appropriate if "the facts are undisputed", or, "the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315–16 (4th Cir.1993). On summary judgment, Plaintiffs are bound by the claims in the Complaint. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009).

I. **Plaintiffs' Failed Conspiracy Theories Do Not Create Issues of Fact.**

Plaintiffs' entire case rests on the personal beliefs of two unelected election advocates whose agenda for SDR never became law. All Plaintiffs offer is a failed attempt to impute those personal beliefs of Womack and Mitchell onto legislators, and then twist the words of these legislators beyond recognition. First, it's undisputed that Mitchell didn't meet with any House members. [Mitchell 200:22-201:11, 203:8-11]. Only Womack communicated with Representative Mills. [D.E. 124-5, 129:6-9; Mills[3] 79:14-80:6]. In fact, Mitchell testified that Womack failed to consult her before using her name in NCEIT materials or offering for her to meet with House members—a meeting which didn't happen. [Mitchell 199:3-202:19].

Next, Plaintiffs take Senator Daniel's testimony wildly out of context. [Resp. 2]. It's undisputed that Womack and Mitchell met with Senator Daniel once to argue that SDR voting should be provisional. [Daniel[4] 64:10-25; Mitchell 251:1-254:21]. While NCEIT claimed credit for initial drafts making SDR ballots provisional [D.E. 124-5, 47-49], absent

---

[3] Exhibit 3, Mills deposition excerpts.
[4] Exhibit 4, Daniel deposition excerpts.

from Plaintiffs' Response is any testimony from legislators endorsing that statement. Instead, Senator Daniel testified that "*all* of the election integrity groups"[5] had concerns about SDR proof of residence, which he considered a constituent issue. [D.E. 124-2, 114:11-16; 148:15-18].

But, Plaintiffs' citations to NCEIT, Mitchell, and the provisional ballot idea are immaterial because Plaintiffs admit that provisional SDR ballots didn't move forward in any legislation. [Resp. 9].[6] If anything, the record shows that advocacy by the NCSBE and Plaintiffs against the provisional ballot idea worked. [DemNC Ex.8[7]]. The provisional ballot version was replaced by the UMP, which, as Plaintiffs point out, Representative Mills believed was more workable. [Resp. 4]. Neither NCEIT, nor Mitchell, were consulted or happy about the UMP. [NCEIT 71:18-72:12; Mitchell 253:4-254:21].

## II. Plaintiffs Lack Standing Post-*Alliance*.

Under Plaintiffs' theory of organizational standing, the narrow exception of *Havens*, would suddenly swallow the rule. *FDA v. All. for Hipp. Med.*, 602 U.S. 367, 370 (2024) ("*Alliance*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) ("*Havens*")). In fact, Plaintiffs' arguments prove why the Supreme Court has been "careful not to extend" *Havens*, and why courts are increasingly skeptical of broad organizational standing theories post-*Alliance*. *Id.* Summary judgment is appropriate here, where

---

[5] Senator Daniel testified that the Electoral Education Foundation also proposed SDR provisional ballots. [Daniel 85:3-91:17].
[6] To the extent Plaintiffs point to H.B. 485, 770, and 772, those didn't become law. [D.E. 124-23–D.E. 124-25].
[7] Exhibit 5, Democracy NC 30(b)(6) deposition Ex.8.

Plaintiffs' belated attempts to recast their all-inclusive organizational missions as narrowly focused defies both precedent and common sense.

### A. Plaintiffs Lack a Cognizable Injury-in-Fact.

Plaintiffs' arguments regarding an Article III injury reflect a fundamental misunderstanding of organizational standing post-*Alliance*.[8] Rather than identify a specific mission and discrete harm, Plaintiffs rely on broad generalities and unsworn exhibits.[9] By Plaintiffs' logic, because S.B. 747 falls within their admittedly large sphere of influence then any objection to it must confer standing. *Alliance* squarely foreclosed this theory. 602 U.S. at 394-95.

Beyond offering self-defined missions which supposedly include general voter education, Plaintiffs' arguments focus on likening themselves to the organizations in *Havens* and *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) ("*RNC*"). Plaintiffs not only distort these cases, but their arguments are contrary to the undisputed evidence.

The organization in *Havens* provided housing counseling services to home seekers. *Alliance*, 602 U.S. at 395.[10] When unlawful housing practices directly impaired its ability to provide counsel, the organization was harmed. *Id*. Similarly, *RNC* doesn't provide a

---

[8] D.E. 120, n.16 (collecting cases).
[9] Plaintiffs attach unsworn exhibits HHH-JJJ, and LLL (which cannot be considered on summary judgment) to assert that Democracy NC was organized "in part" to educate voters and increase civic participation, that the NCBA broadly "work[s] toward systemic change . . . on issues of social and economic empowerment, and LWVNC broadly "empower[s] voters and defend[s] Democracy." [Resp. 15].
[10] Regardless of Plaintiffs' attempts to reframe it, this was the issue-specific mission identified by the Supreme Court in *Alliance* that conferred standing. *Id.*

blank check of standing for any self-proclaimed "voter engagement organization" to challenge voting laws it dislikes, as there, the Republican Party identified a discrete purpose of supporting Republican causes, candidates, and voters. 120 F.4th at 396-97. When voter registration procedures introduced potentially illegitimate votes into elections, those core operations of helping Republican voters support Republican candidates were directly threatened. *Id.* at 397. Unlike here, the *Havens* and *RNC* plaintiffs identified distinct organizational purposes directly and exclusively linked to the challenged actions. Even still, the *RNC* plaintiffs established organizational standing "by the barest of threads." *Id.* at 408-10 (Diaz, C.J. concurring).

Here, Plaintiffs don't identify a specific purpose, rather, they claim to work in ill-defined areas like "democracy," "pro-democracy reforms," and "defending Democracy." [D.E. 119-5, 18:8-14; D.E. 119-14, 17:11-18:5, 24:2-26:5; D.E. 119-6, 29:4-17]. Such "missions" are the antithesis of *Alliance*, *Havens*, and *RNC* and are too broad to establish standing. Plaintiffs' standing theory would allow any organization to define its mission broadly, touching every piece of legislation imaginable. That organization could then spend any amount of money or time opposing legislation, arguing that it falls within their core mission. *Alliance* forecloses this argument. 602 U.S. 393-97.

### B. Plaintiffs' Claims are Not Traceable to S.B. 747 or Redressable.

Plaintiffs' arguments that they establish traceability because they "shifted resources" as a result of S.B. 747, [Resp. 17], fall short of what Article III demands. *Alliance*, 602 U.S. at 394-96. Plaintiffs cannot identify any competent evidence establishing the necessary causal nexus between S.B. 747's supposed harm to "young

5

voters" and the organizational harm alleged. *Id.* at 382. Yet even if these claims were accepted at face value, they fail.

First, Plaintiffs fail to show that the financial expenditures were anything other than routine choices made <u>every</u> election cycle. [D.E. 119-5, 72:22-73:20, 89:7-90:20; D.E. 119-6, 78:9-79:1; D.E. 119-4, 88:20-90:10]. General education efforts and budgetary concerns don't confer organizational standing. *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012). Further, *Alliance* made clear that general diversion of resources doesn't confer standing. 602 U.S. at 370.

Second, Plaintiffs don't point to any evidence linking these routine expenditures to the UMP or its alleged impact on independent choices of "young voters." *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). This is in stark contrast to the directly traceable harm to home seekers in *Havens* or Republican voters in *RNC*. The Fourth Circuit rejects similarly attenuated traceability theories. *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234-36 (4th Cir. 2005).

Third, Plaintiffs don't meaningfully address their fatally attenuated causation theory. *Alliance*, 602 U.S. at 386. All experts agree that there is no data indicating how S.B. 747 would impact voters absent the cure provision implemented because of the injunction in *Voto Latino v. Hirsch*, 712 F.Supp.3d 637, 684 (M.D.N.C. 2024). [D.E. 119-10—D.E. 119-11]. Nor will this data ever exist.[11] Thus, all Plaintiffs are left with is

---

[11] Because of the consent judgment timing in *Voto Latino,* Legislative Defendants don't address mootness here because it would be improper reply material. Rather, these arguments are raised in Legislative Defendants' Jurisdictional Motion to Dismiss. [D.E. 125].

speculation and conjecture regarding the causal link between the UMP, the alleged harm to "young voters," and the resulting injury to the organizations. *Maryland Election Integrity, LLC. v. Maryland State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025).

Finally, Plaintiffs lack the redressability standing demands. *Alliance*, 602 U.S. at 380-81. Plaintiffs' claims weren't redressable the moment this Court issued its injunction in *Voto Latino*. Plaintiffs' claims were forestalled further when the NCSBE responded to the injunction with updated Numbered Memo 2023-05, which Plaintiffs never challenged.[12] [D.E. 119-1, 56-70]. Plaintiffs speculate that there might be *some* form of unspecified relief beyond what the Court already provided but provide no particulars. [Resp. 17-18]. The Supreme Court unequivocally rejected standing based upon such speculation in *Alliance*. 602 U.S. at 383.

### III. Plaintiffs' Twenty-Sixth Amendment Claim Fails.

To state a claim under the Twenty-Sixth Amendment, a plaintiff must first identify a cognizable age-based class. Plaintiffs' selective quotation of *Lee v. Virginia State Bd. of Elections* obscures that the *Lee* court didn't specifically endorse "young voters" as a protected class. Instead, the court merely noted in a footnote that "even accepting" the existence of such a class, the plaintiffs failed to show any intent to discriminate. 188 F.Supp.3d 577, 609 n.18 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016). Moreover, Plaintiffs' assertion that "most" Twenty-Sixth Amendment cases involve college students

---

[12] Plaintiffs now claim to challenge the efficacy of the cure provision. [Resp. 17-18]. However, Plaintiffs had over a year to amend their Complaint and didn't.

is exaggerated. In reality, Twenty-Sixth Amendment caselaw is sparse. *N. Carolina State Conf. of the NAACP v. McCrory*, 182 F.Supp.3d 320, 522 (M.D.N.C. 2016).

Most of the cases Plaintiffs cite in support of a "young voter" class are from outside this circuit and readily distinguishable, as the challenged laws in those cases *explicitly and exclusively* targeted students. *See Allen v. Waller Cnty.*, 472 F.Supp.3d 351 (S.D. Tex. 2020) (college campus voting hours); *One Wis. Inst., Inc. v. Nichol*, 186 F.Supp.3d 958 (W.D. Wis. 2016) (student IDs as voter identification); *Nashville Student Org. Comm. v. Hargett*, 155 F.Supp.3d 749 (M.D. Tenn. 2015) (same); *League of Women Voters of Fla. Inc. v. Detzner*, 314 F.Supp.3d 1205, 1209-10 (N.D. Fla. 2018) (early voting on college campuses). College voters might form an age-based class in those contexts because the policies specifically targeted students. But, as here, where a law applies more broadly and not just to students—the student-age proxy breaks down.

Moreover, Plaintiffs don't provide a compelling basis to dispute that the "young voter" class is constantly changing. Unlike voters aged 65 and older—who remain in a fixed age-based category—the "young" voter class is fluid: individuals continually age into and out of it, making it difficult to accept as a discrete and enduring group. While Plaintiffs need not show all students are young or all young voters are affected, they must identify a clear, discrete class. But Plaintiffs fail to commit to a definition for their class, oscillating between identifying it by age, student-status, and newness to voting. [D.E. 1 ¶¶6, 29-30; Resp. 19-20, 23].

8

Case 1:23-cv-00878-TDS-JEP    Document 129    Filed 05/16/25    Page 8 of 16

A.   **Plaintiffs Fail to Argue *Anderson-Burdick*.**

It is not a forgone conclusion that *Arlington Heights* applies to Twenty-Sixth Amendment claims. Tellingly, Plaintiffs cite to *Hargett,* 155 F.Supp.3d 749, where the court bypassed *Arlington Heights* after finding that a voter-ID law didn't impose a unique burden on students, because it applied equally to all voters and offered multiple acceptable forms of identification. *Id.* at 757. And while the Fourth Circuit in *Lee* found that under *Arlington Heights* no age discrimination was present, it expressed skepticism about applying Fifteenth Amendment principles to Twenty-Sixth Amendment claims. 843 F.3d at 607. But even applying *Arlington Heights*, Plaintiffs claims fail.

B.   **There is No Evidence of Undue Burden.**

First, Plaintiffs' attempt to distinguish their claim from *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), is unavailing. As in *Brnovich*, voters have *multiple* registration methods, and the alleged "burden" of the UMP is not unavoidable as Plaintiffs suggest—all voters can register through the standard registration process. 594 U.S. at 671. Moreover, Plaintiffs grossly oversimplify the findings in *McCrory*, 831 F.3d 204, to draw an inapt comparison. In *McCrory*, the district court acknowledged undisputed evidence that African Americans disproportionately faced socioeconomic barriers, but dismissed their use of early voting and SDR as a matter of "preference." *Id.* at 232–33. The Fourth Circuit reversed, holding that those voting tools were essential for African Americans due to systemic disadvantages. *Id.* Tellingly, the district court in *McCrory* found no Twenty-Sixth Amendment violation, 182 F.Supp.3d at 521-25, a conclusion that wasn't disturbed by the Fourth Circuit. 831 F.3d at 219.

9

Even assuming Plaintiffs could show that young voters disproportionately rely on SDR—which they cannot—they offer no evidence that young voters are "reliant" on SDR due to systematic disadvantages or barriers to standard registration. That failure is unsurprising, given that their proposed "young voter" class lacks the kind of unifying characteristics necessary to establish such a claim.

### C. There is No Evidence of Discriminatory Intent.

Plaintiffs would next have this Court scour the conduct of every person who ever entered the legislative building for evidence of a whiff of discriminatory bias having floated through the room as S.B. 747 was drafted and passed—yet this isn't the standard. Only genuine issues of *material* fact are relevant when analyzing for discriminatory purpose under *Arlington Heights*, and Plaintiffs failed to point to any material facts in dispute.

While the government may not adopt laws simply to advance discriminatory views expressed by the public, the mere fact that members of the public with allegedly discriminatory views support a particular policy does not render the policy itself discriminatory, nor does it impute discriminatory intent to the legislators who enact it. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003). Legislators are entitled (indeed, are elected) to consider public input on issues facing the State without being deemed to endorse every motivation behind it. That's why constitutional scrutiny focuses on governmental purpose—not personal beliefs of some supporters. 538 U.S. at 196–97. Indeed, even if a legislator said something potentially discriminatory related to a bill idea, this isn't evidence of discriminatory purpose if other legislators actively involved in the bill expressed other, genuine reasons for its passage.

*See Brnovich*, 594 U.S. at 687-90 (single legislator's discriminatory remarks didn't establish discriminatory purpose where other lawmakers independently evaluated and supported the bill for legitimate reasons).

Plaintiffs' choice to focus on interactions with two actors with whom they politically disagree does nothing to show that legislators <u>actually relied</u> on those actors. Furthermore, the evidence Plaintiffs cite is inapposite the cases they cite. In *Mi Familia v. Fontes*, 129 F.4th 691 (9th Cir. 2025) the court attributed a third-party's discriminatory purpose to the legislature where the group sent lobbying material with racially-coded language, and was credited by multiple legislators as an author or major contributor to the bill. In *Stout v. Jefferson Cnty Bd. of Ed.*, 882 F.3d 988, 1007-08 (11th Cir. 2018), a group of community members motivated by discriminatory intent lobbied for their schools to secede from a racially integrated school system and later became board members of the newly formed district whose actions were challenged. Both cases demonstrate a level of control by third parties over the legislative process that isn't present here.

Here, it is undisputed that Womack and Mitchell didn't draft the challenged UMP, nor were they happy with it. *Supra* pp 2-3. More importantly, no legislators credit them with authorship.[13] Moreover, *Brnovich* makes clear that the identity of the idea's "progenitor" is irrelevant when the legislative record shows that the proposal was enacted based on the non-discriminatory reasoning of the majority of those involved—which the

---

[13] Plaintiffs claim that legislators credited NCEIT [Resp. 22], but offer <u>no</u> citation in support. In fact, Representative Mills expressly rejected this. [Mills 89:17-25, 94:11-12].

testimony of Senator Daniel, Representative Mills, and the NCSBE indisputably establishes. 594 U.S. at 687-90.

The undisputed facts show that S.B. 747 stemmed from constituent concerns with difficulties in SDR address verification, including timing. [Daniel 39:10-19, 177:20-178:22; D.E. 119-1, 88:18-89:9]. Though the NCSBE didn't conceive S.B. 747 in its entirety, Plaintiffs don't dispute the NCSBE drafted the UMP due to the legislature's concern with election finality and timing. [Resp. 8]. That's how the legislative process is supposed to work.

Plaintiffs failed to show any triable facts demonstrating the legislative process regarding S.B. 747 deviated from the normal legislative process. Furthermore, Plaintiffs admit that the bill sponsors didn't request data on SDR usage [Resp. 5], and it is undisputed that the Legislature had no reports on SDR data broken down by age. [Daniel 265:13-166:11; Mills 241:21-242:21; NCSBE[14] 111:13-112:15]. Clearly age was not a factor.

Lastly, Plaintiffs cannot prove that S.B. 747 disproportionately impacts young voters. Legislative Defendants' expert Dr. White was the only expert to perform a disparate impact analysis. [D.E. 119-10]. Plaintiffs' expert, Dr. Quinn, didn't perform any statistical tests on age. [D.E. 119-11]. Relying on unsworn exhibits and logical leaps, Plaintiffs attempt to argue that certain county boards of election testimony about the cure process shows that the UMP disproportionately impacts young voters. [Resp. 10-11]. But, Plaintiffs' Exhibits LL–MM, RR–UU and WW are unsworn, were never used in County

---

[14] Exhibit 6, NCSBE 30(b)(6) deposition excerpts.

Board depositions, and may not be considered. *Grey v. Potter*, No.1:00CV00964, 2003 WL 1923733, at *4, 7 (M.D.N.C. Apr. 21, 2003) (refusing to consider unauthenticated materials on summary judgment). Furthermore, Plaintiffs use of cure process data from individual counties only speaks to the cure process itself, which Plaintiffs didn't challenge. *Wahi*, 562 F.3d at 617. Without comparing pre-747 fail rates at the county-level to the cure process fail rates at the county-level, Plaintiffs cannot show that the cure process resulted in higher fail rates. In fact, New Hanover County testimony shows that fail rates for college students were likely the same pre- and post-747. [D.E. 124-8, 100:5-16].

## CONCLUSION

For the foregoing reasons, Legislative Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted, this the 16th day of May, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach (NCSB # 29456)
Alyssa M. Riggins (NCSB # 52366)
Nathaniel J. Pencook (NCSB # 52339)
Cassie A. Holt (NCSB # 56505)
Jordan A. Koonts (NCSB #59363)
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3779
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
nate.pencook@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Counsel for Legislative Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 3,121/3,125 words as counted by the word count feature of Microsoft word.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
    Phillip J. Strach
    N.C. State Bar No. 29456

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 16th day of May, 2025, the foregoing was filed and served upon all counsel of record via the Court's CM/ECF system.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach (NCSB # 29456)

16