# Exhibit 2

```
            IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMOCRACY NORTH CAROLINA;            )
NORTH CAROLINA BLACK ALLIANCE;       )
LEAGUE OF WOMEN VOTERS OF            )
NORTH CAROLINA,                      )
                                     )
           Plaintiffs,               )
                                     )
vs.                                  )Civil Action No.
                                     )1:23CV00878-TDS-JEP
ALAN HIRSCH, in his official         )
capacity as CHAIR OF THE STATE       )
BOARD OF ELECTIONS; JEFF             )
CAMERON III, in his official         )
capacity as SECRETARY OF THE         )
STATE BOARD OF ELECTIONS;            )
STACY EGGERS IV, in his              )
official capacity  as MEMBER         )
OF THE STATE BOARD OF                )
ELECTIONS; KEVIN LEWIS, in his       )
official capacity as MEMBER OF       )
THE STATE BOARD OF ELECTIONS;        )
SIOBHAN O'DUFFY MILLEN, in her       )
official capacity as MEMBER OF       )
THE STATE BOARD OF ELECTIONS;        )
KAREN BRINSON BELL, in her           )
official capacity as EXECUTIVE       )
DIRECTOR OF THE STATE BOARD OF       )
ELECTIONS; NORTH CAROLINA            )
STATE BOARD OF ELECTIONS,            )
                                     )
           Defendants.               )
_____/


        VIDEOTAPED DEPOSITION OF CLETA MITCHELL
                 (Taken by Plaintiffs)
                 Raleigh, North Carolina
             Wednesday, September 25th, 2024



            Certified Stenographic Court Reporter
               Amy A. Brauser, RPR, RMR, CRR


                                                        1
```

1   not be saying of Ms. Mitchell, who has had a
2   distinguished career in public service.
3           MR. DOCKTERMAN:  Let's take our lunch
4   break.  It is now --
5           MS. HOLT:  Gentlemen, if I may, I would
6   just like to note Legislative Defendants'
7   objection to getting outside of the scope of
8   the record as well.  Of course, I am not
9   counsel for Ms. Mitchell, but we would like
10  to note that for the record, please.
11          MR. DOCKTERMAN:  Anybody else who is on
12  here virtually want to say anything before we
13  break for lunch?
14          THE WITNESS:  I will say for the
15  record, I would like to answer questions.  I
16  will be -- I will answer questions on
17  same-day registration.  I'm not going to
18  discuss other areas of inquiry, other subject
19  matters, because that's well beyond the scope
20  of your litigation.
21          And I also -- I personally object to
22  your assertion that I somehow influenced
23  Senate Bill 747, which is -- you have no
24  evidence to support that.  It did not happen.
25  You have no evidence to support that.

                                                    196

1    Davis is?
2         A.   I do not.
3         Q.   Okay.  Do you know who Representative
4    Grey Mills is?  He's shown in the cc line.
5         A.   I've heard them talk about him, but I
6    don't know him.
7         Q.   And when you say "them"?
8         A.   Jim Womack.
9         Q.   Jim Womack.
10             In the second paragraph, Mr. Womack
11   begins:
12                  Election law attorney, Cleta
13             Mitchell, and I would welcome the
14             opportunity to pop up to Raleigh to
15             meet with you, Representative Warren,
16             Representative Mills, and any other
17             legislators to address the suite of
18             proposed statutory changes we have
19             submitted, all of which stem from our
20             thorough review of the State
21             statues --
22             I think it means "statutes" although it
23   says "statues."  (Reading)
24                  -- and documented experiences
25             in the last two election cycles.

199

1                     Do you see that?
2          A.    I see that.
3          Q.    Did you review any State statutes with
4     or for Mr. Womack before March 11, 2023?
5          A.    I don't really think so, no.  I think
6     maybe he might have sent me some things.
7          Q.    Okay.
8          A.    But . . .
9          Q.    Well, obviously, Mr. Womack's testified
10    to this, but I'm curious as to your recollection.
11    Do you recall --
12         A.    I don't recall.  I don't recall that,
13    no.
14         Q.    Okay.  Do you recall the offer to "pop
15    up to Raleigh"?
16         A.    No.
17         Q.    It's not much of a pop for you, is it?
18         A.    Well, it's an hour.
19         Q.    Is it an hour?
20         A.    An hour and a half.
21         Q.    Okay.
22               And he specifically mentions
23    Representative Warren, Representative Mills, and,
24    of course, Representative Davis himself.
25               Do you recall ever discussing those

                                                      200

```
 1   folks with Mr. Womack?
 2        A.    No.
 3        Q.    Do you --
 4        A.    Oh, wait.  Ever discussing what?
 5        Q.    Those folks.
 6        A.    I think I've heard him talk about --
 7   he's talked about Representative Grey Mills.  I
 8   think he was chairman of the Elections Committee
 9   but I'm not certain about that.
10              I don't know him.  I've never met with
11   any of these people.
12        Q.    Okay.
13        A.    Other than Mr. Womack.
14        Q.    I got it.
15              And there's also a mention here of a
16   "suite of proposed statutory changes we have
17   submitted."
18              Do you know who "we" is there?
19        A.    NCEIT.
20        Q.    NCEIT.  And he doesn't say NCEIT, he
21   says "Cleta Mitchell and I."  So I wondered --
22        A.    He says:  (Reading)
23                   Cleta Mitchell and I will
24              be -- would welcome the opportunity to
25              come meet with you.
```

                                                                201

```
 1          Q.    Okay.  (Reading)
 2                About the suite of proposed
 3       statutory changes we have submitted.
 4                So that's why I was curious about the
 5   "we."
 6          A.    Well, I think the "we" is NCEIT because
 7   there was a group of people at NCEIT that worked
 8   very hard on whatever they were going to propose to
 9   the legislature.
10          Q.    And were you involved in that at all?
11          A.    No.
12          Q.    Do you know why he would have
13   volunteered you?
14          A.    A lot of states do that.
15          Q.    I'm sorry, what do you mean by that?
16          A.    He would have volunteered me because I
17   live in North Carolina.  And if he had asked me to
18   attend, I probably would have, but -- if I could,
19   but I didn't.  He didn't ask, and I didn't go.
20          Q.    In the fourth paragraph, it begins:
21   (Reading)
22                We applaud the House
23          initiatives to limit the length of the
24          early voting period to compel same-day
25          registrants to use a provisional
```

                                                          202

```
 1            ballot and to require delivery of

 2            mail-in ballots by the end of the

 3            election day.

 4                 I want to make particular reference to

 5       "to compel same-day registrants to use a

 6       provisional ballot."

 7            A.   Uh-huh, yes.

 8            Q.   Were you involved at all in any House

 9       initiatives to compel same-day registrants to use a

10       provisional ballot?

11            A.   I was not.

12            Q.   Do you know who he's referring to here?

13            A.   NCEIT.  I presume that.

14            Q.   I was just going to ask you, do you

15       know or is that an assumption?

16            A.   That's just an assumption.

17            Q.   Okay.

18            A.   It wasn't me.

19            Q.   Do you know if he -- did he run any of

20       those initiatives by you?

21            A.   No.

22            Q.   Did you discuss them with him

23       generally?

24            A.   He sent me a PowerPoint that he had

25       prepared at some point.  I said, "This is great,"
```

203

1          Q.   And everything from that down, that's
2  from WRAL.
3          A.   Well, that makes sense because I see
4  these ugly comments about -- although here is an
5  actual.  (Reading)
6                    It's unclear how much
7            Mitchell -- how much influence
8            Mitchell and others have had in
9            helping craft language of the expected
10           proposal.  Hall said he's never met
11           with her.
12                True statement.
13         Q.   Okay.  (Reading)
14                    But a top Republican in the
15           other chamber -- according to the next
16           sentence -- Senator Ralph Hise, said
17           she's one of the many people he's
18           talked to about the bill.
19         A.   Okay.  If he was at that meeting,
20  that's it.
21         Q.   Okay.
22         A.   That's my only meeting on this bill or
23  any of these.  I don't even know if it was on this
24  bill that is the subject matter of your litigation.
25         Q.   I get it.  I'm just telling you what --

                                                       251

1     A.   Well, I'm just saying, I had one
2  meeting, and that was it.
3     Q.   Sometimes people can talk other than in
4  meetings, Ms. Mitchell, and that's why I'm saying,
5  Senator Hise says you're one of the many people.
6     A.   She is -- I am one of many people he
7  has talked to.
8     Q.   Yes.  "He," Senator Hise.
9     A.   Correct.
10    Q.   So that's why I was trying to determine
11 whether you've ever spoken to Senator Hise.
12    A.   If he was in the meeting that day,
13 which I think maybe he was, I'm not really sure,
14 but I think maybe he was, then, yes, I would be one
15 of the people he talked to because he and I would
16 have been in that meeting.  But that was it for me.
17    Q.   Okay.  So if you go to the next page,
18 there's another quotation from Mr. Hise under-
19 Senator Hise under "What could be in the bill."
20         Do you see that?
21    A.   I do.
22    Q.   (Reading)
23            Hise said that while he has
24         been working with Womack and Mitchell
25         on the bill, he and other GOP leaders

                                                    252

1              have met with plenty of others as
2         well.
3         A.    Where are you reading from?
4         Q.    Do you see where it says "What could be
5    in the bill"?  About a third of the way down.
6         A.    Okay.
7         Q.    The first sentence says:  (Reading)
8                   Hise said that while he has
9              been working with Womack and Mitchell
10             on the bill, he and other GOP leaders
11             have met with plenty of others as
12             well.
13             Do you see that?
14        A.    I do, but they're not quoting him.
15        Q.    I don't know --
16        A.    They're not -- he didn't say -- that is
17   not in quotes.  He said, "I've talked to them."
18        Q.    So I'm just reading this sentence --
19        A.    I understand that, but there's a big
20   difference between some WRAL reporter
21   characterizing or mischaracterizing what he said
22   and the quote where he actually said, "I've talked
23   to them."  I presume that Jim Womack talked to him
24   many times.  If he was in the meeting, and I think
25   maybe he was, I talked to him once.

253

1    Q.   So one of the things that I wanted to
2    confirm with you is he's -- it is attributed to him
3    to have said, whether in quotes or not, that he has
4    been working with Womack and Mitchell on the bill.
5         Are you denying --
6    A.   I am --
7    Q.   Let me finish the question.
8         Are you denying that you worked with
9    Senator Hise on the bill?
10   A.   My definition of "working with" someone
11   would be more than having one meeting.  It would be
12   actually more than one meeting, exchanging
13   information on more than one occasion, all those
14   kinds of things.  That is what I would define as
15   "working with."  I did not work with any legislator
16   on Senate Bill 747.
17   Q.   And do you know whether any of your
18   materials were either invoked or provided to
19   legislative leaders in North Carolina in support of
20   the work on 747?
21   A.   I have no idea.
22   Q.   Okay.
23        MR. DOCKTERMAN:  If you give us
24   two minutes, Tyler.
25        MR. BROOKS:  Sure.

254

```
 1   STATE OF NORTH CAROLINA
 2   COUNTY OF DAVIDSON
 3
 4                   C E R T I F I C A T E
 5           I, Amy A. Brauser, Registered Merit
 6   Reporter/Certified Realtime Reporter, the officer
 7   before whom the foregoing deposition was taken, do
 8   hereby certify that the witness was duly sworn by me
 9   prior to the taking of the foregoing deposition; that
10   the testimony of said witness was taken by me to the
11   best of my ability and thereafter reduced to
12   typewriting under my direction; that I am neither
13   counsel for, related to, nor employed by any of the
14   parties to the action in which this deposition was
15   taken, and further that I am not a relative or employee
16   of any attorney or counsel employed by the parties
17   thereto, nor financially or otherwise interested in the
18   outcome of the action.
19
20           This is the 27th day of September, 2024.
21
22                            _____
23                            Amy A. Brauser, RPR RMR CRR
                              Notary Public # 20023030055
24
25
```