# Exhibit 3

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
                       1:23CV00878-TDS-JEP

DEMOCRACY NORTH CAROLINA;              )
NORTH CAROLINA BLACK ALLIANCE;         )
LEAGUE OF WOMEN VOTERS OF              )
NORTH CAROLINA,                        )
             Plaintiffs,               )
                                       )
       vs.                             )
                                       )
ALAN HIRSCH, in his official capacity  )
As CHAIR OF THE STATE BOARD OF         )
ELECTIONS; JEFF CARMON III, in his     )
official capacity as SECRETARY OF THE  )
STATE BOARD OF ELECTIONS; STACY EGGERS )
IV, in his official capacity as MEMBER )
OF THE STATE BOARD OF ELECTIONS;       )
SIOBHAN O'DUFFY MILLEN, in her         )
official capacity as MEMBER OF THE     )
STATE BOARD OF ELECTIONS; KAREN        )
BRINSON BELL, in her official capacity )
as EXECUTIVE DIRECTOR OF THE STATE     )
BOARD OF ELECTIONS; NORTH CAROLINA     )
STATE BOARD OF ELECTIONS,              )
             Defendants                )

                         DEPOSITION

                            OF

                   PAUL GREY MILLS, JR.

              September 13, 2024 - 10:02 a.m.

                  301 Hillsborough Street
                  Raleigh, North Carolina


PREPARED BY: Susan A. Hurrey, RPR
Discovery Court Reporters
and Legal Videographers, LLC
4208 Six Forks Road
Suite 1000
Raleigh, North Carolina 27609
919-424-8242
www.discoverydepo.com
```

1

1  Q. Correct.
2  A. No, I have not seen those.
3  Q. Would Mr. Coletti have requested that information of
4  his own accord, in your experience?
5  A. I don't know why he would have requested that. He
6  doesn't really do anything with elections, so I don't know what
7  was going on there.
8  Q. In your experience, would he make a data request like
9  that of his -- under his own direction or would someone have
10 asked him to do that?
11          MR. STRACH: Objection. Go ahead.
12          THE WITNESS: I have no idea.
13 BY MR. SHENTON:
14 Q. Do you know anything about Ms. Cleta Mitchell?
15 A. I do not.
16 Q. Have you ever met her?
17 A. No.
18 Q. Have you ever spoken with her?
19 A. No, I don't think so.
20 Q. Are you familiar with her background at all?
21 A. Not really.
22 Q. Not really. What do you know about her background?
23 A. I think she's an attorney in Washington and she lives
24 in Moore County.
25 Q. Anything else about her?

79

1    A.  Not really.  I never spoke to her.
2    Q.  So you never spoke to her.  Fair to say you don't
3 listen to her opinions on election issues?
4    A.  I have never spoken to her about election issues.
5    Q.  Are you aware other legislators met with her?
6    A.  No, I'm not.
7    Q.  I'm going to turn you to the second page of that
8 email.
9    A.  The one you just gave me?
10   Q.  Yeah.
11   A.  Give me just a second.
12   Q.  Yeah.  Take your time.
13   A.  Fix my glasses.  Second page?
14   Q.  Second page under item number one.
15   A.  Okay.  I have it.
16   Q.  Near the bottom of item number one there's a line that
17 starts out-of-state students.
18   A.  Okay.
19   Q.  See where I'm talking about?
20   A.  I see the line that starts out-of-state students.
21   Q.  It says out-of-state students must sign an affidavit
22 of emancipation in order to claim North Carolina as a voting
23 domicile specifying they are not registered to vote elsewhere.
24 Did I read that right?
25   A.  It appears you read that right.

80

1    Q.  Do you remember about when that would have been?

2    A.  I do not.  It would have been early in the session.

3 It would have been -- I cannot give you a date, but I would say

4 that it was well before 747.  So he wrote that in March.  It

5 could have been around that time, but I have no idea.

6    Q.  So sometime before the bill crossed over between March

7 and June?

8    A.  It could have been before or after March.  I don't

9 know when I met him.  And it could have been the session

10 before.  I know I met him one time in my office.

11   Q.  Okay.

12   A.  I assume it was after this email, but I don't know.

13   Q.  Okay.  That's fair.  Like you said, a lot of people

14 want to talk to you.  Turn you to page two of that document

15 real quick.

16   A.  Okay.

17   Q.  Right at the very top under title.  It says the NCEIT

18 team is drafting legislation in these major categories for

19 consideration by the NCGA.

20       Did you ever see any draft language from NCEIT?

21   A.  I don't recall seeing draft language or draft

22 legislation from NCEIT, no.

23   Q.  Did you ever see any draft language or legislation

24 from Mr. Womack?

25   A.  No.  The drafts we use are from our staff.

89

1  sent that cc'd you we just discussed a moment ago.

2       A.  Okay.  All right.

3       Q.  Point you to the second paragraph there.  The first

4  sentence.  Says election law attorney Cleta Mitchell and I

5  would welcome the opportunity to pop up to Raleigh to meet with

6  you, Representative Warren, Representative Mills, or any other

7  legislators to address the suite of proposed statutory changes

8  we have submitted.

9       Did I read that right?

10      A.  Yes, you read that right.

11      Q.  Did you ever meet with Mr. Womack and Ms. Mitchell?

12      A.  No.

13      Q.  Were you ever contacted beyond this email to set up

14  such a meeting?

15      A.  I do not know.

16      Q.  Who would they have contacted if they didn't contact

17  you?

18      A.  They would have contacted me.  They would have sent an

19  email, the same way they did this, to my office.

20      Q.  So you're unaware if any other outreach took place?

21      A.  I'm unaware.

22      Q.  Let me direct you to the third paragraph here, that

23  first sentence.  Says we applaud the house initiatives to limit

24  the length of the early voting period, to compel same-day

25  registrants to use a provisional ballot, and to require

94

1    A.  Okay.  Of undeliverable mail.  Okay.  Yeah, I don't
2 know.
3    Q.  If that were true, would it surprise you?  I guess
4 that's my question.
5           MR. STRACH:  Objection.  Go ahead.
6           THE WITNESS:  Yeah, I don't know.  I have had
7 -- look, I have told you earlier today that we use the postal
8 service.  We were before this bill.  Long before this bill.
9 That's what the county boards use.  That's what the state board
10 uses.  We use the postal service.  We use it in other aspects
11 of our lives.  We didn't change that aspect of the bill.
12 BY MR. SHENTON:
13    Q.  Okay.  Do you think the two mailer system has more
14 margin for error than the one-mailer system?
15    A.  I don't have an opinion to that.  As I said, you know,
16 I've used the mail all my life.  We used mail before this bill.
17    Q.  So one is just as good as two?
18    A.  I think -- yes, I think that it's reliable service and
19 that's the reason we use it.  That's the reason why we use it
20 in the legal field too.
21    Q.  Did you commission a study on same-day voting at any
22 point during the 747 process?
23    A.  Did I commission a study?  No, I did not commission
24 any studies.
25    Q.  Did you direct anyone to commission a study?

241

1    A.  A study of what?
2    Q.  Of same-day registration statistics in North Carolina.
3    A.  No, I did not -- I did not ask anyone to study
4  anything.
5    Q.  Did you review any such study?
6    A.  I'm not sure.
7    Q.  Do you remember reviewing any such study?
8    A.  It's possible.
9    Q.  But no specific recollection comes to mind?
10   A.  No.
11   Q.  Did you ever see any demographic breakdowns of
12 same-day registration usage in North Carolina?
13   A.  No, not that I recall.
14   Q.  Didn't request any?
15   A.  No.
16   Q.  Didn't request any data on how many people fail the
17 first mailer but pass the second mailer?
18   A.  I did not request any data.
19   Q.  Didn't request any data on people who failed both
20 mailers?
21   A.  I didn't request any data.
22   Q.  Didn't request any data on people who make
23 reregistration attempts at the same address where they failed
24 verification previously?
25   A.  I did not make any such request.

242

CERTIFICATE OF REPORTER

STATE OF NORTH CAROLINA    )

COUNTY OF ALAMANCE         )

        I, Susan A. Hurrey, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that the witness reserves the right to read and sign the transcript of the deposition prior to filing; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

        This the 24th day of September, 2024.

        _____

        SUSAN A. HURREY, RPR

        Notary Public #201826800211

252