# Exhibit 4

```
     IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMOCRACY NORTH CAROLINA; NORTH CAROLINA   )
BLACK ALLIANCE; LEAGUE OF WOMEN VOTERS     )
OF NORTH CAROLINA,                         )
                                           )
                    Plaintiffs,            )
                                           )
       -vs-                                )
                                           )
ALAN HIRSCH, IN HIS OFFICIAL CAPACITY AS   )
CHAIR OF THE STATE BOARD OF ELECTIONS;     )
JEFF CARMON, III, IN HIS OFFICIAL CAPACITY )
AS SECRETARY OF THE STATE BOARD OF ELECTIONS; )
STACY EGGERS, IV, IN HIS OFFICIAL CAPACITY AS )
MEMBER OF THE STATE BOARD OF ELECTIONS;    )
KEVIN LEWIS, IN HIS OFFICIAL CAPACITY AS   )
MEMBER OF THE STATE BOARD OF ELECTIONS;    )
SIOBHAN O'DUFFY MILLEN, IN HER OFFICIAL    )
CAPACITY AS MEMBER OF THE STATE BOARD OF   )
ELECTIONS; KAREN BRINSON BELL, IN HER      )
OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF )
THE STATE BOARD OF ELECTIONS; NORTH CAROLINA )
STATE BOARD OF ELECTIONS,                  )
                                           )
                    Defendants.            )
-------------------------------------------)


                  VIDEOTAPED DEPOSITION

                           OF

                SENATOR WARREN T. DANIEL

                   (Taken by Plaintiffs)

                   Raleigh, North Carolina

                Wednesday, September 11, 2024




              Reported in Stenotype by
 Lisa A. DeGroat, Registered Professional Reporter
 Transcript produced by computer-aided transcription
```

```
 1   concerned about for years.
 2        Q.    Tell me more about legislators have been
 3   concerned about that for years.  Can you talk to me
 4   about your own concerns, if you've had any?
 5              MR. STRACH:  Yeah, just -- just --
 6        Senator Daniel, just keep it to your thoughts.
 7              THE WITNESS:  Okay.
 8              MR. STRACH:  Not thoughts of other
 9        legislators.
10              THE WITNESS:  Okay.  So my concerns
11        about same-day registration?
12   BY MS. KLEIN:
13        Q.    Yes.
14        A.    I think it's just the ability to verify --
15   to verify that the voter is a resident of the precinct
16   that they claim to be in, and that -- and that they
17   should be registered in that precinct.  It's just more
18   difficult to ascertain the closer you get to the
19   election and early voting.
20        Q.    What about public statements of other
21   legislators expressing concern, did any public
22   statements of other legislators about same-day
23   registration influence whether you thought it was
24   important to include it in Senate Bill 747 in the
25   filed version?
```

```
 1        bigger one that's on the bottom, which is the
 2        beginning Bates for the document --
 3               MR. STRACH:  Okay.
 4               MS. KLEIN:  -- when it was uploaded
 5        onto our system.
 6               MR. STRACH:  Okay.
 7   BY MS. KLEIN:
 8        Q.    So are you at page ending in 562?
 9        A.    Uh-huh.
10        Q.    And the title of that is, "Election
11   integrity, general recommendations from CPI's Cleta
12   Mitchell."  Do you -- are you familiar with Cleta
13   Mitchell?
14        A.    I know who she is.
15        Q.    Have you ever met her?
16        A.    Yes.
17        Q.    When did you meet her?
18        A.    In the meeting that I mentioned with Jim
19   Womack.
20        Q.    Outside of that meeting, have you talked
21   with her?
22        A.    No.
23        Q.    Have you communicated in other means with
24   her?
25        A.    No.
```

64

1   specifically, do you recall ever doing that?
2        A.   No.
3        Q.   And then he -- it looks like he's -- his
4   e-mail says he's from the Electoral Education
5   Foundation.  Are you familiar with that organization?
6        A.   I really just know Major Dave, and I can't
7   keep track of which group calls themselves what and
8   who is who.  So --
9        Q.   Are you -- do you interact with anybody else
10  from that organization, to your knowledge?
11       A.   I think at one time Hal Weatherman may have
12  been involved before he became a candidate.
13       Q.   Do you recall who that is?
14       A.   Hal Weatherman.
15       Q.   Hal Weatherman.  Sorry.
16            All right.  In the e-mail you said the
17  election chairs -- just to clarify for the record, you
18  meant your fellow cochairs on the senate election and
19  redistricting committee?
20       A.   Yeah.  I meant just the senate chairs.
21       Q.   And that term election integrity groups,
22  you're meaning in this e-mail is the same as the
23  meaning that we discussed earlier in this deposition?
24       A.   The different groups that we've seen
25  documents from today.

85

1  Q. But, also, in addition to that, also the
2  discussion we had earlier about what you consider an
3  election integrity group -- I just don't want to have
4  to rehash that -- is that discussion that we had
5  earlier --
6  A. When recommendations were -- were sent to
7  us, whether it was by a constituent or a group in,
8  like, a formal form, these -- these are things we
9  think would help election laws, then I filtered it to
10 staff, because some of them are redundant.
11         You know, some of the recommendations are
12 redundant, and I wanted them to sort of create a list
13 that we could then -- sort of a menu, I guess, so that
14 we could decide what we were going to include in the
15 bill and what we weren't going to include in the bill.
16 Q. So NCEIT would be included in the election
17 integrity groups you're referring to here?
18 A. Yes.
19 Q. And Jim Womack?
20 A. Yes.
21         MS. KLEIN: Okay. And we'll mark the
22 attachment to this, which we'll also hand over.
23 It's --
24         MS. TALERMAN: It's included.
25         MS. KLEIN: Oh, it's included. Okay.

86

1        Great.
2    BY MS. KLEIN:
3        Q.    So the attachment to this -- so I'll
4    represent that this was recently produced by your
5    counsel.  It's the hand marked-up version --
6        A.    Uh-huh.
7        Q.    -- of the attachment to this.  And so it's
8    titled, "Electoral Education Foundation.
9    Recommendation to the North Carolina General Assembly
10   to improve state election laws for the 2023-24
11   session."
12              And when I say it's the attachment, let's
13   just -- going back to the e-mail, the subject of the
14   e-mail that he originally sent you is, "Recommended NC
15   election law changes for the 2023-2024 sessions."
16              Because this was produced from a hard copy,
17   you know, we don't have metadata that tells us this is
18   the attachment, but, to the best of your knowledge, is
19   this hand markup the attachment that Major Goetze sent
20   to you in this e-mail?
21       A.    Yes.
22       Q.    So it looks like you probably printed it out
23   when you got it from him and did a hand markup; is
24   that correct?
25       A.    I think he gave us actual copies.  I think

87

1  he brought me several copies.
2      Q.   When he did that, did you sit down and have
3  a conversation with him about it?
4      A.   I don't know if it was that day, but it --
5  there was a day when he came to sit down and talk
6  about it.
7      Q.   Do you recall around when that was?
8      A.   (NO AUDIBLE RESPONSE WAS GIVEN.)
9      Q.   It looks like he sent --
10     A.   No.  I mean, probably my assistant could go
11 back on the calendar, and he might be able to find it,
12 but --
13     Q.   So he sent the original e-mail on
14 February 10th, and then you replied to him on
15 March 15th.  Fair to say you probably met with him in
16 between those two dates?
17     A.   No.  I would say that I probably hadn't met
18 with him by then.
19     Q.   So it's probably after March 15th?
20     A.   Uh-huh.
21     Q.   Okay.
22     A.   There wouldn't have been enough time.
23     Q.   When you -- when you say, "There wouldn't
24 have been enough time," what do you mean by that?
25     A.   Well, on the legislative schedule if

88

 1   somebody sends me an e-mail on the 10th, they're not
 2   going to usually get a meeting before the 15th, you
 3   know.  So --
 4        Q.    So it's actually February 10th, and then
 5   March --
 6        A.    Oh, I see what you're saying.  Okay.
 7        Q.    Yeah.
 8        A.    Well, my recollection of sending this e-mail
 9   is that I think I met with him after that --
10        Q.    Okay.
11        A.    -- because I think I wanted some
12   clarification on some of his points.
13        Q.    And then so you sat down with him.  And do
14   you think you took the notes while you were sitting
15   down with him?
16        A.    Uh-huh.  I do.
17        Q.    So we're not going to go through this whole
18   document, because it's rather long.  We're just going
19   to go through specific parts of it.  But if you go to
20   page three of the document.  So that -- the Bates --
21   the ending Bates of that is 6722.
22              And it says, "Recommendations for statutory
23   changes."  Do you see that?
24        A.    Yes.
25        Q.    And then, number four, it says, "Prohibit

89

1  the use of same-day registration provisions as a means
2  of avoiding the casting of a provisional ballot during
3  early voting."
4           Do you see that?
5      A.   I do.
6      Q.   And you didn't put any notes below that;
7  correct?
8      A.   There are no notes.
9      Q.   Okay.  And if we -- we're going to go to the
10 body of it, number four.  And that's in ending Bates
11 6727.  It's on page six of the presentation, if you
12 could go there.
13          And -- so at the top of the page it says,
14 four, "Prohibit the use of same-day registration
15 provisions as a means of avoiding the casting of a
16 provisional ballot during early voting."
17          I'd like you to take just a minute and just
18 read just that section four, if you could.
19     A.   The whole page?
20     Q.   Not the whole page.  Just the section four,
21 until you reach the header for five.
22     A.   Okay.
23     Q.   And you can look up when you're done.
24     A.   Okay.
25     Q.   What do you understand the issue that Major

90

1    Goetze's memo discusses in this section four to be?
2        A.    What is contained in this number four?
3        Q.    What's your understanding of that?
4        A.    It seems what he's pointing out is that
5    people who are already registered in the state have --
6    have at least in -- he has a couple instances where
7    these two individuals who were at college, same day
8    registered, when they were already registered in other
9    counties, instead of just voting in their own county.
10             And the issue -- the issue wasn't found
11   until later, and that their votes were counted anyway,
12   and that that was something he found concerning.
13       Q.    And what do you understand his suggestion to
14   be in response to that issue?
15       A.    I think he's suggesting that all same-day
16   registrants should use a provisional ballot during
17   early voting until their address can be verified.
18       Q.    Where do you see that suggestion in here?
19       A.    I mean, that's just how I read it.
20       Q.    But can you point to --
21       A.    I guess in the heading it says, "As a means
22   of avoiding casting a provisional ballot."
23       Q.    "We hold" -- so let's look at the last --
24   let's look at the last paragraph.
25       A.    Uh-huh.

                                                           91

1	Do you recall seeing this, like, draft
2	language at any point in time with the comments from
3	Paul Cox?  And this is on Bates ending in 658.
4	     A.     Not unless it made it into the bill.  This
5	would have been where Josh and Brent would have been
6	saying we've gotten feedback from the Board of
7	Elections, and we're reviewing it, and we'll make
8	recommendations.
9	     Q.     Okay.  All right.  Here you'll see in the --
10	you'll see in -- under bullet number one, Mr. Cox
11	says, "We're concerned with the administer ability of
12	the multiple ID provisions and the likelihood that it
13	will make a lot of the traditional same-day
14	registration population less likely to be able to use
15	that feature."
16	     "We have taken a stab at language which
17	would directly address what we understand to be the
18	problem, same-day registrants who fail mail
19	verification."
20	     Is Mr. Cox correct that the problem -- you
21	know, the bill -- the bill -- this provision of the
22	bill was seeking to address was some sort of problem
23	with same-day registrants who fail mail verification?
24	     A.     I think that's what the provision is.  And
25	by -- by extension it's same-day registrants, who

177

1  might not be eligible to vote --
2      Q.    So --
3      A.    -- in that precinct or that county.
4      Q.    So he does accurately identify the problem
5  to be addressed, the same-day registrants who fail
6  mail verification, and you're saying that's because
7  you're equating those with people who are not eligible
8  to vote; correct?
9      A.    Yes.
10     Q.    Okay.
11     A.    At least in a lot of cases.
12     Q.    "In a lot of cases."
13     Under this -- and he goes on to say, "Under
14 this proposal the registrant would get one
15 verification mailing. And if that is returned by the
16 day before canvas, the county board would be
17 instructed to retrieve and discount the ballot."
18     So -- and at the end, the last sentence, he
19 says, "Importantly, it would directly address the
20 population that fails mail verification, which is a
21 fairly small population of same-day registrants, 1 to
22 2% per attached stats."
23     Do you know what, if anything, was done
24 after -- to Senate Bill 747 after Mr. Yost and
25 Mr. Woodcox received this information from Paul Cox?

178

```
 1        A.    The only -- I mean, Gov Ops was, obviously,
 2   working on this type of an issue.  So if there was any
 3   type of a study being done, they would have done it.
 4        Q.    The house --
 5        A.    No.
 6        Q.    -- or --
 7        A.    Just either side.
 8        Q.    Either side.
 9        A.    I can't remember if Gov Ops is a joint
10   committee or not.
11        Q.    You would definitely know better than me.
12   So I'm not going to opine on that one.
13              Are you aware, you know, of any request for
14   data from the North Carolina General Assembly about
15   same-day voting in the -- that we haven't discussed in
16   the lead-up to Senate Bill 747 being passed?
17        A.    Can you say that again?
18        Q.    Is there any study or data request on
19   same-day registrations that you're aware of that we
20   haven't discussed today that --
21        A.    Oh, no, not that we haven't discussed
22   already.
23        Q.    And that includes, like, requests from the
24   state board on that issue?
25        A.    No.
```

                                                            265

```
 1        Q.    You're not aware of anything we haven't
 2   discussed today?
 3        A.    No.
 4        Q.    Okay.  And anybody else?  You're not aware
 5   of any other study from a third party --
 6        A.    No.
 7        Q.    -- that we haven't discussed today?
 8              Did you request any same-day registration
 9   data with any demographic breakdowns during the
10   legislative process for Senate Bill 747?
11        A.    No.
12        Q.    Are you aware of whether anybody else did?
13        A.    No, I'm not sure.
14        Q.    Okay.  So you didn't see any breakdown like
15   that?
16        A.    No, other than the comment that was made, I
17   think, by Mr. Cox about -- just in this e-mail that I
18   saw today.
19        Q.    Did you request any -- from anyone data on,
20   you know, how many same-day registrants will fail the
21   first mail verification, but would fulfill the second
22   one during the old version of the law?
23        A.    No.
24        Q.    What about data on registrants that failed
25   both verifications, did you request any data on that
```

266

```
 1   STATE OF NORTH CAROLINA

 2   COUNTY OF DURHAM

 3                   REPORTER'S CERTIFICATE

 4            I, Lisa A. DeGroat, RPR, a Notary Public in

 5   and for the State of North Carolina, do hereby certify

 6   that there came before me on Wednesday, the 11th day

 7   of September, 2024, the person hereinbefore named, who

 8   was by me duly sworn to testify to the truth and

 9   nothing but the truth of his knowledge concerning the

10   matters in controversy in this cause; that the witness

11   was thereupon examined under oath, the examination

12   reduced to typewriting under my direction, and the

13   transcript is a true record of the testimony given by

14   the witness.

15            I further certify that I am neither attorney

16   or counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto or

18   financially interested in the action.

19            IN WITNESS WHEREOF, I have hereto set my

20   hand, this the 18th day of September, 2024.

21

22

23   _____

24   LISA A. DeGROAT
     Registered Professional Reporter
25   Notary Public 19952760001
```

292