IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DEMOCRACY NORTH CAROLINA, NORTH CAROLINA BLACK ALLIANCE, and LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FRANCIS X. DE LUCA, in his official capacity as Chair of the State Board of Elections, JEFF CARMON III, in his official capacity as Secretary of the State Board of Elections, STACEY EGGERS IV, in his official capacity as Member of the State Board of Elections, ROBERT RUCHO, in his official capacity as Member of the State Board of Elections, SIOBHAN O'DUFFY MILLEN, in her official capacity as Member of the State Board of Elections, SAM HAYES, in his official capacity as Executive Director of the State Board of Elections, and NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 1:23-CV-878 |
| Defendants, | ) ) | |
| and | ) ) | |
| PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and DESTIN HALL, in his official capacity as Speaker of the North Carolina House of Representatives, | ) ) ) ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case involves challenges by Plaintiff voting rights groups to North Carolina's passage of Senate Bill 747 ("SB 747") to the extent it altered the state's prior system of verifying voter registration for voters who elected to both register and vote during the 17-day early-voting period immediately before election day (known as same-day registration ("SDR")). More specifically, Plaintiffs challenge SB 747's modification of the prior two-card verification process (where a registration card mailed by the county board of elections to verify the registrant's asserted address returned as undeliverable will not result in registration being denied until a second card is similarly returned). SB 747 eliminated the second verification card and directed that ballots cast be retrieved from the count upon return of the first verification card. Plaintiffs claim that this change, considered alongside the consequent potential denial of ballots for affected voters, constitutes an undue burden on the fundamental right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution and is the product of intentional discrimination against young voters in violation of the Twenty-Sixth Amendment to the U.S. Constitution. Defendants contend that the change is a valid response to the fact that the close proximity of the early voting period to election day (and resulting canvass)

2

leaves insufficient time for the second verification card to be returned; as a result, ballots are counted for individuals who fail the registration process after the canvass.

The court held a five-day bench trial beginning on October 20, 2025. For the reasons set forth below, the court concludes that Plaintiffs have failed to demonstrate that the law's changes are unconstitutional.

## I.      PROCEDURAL HISTORY

This case concerns SB 747 to the extent it changed the address verification process for same-day registrants by eliminating a second "notice" (commonly referred to as "voter registration card" (hereinafter, "verification card") sent to the registrant by the county boards of elections by non-forwardable United States mail. Under SB 747, if, before the close of business on the day before the canvass, the United States Postal Service returns the verification card to the county board as undeliverable, the county board shall not send a second verification card, shall not register the applicant to vote, and must remove the applicant's ballot from the official count. In the words of SB 747, the challenged "undeliverable mail provision" reads:

> Notwithstanding any other provision of this Chapter, if the Postal Service returns the first notice required under G.S. 163-82.7(c) as undeliverable before the close of business on the business day before canvass, the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count.

3

2023 N.C. Sess. Laws 140, § 10.(a) (codified as N.C. Gen. Stat. § 163-82.6B(d) (2024)).

On October 17, 2023, Plaintiffs filed this lawsuit, alleging that SB 747's changes violate voters' due process rights (Count 1), amount to an undue burden on the right to vote (Count 2), and result from intentional discrimination against young voters on the basis of age (Count 3). (Doc. 1 at ¶¶ 94-118.) Pursuant to their statutory right, Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Destin C. Hall, in his official capacity as Speaker of the North Carolina House of Representatives (collectively, the "Legislative Defendants") were permitted to intervene to defend the legislation. (Minute Entry 11/15/23.)

Two other lawsuits were also filed in this district that simultaneously challenged SB 747's SDR provisions: North Carolina Democratic Party v. North Carolina State Board of Elections, No. 1:23-cv-862; and Voto Latino v. Hirsch, 1:23-cv-861. Though the cases were not consolidated, the court issued a memorandum opinion and order in those two cases that preliminarily enjoined enforcement of the undeliverable mail provision unless certain procedural protections were put in place. Specifically, this court enjoined the North Carolina State Board of Elections (the "State Board") and others from

4

> utilizing the procedures of N.C. Gen. Stat. § 163-82.6B(d) to remove from the official count the votes of the ballot of any voter who has provided contact information in the registration process and whose first notice required under N.C. Gen. Stat. § 163-82.7(c) is returned by the Postal Service as undeliverable before the close of business on the business day before the canvass, <u>without first providing such voter notice and an opportunity to be heard.</u>

<u>Voto Latino v. Hirsch</u>, 712 F. Supp. 3d 637, 684 (M.D.N.C. 2024) (emphasis added). Thereafter, the State Board, pursuant to North Carolina General Statute § 163-22.2, implemented a notice-and-cure procedure it contended complied with the preliminary injunction. (<u>See</u> Doc. 53-1 (Numbered Memo 2023-05 (Jan. 29, 2024 Update)).) Though that version of the Numbered Memo expired in March 2025, the parties to those related actions moved for, and on April 28, 2025, the court entered, a consent judgment to make the preliminary injunction order permanent, thus binding the State to the formal notice-and-cure process. (Doc. 125-1.)

In light of the consent judgment, Plaintiffs in the present case voluntarily dismissed Count 1. (Doc. 133.) The court subsequently denied Defendants' motion for summary judgment as to the remaining counts. (Doc. 149.)

A five-day bench trial was held beginning on October 20, 2025. Each side presented two expert witnesses; the court also heard testimony from thirteen fact witnesses. After careful consideration of the complete record and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court enters the

5

following findings of fact — based upon an evaluation of the evidence, including the credibility of witnesses, and the inferences that the court has found reasonable to be drawn therefrom — and conclusions of law. To the extent any factual statement is contained in the conclusions of law, it is deemed a finding of fact as well.

## II. THE PARTIES

### A. Plaintiffs

Plaintiff Democracy North Carolina ("Democracy NC") is a non-partisan, non-profit organization dedicated to increasing voter access and participation. Its work was discussed at trial by Cheryl Carter, its former co-executive director, and Lucas Seijo, its Eastern Regional Managing Organizer. (Doc. 186 at 238:20–256:9 (Carter); id. at 263:12–267:4 (Seijo); Doc. 187 at 5:14–15:23 (Seijo).[1])

Democracy NC's "mission is to strengthen and protect democratic structures, to empower and to build power within disenfranchised communities, and inspire confidence" in the political process. (Doc. 186 at 239:7–14.) Democracy NC works for pro-democracy efforts through operating substantial election protection efforts to ensure access to the ballot, producing non-

---

[1] The trial transcript is found at docket entries 185–188, 191–193. For ease of reference, the court cites to the lines of testimony based on the docket entry pages.

6

partisan voter guides to educate voters about candidates and issues, and partaking in "tabling events, voter registration, coalition meetings, [and] press events." (Id. at 239:17-24; 252:11-14; Plaintiffs' Exhibit ("PX") 153 (example of voter education materials).) A significant part of this effort is through engagement with young and student voters, through programs like Democracy Summer, a youth leadership program on community organizing and advocacy around voting rights. (Doc. 186 at 240:18-241:4.) Democracy NC also strives to form lasting relationships with colleges and universities throughout North Carolina to assist students in navigating the election process, so that their "first-time voting . . . experience is positive," and that they "develop habits" to become "lifetime voter[s]." (Id. at 243:10-22; see also Doc. 187 at 7:3-24.) Ms. Carter testified that SB 747 imposed burdens on Democracy NC's labor, time, and personnel. Democracy NC was forced to reprint many of its materials and spend additional time training its staff and personnel as well as its campus advocates. (Doc. 186 at 247:17-248:15.) Mr. Seijo similarly testified that he had to "commit more time to going to campuses," and that he had to be "more thorough" in explaining the voter registration process to such students. (Doc. 187 at 11:14-15, 11:20-21.)

Plaintiff North Carolina Black Alliance ("NCBA") is a non-partisan, non-profit organization that addresses policy and

economic issues to enhance black communities through promoting policy change and youth development.  Its work was discussed at trial by Marcus Bass, its Deputy Director, and Gabrielle Martin, its Youth Voter Engagement Coordinator.  (Doc. 185, 28:14-72:25 (Bass); Doc. 186, 256:17-262:22 (Martin).)

NCBA "seek[s] to create systemic policy change to improve the lives and living conditions of individuals across the state . . . [and] do direct engagement with individuals that are wanting to vote and create that systemic change."  (Doc. 185, 29:3-7.)  To mobilize the electorate, NCBA partners with historically black colleges and universities ("HBCUs") in North Carolina to provide voter resources and voter education.  (Id. at 30:14-31:10.) NCBA operates many programs directed toward students, including the HBCU Think Tank, "votecoming," and Raising the BAR.  (Id. at 31:13-33:25; Doc. 186 at 257:19-258:4.)  Because "a voter's first experience oftentimes sets the expectation for engagement," NCBA strives to ensure that student voters are "having a positive experience in seeing their vote count."  (Doc. 185 at 50:1-14.) Mr. Bass testified that the changes in SB 747 have caused NCBA staff and volunteers to spend more time explaining the registration process to prospective voters than they did prior to passage.  (Id. at 49:23-50:5.)  Among other things, because SB 747 eliminated the second address verification card, NCBA staff and volunteers now must spend more time determining the different mailing procedures

used for different college campuses. (Id. at 48:24-49:7.) After voting, NCBA is forced to spend more time tracking ballots to ensure votes are counted. (Id. at 49:8-12.)

Plaintiff League of Women Voters of North Carolina ("LWVNC") is an all-volunteer, non-partisan, non-profit community-based organization that is the state affiliate of the League of Women Voters. Its work was described at trial by Jennifer Rubin, its President. (Doc. 186 at 217:10-237:24.)

While LWVNC began as an organization focused on training women voters, it has evolved into one dedicated to educating and advocating for its mission "to empower voters and defend democracy." (Id. at 219:9-10.) LWVNC promotes informed and active participation in government through citizen education and public policy advocacy. This includes holding frequent voter registration and other election activities, including at college campuses and high schools, to reach young voters and "help them understand the [voting] process." (Id. at 219:18-22, 223:4-8, 226:16-17; PX159 (Empowering Voters Defending Democracy Presentation).) LWVNC's objective in protecting the rights of young voters is to help them "vote and vote successfully" so that they can become lifelong voter[s]." (Doc. 186 at 228:2-8.)

Ms. Rubin explained that SB 747 places strain on LWVNC's resources, particularly its time. (Id. at 224:5-226:6.) She stated that LWVNC has "spent a lot more time evaluating the

9

legislation and training our members in making sure that they were able then to explain that legislation and explain the process to the people that they were registering to vote." (Id. at 224:18-21.)

### B. Defendants

The Defendant State Board members are sued in their official capacity. Francis X. De Luca is the State Board chair, Jeff Carmon III was its Secretary and is a member of the State Board, Stacy Eggers IV was a member of the State Board and is now its Secretary, Robert Rucho is a member of the State Board, Siobhan O'Duffy Millen is a member of the State Board, and Sam Hayes is the Executive Director of the State Board. The State Board is the agency responsible for the administration of the election laws of the State of North Carolina.[2]

### C. Defendant Intervenors

While the court permitted Senator Berger and Representative Moore to intervene on behalf of the General Assembly and as agents of the State of North Carolina to defend Senate Bill 747, on January 9, 2025, Moore was replaced by Representative Destin Hall, as the successor in office and current Speaker of the North Carolina House of Representatives. (Docs. 104, 174.)

---

[2] On July 7, 2025, pursuant to Federal Rule of Civil Procedure 25(d), Francis X. De Luca and Robert Rucho replaced Alan Hirsch and Kevin Lewis as chair and member, respectively; Sam Hayes later replaced Karen Brinson Bell as Executive Director. (Docs. 145; 175).

10

## III. STANDING

The court begins its analysis by addressing standing. "Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" Chafin v. Chafin, 568 U.S. 165, 171 (2013); see U.S. Const. art. III, § 2. A case or controversy exists "only when at least one plaintiff establishes that [it] has standing to sue." Murthy v. Missouri, 603 U.S. 43, 57 (2024) (quotation marks and alterations omitted). Three elements form the "irreducible constitutional minimum of standing": (1) a plaintiff must have "suffered an injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury must be "fairly traceable to the challenged action of the defendant"; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–561 (1992) (quotation marks, alterations, and ellipses omitted). Where there are multiple plaintiffs, as here, the standing of only one plaintiff suffices. See Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) (noting that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought. . . . when there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint") (quotation marks omitted).

11

At the summary judgment stage, this court concluded that Plaintiffs forecasted facts sufficient to support standing. (Doc. 149 at 3-4.) As noted, at trial Plaintiffs introduced evidence that in the aftermath of SB 747 they have been forced to spend additional time and resources to achieve their mission to educate and register would-be voters. Defendants' post-trial joint proposed findings of fact and conclusions of law do not address this evidence or contest standing. (Doc. 194.) The court finds that the trial evidence is sufficient to support standing. See Republican Nat'l Comm. v. N.C. State Bd. of Elections, 120 F.4th 390, 396-97 (4th Cir. 2024) (organizations with a common core mission of "promoting Republican voter engagement and electing Republican candidates" possessed standing where they alleged the state's violations of federal law "forced them to divert significantly more of their resources into combatting election fraud in North Carolina" and those efforts "frustrated their organizational and voter outreach efforts") (quotation marks and citations omitted); Common Cause Ind. v. Lawson, 937 F.3d 944, 952-53 (7th Cir. 2019) (collecting cases and upholding standing of voter advocacy organizations that challenged election laws based on drains on their resources); cf. South Carolina Conf. of the NAACP v. South Carolina Dep't of Juvenile Justice, 165 F.4th 858, 861, 868-69 (4th Cir. Jan. 29, 2026) (concluding advocacy organizations did not have standing to challenge conditions in

12

South Carolina's Department of Juvenile Justice's facilities, but distinguishing voting rights caselaw where standing was demonstrated) (citing, inter alia, Common Cause Ind., 937 F.3d at 952-53) (reh'g en banc granted and opinion vacated Mar. 13, 2026).[3]

## IV.  FINDINGS OF FACT

### A.    North Carolina's Voting System

A voter in North Carolina must be registered.  N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. §§ 163-54, 163-82.1.  To register, an individual must be qualified, N.C. Gen. Stat. § 163-55; that is, he or she must be: (1) a United States Citizen; (2) at least 18 years old on or before the date of the next general election, with certain exceptions for 16 and 17 year-olds who preregister to vote; (3) not currently serving a sentence for a felony; and (4) a resident of the county at the voting address for the "30 days next preceding an election," N.C. Gen. Stat. §§ 163-55, 163-57, 163-82.1.  By completing and signing a voter registration application, applicants attest under penalty of perjury that they meet these requirements.  See N.C. Gen. Stat. § 163-82.4(c)(1); (Doc. 187 at 257:16-17.)

Broadly speaking, voter registration in North Carolina occurs in one of two ways: "traditional registration methods," and SDR.

---

[3] FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024), does not change this result.  The Fourth Circuit's opinion in Republican National Committee, which affirmed the standing of a voter engagement organization on a diversion of resources theory, 120 F.4th at 396-97, postdated that opinion.

13

Traditional registration methods include (1) submitting a paper form in person at the county board of elections in the county where the registrant resides or at a variety of other state agencies (including the Department of Motor Vehicles ("DMV") and local government facilities); (2) using the DMV online portal; or (3) submitting a completed voter application form via facsimile, email, or U.S. Mail to the applicable county board of elections. N.C. Gen. Stat. §§ 163-82.1, 163-82.3; 163-82.6, 163-82.20–163-82.23. (State Board of Elections Defendants' Exhibit ("SBEDX") 001; (Doc. 187 at 234:24-235:23).)

Upon receiving a voter registration application through traditional registration methods, the county board of elections makes a preliminary determination whether the applicant is qualified to vote at the address given on the application, subject to a two-card mailing system to verify the address. N.C. Gen. Stat. § 163-82.7(a). (Doc. 187 at 259:20-262:10.) This two-card mailing system for traditional registration is not challenged in this lawsuit and was unchanged by SB 747. But it provides context for the issues in this case and proceeds as follows:

a. The county board of elections mails a non-forwardable verification card to the address provided in the application. N.C. Gen. Stat. § 163-82.7(c). (Doc. 187 at 261:12-16.) If the postal service does not return the first verification card as undeliverable within 15 days, the voter is registered

14

to vote.  N.C. Gen. Stat. § 163-82.7(d).  (Doc. 187 at 261:17-262:10.)

b.   If  the  first  verification  card  is  returned  as undeliverable  within  the  15-day  window,  a  second  non-forwardable  verification  card  is  mailed  to  the  address provided in the application.  N.C. Gen. Stat. § 163-82.7(e). (Doc. 187 at 262:2-10.)  If the second verification card is not returned as undeliverable within 15 days, the voter is registered  to  vote. N.C.  Gen.  Stat.  §§ 163-82.7(e),  163-166.16.  (Doc. 188 at 20:13-19.)[4]

c.   However, if the second verification card is returned as undeliverable  within  the  second  15-day  window,  there  is  no cure process, the application is denied, and the person is not registered to vote.  N.C. Gen. Stat. § 163-82.7(f). (Doc. 188 at 18:23-19:5.)

Once registered, voters may vote in a variety of ways: mail-in absentee ballot; in-person early voting at any site in their county (even if not their precinct); or on election day at their assigned  precinct.    N.C.  Gen.  Stat.  §§ 163-166.35(d),  163-166.40(b).  (Doc. 187 at 244:2-247:16.)  North Carolina offers a 17-day early voting period up to the Saturday before election day.

---

[4]  If the first verification card is returned as undeliverable after the 15-day window, however, staff are instructed to manually initiate the second card, and the registrant is treated as failed pending resolution of the second card.  (Doc. 188 at 20:20-21:4.)

N.C. Gen. Stat. §§ 163-166.35(d), 163-166.40(b).  (Doc. 187 at 245:13-246:4.)

North Carolina has approximately 2,600 polling places open from 6:30 a.m. to 7:30 p.m. on election day.  N.C. Gen. Stat. § 163-166.25(a).  (Doc. 187 at 246:13-17.)  No-excuse absentee voting by mail is available to all registered voters.  N.C. Gen. Stat. § 163-226(a).  (Doc. 187 at 244:9-15.)  Absentee ballots, which may be requested using a paper form or online, are available 60 days prior to election day in general elections and 50 days prior to the date of any other election, except municipal elections, in which case absentee ballots are available 30 days beforehand.  Id., §§ 163-227.10(a), 163-230.3.  (Doc. 187 at 244:15-24.)  North Carolina's absentee ballot system relies almost exclusively on the U.S. Postal Service.  See id. §§ 163-230.2-.3, 163-231.  (Doc. 187 at 244:9-15; see id. at 242:13-23.)  North Carolina law also provides various accommodations for voters who need assistance.  For example, during early voting and on election day, voters unable to enter the voting place and vote without assistance due to age or disability are allowed to vote curbside from their vehicle.  N.C. Gen. Stat. § 163-166.9.

Traditional registration methods are available year-round, and North Carolina extends the national cutoff before an election by five days; thus, a voter may register up to 25 days before a particular election.  (Doc. 187 at 234:24-235:3.)  However, SDR is

16

available for voters who have missed the traditional registration window for a particular election and still wish to vote in that election, because it allows a voter to register and cast a ballot on the same day. North Carolina is one of the 23 states, along with Washington D.C., which permits SDR in any form. (Legislative Defendants' Trial Exhibit ("LDTX") 125 at 16.)

Unlike traditional registrants, same-day registrants must show proof of residence. (Doc. 187 at 42:13-24, 223:22-225:3.) Acceptable documentation is a copy of a "HAVA[5] document" listing the individual's name and current address, which includes a current utility bill, bank statement, government check, paycheck, or any other current government document or document issued from the institution that issued the photo identification shown by the voter pursuant to North Carolina General Statute §§ 163-166.16 and 163-82.6B. (Joint Exhibit ("JX") 002 at 5; JX061 at 3 (Numbered Memo 2023-05, describing different forms of 10 acceptable HAVA documents).)

Since its institution in 2007, SDR in North Carolina has always used mail verification to confirm an individual's residence. See 2007 N.C. Sess. Law 253. Before SB 747, mail verification for SDR users employed the two-card system used for traditional registrants:

---

[5] Help America Vote Act, 52 U.S.C. §§ 20901-21145.

a.   Within two business days of the qualified individual's SDR application, the county board of elections would research the voter and make a preliminary determination whether he or she is qualified to vote.  (JX029 at 4 (N.C. Gen. Stat. § 163-82.6A).)

b.   If the preliminary determination was positive, the traditional voter registration two-card system set forth in N.C. Gen. Stat. § 163-82.7 commenced. (JX029 at 4 (N.C. Gen. Stat. § 163-82.6A).)

c.   The same-day registrant's retrievable ballot remained in the count unless the applicant failed the second verification card before county canvass.  If the second verification was returned as undeliverable before the county canvass, the associated ballot could be challenged and, if successful, removed from the count.  N.C. Gen. Stat. § 163-82.7(g)(2); (JX029 at 4 (N.C. Gen. Stat. §163-82.6A).)

Over the course of the November general elections in 2016, 2018, 2020, and 2022, 296,859 new voters attempted to register to vote via SDR.  (JX031.)  Of those, 291,822 successfully verified addresses; the remaining 5,037 failed, for a failure rate of 1.697%.  (Id.)  Phrased differently, slightly over 98% of all new voter SDR users in those four November general elections successfully verified.

Senate Bill 747 altered the verification procedure for SDR

18

users by eliminating the sending of a second verification card when the first card is returned as undeliverable. Owing to this court's consent decree in the related cases, however, the State Board has put in place a notice-and-cure process for same-day registrants whose address verification card is returned as undeliverable. See Voto Latino, 712 F. Supp. 3d at 684.

The notice-and-cure process is memorialized in State Board Numbered Memo 2023-05. (See JX062.) Under this Numbered Memo, the process to be followed depends on the timing of the verification card's return as undeliverable. If the single verification card is returned as undeliverable before the close of business two days before the county canvass, the voter's status is changed to "denied," but additional steps are followed to effectuate a notice-and-cure process. (JX062 at 6.) Specifically, county board of elections staff must check the address on the verification card against the voter's registration application to determine if staff entered the address correctly. If staff identify an error, they are instructed to send a new verification card – which is treated as a corrected first verification card – and designate the voter as "active" in the state's election database.[6] (JX062 at 6-7.) If no error is identified, staff must, within one business day, mail the voter a "Notice to Verify Your

_____

[6] SB 747's text did not require this address check. (See JX002 at 5.)

19

Address." (JX062 at 7.) If the voter provided a phone number or email address on the voter registration form, staff are instructed to notify the voter through those means, too. (JX062 at 7.) To cure the registration and have the ballot counted, a voter must either: (1) submit an additional HAVA document, different from the one used at SDR, by close of business on the day before canvass; or (2) attend the county canvass meeting in-person to verify his address. (JX062 at 7-8.) If the voter cures, his registration will be changed to "active" status again, and his ballot will be included in the count. If the voter does not cure, the ballot will be retrieved from the count. (JX062 at 9.)

If U.S. Postal Service returns a same-day registrant's verification card as undeliverable after the two-day cutoff before the canvass, the ballot remains in the count for that election, but the voter will be mailed a second verification card. If the second verification card is returned as undeliverable, the registration application is denied, and the county board need not notify the registrant further. (JX062 at 8.)

Plaintiffs contend that the elimination of the second verification card amounts to an undue burden on the right to vote, in violation of the First and Fourteenth Amendments to the federal Constitution (the "undue burden claim"); they also contend SB 747 was enacted with discriminatory animus toward young voters, in

20

violation of the Twenty-Sixth Amendment to the federal Constitution (the "intentional discrimination claim").

**B.    Election Integrity Groups and Lobbyists**

Much of Plaintiffs' intentional discrimination claim is focused on the actions of various lobbyists who advocate for action characterized as election integrity – and most specifically, Ms. Cleta Mitchell, called by Plaintiffs. Mitchell's background in civic engagement for conservative causes is extensive. In 1991, she became the director and general counsel of Term Limits Legal Institute. (Doc. 186 at 10:7-10.) She also served as the chair of the American Conservative Union Foundation. (Id. at 14:2-4.) She was the co-convenor of the Only Citizens Vote Coalition, the purpose of which was to "address the threat of noncitizen voting in the 2024 general election and thereafter." (Id. at 15:3-5, 15:9-10.) She is a life member of the Republican National Lawyers' Association and previously served as its president. (Id. at 15:11-15.) She was a founder and chairman of the Public Interest Legal Foundation. (Id. at 15:16-20.) That foundation exists "to assist states and others to aid the cause of election integrity and fight against lawlessness in American elections." (Id. at 16:6-9.) It was involved in "cleaning voter rolls for a number of years before 2020." (Id. at 16:13-15.) She is also a senior fellow at the Conservative Partnership Institute, which trains conservative leaders across the country and attempts to connect conservative

21

scholars and experts with policymakers, including members of Congress. (Id. at 21:5-13.) Mitchell also hosted the "Who's Counting" podcast, which was produced by the Conservative Partnership Institute. (Id. at 42:2-6, 43:5-7.) The podcast educated the public about election integrity issues and elections more generally. (Id. at 43:8-10.)

Most directly related to this litigation, Mitchell is the founder of the Election Integrity Network ("EIN"). EIN's mission is to "help build a permanent election integrity infrastructure, [and] to help train and mobilize citizens so that they can have oversight of their elections." (Id. at 24:16-18.) EIN employs multiple strategies to carry out this mission. It offers training in the administration of elections. It also undertakes a variety of mobilization initiatives, including a recent effort to increase support for a rulemaking petition before the Election Assistance Commission. (Id. at 25:1-6.) Further, it supports national working groups who address election integrity issues and identify vulnerabilities within election systems. (Id. at 25:7-20.)

One focus of EIN is its opposition to SDR. As Mitchell explained, "we think that the time to confirm eligibility and to verify eligibility to vote is before voting begins." (Id. at 28:5-7.) In her view, SDR offers a way to manipulate elections. (Id. at 31:14-18.) She testified emphatically about her opposition to

22

SDR and desire to eliminate SDR in its entirety.  (Id. at 77:5-9.)

Mitchell also linked efforts to improve voter turnout among college students to Democratic initiatives:

> There is a reason that Democratic operatives decided over a decade ago to focus on trying to make it much easier for college students, not just 18-year-olds, not just 19-year-olds, but college students. That is a subset, and that's who they focused on for that very reason, because they were largely Democrat voters – known Democrat voters.  That's historically been the case.  So they made changes in the laws to make it easier for that subgroup so that they could help impact the outcome of the election.  Yes, they did that.

(Id. at 78:8-16.)  She explained credibly, though, that she opposed SDR not because it was used by college students or any particular group, but simply "because you cannot properly verify the registration when it's happening at the same time as voting." (Id. at 78:21-79:1.)  She also acknowledged that college students who are North Carolina residents should be allowed to register and vote in North Carolina.  (Id. at 32:23-33:11.)

According to Mitchell, there has been "a serious erosion of election protections in this country" over "the last decade or so." (Id. at 46:23-47:1.)  This erosion, she said, is "the result of a deliberate plan by a group of progressive leftist organizations who pledge to change our political system." (Id. at 47:2-5.)  One of those organizations, she testified, is the League of Women Voters – a plaintiff in this case – whom Mitchell claimed

23

"don't believe in election integrity."  (Id. at 48:19-25.)
Mitchell testified that, in her view, efforts by left-leaning
political organizations have harmed election integrity:

> [E]lection administration in this country has been under
> direct assault so that it is very difficult for election
> administrators – even if they have the best intentions,
> it is very difficult for them to actually enforce the
> laws that the legislatures have enacted and make certain
> that they are having clean voter rolls; that only people
> who are eligible to register are being registered, and
> that all of the bells and whistles that the leftist
> groups have come up with have done great damage to
> election administration and the integrity of the
> election administration in this country.

(Id. at 49:12-22.)

Mitchell attended the Republican National Committee donor
retreat in Nashville, Tennessee on April 15, 2023.  (Id. at 64:23-
65:2.)  Georgia Governor Brian Kemp and Tennessee Senators Marsha
Blackburn and Bill Hagerty were in attendance, along with other
figures.  (Id. at 65:7-15.)  Mitchell gave a presentation on
election integrity to what she referred to as a "small working
group" that was not part of the official program.  (Id. at 65:20-
23.)  This included a PowerPoint presentation entitled "A Level
Playing Field for 2024."  (Id. at 65:24-66:1-2.)  During this
presentation, she stated that "[w]e can fix a few things in North
Carolina because . . . we now have a legislature controlled by
Republicans if we can persuade the new Republican member to vote
with us."  (Id. at 67:17-24.)

Mitchell has conducted summits on election integrity in nine

24

states, including North Carolina.  (Id. at 54:10-13.)  The purpose of the North Carolina summit was "to build an awareness and a knowledge of the work that needed to be done in North Carolina to try to improve integrity in North Carolina's elections."  (Id. at 54:20-22.)  EIN has supported a local election integrity group, the North Carolina Election Integrity Team ("NCEIT").  (Id. at 55:2-16.)  This support takes the form of providing information and materials that have been incorporated into NCEIT's own materials, as well as training efforts.  (Id.)

NCEIT's leader is James Womack, Jr.; he was also called by Plaintiffs.  (Id. at 55:2-5.)  Womack has held the role of NCEIT's president since February 2022.  (Doc. 187 at 147:12-16.)  He testified to Mitchell's influence on NCEIT, viewing her as his "mentor" and "inspiration."  (Id. at 149:21-25.)  Her primer, Election Integrity Infrastructure, was "fundamental" to NCEIT's development of its "Eight Lanes of Election Integrity," which outlines NCEIT's areas of focus.  (Id. at 149:13-20; see id. at 147:22-148:12.)  In Womack's words, the purpose of NCEIT is to "detect unfair influences on elections and to report them."  (Id. at 151:3-4.)  In doing so, NCEIT hopes to "get corrective action taken" at "the lowest level [possible]," first administratively, then legislatively, then by "legal action."  (Id. at 151:13-24.)

It is a problem for election integrity, Womack testified, not only when someone who is ineligible to vote casts a ballot, but

25

also when someone who is eligible to vote is unable to do so. (Id. at 151:25-152:7.) To the latter concern, NCEIT works to ensure access to the groups it considers vulnerable voters, including those in the military and certain classes of elderly voters. (Id. at 153:4-19.) Not among vulnerable voters are college students, because, Womack testified, North Carolina "bends over backwards" to accommodate them. (Id. at 154:3-8.) Nor does NCEIT consider young voters to be vulnerable voters. (Id. at 154:9-12.) Womack viewed North Carolina's laws regarding legal residence as weak and permissive, and he believed college students take advantage of that to register and vote. (Id. at 158:14-20.) According to Womack, this can open the door for election fraud because out-of-state students may be dual-registered to vote in both their home states and North Carolina. (Id. at 158:17-159:6.) In Womack's view, these students should vote in their home states – not North Carolina – if they do not intend to stay in North Carolina after college. (Id. at 159:19-60:10.)

Beyond concerns specific to college student voting, NCEIT is opposed to SDR under any circumstances. (Id. at 160:15-17.) He contended that SDR "creates problems that cannot be overcome." (Id. at 160:19-22.) One of those problems is the ease of creating a fake HAVA document, though Womack was unaware of any specific instance in which a forged HAVA document was used for registration, SDR or otherwise. (Id. at 161:4-15.) Womack also believes that

26

reliance on the U.S. Postal Service "creates a problem for mail verification." (Id. at 162:3-5.)

## C. The Legislative History of SB 747

Both sides called Senator Warren Daniel, a co-chair of the Senate Elections Committee during the relevant period, who testified to the origins of SB 747. Representative Paul Grey Mills, Jr., called by Plaintiffs, similarly testified to the progress of SB 747 in the North Carolina House of Representatives. In early 2023, in the aftermath of the 2022 midterm elections, Senator Daniel and the co-chairs of the Senate Elections and Redistricting Committee (Senators Ralph Hise, Jr. and Paul Newton) received over 75 policy recommendations from various election integrity groups. (Doc. 187 at 23:12-16.) Trying to hear out his constituents, Senator Daniel met or spoke with a variety of individuals and group representatives over their concerns about election administration and election integrity. (Id. at 64:9-13.) One of those groups was NCEIT. (Id. at 23:16-19.)

On January 17, 2023, NCEIT legislative liaison Joanne Empie, who was known to Senator Daniel, emailed NCEIT's "Post-Election Analysis" to one of the Senator's staffers. (JX039 at 1; (Doc. 187 at 162:7-163:13) (Womack); (Doc. 187 at 18:5-11, 23:23–24:18) (Daniel).) The purpose of this email and attached document was to "[p]rovide an overview of Observations, Experiences and Challenges during the 2022 General Election - then discuss legislative

27

priorities for improving NC election integrity for 2023 and beyond." (JX039 at 4.) The document provided 15 "Election Integrity General Recommendations from CPI's Cleta Mitchell." (Id. at 24; see id. at 24-30.) One of the recommendations was to eliminate SDR. (Id. at 26.)

On February 8, 2023, a self-described "volunteer" for NCEIT sent an email to members of the North Carolina General Assembly, including Senator Daniel and Representative Mills, asking them to pass legislation relating to NCEIT's election integrity priorities. (PX087 at 1.) Womack acknowledged he had drafted the recommendations and priorities listed in the email. (Doc. 187 at 164:8-11.) One of these recommendations was that "[o]ut-of-[s]tate [s]tudents must sign an affidavit of emancipation in order to claim NC as a voting domicile specifying they are not registered to vote elsewhere." (PX087 at 2.)

Other recommendations dealt with SDR. The email urged the legislature to "[r]educe early voting duration to 10 days,"[7] and "[m]ake same-day registrants eligible only for [p]rovisional ballots[,] which can be researched and challenged prior to canvass." (Id. at 3.) Womack explained that NCEIT's suggestion to make SDR ballots provisional was a second-best recommendation:

---

[7] The General Assembly had done just that in 2013, but it was held unconstitutional as part of the legislature's omnibus voting legislation. North Carolina Conference of the NAACP v. McCrory, 831 F.3d 204, 216, 241-42 (4th Cir. 2016).

28

he would have preferred to eliminate SDR entirely, but based on conversations with members of the General Assembly he came to understand that wholesale elimination was "mission impossible." (Doc. 187 at 166:20-167:1.)  Based on his back-and-forth with legislators, Womack attempted to find a "reasonable restriction or protection" that would "limit the potential exploitation" of SDR, in lieu of its elimination.  (Id. at 166:3-4, 166:21.)

Womack also sent a list of NCEIT's legislative priorities to Representative Mills on March 1, 2023.  (JX040 at 1.)  The email noted that NCEIT had within the past several months briefed Speaker Moore and Joe Coletti, who worked for the House Oversight Committee, on NCEIT's priorities; both seemed receptive to NCEIT's efforts.  (Id.; see Doc. 188 at 39:20-22.)  Senator Daniel received NCEIT's legislative priorities list prior to filing SB 747.  (Doc. 187 at 28:21–29:14 (Daniel).)  He also passed these recommendations on to his staff.  (Id. at 30:5–8.)

Sixteen days after this email, on March 27, Representative Ted Davis filed a bill that would make SDR ballots provisional. (See PX010 (a summary of House Bill 485, found on the General Assembly's website).)  That bill's language closely tracks that which appeared in the filed version of SB 747.  Compare PX010 at 2, with JX013 at 10; see also Doc. 187 at 120:16–122:10 (Mills) (comparing the two bills side by side and acknowledging that they were "substantially similar, very well could be the same").

29

The General Assembly also considered other proposals from NCEIT beyond its efforts to eliminate or reduce SDR. Also among Womack's March 1 email were suggestions for a "Poll Watcher Bill" and "Cast Vote Records (CVR) Bill." (PX096 at 1.) Womack testified that these two proposals "would be later characterized as House Bill 770 and House Bill 772." (Doc. 187 at 167:3–25.) Representative Mills ultimately sponsored both bills, and he acknowledged at trial that their language was nearly identical to that of NCEIT's proposed bills. (PX011 (House Bill 770, listing Representative Mills as one of four primary sponsors); (PX012 House Bill 772) (same);[8] (Doc. 187 at 113:22–115:15, 117:11–119:15).) HB 770, the Cast Vote Records bill, passed in the House on a 73-29 vote, although it was not ultimately enacted. (PX011 at 1–2.)

On the Senate side, work had begun on an omnibus bill. On May 24, 2023, Senator Daniel, the other election chairs, and Senate staff (including Senate pro tem staff member Brent Woodcox), met with both Mitchell and Womack in the legislative office building. (Doc. 187 at 30:12–31:17 (Daniel)); (Doc. 187 178:6–179:7 (Womack).) Also present at the meeting was Jay DeLancy, head of the Voter Integrity Project of North Carolina. (Id. at 178:25-179:4.)

The PowerPoint slideshow presentation from that meeting

---

[8] SB 747's final form ultimately incorporated changes similar to those in HB 772. (See JX002 at 2-3.)

included a list of "Election Integrity Challenges Facing North Carolina." (JX042 at 6.) It deemed "Challenge #1" to be that "Same Day Registration (SDR) during early voting is inadequately scrutinized - electronic & unverified address documentation [is] allowed." (Id. at 8.) It advised that "[o]ut of state college student registration to vote in North Carolina remains problematic." (Id.) It recommended "[e]liminat[ing] same-day registrations (SDRs) during early voting – or at least requir[ing] SDRs be issued provisional ballots so that addresses can be verified and challenges permitted prior to canvass." (JX042 at 17 (emphasis omitted).)

Womack sent a recap email the same day to Woodcox, with a copy to Mitchell. (Doc. 187 at 184:7-12; JX043 at 1.) The email included a "recap of vitally important features we discussed," and stated "we would like to see these prioritized in the upcoming Omnibus bill." (JX043 at 1.) One of those recommendations urged treating SDR votes as provisional:

> Same-day registrants may only vote provisionally[,] and the ballot cannot be counted until identity, eligibility, and address are verified (prior to canvass). Verification documentation records are public records and cannot be discarded for 24 months.

(JX043 at 1.) Mitchell testified that she "d[id] not recall having the conversation [about treating SDR votes as provisional]" at the meeting. (Doc. 186 at 69:8-16.) The email stated that "Cleta, Jay, and I stand ready to assist with proposed language and

31

statutory citations wherever you might need our assistance." (JX043 at 1.) Mitchell, for her part, testified that she remembered little in the way of specifics that were discussed at the meeting, but generally agreed with the points noted in the PowerPoint. (Doc. 186 at 76:8-24.) Mitchell testified that she "never heard a word" from the legislators regarding the lobbyists' offer of assistance. (Doc. 186 at 68:20-21.)

SB 747 was filed on June 1, 2023, with Senators Ralph Hise, Jr., Paul Newton, and Warren Daniel as the primary sponsors. (Doc. 174 at ¶ 8 (citing JX001 at p.1 and JX013).) The bill included a provision to "Require [a] Provisional Ballot for Same-day Registration." (JX013 at 10.) Same-day registrants' provisional ballots would be counted only upon passing mail verification or if they brought in additional documentary proof of residence to their county board office. (Id.)

That same day, Jane Bilello, the operator of the Asheville Tea Party's website – and a board member of NCEIT – posted on the Asheville Tea Party's website to celebrate NCEIT's efforts. (PX194; see PX091 at 3 (Bilello identifying herself as a board member of NCEIT).) NCEIT's logo appears at the top of the post. (PX194 at 1.) Reproduced in the post is a quote that Womack gave to the news outlet WRAL. (Id.; see Doc. 187 at 186:3-9.) That quote included the statements, "[f]rom talking to leaders in the House and Senate, it appears they're going to bundle all these

32

meritorious changes and put them in the omnibus bill," and "[t]his is something my group has been pushing for." (PX194 at 1.) Bilello's post also included the exclamation "Look What WE Did!" (Id.) At trial, Womack emphasized that he was not consulted on the post prior to it being made and that the "Look What WE Did!" was, in his view, "braggadocious." (Doc. 187 at 186:10-14.)

Plaintiffs called Paul Cox, general counsel for the State Board from 2022 through the time of the trial, which includes the period leading up to the passage of SB 747; he testified about the reaction within the State Board as to the filing of SB 747. (Doc. 187 at 202:1-22.) Mr. Cox testified that he did not see a draft of SB 747 until it was introduced. (Id. at 203:18-204:6.) Before then, the State Board had not advocated for changes to SDR because it was not concerned that there was a problem with fraudulent voting such that the SDR process needed to be changed. (Id. at 204:7-13.)

According to Cox, the State Board was concerned with the administrability of the initial version of SB 747 brought in the Senate, which would have treated the ballots of same-day registrants as provisional. (Id. at 204:21-205:7.) Provisional voting, he explained, is resource-intensive both at the polling site and at the county board of elections offices across the state when the election is canvassed. (Id. at 205:1-21.) At the polling site, a voter must receive specific instruction at a help desk on

33

how to vote provisionally; the result is that the more voters who vote provisionally, the more poll workers are needed. (Id. at 205:8-14.) At the county board offices, provisional votes require "intensive research" by workers to determine whether a provisional vote is in fact eligible to be counted. (Id. at 205:15.) The timing for counting provisional ballots also presented a difficulty, as provisional ballots often are not counted until immediately before canvas, which occurs ten days after the election. (Id. at 206:11-24.) So, treating more votes as provisional would have put the workers at county boards of elections under a time-crunch to determine eligibility prior to canvas. (See id.) The State Board was also concerned with the burden on voters of the requirement to present themselves at county boards of elections to cure their ballots. (Id. at 205:22-206:5.) Finally, the State Board was concerned that the proposed law took a restrictive view of what documents could satisfy the address verification requirement for SDR voters – essentially restricting permissible documents to a DMV-issued ID, which many SDR voters were not using at their initial registration during SDR. (Id. at 210:14-211:14.)

The State Board communicated its concerns to the General Assembly. (Id. at 208:19-09:1; JX032.) As Cox explained, when legislation such as SB 747 is introduced that was not prompted by the State Board, the State Board considers its role to review the

34

legislation and educate legislators about the law's likely impact on elections and voters.  (Doc. 187 at 207:10-208:3.)  The State Board explicitly noted in an email that "[t]his will also be very difficult for military personnel, students, and low-income people/renters who move frequently."  (JX032 at 1; Doc. 187 at 211:15-212:14.)  If voters were required to verify their address via a DMV-issued photo ID, voters that moved frequently would be especially burdened.  (See Doc. 187 at 211:15-212:14.)  And the lag between moving and obtaining an updated ID from the DMV could mean that certain voters might be unable to participate in a given election.  (See id.)  Cox communicated his concern about any requirement of a DMV-issued photo ID to Representative Pricey Harrison.  (Id. at 215:24-217:5.)

On June 22, 2023, SB 747 crossed over to the House.  (Doc. 174 ¶ 10; JX001 at 8.)  Representative Mills was responsible for carrying the bill forward at that point.  (Doc. 187 at 70:1-10 (Mills).)  On July 3, Cox emailed Representative Mills with suggestions attempting to address what he saw as the General Assembly's core concern: "same-day registrants who fail mail verification."  (PX093 at 2.)  To that end, he suggested using a single-verification-card system while making SDR ballots retrievable rather than provisional.  (Id.)  He explained that his suggested approach would (1) be more familiar to county board and poll workers, and thus more administrable; (2) shorten the

35

verification period; and (3) "streamline the process to discount a ballot for a registrant who fails mail verification." (Id.) As testified to by both Representative Mills and Senator Daniel, this suggestion was incorporated into the House version of the bill and ultimately made it into the final draft. (Doc. 187 at 62:23-63:14 (Daniel), 127:8-19 (Mills).)

Cox, alongside Lindsey Wakely, the State Board's deputy general counsel, also met with Representative Mills, the House election chair, and other members of leadership staff upon crossover to the House to draft a proposed committee substitute. (Doc. 187 at 217:13-23.) Cox provided them with some of the same recommendations he offered to the Senate regarding changes to SDR. (Id. at 217:13-218:2; see JX058.)

On August 15, 2023, the House Committee on Election Law & Campaign Finance held a properly noticed committee hearing on the proposed House committee substitute of SB 747. (JX001 at 8.) Representative Mills testified that the Committee heard "a lot of amendments" during that hearing, and debate was not limited in any way. (Doc. 187 at 141:13-21.) In fact, Representative Mills had to get permission for the Committee to run overtime, resulting in an "extra-long committee meeting" that day. (Doc. 187 at 141:13-23.)

The House version of the bill ultimately incorporated Cox's suggestion to utilize a single verification card system with

36

ballots being retrievable, instead of making SDR voting provisional. (Id. at 220:2-10.) Neither the House bill nor the final legislation adopted his recommendation to accept more forms of ID for students at private universities. (Id. at 220:17-223:6.) Cox did not communicate with Senator Daniel about SB 747. (Id. at 223:7-10.)

Cox testified that, on its own, the State Board would not have advocated for a change to SDR. (Id. at 214:16-21.) What he offered legislators was a "better approach" to accomplish their goal of changing SDR while making the adjustments more administrable and less likely to wrongly exclude otherwise eligible voters. (See id. at 214:7-215:7.)

SB 747 passed the House on August 16 and was ultimately ratified on August 17. (Doc. 174 ¶ 12; JX001 at 5-6.) On August 24, Governor Cooper vetoed the legislation. (Doc. 174 ¶ 13; JX001 at 5.) However, SB 747 became law on October 10, when the General Assembly overrode the Governor's veto. (Doc. 174 ¶ 14; JX002; JX001 at 4-5.) SB 747 remained unchanged from ratification and the veto override. (Doc. 187 at 39:7-10 (Daniel).) Senator Daniel and Representative Mills both credibly testified that they neither viewed nor had any understanding of age-related or demographic data around SDR usage. (Doc. 187 at 55:1-3, 57:2-8, 66:23-67:3, 131:4-11, 132:6-13.) And both credibly testified that at no time during the process did they seek to discriminate against young

37

voters.  (Doc. 187 at 41:16-18, 66:10-22, 141:4-9.)

Finally, the court notes as relevant to SB 747's legislative history evidence Defendants presented by expert Dr. Andrew Taylor. Dr. Taylor received his Ph.D. in political science from the University of Connecticut and is currently a professor of Political Science at North Carolina State University.  (Doc. 188 at 138:7-12.)  His expert report in this case is contained in LDTX125. Dr. Taylor explained that he had reviewed polling data indicating that "a fairly sizable majority of Americans right before the 2024 election were either concerned or very concerned that the upcoming election would experience voter fraud."  (Doc. 188 at 161:22-25.) Dr. Taylor also opined that it would be sensible for North Carolinians to be especially concerned about voter fraud, given that the State Board in 2018 voided an election for the United States House of Representatives after receiving significant evidence of fraudulent behavior.  (Id. at 162:7-14.)

Having carefully considered all the evidence, the court finds that the General Assembly did not deviate from the ordinary legislative process in passing SB 747.  It followed normal order and held the proper number of hearings, including one that was extended.

The court also finds that while Mitchell and Womack personally held criticisms of how college voting was conducted in the state, their criticisms of SDR related to how it was conducted for all

38

voters, irrespective of age. Mitchell and Womack credibly testified that they were opposed to SDR in all instances, regardless of who used SDR or for whom SDR users tended to vote, and that they were ultimately disappointed in SB 747's changes to the SDR mail verification scheme. This is not contradicted by the Asheville Tea Party's post seeking to claim credit for the change in law, as it has been said that victory has a thousand fathers, and Womack credibly testified that he did not approve the post. Additionally, this post occurred before SB 747 was revised to treat SDR ballots as retrievable, despite the lobbyists' request to treat SDR ballots as provisional. (Compare PX194 with JX032.)

The court is also persuaded Plaintiffs have failed to show that the General Assembly, in passing SB 747, adopted what may have been the subjective motivations of Mitchell and Womack. Senator Daniel credibly testified that in the aftermath of the 2022 midterms he received over 75 recommendations regarding election integrity from a variety of groups and individuals, of which NCEIT was only one. The General Assembly ultimately did not accept any of Mitchell's or Womack's suggested adjustments to SDR verification.

D.   18-25-Year-Olds As a Class of "Young Voters"

The parties dispute whether Plaintiffs' proposed class of 18-25-year-old voters is a coherent class of "young voters."

39

### 1. Plaintiffs' evidence

Plaintiffs offered the testimony of Dr. Jacob Grumbach, an associate professor of public policy at the University of California at Berkeley. (Doc. 188 at 66:16-17.) He received his bachelor's degree in history and political science from Columbia University, his master's degree and Ph.D. in political science from the University of California at Berkeley, and was a postdoctoral fellow at the Center for the Study of Democratic Politics at Princeton University. (Id. at 67:16-23.) He was retained by Plaintiffs to assess SB 747's impact on the political participation and incorporation of young Americans. (Id. at 69:24-70:1.) The parties stipulated that Dr. Grumbach is an expert in political science and public policy, U.S. politics, the study of age in U.S. politics, quantitative methodology, and the study of state-level election administration methods and policies. (Doc. 174 (Joint Stipulations) ¶ 5.)

Dr. Grumbach formed his opinions through use of the standard methods in social science and political science, using quantitative analysis, including difference-in-difference analysis on the effect of SDR, and quantitative analysis of public opinion data. (Doc. 188 at 70:10-15.) He concluded that SB 747 reduces the political incorporation and participation of "young

40

Americans" in elections.[9]  (Id. at 71:1-3.)  Dr. Grumbach produced an initial report and rebuttal report.  (PX 176, PX 179.)  Several themes emerged from Dr. Grumbach's work.  (Doc. 188 at 71:8.)

As a starting point, Dr. Grumbach testified that the electorate is polarized across age groups.  (Id. at 71:9-17.)  This generational polarization occurs "when the political values and policy preferences of different generations or age groups diverge or are distinct."  (Id. at 71:21-72:1.)  Generational polarization is due to "life cycle effects" and "cohort effects" across generations.  (Id. at 71:12-22.)  The former refers to the particular stage of life young Americans occupy at a given time relative to older Americans, when they are more likely to be obtaining an education, purchasing a home, and establishing a relationship and family.  (Id.)  The latter refers to the unique experiences of these young Americans which were not experienced by previous generations at the same age – such as the Covid pandemic. (Id.)

The upshot of this generational polarization, Dr. Grumbach testified, is that older voters are incentivized to exclude or reduce the political participation of younger Americans.  (Id. at 73:13-17.)  And older Americans are capable of doing so because

---

[9] Dr. Grumbach defined "young Americans" in his opening report as under 35, 18 to 24 years old, or left them undefined.  (See, e.g., PX 176 at 18, 19.)

they make up a disproportionate share of the U.S. Congress and North Carolina General Assembly. (Id. at 72:2-13.) Dr. Grumbach asserts that policymakers couch proposals that reduce political participation among young voters in the language of fraud prevention measures. (Id. at 74:12-16.) He contends that policymakers also argue that young Americans are less deserving of political participation because of a lack of civic capacity and necessary knowledge to be fully informed citizens, or are not sufficiently rooted in the community. (Id. at 74:18-75:8.) This results, he contends, in a trend in state governments to enact laws and policies that reduce the electoral power of younger Americans. (Id. at 75:11-14.) Such changes include prohibiting college IDs from serving as acceptable forms of voter ID and reducing the availability of SDR. (Id. at 75:16-76:18.) He contends that these changes are often accompanied by changes that make participation for older Americans easier – such as allowing hunting licenses, which are disproportionately held by older Americans, to serve as voter ID. (Id. at 76:11-18.)

In Dr. Grumbach's view, young voters are especially vulnerable to increased burdens on voting. (Id. at 76:22-25.) This is because they are "developing the habit of voting" and tend to be more "residentially mobile" than older voters. (Id.) Moving residences requires re-registration and learning new procedures. (Id. at 77:8-14.) Dr. Grumbach calculated that moving within the

42

past year reduces a person's likelihood of voting anywhere from 14% to 24%.  (Id. at 78:19-24.)

One solution to the inverse relationship between voting and residential mobility, he opined, is to increase the availability of SDR.  (Id. at 79:11-16.)  He asserts that SDR disproportionately assists young Americans in overcoming residential mobility-related obstacles to voting.  (Id. at 79:25-80:6.)  This is so because mobile voters are more likely to have missed the traditional registration deadline, and SDR allows them an opportunity to register and vote at once during the early voting period after they have missed the traditional registration deadline.  (Id. at 79:19-80:6.)  Dr. Grumbach utilized difference-in-differences analysis to quantify the impact of SDR on youth voting.  (Id. at 80:18-23; PX176 at 19 (Fig. 7).)  Broadly speaking, the analysis attempts to separate correlation and causation; in this case, Dr. Grumbach's difference-in-differences looks at the states with SDR voting and attempts to "estimate how turnout by age group changes compared to the states that don't pass same-day registration." (Doc. 188 at 81:21-82:5.)  Applied here, the analysis involves a comparison between states that utilize SDR and those that do not to assess the causal impact of SDR on youth voting.  (Id.)  Dr. Grumbach offers nine difference-in-differences analyses of this question.  (PX176 at 19 (Fig. 7).)  He concludes from these analyses that SDR "tends to be a small boost for all age groups,

43

but disproportionately assists young Americans in turning out to vote." (Doc. 188 at 82:22-83:3.)

North Carolina's SDR system was, according to Dr. Grumbach, already more restrictive than those of other states with SDR because it does not offer it on election day.[10] (Id. at 83:15-17.) In Dr. Grumbach's view, SB 747, by reducing the mail verification to one card causes both vote suppression (an actual decrease in the absolute number of ballots cast) and voter suppression (an increase in the burdens of voting). (Id. at 85:24-86:4, 86:23-87:5.)

Dr. Grumbach notes that the most common justification for increasing obstacles to voting, including measures like SB 747, is to reduce voter fraud. (Id. at 87:6-9.) He rejects this justification because, he testified, elections in the United States are highly secure. (Id. at 87:10-11.) This is based on his personal experience evaluating mail-ballot verification in Washington state, as well as his belief that the risk-reward calculus sufficiently discourages voter fraud because one's fraudulent vote is unlikely to change an election outcome and is outweighed by the possibility of severe criminal penalties. (Id. at 87:10-89:9.)

Dr. Grumbach opined that increasing the barriers to voting is

---

[10] Of course, this is something different, known as Election Day Registration. (See Doc. 188 at 3-6.)

44

problematic for electoral democracies where casting a ballot is the primary way of expressing one's political preferences. (Id. at 90:17-91:1.) Increased barriers to voting are especially problematic for their impact on young voters. As Dr. Grumbach explains, young voters are, by virtue of their age, not yet habitual voters. (Id. at 90:14-16.) When that habit formation is disrupted through the imposition of barriers to voting, it not only prevents a young voter from voting in a given election but makes it less likely that he or she will attempt to vote in subsequent elections. (Id. at 89:12-22.) Such thwarted individuals often "feel[] like the system is set up against them or that they are not politically efficacious."[11] (Id. at 89:21-22.)

### 2. Defendants' evidence

Defendants relied on the testimony of Dr. Taylor. He concluded that Plaintiffs' definition of young voters as those aged 18 to 25 is "[h]ighly defensible[,] but arbitrary." (Doc. 188 at 143.) This definition is arbitrary because although age 18 constituted a clear lower bound to the category, several reasonable choices could be made for the upper bound. Drawing on the 26th Amendment's enfranchising of those aged 18, 19, and 20, for

---

[11] Dr. Grumbach contends that a recent political science paper evaluating the impact of changes to Texas's absentee ballot system illustrate these downstream effects on voting in subsequent elections. (Doc. 188 at 89:23-90:13.)

example, one could reasonably define young voters as those aged 18 to 20. (Id.) Dr. Taylor noted that various commercial outfits, such as Gallup and the New York Times, classify age differently. (Id. at 143.) For example, 18 to 24 is a frequent grouping given for young voters, but so is 18 to 29; some even extend the group to as high as age 34. (Id. at 143-44.) Academic researchers have sometimes, but not consistently, used the 18 to 25 age range to define young voters.

### 3. The court's findings

The court has several concerns with Dr. Grumbach's opinions about SB 747's burden on young voters.

First, his analysis is based on the political attitudes of young Americans nationwide; he has not studied those of North Carolinians aged 18 to 25. Second, his focus on generational cohorts, with the repeated elision between Millennials and Gen Z, similarly diverges from the 18 to 25 age range on which Plaintiffs rest their case. (See PX176 at 5.) It is therefore not surprising that "young voters" was either undefined or something of a moving target in Dr. Grumbach's opening report and was only defined as those age 18 to 25 in his rebuttal report. (Compare PX176 at 18 Fig. 6 and 19 Fig. 7 (using, respectively, "under 35" and 18 to 24 for the youngest age tranches) with Doc. 179 at 2 (defining "young Americans" as those "between the ages of 18 and 25").) Third, Dr. Grumbach did not provide a concrete or reliable definition of what

46

constitutes generational polarization.

Moreover, Dr. Grumbach's criticisms are frequently off-point and at times speculative. For example, his contention that older voters generally tend to discriminate against younger voters by being resistant to the use of college IDs for voter identification rests on shaky support and appears speculative. There are plenty of examples of national interest in ensuring that identification standards are sufficiently standardized and thus secure. See, e.g., The Real ID Act of 2005, Pub. L. No. 109-13, §§ 201-02, 119 Stat. 302, 311-12 (2005) (codified at 49 U.S.C. § 30301 et seq.) (standardizing requirements for a driver's license and IDs issued by states to board an airliner and enter certain federal facilities). Similarly flawed is his conclusion that states liberalize the use of licenses for voting for "older" Americans, such as hunting licenses, while being more restrictive on young adult voting. And though North Carolina has SDR, unlike approximately half of the states, he criticizes the state for not expanding SDR by instituting Election Day Registration. Whatever "barriers" so-called "young voters" may face for participating in elections where there is no SDR, that is a strawman here, as SB 747 did not eliminate SDR for anyone. There was also little support for the proposition that students were disadvantaged timewise in being able register to vote; most arrive on campus in August or early September before the fall election, leaving them

47

adequate time to register traditionally.  (See Doc. 185 at 70:12-72:25.)  The best that can be said is that they may be distracted or inattentive to their need to register.

The court thus affords only modest weight to Dr. Grumbach's opinions and conclusions.  Voting preferences can and do diverge based on age.  Moreover, no doubt there are more older voters than "young voters" (irrespective of the range offered by him) simply by virtue of demographics (e.g., he excludes every adult not 18 to 25).  Even so, Plaintiffs have failed to establish that any generational polarization, assuming it exists, is sufficient to have an actual effect on young voters any different from that of any other voter.  Finally, the court is not persuaded that Dr. Grumbach's designation of voters aged 18 to 25 is based on any articulable standard; rather, it is completely arbitrary.

**E.    The Empirics of Mail Verification**

**1.    Plaintiffs' evidence**

Plaintiffs offered the expert testimony of Dr. Kevin Quinn to support their contention that young voters are disproportionately failing the first verification card and relying on the second one to verify residence – and thus are most likely to be impacted by SB 747's removal of the second card.  Dr. Quinn is a professor at Emory University specializing in empirical legal studies – the application of statistical methods to law and legal institutions. (Doc. 186 at 84:15-25.)  The parties jointly stipulated that Dr.

48

Quinn is an expert in political science and political methodology, with an emphasis on empirical legal studies and statistical methods for law and social science. (Doc. 174 at 2 (Joint Stipulations) ¶ 4.) Dr. Quinn was permitted to offer opinions as tendered. (Doc. 186 at 85:21–86:1.)

Dr. Quinn prepared three reports for this case: an opening report (PX180), a supplemental report (PX182), and a rebuttal report (PX184). All were admitted into evidence. (Doc. 174 at 1 (Joint Stipulations) ¶ 3; Doc. 186 at 86:16–24 (Quinn).)

Dr. Quinn evaluated early voting and SDR, with a focus on how different age groups, particularly so-called young voters, utilized early voting and SDR. (Doc. 186 at 86:4-7.) He defined young voters as those under age 26 (i.e., age 18 to 25). (Id. at 92:9-10.) At the heart of Dr. Quinn's analysis was "the empirics of mail verification in North Carolina." (Id. at 88:5-7.) In his own words, "[t]he key thing there is to look to see who is failing the first [card] and who is relying on the second [card] to successfully register or not successfully register, as the case may be." (Id. at 88:11-14.) Dr. Quinn also evaluated the effects of the notice-and-cure process in the 2024 elections. (Id. at 88:15-18.)

Broadly speaking, Dr. Quinn looked at two sources of data: publicly available files from the State Board, and confidential elections results data produced by the State Board during the

49

litigation.  (Id. at 88:19-89:3.)  His analysis led him to several conclusions.

First, he opined, early voting, especially in general elections, has been increasing over time in North Carolina, both as an absolute number and as a percentage of total votes cast. (Id. at 90:8-11.)  Approximately three million early votes were cast in the 2016 presidential general election.  (PX180 at 11 Fig. 1.)  By 2024, that number had increased to over four million. (Id.)  SDR voting also increased over the same period, albeit more modestly.  One hundred thousand voters used SDR in the 2016 presidential general election; that number increased to slightly under 120,000 in 2020, and increased again to approximately 130,000 in 2024.  (PX180 at 16 Fig. 3.)

Dr. Quinn broke down these metrics for early voting and SDR voting by age, using six age groups: 18-25 ("young voters,") 26-35, 35-45, 46-55, 56-65, and 65 and older.  (See PX180 at 22 Fig. 5.)  Explaining why he chose these groups, Dr. Quinn stated that voters aged 18-25 are a "coherent demographic category": they generally have similar life experiences, such as frequently being in college, graduate school, or professional school; additionally, the State Board uses 18-25 as its youngest age group when tabulating age.  (Id. at 92:12-19.)  Dr. Quinn applied similar reasoning to the 65 and older range: in his view, they are likely to be past retirement age and otherwise share similar life

50

experiences.  (Id. at 93:2-6.)  The interior four groups he justified on the ground that their ten-year ranges facilitated ease of comparison.  (Id. at 93:7-17.)

Young voters, according to Dr. Quinn's calculations, comprised the smallest absolute number of registrants among the age groups across general election years from 2014 to 2024.  (Id. at 94:18-25; PX180 at 22 Fig. 5.)  Among the six groups, young voters also represented the smallest percentage of all registrants, amounting to approximately 12.5% to 13% during that time period.  (PX180 at 23 Fig. 6.)  The actual voting, or turnout, among young adult registrants increased as an absolute number between 2014 and 2024 in general elections, though it stayed relatively flat in primary elections.  (Doc. 186 at 95:18-23; PX180 at 24 Fig. 7.)

Despite their being the age group with the fewest members, Dr. Quinn found, young voters consistently represented the largest absolute number of SDR users.  (Doc. 186 at 97:1-4; PX 180 at 28 tbl. 3.)  He also found, correspondingly, that young voters were most likely to use SDR among the six groups.  In the 2024 general election, 6.99% of young voters cast their votes via SDR.  (Doc. 186 at 97:7-25; PX 180 at 29 tbl. 4.)  In that same election, by contrast, the overall percentage of all votes cast via SDR was only 2.29%.  (Id.)  Dr. Quinn concluded that young voters were always more than twice as likely to utilize SDR than other voters,

51

and on some occasions more than ten times as likely to do so. (Doc. 186 at 98:4-18, PX180 at 29.)

Dr. Quinn also analyzed the effects of SDR usage in a given election on voting in future elections. He opined that registration in one election facilitates ease of voting in future elections, because ordinarily a voter need not re-register after the first registration. (Doc. 186 at 99:15-100:4.) As such, he claimed, SDR "operat[es] as a pathway into becoming [a] habitual voter." (Id. at 100:18-19.) And while SDR offers this pathway to all voters, it has a greater effect on young voters because of their greater reliance on SDR. (Id. at 100:18-23.) Of young voters who voted in the 2024 general election, almost 11% voted after having been registered via SDR, either in that election or in a previous election. (Doc. 186 at 100:11-17; PX180 at 33 tbl. 6.)

Dr. Quinn considered the empirics of the two-card registration verification system (i.e., the system in place for SDR prior to SB 747 and which still exists for traditional registrants). He analyzed the period from 2010-2025, using the confidential data produced by the State Board. (PX180 at 76.) One limitation of his analysis, however, was that he considered traditional registrants and SDR registrants together, rather than separately. He explained that considering them as separate classes was impossible because the confidential dataset itself did not

52

distinguish based on traditional or SDR registration. (Doc. 186 at 103:5-9.) Considering traditional registrants and SDR registrants together was preferable, he also asserted, because doing so would provide more data points and thus more information about "essentially the same [verification] process." (Id. at 102:18-103:4.)

Dr. Quinn had to supplement this section about the empirics of mail verification in his initial report, however, because of multiple errors. (Id. at 105:2-109:21; see PX182.) His conclusions nevertheless did not change. (Doc. 186 at 109:22-24.)

In his supplemental report, Dr. Quinn concluded that over the 15-year period considered, 44,264 individuals were verified via the second card, after their address could not be verified on the first card. (Doc. 186 at 112:10-19; PX182 at 11 tbl. 9.) As noted, these 44,264 include both traditional registrants and SDR registrants. (Doc. 186 at 111:22-23.) Although Dr. Quinn's analysis did not distinguish between those two groups, it did purport to distinguish between young voters and older voters. According to his calculations, 19,498 of those voters – approximately 44% of the total – were under the age of 26. (Doc. 186 at 112:16-19; PX182 at 11 tbl. 9.) This made young voters the largest age group represented among those who verified only after the second card. (Id.) Dr. Quinn was unable to precisely calculate those voters' age, however, because the State Board's

53

figures only included year and month, and not day, of birth for the voters. (Doc. 186 at 115:9-16.) To estimate the age of the registrant, Dr. Quinn simply took the <u>year</u> of the registration event and subtracted from that the birth year of the registrant. (<u>Id.</u> at 115:17-21.) He also considered those who <u>failed</u> verification after two cards - 102,697 individuals. (Doc. 186 at 118:13-17; PX 182 at 12 tbl. 10.) Of these, approximately half – 51,490 – were young voters, who represented by far the largest age group of those denied on the second card. (<u>Id.</u>)

Dr. Quinn drew several conclusions from his analysis. First, he opined, "the mail verification process generally is a difficult process for youth voters." (Doc. 186 at 119:12-14.) Second, young voters disproportionately rely on the second card to successfully verify residence. (<u>Id.</u> at 119:15-17.) From these two observations he drew the further conclusion: "when we take that second [card] away, as is the case for same-day registrants under SB 747, that's going to have a larger effect on youth voters than other age categories." (<u>Id.</u> at 119:17-20.)

Finally, Dr. Quinn considered the notice-and-cure process employed for SDR registrants following the consent decree in <u>Voto Latino</u> by evaluating the March 2024 primary and November 2024 general elections. (PX180 at 48-60.) Again relying on the data produced by the State Board, Dr. Quinn was able to separate registrants who successfully utilized the notice-and-cure process

54

from registrants who failed that process.  (Doc. 186 at 121:5-17; PX180 at 48-60.)  Among those who failed the process, he was able to distinguish between those who failed to send the necessary HAVA documents in time (designated "Denied Default Time Limit" in the State Board dataset), and those who submitted unacceptable documentation (designated "Denied Failed Cure").  (Doc. 186 at 121:11-17; PX180 at 50-51 & tbl. 14.)  For young voters, 541 of them ended up in the notice-and-cure process.  (Doc. 186 at 121:25-122:5; PX180 at 52-53 & tbl. 15, n.37.)  Only 76 of those 541, or approximately 14%, successfully cured.  (Doc. 186 at 121:25-122:5; PX180 at 52-53 & tbl. 15.)  Of the remainder, the State Board designated 418 "Denied Default Time Limit" and 47 "Denied Failed Cure."  (Doc. 186 at 121:25-122:1; PX 180 at 52 (tbl. 15).)  Young voters had the lowest successful cure rate of all the age groups. (Doc. 186 at 122:15-17; PX180 at 52-53.)  Dr. Quinn concluded that the notice-and-cure process was ordinarily not effective for young voters.  (Doc. 186 at 120:6-7; PX180 at 62; see PX182 at 18-19.)

In contrast, young voters were disproportionately likely to have received a "new mailing," which occurs when county board of elections staff identify an address error on the first verification card.  (See Doc. 186 at 123:9-13; PX 180 at 52 (tbl. 15), 53.)  Under the notice-and-cure process, these corrected cards are considered new first verification cards rather than second cards. In the 2024 general election, 172 individuals received this

55

"Started New Mailing" designator.  (Doc. 186 at 123:11-15; PX180 at 52 (tbl. 15).)  Of those 172, 86 – fully 50% – were young voters, making them the largest age group who were sent "new verification cards" under the notice-and-cure process after county boards of elections members corrected address errors.  (PX180 at 52 (tbl. 15), 53.)

Despite his conclusion that the notice-and-cure process was ineffective for young voters, Dr. Quinn acknowledged (and his data indicated) that there was a greater turnout of youth registrants in the 2024 general election than the 2020 general election.  (Doc. 186 at 165:21-25; PX180 at 24 (Fig. 7).)  In other words, youth voting actually increased after the implementation of SB 747 and the notice-and-cure process.

Plaintiffs also offered lay witness testimony attempting to explain why young voters, particularly students, might be reliant on the second card.  They called Gabrielle Martin, who is the Youth Voter Engagement Coordinator for North Carolina Black Alliance. (Doc. 186 at 257:2-6.)  She works with college students at HBCUs and has spoken with over 1,000 students as part of her work to improve student voting turnout.  (Id. at 257:13-16, 259:8-10.) She explained that student voters faced several challenges in registering to vote, including: knowing how to fill out their voter registration forms; difficulty with the address verification process; and colleges not having enough mailboxes for all students

56

to receive their verification card.  (Id. at 260:1-261:18.)

Plaintiffs similarly offered the testimony of Lucas Seijo, a full-time employee of Democracy North Carolina and its Eastern Regional Managing Organizer since March 2023.  (Id. at 263:21-261:3.)  His work focuses on communicating with constituents about elections and how they can communicate with government.  (Id. at 265:4-16.)  He estimates he has interacted with thousands of individual voters.  (Doc. 187 at 6:4-6.)  Mr. Seijo's efforts focus on young voters because of their lack of familiarity with the voting process; most of the young voters with whom he interacts are college students.  (Id. at 7:1-24.)  While talking with voters, he focuses on informing them about HAVA-compliant documents and the difference between residential and mailing addresses for the purposes of voter registration.  (Id. at 9:16-10:16.)

Plaintiffs also offered the testimony of Timothy Greene, a retired U.S. postal worker with 40 years' experience as a letter carrier.  (Doc. 186 at 196:17-25.)  He explained various ways in which a piece of mail could be returned as undeliverable, including some that would involve no fault of the person registering to vote. Common reasons a piece of mail would be undeliverable include insufficient address, incorrect address, deficient barcode, or vacant address.  (Id. at 199:2-5.)  In his experience, multi-unit dwellings tended to experience more undeliverable verification cards than single-unit homes.  (Id. at 199:6-16.)  This was due,

57

he expected, to people moving frequently and failing to provide change-of-address forms. (Id.)[12]

Plaintiffs also offered the testimony of Director of Elections for the Forsyth County Board of Elections Tim Tsujii. (Doc. 185 at 81:11-14.) The Forsyth County Board of Elections uses several "best practices," not required by statute or State Board guidance, to better register college students in Forsyth County. (Id. at 85:22-86:2, 88:21-91:5). It works with schools to obtain rosters of students living on campus to be able to assist students with the same-day registration process. (Id. at 85:9-17.) It also coordinates with those schools to obtain address information, because "those addresses can be unique depending on the school." (Id.) It creates resources for poll workers and the public on how to properly enter student residential and mailing addresses. (JX049 (Guidance for College Addresses); JX050 (Frequently Asked Questions for Students Living on Campus); (Doc. 185 at 88:21-91:2).) Despite these efforts, SDR verification cards were returned as undeliverable in Forsyth County – according to Dr. Quinn's data, this occurred 93 times between the 2024 primary and general elections. (PX180 at 57 (tbl. 19).) Only four of those 93 were cured. (Id.) Other counties, with their own varied

---

[12] Plaintiffs also proffered the testimony of Jaimee Suwalkowski, (Doc. 185 at 77:3-8), which the court excluded based on an untimely disclosure (Doc. 180). Plaintiffs alternatively offered her testimony for impeachment purposes. Considered on either basis, the testimony fails to alter the court's conclusions.

58

practices for student registration, similarly had undeliverable verification cards.  (Doc. 156-7 (Hunter-Havens Dep.) at 21:21–22:11, 100:8–18, 137:18–138:14 (New Hanover County)); (Doc. 156-4 at 40:21–42:13 (Amaro Dep.), Doc. 156-5 at 44:5–45:4 (Hill Dep.) (Cumberland County).)

### 2.  Defendants' evidence

Legislative Defendants offered the testimony of Dr. Paul White, who the parties stipulated is an expert in the field of economic and applied statistical analysis, including disparate impact analysis. (Doc. 174 at ¶ 7.)  Dr. White obtained both a master's degree and his Ph.D. from North Carolina State University in 1993, where he focused on labor economics and healthcare, with a minor in statistics.  (Doc. 188 at 200:13-23.)  Dr. White has extensive experience as an expert witness, having testified in over 125 matters using analyses similar to those which he performed in this case.  (Doc. 188 at 200:24-201:14, 202:1-203:17; LDTX131 at 2-16.)  Dr. White was an adjunct professor for six years at Florida State University, where he taught graduate courses in applied economics and research design.  (Doc. 188 at 201:19-25.) He has spent decades in private practice as a statistician and is presently employed by Resolution Economics.  (Doc. 188 at 202:1-11.)

Broadly speaking, Dr. White addressed three topics.  First, analyzing data from the 2016 through 2023 elections, he considered

59

whether there is a statistically significant difference in the registration denial rate of younger voters and older voters among those who received a second verification card. (Doc. 188 at 206:3-11.) Second, he examined the notice-and-cure process data from 2024 to determine whether there is a statistically significant difference in the number of young voters who were approved during that process compared to their representation among those who actually were in that process. (Doc. 188 at 206:12-17.) Third, he responded to Dr. Quinn's reports. (Doc. 188 at 206:18-19; LDTX129.)

The core of Dr. White's work was his disparate impact analyses. He compared the reported data to what would be expected under neutral circumstances. (See Doc. 188 at 207:3-6.) In doing so, he relied on the "multiple pools test." (Doc. 188 at 208:20-22.) This test involves first calculating the likelihood that the difference between an expected outcome and the outcome actually observed in the data is the product of random chance (through the "Fisher's exact test"). (Doc. 188 at 209:9-22; LDTX128 at 11-12.) Then, having performed the Fisher's exact test for different datasets, the results are aggregated via the Mantel-Haenszel aggregation technique to form a larger pool. (LDXT128 at 12-13; see Doc. 188 at 209:20-210:1.) Here, Dr. White performed a Fischer's exact test for each possible combination of election and county in the data, asking whether the denial rates for young

60

voters in that specific county in that specific election were consistent with random chance. (LDTX128 at 12.) He then combined those results to produce an aggregated result for each election, for each county, and overall across all elections and counties in the data. (Id. at 12-13; see id. at 13-20.)

Dr. White's first inquiry – whether there is a statistically significant difference in the denial rate of so-called young voters and older voters among those who received a second SDR verification card – involved a disparate impact analysis based on 7,156 observations. (Doc. 188 at 222:18-21; LDTX128 at 8.) These 7,156 observations resulted from multiple filtering levels applied to the State Board's confidential data across ten elections, from the March 2016 primary through the November 2024 general.[13] It is important to understand what those observations represent: Dr. White's attempt to capture the instances in which an SDR registrant received a second card – a narrower category than all instances of a card being sent out to an SDR registrant, and also narrower than Dr. Quinn's analysis of the second card sent to both SDR and traditional registrants. (See Doc. 188 at 222:18-223:4.)

Dr. White was able to tabulate these observations by age of the registrant. He used two dichotomies of young voters and older voters: first, those aged 18-25 against those aged 26 and older;

---

[13] The filtering steps used to reach the final 7,156 observations are described at Docket Entry 186 at 216-22 and LDTX128 at 10 table 2.

second, those aged 18-29 against those aged 30 and older. (Doc. 188 at 223:8-15; LDTX128 at 91 (Appendix F).) These tabulations allowed Dr. White to perform a disparate impact analysis considering whether the actual denial rates of young voters who received a second verification card differed, in a statistically significant way, from their expected denial rate in a given election. (See LDTX128 at 91 (Appendix F).) Dr. White defined a statistically significant result as one which was less than 5% likely to occur due to chance. (Doc. 191 at 5:3-14.)

For the period prior to passage of SB 747, Dr. White concluded, the registration denial rates for those who received a second verification card fluctuated, without consistently advantaging younger or older voters. (Doc. 191 at 7:23-8:4.) Of the pre-SB 747 elections across all counties, only two elections produced statistically significant differences between actual and expected denial rates for an age group. (Id. at 9:12-13; LDTX128 at 91 (Appendix F).) First, in the March 15, 2016 election, the actual denial rate for young voters (18-25) was higher than expected. Second and conversely, in the November 3, 2020 election, the actual denial rate for the younger group was lower than expected. (Doc. 191 at 9:14-21; LDTX128 at 91 (Appendix F).) Even additionally considering the data at the county-specific level, Dr. White ultimately found few statistically significant results, and none consistently favored or disfavored young voters:

62

> While there is a relatively small number of instances where younger registrants would have been worse off had SB 747 (i.e., the removal of the second mailing) been in effect prior to 2024, there are also even more instances where younger registrants would have benefited from SB 747 being in effect. However, for the vast majority of the elections at the county level, and across all of North Carolina, from a statistical standpoint the second mailing had no significant effect on the denial rates of younger registrants.

(LDTX128 at 21-22.)

Dr. White also considered failure rates of the age groups after the implementation of the notice-and-cure process after SB 747. Neither of the two post-SB 747 elections (March 5 and November 5, 2024) produced statistically significant results. (Doc. 191 at 9:22-24; LDTX128 at 91 (Appendix F).)

In addition to performing his own analyses, Dr. White also examined Dr. Quinn's work. According to Dr. White, Dr. Quinn only utilized "descriptive statistics" – calculating the denial rates by percentage of those voters who received a second verification card and then "mak[ing] conclusions and assumptions based upon those percentages." (Doc. 191 at 13:7-11; LDTX129 at 2-3.) Reliance on these descriptive statistics falls short of an accepted disparate impact analysis, Dr. White asserted, because Dr. Quinn failed to test for statistical significance. (Doc. 191 at 13:12-15.) Dr. White also identified numerous programming errors in Dr. Quinn's analysis. (LDTX129 at 3.)

Defendants also offered testimony from Dr. Taylor. Dr. Taylor

noted that young voters, like other voters in North Carolina, have access to all forms of North Carolina voting. (Doc. 188 at 157:20-158:5.) Dr. Taylor also evaluated Plaintiffs' claim that there were approximately 91,000 failed address verifications between January 2012 and January 2022, and that approximately 50% of these denials were attributable to young voters. (Id. at 158:13-159:3.) Dr. Taylor noted that the approximately 45,000 young voters purportedly denied (roughly 50% of the 91,000 figure) amount to approximately 3.5% of the total population of North Carolinians aged 18 to 25. (Id. at 159:4-9.) But as Dr. Taylor noted, those 45,000 denials occurred across 5 elections between January 2012 and January 2022, so that in any given election only approximately .7% of the youth voting population was denied registration. (Id. at 159:9-10.) Dr. Taylor further noted that these estimates assume that all denials are attributable to separate individuals, without accounting for the possibility that some portion of the denials might be attributable to the same individual being denied registration on multiple occasions – suggesting that the .7% number may overestimate the number of young voters being denied registration in a given election. (Id. at 159:11-13.) Finally, relying on data produced by the Office of the Inspector General, Dr. Taylor noted that nationally, only 23% of undelivered mail was due to the fault of the United States Postal Service; instead, most failures were due to "user error." (Id. at 159:17-160:9.)

64

### 3. The court's findings

The court, having carefully considered the testimony and reports of Dr. Quinn and Dr. White, finds Dr. White's analysis to be more reliable. As an initial matter, the programming errors plaguing Dr. Quinn's reports make it difficult to fully credit his analysis. Dr. Quinn's initial report designated certain individuals as having verified (via the second card) who in actuality were denied. (Doc. 186 at 105:11-106:21.) The initial report also included duplicates of certain individuals, which had to be corrected in the supplemental report. (Doc. 186 at 107:18-108:6.) Because Dr. Quinn's report determined the age of voters solely by their birth years given in the data (without taking into account birth month, which was also available), some voters were placed into the wrong age group. (Doc. 186 at 115:9-21.)

And the adjustments made by the supplemental report were not small. In his original report, Dr. Quinn concluded that 60,000 North Carolinians relied on the second verification card to successfully complete registration. (PX180 at 61 ¶ 150.) The supplemental report, however, reduced that number to 45,000, PX182 at 18 ¶ 43, a decrease of 25% from the previous number. Also decreased was the percentage of success for those who received a second verification card. Dr. Quinn initially reported that approximately 55% of all registrants who were sent a second verification card during the previous fifteen years were

successfully verified by that second card. (Doc. 186 at 155:11-156:1; PX180 at 38 ¶ 102 (60,000 North Carolina voters relying on the second mail verification card to successfully register to vote divided by 110,000 total second cards sent).) In his supplemental report, however, that number dropped to 28%. (PX182 at 8 ¶ 21 (45,000 North Carolina voters relying on the second mail verification to successfully register to vote divided by 160,000 total second cards sent).)

Dr. Quinn's original report also overstated the positive effect of the second verification card on young voter registration. He initially reported that approximately 26,000 young voters successfully registered through the second card since 2010. (Doc. 186 at 156:21-24; PX180 at 61 ¶ 152.) In his supplemental report, this number dropped to approximately 20,000. (PX182 at 18 ¶ 44.)

By contrast, the court affords substantial weight to the reports and testimony of Dr. White, who cogently explained his own analyses to the court. Notably, Dr. Quinn's rebuttal report did not identify errors in Dr. White's data practices, and instead only faulted Dr. White's interpretation of the data. (See generally PX184.)

The court accordingly finds that, even assuming the figures from Dr. Quinn's supplemental report are correct, a substantial majority – at least 72% – of those who were sent a second card under both traditional and SDR registration failed to successfully

66

register.  (PX182 at 7 tbl. 7 (44,264 voters verified on second card divided by 158,163 total second cards yields success rate of 27.99%).)

Plaintiffs fail to show that SB 747 disproportionately impacts young voters, for two independently dispositive reasons. First, Plaintiffs have failed to show that SB 747, considered alongside the notice-and-cure process, leaves young voters worse off than did the pre-SB 747 SDR scheme with the second verification card.  Second, only insubstantial numbers of voters are actually affected by the change from one system to another.  Each is discussed in turn.

First, Plaintiffs have failed to show that young voters are now worse off under SB 747 and the notice-and-cure process than they were under the previous two-card SDR verification system. Both Dr. Quinn's and Dr. White's analyses support this conclusion. Dr. Quinn's data suggest that prior to SB-747, few voters, either as an absolute number or percentage of all voters, successfully used the second card to verify.  His analysis of the elections between 2010 and 2025 would suggest that approximately 72% of all those who received a second verification card ultimately failed mail verification, meaning the second card is not effective for a substantial majority of all recipients.[14]  (PX182 at 7 tbl. 7

---

[14] Dr. Quinn's 72% figure does not distinguish between younger and older voters and includes second verification cards sent pursuant to both pre-

(44,264 voters verified on second card divided by 158,163 total second cards yields success rate of 27.99%).) The ineffectiveness of second verification cards holds true for young voters, who in Dr. Quinn's figures succeed on a second card less than 26% of the time a second card is sent. (PX182 at 11 tbl. 9 (19,498 young voters verified on second card divided by 76,429 total second cards sent to young voters yields 25.51%).)[15] Dr. Quinn's analysis, properly understood, suggests that SB 747 has not diminished young voters' lot against these pre-SB 747 benchmarks. His opening report indicates that 627 young voters attempted to vote via SDR in the 2024 November general election and failed the first mail verification. (PX180 at 52 tbl. 15.) Of these, 162 had a favorable or likely favorable outcome: 76 were verified through the cure process, and 86 were designated "started new mailing" – meaning that an address error was identified and corrected by a county board of elections. (Id.) Thus, 25.83% (126/627) of young voters in the notice-and-cure process had a successful outcome in the November 2024 general election.

_____

SB 747 SDR and traditional registration.

[15] Dr. White's analysis, which focused specifically on second verification cards sent for SDR and distinguishing 18-25 from older voters and 18-29 from older voters, generally found a lower denial rate among those who were sent a second card. (See LDTX128 at 91 (Appendix F); Doc. 191 at 6:21-7:11.) Denial rates fluctuated from a low of 1.94% for the older than 25 age group in the March 2016 election, to a high of 21.67% for the younger than 26 age group in the November 2018 election. (Id.)

Dr. Quinn asserts that the notice-and-cure process implemented by SB 747 has been less effective than the previous two-card system, concluding that only 14% of young voters who failed the first card successfully navigated the notice-and-cure process. (PX180 at 52-53 & n.37.) He draws this conclusion, however, by excluding from his calculations the 86 "started new mailing" voters. (See id.) But this exclusion is unwarranted, given Cox's credible testimony that the "started new mailing" category involved the correction of county board staffers' scrivener's errors and sending of a new card, and Dr. White's reliable analysis (itself in keeping with Cox's testimony) indicating that "the vast majority of the started new [cards] were ultimately successful." (Doc. 188 at 35:11-36:3; Doc. 191 at 39:14-40:6.) Even assuming some small portion of voters under the "started new mailing" category are ultimately denied registration, the rates would not be meaningfully different before and after SB 747. The court finds that, even considering Dr. Quinn's data, Plaintiffs have not shown that young voters' registration denial rates (and thus ballot exclusion) have increased from the changes implemented by SB 747.

Dr. White's analysis leads to the same determination that young voters are not now worse off under SB 747. He concludes there was no statistically significant change in the denial rates for young voters between SB 747 (with its notice-and-cure process)

69

and the previous two-card system.  The March 5, 2024 election produced a denial rate of 7.61% for voters aged 18-25 and 6.90% for those aged 18-29.  (LDTX128 at 91 (Appendix F).)  The November 5, 2024 election yielded a denial rate of 8.79% for voters aged 18-25 and 8.29% for voters aged 18-29.  (Id.)  These rates fell within the range of pre-SB 747 denial rates for those receiving a second verification card, which varied from a low of 1.94% denied for the over-25 category during the March 2016 election and a high of 21.67% denied for the under-26 category in the November 2018 election.  (Id.; Doc. 191 at 6:16-8:17.)  He observed that the denial rates for the elections after SB 747 were within the range of those prior to its passage.  (Doc. 191 at 8:9-17.)  Dr. White concluded that there was "no discernible difference post-SB 747 in the ultimate outcome for these voters than it was before SB 747 when the second [card] was in place."  (Id. at 8:21-25.)

Second, even assuming Plaintiffs have shown that young voters are marginally worse off due to SB 747, Plaintiffs fail to show that substantial numbers of voters are likely to be impacted by the change from the two-card system to SB 747 with its notice-and-cure process.  Dr. Quinn's data – of which the court is dubious – would show that between 2010 and 2025, 158,163 voters received a second verification card (PX182 at 11-12 ¶ 30 & tbl. 9

70

(Quinn Supp. Report));[16] of those, 76,429 were young voters, and of those young voters, 51,490 were <u>denied</u> after two cards. (<u>Id.</u>; <u>id.</u> at 12 (tbl. 10).) Conversely, 19,498 young voters were successfully registered by the second verification card during that 15-year span. (<u>Id.</u> at 11 (tbl. 9).) Zeroing in on specific elections, Dr. Quinn's data would indicate that SDR voting is increasing in presidential-year general elections but is still a small proportion of overall votes cast.[17] (Doc. 180 at 16 Fig. 3.) In the 2024 presidential-year general election, approximately 130,000 votes were cast via SDR, <u>id.</u>, which accounted for slightly under 6% of total votes cast in that election, <u>id.</u> at 18 figure 4. In that same general election, there were slightly over one million (1,049,530) young voters. (<u>Id.</u> at p. 22 Fig. 5.) And in that election, young voters cast 42,139 votes by SDR, <u>id.</u> at 28 table 3, meaning that even if the court were to credit Dr. Quinn's analysis, SDR voting accounted for only 4.015% of the total so-called youth vote in that election.

A few observations on all these numbers. First, the second SDR verification card – the elimination of which is the core of

---

[16] Again, Dr. Quinn's figures include second verification cards sent for both the pre-SB 747 SDR scheme and for verification cards sent under traditional registration.

[17] This figure and the remainder of those in the paragraph come from Dr. Quinn's initial report; because this report was issued prior to corrections, the court is especially hesitant to accept these figures at face value.

71

this litigation – is only a miniscule portion of North Carolina's voting framework.  Second, young voters who receive the second card generally fail to verify via that second card, with fewer than 20,000 having so verified over a fifteen-year span – even including those who used traditional registration, which is not impacted by SB 747.  Third, and by logical extension, because only a relatively small number of young voters have verified by the second card, it follows that only a small number of young voters could be hurt by the replacement of the second verification card with the notice-and-cure process.  But, as noted, Plaintiffs have not shown that the notice-and-cure process actually worsens the lot of SDR voters.  Fourth and finally, though SDR voting has increased among young voters, it is still only a small fraction – a shade over 4% at most – of the youth vote in any election.  So although Plaintiffs critique Dr. White for failing to consider young voters' disproportionate likelihood to use SDR and receive a second card under the previous scheme, the data Plaintiffs provide suggest SDR voting (and the second verification card especially) were but a fraction of youth voting in North Carolina.

The court finds that, at most, 158,163 voters received a second verification card between 2010 and 2025, considering both SDR and traditional-registration voters.  The court further finds that, at most, 76,429 so-called young voters received a second card during that span, and of those voters, at most only 19,498

successfully registered via the second card.  The court finds that young voters have cast at most 42,139 votes by SDR in any single election, and that SDR voting has accounted for at most 4.015% of the total youth vote in any election.  Finally, the court finds that denial rates after SB 747's implementation are within the range of denial rates for elections prior to SB 747 – there is "no discernible difference post-SB 747 in the ultimate outcome for these voters than it was before SB 747 when the second [card] was in place."  (Doc. 191 at 8:21-25.).

### F.     North Carolina's Treatment of Young Voters Throughout History and Against National Benchmarks

Defendants offered the testimony of Dr. Taylor, who compared the experience of young voters in North Carolina to that of young voters in other states.  (Doc. 188 at 141:16-20.)  He evaluated youth turnout data from the Center for Information and Research on Civic Learning and Engagement ("CIRCLE") in the Tisch College at Tufts University.  (Id. at 146:19-22.)  CIRCLE presented data on youth turnout for 40 states in the midterm elections of 2014, 2018, and 2022, as well as for the presidential election of 2020.[18]  (Id. at 147:1-6.)  Dr. Taylor noted that in three of four elections evaluated, North Carolina scored in the top 20 states for youth turnout.  (Id.)

---

[18] CIRCLE defines young voters as those aged 18-29.  (Doc. 188 at 147:7-9.)

73

Dr. Taylor also evaluated North Carolina's role in the history of the ratification of the Twenty-Sixth Amendment to evaluate Plaintiffs' claim that North Carolina has historically attempted to restrain the youth vote. (Id. at 146:8-14.) He noted that no member of the North Carolina congressional delegation voted against the Twenty-Sixth Amendment and that North Carolina's role in ratification was material because it was one of the very first states to vote for ratification. (Id.)

To evaluate the accessibility of North Carolina's voting processes for young voters, Dr. Taylor compared North Carolina's voting system to legislative proposals advanced by those trying to increase youth turnout. (Id. at 148:1-15.) He evaluated S. 2985, a bill called the Youth Voting Rights Act which was introduced in the United States Congress by Senator Elizabeth Warren of Massachusetts and Representative Nikema Williams of Georgia. (Id.) Dr. Taylor considered North Carolina's voting scheme against five proposals within that bill. (Id. at 148:16-18.) First, he considered the proposed designation of public colleges and universities as "voter registration agencies" under the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified at 52 U.S.C. § 20501 et. seq.) ("NVRA"), to expand voter registration services at those institutions. (Id. at 148:20-149:2.) North Carolina public universities are not currently NVRA agencies. (Id. at 149:3-5.) But Dr. Taylor noted voter

74

registration at North Carolina universities is "pretty healthy," with an 89.5% registration rate in 2020. (Id. at 149:6-150:14; LDTX125 at 9.) This exceeded the national average by 6.5%. (Doc. 188 at 150:15-19; LDTX125 at 9-10.) S. 2985 would secondly establish preregistration processes for 16- and 17-year-olds and allow states to expand their processes to those younger than 16. (Doc. 188 at 150:21-151:1; LDTX125 at 11.) North Carolina is among the minority of states that permit preregistration for those aged 16. (Doc. 188 at 151:2-4; LDTX 125 at 11.) The Senate bill thirdly recommends increasing the availability of polling places at higher education campuses. (Doc. 188 at 151:8-11; LDTX125 at 11.) Dr. Taylor noted that 70% of UNC System campuses had early voting polling sites. (Doc. 188 at 151:17-152:7; LDTX125 at 11-12.) The Senate bill fourth recommends limiting durational residency requirements. (Doc. 188 at 152:11-16; LDTX125 at 12.) Durational residency requirements are the length of time someone must reside in an area in order to register to vote there for the intended election. (Id.) The durational residency requirement in North Carolina is 30 days "next preceding an election," which as Dr. Taylor explained is "a fairly prominent definition of the durational residency requirement." (Doc. 188 at 152:20-153:6; LDTX125 at 12-13; N.C. Gen. Stat. 163-55(a).) The final proposal from the Senate bill is that student IDs be accepted for those states which require photo ID. (Doc. 188 at 153:19-24; LDTX125 at

75

13.)  North Carolina permits some student IDs for its photo ID requirement.  (Doc. 188 at 153:25-154:6; LDTX125 at 13.) Of the 21 states that require photo ID, six do not allow any student IDs to satisfy the requirement.  (Doc. 188 at 154:3-6; LDTX125 at 13.) Dr. Taylor ultimately concluded that "North Carolina hasn't unusually or historically acted to restrain the youth vote."  (Doc. 188 at 154:8-11; <u>see</u> LDTX125 at 13.)

Plaintiffs did not offer expert testimony on North Carolina's historical treatment of young voters.  Instead, they sought to impeach Dr. Taylor and introduce examples of proposed legislation which, they contend, represent efforts to restrict North Carolina youth voting.  On cross examination, Dr. Taylor admitted his unfamiliarity with bills historically introduced in the North Carolina General Assembly which sought, unsuccessfully, to lower the voting age from 21 to 18 prior to the passage of the Twenty-Sixth Amendment.  (Doc. 188 at 169:6-22.)  Specifically, he was unaware that in 1951 the North Carolina Senate defeated a bill to lower the voting age, and that in 1963 both the Senate and House defeated bills to lower the voting age.  (<u>Id.</u>)  He had also been unaware at the time of forming his opinion that <u>preregistration</u> for 16- and 17-year-olds only came about in 2009, or that the General Assembly passed legislation in 2013 which eliminated both preregistration and SDR and was ultimately struck down by the Fourth Circuit.  (<u>Id.</u> at 173:1-12.)  He had also been unaware that

76

earlier legislation eliminated student IDs as an approved form of voter ID.  (Id. at 177:6-10.)

The court credits Dr. Taylor's testimony and finds that North Carolina's prior legislative history fails to demonstrate that North Carolina intentionally discriminated against young voters. Proposed legislation from over half a century ago – well before adoption of the Twenty-Sixth Amendment - is simply much less relevant to the question before the court.  What is more relevant is North Carolina's role in 1971 as one of the first states to ratify the Twenty-Sixth Amendment – the constitutional basis for Plaintiffs' claims here.  The court also finds useful Dr. Taylor's comparative approach for evaluating North Carolina's treatment of young voters.  Simply put, Plaintiffs have failed to demonstrate that North Carolina has either shown animus toward young voters or is behind the times in enfranchising them.  Rather, the state has adopted voting conveniences well ahead of many other states.

## V.   CONCLUSIONS OF LAW

### A.   Introduction

The court's five-day bench trial focused on Plaintiffs' two remaining claims:  first, whether SB 747, as modified by the Consent Judgment, constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the federal Constitution; and second, whether SB 747 was passed with discriminatory intent in violation of the Twenty-Sixth Amendment

77

to the federal Constitution.  (See Doc. 133.)  Each is addressed below.

**B.   Undue Burden on the Fundamental Right to Vote**

The parties agree that the undue burden claim is governed by the Anderson-Burdick framework.  See Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992).  The court must determine whether the burdens on voters' rights are severe, minimal, or "in between these two extremes."  Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012).  Election regulations that impose a "severe" burden are subject to strict scrutiny.  Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014).  Such severe burdens are generally "invidiously" discriminatory by virtue of being "irrelevant to the voter's qualifications."  Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 189 (Stevens, J., announcing the judgment of the court) (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666-67 (1966)).  By contrast, "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious and satisfy the standard set forth in Harper."  Id. at 189-90 (quoting Anderson, 460 U.S. at 788 n.9).

There is no "litmus test for measuring the severity of a burden that state law imposes on . . . an individual voter, or a discrete class of voters."  Id. at 191.  The court must consider both the "character and magnitude" of the alleged burden on voting,

78

Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789), and then "make the 'hard judgment' that our adversary system demands," Crawford, 553 U.S. at 190, (Stevens, J.). Courts generally evaluate the burden from the perspective of all affected voters, "within the landscape of all opportunities that [the State] provides to vote." Mays v. LaRose, 951 F.3d 775, 784-85 (6th Cir. 2020); see also Crawford, 553 U.S. at 198-99 (Stevens, J.) (reviewing burden on "most voters" where photo ID law applied to in-person voters); Tully v. Okeson, 977 F.3d 608, 617 (7th Cir. 2020) (reviewing burden on voters who could not vote absentee in light of "Indiana's electoral scheme as a whole").

Severe burdens must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). Non-severe burdens, by contrast, are subject to Anderson–Burdick's more flexible balancing standard, under which this court must

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. (quoting Anderson, 460 U.S. at 789). The balancing standard operates as a sliding scale: the greater the burden, the greater the justification must be. Id.

The Fourth Circuit has previously considered the entirety of

79

a state's ballot-access regulations when considering a challenge under <u>Anderson-Burdick</u>. <u>Pisano</u>, 743 F.3d at 933; <u>see also</u> <u>Wood v.</u> <u>Meadows</u>, 207 F.3d 708, 711 (4th Cir. 2000) ("When determining whether a given state's filing deadline unconstitutionally burdens candidates' and voters' rights, a court must examine that state's ballot access scheme in its entirety.").

The parties disagree on whether the burden imposed by SB 747 is severe such that strict scrutiny applies, or non-severe such that the balancing test applies.

### 1. Whether SB 747 imposes a severe burden

Plaintiffs contend that SB 747 imposes a severe burden on the right to vote for two reasons. First, they argue, SB 747 is likely to increase the number of wrongly-rejected applicants. In their words, it "creates significant risk that eligible, bona fide voters who follow all applicable rules and affirmatively prove their address when registering will nonetheless be disenfranchised through no fault of their own." (Doc. 195 at 100-01.) Second, they say, this burden is imposed disproportionately on a constitutionally-protected group – young, first-time voters newly enfranchised by the Twenty-Sixth Amendment. (<u>Id.</u> at 101.) The heightened risk of wrongful disenfranchisement exists, they contend, despite the notice-and-cure process now in place. (<u>Id.</u>)

Plaintiffs also assert that there are two "unusual factors" that "exacerbate SB 747's undue burden on same-day registrants."

80

(Id.)  First, they contend, SB 747 imposes a uniquely onerous burden because it forces applicants to hope their ballots are not disqualified through no fault of their own, at a moment when there are no alternatives remaining to those applicants.  (Id. at 101-02.)  Second, they argue, "the manner in which SB 747 burdens same-day registrants' exercise of their right to vote, through administrative errors that are almost entirely out of the control of the voter, is demonstrably more likely to permanently depress an impacted voter's political participation."  (Id. at 103.)

The court concludes first that the burden imposed by SB 747 is relevant to a voter's qualifications: namely, the constitutional requirement that a person be registered prior to voting.  N.C. Const. art. VI, § 3(1); see N.C. Gen. Stat. §§ 163-54, 163-82.1.  SB 747's verification card requirement is designed to verify that the applicant lives at the address provided, an important requirement for registration.  See N.C. Gen. Stat. § 163-82.7.

But does SB 747 single out an "identified class" of voters?  Plaintiffs suggest it does.  In their view, SB 747 "creates a scheme where same-day registrants, unlike other voters, cannot be assured that their ballots will count – even after they have completed every step required . . . of other in-person voters."  (Doc. 195 at 101.)  This characterization is unpersuasive.

First, plaintiffs view SB 747 through the wrong conceptual

81

lens.  As the court has found, North Carolina is one of the minority states which allows SDR voting in the first place.  And, as also found, SDR creates unique challenges for a state's ability to verify a voter's qualifications, given SDR's temporal proximity to election day.  As such, rather than as a provision that singles out an identified class of voters, it is more accurate to characterize SB 747's changes to the verification system for SDR as North Carolina's condition on the use of a form of voting that the state was not required to provide in the first place, and which requires unique considerations because it permits registration so close to election day and canvass where the two-card verification process, which is the state's statutory method of verification for traditional registration, faces practical limitations.  Of course, the voters who use SDR are entitled to make timely use of traditional registration on any of the 340 days of the year before an election.

Second, the category of "SDR voters" does not readily track an "identified class" of voters as that term is used by the caselaw:

> In applying strict scrutiny, the Supreme Court has invalidated certain measures enacted by states.  See, e.g., Harper v. Virginia Bd. of Elections, 383 U.S. 663 (1966) (right to vote predicated on $1.50 poll tax violates equal protection); Smith v. Allwright, 321 U.S. 649 (1944) (striking down white primary laws); Carrington v. Rash, 380 U.S. 89 (1965) (striking down on equal protection grounds statute that prevented resident military personnel from voting where

82

stationed); and <u>Kramer v. Union Free School Dist. No. 15</u>, 395 U.S. 621 (1969) (striking down statute that prevented non-property owners from voting in school district election as violative of equal protection).

In each of these cases, the state law under attack prohibited an identified class of persons from voting.

<u>Greidinger v. Davis</u>, 988 F.2d 1344, 1349-50 (4th Cir. 1993).

SB 747, at its core, alters the way in which North Carolina verifies the residences of all voters who choose to use SDR. It is different in kind from white primary laws, poll taxes (with their associated racial connotations), restrictions on military personnel specifically, and property ownership requirements.

The court is thus unpersuaded that SB 747 singles out SDR voters as a disfavored class; indeed, it does not single out a class of voters at all. Because its requirements for SDR verification are relevant to a voter's qualifications, SB 747 does not fit within the class of restrictions courts have found to be "invidiously" discriminatory. <u>Crawford</u>, 553 U.S. at 189 (Stevens, J.) (citing <u>Harper</u>, 383 U.S. at 666-67). It also does not single out a class of voters for unfavorable treatment. The court thus turns to the severity of the burden it imposes on voters.

Plaintiffs' argument on severity fails for two independent reasons. First, the evidence at trial does not support the conclusion that SDR registrants generally, when considering the notice-and-cure process, are worse off now than they were under the pre-SB 747 two-card verification scheme. SB 747 simply does

83

not impose a severe burden on the right to vote when registration denial rates after the implementation of the notice-and-cure process are within the range of denial rates pre-SB 747. And although Plaintiffs argue that young voters are likely to have their political participation permanently depressed because of wrongful disqualification, Plaintiffs have failed to show that young voters specifically (whether considered as those aged 18-25 or 18-29) are denied registration at a higher rate now than they were prior to SB 747. Indeed, youth voting actually increased in North Carolina since the passage of SB 747.

Second, Plaintiffs' contention that SDR voters have no alternatives at the time they attempt to vote via SDR views North Carolina's electoral scheme from the wrong vantage point. It is true, as Plaintiffs point out, that at the time of SDR voting, traditional registration methods are no longer available because of the proximity to election day. But to suggest that North Carolina has forced SDR users into this situation is meritless. The evidence establishes that North Carolina offers extensive opportunities for voting and registration, including five more days of traditional registration than is required under federal law, 2,600 polling places, no-excuse absentee voting, and curbside voting. An individual's decision to forego traditional registration is almost certainly the product of his or her own choice; to be sure, Plaintiffs have not proffered evidence

84

otherwise.  And, as testimony established at trial, college voters have access to traditional registration in the same manner as all other North Carolinians.  Indeed, even assuming they do not register until they arrive on campus in the fall, college voters still have many weeks to register traditionally.  As such, it is proper for this court to consider SB 747 and its effects alongside all other opportunities North Carolina offers voters.  See Brnovich v. Democratic Nat'l Comm., 594 U.S. 647, 671 (2021); Pisano, 743 F.3d at 933; see also Wood, 207 F.3d at 711.  It is difficult to conclude that, considered in the context of all the state's registration and voting opportunities, the burden imposed by the replacement of the second verification card with the current notice-and-cure process is severe.[19]  Cf. Burdick, 504 U.S. at 441-42 (upholding complete ban on write-in ballots); Nelson v. Warner, 12 F.4th 376, 379-80 (4th Cir. 2021) (upholding rule allowing one party to always be listed above the other on ballots).

Considering the full panoply of voting opportunities provided

_____

[19] Plaintiffs strive to escape precedents upholding more restrictive schemes by characterizing SB 747's purported harm not as restrictive access to voting, but as after-the-fact disenfranchisement.  According to Plaintiffs, SB 747 "creates significant risk that eligible, bona fide voters who follow all applicable rules and affirmatively prove their address when registering will nonetheless be disenfranchised through no fault of their own."  (Doc. 195 at 100-01.)  This was true to some extent, of course, even under the prior two-verification card system.  Even if Plaintiffs' characterization were correct, however, they have failed to show that voters are now more likely to have their votes wrongly discounted after the implementation of SB 747 and the notice-and-cure process.

85

by North Carolina, and given that Plaintiffs have failed to show SB 747 alongside the notice-and-cure process has increased burdens on voting, the court concludes as a matter of law that any burden imposed by SB 747 is minimal.

### 2. **Anderson-Burdick** balancing

Having determined that SB 747 imposes at most a minimal burden on voters' rights, the court considers whether that minimal burden is justified in relation to North Carolina's asserted interests. The court must consider not only the legitimacy and strength of the state's asserted interests in the abstract, but their application in this case and their relationship to the burden imposed. Anderson, 460 U.S. at 789. Once again, the totality of avenues available to voters, rather than the challenged component only, is relevant to the inquiry. See Brnovich, 594 U.S. at 671.

The court begins, as it must, with the presumption of legislative good faith. McGowan v. State of Md., 366 U.S. 420, 425-26 (1961). Here, Defendants assert an interest in preventing voter fraud/promoting election integrity, addressing the appearance of voter fraud, promoting election finality, and ensuring efficient election administration. (Doc. 194 at 92-94, 97.) These are all valid interests. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters"; "public confidence in the integrity of the electoral process has independent significance,

86

because it encourages citizen participation in the democratic process." Crawford, 553 U.S. at 196, 197 (Stevens, J.); Memphis A. Philip Randolph Inst. v. Hargett, 978 F.3d 378, 391 (6th Cir. 2020 (noting a state's interests in preventing election fraud and promoting election finality); Clements v. Fashing, 457 U.S. 957, 965 (1982) (noting states' "important interest[]" in "ensuring that their election processes are efficient"). And the court is mindful that "[w]hen, as here, a statute places only a modest burden on [a constitutional] right[], 'a State's important regulatory interests will usually be enough to justify its reasonable, nondiscriminatory restrictions.'" See S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 759 (4th Cir. 2010) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)).

The court concludes that the state's asserted interests are served by SB 747, and that any minimal burden imposed is justified in relation to those interests. SB 747 serves the efficient administration of elections, aids in the prevention of fraud and the appearance of fraud, and promotes public confidence in the integrity of the electoral process. Concerns over timing problems with second cards for SDR are not new. Indeed, the State Board has expressed such concerns for almost a decade. (JX029 at 3.) And members of the North Carolina public shared these concerns. As the court has found, witnesses credibly testified that the

87

Senate collected 75 recommendations on election integrity from constituents and interest groups, and that the 2022 general election in particular prompted an outpouring of concern for election integrity. Though SB 747 does not fully address these concerns – as evidenced by the fact that a ballot will remain in the count if the associated verification card returns as undeliverable within two days of county canvass – it goes some length toward addressing the problem of conducting a second verification too late in the process (i.e., after the vote is counted but the verification thereafter fails) and promoting public confidence in election security. Under the pre-SB 747 scheme, SDR voters whose second verification card was returned as undeliverable after the canvass had their vote counted even though under North Carolina's system of verification their registration is considered to have failed and could thereafter be cancelled. The state has a legitimate interest in attempting to shore up the registration system for SDR voters, given this unique challenge. It is true that SB 747's adjustments do not perfectly address this timing problem. Even under SB 747, some SDR voters whose mail verification is rejected within two days of the canvass will nevertheless have their votes counted. But the elimination of the second verification card means that the process is, on the whole, adjusted to meet SDR's close proximity to election day and the canvass. Striking this balance is among the proper policy choices

88

available to a legislature.  A legislature is not precluded from improving the system because of its inability to perfect it.  Nor should election changes become a one-way ratchet, incapable of improvement merely because voting may become marginally harder.

A state's interest in election integrity includes not only the prevention of actual fraud, but also addressing the appearance of fraud, which is harmful to a democracy.  Crawford, 553 U.S. at 197 (Stevens, J.).  SB 747, the product of many legislative proposals, responds to concerns that the prior system did not appear to be fair because it allowed for the potential of counting ballots for voters whose registrations later failed.  It is noteworthy that SB 747 was adopted only after meaningful alterations (such as eliminating the treatment of SDR ballots as provisional) based on commentary from the public and the State Board.  And although Plaintiffs fault Defendants for not possessing reliable data indicating that fraud was actually occurring, there is no such requirement in the law.  See Voting for Am., Inc. v. Steen, 732 F.3d 382, 394 (5th Cir. 2013) (explaining that states "need not show specific local evidence of fraud in order to justify preventive measures"); Crawford, 553 U.S. at 195-96 (explaining that the legislature need not wait until a problem occurs to take the proactive steps it deems appropriate) (Stevens, J.).

The court accordingly concludes that the minimal burden imposed by SB 747 is justified in relation to the legitimate state

89

interests in election integrity, election administration, and promoting public confidence in the electoral process that are served by the law. Plaintiffs' <u>Anderson-Burdick</u> claim fails. Consequently, the court concludes as a matter of law that SB 747 does not unduly burden the right to vote.

**C. Intentional Discrimination in Violation of the Twenty-Sixth Amendment**

Plaintiffs allege that the North Carolina General Assembly acted intentionally, through the passage of SB 747, to "abridge and deny the right to vote for young voters on the basis of their age," in violation of the Twenty-Sixth Amendment. (Doc. 1 ¶¶ 114-18.)

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. The parties dispute the governing standard for this claim, whether Plaintiffs' proposed grouping of young voters as those aged 18 to 25 comprises a cognizable class, and whether the legislature intended for SB 747 to discriminate against voters because of age.

Plaintiffs argue this court should apply the <u>Arlington Heights</u> framework. <u>See</u> <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252 (1977). (Doc. 170 at 4.) They posit that a "consensus has been emerging" in favor of applying

90

the Arlington Heights framework to claims for intentional discrimination in violation of the Twenty-Sixth Amendment. (Doc. 195 at 86 (quoting League of Women Voters of Fla., Inc. v. Detzner, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018)) (alteration omitted).) Defendants argue this court should instead consider the claim under the Anderson-Burdick framework. (Doc. 169 at 15-17.) They rely on this court's previous opinion noting that the Anderson-Burdick test is applied to a wide range of election-law challenges to voting restrictions. (Doc. 194 at 103 (citing Voto Latino, 712 F. Supp. 3d at 665).)

As this court and other courts have recognized, there is a dearth of guidance on what test applies to claims under the Twenty-Sixth Amendment. See Detzner, 314 F. Supp. 3d at 1221 (citing cases, including this court's). And as the parties' conflicting positions reflect, there is no controlling case law. As the only two circuit courts to have addressed the amendment noted recently, courts are "working, in essence, on a constitutional blank slate." Tully v. Okeson, 78 F.4th 377, 382 (7th Cir. 2023) (citing Texas Democratic Party v. Abbott, 978 F.3d 168, 183 (5th Cir. 2020)). Both circuit courts applied the Twenty-Sixth Amendment in the context of states' easing ballot restrictions for voters age 65 or older, permitting them to vote by mail. Neither case is directly applicable here, as both courts found that accommodating the elderly does not abridge the right of those under age 65 because

91

it does not impose a burden on the younger voters to exercise the right to the franchise. Tully, 78 F.4th at 388; Texas Democratic Party, 978 F.3d at 194. However, their analysis is informative in several respects.

First, while Plaintiffs' complaint alleges both denial and abridgment, Plaintiffs' proof and post-trial submission speak in terms of "disparate impact." (See, e.g., Doc. 195 at 95-97.) The Supreme Court's definition of "denial" has not changed before or after ratification of the Twenty-Sixth Amendment: the right to vote is denied where one is totally prohibited from voting. McDonald v. Bd. of Election Comm'rs of Chi., 394 U.S. 802, 807-08 & n.7 (1969) (where voter is "in fact absolutely prohibited from voting"); Goosby v. Osser, 409 U.S. 512, 521 (1973) (where law "absolutely prohibits them from voting"); accord Texas Democratic Party, 978 F.3d at 188. In the present case, there is no dispute that North Carolina does not prohibit any voter age 18 and older from voting based on age. As noted earlier, they are provided ample time and a variety of ways to cast a ballot. Thus, Plaintiffs do not press, nor does the court find, any denial here.

Rather, Plaintiffs allege an abridgment of the right to vote by young voters. The parties offer no Fourth Circuit law on point. The Fifth Circuit has noted that "abridge" means to "reduce or diminish." Texas Democratic Party, 978 F.3d at 188 (quoting Black's Law Dictionary 7 (10th ed. 2014)). Whether a law abridges

92

a right necessarily requires a comparison.  Reno v. Bossier Parish, 528 U.S. 320, 333-34 (2000).  Here, Plaintiffs urge, and Defendants do not contest (Doc. 194 at 108-18), that the proper baseline is the pre-SB 747 scheme with a second verification card.  Moreover, the Supreme Court has been "clear that an 'abridgement' must involve the imposition of a 'material requirement.'"  Tully, 78 F.4th at 385-86 (quoting Harman v. Forssenius, 380 U.S. 528, 542 (1965) (Twenty-Fourth Amendment)).

Plaintiffs argue that the elimination of the second verification card abridges young voters' Twenty-Sixth Amendment right because "SB 747's restriction on same-day registration — and its corresponding rejection of eligible voters' ballots — bears more heavily on young voters than other age groups." (Doc. 195 at 95.)  Thus, it is the registration verification that underlies the potential burden.  At its core, Plaintiffs' claim is that the General Assembly intentionally sought to restrict youth voting by burdening their registration process through eliminating the second verification card that would be sent within the short window provided by early voting.  To be sure, nothing about SB 747 makes the act of voting itself harder for anyone, much less young voters.

It is true, as Plaintiffs note, that some district courts have applied the Arlington Heights framework to age-based election claims.  Detzner, 314 F. Supp. 3d at 1221 (citing cases).  But the Fourth Circuit has cast doubt on such an approach.  Lee v. Virginia

93

<u>State Bd. of Elections</u>, 843 F.3d 592, 607 (4th Cir. 2016) (noting it is "far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth Amendment jurisprudence"). Even the Seventh Circuit, which noted that the Supreme Court's interpretation of the equivalent language in the Fifteenth Amendment is "a good starting place" for analysis, was careful to note that, unlike the Fifteenth Amendment, which permits no distinction based on race, the Twenty-Sixth Amendment falls short of prohibiting all age-based distinctions. <u>Tully</u>, 78 F.4th at 382-83. In any event, neither <u>Tully</u> nor <u>Texas Democratic Party</u> found it necessary to resolve whether <u>Arlington Heights</u> applied.

True, the text of the Twenty-Sixth Amendment parallels that of the Fifteenth. But the <u>Arlington Heights</u> framework is hardly collected from the text of the Fifteenth Amendment. Instead, those factors were distilled to ferret out racial discrimination specifically. Indeed, the Court in <u>Arlington Heights</u> acknowledged the difficult tasks facing courts when reviewing the myriad considerations that prompt legislation, but noted that "racial discrimination is not just another competing consideration." 429 U.S. at 265.

The law, unsurprisingly, does not treat age-based classifications the same as racial classifications; only the latter are inherently suspect. <u>Kimel v. Florida Bd. of Regents</u>,

94

528 U.S. 62, 83 (2000).  This makes sense.  Racial minorities have suffered a "history of purposeful unequal treatment" in this country.  Id. (quoting Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 313 (1976) (per curiam)).  All this to say, because the law does not treat age the same as race, the court is disinclined to conclude that Plaintiffs' claim of age-based discrimination in voting necessarily requires wholesale application of a judicially-created test designed to assess racial discrimination.  But a final determination is not necessary because, as explained below, even if the court were to consider Plaintiffs' claim under the Arlington Heights framework, it would still fail.[20]

Arlington Heights requires a court to consider factors which may be relevant to a determination of whether decisionmakers acted with discriminatory intent: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race[here, age group] than another.'"  N.C. State

---

[20] Similarly, the court need not define the precise contours of the Twenty-Sixth Amendment right.  The Fifth Circuit has stated that the historical context for passage of the amendment suggests it may have swept narrower than other constitutional amendments affecting voting; namely, to fulfill what Congress sought unsuccessfully to do in 1970 in lowering the voting age for all elections to age 18.  Texas Democratic Party, 978 F.3d at 184-88.  It is enough to assume for purposes of Plaintiffs' claims here, as the Fifth and Seventh Circuits have concluded, that the amendment prohibits discrimination on the right to vote "on account of age."  See id. at 184; Tully, 78 F.4th at 383.

95

<u>Conf. of the NAACP v. Raymond</u>, 981 F.3d 295, 303 (4th Cir. 2020) (quoting and citing <u>Arlington Heights</u>, 429 U.S. at 265-69).  An analysis of Plaintiffs' evidence as to each factor demonstrates why their claim nevertheless fails.

### 1. The historical background: North Carolina's treatment of young voters

The evidence at trial indicates that North Carolina has historically improved youth access to voting, not diminished it. Most crucially, North Carolina's support for the Twenty-Sixth Amendment was material, because it was one of the first states to vote for ratification.  Especially illuminating as well were Dr. Taylor's testimony and reports.  North Carolina performs well nationally in young voter turnout, due in no small part to its support for registration and voting access at public universities. It is also relevant that North Carolina has already adopted many of the pro-youth-vote enactments championed by proponents of youth voting.

The court can take judicial notice of the historical proposed legislation proffered by Plaintiffs. Fed. R. Evid. 803(8) (hearsay exception for public records) and 902(5) (official publications issued by a public authority are self-authenticating); <u>see</u> <u>Papasan</u> <u>v. Allain</u>, 478 U.S. 265, 268 n.1 (1986) ("[W]e are not precluded . . . from taking notice of items in the public

96

record.").[21]  The proffered materials include (1) pre-Twenty-Sixth Amendment proposed legislation that would have lowered the voting age but was not passed (PX215, PX216, PX217, PX218); (2) the 2013 repeal of both pre-registration for 16- and 17-year-olds and SDR in an omnibus elections bill that was ultimately declared unconstitutional by the Fourth Circuit based on race (PX220A, PX220C; see N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 219 (4th Cir. 2016)); and (3) the 2018 law which permitted student IDs to be used for voting but only if universities met certain requirements (PX223, PX223A).  The court is unpersuaded, even upon consideration of these materials, that North Carolina has historically worked to restrain the youth vote.  The mere introduction of proposed legislation, without any other context, fails to demonstrate that North Carolina historically discriminated against the youth vote.  Legislation is considered and rejected for any number of reasons, but Plaintiffs offered none that would have provided any context.  Most importantly, even if the rejection of efforts to enfranchise 18-20-year-olds demonstrated some animus toward young voters, these bills pre-date North Carolina's vote in 1971 to adopt the Twenty-Sixth Amendment, which is the cornerstone of their claim.  Consequently, North

---

[21] Defendants, for their part, do not oppose the court's taking judicial notice of the requested bills, "so long as Plaintiffs are not offering them to prove their own interpretation of the bills."  (Doc. 195 at 56 n.18.)

97

Carolina's failure to enfranchise young voters decades before its 1971 vote to pass the Twenty-Sixth Amendment, especially in light of the fact that at the time of the amendment forty-seven states recognized the right to vote at an age higher than eighteen, Texas Democratic Party, 978 F.3d at 186, is unpersuasive evidence that North Carolina harbored animus toward young people in adopting SB 747 in 2023. Any animus toward young voters which the court might infer from the failed repeal of pre-registration and SDR, and the requirements to use student IDs, is at most de minimis and does not outweigh the evidence offered by Defendants.

The court concludes North Carolina has historically improved youth voting, not diminished it.

### 2. and 3. Events leading to the law's enactment and its legislative history

Plaintiffs have failed to show that the sequence of events leading to SB 747's passage was anything other than the normal legislative process. Constituents raised concerns, lawmakers proposed legislation in response to those concerns, and the legislature considered and amended the law under regular order before its passage.

Plaintiffs' argument that SB 747 was the product of anti-youth animus centers on the input of lobbyists Mitchell and Womack. For several reasons, this fails to attribute anti-youth animus to the General Assembly.

98

First, the best reading of Plaintiffs' evidence is that Mitchell and Womack disapproved of SDR altogether, mainly because they deemed it unnecessary and believed it creates the potential for abuse. Mitchell credibly testified that she was opposed to SDR regardless of who used it and for whom SDR users tended to vote. This undercuts Plaintiffs' argument that the lobbyists attempted to "'fenc[e] out' from the franchise a sector of the population because of the way they may vote." (Doc. 195 at 92 (quoting Carrington v. Rash, 380 U.S. 89, 94 (1965)).) Moreover, to the extent Plaintiffs focus on "college voters," that group is both over- and under-inclusive of Plaintiffs' preferred 18- to 25-year-old young voter group. Many voters, perhaps approaching half, at the higher end of that age group will have already graduated college, and others at the low end may not have attended college at all. There are furthermore some "college voters" older than age 25 or 29. And of course, the focus on college voters misses the North Carolinians aged 18-29 who never attended college.

Second, even if Mitchell and Womack disliked young voters and sought to target them specifically, Plaintiffs have not introduced sufficient evidence for this court to conclude that such anti-youth animus should be attributed to the General Assembly. Statements from no more "than a handful" of the bill's proponents are of limited probative value where the statute is constitutional on its face. Hunter v. Underwood, 471 U.S. 222, 228 (1985)

99

(quoting <u>United States v. O'Brien</u>, 391 U.S. 367, 383–84 (1968)).

Plaintiffs rely on <u>Mi Familia Vota v. Fontes</u>, 129 F.4th 691 (9th Cir. 2025). There, a purportedly discriminatory third party, the Free Enterprise Club, "helped author" a voting law and was extensively involved with that law's ultimate passage:

> House Speaker Toma, referring to the Free Enterprise Club, called H.B. 2243 "their" bill. And Greg Blackie of the Free Enterprise Club testified to the details of the bill as the Senate Government Committee's expert witness on March 14, 2022. Also, the bill's sponsor, state Representative Jacob Hoffman, deferred to Blackie when asked questions about the bill in a committee hearing. Representative Hoffman emphasized the role of the Free Enterprise Club, telling the same committee that he had been "working with the Free Enterprise Club on this bill, and they've spent hundreds of hours digging into this."
>
> The Free Enterprise Club, in its advocacy for the Voting Laws, sent lobbying materials to Arizona legislators with the heading "how more illegals started voting in AZ."

<u>Id.</u> at 727.

That case does not help Plaintiffs. Whatever the involvement by the advocacy group in <u>Mi Familia Vota</u>, here the legislators of the North Carolina General Assembly, even if spurred in part by the efforts of Mitchell and Womack, carried out their "duty to exercise their judgment and to represent their constituents." <u>Brnovich</u>, 594 U.S. at 689-90. Importantly, rather than defer to Mitchell and Womack, the legislators (1) rejected their request to eliminate SDR, and (2) changed the treatment of an SDR ballot from provisional, as requested by the lobbyists, to a single-card

retrievable ballot, as suggested by the State Board's general counsel, Cox. The remainder of the legislative process that produced SB 747's single card proceeded in regular order. The General Assembly did not shorten the time for debate or impose any procedural irregularity, and Plaintiffs have identified no such shortcoming. (See Doc. 195 at 89-95.) Furthermore, it is undisputed that there was no request for demographic data, including age data, about SDR users in the drafting, amendment, or passage of SB 747. Cf. McCrory, 831 F.3d at 214. And, as noted, the General Assembly did not simply force SB 747 through to passage without meaningful consideration – instead, it amended the SDR provisions, in response to concerns expressed. Plaintiff Democracy NC and the State Board both expressed their concerns over SB 747's initial treatment of SDR ballots as provisional. (Doc. 186 at 250:15-251:3; Doc. 187 at 129:14-130:4, 136:8-137:11.) The General Assembly responded with a single-card system, which was advocated by the State Board's general counsel, Cox.

Plaintiffs' efforts to attribute the purported animus of lobbyists Mitchell and Womack to the North Carolina General Assembly bears a close resemblance to the "cat's paw" theory roundly rejected by the Supreme Court in Brnovich, 594 U.S. 647. There, the Maricopa County Republican Chair had posted a video of purported election fraud that the district court described as containing "racially tinged and inaccurate commentary."

101

<u>Democratic Nat'l Comm. v. Reagan</u>, 329 F. Supp. 3d 824, 876 (D. Ariz. 2018).  The video "became quite prominent in the debates" over the voting restrictions, and a senator made "unfounded and often farfetched allegations of ballot collection fraud" in an effort to spur support for the voting restrictions.  <u>Id.</u> at 877, 880 (citations omitted).  The district court concluded that state legislators had a sincere, albeit unsupported, belief that ballot collection initiatives offered possibilities for abuse, due in no small part to the racialized and unfounded allegations in the video and the senator's remarks.  <u>Id.</u> at 879.  Favoring the sincerity of beliefs about fraud over the racialized source of those beliefs, the district court found no improper intent in the passage of restrictions.  <u>Id.</u> at 879-83.  The Ninth Circuit reversed, finding that intent could be inferred from the video and the senator's comments, and imputed it to the legislature as a whole.  <u>Democratic Nat'l Comm. v. Hobbs</u>, 948 F.3d 989, 1046 (9th Cir. 2020) (en banc). The Supreme Court reversed.  <u>Brnovich</u>, 594 U.S. at 655, 690.  The Court was clear:

> The "cat's paw" theory has no application to legislative bodies.  The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents.  Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.

<u>Id.</u> at 689-90.

102

This case is much like <u>Brnovich</u>. While Plaintiffs seek to impute the intent and motivations of Mitchell and Womack to the North Carolina General Assembly, the record makes plain that the legislators rejected the lobbyists' claims and exercised their judgment in representing their constituents. Absent a proper record, Legislators cannot be held responsible for the claims of every lobbyist who is paid to influence legislation. Here, the General Assembly never entertained the elimination of SDR or even ultimately accepted the treatment of SDR votes as provisional.

Having considered the entirety of the sequence leading up to the passage of SB 747 and its legislative history, the court concludes that <u>Arlington Heights</u> factors 2 and 3, even if applicable, favor defendants.

### 4. Whether the law bears more heavily on young voters

As noted, SB 747 does not bear more heavily on young voters. The court is persuaded by Dr. White's conclusion that there was no statistically significant change in the denial rates for young voters between SB 747 with its notice-and-cure process and the previous two-card verification system. But it is worth noting that even if Dr. Quinn's analysis were accepted, it fails to demonstrate that so-called young SDR voters are worse off under SB 747 with its notice-and-cure provisions. The ultimate denial rates for SDR registrants overall under SB 747 are not statistically different from those for elections prior to SB 747. And youth

103

voter turnout has actually <u>increased</u> after SB 747's passage. Moreover, before SB 747, young voters were unlikely to successfully register on the second verification card; most failed, and only a small number succeeded. And Plaintiffs have failed to show that the notice-and-cure process is less effective for young voters than the previous two-card system.

The court also considers that SB 747, when passed, did not include the notice-and-cure process. But even without it, only a very small number of young voters are denied registration. Thus, even if there could be said to be a burden on young voters, it can only be slight. As the Supreme Court has explained in the Voting Rights Amendment Section 2 context, there is a difference between minor disparities of impact on differently-situated groups and an election system not being equally open:

> The size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider. Small disparities are less likely than large ones to indicate that a system is not equally open. To the extent that minority and non-minority groups differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules. But the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. The size of any disparity matters. And in assessing the size of any disparity, a meaningful comparison is essential. What are at bottom very small differences should not be artificially magnified.

104

<u>Brnovich</u>, 594 U.S. at 671 (citing <u>Frank v. Walker</u>, 768 F.3d 744, 752, n. 3 (7th Cir. 2014)).  Whatever burden this factor can be said to have, it would weigh only slightly in favor or Plaintiffs. It is far from enough for this court to infer discriminatory intent on the part of the legislature.

*   *   *

In sum, even if <u>Arlington Heights</u> applies to Plaintiffs' intentional discrimination claim, which is doubtful, the factors weigh in favor of Defendants.  Under any analysis, the totality of the circumstances fails to demonstrate that SB 747 was passed with the intent to discriminate against anyone based on age.[22] Plaintiffs' intentional discrimination claim thus fails.

## VI.  CONCLUSION

North Carolina's voting laws are among the more expansive in the nation.  A voter can register to vote year-round and up to 25 days before an election (five days more than federal law requires). A registered voter may cast a mail-in, no-excuse absentee ballot (available 60 days prior to election day in general elections and 50 days prior to the date of any other election except municipal elections), vote in-person during 17 days of early voting (including a Saturday before election day) at any site in their

---

[22] Plaintiffs fail to offer an alternative to <u>Arlington Heights</u>, nor do they contend they could prevail on their Twenty-Sixth Amendment claim under <u>Anderson-Burdick</u>, which Defendants contend applies, even if they fail that test for their undue burden claim.  (<u>See</u> Doc. 195 at 80-98.)

105

county (even if out of precinct), or on election day at their assigned precinct. The state has approximately 2,600 polling places open from 6:30 a.m. to 7:30 p.m. on election day. North Carolina even allows voters who need assistance to vote curbside from their vehicle.

In 2007, North Carolina implemented SDR, permitting same day registration and voting during the 17 days of early voting. Thus, for those voters who neglected or failed to register to vote at an earlier time, they could do so then. To verify SDR registrations, the state simply relied on its statutory two-card mail verification process used for traditional registration. Since at least 2016, it had become apparent that some SDR ballots were counted for voters who failed the second card after the canvass; thus, there was insufficient time in the short SDR window before canvass to allow for full verification under the traditional method. See JX029 at 3 (Numbered Memo 2016-15) ("The State Board of Elections is keenly aware that a number of same-day registrants fail mail verification _after_ the county has completed its canvass.") (emphasis in original). Indeed, those voters would be subject to possible removal from the registration records under the then-existing statutory scheme, even though the statutory scheme required that their ballots be counted. See N.C. Gen. Stat. § 163-82.7(g)(3) (amended April 30, 2017) (requiring vote to be counted but then subjecting the registration to a confirmation mailing);

106

JX029 (citing statutory process).  So, in 2023, the state sought to amend the SDR verification process to require one mail verification card, thus adjusting the process to reflect SDR's limited window for residence verification, by passing SB 747.  SB 747 does not perfectly fix this timing problem (as it allows ballots to be counted if the verification card is returned within 2 days of the canvass).  But a legislature is entitled to make such policy choices and is not precluded from improving its electoral system because of its inability to perfect it.  Nor should election changes become a one-way ratchet, incapable of alteration merely because some voters may be affected.

Thereafter, the state entered a consent decree providing a notice-and-cure process for any SDR voter whose single verification card was returned as undeliverable, so they could seek to have their registration perfected.

Plaintiffs challenge SB 747, claiming it was intended to disenfranchise "young" voters in violation of the Twenty-Sixth Amendment and constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments.  The court concludes that Plaintiffs have failed to demonstrate either.

Plaintiffs' intent claim fails because, even assuming "young" voters constitute some kind of identifiable protected class, which is doubtful, Plaintiffs have failed to demonstrate that SB 747 was passed with any intent to disenfranchise them.  This is so even

107

assuming application of the <u>Arlington Heights</u> framework Plaintiffs urge.

Plaintiffs' undue burden claim also fails. Any burden on voting rights from SB 747 with its notice-and-cure provisions is minimal, at best, given North Carolina's array of methods to register and vote, and such minimal burden is justified in relation to the State's legitimate interests in preventing voter fraud, promoting election integrity, addressing the appearance of voter fraud, and ensuring efficient election administration. For these reasons therefore,

IT IS ORDERED that judgment be entered for Defendants and that the remaining claims (counts II and III) of the complaint (Doc. 1) be DISMISSED WITH PREJUDICE. A corresponding judgment will be issued.

March 26, 2026

<u>/s/ Thomas D. Schroeder</u>
United States District Judge